## IN THE UNITED STATED DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

FRANK E. ACIERNO, CHRISTIANA          :
TOWN CENTER, LLC, a Delaware limited  :
liability company, 395 ASSOCIATES, LLC,:
a Delaware limited liability company,  :
ESTATE HOMES, INC., a Delaware         :
corporation,                           :
                                       :
            Plaintiffs,                :          C.A. No. 04-1376
                                       :
    v.                                 :
                                       :
GEORGE O. HAGGERTY, individually and:
in his official capacity as Assistant General :
Manager of the New Castle County       :
Department of Land Use, SCOTT G.       :
WILCOX, individually and in his official :
Capacity as a First Assistant County   :
Attorney, TIMOTHY P. MULLANEY,         :
individually and in his capacity as New :
Castle County Attorney, CHARLES L.     :
BAKER, individually and in his capacity as :
General Manager of the New Castle County :
Department of Land Use, JAMES H.       :
EDWARDS, individually and in his capacity:
As Inspections Manager and Licensing   :
Division Manager of the New Castle County:
Department of Land Use, and SHERRY L.  :
FREEBERY, in her individual capacity as :
Chief Administrative Office of New Castle :
County, and NEW CASTLE COUNTY, a       :
political subdivision of the State of  :
Delaware,                              :
                                       :
            Defendants.                :          JURY TRIAL DEMANDED

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO NEW CASTLE COUNTY'S MOTION TO DISMISS

THE BAYARD FIRM

Richard L. Abbott (I.D. No. 2712)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
Telephone (302) 655-5000
Facsimile (302) 658-6395
E-Mail: rabbott@bayardfirm.com

Attorneys for Plaintiffs

Dated: March 16, 2005

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

**STATEMENT OF NATURE AND STAGE OF PROCEEDINGS** ............................ 1

**SUMMARY OF ARGUMENT** ........................................................................ 3

**STATEMENT OF FACTS** ............................................................................. 6

**ARGUMENT** .......................................................................................... 25

I.　　THE AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF AGAINST NEW CASTLE COUNTY IN ALL COUNTS ................................................... 25

　　A.　　Counts I And II State A Cognizable Claim Under 42 U.S.C. § 1983 .................................................. 26

　　　　1.　　The Claims Identified The County Policy And Allege Causation: The Orders To Abuse Authority And Misapply The Law To Harm Acierno Financially, Which Has Succeeded .................................................. 26

　　　　2.　　Count I States A Valid Claim For Relief ........................... 27

　　　　　　(a)　　Acierno Pled A Good Substantive Due Process Claim .............................................. 27

　　　　　　(b)　　Count I Also States A Valid Procedural Due Process Claim ............................... 29

　　　　　　(c)　　Count I Also States a Cognizable Claim For A Temporary Taking ........................... 31

　　　　　　(d)　　Count II States a Valid Equal Protection Claim ........................................ 34

　　B.　　Count III States A Valid Civil RICO Claim Against The County .................................................... 36

　　C.　　Counts IV and V State Cognizable Claims Against The County, But They Were Not Intended ........................ 41

II.   THE DOCTRINES OF *ROOKER-FELDMAN*, *RES JUDICATA*, COLLATERAL ESTOPPEL, AND *NOERR-PENNINGTON* ARE INAPPLICABLE TO THE AVERMENTS OF THE COMPLAINT .......................................................42

III.   ACIERNO'S CLAIMS SHOULD NOT BE STAYED ON ABSTENTION GROUNDS ........................................................................43

**CONCLUSION** ..............................................................................................................45

## TABLE OF AUTHORITIES

Page

Cases

*Bernstein v. IDT Corp.*,
    582 F.Supp. 1079 (D. Del. 1984)................................................................................ 37

*Cook County v. U.S.*,
    538 U.S. 119 (2003)...................................................................................... 40, 41

*Cox v. Administrator United States Steel And Carnegie*,
    17 F.3d 1386 (11th Cir. 1994) ................................................................................. 38

*Davis v. Mutual Life Ins. Co. of New York*,
    6 F.3d 367 (6th Cir. 1993) ...................................................................................... 38

*Dover Historical Soc'y v. City of Dover Planning Comm's*,
    2004 WL 1790164, Witham, J. (Del. Super. 2004) .................................................... 30

*First English Evangelical Lutheran Church of Glendale v. County of Los
    Angeles*,
    482 U.S. 304 (1987)...................................................................................... 31, 32

*Genty v. Resolution Trust Corp.*,
    937 F.2d 899 (3d Cir. 1991)........................................................................ 39, 40, 41

*Hackett v. Board of Adjustment of the City of Rehoboth*,
    794 A.2d 596 (Del. 2002) ...................................................................................... 30

*In re: 244.5 Acres of Land*,
    808 A.2d 753 (Del. 2002) ...................................................................................... 33

*Jeffreys v. Exten*,
    784 F. Supp. 146 (D. Del. 1992)............................................................................. 36

*Leon N. Weiner & Associates, Inc. v. Krapf*,
    623 A.2d 1085 (Del. 1993) .................................................................................... 28

*McNally v. U.S.*,
    483 U.S. 350 (1987).............................................................................................. 39

*OKI Semiconductor Co. v. Wells Fargo Bank, N.A.*,
    298 F.3d 768 (9th Cir. 2002) ................................................................................. 38

*Palazzolo v. Rhode Island*,
    533 U.S. 606 (2001)............................................................................................. 34

*Petro-Tech, Inc. v. Western Co. of No. America,*
   824 F.2d 1349 (3d Cir. 1987)........................................................................ 37, 38

*Philadelphia Electric Co. v. Hercules, Inc.,*
   762 F.2d 303 (3rd Cir. 1985) ...................................................................... 28

*Reise v. Bd. Of Bldg. Appeals of City of Newark,*
   746 A.2d 271 (Del. 2000) ........................................................................... 30

*Rose v. Bartle,*
   871 F.2d 331 (3rd Cir. 1989) ...................................................................... 25

*Sevill Indus. Mach. Corp. v. Southmost Mach. Corp.,*
   742 F.2d 786 (3rd Cir. 1984) *cert. den.*, 469 U.S. 1211 (1985).................... 25

*U.S. v. Paridies,*
   98 F.3d 1266 (11th Cir. 1996) .................................................................... 40

*Williamson County Regional Planning Comm'n v. Hamilton Bank of*
   *Johnson City*,
   473 U.S. 172 (1985)................................................................................... 34

*Young v. West Coast Industrial Relations Ass'n, Inc.,*
   763 F.Supp. 64 (D. Del. 1991)................................................................... 25

<u>Statutes</u>

9 *Del. C.* § 1101, *et seq.* ................................................................................. 7

9 *Del. C.* § 3001 ........................................................................................... 23

9 *Del. C.* §3004 ............................................................................................ 23

18 U.S.C. § 1341.......................................................................................... 39

18 U.S.C. § 1343.......................................................................................... 39

18 U.S.C. § 1346.......................................................................................... 39

18 U.S.C. § 1961.......................................................................................... 39

18 U.S.C. § 1962..................................................................................... 21, 40

18 U.S.C. § 1962(c) ................................................................................. 37, 39

18 U.S.C. § 1962(d) ..................................................................................... 37

18 U.S.C. § 1964(c) ..................................................................................... 39

18 U.S.C. § 1983 ............................................................................................. passim

Other Authorities

1 Woolley On Delaware Practice, §§ 896-898 ............................................................ 30

Rules

Rule 12(b)(1) .............................................................................................. 45

Rule 12(b)(6) ........................................................................................... passim

Rule 15 .................................................................................................. 26, 45

Constitutional Provisions

5th Amendment to the United States Constitution ..................................................... 20, 23

14th Amendment to the United States Constitution ............................................. 19, 20, 23

Article I, § 7 of the Delaware Constitution ............................................................... 23

Article I, § 8 of the Delaware Constitution ............................................................... 23

Article I, § 9 of the Delaware Constitution ............................................................... 23

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

The Plaintiffs, Frank E. Acierno and three (3) of his business entities, filed this action on October 21, 2004 out of a sense of complete and total frustration arising from over two (2) years of being victimized by an illegal conspiracy formulated by high level County government officials to take any actions necessary, including flagrantly breaking the law, to prevent him from using and developing his lands in the County. On an all too frequent basis, Acierno has been required to react to a seemingly never ending course of conduct by County Officials which either have no valid basis in law or fact on their face or are merely a pretext for underlying misinterpretations and misapplications of the law, all of which were intended to carry out their hidden illegal agenda.

The County has a system whereby a property owner such as Acierno is forced to jump through two (2) administrative hearing hoops before he can even get to the extremely narrow scope of review accorded to him by the common law *Writ of Certiorari* in the Superior Court. Defendants have intentionally seized on this one-sided system by taking blatantly illegal actions and then scurrying for cover behind the protections afforded them by the presumption of good faith and the interpretive deference typically accorded to government officials under the law. This makes their conduct an even more egregious breach of the public trust. Consequently, Acierno has had no choice but to bring numerous actions in the Court of Chancery to obtain the opportunity for the first time to challenge the illegal conduct of the County and its agents based upon a *de novo* standard of review and a complete record. Thus, this case arises primarily from the inadequacies and failings of a useless County administrative hearing and administrative

appeal process, as well as a virtually impossible standard to satisfy in subsequent common law *certiorari* appeals.[1]

---

[1] Counsel for the Plaintiffs has been involved in numerous *certiorari* actions, and has researched virtually dozens of them that have resulted in opinions over the last fifteen (15) years or so. Few of those decisions have ever resulted in government action being overturned, primarily because of the highly limited record and standard/scope review.

