EXHIBIT 1
TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in A.2d
2003 WL 21499842 (Del.Super.)
**(Cite as: 2003 WL 21499842 (Del.Super.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
395 ASSOCIATES, LLC, A Delaware limited
liability company, Estate Homes, Inc.,
A Delaware Corporation Allied Homes, and Frank
E. **Acierno.** Petitioners
v.
NEW CASTLE COUNTY, A Political Subdivision
of the State of Delaware, New Castle
County Department of Land Use, and administrative
agency of New Castle County
and George O. Haggerty, as New Castle County
Code Official, Respondents.
No. Civ.A.03M06039RSG.

**Page 40**

June 27, 2003.

ORDER

GEBELEIN, J.

*1 Now this 27th day of June 2003, the Court
recognizes that the Respondents have issued letters
of compliance to the Petitioners as requested in this
action.

IT IS THEREBY ORDERED that the *Writ of
Mandamus* is dismissed with prejudice.

IT IS SO ORDERED.

2003 WL 21499842 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 2
TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in F.Supp.
1993 WL 215133 (D.Del.)
**(Cite as: 1993 WL 215133 (D.Del.))**
▶

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Frank E. ACIERNO, Plaintiff,
v.
Phillip CLOUTIER, in his individual and official
capacity, Richard Cecil, in
his individual and official capacity, Robert Powell,
in his individual and
official capacity, J. Robert Wood, in his individual
and official capacity, J.
Christopher Roberts, in his individual and official
capacity, Penrose Hollins,
in his official and individual capacity, Karen
Venezky, in her official and
individual capacity, Michael Mitchell, in his official
and individual capacity,
and New Castle County, Defendants.
No. C.A. 92-385-SLR.

June 9, 1993.

Carl A. Agostini, of Agostini, Levitsky & Agostini,
Wilmington, DE,    John J. Yannacone, of
Yannacone, Fay, Baldo & Daly, Media, PA, for
plaintiff.

Collins J. Seitz, Jr., and James D. Heisman, of
Connolly, Bove, Lodge & Hutz, Wilmington, DE,
for New Castle County and the Council Member
defendants.

Barry M. Willoughby, of Young, Conaway,
Stargatt & Taylor, Wilmington, DE, for Michael
Mitchell.

MEMORANDUM OPINION

ROBINSON, District Judge.

I. INTRODUCTION

*1 Plaintiff Frank E. Acierno, a real estate
developer, brings this action pursuant to title 42,
section 1983 of the United States Code, seeking
damages as well as injunctive and declaratory relief.
Plaintiff's Amended Complaint raises several federal
constitutional claims as well as a Delaware state law
claim under the equitable estoppel doctrine. These
claims focus on two ordinances adopted in 1992 by

the New Castle County Council ("County Council")
which had the effect of precluding plaintiff from
developing certain property consistent with a record
development plan and zoning classification. Before
the Court is defendants' motion for partial summary
judgment as to plaintiff's constitutional claims.

II. PROCEDURAL BACKGROUND

Plaintiff filed his original Complaint with this Court
on July 1, 1992 raising claims against New Castle
County ("County"), members of County Council,
and the Delaware Department of Transportation
("DelDOT").    By stipulation of the parties and
order of the Court, DelDOT was dismissed from the
case without prejudice.

On or around December 4, 1992, the remaining
parties-defendant filed a motion for summary
judgment and for a stay of discovery pending
resolution of the summary judgment request. (D.I.
29)    Plaintiff filed a brief in opposition to
defendants' summary judgment motion on December
18, 1993.    Defendants filed their reply brief on
January 7, 1993.    The Court determined that
defendants raised arguments in their reply brief
which were not included in their opening brief, *see*
District of Delaware Local Rule 7.1.2(c)(2), and *sua
sponte* granted plaintiff leave to file a brief in sur-
reply. (D.I. 60) Plaintiff filed his brief in sur-reply
on or around March 29, 1993.

Plaintiff filed a motion requesting leave to file an
amended pleading on March 12, 1993. On April 2,
1993, the Court granted plaintiff's motion for leave
to amend. [FN1] Plaintiff's Amended Complaint
deleted one state law claim and asserted another,
raised additional averments of fact, and added an
additional party defendant. [FN2]

On April 8, 1993, defendants requested leave to file
a brief in response to plaintiff's sur-reply brief.
The Court granted defendants' motion on April 16
and defendants filed their responsive brief on April
29, 1993.    As defendants freely acknowledged, said
brief raised a new argument based on the abstention
doctrine.

The Court issued an Order on May 10, 1993
indicating the Court had "determined that the parties
largely failed to provide copies of the various New

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *1 (D.Del.))

Page 32

Castle County Code provisions and New Castle County ordinances relied upon in said submissions and that the Court does not have ready access to said provisions and ordinances." (D.I. 77) The Court accordingly ordered that "[o]n or before May 13, 1993, defendants shall provide copies of all said regulations and ordinances relied upon in their submissions ... except insofar as said documents already were included in the record." (D.I. 77) The Order further provided that "[a]ny regulations or ordinances not so included in the record shall not be considered in resolving defendants' motion for partial summary judgment." (D.I. 77)

*2 Defendants responded to the Order on May 13, 1993 by filing copies of various New Castle County ordinances and Code provisions.    In addition, defendants filed correspondence and affidavits with the Court seeking to explain certain facts that allegedly arose in connection with defendants' efforts to comply with said Order and to set forth defendants' preliminary positions regarding the legal impact of those facts.

The Court issued another Order on May 17, 1993 in which it "determined that (1) plaintiff is entitled to respond to defendants' newly-raised abstention argument and to address the relevance and legal significance, if any, of the recently revealed facts [set forth in defendants' correspondence and affidavits filed on May 13, 1993]; and that (2) defendants may also, pursuant to their request, file papers addressing said latter issue." (D.I. 79) On May 20, 1993, the parties filed submissions responsive to the Court's Order of May 17, 1993, and briefing on the matter at bar finally concluded. Defendants' motion for summary judgment comes before the Court without the benefit of any discovery due to defendants' pending motion to stay, which motion, in effect, has been granted *de facto*.

## III. FACTUAL BACKGROUND

On October 5, 1984, plaintiff purchased a parcel of land comprising approximately 38 acres situate in New Castle County, Delaware (the "Property"). Plaintiff purchased the Property for a price of over $1,000,000. As of April 1971, the Property had a zoning classification referred to as "diversified, planned unit development" ("DPUD"). On April 11, 1974, a major land development plan for the Property had been approved and recorded by the County.    The approved record development plan

provided for the development of a 322-unit apartment complex together with development of .87 acres of land for commercial use.

It is undisputed that the Property's DPUD zoning classification and the fact that the Property was the subject of an approved record development plan were critical factors in plaintiff's decision to purchase the Property. It is undisputed as well that plaintiff "paid a premium of approximately [$900,000] in reliance upon the DPUD zoning classification and the fact that the property was the subject of an approved record plan." (D.I. 61, Exhibit A (Affidavit of Frank E. Acierno) at ¶ 3) Indeed, the agreement of sale executed in connection with plaintiff's purchase of the Property described the parcel of land as "[a]ll that parcel of land situated west of McKennans Church Road in Delaware, known as 'The Maples Apartments' and containing approximately 38.65 acres of land." (D.I. 55 at A-3) The description of the Property further provided that "[s]aid parcel has been approved by New Castle County officials for the construction of three hundred and twenty-two apartments...." (D.I. 55 at A-3)

Prior to closing for the purchase of the Property, plaintiff, through a realtor, sought and received assurances from the New Castle County Department of Planning ("Planning") regarding the current zoning and record plan status of the Property. Correspondence supplied in response to plaintiff's request contained the following assurances:
*3 The land is still currently zoned Diversified Planned Unit Development (DPUD).    The status of the record plan is that it is current and, therefore, the uses permitted are noted on the plan subject to limitations regarding the density, commercial area, etc.
(D.I. 55 at A-6)

Plaintiff's representatives, on or around October 21, 1985, filed with Planning a revised development plan for the "Westhampton project." (D.I. 55 at A-8) Planning officials then directed plaintiff's engineers to make certain modifications and updates to the development plan. (D.I. 55 at A-8)

On or around December 17, 1985, County Council issued Resolution No. 85-443 requesting, "pursuant to Section 23-81(21) of the [then] New Castle County Code," "that the Department of Planning give County Council a recommendation to consider

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *3 (D.Del.))

voiding the existing record development plan for the
project previously known as 'the Maples
Apartments,' now known as 'Westhampton' in
Millcreek Hundred." (D.I. 55 at A-10) [FN3] The
purported bases for this request were that County
Council (1) "[was] concerned with DPUD rezonings
which have not been developed in a timely fashion";
(2) "[was] acutely [sic] interested in the quality of
life in the county" and "housing density has a direct
impact on that quality";   (3) "wishe[d] to have
proper review of traffic, water and sewer facilities
in support for the [Maples/Westhampton] project";
and (4) "desire[d] to have the subject project
reviewed by the Subdivision Advisory Committee in
light of the character of the existing neighborhood."
(D.I. 55 at A-10)  The record indicates that the only
property having an approved record DPUD plan
subject to County review at that time was the
Property at issue.   (D.I. 55 at A-10)  There is no
record of any consideration by the County of
voiding the record development plan for the
Property prior to plaintiff's purchase thereof,
although the record shows that the status of said plan
was "current" and "approved" for ten years prior to
plaintiff's purchase of the Property.  (D.I. 55 at A-3
to A-4, A-6)

 In response to County Council's request for "a
recommendation to consider voiding the existing
record development plan for" the Property, Planning
reported to County Council as follows:
  As directed by ... Resolution [No. 85-443], this
  Department has reviewed your request and has
  solicited comments from Artesian Water Company,
  New Castle County Department of Public Works,
  and [DelDOT], Division of Highways. Attached
  are their responses.  [D.I. 55 at A-12 to A-14]  In
  all three cases, they have indicated that adequate
  capacity exists to serve this project, recorded as a
  Major Land Development Plan for The Maples
  (Microfilm   No.   2600).   Accordingly,   this
  Department sees no reason to recommend that you
  consider voiding [said] Record Plan.
  (D.I. 55 at A-11)

 Approximately two months later, then County
attorney Gary Bryde sent a memorandum to County
Council regarding Resolution No. 85-443.   The
memorandum states the following:
  *4 After review of the January 14, 1986 memo of
  Wayne W. Grafton, Director of Planning, to you
  and Council, it is my opinion that there is nothing
  remaining for Council to consider with regard to

Resolution No. 85-443.  Accordingly, I suggest that
a letter or memo be sent to the Department of
Planning indicating that it should now continue its
review process in its normal course.
My opinion is based upon Section 23-81(21) of the
New Castle County Code, the memo of Scott A.
Green, County Attorney, to Wayne W. Grafton
dated 12/9/85, and the memo of Richard A.
Hauge, Assistant County Attorney, to the
Honorable Deborah Boulden dated 12/3/85.
The operative language of Section 23-81(21) as it
applies to the matter is as follows:
"If construction has not been completed ... within
five (5) years after the date of approval of the
record development plan for the DPUD ... then the
approval shall be voidable at the discretion of
county council, upon recommendation of the
department of planning.
This language indicates that the Department must
affirmatively support the voiding of a record plan
before Council's discretion comes into being.
Without such prerequisite support, Council has no
discretion to act.  If this were not the case, review
by the Department would be meaningless.
As part of its review as requested by Council's
resolution relating to this ordinance, the
Department actually solicited and received very
similar input to that requested for approving a
proposed final record plan.   The letters supplied
by Artesian Water, the Department of Public
Works and the Division of Highways all indicate
that adequate capacities presently exist for the
proposed project.  Thus, had the record plan been
voided, the plan would have been subject to
virtually the same review that it has just received.
Therefore, the safeguards to prevent stale
development have been met.
(D.I. 55 at A-15 to A-16 (emphasis added))

 On March 11, 1986, County Council President
Karen Peterson informed plaintiff that "according to
the opinion" of County Council's attorney
"regarding the status of Resolution No. 85-443," "
'there is nothing remaining for Council to consider
with regard to Resolution No. 85-443.' "  (D.I. 55
at A-17)  The correspondence further explained that
County Council had "not received any other
ordinances or resolutions to be placed on Council's
agenda with regard to this matter."  (D.I. 55 at
A-17)

 During the period from approximately March 1986
to December of that same year, the record indicates

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *4 (D.Del.))