## SUMMARY OF ARGUMENT

The Amended Complaint states valid claims for relief under the correct Rule 12(b)(6) standard. The County has asserted an incorrect standard. Essentially it suggests that this Court should review the pleadings based upon either a summary judgment standard or a *prima facie* case trial standard.

The Count I substantive due process claim easily satisfies the due process "shocks the conscience" standard; when a group of high-level governmental officials get together and decide to spend years illegally abusing their authority by targeting a developer in order to torture him and prevent him from using and developing his lands, it cannot legitimately be gainsaid that such reprehensible conduct is anything but shocking. As for the procedural due process claims, the Amended Complaint clearly states both general and specific allegations with respect to the County's abuse of its process to carry out the scheme to cause Acierno pecuniary harm regarding his development projects.

The "temporary taking" claim also states a cognizable § 1983 cause of action; it is based upon the fact that for an extensive number of years the County has prohibited Acierno from using portions of his projects and lands, thereby directly causing him to lose rent and profits.

The § 1983 claims in Counts I and II specifically identify the County-adopted policy, instituted by the Chief Administrative Officer's fiat, to put Acierno projects and properties "under the microscope" and to intentionally misinterpret and misapply the law in order to carry out the scheme of land use denial against Acierno. As with other torts, the § 1983 cause of action carries with it the ability to establish vicarious liability based upon *respondeat superior* principles. The Complaint so pleads, and it is more than adequate to meet the necessary standard.

579630v1

3

The Amended Complaint also alleges that Acierno has been singled out for mistreatment like no other developer in the County and in violation of the law, circumstances which constitute the very essence of arbitrary and irrational governmental action.

The Civil RICO claim stated in Count III may in fact be brought against the County on the grounds of *respondeat superior* if the employer benefited from the employee's RICO violation, and to the extent that the enterprise at issue in the RICO context is not the County.

Counts IV and V alleging civil conspiracy and tortious aiding and abetting are actionable because they need only be based on some form of illegal conduct, such as that committed by the Defendants under federal, state and local laws. But Acierno did not intend to pursue these claims against the County, and he therefore seeks leave to amend in order to clarify that fact.

The Amended Complaint seeks to litigate for the first time the devious scheme and conspiracy concocted and carried out in contravention of the law by the Defendants. Because the fundamental basis of all Counts of this Complaint is the multi-year, combined effort of the Defendants to deny Acierno his rights to use and develop numerous of his properties, through multiple endeavors undertaken by the co-conspirators, the claims are not barred by *res judicata* or collateral estoppel. Nor do the narrow doctrines of *Rooker-Feldman* or *Noerr-Pennington* apply since the damages are in many instances unrecoverable in State proceedings, and even where they are they have not been sought on the grounds that equitable relief in the form of permission to develop has been the primary focus and/or a desired jury trial decision on damages is

unavailable. Nor should the Court abstain from hearing the Amended Complaint and stay the action, since the very essence of this case is the past (and in some instances ongoing) hijacking of the machinery of the County government for purposes of furthering an illicit conspiracy; a nefarious plot which should be stopped at the Court's earliest opportunity.

## STATEMENT OF FACTS[2]

I.    The Parties

Plaintiff Frank E. Acierno ("Acierno") is the owner of certain real estate related businesses. Complaint at para. 1. These businesses include: 1) Plaintiff Christiana Town Center, LLC ("Christiana" and collectively with other plaintiffs "Acierno"), a Delaware limited liability company; 2) Plaintiff 395 Associates, LLC ("395" and collectively with other plaintiffs "Acierno"), a Delaware limited liability company; and 3) Plaintiff Estate Homes, Inc. ("EHI" and collectively with other plaintiffs "Acierno"), a Delaware corporation. Complaint at paras. 2-4.

Defendant George O. Haggerty ("Haggerty") is a Maryland resident who is employed as the Assistant General Manager of the New Castle County Department of Land Use. Complaint at para. 5. Haggerty was hired by the current (now immediate past) New Castle County government administration headed by County Executive Thomas P. Gordon (the "Gordon Administration"). *Id.*

Defendant Scott G. Wilcox ("Wilcox") is believed to be a Delaware resident, who at all times relevant to this action was either a First Assistant County Attorney or private outside legal counsel on behalf of the County in dealing with Plaintiffs. Complaint at para. 6. Wilcox was hired by the Gordon Administration. *Id.*

Defendant Timothy P. Mullaney ("Mullaney") is a resident of Kent County, Delaware, who at all times relevant to this action was employed as the purported New Castle County Attorney. Complaint at para. 7. Mullaney was purportedly the County Attorney, the head of the Office of Law, and served as direct supervisor of Wilcox in

---

[2] The facts are derived from the Amended Complaint in this action.

Wilcox's dealings with Plaintiff. *Id.* Mullaney was hired by the Gordon Administration. *Id.*

Defendant Charles L. Baker ("Baker") is a Delaware resident employed as the General Manager of the New Castle County Department of Land Use. Complaint at para. 8. Baker is the administrative head of the New Castle County Department of Land Use, and is Haggerty's direct supervisor. *Id.* Baker was hired by the Gordon Administration. *Id.*

Defendant James H. Edwards ("Edwards") is a Delaware resident currently employed as the Licensing Division Manager (and previously as the Inspections Manager) for the New Castle County Department of Land Use. Complaint at para. 9. Edwards was hired by the Gordon Administration. *Id.*

Defendant Sherry L. Freebery ("Freebery") is a Delaware resident employed (now formerly) as the Chief Administrative Officer of New Castle County. Complaint at para. 10. Freebery is responsible for the management of the executive branch of the County and is Baker's and Mullaney's direct supervisor pursuant to Title 9 of the Delaware Code. *Id.* Freebery was hired by Gordon, and Freebery was the Chief Administrative Officer when all other individual Defendants were hired. *Id.*

Defendant New Castle County ("County") is a political subdivision of the State of Delaware. Complaint at para. 11. The County is created by and subject to the grant of powers and mandatory responsibilities contained in the Delaware Code at 9 *Del. C.* § 1101, *et seq. Id.*

II.    The Motive For The Conspiracy To Deny Acierno's Rights

The current (now former) New Castle County Executive, Thomas P. Gordon ("Gordon") was elected in 1996 and 2000 based, in part, upon an anti-developer platform. Complaint at para. 17. Because of a two term limit in Delaware for a New Castle County Executive, Gordon could not run in the 2004 County Executive race. *Id.*

State law did not prohibit Gordon's Chief Administrative Officer, Freebery, from running for the office of County Executive in 2004. Complaint at para. 18. Freebery ran for County Executive and, following Gordon's past election tactics, publicly and falsely alleged that Acierno was consistently attempting to subvert the law and that his efforts would be vigorously opposed by the County.[3] *Id.*

III.   The Conspiracy Is Hatched And Implemented To Kill A Mobile Home Park

In or about the year 2002, Haggerty, Wilcox, and Freebery decided to act in concert to plan and carry out a scheme and conspiracy to deny Acierno his legal right to use and develop properties owned by him in the unincorporated areas of New Castle County within the County's land use regulatory jurisdiction. Complaint at para. 19. On December 31, 2002, Haggerty and Wilcox improperly and unlawfully canceled a meeting regarding development of property owned by Acierno's corporation, Sterling Properties, Inc. (the "Pre-Construction Meeting"), thereby preventing Acierno from commencing construction in order to comply with a year-end 2002 deadline to preserve property rights under a previously approved land development plan known as Red Lion Village. Complaint at para. 20. Thereafter, Baker improperly and unlawfully ordered that the

---

[3] Freebery's run for County Executive, just like her activities in targeting Acierno, was in direct violation of the law; namely the Federal Hatch Act. *See* Exhibit A, attached.

development plan for Red Lion Village was legally invalidated pursuant to a letter sent via U.S. Mail. Complaint at para. 21. These actions have caused Acierno to be unable to utilize his lands in accordance with the previously approved land development plan, to expend substantial sums in attorneys fees to obtain legal redress for the Defendant's violations of his rights, and to generally deny Acierno the opportunity to use and develop his property as he had intended to and would have otherwise been legally entitled to do. *Id.*

On December 31, 2002 and January 3, 2002, Wilcox sent certain letters regarding legally and factually incorrect justifications for canceling the Pre-Construction Meeting. The letters were posted in the United States Mail and sent over the telephone via facsimile transmission. Complaint at para. 22.