Page 34

that plaintiff and his representatives revised the development plan for the Property in order to address concerns raised by the County regarding the planned use of the development site. (D.I. 61, Exhibit A at ¶¶ 7, 13-16) On or around June 4, 1986, Planning informed plaintiff and other interested parties that his revised and updated record plan, referred to as "SLD 85-343 (Westhampton)," "Microfilm Number 8034," was approved and recorded on April 18, 1986. (D.I. 55 at A-18) It appears from the record that this new plan replaced and modified the prior record plan, referred to as "SLD 70-193," "The Maples Apartments," "Microfilm No. 2600." (D.I. 55 at A-8 to A-9, A-47 to A-48, A-54, A-55, A-57, A-86, A-93) A revised record development plan referred to as "Westhampton" and reflecting the agreed-upon changes and revisions was approved and recorded on December 5, 1986. (D.I. 55 at A-23) According to the record, said plan "superseded" the approved plan recorded on April 18, 1986. (D.I. 55 at A-20)

*5 In 1987, County Council, together with various County agencies and officials, particularly Planning, undertook to substantially revise, update and amend the County's DPUD zoning ordinance. In October 1987, drafting of the amended version of the DPUD ordinance was substantially completed and County Council conducted a "workshop" with Planning officials regarding the amended ordinance. At the time of the workshop, the proposed DPUD amended ordinance contained a "savings clause" that provided as follows:

Section 4. This ordinance shall become effective immediately upon its adoption and approval except for rezoning applications currently pending DPUD approval which shall be exempt from the provisions of this ordinance, but subject to the provisions of the Code in effect at the time of rezoning to DPUD.

(D.I. 81, Exhibit 1 at 21) The proposed DPUD ordinance containing this savings clause, which County Council did not enact into law, was referred to as "Substitute Ordinance No. 1 to Ordinance No. 87-025."

As a result of the workshop, County Council and Planning apparently determined that certain changes in the language of this savings provision were necessary. (D.I. 81, Exhibit 3) Accordingly, Section 4 of the amended DPUD ordinance was revised to read as follows:

Section 4. This ordinance shall become effective

immediately upon its adoption and approval except for rezoning applications currently pending DPUD approval which shall be exempt from the provisions of this ordinance *except Section 23-81(18),* but subject to the provisions of the Code in effect at the time of rezoning to DPUD.

(D.I. 81, Exhibit 2 at 21 (emphasis supplied to highlight change in language)) The revised version of the proposed amended DPUD ordinance, referred to as "Substitute Ordinance No. 2 to Ordinance No. 87-025," ultimately was adopted by County Council on October 13, 1987. [FN4]

In 1988, plaintiff further revised his record development plan and submitted the revised plan for County review. On or around June 16, 1988, Planning informed plaintiff and other interested parties that development plan "SLD 88- 95 (Westhampton)" was approved, recorded and "assigned Microfilm Number 9236." (D.I. 55 at A-31) The record indicates that the 1988 record plan "supersede[d]" the "record plan of Westhampton recorded on" December 5, 1986. (D.I. 55 at A-27) It is undisputed that by December 1988, plaintiff already had expended in excess of $1,000,000 developing the Westhampton project, including expenses for mortgage interest, engineering fees and real estate taxes. (D.I. 55 at A-41 to A-46; D.I. 61, Exhibit A at ¶ 24)

On or around April 23, 1991, County Council once again introduced a Resolution "request[ing] that the Department of Planning provide County Council a recommendation in consideration of voiding the existing record development plan for the [Westhampton project]." (D.I. 30, Exhibit A) The purported bases for Resolution No. 91-107 were essentially identical to those set forth as justification for County Council's prior such request. The Resolution indicated that it was introduced "[p]ursuant to Section 23-81(21) of the New Castle County Code." (D.I. 30, Exhibit A)

*6 By correspondence dated April 25, 1991, Bryan C. Shuler, then Director of Planning, informed DelDOT that County Council "had asked the Department of Planning to prepare a recommendation regarding th[e Westhampton] project." (D.I. 55 at A-55) Shuler also stated in the correspondence that he was "enclos[ing] a copy of the current record plan (Microfilm No. 9236)," i.e., the record plan approved and recorded in 1988, and requested that DelDOT "review the plan and submit

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *6 (D.Del.))

[its] written comments, if any, to the Department [of Planning]." (D.I. 55 at A-55 (emphasis added)) The correspondence further noted that "[o]f specific interest is the need to identify any issues that would preclude development of the site as depicted by the [record] plan." (D.I. 55 at A-55)

Similarly, in a memo from Shuler to County Council dated May 22, 1991, Shuler advised County Council that Subdivision Advisory Committee members "were asked to comment on [the approved Westhampton record plan] and identify any issues that might preclude development of the site as depicted by the plan." (D.I. 55 at A-60) The memo specifically noted that the plan under consideration for voiding was "the current record plan (Microfilm No. 9236)," i.e., the record development plan approved and recorded on June 16, 1988. (D.I. 55 at A-60) In his May 22, 1991 memorandum to County Council, Shuler also detailed various purported deficiencies in the Westhampton plan found to exist by the assortment of government agencies in response to Planning's request that the agencies "identify any issues that might preclude development" of the Westhampton project. Shuler acknowledged, however, that "[t]his situation can be remedied ... through voluntary revisions to the current plan...." (D.I. 55 at A-65)

In a letter dated May 29, 1991, plaintiff advised Planning that he intended to cooperate with Planning and the other involved governmental agencies to address and resolve the cited deficiencies. (D.I. 55 at A-66) Indeed, by June 1991, plaintiff completed a wetlands delineation report, the absence of which had been cited in the Shuler memo as one of the deficiencies in the existing record plan. (D.I. 55 at A-64 to A-67)

On or around July 2, 1991, County attorney Mitchell issued a legal memorandum for County Council setting forth his opinion regarding the issue of whether County Council had authority to lawfully void plaintiff's approved record development plan. Mitchell offered the following legal analysis:

The current provision, codified as 23-81(18) of the New Castle County Code provides a sunset period of ten (10) years, rather than five (5) years. In addition, the current provision provides for review by the Department subsequent to the sunset date and staging of the development in accordance with adequate support facilities as determined by the Department.

In determining the applicability of the two (2) provisions, Section 4 of Substitute Ordinance No. 1 to Ordinance No. 87-205 is paramount. That Ordinance amended the DPUD provisions. Section 4 provides:

*7 This Ordinance shall become effective immediately upon its adoption and approval except for rezoning applications currently pending DPUD approval which shall be exempt from the provisions of this ordinance, but subject to the provisions of the code in effect at the time of rezoning to DPUD.

In adopting the current DPUD provisions, the County Government expressly excluded any pending rezoning applications from the requirements of the revised DPUD Ordinance. Having included a "savings clause" in the current Ordinance, the rights of property owners who had DPUD zonings pending review at that time are governed by the statute in effect when the application was filed, not the newly-adopted provision. [citations omitted] While Section 4 of Substitute Ordinance No. 1 to Ordinance No. 87-025 expressly applies only to those rezoning applications currently pending DPUD approval, it can necessarily be implied that the intent of the County Government was that the then existing DPUD provisions applied to lands already rezoned to the DPUD classification.

In light of the foregoing, the provisions of Ordinance No. 70-10 must be applied to the Plan of Westhampton. Pursuant to that Ordinance, the New Castle County Council does have the authority to void the [Westhampton] Plan upon recommendation from the Department [of Planning].

(D.I. 55 at A-69 to A-71 (citations omitted) (emphasis added))

During the period from May 1991 to April 1992, plaintiff continued his efforts to remedy any and all purported deficiencies in the Westhampton plan. (D.I. 61, Exhibit A at ¶¶ 35 to 44 and documents cited therein) Said efforts included the filing of a revised plan for Planning review and approval which incorporated the required changes. (D.I. 55 at A-83 to A-85) In early September 1991, Planning allegedly informed plaintiff that he had complied with all material deficiencies set forth in the May 22, 1991 Shuler memo. (D.I. 55 at A-78) As of April 2, 1992, the "majority of the substantive issues [identified as deficiencies in plaintiff's record plan were] resolved." (D.I. 55 at A-89 to A-90) By

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *7 (D.Del.))

Page 36

memorandum of that date, Planning official Shuler advised County Council that "the only remaining issue with respect to our memo of May 22, 1991, is access through the Oakwood Hills subdivision" and that "[s]hould Council be of the opinion that this issue warrants voiding of the plan, the Department would recommend that it proceed with action on Resolution No. 91-107 as this appears to be the only method of bringing closure on this issue." (D.I. 55 at A-90)

On April 14, 1992, County Council enacted Ordinance No. 91-190 voiding the approved record development plan for Westhampton project. (D.I. 30, Exhibit D) It is undisputed that this was and is the only instance in which the County has ever voided an existing DPUD record plan. (D.I. 61, Exhibit A at ¶ 48)

On April 15, 1992, only one day later, defendant Philip Cloutier, then a member of County Council, informed Planning official Shuler that "[p]ursuant to Section 23-85.1(1)(c) [of the New Castle County Code], I will introduce an ordinance to change the zoning classification of [plaintiff's] property" from DPUD back to R-2, the Property's zoning classification prior to its rezoning to DPUD in 1971. (D.I. 55 at A-93)

*8 In correspondence dated May 27, 1992, Shuler provided certain information to Shirley Agnor, Clerk of the County Council, regarding the proposed zoning ordinance. (D.I. 55 at A-96) Shuler included in said correspondence his recommendation that the title of the proposed ordinance contain information indicating that, under the proposed ordinance, the property would be rezoned "from DPUD (Diversified Planned Unit Development) to R-2 (Agricultural and General Purpose)." (D.I. 55 at A-96) As required by statute, legal notice of the proposed zoning ordinance appeared in the News Journal on June 20, 1992. (D.I. 55 at A-97, p. 4) Consistent with Shuler's recommendation, the title of the proposed ordinance contained in the notice informed the public that the ordinance, if enacted, would rezone the subject Property from DPUD to an R-2 zoning classification.

On July 7, 1992, a statutorily required hearing was held before the New Castle County Department of Planning and Planning Board concerning the proposed rezoning amendment. (D.I. 30, Exhibit F) Two weeks later, Planning issued its

recommendation regarding the proposed ordinance. (D.I. 55 at A-99) Planning recommended the adoption of a substitute ordinance to proposed Ordinance 92- 119. The recommended substitute ordinance, instead of rezoning the subject Property from DPUD to R-2, would rezone the Property from DPUD to R-1-B. (D.I. 55 at A-99, page 4)

On September 9, 1992, County Council adopted Substitute 1 to Ordinance No. 92- 119 rezoning the Property from the DPUD zoning classification to a much more restrictive R-1-B classification. (D.I. 30, Exhibit G) It is undisputed that all notices predating the meeting indicated that the proposed ordinance contemplated, as stated in the proposed ordinance title, a rezoning from DPUD to an R-2 classification. (D.I. 55 at A-96 and A-97, p. 4) The rezoning of the subject Property precluded plaintiff from constructing the 322-unit apartment complex he had been planning and developing, with County approval, for seven years at a cost of over $1,000,000.

IV. DISCUSSION

Plaintiff's Amended Complaint asserts constitutional claims grounded on alleged violations of his substantive due process, procedural due process and equal protection rights found in the Fourteenth Amendment to the Constitution. Defendants contend they are entitled to summary judgment as to plaintiff's constitutional claims. Additionally, the individual moving defendants, who were members of County Council at all relevant times hereto, assert that they are entitled to legislative and qualified immunity.

A. Summary Judgment Standard

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Electric*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *8 (D.Del.))

*Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B. Due Process Claims

*1. Protected Property Interest*

**\*9** Defendants' first argument in support of their motion for summary judgment as to plaintiff's due process claims is that plaintiff had no protected property interest grounded in state law in either his existing record development plan or in the DPUD zoning classification with respect to the Property. It is well-settled that for a plaintiff to recover on a due process claim, he must prove that the defendant governmental authority "infringed a property interest encompassed by the Fourteenth Amendment." *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667, 679 (3d Cir.1991), *cert. denied,* 112 S.Ct. 1668 (1992). "A property interest subject to protection by the due process clause results from a 'legitimate claim of entitlement' created by an independent source such as state law." *Id.* (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972) ).

State, county and municipal law may create a property interest in building permits, use licenses (such as a liquor license) and zoning classifications where said law gives the property owner a "legitimate claim of entitlement" thereto. *See, e.g., Abraham v. Pekarski,* 728 F.2d 167, 170-71 (3d Cir.1984); *see also Midnight Sessions, Ltd., supra* at 679-80. The cases cited by defendants in support of this argument, and the cases cited therein, exemplify the operation of these legal principles. For example, defendants place heavy emphasis upon the Third Circuit's recent opinion in *Midnight Sessions, Ltd.* In that case, the court considered whether a property owner who had applied unsuccessfully for a permit to operate an all-night dance hall had a property interest in the issuance of said permit based on a provision of Pennsylvania state law which "preclude[d] issuance of a license until it has been ascertained that the facility complies with 'all laws, ordinances, health and fire regulations, applicable thereto, and is a safe and proper place for the purpose for which it shall be used.' " *Id.* at 679. The Court of Appeals concluded that this provision did not create a property interest in the issuance of the permit. The court determined that the "safe and proper place for the purpose for which it shall be used" language precluded a legitimate claim of entitlement since said language gave the relevant government agency complete discretion to issue the permit depending upon whether it considered the subject property to be a "safe and proper place for" an all-night dance hall.

In *Midnight Sessions, Ltd.,* the Third Circuit also cited, with approval, a number of other federal cases where "different results were reached ... because the local law was different and justified a claim of entitlement." *Id.* at 680. These cases cited by the Third Circuit reflect the type of situation, and the kind of local law, where a legitimate claim of entitlement to building permits and the like properly is found to exist. For example, in *Littlefield v. City of Afton,* 785 F.2d 596, 601 (8th Cir.1986), the court concluded that the plaintiff land developer had a property interest in the issuance of a building permit where, under relevant state law, "[i]f the landowner complie[d] with the [applicable local] laws and codes, the municipality lack[ed] discretion" to deny the permit. Since the plaintiff developer had complied with all the legal requirements contained in the applicable municipal ordinances, the court correctly concluded that he had a protected property interest in the issuance of the permit. *Id.* at 602.

**\*10** In the case at bar, the Court concludes that plaintiff had a protected property interest both in the record development plan and in the DPUD zoning classification with respect to the Property, and further concludes that said property interest was derived, independently, both from New Castle County law and from Delaware state law sources.

a. Property Interest Arising From County Law

The record demonstrates that in 1992, County Council relied upon New Castle County Code § 23-81(21), the "five-year sunset provision" repealed in October 1987, as authority for its power to void plaintiff's record plan. [FN5] Assuming, for purposes of these summary judgment proceedings, that the five-year sunset provision contained in repealed Code § 23-81(21) was properly applied in connection with County Council's efforts to void plaintiff's record development plan, it nonetheless is clear that said provision gave plaintiff a legitimate claim of entitlement to the continuing validity of the record plan and the zoning classification to which it related, and to develop the Property consistent therewith.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *10 (D.Del.))

Page 38

The five-year sunset provision of repealed Code §
23-81(21) stated that "[i]f construction has not been
completed ... within five (5) years after the date of
approval of the record development plan for the
DPUD ... then the approval shall be voidable at the
discretion of county council, upon recommendation
of the department of planning." (D.I. 81, Exhibit 2
at 20) In an effort to convince the Court that the
five-year sunset provision does not create a
legitimate claim of entitlement, defendants argue as
follows:

When the zoning ordinance under which a rezoning
is enacted allows for the voiding of the Record
Development Plan, at the discretion of County
Council, upon recommendation from the
Department of Planning (also discretionary), there
is no [claim of] "entitlement" under the due
process clause. Such "double" discretion defeats
plaintiff's claim to any property interest in the
record development plan. *Midnight Sessions*, 945
F.2d at 679.
(D.I. 32 at 8)

The Court disagrees with defendants' contention.
First, defendants seem to concede, as they must, that
during the five-year "sunset" period, County
Council had no authority whatsoever to void record
DPUD development plans. Accordingly, it is clear
that plaintiff had a property interest arising from
said provision insofar as it gave him a legitimate
claim of entitlement to develop the Property,
consistent with his approved record plan and the
DPUD zoning classification, for a period of "five
(5) years after the date of approval of the record
development plan for the DPUD." The record
clearly indicates, as a factual matter, that the
"existing" record plan" which County Council
voided in 1992, i.e., the "record plan of
Westhampton" with "microfilm No. 9326," was the
record plan approved and recorded in 1988. (D.I.
55 at A-27, A-54, A-55, A-57, A-60, A-64, A-68,
A-93) Accordingly, the requisite five-year period
had not yet elapsed in 1992 when County Council
acted to void plaintiff's record development plan.
[FN6]

*11 Additionally, the five-year sunset provision
clearly requires, as County Council was well aware
from the legal advice given by its attorney in a
memorandum dated March 5, 1986, "that the
Department [of Planning] must affirmatively support
the voiding of a record plan before Council's
discretion comes into being [and that] [w]ithout such

prerequisite support, Council has no discretion to
act." (D.I. 55 at A-15 to A-16) This language,
therefore, similarly creates a legitimate claim of
entitlement because it gave plaintiff the right to
pursue development of his approved DPUD project
without County interference, even after the
expiration of the five-year sunset period, unless and
until Planning "affirmatively support[ed] the voiding
of [plaintiff's] record plan." Taking the facts of
record in a light most favorable to plaintiff, as the
Court must in summary judgment proceedings, the
recommendation given by Planning here (D.I. 55 at
A-89 to A-90) cannot reasonably be considered
"affirmative support [for] the voiding of [plaintiff's]
record plan."

If this Court were to assume, in the alternative, that
the five-year sunset provision contained in repealed
Code § 23-81(21) could not be applied lawfully in
1992 and that only the new ten-year sunset provision
contained in current Code § 23-81(18) was properly
applicable, it nonetheless is clear that the current
provision also created a legitimate claim of
entitlement. Significantly, the current ten-year
sunset provision contains no language providing
County Council with any authority to void record
development plans. Indeed, rather than imposing a
limitation on the amount of time a developer has to
complete development of a DPUD project, the
language of Code § 23-81(18) provides that "[t]he
landowner shall have ten (10) years ... to develop
the parcel as proposed." Such language indicates
that a developer will have at least ten years to
complete his DPUD project, without County
interference. Even after the ten-year period has
expired, the plain language of Code § 23- 81(18)
indicates that a developer, if he "desires," may
proceed with the DPUD project, without County
interference, by complying with certain
requirements; namely, the developer "must submit,
to the department of planning, current support
facilities information demonstrating the impact on
and availability of traffic, sewers, water and open
space." (D.I. 81, Exhibit 2 at 20-21) At that point,
Planning reviews the information and determines
"whether such facilities are adequate for the
development as originally established." (D.I. 81,
Exhibit 2 at 20-21) "If the support facilities are
deemed adequate, the landowner can proceed with
the development as shown on the original rezoning
ordinance." Significantly, Code § 23-81(18) further
provides that even "[i]f the support facilities are
determined to be inadequate, only that portion of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *11 (D.Del.))

development which can be supported by existing facilities will be allowed to proceed and the balance of the development will be staged based upon the availability of support facilities, if at all." *(Id.)*

**\*12** The Court thus concludes that plaintiff had a protected property interest in the Westhampton record development plan and DPUD zoning classification, that such protected property interest was grounded in New Castle County law, and that such protected property interest existed irrespective of whether the five-year or ten-year sunset provision lawfully applied in 1992 when plaintiff's record development plan was voided.

### b. Property Interest Arising Under Delaware State Law

Turning to applicable state law, it appears that even if plaintiff did not obtain a property interest based on a legitimate claim of entitlement arising from the New Castle County ordinance and Code provisions discussed in the foregoing, he nonetheless acquired such an interest from Delaware state law.

Defendants contend that "[a] developer has no vested rights in a zoning classification" and that this "rule is absolute." (D.I. 75 at 2) In support of these assertions of law, defendants cite the Delaware Supreme Court case of *Shellburne, Inc. v. Roberts,* 224 A.2d 250, 255 (Del.1966), where the court stated that "a property owner has no vested right in a zoning classification." The Delaware Supreme Court did not limit its discussion to the one holding cited by defendants, however, but went on to explain as follows:

It is generally recognized that the issuance of a permit does not, alone, confer any right against a later zoning change subsequently adopted. The acquisition of vested rights requires more. As of the time of the zoning change, there must have been a substantial change of position, expenditures, or incurrence of obligations, made lawfully and in good faith under the permit, before the land owner becomes entitled to complete the construction and to use the premises for a purpose prohibited by a subsequent zoning change.
*Id.* at 254.

Subsequent Delaware cases have applied the vested rights doctrine and closely related equitable estoppel doctrine to a broad range of circumstances. *See, e.g., Wilmington Materials, Inc. v. The Town of Middletown, Delaware,* 1988 WL 135507, Del. Ch.

LEXIS 157, Civil Action No. 10392 (Del. Ch.1988); *Dragon Run Farms, Inc. v. The Board of Adjustment of New Castle County,* 1988 WL 90551, 1988 Del.Super. LEXIS 297, Civil Action No. 88A-JA-2-1-AP (Del.Super.1988); *Raley v. Stango,* 1988 WL 81162, 1988 Del Ch. LEXIS 105, Civil Action No. 1047-S (Del.Ch.1988); *New Castle County v. Mitchell,* Civil Action No. 6231, slip op., reported in 1981 WL 15144, LEXIS Del.Ch. file (Del.Ch. Nov. 25, 1981).

In *New Castle County v. Mitchell,* the Court of Chancery set forth and applied the following legal principles:

In general terms the rule is that where the permit is regularly issued in accordance with the zoning ordinance, it may not be revoked after reliance. It must be determined at what point it can be said that an individual has performed acts which form the wellspring from which certain protectable interests may flow and create a countervailing force which will prevail over the normally paramount authority of the municipality to preserve the desirable characteristics of the community through zoning.
**\*13** There is no easy formula to resolve issues of this kind. The ultimate objective is fairness to both the public and the individual property owner. We think there is no profit in attempting to fix some precise concept of the nature and quantum of reliance which will suffice. Rather a balance must be struck between the interests of the permittee and the right and duty of the municipality. [FN7]

\* \* \*

What "action" is sufficient to secure a vested right is a question of fact and degree in each case … While ordinarily, courts stress actual construction pursuant to a validly issued permit, other courts, more realistically, lay stress upon a change of position which has committed the permittee to substantial expenditure or which has resulted, wholly or partially, in a physical change in the land or improvements thereon. [FN8]

(Internal quotations omitted) (emphasis added) The court went on to adopt the principle "that because there seems to be no hard and fast rule in these situations, that to a great extent, the decision of the courts in such type of case involves a balancing of the equities." *New Castle County v. Mitchell, supra.*

In applying these principles, which are fully

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *13 (D.Del.))

consistent with the legal principles set forth in *Shellburne v. Roberts,* [FN9] the court held as follows:

> In the instant case, there exist the following considerations to be looked into in balancing the equities. (1) The ordinance was proposed and enacted following the issuance to the defendants [land owners] of a state license, (2) defendants had to comply with the strict provisions of 24 Del. C. § 1601 et seq. in order to obtain such a license, (3) defendants' type of business is legal under existing Delaware law and was permitted to be carried out in an area zoned C-2 at the time a State license was applied for, (4) defendants had no knowledge or reason to know of the proposed zoning change, (5) there was no reason for defendants to suspect that the required building permit as well as a use permit would not be granted, (6) at the time of the original alterations [to the building on their property], which were made prior to June 25 [when an application for a certificate of occupancy was filed], defendants were not required to have a building permit, (7) there was no testimony of any substantial change in the character of the area in question which would have put defendants on notice even though the new zoning was part of a comprehensive plan, (8) defendant Mitchell signed a lease conditioned on his obtaining a State license and thereby became obligated to pay rent, (9) defendants acted promptly on the issuance of the license, but because the defendant Mitchell had no knowledge of the imminence of the proposed change on zoning, he cannot be charged with seeking to establish his adult book center in order to beat a deadline.