IV.     The Conspiracy To Prevent Acierno From Developing Continues:
        Christiana Town Center Is The Next Site Victimized

On January 15, 2003, Haggerty and Wilcox continued their scheme to deny Acierno his rights by issuing a Violation Notice under the County Drainage Code regarding property he owned known as the Christiana Town Center shopping center. Complaint at para. 23. A Rule to Show Cause hearing was unilaterally scheduled for January 24, 2003 by Haggerty and Wilcox, and certain Plaintiffs were given less than 24 hours advance notice of the hearing. *Id.* At the hearing, Haggerty, with Wilcox's express assistance and involvement, found Christiana to be in violation of numerous non-existent provisions of the County Drainage Code, many of which Christiana could not have come into compliance with as a practical matter given the short time period between the date of the Violation Notice issuance and the date of the Rule to Show Cause hearing due to adverse weather conditions. *Id.* The purpose of Haggerty and Wilcox's unreasonable

actions was to further their scheme to deny Acierno his constitutional right to use and develop his property. *Id.* This phase of the Haggerty-Wilcox conspiracy was carried out through use of the United States mail and via telephone calls. *Id.*

On January 24, 2003, a factually incorrect and legally unsupported Violation Notice was issued to Christiana regarding the alleged failure to obtain a Certificate of Occupancy for Building Nos. 4 and 5 at the Christiana Town Center shopping center (the "Shopping Center"). Complaint at para. 24. The Violation Notice was issued despite the fact that Certificates of Occupancy had already been issued for all space in Building Nos. 4 and 5, and that the space was already occupied by two (2) retail tenants. *Id.* The County Code only requires Certificates of Occupancy to be issued for space that is actually occupied, and Christiana was in full compliance with the Code at the time of the issuance of the Violation Notice. *Id.* Despite this fact, Haggerty and Wilcox brought the bogus charges, prosecuted them, and forced Christiana to spend substantial sums in attorneys fees in prosecuting appeals thereof. *Id.* This phase of the scheme included use of the United States mails, telephone facsimiles, and telephone calls by Haggerty and Wilcox. *Id.*

In March of 2003, Haggerty and Wilcox further carried out their scheme to deny Acierno his constitutional right to use and develop his lands by improperly and unlawfully denying Christiana and one of its tenants, Bertucci's Restaurant Corp., the ability to obtain building permits necessary to complete a small restaurant building at the Christiana Town Center. Complaint at para. 25. In the process, Wilcox acted outside of his role as First Assistant County Attorney, instead taking on a role as an administrative decision-maker in Haggerty's stead. *Id.* In fact, Wilcox authored or assisted in the

preparation of numerous letters and other written documents ultimately issued by Haggerty in the course of denying Christiana its legal rights to obtain the necessary building permits. *Id.* Haggerty and Wilcox also conspired with Baker, who wrote a letter to Acierno regarding a false, manufactured basis for denying the permits. *Id.* All letters were sent via the United States mail and/or telephone facsimile. *Id.*

As a result of the actions of Wilcox, Haggerty and Baker with regard to the improper and unlawful building permit denials in March of 2003, Acierno and Christiana were forced to spend substantial sums in attorneys fees to force said Defendants to follow the law. Complaint at para. 26. Throughout the course of approximately 2½ months of expedited litigation on the matter, said Defendants took numerous untenable legal positions on issues, which had no good faith basis, but were instead aimed solely at carrying out the scheme to deny Acierno his legal right to use and develop his land. *Id.* This part of the Wilcox/Haggerty plot also involved communications via United States mail and via telephone facsimile. *Id.*

V.    The Conspiracy Moves On To Acierno's Homebuilding Activities

In June of 2003, Wilcox and Haggerty undertook additional acts in furtherance of their scheme to deny Acierno his legal right to use and develop his land by refusing to issue Letters of Compliance after documentation establishing compliance with prior Violation Notices regarding Home Warranties was submitted to Haggerty on June 5, 2003. Complaint at para. 27. Wilcox and Haggerty refused to issue the Letters of Compliance, necessitating the filing of an action in the New Castle County, Delaware Superior Court seeking a Writ of *Mandamus* to force their issuance. *Id.* In addition, Haggerty and Wilcox authored letters to tenants and contractors which contained

knowingly false statements about the status of the Home Warranty issue, with the express intent to carry out their illegal plan and scheme and cost Acierno money in the form of lost rents. *Id.* The letters were sent by them via the United States mails and telephone facsimile. *Id.*

After three (3) weeks of dragging their feet, Haggerty and Wilcox finally issued the Letters of Compliance after the Superior Court indicated it would likely issue a Writ of *Mandamus.* Complaint at para. 28. As a result of the acts and failures to act by Wilcox and Haggerty, Acierno was forced to spend substantial sums in attorneys fees and litigation costs. *Id.* Numerous properties owned by Acierno or entities in which he had a controlling interest were denied the opportunity to use their premises based upon the County's improper and unlawful denial of requests for permits, inspections, and other land use application approvals during that time period. *Id.*

VI.    Return To The Town Center: The Conspiracy Strikes Again

Haggerty and Wilcox further continued their scheme to deny Acierno his legal rights to use and develop his land based upon the issuance of a Violation Notice dated June 11, 2003 regarding certain bogus charges under the County Drainage Code. Complaint at para. 29. The charges included an allegation that Christiana did not have an approved Erosion And Sediment Control Plan for its site, despite the fact that the County had stamped such a plan "approved" on April 24, 2002 and was fully aware of that fact. *Id.* In addition, the charges included overly vague and general allegations without citations to specific regulatory sections, or an explanation of the location and nature of the alleged violation. *Id.* The County refused to provide any further information

regarding the charges despite numerous requests from counsel for Acierno prior to a July 8, 2003 Rule to Show Cause hearing conducted by Haggerty and Wilcox. *Id.*

At the July 8th hearing, Haggerty and Wilcox continued their effort to deny Acierno his legal rights by holding a "kangaroo court" session where they committed a half a dozen or more violations of Acierno's Constitutional Due Process Rights: 1) lack of sufficient description of the deficiencies alleged, in order to allow the preparation of a defense; 2) failure to allow cross-examination of the prosecution's sole fact/expert witness; 3) denial of the right to call a County employee present at the hearing as a witness in the defense case; 4) failure to allow a continuance of the hearing after the County presented photographs, diagrams, documents, and additional evidence which identified the specific Code provisions charged and clarified the nature and location of the purported violations for the first time; 5) admission of evidence, which constituted the sole portion of the County's case-in-chief regarding certain of the alleged violations, based solely on hearsay statements contained in documents; and 6) failure to record the hearing in order to allow for an appropriate Court review. Complaint at para. 30.

After Haggerty and Wilcox brought the "trumped up" charges against Acierno, and held the "kangaroo court" hearing, they issued a Rule to Show Cause Decision which contained their pre-ordained conclusion (Drainage Code violations) planned in order to further their scheme to deny Acierno his legal right to use and develop his land. Complaint at para. 31. The Rule to Show Cause Decision included the knowingly false finding that an approved Erosion And Sediment Control Plan had been revoked by a December 20, 2002 Rule to Show Cause Decision. *Id.* This process involved

communications carried out through use of the United States mails and telephone facsimiles. *Id.*

As a result of the County's trumped up charges, kangaroo court proceeding, and bogus Rule to Show Cause Decision, Acierno has been caused to spend substantial sums in attorneys fees and expert fees. Complaint at para. 32.

VII.  The Conspiracy Hits A New Low: Block Permits For An Entire Town Center Phase

Haggerty and Wilcox also furthered their scheme to deny Acierno his legal right to use and develop his land in August of 2003 by ordering that County personnel not issue a building permit for development of Phase 4 of the Christiana Town Center shopping center. Complaint at para. 33. One of the purported bases for denial of the permit application, failure to receive a letter from DelDOT regarding road improvements, was known by them to be impossible to comply with since DelDOT had refused to permit the road work and had dubbed it unnecessary in June of 2002. *Id.* In addition, the three (3) other reasons asserted as bases for permit denial are not required by the County Building Code. *Id.* Further, Haggerty and Wilcox joined forces to manufacture a letter which falsely alleged that there were additional reasons for denying the building permit. *Id.* The only explanation for Haggerty and Wilcox's refusal to accept and issue the Phase 4 building permit application is their ongoing scheme to illegally and unconstitutionally deny Acierno the right to use and develop his land. Complaint at para. 33.