*New Castle County v. Mitchell, supra* at 6. The court then offered the following in support of its ultimate ruling:

**\*14** Admittedly the State license as such gives no immutable right to a zoning classification, nor is individual financial loss controlling in determining whether or not zoning has been properly carried out under the police power. Additionally, there exists no prescribed formula as to what degree of reliance is tantamount to a substantial change of position, including the making of expenditures, and the incurrence of obligations, made lawfully under the permit. Notwithstanding the above, and upon consideration of all factors previously enumerated, coupled with the fact that the defendant Mitchell does not operate a large corporation but is rather an individual whose livelihood is derived from two incorporated and legal business establishments, one

ow which the County with some vindictiveness is seeking to shut down, there is ... only one conclusion to be reached, namely that defendants have acquired vested rights in their [adult entertainment] establishment ... and that the principle of estoppel entitles them to continue the operation of their business at such location.
*Id.*

The *New Castle County v. Mitchell* case, and the principles of law set forth therein, are relevant to the matter at bar in a number of significant respects. First, *New Castle County v. Mitchell* fully rebuts defendants' contention that, under Delaware law, "a landowner has no vested right to continue to develop property after an adverse zoning change unless, prior to the zoning change, he had obtained a building permit and materially changed his position in reliance upon the permit." (D.I. 75 at 3) The *Shellburne v. Roberts* case itself did not contain any such holding. The vested rights doctrine clearly is a broader and more flexible legal theory than defendants acknowledge. [FN10] The *New Castle County v. Mitchell* case correctly recognizes that issuance of a building permit is not a talisman necessary for application of the vested rights/ equitable estoppel doctrines. Indeed, in *Mitchell* the court relied not upon the issuance of a building permit as the source for detrimental reliance on the part of the property owner, but instead upon the issuance of a state license authorizing operation of an adult entertainment center. Moreover, the court established and applied the principle "that because there seems to be no hard and fast rule in these situations, that to a great extent, the decision of the courts in such type of case involves a balancing of the equities." *New Castle County v. Mitchell, supra.*

In *Wilmington Materials, supra,* another Delaware case involving facts quite analogous to the circumstances at bar, the court similarly applied the vested rights/equitable estoppel doctrines in concluding that a landowner was entitled to develop his property consistent both with previously approved construction plans and with a prior zoning classification, despite the fact that the local legislative council had passed an ordinance precluding the development.

**\*15** In connection with the property owner's claim under the vested rights doctrine, the court in *Wilmington Materials* accepted the theory that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *15 (D.Del.))

Page 41

plaintiff had "substantially relied upon the then-current zoning classification at the time of its application [for a building permit], and thereby obtained a vested right that could not be abrogated by an adverse change in that zoning classification." *Wilmington Materials, supra* 1988 WL 135507 at *6, 1988 Del.Ch. LEXIS 157 at *18. The court quoted language from the Delaware Supreme Court's decision in the *Shellburne v. Roberts* case, and held that "[a]lthough *Shellburne* involved a vested right to the issuance of a building permit, the governing principle is the same where (as here) the claim is to a vested right in an existing zoning classification." *Wilmington Materials, supra* at *6-*7, 1988 Del.Ch. LEXIS 157 at *18-*19 (citing, *inter alia, Raley v. Stango, supra,* slip op. at 8).

As to the closely-related equitable estoppel doctrine, the court explained as follows:

The estoppel doctrine has been applied where a landowner was induced to expend substantial sums in reasonable, good faith reliance upon governmental assurances (or equivalent conduct) that the landowner's intended use of the property is permitted under the zoning code, and thereafter the government attempts to thwart that land owner's plans by amending the zoning code to prohibit those very intended uses. In such circumstances, the local governmental authority has been held equitably estopped from applying the amended zoning regulation to the landowner.

*Wilmington Materials, supra* at *6-*7, 1988 Del.Ch. LEXIS 157 at *19-* 20 (citations omitted).

In applying the vested rights doctrine to the facts before it, the court in *Wilmington Materials* focused on two factors: (1) Whether the landowner relied on assurances by governmental officials regarding its ability to develop the property in a manner consistent with the prior zoning classification, and with approved construction and development plans; and (2) Whether the landowner's expenditures incurred on the basis of such reliance were sufficiently substantial as to give rise to a vested right. *Id.* at *7-*8, 1988 Del.Ch. LEXIS 157 at *21-*24.

In concluding that the plaintiff in *Wilmington Materials* had satisfied the first of these two prongs, the court opined:

WMI [the plaintiff land developer] acted under a reasonable and good faith belief that the current Zoning Code would apply to, and permit, its intended uses. Mr. Daley's [the Town Solicitor] opinion, which was issued on behalf of the Town with the Mayor's tacit, if not express, imprimatur, made it reasonable for WMI to form that belief. That belief was reinforced by the absence of any challenge to that opinion for over six weeks. Accordingly, [the court] find [s] that WMI prepared its application to the Town for the various required approvals, and for that purpose incurred $88,000 of expenses, in reasonable reliance upon the aforementioned belief and expectation.

*Id.* at *7, 1988 Del.Ch. LEXIS 157 at *21.

As to the second factor, the court concluded the following:

*16 What level of expenditure will suffice to constitute substantial reliance cannot be determined by any magic formula. That inquiry is necessarily fact specific and must take into account all relevant circumstances. In these specific circumstances, [the court] find[s] WMI's expenditures sufficient to establish substantial reliance. Two factors are material to that conclusion. First, the $88,000 dollar amount, standing alone, would appear significant for a small local firm such as [plaintiff]. *See Board of Supervisors of Fairfax County v. Medical Structures, Inc.,* Va.Supr., 192 S.E.2d 799, 801 (1972) (Expenditure of $59,600 for engineering and structural plans, plus other considerable development costs, established substantial reliance). Second, any reasonable doubt should be resolved in WMI's favor, because ... it would be unconscionable, in this instance, to permit the Town, by its zoning amendment, to defeat WMI's expectations and reliance.

*Id.* at *8, 1988 Del.Ch. LEXIS 157 at *23-*24.

In finding that those same basic facts supported a claim under the equitable estoppel doctrine, the court in *Wilmington Materials* opined:

Clearly the Town, acting through its officials, engaged in conduct that it knew or should have known would (and, in fact, did) induce substantial reliance by WMI. The Mayor caused the Town Solicitor to issue an official, formal opinion advising WMI that its intended uses were permitted under the Zoning Code. At the August 17 meeting with the Mayor and other Town officials, Mr. Corrado [one of WMI's principals] specifically told those present that WMI would be moving forward in furtherance of its plans, and that it would incur expenses and financial obligations. He asked those present if there were

any reason why WMI should not proceed, and no one spoke up. Specifically, no Town official responded negatively, or with a caveat that WMI's plans were subject to approval by the Town Council and that any expenditures WMI incurred would be at its own risk. Thus, the Town's conduct could only be viewed as a "green light" for WMI to proceed to prepare its application, with assurance that zoning would not be an issue.

Finally, to permit the Town to defeat WMI's proposal by applying the zoning amendment to it retroactively, would be highly inequitable. The Zoning Code amendment was not adopted out of "police power" considerations, i.e., policy concerns for the health, safety or general or moral welfare of the community. Those broad issues had already been resolved when the Code was adopted in January, 1987, only 23 months before, after extensive study and hearing process. Rather, the purpose for the zoning amendment was to prevent lawful use of the land by WMI, motivated by a vocal protest movement that included a petition signed by many objecting citizens.

*Id.* at *8-*9, 1988 Del.Ch. LEXIS 157 at *24-*26. The court accordingly enjoined the Town from enforcing its zoning amendment so as to prevent the landowner from developing its property under the prior zoning classification. [FN11]

**\*17** As discussed above, defendants contend that this Court should not rely upon the *Wilmington Materials* and other lower Delaware state court cases discussed herein on the ground that they are inconsistent with applicable Delaware Supreme Court precedent, particularly as to the equitable estoppel doctrine. Defendants contend that "[t]he Supreme Court of Delaware has never accepted the theory that equitable estoppel can be applied against a governmental entity exercising its governmental functions." (D.I. 75 at 7-8) Defendants' contention in this regard is refuted by relevant Delaware caselaw, including a Delaware Supreme Court case decided in 1991.

In *State of Delaware v. Raley*, 1991 WL 18114, 1991 Del.Super. LEXIS 40 (Del.Super.), *aff'd*, 604 A.2d 418, 1991 WL 235357, 1991 Del. LEXIS 327 (1991), a criminal case involving application of the vested rights and equitable estoppel doctrines, defendant Raley, a landowner, was charged with violation of certain Delaware marina regulations which were promulgated subsequent to the time when he received approval to build his marina

facility. Although the Delaware Superior and Supreme courts found against Raley on his vested rights and equitable estoppel claims, the courts' discussions of those legal theories refute defendants' narrow interpretation thereof.

The Superior Court's decision in *State v. Raley, supra* at *3-*4, 1991 Del.Super. LEXIS 40 at *9-*10, contains the following explanation of the vested rights doctrine:

The underlying basis for the vested rights doctrine is a recognition that the imposition of government regulation of an intended use of a person's land once he has reached a certain point in achieving his goal, by incurring substantial expenditures or obligations, constitutes a due process violation. The State's imposition of the Marina Regulations constitutes a land-use regulation, very similar to a zoning ordinance. Accordingly, if the doctrine's requisite elements are present here, then the vested rights doctrine applies.

If Raley has a constitutionally-protected vested right to continue building this marina as planned, then DNREC may not require him to obtain a permit under the Regulations.

(Footnotes and citations omitted) In applying the vested rights doctrine, the court determined that Raley had not incurred substantial expenditures or obligations in a good faith belief that the newly-promulgated Marina Regulations would not impede his ability to construct the marina facility. It is significant to note the broad characterization of the vested rights doctrine as explained by the Superior Court in *Raley*. This Court would note also that the Superior Court in *Raley* cited with approval the *Wilmington Materials* and *New Castle County v. Mitchell* cases discussed above.

As to the equitable estoppel doctrine, the Superior Court, quoting from the *Wilmington Materials* decision, explained as follows:

Under the estoppel doctrine, a municipal government or zoning authority may be estopped from exercising its zoning power where a property owner, relying in good faith upon an act of a municipal government, has made a substantial change in its position, or has incurred such extensive obligations and expenses, that it would be highly inequitable and unjust to subject the owner to the zoning change.

**\*18** *State v. Raley, supra* at *6, 1991 Del.Super. LEXIS 40 at *15-* 16 (citing cases). Again, although the court determined that the equitable

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *18 (D.Del.))

Page 43

estoppel doctrine could not be applied in Raley's favor based on the facts of that case, the court's characterization of that doctrine and its reliance on the *Wilmington Materials* decision is significant.

The Delaware Supreme Court, characterizing the Superior Court's conclusions in *Raley* as "supported by the evidence and the product of a logical and deductive reasoning process," affirmed. In affirming, the Supreme Court gave its tacit if not express approval of the Superior Court's characterizations of the vested rights and equitable estoppel doctrines and of the manner in which the lower Delaware courts had expanded those theories. As to the vested rights doctrine, the court opined:

The vested rights doctrine protects the holder of an administrative permit from the retroactive application of new regulations. The doctrine does not afford protection, per se, but applies only where the holder of the permit has substantially changed position, in good faith, by incurring obligations or making substantial expenditures before the new regulations are adopted.