VIII.  Freebery Gets In Her Digs At Acierno And Her Gang Chips In

In furtherance of the ongoing scheme to violate Acierno's constitutional rights and in contradiction of law, Freebery did in 2003 and 2004 intentionally and with ill will utilize County resources and personnel to issue multiple inaccurate press releases or

written statements; falsely painting Acierno as a lawbreaking developer. Complaint at para. 34. Freebery did so in concert with Mullaney in 2003. *Id.* Freebery's efforts were aimed at further harming Acierno as a part of the joint scheme among all Defendants. *Id.*

In addition, through the uneven and selective application of the law to Acierno from 2002 through 2004, Freebery, Haggerty, Baker, Edwards, and Wilcox (in 2002 and 2003 while employed by the County) intentionally, and with ill will, treated Acierno differently from others subject to the same or similar laws and who were similarly situated, without a rational basis for such different treatment. Complaint at para. 35. Such discriminatory treatment of Acierno included, but was not limited to, the unequal use and application of the law with respect to decisions regarding: violation notices, rule to show cause hearings, "clean hands", stop work orders, building permits, inspections, certificates of occupancy, certified construction review reports, the filing of litigation, the issuance of press releases, site inspections, erosion and sediment control plan review, the processing of land use applications, civil penalties, time permitted to obtain code compliance, and interpretation of laws and regulations. *Id.*

IX.    Funny How Baker Treats Other Developers So Nice

Such unequal treatment is also evidenced by personal visits from Baker in 2004 at two sites owned by an individual who had a history of outstanding code violations. Complaint at para. 36. When Baker visited these two sites he was accompanied by the property owner and a member of Freebery's office. *Id.* Thereafter, the charges against this same property owner were dropped by the County. *Id.* Acierno has incurred legal expenses and lost rents as a result of the unlawful and unconstitutional denial of the building permits for Phase 4 of the shopping center. Complaint at para. 43.

579630v1

15

Thereafter, Baker caused subsequent land use applications for these same two properties, which had been submitted late and/or incomplete, to be placed upon a public hearing agenda. Complaint at para. 37. This same property owner had placed Freebery for County Executive signs on his property. *Id.* In regard to these same land use applications, and just prior to Freebery's primary election for County Executive, Baker took affirmative steps in an attempt to cause the issuance of two favorable recommendations for both of the properties despite the existence of long-standing code violations at both sites, and an unresolved U.S. Army Corps of Engineers stop work order at one of the two sites. *Id.* After Freebery lost her primary, Baker was ultimately successful in causing one favorable recommendation to be issued. *Id.*

X.     Edwards Chimes In With His Shot At Acierno

On January 30, 2004, Edwards held a rule to show cause hearing regarding one of Acierno's former properties. Complaint at para. 38. It was pointed out at the hearing, in writing and verbally, that the rule to show cause hearing was improperly convened, in whole or in part, due to the expiration of a statute of limitations and the applicability of a County home warranty. *Id.* No decision was issued by Edwards for over six months and Acierno believed the matter was finally resolved. *Id.* However, in furtherance of the ongoing scheme to violate Acierno's constitutional rights and in contradiction of law, on July 13, 2004 (more than 6 months after the hearing) Edwards issued an adverse decision shortly after Acierno had filed a motion to compel the deposition of Baker and Freebery regarding Baker's alleged active assistance in concealing an alleged criminal act by Freebery for which she has been indicted by a federal grand jury. *Id.*

In January, 2004, Edwards conducted a rule to show cause hearing based on charges brought against Edgewood Village, LLC for violating the Unified Development Code and the County Drainage Code as a result of a land disturbing activity and the demolition of an historic stone wall at the Paladin Club community, on Paladin Drive. Complaint at para. 39. Edgewood is owned and controlled by major New Castle County developer Verino Pettinaro. *Id.* Edwards found Edgewood in violation, but only fined it $200. *Id.* Edwards has refused to require the re-construction of the stone wall or the stabilization of the disturbed land area to this day. *Id.*

XI.     Interesting How Developers That "Play Ball" With Freebery Or Aren't On The "Blacklist" Get Slapped On The Wrist

In February of 2004, the County issued a building permit to Pettinaro for the construction of a 7-story apartment building at Greenville Place despite the fact that the County's "clean hands" provision legally prohibited it. Complaint at para. 40.

Not coincidentally, Pettinaro has had business dealings with Gordon and Freebery which have proven quite favorable to them. Complaint at 41. Gordon's 2000 and Freebery's 2004 County Executive race headquarters were located at Pettinaro's Tower Office Park in Newport. *Id.* More importantly, Gordon has for four (4) years now resided in a bi-level luxury, riverfront condominium unit owned by Pettinaro and known as Unit 215, Brandywine Park Condominiums. *Id.* Gordon has benefited in the amount of thousands of dollars in value from a substantially below market rental rate for the unit. *Id.* Not surprisingly, Gordon has never reported these substantial gifts from Pettinaro on his annual financial disclosure statement filed with the County Ethics Commission. *Id.*

Numerous other examples of differing treatment accorded to developers by Defendants exist. Complaint at para. 42. Edwards has previously given developer Louis

Capano over six (6) months to resolve relatively minor erosion and sediment control violations at a commercial shopping center site without penalty. *Id.* In short, the County has a relaxed standard of applying and enforcing the laws with many developers, but a stringent and virtually unforgiving standard that it applies to Acierno. *Id.* Further, the County does not generally single out developers for schemes to deny property rights like they have with Acierno. *Id.*

### XII. The Supervisors Knew The Scoop, Did Nothing And Pitched In On The Acierno Attacks

As Haggerty's supervisor, Baker has been aware of and has failed to intervene to correct Haggerty with respect to his unlawful and unconstitutional actions. Complaint at para. 44. Baker has a duty to oversee Haggerty's actions, and he has failed to properly to do so with regard to these matters involving Acierno. *Id.* Baker has also knowingly participated in portions of the illegal and unconstitutional Haggerty/Wilcox scheme. *Id.* Moreover, in an effort to conceal Freebery's involvement in Acierno related litigation, Baker is believed to have testified under oath untruthfully. *Id.*

As Wilcox's supervisor, Mullaney has been aware of Wilcox's actions regarding Acierno. Complaint at para. 45. Mullaney failed to properly supervise Wilcox and prevent him from acting unlawfully and unconstitutionally. *Id.* Mullaney has a duty to properly supervise Wilcox so as to prevent him from undertaking such illegal and unconstitutional actions, but failed to do so. *Id.*

As Baker's and Mullaney's supervisor, Freebery not only failed to properly supervise Baker and Mullaney in order to prevent them from acting unlawfully and unconstitutionally, but, in fact, directed unlawful and unconstitutional actions to be taken against Acierno. Complaint at para. 46.

XIII.   The Whole Gang Knew What They Were Doing Was Wrong

Wilcox, Haggerty, Edwards, Mullaney, and Freebery either knew or should have known that they were acting contrary to the law and the Constitution. Complaint at para. 47. They took the actions described herein fully aware of the dishonest, reckless, and deceptive nature of their factual misrepresentations and misapplications of the law. *Id.* The acts and failures to act committed by Haggerty, Wilcox, Baker, Edwards, Freebery, and Mullaney were in violation of Acierno's Constitutional and federal statutory rights and were taken under color of law pursuant to their governmental roles. Complaint at para. 49.

Counsel for Plaintiffs informed and advised Wilcox and Haggerty in writing on numerous occasions that they were misstating the facts and misinterpreting the law, and warned them of the potential legal effect and consequences of their actions and ongoing scheme. Complaint at para. 48 Despite the advisories and warnings of Plaintiffs' counsel, Haggerty and Wilcox continued to carry out their plan to deny Acierno his constitutional right to use and develop his property by knowingly and intentionally fabricating factual allegations and misapplying the law to Acierno's substantial financial detriment. *Id.*

XIV.   They Broke Their Promise To Uphold The Constitution, But The Law Affords Acierno Redress

The actions of the individual Defendants have violated Acierno's clearly established substantive and procedural due process rights in violation of the 14th Amendment to the United States Constitution. A reasonable County employee or official should have been aware of the need to provide Acierno adequate notice, a sufficient

opportunity to be heard, a fair hearing, and a legally cognizable application of law. Complaint at para. 51.

The actions of the individual Defendants have also caused Acierno's clearly established property rights to be temporarily taken without just compensation in violation of the 5th and 14th Amendments to the United States Constitution. Complaint at 52. A reasonable County employee or official should have been aware that Acierno could not be prevented from using and developing his lands without a proper police power justification. *Id.*

Acierno has been caused to suffer damages in the form of lost rent, lost opportunity costs, attorney and expert witness costs and fees, and other consequential and compensatory damages recoverable under § 1983. Complaint at 54. The acts of the individual Defendants were taken with evil motive and intent and a reckless indifference to Plaintiffs' rights. *Id.*

Through the improper, uneven and selective application of the law to Acierno from 2002 through 2004, Freebery, Haggerty, Baker, Edwards, Mullaney, and Wilcox intentionally, and with ill will, treated Acierno differently from others subject to the same or similar laws and who were similarly situated, without a rational basis for such different treatment. Complaint at para. 58. The County is liable for the acts of the individual Defendants on the grounds that such acts constitute the implementation or execution of County custom or policy. *Id.*

### XV.    Bring The Racketeers To Justice: Acierno Redress Revisited

Freebery, Haggerty, Wilcox, Baker, and Mullaney were employed by or associated with the County and have, with a scheme to defraud and through the course of

two or more acts identified herein, engaged in a pattern of racketeering activity through their participation in an enterprise, the activities of which affect interstate commerce and the activities of which caused injury to Acierno through conduct in violation of 18 U.S.C. § 1962. Complaint at para. 61. The County is a legally organized governmental entity. *Id.* at 62.