*State v. Raley, supra* 1191 WL 235357 at *3, 1991 Del. LEXIS 327 at *8-*9 (citing *Shellburne, Inc. v. Roberts, supra* ). Likewise, as to the equitable estoppel doctrine, the court held:

The trial court also determined Raley's estoppel argument to be unavailing because it found no substantial change of position and because it concluded that there had been no act by DNREC upon which Raley could reasonably rely. A substantial change in circumstances based on a good faith reliance upon another's act is required for the estoppel doctrine to apply. *Wilson v. American Ins. Co.,* 209 A.2d 902 (1965). [T]here is evidence in the record to support the conclusion that Raley has not substantially and in good faith changed position.

*Raley v. State, supra* at *4, 1991 Del. LEXIS 327 at *10-*11. Thus, rather than refusing to "accept[ ] the theory that equitable estoppel can be applied against a governmental entity exercising its governmental functions" (D.I. 75 at 7-8), the Delaware Supreme Court readily accepted such a theory as a valid application of Delaware law, although on the facts in *Raley* the court declined to apply the doctrine. Moreover, the Delaware Supreme Court's characterization of the vested rights doctrine is quite broad.

In applying these principles to the case at bar, it is clear that Delaware law provided plaintiff with a

protected property interest both in his approved record development plan and in the DPUD zoning classification with respect to the subject Property. The relevant inquiry, under either the vested rights doctrine or the equitable estoppel doctrine, reduces itself to whether plaintiff, reasonably and in good faith, relied on assurances by governmental officials regarding his ability to develop the subject Property in a manner consistent with the DPUD zoning classification and with the officially-approved record development plan, and whether his expenditures incurred on the basis of such reliance were sufficiently substantial as to give rise to a vested right or to application of equitable estoppel. If both questions are answered in the affirmative, then plaintiff has a right under Delaware law to develop the Property without regard to subsequent zoning or similar changes which would preclude such development. The record in this case demonstrates that the County and its officials, including County Council, through their assurances and conduct, gave plaintiff a reasonable, good faith belief and expectation that he would be entitled to develop the subject Property under the DPUD zoning classification and in a manner consistent with his approved record plan, and that plaintiff reasonably relied thereon to his substantial detriment.

**\*19** It is undisputed that the existence of an approved record development plan, together with an approved DPUD zoning classification, were crucial factors in plaintiff's decision to purchase the subject Property. The record demonstrates that, prior to closing for the purchase of the Property, plaintiff sought and received assurances from County officials regarding the zoning and record plan status of the Property. (D.I. 55 at A-6) It is undisputed as well that plaintiff paid a premium of approximately $900,000 in reliance upon the above factors. (D.I. 61, Exhibit A at ¶ 3)

Defendants seek to rebut this conclusion by contending that the Property's "purchase price is not [properly] considered for purposes of determining vested rights." (D.I. 56 at 8 (citing *Raley v. Stango, supra,* slip op. at 9-10)) In *Raley,* although the court found that "acquisition costs are not includable as a general rule," the court specifically left open the possibility that "if a portion of the purchase price represented a premium directly related to the intended use, the premium arguably could be considered under a substantial reliance test." *Raley, supra* at *4, 1988 Del.Ch. LEXIS 105

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *19 (D.Del.))

at *11-*12. Thus, although on the facts before it the court in *Raley* concluded that "there [was] nothing in [the] record to establish that Raley paid any such premium," the court did not preclude such a finding. The Court concludes the instant case presents facts supporting such a finding.

The facts of record also indicate that plaintiff, in connection with the Westhampton project, incurred substantial expenditures (over $1 million to date) and expended considerable effort in preparing various development plans; in negotiating with County officials, planners and engineers in an effort to resolve the various purported deficiencies; and in carrying out remedial measures regarding those deficiencies. (D.I. 55 at A-8, A-18 to A-23, A-64 to A-67, A-72 to A-74, A-78, A-83 to A-90; D.I. 61, Exhibit A at ¶¶ 7, 13-18) Indeed, County officials continued to reinforce plaintiff's well-founded expectations regarding his ability to develop the Westhampton project by officially approving and recording his modified, superseding development plans, including the 1988 plan, that incorporated, and apparently were filed as a result of, the various purported deficiencies noted and modifications requested by County planning officials. [FN12] Even after County Council introduced its 1991 resolution seeking to void plaintiff's record development plan, Planning officials continued to conduct themselves in a manner such that plaintiff could have reasonably concluded, and did conclude, that he would be allowed to resolve any noted deficiencies or other problems in connection with Westhampton and, thereby, to continue the DPUD development. (D.I. 55 at A-64 to A-67, A-78, A-83 to A-85)

Reviewing these facts in a light most favorable to plaintiff and under settled and well-reasoned principles of Delaware law, the Court concludes that plaintiff's substantial expenditures and efforts, undertaken in reasonable reliance on the conduct of the County and its representatives, form the basis for a valid claim of vested rights both in the voided development plan and in the removed DPUD zoning classification, and, alternatively, for a valid claim that the County should be equitably estopped from enforcing its ordinances so as to deprive plaintiff of these rights and of developing the Property consistent therewith.

c. Pullman Abstention

**\*20** Defendants contend that the Court should

dismiss this action under the *Pullman* abstention doctrine, *see Railroad Comm'n of Texas v. Pullman,* 312 U.S. 496 (1941), on grounds that (1) the lower Delaware court cases relied upon herein, *i.e.,* the *New Castle County v. Mitchell, Raley* and *Wilmington Materials* cases, are "conflicting" with the Delaware Supreme Court's decision in *Shellburne, Inc. v. Roberts,* and (2) "[t]o the extent this Court ... makes a determination that equitable estoppel applies, it would be venturing onto legal waters uncharted by Delaware's highest court." (D.I. 75 at 10) [FN13]

"[T]he Supreme Court has recognized that abstention is an 'extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to state court would clearly serve an important countervailing interest.' " *Heritage Farms, Inc. v. Solebury Township,* 671 F.2d 743, 746 (3d Cir.1982) (quoting *County of Allegheny v. Frank Mashudo Co.,* 360 U.S. 185, 188-89 (1959)). The Third Circuit has held that "the mere presence of a potentially dispositive question of state law ... has never been a sufficient basis in itself for declining federal jurisdiction under Pullman. The doctrine requires that the question of state law be unsettled." *Heritage Farms, Inc.,* 671 F.2d at 747 (internal quotations and citation omitted) (emphasis in original).

In the case at bar, the Court will deny defendants' request for *Pullman* abstention because the state law principles upon which the Court relies in this decision are not unsettled. As indicated throughout the foregoing discussion, the Court finds that the well-reasoned lower Delaware court decisions relied upon herein are fully consistent with the Delaware Supreme Court's opinion in the *Shellburne, Inc. v. Roberts* case. Moreover, although said decisions may have expanded the vested rights and equitable estoppel doctrines, this does not make Delaware law unsettled regarding these principles. *See Raley v. State of Delaware,* 1991 WL 235357, 1991 Del. LEXIS 327.

A recent Sixth Circuit case, involving closely analogous facts and a strikingly similar body of forum law in relation to the matter at bar, provides support for the Court's conclusions that plaintiff had a property interest in the Westhampton record

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *20 (D.Del.))

Page 45

development plan and DPUD zoning classification under Delaware law and that *Pullman* abstention should not be exercised here.

In *Nasierowski Brothers Investment Company v. City of Sterling Heights,* 949 F.2d 890 (6th Cir.1991), the Sixth Circuit was presented with an appeal where the district court had concluded that the plaintiff-landowner did not have a protected property interest under Michigan vested rights doctrine "because he had not obtained a building permit and had not commenced construction of the development prior to the time at which [the subject property] was rezoned." *Id.* at 897. Significantly, the body of forum law upon which the district court relied in reaching this conclusion was substantially similar to the body of Delaware law applicable in the instant case. Much like the relevant Delaware law, Michigan law embodied a state Supreme Court case which provided a narrow view of the vested rights doctrine and a more recent case decided by a lower court which broadened the doctrine. In *City of Lansing v. Dawley,* the Supreme Court of Michigan opined as follows:

> *21 [T]he first work done upon the new building was three months after the ordinance went into effect and after the defendant had been notified that his permit had been revoked. If he had constructed the building or partially constructed it, if the work he did after the enactment of the ordinance had been done before, there would be no question as to his vested property rights. But he did nothing of a substantial character. He went no farther than to order plans and cause a survey to be made of the lot. This preliminary work was not sufficient to create a vested right to erect the building. * * *

> [T]he test in each case as to whether a holder of a permit has acquired vested rights thereunder is not whether he has spent much or little in reliance upon it, but rather whether there has been any tangible change in the land itself by excavation and construction.

> It is our conclusion that the defendant acquired no vested right to erect this building in violation of the zoning ordinance.

247 Mich. 394, 396-97 (Mich.1929) (citation and internal quotation omitted). In the lower court decision, the court held that "[a] vested property interest acquired before the enactment of an ordinance may not be destroyed by a subsequent rezoning;" moreover, "[t]o have acquired a vested right in the planned business classification, plaintiff

would have had to have undertaken acts, in reliance on the zoning change, of such a nature that a rezoning back to SFR [the new classification] would be to his substantial detriment." *Trever v. City of Sterling Heights,* 53 Mich.App. 144, 146 (1974). The court determined:

> Plaintiff undertook no such acts here. The Mobil lease was executed more than six months before the township zoned the property planned business. Thus, there could have been no reliance. While plaintiff hired an architect to prepare preliminary studies for a shopping center, he did not do so until September, 1969, almost a year after the property had been rezoned SFR. * * * Since plaintiff did not rely to his detriment on the planned business classification, he acquired no vested right in it.
> *Id.* at 147.

Relying solely upon these Michigan authorities, which are quite similar, though less favorable, to landowners than the Delaware cases cited herein, the Sixth Circuit in *Nasierowski* held as follows on the facts before it:

> Nasierowski actively pursued and completed a course of action of an inarguably substantial character in an effort to construct a retail and warehouse development on the property. First, and perhaps foremost, he expressly conditioned the purchase of the property on his obtaining a favorable zoning opinion from the City. It is clear that Nasierowski would not have purchased the land unless the City had first advised him that, as of right, he was authorized to develop the parcel along proposed lines. The acquisition of the land was, in and of itself, a substantial act undertaken exclusively upon the City's approval and affirmative encouragement of the proposal.

> *22 Second, Nasierowski expended considerable money and effort in drafting a site plan, submitting it to the City for preliminary approval, petitioning the City for a variance from the specific site plan requirements, and negotiating with the City's planners and engineers in an effort to resolve minor disputes over relatively insignificant matters. These substantial undertakings bear only a vague resemblance to the modest efforts of the landowner in *City of Lansing,* who in 1927 "went no farther than to order the plans and cause a survey to be made of the lot." [citation omitted] The expenditure of the plaintiff in City of Lansing, in contrast to Nasierowski's in the case at bar, was correctly deemed too modest to give rise to a vested property interest. Thus, Nasierowski had a

property interest in the old zoning classification within which his development was permitted. That property interest was securely vested by Nasierowski's engagement in substantial acts in reliance, to his detriment, on representations from and affirmative actions by the City.

Accordingly, the district court's grant of summary judgment in favor of the city is hereby REVERSED. Based on the record as it currently stands, it is evident that Nasierowski should have been granted his motion for summary judgment insofar as he requested an injunction prohibiting enforcement of the new zoning ordinance as against his property.