Wilcox and Haggerty have conducted and participated in, both directly and indirectly, conduct of the County's affairs through a pattern of racketeering activity. Complaint at 64. Freebery, Baker and Mullaney have participated in a supervisory capacity, indirectly and directly providing authority, review, and approval of activities known by them to be unlawful. *Id.*

The racketeering activity committed by Defendants and identified herein has included, but have not been limited to, mail fraud and wire fraud including the use of the United States mails, telephone communications, radio transmissions, and television transmissions. This mail and wire fraud was utilized by Defendants to deceive the public through the intentional use of false and inaccurate statements in an effort to harm the reputation of Acierno and to injure his business and property by preventing Acierno from completing construction projects, retaining tenants, obtaining new tenants, and generally being able to carry on activities necessary to fully use and develop commercial real estate owned, operated, and/or developed by Acierno. Complaint at 65. The actions of Freebery, Haggerty, Mullaney, and Wilcox identified herein also constitute mail and wire fraud based upon their intent to utilize mail and wire communications to deceive the public, to deny the public and Acierno their right to honest government services, and to

further their scheme to defraud and deny Acierno of his right to use and develop his lands by making material misstatements and knowing of their falsity. *Id.* at 66.

Freebery, Haggerty, Mullaney, and Wilcox have conspired to commit the acts alleged through their assistance and participation in the creation of false press releases and the preparation, distribution and dissemination through mail and wire fraud of inaccurate information regarding Acierno. Complaint at para. 67. Their conspiracy has involved a set and group of related activities, which continue to pose a threat of continued occurrence. *Id.* The enterprises that they have acted on behalf of include both their own conspiracy and the County. *Id.*

Haggerty and Wilcox have perpetrated a pattern of racketeering activity against Acierno. Complaint at para. 68. Haggerty and Wilcox have used the mails and telephone lines in order to carry out their scheme to deprive the citizens of New Castle County of an honest government and to more specifically deprive Acierno of his rights thereto and his legal rights to use and develop his property. *Id.*

The actions of Freebery, Haggerty, Mullaney, and Wilcox are related to the scheme to defraud Acierno. Such activities establish and constitute a threat of continued criminal activity due to their consistency, magnitude, length, and clear common purpose. Complaint at 69. All reasonable efforts to convince Defendants named in this Count to stop perpetrating these unlawful acts have failed. *Id.* The individual Defendants acted in a combined and concerted effort to unlawfully deny Acierno his legal rights to use and develop his properties. Complaint at para. 73. Acierno has been damaged in the form of lost rents, delay damages, attorneys fees, litigation costs, expert fees, and other consequential and compensatory damages. *Id.*

XVI.    The Supports For The Common Law Torts: Redress Redux

The individual Defendants have violated the New Castle County Code ("County Code") and the Delaware State Code. Complaint at para. 74. The violations include, but are not limited to, provisions of: 1) County Code Chapter 6, the Building Code, regarding new home warranties and the issuance of building permits; 2) County Code Chapter 12, the Drainage Code, regarding approval of erosion and sediment control plans, violation notice and enforcement procedures and conduct of pre-construction meetings; 3) County Code Chapter 40, the Unified Development Code, regarding sunsetting of previously approved subdivision plans, the application of "Clean Hands" provisions and grand-fathering Old Code subdivision plans; 4) the Delaware Sediment and Stormwater Regulations and Title 7, Chapter 40 of the Delaware Code regarding limits on legal authority delegated by the Delaware Department of Natural Resources and Environmental Control ("DNREC"), Certified Construction Reviewer reports, and approval and enforcement of erosion and sediment control plans; 5) provisions of the former versions of the New Castle County Subdivision Code and Title 9, §§ 3001-3004 of the Delaware Code regarding subdivision regulations; 6) the provisions of Article I, §§ 7, 8 and 9 of the Delaware Constitution regarding due process of law and takings without just compensation; and 7) the provisions of the 5th and 14th Amendments to the United States Constitution regarding due process of law, equal protection of the laws and takings without just compensation.

Freebery, Haggerty, Mullaney, and Wilcox breached their duty to abide by the law and their sworn duty to follow the requirements of the United States and Delaware Constitutions in violating the rights of Acierno to use and develop his land. Complaint at

para. 77. Their actions have been taken pursuant to a conscious conspiracy, in concert with one another. *Id.* Their efforts have been based upon a common design to unlawfully deny Acierno the right to use and develop his land. *Id.* All of the Defendants named in this Count have known of one another's conduct; the unlawful actions taken by Freebery, Wilcox, and Haggerty in an effort to deny Acierno his legal rights to use and develop his land. *Id.* at 78. Each of the Defendants has been fully cognizant of the breach of duty that such actions constitute under the County Code, State Code, and the Constitutions of the United States and the State of Delaware. *Id.* at 79. Each of the Defendants has provided one another with substantial assistance and encouragement so as to achieve the ultimate objective of denying Acierno the legal right to use and develop his land in accordance with the law. *Id.* at 80.

## ARGUMENT

I.    THE AMENDED COMPLAINT STATES VALID CLAIMS FOR RELIEF AGAINST NEW CASTLE COUNTY IN ALL COUNTS

The Court, in determining a Motion to Dismiss for failure to state a claim upon which relief may be granted, must presume that all the factual allegations stated in the Complaint are true, and make all reasonable inferences in favor of the non-moving party. *Young v. West Coast Industrial Relations Ass'n, Inc.*, 763 F.Supp. 64, 67 (D. Del. 1991). A Complaint should not be dismissed unless it can be established that the Plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Id.* The burden of demonstrating that no claim has been stated upon which relief could possibly be granted is on the movant. *Id.*

Claims under RICO are subject to the same pleadings standards as other claims under Rule 12(b)(6). *Young v. West Cost Industrial Relations Ass'n, Inc.*, *supra.*, citing *Rose v. Bartle*, 871 F.2d 331, 355 (3rd Cir. 1989). The 3rd Circuit in *Bartle* went on to explain that under the modern federal rules, it is sufficient that a complaint put a defendant on notice of the claims brought against him or her. *Id.* "It is the function of discovery to fill in the details and of trial to establish fully each element of the cause of action." *Id.*, citing *Sevill Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 790 (3rd Cir. 1984) (reversing District Court's dismissal of RICO Count), *cert. den.*, 469 U.S. 1211 (1985).

Given the extensive detail and quite specific identification of acts and the time that Defendants committed them, the County's Motion to Dismiss cannot possibly meet the applicable standard.  Indeed, only a few of the arguments made by the County actually zero in on whether the necessary basic allegation needed to state the elements of

579630v1

25

a cause of action has been provided.  Even if those few instances are proven to be true, Acierno would request that this Court exercise its authority under Rule 15 in order to grant him leave to amend his Complaint in order to state the necessary "magic words."

<blockquote>

A.    Counts I And II State A Cognizable Claim Under 42 U.S.C. § 1983

1.    The Claims Identified The County Policy And Allege Causation: The Orders To Abuse Authority And Misapply The Law To Harm Acierno Financially, Which Has Succeeded

</blockquote>

The County correctly notes that some facts regarding a County policy or custom which has violated Acierno's Constitutional rights must be stated in the Complaint in order to state a valid cause of action under § 1983.  Opening Brief at 4-5.  This Acierno had done in spades.

The County policy adopted by the coterie of co-conspirators to deny Acierno the right to use and develop his land by singling him out for disparate treatment and trumping up charges, conducting bogus hearings, and misapplying and misinterpreting the law on purpose, all combine to establish a clear policy to cause Acierno harm.  The actions were undertaken by County officials under the cloak of their official County duties, thereby implicating the County.  The result of the quite successful implementation of this illegal County policy has been millions of dollars in delay damages, costs, and otherwise unnecessary litigation expenses.

Even assuming *arguendo* that the action of some of the highest level officials in the County government could somehow not constitute an official "policy," it certainly satisfies the "custom" requirement.  The County asserts in essence that an unwritten practice approved by high level governmental officials can constitute a "custom."  We

579630v1

26

have that very set of circumstances in the case at bar. Freebery decided to use Acierno as a foil in her race for County Executive, and appropriate instructions in furtherance of that objective were provided to other Defendants down the chain of command in the County in order to implement the policy or custom to illegally deny Acierno the right to use and develop his lands. No stone was left unturned in the County's efforts to break the law in order to manufacture legal requirements that did not exist and to fabricate factual scenarios to satisfy farfetched applications of the law.

Having previously represented the County and Ms. Freebery, Acierno would think that counsel for the County would understand that in practice whatever Freebery said effectively constituted County custom and policy based upon her eight (8) year rule by virtual fiat. For the County to suggest that all of the top level officials in the County government getting together to form the conspiracy alleged in this Complaint cannot constitute a "custom or policy" sheds light on the real purpose for these motions: to needlessly increase the cost of this litigation so as to further their conspiracy by causing him even more pecuniary harm.

2.      Count I States A Valid Claim For Relief

(a)      Acierno Pled A Good Substantive
          Due Process Claim

The County alleges that in order to state a valid substantive due process claim Acierno must satisfy the "shocks the conscience" standard, which requires egregious official misconduct. Answering Brief at 8. Then the County concedes that the standard has only been adopted generally and not specifically in the realm of land use cases. *Id.* at 8-9. And that if it is not the standard in a land use case, it would continue to be the "improper motive" test. *Id.* at 8.