949 F.2d at 897 (emphasis in original).

The *Nasierowski* case has relevance to several matters at issue in the case at bar. First, while abstention apparently was not raised in *Nasierowski,* it is obvious that the Sixth Circuit did not consider Michigan law to be "unsettled" and had no difficulty relying upon a lower state court case which obviously went beyond the applicable state supreme court case. Second, without citing any Michigan authority, the court had no difficulty in holding that the property's purchase price could be considered in undertaking a vested rights analysis where, as here, the record showed that the subject property was purchased in reliance upon assurances from government officials that the property could be developed consistent with the purchaser's proposal. Third, the other facts upon which the Sixth Circuit relied in concluding that the plaintiff had a property interest in the subject zoning classification are also present in the instant case; i.e., that the landowner had "expended considerable money and effort in drafting a site plan, submitting it to the City for preliminary approval, petitioning the City for a variance from the specific site plan requirements, and negotiating with the City's planners and engineers in an effort to resolve minor disputes over relatively insignificant matters," are likewise present in the case at bar. [FN14]

Defendants also contend that legal uncertainty regarding the interpretation and application of the New Castle County ordinance and Code provisions at issue likewise compels the Court to exercise *Pullman* abstention. The Court disagrees. The inquiry under the second prong of the *Pullman* doctrine is whether the pertinent law "is amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the constitutional issues." *Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 632 (3d Cir.1991), *cert. denied,* 112 S.Ct. 1265 (1992). Because the Court has determined that Delaware state law, wholly independent of pertinent New Castle County law, gives plaintiff a protected property interest in the Westhampton record development plan and DPUD zoning classification, a contrary conclusion with regard to plaintiff's protected property interest under County law "would [not] obviate the need for or substantially narrow the scope of the constitutional issues" at bar.

**\*23** For all of the foregoing reasons, the Court must reject defendants' contention that Delaware law regarding the vested rights and equitable estoppel doctrines is so unsettled that *Pullman* abstention should be exercised.

### d. Substantive Due Process
It is well-settled that the "test for determining whether a law comports with substantive due process is whether the law is rationally related to a legitimate government interest." *Midnight Sessions, Ltd.,* 945 F.2d at 682. It is equally clear, however, at least in land use planning cases involving substantive due process claims, that "allegations that the government's actions in a particular case were motivated by bias, bad faith, or improper motive, such as partisan political reasons or personal reasons unrelated to the merits of the plaintiffs' [land use proposal, or license or building permit] application, may support a finding of a substantive due process violation." *Id.*

Although the Third Circuit has not yet defined "the outer limits of the showing necessary to demonstrate that a governmental action was arbitrary, irrational, or tainted by improper motive," the court has held that summary judgment must not be granted where a plaintiff "present[s] evidence from which a factfinder could reasonably conclude that certain council members, acting in their capacity as officers of [a] municipality improperly interfered with the process by which the municipality issued building permits, and that they did so for partisan political or personal reasons unrelated to the merits of the application for the permits." *Bello v. Walker,* 840 F.2d 1124, 1129 (3d Cir.), *cert. denied,* 488 U.S. 851 (1988).

The Third Circuit concluded in *Bello* that governmental actions that are "arbitrary, irrational,

or tainted by improper motive" "can have no relationship to any legitimate governmental objective, and if proven, are sufficient to establish a substantive due process violation actionable under section 1983." *Id.* at 1129-30. The Third Circuit further concluded, on the particular facts of the *Bello* case, that "[w]hile the defendants claim that the building permit was denied because of plaintiffs' failure to build in numerical sequence, thus presenting an arguably rational ground for the denial of the permit, it is the factfinders' role to resolve this factual dispute." *Id.* at 1130.

With respect to plaintiff's substantive due process claim, defendants contend that County Council had a rational basis for voiding plaintiff's record plan and for rezoning the Property from DPUD to R-1-B. In support of this contention, defendants point to two documents prepared by Planning in connection with the County's 1991-92 effort to void plaintiff's record development plan. (D.I. 32 at 13) Defendants first rely upon the May 22, 1991 memo drafted by Planning official Shuler in which Shuler "identified [various] ... significant issues affecting development of the [Westhampton] site." (D.I. 30, Exhibit B at 1) Defendants apparently suggest that the "significant issues" identified in the May 22, 1991 Shuler memo provided a rational basis for the voiding of plaintiff's record plan. However, in a subsequent memo dated April 2, 1992, Shuler informed County Council that, with one exception, the "significant issues" identified in the May 22, 1991 memo had been resolved and further informed County Council that "the only remaining issue with respect to [Planning's] memorandum of May 22, 1991, is access through the Oakwood Hills subdivision." (D.I. 30, Exhibit C at 2) Although the Shuler memo alleged that plaintiff "has not indicated he will cooperate" to resolve the access issue, the record does not contain any evidence to support this assertion; [FN15] indeed, the record indicates the contrary. (D.I. 55 at A-8, A-18 to A-23, A-27 to A-31, A-33 to A-34, A-47 to A-49, A-66, A-67, A-72, A-73 to A-74, A-87 to A-88; D.I. 61, Exhibit A at ¶¶ 7, 13-18, 25, 35, 36, 38, 43-44) Nor is there any indication on the record that plaintiff was given an opportunity to remedy the Oakwood Hills subdivision access issue "through voluntary revisions to the current plan" prior to County Council's voiding of the Westhampton record development plan.

**\*24** Plaintiff alleges in the case at bar that the entire

process voiding the Westhampton record development plan and rezoning the Property was undertaken by defendants "maliciously" and for "political" and "personal" reasons "unrelated to the merits of the subject record plan[ ] and the zoning depicted thereon." (D.I. 61, Ex. A; D.I. 72 at 12) Viewing the evidence presented in a light most favorable to plaintiff, the Court concludes that it is the factfinders' role to determine whether the governmental actions in issue were "arbitrary, irrational, or tainted by improper motive." *See Midnight Sessions, Ltd.,* 945 F.2d at 683; *Bello,* 840 F.2d at 1129-30; *deBotton v. Marple Township,* 689 F.Supp. 477, 481 (E.D.Pa.1988).

Defendants' motion for summary judgment as to plaintiff's substantive due process claim, therefore, must be denied.

### 2. Procedural Due Process

In *Midnight Sessions, Ltd.,* 945 F.2d at 680, the Third Circuit set forth the following settled principles applicable to procedural due process claims:

To establish a cause of action for a violation of procedural due process, a plaintiff in addition to proving that a person acting under color of state law deprived it of a protected property interest, must establish that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process. *Parratt v. Taylor,* 451 U.S. 527, 537 (1981). Due process requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case," *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1981), and the opportunity to be heard must be at a meaningful time and in a meaningful manner. *Armstrong v. Manzo,* 380 U.S. 545 (1965). However, when a state "affords a full judicial mechanism with which to challenge the administrative decision [regarding zoning, the issuance of a building permit or other similar land use matters]," the state provides adequate due process. *Bello v. Walker,* 840 F.2d at 1128. (Parallel citations omitted).

Defendants contend that summary judgment is proper as to plaintiff's procedural due process claim because plaintiff received adequate "notice and an opportunity to be heard, of which he repeatedly availed himself, at every step of the public process for both the voiding of the record plan and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *24 (D.Del.))

Page 48

rezoning of the property." (D.I. 32 at 10) Defendants further contend that "there is no question that the alleged technical defects could have been challenged in state court by way of a declaratory judgment or injunction action. *See Shellburne, Inc. v. Buck,* 240 A.2d 757, 759 (Del.1968). The state judicial procedures being adequate, there is no procedural due process cause of action." (D.I. 56 at 9)

Plaintiff essentially concedes, and the record indicates, that he received actual notice of County Council's proposed actions with respect to the Property, and the purported reasons therefor, and that he exercised his right to be heard at the various public hearings preceding defendants' voiding of his record plan and rezoning of the Property. (D.I. 54 at 20-21; D.I. 61 at 9) Plaintiff also does not dispute defendants' contention that the Delaware state courts may provide an adequate post-deprivation judicial mechanism for challenging defendants' deprivation of his property interests. Plaintiff's argument in opposition to defendants' motion for summary judgment as to his procedural due process claim is that defendants failed to follow applicable state and local laws in connection with the adoption of the ordinances which effectuated the deprivation of his property interests. (D.I. 54 at 20-21; D.I. 61 at 9)

*25 The Court rejects plaintiff's argument because it is well-settled that a procedural due process claim cannot be grounded on the failure of government officials to follow applicable state and local procedures and regulations governing the deprivation process so long as the plaintiff received constitutionally adequate notice and an opportunity to be heard. *See, e.g., Board of Curators v. Horowitz,* 435 U.S. 78, 92 n. 8 (1978); *Eguia v. Tompkins,* 756 F.2d 1130, 1137-38 (5th Cir.1985); *C & M Group, Inc. v. New Britain Township,* 1991 WL 25684, 1991 U.S. Dist. LEXIS 2239 (E.D.Pa.1991). While it appears from the record that the process leading to the alleged deprivation of plaintiff's property interest may have been accompanied and accomplished by procedural irregularities and possibly unlawful actions, the Court nonetheless finds that plaintiff received constitutionally adequate notices and opportunities to be heard throughout that process. As recently held by another district court in this circuit, "even if [the government officials] acted arbitrarily and failed to base [their] decision on the applicable law and facts,

that goes to substance rather than procedure. It does not amount to a failure to provide adequate procedure." *C & M Group, Inc.,* 1991 WL 25684 at *3, 1991 U.S. Dist. LEXIS 2239 at *8-*9 (citing *Rogin,* 616 F.2d at 692-94). [FN16]

Accordingly, defendants' motion for summary judgment as to plaintiff's procedural due process claim will be granted.

C. Equal Protection

Defendants seek summary judgment as to plaintiff's equal protection claim on three separate grounds. Defendants first contend they are entitled to summary judgment as to this claim because plaintiff's "Complaint is devoid of any specific facts concerning the identities of any other 'similarly situated landowners and developers,' or how the defendants allegedly treated such developers differently from plaintiff. As such, it is facially defective." (D.I. 32 at 14 (citing *Carr v. Town of Dewey Beach,* 730 F.Supp. 591, 611-12 (D.Del.1990))

As an initial matter, the Court must reject defendants' suggestion that plaintiff was required to plead specific allegations regarding how other developers were treated in comparison to him. The *Carr* opinion cited by defendants in support of this assertion contains no such requirement. Further, the Court is not aware of any authorities which required plaintiff, in pleading his equal protection claim, to plead more facts than those contained in the Complaint and Amended Complaint.

Insofar as plaintiff was required to set forth specific facts supporting his constitutional claims brought under 42 U.S.C. § 1983, *see Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1035 (3d Cir.1987), the Court concludes plaintiff has satisfied that requirement. Plaintiff alleges in his pleadings that this is the only instance in which County Council has acted to void an existing record DPUD development plan. The record also indicates that this case may involve the only instance in which County Council has removed a DPUD zoning classification which was subject to a record development plan. Defendants have neither disputed these factual assertions nor presented any evidence refuting plaintiff's claims of unequal treatment. Moreover, since no discovery has been conducted as of yet, defendants' argument in this regard is most

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *25 (D.Del.))

Page 49

likely premature.

*26 Defendants' second argument is that "for purposes of equal protection analysis, the same rational basis test [as applied to substantive due process claims] applies." (D.I. 56 at 12; D.I. 32 at 14-15) The Third Circuit has held that "[t]o prevail on [an] equal protection claim, [the plaintiff] must [demonstrate] that the passage and application of [local] zoning [ordinances] 'so lack rationality that they constitute a constitutionally impermissible denial of equal protection.' " *Rogin v. Bensalem Township,* 616 F.2d 680, 688 (3d Cir.1980) (quoting *New Orleans v. Dukes,* 427 U.S. 297, 305 (1976) (per curiam)). In *Rogin,* the court further posited that dismissal of a plaintiff's equal protection claim is proper unless the governmental authorities' decisions and actions at issue were "so unrelated to the achievement of the Townships's [legitimate] objectives as to be irrational...." 616 F.2d at 689.

Defendants contend that for the same reasons they are entitled to summary judgment as to plaintiff's substantive due process claim, they are likewise entitled to judgment on plaintiff's equal protection claim. The Court rejects this argument for reasons stated above in its analysis of plaintiff's substantive due process claim.