Acierno has clearly stated a claim based upon the "improper motive" standard. The Complaint is replete with allegations regarding the conduct aimed at trying to make Acierno out as a villainous enemy for Freebery's political campaign and because of her and others' personal biases and prejudices against Acierno. This is in stark contrast with the treatment accorded to developers she had no beef with, and widely variant from other developers that did valuable personal favors for members of the Gordon Administration.

Even assuming *arguendo* that the "shocks the conscience" standard would apply in the land use context, however, Acierno has pled sufficient facts to meet that standard. If it is just the question of not incanting the appropriate magical words (*i.e.* "shocks the conscience"), then the Court should allow Acierno leave of Court to amend his Complaint accordingly. The allegations of the Complaint, however, describe with a good degree of specificity actions by the County government which offend one of the most sacred principles enjoyed in this great Country: private property rights. The common law has enshrined this principle in its well established general rule regarding the right to the free use of land. *See Leon N. Weiner & Associates, Inc. v. Krapf*, 623 A.2d 1085, 1088 (Del. 1993). And land use regulation arises from traditional common law concepts of nuisance, which is only guardedly permitted to interfere with and restrain the revered principle of free use of land. *See Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 314 (3rd Cir. 1985). Thus, the County's illegal denial of Acierno's right to use his land damages one of the bedrock principles upon which the rule of law and this Country are based.

The conduct of the Defendants in the case at bar is so offensive and egregious, representing a concerted, well thought out, carefully planned scheme, that no Court could

possibly conclude that the activities were anything but "shocking." When government officials who are sworn to abide by the Constitution and laws of this State and these United States so blatantly and intentionally agree to act in direct contravention of their sworn duties, the result is government corruption of such a disturbing nature and magnitude that it must shake the confidence of any reasonable person due to its serious conflict with the revered institution of government.[4] Only unreasonable persons with a jaded view of the importance of maintaining public trust in government could conclude otherwise.

(b)    Count I Also States A Valid
Procedural Due Process Claim

The County asserts that Acierno's procedural due process claim fails because it does not allege that Constitutional procedures for challenging the deprivation do not exist. Answering Brief at 11. Acierno refers the Court to his Answering Brief in opposition to the Individual Defendants' Motion to Dismiss for a complete explication of his reasons in support of his counterpoints to this argument.

It should be noted, however, that there is no direct right of appeal from the New Castle County Planning Board or the New Castle County License Inspection & Review Board under the Delaware Code. Both of these boards have quite narrow, limited scopes of review, and they regularly decline to consider arguments such as equitable estoppel, violation of Constitutional rights, etc. How can an administrative process that fails to

---

[4] "Government is a trust and the officers of Government are trustees; and both the trust and the trustees are created for the benefit of the people." *Korn v. New Castle County*, 2005 WL 396341, *7, n.9, Chandler, Ch. (Del. Ch. 2005), quoting Letter by Henry Clay (Dec. 4, 19801) reprinted in Bartlett's Familiar Quotations (16th ed. 1992).

consider violations of Constitutional rights constitute a roadblock to the consideration by the federal courts of the very Constitutional principles upon which they are founded?

As a result, the only judicial review possible for the decisions of the County boards is pursuant to the ancient common law *Writ of Certiorari*, which involves the application of a very narrow scope of review and is conducted solely on the limited record below. 1 Woolley On Delaware Practice, §§ 896-898. In fact, it is the functional equivalent of an appeal. *Hackett v. Board of Adjustment of the City of Rehoboth*, 794 A.2d 596, 598 (Del. 2002). But the scope of review on *Certiorari* is more limited than the review available on appeal. *Reise v. Bd. Of Bldg. Appeals of City of Newark*, 746 A.2d 271, 272 (Del. 2000). Consequently, the reality is that the County has the ability of trumping up charges, having it virtually "rubber stamped" by the boards that it controls (through appointment by the same County official who concocted the conspiracy), and then easily convince the Superior Court that there is sufficient (manufactured) cause to leave the administrative decision undisturbed. This extremely "uphill battle" can hardly qualify as an "adequate procedure" to challenge improperly decided matters. Indeed, the *Certiorari* standard is so nearly impossible to satisfy that in recent history few reversals have occurred in spite of the existence of dozens of appeals from administrative tribunals.[5] Accordingly, the Court may apply the well established law in this area to the pleadings in the Complaint in order to determine that no adequate judicial review on the merits has been allowed Acierno.

---

[5] In fact, the only reversal in recent history interestingly had as a plaintiff a former Delaware Supreme Court Justice. *Dover Historical Soc'y v. City of Dover Planning Comm's*, 2004 WL 1790164, Witham, J. (Del. Super. 2004).

(c)    Count I Also States a Cognizable
Claim For A Temporary Taking

Next, the County asserts that the significant and substantial illegal delays in Acierno's ability to use and develop his lands are not compensable takings because they are part of the normal, everyday process of land use regulatory decision making. Brief at 15-16. Perhaps this is true in the County's dream world in which it could continue to carry out its scheme to deny Acierno the ability to use and develop his lands unabated, but this is not the case in the real world in which this action is being litigated. The U.S. Supreme Court has previously held that temporary takings are compensable. *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987). In that action, the Supreme Court indicated that a taking could occur in the case of an abnormal delay in obtaining a building permit or other type of approval which is a necessary prerequisite to development and use of property. *Id.* at 321.

Similar to the *First English Evangelical* case, this action involves numerous instances of the County denying Acierno the ability to use and develop his lands. Based on the Rule 12(b)(6) review standard, the Court may assume that the actions of the County have: 1) prohibited Acierno from being able to move forward with the development and concomitant pecuniary gain with respect to the 600+ unit Red Lion Village manufactured home community in Bear for more than two (2) years now; 2) barred Acierno from going ahead with construction and leasing of 60,000 square feet at the Christiana Town Center shopping center for more than one and a half (1½) years now; and 3) delayed him for approximately six (6) months with respect to opening of the Bertucci's Restaurant at the shopping center. In addition, Acierno has moved to amend the Complaint to add additional claims arising from the illegal expiration of the record

major subdivision plan for Acierno's shopping mall located next to the Christiana Mall, known as the Christiana Fashion Center in March of 2002.[6]

Delay damages for the County's impact on Acierno's valuable property rights will in the hundreds of millions of dollars. The time period of delay is not normal, and is in fact extraordinary and significant in its breadth. Consequently, the delays caused by the County have been both extraordinary in terms of their length and in terms of the sheer number of projects delayed; easily satisfying the Supreme Court standards which have been set down by the *First English Evangelical* case and is progeny.

The County also asserts a bizarre theory that Acierno must concede the legal validity of the governmental action that he challenges before he can seek recovery for an unconstitutional taking. The County's counterintuitive argument must fail based on the illogic of the alleged principle alone. If Acierno was required to admit that the County had acted legally before bringing a claim challenging the legality, the County would undoubtedly argue that Acierno had made an admission against interest and move for summary judgment based upon mootness and lack of any unconstitutional conduct. More importantly, however, the two (2) cases mentioned in the County's brief simply do not stand for the proposition for which they are cited. Accordingly, this argument is just another in a long litany of bogus issues raised by the County in its never-ending effort to force Acierno to jump through an innumerable number of hoops just to get what the law entitles him to.

In yet another extraordinary feat of legerdemain, the County alleges that Acierno cannot establish that he was denied all economically viable use of his lands. Brief at 16.

---

[6] A Motion for Leave of Court to file the Second Amended Complaint adding this Count was filed on March 13, 2005.

While it should be enough that Acierno has not been able to develop a number of huge projects, causing him hundreds of millions of dollars in delay damages and millions of dollars in fees and costs, Acierno will introduce the County to the very laws that it is duty bound to honestly apply. The County knows full well that Acierno cannot develop any lands until he has received approval of plans and permit applications. What makes the County think that Acierno could have reasonably expected to receive any different treatment different than the shabby, illegal conduct committed against him if he were to pursue alternative approvals for the development of the lands that the County shut him down on? Obviously, the County completely prohibited Acierno from putting his lands to any legitimate productive use. Acierno's property rights were fully vested pursuant to all preliminary approvals needed to develop[7], and the County's illicit activities in denying approvals which constituted the "final go ahead" are at issue in this action. As a consequence, this criteria, even assuming that it exists, is easily satisfied by the pleadings.

Finally, the County asserts that the takings claim should not be considered at this time based upon the defense of ripeness. Brief at 16. Acierno refers the Court to points raised in his Answering Brief in opposition to the Individual Defendants' Motion to Dismiss for a more extensive elucidation of his arguments, but the matter will be briefly addressed here.

---

[7] Vested rights to develop arise after substantial time and expense have been expended, and the landowner has substantially complied with all legal requirements within his control. *In re: 244.5 Acres of Land*, 808 A.2d 753, 758 (Del. 2002) (en banc) (developer's right to build vested where it ought to comply and did fully comply with all local governmental requirements, but was held up due to State restrictions in a process over which it had no control).