Defendants' final argument is that "[i]n order to assert a viable constitutional claim based on a violation of equal protection, a complaining party must assert disparate treatment based on membership in a protected group." (D.I. 32 at 15) Defendants misconstrue applicable precedent.

Relevant decisions from this circuit and others indicate that it is precisely in cases where the plaintiff does not allege membership in a protected group or suspect classification that it is necessary, in order to succeed on an equal protection claim, for the plaintiff to prove that the defendants' actions "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." *See, e.g., Rogin,* 616 F.2d at 687 n. 29; *Scott v. Greenville County,* 716 F.2d 1409, 1420 (4th Cir.1983); *Redfield v. City of Jersey City,* 1989 WL 4956, *10, 1989 U.S. Dist. LEXIS 529, *28 (D.N.J.1989); *see also Homebuilders Association of Bucks/Montgomery Counties, Inc. v. Borough of Trappe,* 1991 WL 74911, *10, 1991 U.S. Dist. LEXIS 6019, *32 (E.D.Pa. May 3, 1991) ("inquiry under the equal protection clause is whether

Borough has irrationally distinguished between similarly situated classes, [whereas] the question under substantive due process is whether it was irrational for the Borough to have passed the law at all and to have applied it to [this developer]"); *Hidden Creek Stock Farms, Inc. v. Upper Frederick Township Bd. of Supervisors,* 1993 WL 40056, *5, 1993 U.S. Dist Lexis 1747, *17 (E.D.Pa. Feb. 1993) ("When a municipality treats similarly situated landowners differently, and the discrimination is arbitrary or irrational, an equal protection violation arises").

In the case at bar, it is undisputed that defendants have not treated any other landowner in the manner in which they have treated plaintiff. [FN17] Whether the treatment resulted from arbitrary or irrational conduct, viewing the evidence presented in a light most favorable to plaintiff, cannot be resolved on the record as it stands. Therefore, defendants' motion for summary judgment as to plaintiff's equal protection claim must be denied.

D. Legislative Immunity

*27 Members of municipal legislative bodies are entitled to legislative immunity only when both of the following conditions are present: (1) The actions of the legislative body at issue must have been legislative in nature, as opposed to being administrative or managerial; [FN18] and (2) The actions of the legislative body must have been taken pursuant to and in compliance with the statutory procedures specified for such action. [FN19] In support of their motion for summary judgment as to the issue of legislative immunity, defendants (who were members of County Council at all relevant times hereto) have addressed the latter of the two conditions set forth above, but have failed to address sufficiently the former.

Relevant authorities indicate that legislative acts are those which apply generally to the entire community, whereas acts specifically directed at one or a few individuals are executive or administrative acts. *See Donivan,* 835 F.2d at 488; *Rogin,* 616 F.2d at 693; *Ryan,* 708 F.Supp. at 640; *de Botton,* 689 F.Supp. at 482-83; *see also Cutting v. Muzzey,* 724 F.2d 259, 261 (1st Cir.1984) ("[i]f the action involves establishment of a general policy, it is legislative; if the action 'singles out specifiable individuals and affects them differently from other,' it is administrative"); *Scott v. Greenville County,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *27 (D.Del.))

Page 50

716 F.2d at 1422-23 (county council members "assumed non-legislative role" when they did "more than adopt prospective, legislative-type rules and [took] the next step into the area of enforcement"). [FN20]

County Council's adoption of ordinances voiding plaintiff's record development plan and rezoning the Property clearly were acts which involved "not only general policy considerations but also application of that policy to an individual landowner."  It is significant to note in this regard that County Council did not seek to rezone any other property except plaintiff's in connection with the rezoning ordinance at issue.  *Compare Horizon House Development Services, Inc. v. Township of Upper Southhampton,* 1990 U.S. Dist. LEXIS 6081, *15 (E.D.Pa. May 1990) (in finding that county council acted in legislative capacity, court relied upon fact that defendants "did not become involved in a particular issuance of a permit or an individual zoning decision"; rather "they adopted an ordinance that not only regulate[d] plaintiff's homes, but many other categories of group homes as well").  As such, defendants' acts are properly characterized as administrative rather than legislative.  *See Rogin,* 616 F.2d at 693 n. 60.

Even if it were assumed that the defendants have met their burden to show that their actions taken with respect to the Property were of a legislative nature, they have failed to demonstrate that their actions were taken pursuant to and in compliance with specified statutory procedures, at least with respect to the rezoning of the Property. [FN21]

Defendants contend that "[t]here is no question that Council followed all applicable laws in proposing and adopting" the ordinance which rezoned the Property.  (D.I. 32 at 19)  In response to this assertion, plaintiff contends that County Council failed to follow specified procedures regarding the adoption of rezoning ordinances.  In particular, plaintiff posits that County Council failed to comply with the statutory requirements for adoption of ordinances imposed by title 9, section 1152(b) of the Delaware Code.

*28 Code § 1152(b) provides that "[a]fter the public hearing [mandated by this section] the county government may adopt the ordinance with or without amendments or reject it, but if it is amended as to any matter of substance which is not embraced

within the title of the ordinance, the county government may not adopt it until the ordinance or its amended sections have been subjected to all of the procedures ... required [under this section] in the case of a newly introduced ordinance." [FN22] Plaintiff contends that County Council failed to comply with specified statutory procedures because (1) it adopted an amended version of the proposed rezoning ordinance, (2) said amendment went "to a matter of substance which [was] not embraced within the title of the ordinance" as originally proposed, and (3) County Council failed to subject the amended ordinance "to all of the procedures ... required in the case of a newly introduced ordinance." 9 Del.C. § 1152(b).

Defendants respond to this argument by seeking to demonstrate that the amended rezoning ordinance adopted by County Council did not go "to a matter of substance which [was] not embraced within the title of the ordinance" as originally proposed.  As discussed in the foregoing statement of facts, the ordinance County Council originally proposed would have rezoned the Property from DPUD to R-2.  It is undisputed that all notices preceding the hearings regarding the proposed rezoning ordinance and the meeting of County Council at which the amended ordinance was adopted indicated that the proposed ordinance would rezone the Property from DPUD to an R-2 classification.  It also is undisputed that County Council ultimately adopted an ordinance rezoning the Property from DPUD to R-1-B, after receiving the recommendation from Planning that the Property should be rezoned to R-1-B instead of R-2.

Defendants contend that County Council was not required to subject the amended ordinance to the statutorily mandated process for adoption of newly-introduced ordinances because the rezoning ordinance "was not amended substantively;" that the information in the public notices indicating that the proposed ordinance, if adopted, would rezone the Property from DPUD to R-2 was "informational only" and not part of the ordinance title because said language was "in lower case" and bracketed whereas, according to defendants, "[t]he title is clearly that [unbracketed] portion set apart in capital letters." (D.I. 56 at 10)  Defendants' assertion in this regard is without merit.

Evidence of record demonstrates that the title of the proposed ordinance contained information indicating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the rezoning ordinance, if adopted, would rezone the Property from DPUD to R-2. [FN23] Moreover, it cannot seriously be disputed that a change in the proposed rezoning was both "material" and "a matter of substance" since the very purpose of the ordinance was to change the zoning classification of the subject Property.    Indeed, besides the location of the Property, a more material piece of information regarding the rezoning can hardly be imagined.    Rezoning the Property from DPUD to R-1-B clearly was not a matter embraced within the title of the ordinance as originally proposed.

*29 The Court, therefore, finds that County Council was required by Delaware law to subject the amended ordinance to the statutorily mandated process for adoption of newly-introduced ordinances.    Since County Council failed to do so, defendants' contention that County Council followed all statutorily specified procedures in connection with the rezoning process must fail on the record presented.

For the foregoing reasons, the Court concludes that the moving defendants are not entitled to summary judgment on the issue of whether they enjoy legislative immunity in this action as members of County Council.

E. Qualified Immunity

Defendants contend, in the alternative to their legislative immunity defense, that they are shielded from liability by qualified immunity.    It is well-settled that qualified immunity applies only when a defendant's conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "[O]fficials are protected by qualified immunity if 'reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful.' " *Elsmere Park Club Ltd. Partnership v. Town of Elsmere,* 771 F.Supp. 646, 654 (D.Del.1991) (quoting *Good v. Dauphin County Social Serv. for Children and Youth,* 891 F.2d 1087, 1092 (3d Cir.1989)).

In 1992, when County Council enacted ordinances voiding plaintiff's record development plan and rezoning the Property, the vested rights and

equitable estoppel doctrines were clearly established by Delaware state law.    A reasonable official would have realized, in light of the decisional law discussed *supra,* that County Council was precluded by law from enacting ordinances which prevented plaintiff from developing the Property consistent with his record development plan and the DPUD zoning classification.

The Court also finds that a reasonable official would have realized that the County's own laws precluded the actions taken as to the Property.    The record clearly demonstrates that County Council relied upon an unadopted ordinance to apply a repealed Code provision to void plaintiff's record development plan. [FN24] It is self-evident that no reasonable official in defendants' positions at the relevant time could possibly believe that any decision, particularly one which substantively affects the property rights of a citizen, should be based on legislation that the official never adopted. Defendants argue, and make considerable efforts to demonstrate, that language contained in the "savings clause" of the revised DPUD ordinance that actually was adopted by County Council can be interpreted in a manner consistent with County Council and County attorney Mitchell's legal conclusion that said clause provided authority for applying the repealed five-year sunset provision to void plaintiff's record plan.    Whether or not then County Council and its legal advisor would have interpreted the savings provision contained in the adopted ordinance as allowing County Council to apply a repealed Code provision, and whether the members of County Council would have actually voted in favor of the ordinance voiding plaintiff's record plan had they been aware of the language contained in the actual savings clause of the adopted ordinance, is speculative and provides insufficient grounds on which to conclude that qualified immunity is available to the moving defendants.

*30 Under the circumstances at bar, defendants' motion for summary judgment on the issue of qualified immunity must be denied.

V. CONCLUSION

For the reasons stated, defendants' motion for summary judgment shall be denied except as it relates to plaintiff's procedural due process claim.

FN1. Although defendants filed an untimely brief in

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *30 (D.Del.))

opposition to plaintiff's motion for leave to amend on March 31, 1993, said brief was not yet before the Court on April 2 when plaintiff's motion was granted.  On April 5, 1993, defendants filed a letter requesting that the Court vacate its April 2 Order on the ground that said Order mischaracterized plaintiff's motion as "unopposed." (D.I. 67) The Court denied defendants' request in an order issued on April 16, 1993. (D.I. 69)

FN The Court's Order of April 16, 1993 also denied defendants' motion to strike the affidavit of Frank E. Acierno and provided that defendants' pending motion for summary judgment as to the original Complaint would be treated as a motion for partial summary judgment as to plaintiff's constitutional claims raised both in his initial pleading and in his Amended Complaint. (D.I. 69)

FN2. The newly-added party defendant, Michael Mitchell, New Castle County First Assistant County Attorney, is represented by his own counsel and has not formally joined in the other defendants' motion for partial summary judgment.  Therefore, the Court will refer only to the moving defendants as "defendants" in this Memorandum Opinion.