The Supreme Court has held that a takings claim challenging the application of land use regulations is ripe when the government implementing the regulations "has reached a final decision regarding the application of the regulations to the property at issue." *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001), quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985). Indeed, Acierno has received numerous "final decisions" from the Department at issue in this action.   And while the State of Delaware may have recognized an inverse condemnation cause of action for situations in which a physical invasion of land or efforts to acquire it have occurred, its Courts have not done so with respect to regulatory takings claims under the Delaware Constitution.  This eliminates the possibility of any effective State court review of Acierno's takings claims at issue in the case *sub judice*.

Perhaps most importantly, however, the claim should be permitted to proceed in this action due to the fact that the facts involved are inextricably intertwined with the RICO and § 1983 Due Process claims that will be permitted to proceed.  Considerations of judicial economy and efficiency weigh heavily  in favor of permitting the claim to proceed.

(d)     Count II States a Valid Equal<br>Protection Claim

In attacking Acierno's equal protection claim, the County once again argues that Acierno's Complaint should be dismissed on the grounds that it does not present sufficient proof to establish the claim.  Brief at 16-20.  Of course, this is not the applicable legal standard for reviewing a Motion to Dismiss.  Indeed, the very circumstance that the County complains of, "the Amended Complaint's lack of specifics," is not a frailty under the Rule 12(b)(6) standard.  Acierno alleges that he was

singled out by the Defendants for illegal treatment, in a scheme to deny him the right to use and develop his land. The fact that Acierno provides numerous instances of different treatment accorded to similar developers and developments is actually more than the bare necessity required to withstand a Motion to Dismiss.

The County also again repeats the ridiculous assertion that an illegal scheme by a gang of high level County employees to deny the legal rights of a landowner in violation of their sworn duty to follow the law is not "irrational" or "arbitrary." Nothing could be further from the truth. The conduct of the Defendants at issue in this action is so reprehensible and inexcusable that referring to it as "irrational" would be overly generous. When high level governmental officials make decisions based not on the facts and law, but instead based on personal animus and aggrandizement, their actions fall comfortably within the confines of what constitutes "wholly arbitrary" decision making.

The discovery process will doubtless permit Acierno to unearth numerous additional circumstances where the County has accorded far different treatment to those persons who provided the personal favors that the former heads of the County government so lustfully sought and obtained during their regime's eight (8) year command-control reign. In fact, Acierno has already discovered in other litigation with the County countless circumstances of diametrically opposed enforcement standards applied to development projects which were favored for their economic and job creation achievement or were being conducted by one of the County administration's "most favored developers." Regardless, Acierno's general averments that he was treated differently sufficiently state a claim, and the facts which will be harvested during the

discovery process will determine whether such claims will be permitted to ultimately proceed to trial.

As with many of the County's arguments, this is yet another example of their effort to inject a trial-like preponderance of the evidence standard on a review of Acierno's Complaint pursuant to Rule 12(b)(6). This they cannot do. Acierno's averments go far beyond "conclusory labels" as the County asserts. In fact, at times the County appears to suggest that Acierno must almost prove his case beyond a reasonable doubt at this early pleading stage of the litigation. Obviously, the appropriate response to this proposition is "No." The Court should accord the County's Motion to Dismiss a similar response.

> B.    Count III States A Valid Civil RICO Claim Against
>        The County

The County asserts that it should be dismissed from the RICO component of this action on the grounds that it may not be held liable due to its involvement in the racketeering scheme as the "enterprise." Brief at 20-25. The County's argument is overly simplistic and legally incorrect.

It is well settled that the actions of a number of individuals combined can provide the necessary degree of association in fact to qualify as an "enterprise." *Jeffreys v. Exten,* 784 F. Supp. 146, 159-60 (D. Del. 1992). Paragraph 76 of the Complaint describes the RICO enterprise as including four (4) individual defendants and the County (using "and" in the disjunctive). Thus, the "enterprise" alleged to have been the vehicle for the "pattern of racketeering activity" conducted by the Individual Defendants may either be the small coterie of illegal actors or the County.

Recognizing that the Complaint can be read to allege that the County acted as the "enterprise" through which certain of the Individual Defendants conducted their RICO activities, however, RICO liability may still be pursued in accordance with the law. This Court has previously held that the "enterprise" involved in a Civil RICO case may be liable for the actions of its employees under the vicarious liability principle of *respondeat superior*. *Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1083-84 (D. Del. 1984). In addition, the Court held that a conspiracy claim could likewise be brought under RICO against the entity that constituted the "enterprise." *Id.*

It should be noted, however, that Judge Stapleton's decision in the *Bernstein* case has been brought into question by the Third Circuit. In *Petro-Tech, Inc. v. Western Co. of No. America*, 824 F.2d 1349, 1358-60 (3d Cir. 1987), the Court held that a corporation could not be held liable for the RICO violations of its employees under 18 U.S.C. § 1962(c) pursuant to the principles of *respondeat superior* or aiding and abetting, where to do so would make the corporation/enterprise liable for the RICO violations which victimized it. While subsequent decisions have stated the rule more generally, it is clear that the *Petro-Tech, Inc.* decision forms the genesis for this principle, and therefore the express terms and limitations of the rule laid down in that case still apply. Under the *Petro-Tech* rule, therefore, an entity/enterprise that benefited from (rather than being victimized by) the actions of the RICO employees could be liable under § 1962(c). In addition, the *Petro-Tech* rule does not appear to prohibit the entity/enterprise from being liable under the conspiracy provisions of § 1962(d).

This reading of the holding in *Petro-Tech* is in conformance with the position of other circuits that *respondeat superior* liability only attaches under RICO if an employer

579630v1

37

benefited from its employee's RICO violations. *OKI Semiconductor Co. v. Wells Fargo Bank, N.A.*, 298 F.3d 768, 775 (9th Cir. 2002); *Cox v. Administrator United States Steel And Carnegie*, 17 F.3d 1386, 1406-7 (11th Cir. 1994) (the entity/enterprise may be liable for employee RICO violations under *respondeat superior*, ratification, aiding and abetting, and conspiracy theories, at 1411); *Davis v. Mutual Life Ins. Co. of New York*, 6 F.3d 367, 379-80 (6th Cir. 1993) (noting that their decision "finds support from the Third Circuit [case of *Petro-Tech*], which finds vicarious liability under § 1962(c) to be 'appropriate' in cases like this one, where the corporate principle is distinct from the RICO enterprise and 'is alleged to have attempted to benefit from its employees' racketeering activity").

In the case at bar, no affirmative assertion of benefit to the County as a result of the RICO activities of the Individual Defendants has been directly alleged in the Complaint, unless Freebery's well documented belief in the Napoleonic adage "leo estat est moi" is sufficient. It is plausible, however, that a good faith pleading could be made that the County benefited from the Individual Defendants' RICO activities in the form of political gain by further cementing the Gordon Administration's reputation as anti-development, and therefore effectively pro-community interest. It is no secret that the County has for decades violated Acierno's rights to use and develop his land as a form of political propaganda to create a public perception of "tough" application of the law against a wealthy developer whom so many in the public unfortunately jealously observe from afar.

Additionally, the Complaint alleges that the County has participated in a pattern of racketeering as a member of the Individual Defendants' separate "enterprise." In that

capacity, the County has acted as a "person" and not an "enterprise." Further, the County qua "person" has participated as a co-conspirator in the Individual Defendants' "enterprise." This means that the County may be pursued as a RICO defendant in this action without running afoul of the rule requiring separateness between the RICO "person" and the RICO "enterprise." Accordingly, the County should remain as a RICO defendant for all purposes in this action.

Finally, the County asserts it is immune from RICO's grasp based upon the principle that municipal corporations cannot be liable for exemplary damages of the type permissible under § 1962(c), citing the case of *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 910 (3d Cir. 1991). Brief at 24. The *Genty* case does in fact hold that a civil claim brought under § 1964(c) of the RICO Act cannot be maintained against a municipal corporation due to the mandatory award of treble damages, which the Third Circuit found to be punitive in nature, based upon a lack of evidence that Congress intended to abrogate the long-established common law principle prohibiting the award of punitive damages against municipalities. *Genty* at 914. With all due respect to the Third Circuit Court of Appeals, however, Congress has evidenced an intent to allow RICO liability against governmental actors. In 1988, Congress adopted an amendment to the RICO Act which defined the term "scheme or artifice to defraud" so as to include the deprivation of the intangible right of honest services. 18 U.S.C. § 1346. Mail fraud under 18 U.S.C. § 1341 and wire fraud under § 1343 are both predicate RICO Acts under § 1961. And the amendment to § 1346 was intended, at least in part, to bring government actions more within the ambit of RICO's coverage. Specifically, Congress acted in direct response to the Supreme Court's decision in *McNally v. U.S.*, 483 U.S. 350 (1987), where the Court

held that the mail and wire fraud statutes did not prohibit schemes to deprive the public of the honest services of elected officials. *See U.S. v. Paridies,* 98 F.3d 1266, 1283, n.30 (11th Cir. 1996).