FN3. Then Code § 23-81(21) provided in relevant part as follows:
If construction has not been completed within ... five (5) years after the date of approval of the record development plan for the PUD or the date of approval of the record development plan of the last stage of PUD, if submitted in stages, whichever is longer, then the approval shall be voidable at the discretion of county council, upon recommendation of the department of planning.
(D.I. 81, Exhibit 2 at 20)

FN4. Current Code § 23-81(18) provides in relevant part as follows:
The landowner shall have ten (10) years from the effective date of the original rezoning ordinance to develop the parcel as proposed.  The rezoning ordinance shall contain the expiration date for the zoning date for the zoning classification. If, at the end of ten (10) years, or at the time of requesting revised record plan approval, the parcel has not been fully and completely developed and the landowner desires to proceed under this classification, he must submit, to the department of planning, current support facilities information demonstrating the impact on and availability of traffic, sewers, water and open space.  The department of planning will evaluate the data submitted, consult with the support facilities agencies where deemed necessary, and determine whether such facilities are adequate for the development as originally established.        If the

support facilities are deemed adequate, the landowner can proceed with the development as shown on the original rezoning ordinance.  If the support facilities are determined to be inadequate, only that portion of the development which can be supported by existing facilities will be allowed to proceed and the balance of the development will be staged based upon the availability of support facilities, if at all.
(D.I. 81, Ex. 2 at 20-21)

FN5.  The Court rejects defendants' contention that County Council did not rely upon unadopted Substitute Ordinance No. 1 to 87-025, and the language contained therein, as authority for its interpretation of New Castle County law providing it with discretion to void plaintiff's record plan under the repealed five-year sunset provision, and for defendants' related contention that County Council did not rely upon repealed § 23- 81(21) as the legal authority which provided it with power to void plaintiff's record plan.  The record contemporaneous with County Council's decision to void plaintiff's record plan, as well as the court record in this litigation, clearly show otherwise. (D.I. 55 at A-54, A-69 to A-71 and A-89; D.I. 32 at 7-8; D.I. 56 at 3-4)

FN6.  Defendants contend that the record development plan approved in 1974 is the record plan which County Council voided.  The record indicates, as just mentioned, that the actual "existing" record plan which defendants considered and voided was the record plan which was approved and recorded in 1988. (D.I. 55 at A-27, A-54, A-57, A-60, A-64, A-68, A-93)

FN7.  1981 WL 15144 at *5, LEXIS slip op. at 6 (quoting *Tremarco Corporation v. Garzio*, 161 A.2d 241, 245 (N.J.Super.1960)).

FN8.  1981 WL 15144 at *6, LEXIS slip op. at 6 (quoting 3 Rathkopf, § 10, pp. 57-19 & 20)).

FN9.  Significantly, the court in *New Castle County v. Mitchell* specifically relied upon the *Shellburne v. Roberts* decision in rendering its legal analysis. *Supra* at 4.  Indeed, the court characterized the *Shellburne, Inc. v. Roberts* case as involving "[a]n analogous situation." *Id.*

FN10.  Defendants contend that the "Supreme Court of Delaware [has] reaffirmed the 'permit plus' rule it had adopted in *Shellburne*." (D.I. 75 at 4 (*citing Mayor & Council of New Castle v. Rollins Outdoor Advertising, Inc.*, 475 A.2d 355, 360 (Del.1984)). However, in the *Rollins* case, the Delaware Supreme

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *30 (D.Del.))

Page 53

Court merely reiterated that "under certain circumstances, such as where an owner had made a substantial change of position or a substantial expenditure, a vested right arises from good faith reliance upon a building permit." *Id.* Again, the court did not hold that this is the only circumstance in which a vested right can arise.

Defendants also cite *Willadel Realty, Inc. v. New Castle County,* 270 A.2d 174, 178 (Del.Ch.), *aff'd,* 281 A.2d 612 (Del 1971), a case in which County Council rezoned the plaintiff's property while a building permit application was pending and after the plaintiff already had obtained plan approval from the Department of Planning. Defendants argue that "the Chancery Court held that the lack of a building permit at the time of rezoning was fatal to plaintiff's claim." (D.I. 75 at 4)

In *Willadel,* however, the Chancery Court, after recognizing that under *Shellburne* "(a) the Levy Court may institute a change in zoning on its own initiative, and (b) it may do so even if the owner has obtained a building permit for a use permitted under present classification but forbidden in the proposed classification," simply held that in the case before it the "County government initiated the change without request, ownership had not changed, and, (unlike *Shellburne* ) the owners did not have a permit at the time of rezoning." *Id.* at 278. Significantly, the court went on to point out that the plaintiff there failed to show "any of the kinds of matters which created vested rights as outlined in the Supreme Court's opinion in [*Shellburne* ]," *id., e.g.,* "a substantial change of position, expenditures, or incurrence of obligations."

FN11. Defendants characterize the *Wilmington Materials* case as "an extreme factual situation where an opinion of counsel was given to the developer approving his proposed project under the existing zoning classification." (D.I. 75 at 5) In the instant case, more than involving a situation merely where "an opinion of counsel was given to the developer approving his proposed project under the existing zoning classification," plaintiff received repeated assurances from various County officials, including County Council itself, County attorney Bryde, various Planning officials and others, indicating that his proposed (and approved) development project was and would be allowed under the existing record plan and DPUD zoning classification.

FN12. It should be noted that the entire process leading to these assurances from the County essentially constituted a re-approval process whereby the County gave its approval for plaintiff to develop the Westhampton project and to have the Property classified under the DPUD zoning classification. *See* New Castle County Code § 23- 81(21) (1986);

D.I. 55 at A-15 to A-16.

FN13. On the basis of the Delaware Supreme Court's decision in *Raley v. State, supra,* the Court rejects this latter contention.

FN14. The Court notes that defendants' reliance upon the Sixth Circuit's decision in *Sequin v. City of Sterling Heights,* 968 F.2d 584 (6th Cir.1992), is misplaced because the court there relied upon language from a Michigan Supreme Court case decided subsequent to *Nasierowski,* where the court held that the "test in each case is not whether a little or a lot has been spent in reliance upon past zoning classifications, but, rather, whether there has been any tangible change in the land itself by excavation and construction." *Sequin,* 968 F.2d at 591, *citing Bevan v. Brandon Township,* 475 N.W.2d 37 (Mich.1991). Delaware zoning cases relied upon herein are contrary thereto.

FN15. The April 2, 1992 Shuler memo stated the following with respect to this issue:
Responding to the Department of Planning's inquiry, DelDOT, in a letter dated November 8, 1991 ..., recommended that the Oakridge Road access be deleted from the plan, and that a note be placed on the plan limiting development to 100 units until such time as additional frontage is obtained on McKennans Church Road. The applicant has agreed to place such a note on the plan but, to date, has not been willing to delete the secondary access to Oakridge Road.
(D.I. 30, Exhibit C at 2 (emphasis added))

FN16. Since the Court finds that the deprivation of plaintiff's property interest was " 'preceded by notice and opportunity for hearing appropriate to the nature of [this] case,' " *Midnight Sessions, Ltd., supra* (emphasis added), it is unnecessary to reach defendants' undisputed contention that procedural due process was satisfied here because the Delaware state courts afforded plaintiff with "a full judicial mechanism" for challenging County Council's adoption of ordinances voiding his record plan and rezoning the Property.

FN17. Defendants have submitted evidence indicating that County attorney Mitchell, in another unrelated case, interpreted the savings clause at issue here in a manner consistent with the interpretation set forth in his July 1991 memo to County Council. (D.I. 74) The Court views this evidence as irrelevant to the issue at hand. The question is whether defendants treated similarly situated landowners the same or differently in connection with the voiding of record DPUD development plans

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *30 (D.Del.))

Page 54

and rezoning of DPUD classified property. The evidence supplied by defendants does not indicate that any other similarly situated landowners have had their approved record development plans voided or that other land zoned DPUD has been rezoned in the manner which County Council rezoned plaintiff's land. Development of these factual matters clearly requires discovery.

FN18. *See, e.g., Donivan v. Dallastown Borough,* 835 F.2d 486, 487- 89 (3d Cir.1987); *Abraham v. Pekarski,* 728 F.2d 167, 174-75 (3d Cir.1984); *Ryan v. Burlington County, New Jersey,* 708 F.Supp. 623, 639- 40 (D.N.J.1989).

FN19. *See Abraham,* 728 F.2d at 174-75.

FN20. *See also Jodeco, Inc. v. Hann,* 674 F.Supp. 488, 495 (D.N.J.1987), where the court held as follows:
[T]he appropriate inquiry [is] whether the conduct of the defendant zoning officials involved either the enactment or amendment of zoning legislation or simply the enforcement of already existing zoning laws. Acts performed pursuant to the former are legislative in character and the officials performing them are entitled to absolute immunity, while acts performed pursuant to the latter are administrative, executive, or ministerial and the officials performing them may only receive the protection of qualified immunity. Factored into this equation should be the impact that such official conduct has on the citizens of the municipality. Official acts affecting the community at-large might tip the balance in favor of a finding of legislative conduct, while acts directed at one or a few individuals might be dispositive of executive or administrative conduct.
(Emphasis added)

FN21. As to the process leading to passage of the ordinance voiding plaintiff's record plan, it is clear, as discussed below, that Council failed to follow its own laws.

FN22. It should be noted that New Castle County Code section 23- 85.1(13) imposes the same requirement.

FN23. As related above, in correspondence dated May 27, 1992, Planning official Shuler gave his recommendation that the title of the proposed ordinance include information indicating that, under the proposed ordinance, the subject property would be rezoned "from DPUD (Diversified Planned Unit Development) to R-2 (Agricultural and General Purpose)." (D.I. 55 at A-96) As required by statute, legal notice of the proposed zoning ordinance

appeared in the News Journal on June 20, 1992. (D.I. 55 at A-97, p. 4) Consistent with Shuler's recommendation, the title of the proposed ordinance contained in the notice informed the public that the ordinance, if enacted, would rezone the subject Property from DPUD to an R-2 zoning classification. (D.I. 55 at A-96, A-97 at 4) This evidence directly contradicts defendants' contention that the information regarding the proposed change in zoning classification was not part of the title.

FN24. Significantly, defendants did not call to the Court's attention this fact until the Court required defendants to make available copies of all the legislative materials upon which they relied in support of their motion for summary judgment. Having been ordered to submit the full record, defendants now make a transparent effort to justify County Council and County attorney Mitchell's reliance upon an unadopted ordinance as authority for their position that a repealed Code provision gave County Council discretion to void plaintiff's record plan, by (1) emphasizing that "all parties to this proceeding were construing a version of Ordinance 87-025 which was never adopted by New Castle County Council" (D.I. 82 at 1 (emphasis supplied)); and (2) attempting to set forth a factual explanation in an effort to justify defendant Mitchell and County Council's "good faith, but mistaken" (D.I. 85 at 1) reliance on an unadopted ordinance. (D.I. 80 and D.I. 81)
The Court rejects these efforts for the following reasons: (1) County Council and its official attorney are reasonably charged with constructive knowledge of which version of any ordinance actually is adopted; (2) There is no evidence in the record demonstrating that defendants did not themselves have actual knowledge that they had not adopted Substitute Ordinance No. 1 to 87-025; (3) The record indicates that County attorney Mitchell had actual knowledge as early as 1988, and as recently as April 29, 1993, of the existence of Substitute Ordinance No. 2 to 87-025 and of the fact that said substitute was the adopted version of this ordinance (D.I. 74 and D.I. 74, Exhibit A); (4) When County attorney Mitchell undertook to analyze the effect of the savings provision contained in Ordinance 87-025, he was duty-bound to ensure that the version of the ordinance upon which he relied was an adopted ordinance, as were defendants' counsel at bar when they relied upon unadopted Substitute Ordinance No. 1 to 87-025 in moving for summary judgment; (5) The record indicates that County Council and County attorney Mitchell initially and continuously represented that Substitute Ordinance No. 1 to 87-025 constituted the adopted ordinance language applicable to this issue (D.I. 55 at A-70; D.I. 55 at A-89; D.I. 32 at 7-8; D.I. 56 at 3-4), and that plaintiff and plaintiff's counsel, both in litigation and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1993 WL 215133, *30 (D.Del.))

during the public proceedings before County Council, reasonably relied upon said representations in assuming that the ordinance so represented and relied upon by County Council in voiding plaintiff's record plan in fact was an adopted piece of legislation;   (6) Defendants' explanation of how these events occurred (D.I. 81 and D.I. 80) is insufficient, particularly given the facts just noted regarding Mitchell's actual knowledge regarding the status of Substitute Ordinance No. 1 to 87-025 and Substitute Ordinance No. 2 to 87-025, which raise a genuine issue of material fact as to Mitchell's

knowledge, as well as the knowledge of the moving defendants.

1993 WL 215133 (D.Del.)

Motions, Pleadings and Filings (Back to top)

· 1:92CV00385      (Docket) (Jul. 01, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.