More importantly, the United States Supreme Court has rejected the reasoning of the *Genty* case *sub silentio* in *Cook County v. U.S.,* 538 U.S. 119 (2003). There the U.S. Supreme Court was faced with an interpretative challenge identical to that decided in *Genty.* In *Cook County,* the local governmental entity argued that a municipality could not constitute a "person" under the federal False Claims Act since such an interpretation would run counter to the traditional common law rule prohibiting punitive damages against municipalities. The Court rejected the County's argument, expressly holding that treble damages do not equate to punitive damages, and that such statutory exemplary damages could be awarded and the County could be held liable under the FCA. The Supreme Court reasoned that treble damages, unlike punitive damages, do not leave the jury with an open-ended opportunity to decide upon a number because the jury only returns a verdict and the law leaves it up to the court to determine any multiplier.

The RICO Act is not materially different from the FCA. RICO provides that a person injured in his business or property by a violation of § 1962 "shall recover threefold the damages he sustains." Thus, the RICO statute contemplates a procedure whereby the jury will return a verdict for a simple: a compensatory damages amount, which will thereafter be multiplied by three pursuant to either jury instructions or an automatic tripling of the award by operation of law or court order. Thus, no discretion at all is left in the hands of the jury in a fashion which could equate RICO triple damages to the classic type of "punitive damages" which the common law proscribes from being

awarded against a municipality. If the Supreme Court were presented with the *Genty* issue today they would doubtless rule as they did in *Cook County*. Consequently, *Genty* should no longer be considered as good precedent.

Acierno also adopts all of the arguments regarding the Count III Civil RICO claim contained in his Answering Brief to the Individual Defendants' Motion to Dismiss. In particular, however, the Complaint expressly identifies the times and nature of mail and wire transactions conducted by certain of the Individual Defendants. In addition, the Complaint alleges specific acts over a fifteen (15) month time period and more general acts over a more than two (2) year time frame, which is more than sufficient to establish a lengthy "pattern" from a temporal standpoint. It should be noted, however, that the "pattern" requirement actually looks at the number of different acts, and is not *per se* based upon the length of the time frame at issue. Moreover, Acierno intends to amend the Complaint to add averments which extend the activities as far back as early 2002 and as recently as February, 2005. As a result, Acierno is confident that he has adequately stated the necessary elements of a RICO claim.

### C.  Counts IV and V State Cognizable Claims Against The County, But They Were Not Intended

The County asserts that Acierno's claims for Civil Conspiracy and Tortious Aiding And Abetting do not constitute independent causes of action, have not had all of their elements adequately pled, do not expressly allege that the County was a participant in the stated tort activities, and that the County is immune from them due to sovereign immunity. Brief at 25 through 33. On the County's third point, Acierno agrees. Acierno made a conscious decision not to pursue the claims against the County and then left the issue unclear due to inherently inconsistent language. Dismissal is not appropriate,

however, since the Complaint was not intended to bring a cause of action against the County with regard to these claims.[8]

II. THE DOCTRINES OF *ROOKER-FELDMAN*, *RES JUDICATA*, COLLATERAL ESTOPPEL, AND *NOERR-PENNINGTON* ARE INAPPLICABLE TO THE AVERMENTS OF THE COMPLAINT

Acierno adopts the arguments set forth in his Answering Brief in opposition to the Individual Defendants' Motion to Dismiss under the principles of *res judicata*, collateral estoppel, and the *Rooker-Feldman* doctrine. None of the claims raised in the Complaint have been previously adjudicated in any prior actions. Acierno has never before brought an action pursuant to the RICO Act or § 1983 against any of the Defendants in this action arising from any of the conduct alleged.

Interestingly, this argument by the County points up the typical circuity of logic inherent in many of its arguments. On the one hand, the County argues that Acierno must have exhausted certain State procedural remedies in order to have a ripe federal claim, while on the other hand the County it submits here that the prosecution of such claims in a State court would act as a bar to their prosecution in this action. As previously noted hereinbefore, Acierno has never received a final decision in State court action based upon a complete record and plenary standard of review. Instead, Acierno has been mired in years of litigation, handcuffed by the County's clever enactment of an administrative

___

[8] Acierno concedes that the prayer for relief at the end of the Complaint, which does not qualify as a substantive statement of claim, does somewhat inartfully request relief "against all Defendants on all Counts of this Complaint." In addition, Acierno mistakenly included *respondeat superior* references at the end of each Count since the same language was included in Counts I through III. If the County or this Court believe that clarification of that point is necessary, then Acierno is more than willing to modify the prayer clause and delete the unintended *respondeat superior* references at the conclusion of Counts IV and V to specify that relief under those Counts is only sought against the Individual Defendants. Indeed, Acierno has already filed a Motion which, *inter alia*, seeks to effect this very change.

appeal process with an extremely narrow scope of review, after which he has been largely relegated to appealing to the Superior Court, and in one instance the Supreme Court, based upon scopes of review which narrow even further at each successive stage of the appellate process. The initial County administrative hearing on which Acierno's County Building and Drainage Code matters are based: 1) is not recorded; 2) does not offer the opportunity for cross-examination 3) fails to provide for the subpoena of witnesses; and 4) lacks any of the other basic rudimentary procedural mechanisms that would be accorded to Acierno in an unrestricted Court challenge context. Accordingly, neither Acierno's claims nor the issues that they raise have been definitively decided in a fully open-ended litigation such as the case at bar.

### III.    ACIERNO'S CLAIMS SHOULD NOT BE STAYED ON ABSTENTION GROUNDS

The County submits that abstention principles arising from U.S. Supreme Court cases and their progeny are cause for this Court to abstain from proceeding with this action at this time. Brief at 34. Acierno incorporates his arguments in response to this point contained in his Answering Brief in opposition to the Individual Defendants' Motion to Dismiss. Suffice it to say, however, that this case is fundamentally about a conspiracy among various high level County officials to knowingly and intentionally violate Acierno's legal right to use and develop his land solely for the purposes of carrying out a campaign of personal animus and self-promotion in violation of the law. Their illegal conduct contravenes serious federal laws such as the RICO Act and the United States Constitution, the latter of which all of these Individual Defendants have sworn to uphold as members of the Bar of this State and/or as County officials. This Court's failure to exercise federal jurisdiction promptly in this action would run counter

to the purposes of the RICO Act and § 1983: to provide for redress for persons harmed by egregious, illegal conduct, to punish the parties who have committed such reprehensible conduct, and to hopefully prevent such illegal conduct from being repeated in the future. With Haggerty and perhaps newly engaged cohorts having joined forces as late as a few months ago in order to continue carrying out their scheme of retribution and harassment against Acierno, the Court cannot act soon enough.

CONCLUSION

Based on the foregoing arguments, the Plaintiffs respectfully request that this Court deny the County's Motion to Dismiss in its entirety, or in the partial or total alternative, grant them leave of Court pursuant to Rule 15 of the Federal Rules of Civil Procedure to amend the Complaint in order to state any additional averments that are necessary to satisfy the Court that cognizable claims have been adequately stated pursuant to this Court's pleading rules. In addition, the Court should deny the request for dismissal under Rule 12(b)(1) since none of the claims asserted or issues arising therefrom are barred by any common law or decisional law doctrinal principles. Finally, none of the principles for which federal abstention is typically exercised are here present, and the purposes of the statutory grounds upon which this action is based will instead be best served by the prompt consideration of Plaintiffs' claims.

Respectfully submitted,

THE BAYARD FIRM

Richard L. Abbott (I.D. No. 2712)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
Telephone (302) 655-5000
Facsimile (302) 658-6395
E-Mail: rabbott@bayardfirm.com

Attorneys for Plaintiffs

Dated:  March 16, 2005

579630v1

## CERTIFICATE OF SERVICE

I, Richard L. Abbott, Esquire, do hereby certify that on this 16th day of March, 2005, I caused the foregoing **Plaintiffs' Answering Brief In Opposition To New Castle County's Motion To Dismiss** to be electronically filed with this Court, and to be served upon the below-listed individuals according to electronic notification:

| | |
|---|---|
| Collins J. Seitz, Jr., Esquire<br>Matthew F. Boyer, Esquire<br>Max B. Walton, Esquire<br>Connolly Bove Lodge & Hutz, LLP<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE 19801 | Michael P. Kelly, Esquire<br>Paul Bradley, Esquire<br>McCarter & English<br>919 N. Market Street, Suite 1800<br>Wilmington, DE 19801 |
| Jeffrey I. Pasek, Esquire<br>Shelly A. Kinsella, Esquire<br>Cozen O'Connor<br>1201 North Market Street, Suite 1400<br>Wilmington, DE 19801 | Claire M. DeMatteis, Esquire<br>C. Clark Hodgson, Jr., Esquire<br>Stradley Ronon<br>300 Delaware Avenue, Suite 1018<br>Wilmington, DE 19801 |
| Joseph R. Biden, III, Esquire<br>Ian Connor Bifferato, Esquire<br>Joseph K. Koury, Esquire<br>Bifferato, Gentilotti & Biden, P.A.<br>1308 Delaware Avenue<br>Wilmington, DE 19806 | Dennis J Siebold, Esquire<br>New Castle County Department of Law<br>87 Reads Way<br>New Castle, DE 19720 |

Richard L. Abbott, Esquire (I.D. 2712)