EXHIBIT 3
TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in F.Supp.                                    **Page 1**
1994 WL 827161 (D.Del.)
**(Cite as: 1994 WL 827161 (D.Del.))**
**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Frank E. ACIERNO, Plaintiff,
v.
Phillip CLOUTIER, et al. Defendants.
Frank E. ACIERNO, Plaintiff,
v.
NEW CASTLE COUNTY, Defendant.
Civ. A. Nos. 92-385-SLR, 93-579-SLR.

Dec. 2, 1994.

Thomas S. Neuberger, Wilmington, DE, and John J. Yannacone, Yannacone, Fay, Baldo & Daly, Media, PA, for plaintiff.

Collins J. Seitz, Jr., and N. Richard Powers, of Connolly, Bove, Lodge & Hutz, Wilmington, DE for New Castle County and Council Member defendants; and Barry M. Willoughby, Young, Conaway, Stargatt & Taylor, Wilmington, DE for Michael Mitchell.

*MEMORANDUM OPINION*

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 Before me are defendant New Castle County's [FN1] motions for disqualification, filed pursuant to 28 U.S.C. § 455(a) and (b). (C.A. No. 92-385, D.I. 188; C.A. No. 93-579, D.I. 43) The facts underlying the motions are not in dispute. [FN2]

During the pendency of the litigation at issue, the company by which my husband is employed [FN3] bid for and was awarded a professional services contract by the County which required that the following work be performed: "[F]act finding for a comprehensive master plan for renewal of Brandywine Park." (C.A. No. 92-385, D.I. 199 at 2; C.A. No. 93-579, D.I. 43 at 2) Brandywine Park is a public park which is owned by the City of Wilmington but maintained by New Castle County under a contract which expires in 2009. According to the County, the award of a professional services contract is "discretionary" and must be approved by the County Law Department and the County

Executive before such a contract is executed. However, the decision to award the contract in the first instance was made (in this case) by members of a selection committee, none of whom were members of either the Law Department or the Executive's staff. [FN4] The contract executed by the County and CLRR represents that my husband is the "principal-in-charge responsible for overall project administration and coordination of the work of the consultant team." (*Id.*) Similarly, the Department of Parks and Recreation is responsible for the overall project administration and coordination of the work on the County's side.

II. DISCUSSION

Section 455 of Title 28, United States Code, provides in relevant part as follows:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances: ...

(4) He knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding.

"Financial interest" is defined as an "ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party...." 28 U.S.C. § 455(d)(4). A judge who holds office in an educational, religious, charitable, fraternal, or civic organization, however, is deemed not to have a "financial interest" in securities held by such an organization. 28 U.S.C. § 455(d)(4)(ii). Similarly, a judge who owns government securities is deemed not to have a "financial interest" in the issuer unless "the outcome of the proceeding could substantially affect the value of the securities." 28 U.S.C. 455(d)(4)(iv).

The County contends that disqualification is mandated in this litigation pursuant to § 455(b) because my husband has a "financial and equitable interest in the County by virtue of the current ... professional services contract...." (*Id.* at 5) The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

County further contends that, "through [my] spouse [I] ha[ve] an 'interest that could be substantially affected by the outcome of the proceedings' " under 28 U.S.C. § 455(b)(4). (*Id.*) The County additionally argues that my husband "serves as an advisor or active participant in the affairs of the County within the meaning of [§ 455(d)(4) ]" because the contract between CLRR and the County provides that CLRR "is a consultant to the County." (*Id.*)

*2 In analyzing the County's argument that the CLRR contract is the equivalent to owning a legal or equitable interest in the County, I start with the proposition that governments are fundamentally different entities than are business organizations. This proposition draws support from several different sources.

The United States Supreme Court, for example, in *Berger v. United States,* 295 U.S. 78 (1934), recognized the distinction in comparing the differences between the United States Attorney's office and a private law firm:

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.

*Id.* at 88.

The distinction drawn above was cited as support for the determination that a judge's impartiality could not reasonably be questioned because his son was an Assistant United States Attorney: "It does not seem reasonable to do so in view of the unique nature and obligations of the United States Attorney's office, which does not represent clients, as do private law firms, but rather, the public interest...." Advisory Opinion No. 38 of the Judicial Conference's Advisory Committee on Codes of Conduct (emphasis in original). [FN5]

In *Plechner v. Widener College, Inc.,* 569 F.2d 1250 (3d Cir.1977), the United States Court of Appeals for the Third Circuit had occasion to review 28 U.S.C. § 455(d)(4) in the context of a judge's membership in the American Bar Association

("ABA"). In concluding that membership in the ABA was not a financial interest which required that a judge disqualify himself where the ABA was a party, the court noted:

[T]he definition of "financial interest" ... is part of a carefully constructed, cohesive system that sets standards for disqualification of a judge for economic interest. ... Not all of a judge's economic interests are defined as "financial." ... The "financial interest" of a judge that will disqualify him is his direct legal or equitable ownership interest, no matter how small, in a party or in a subject matter in a proceeding before him. ...

*Id.* at 1262 n. 7. Because the ABA "is not a business corporation, [however,] but a nonprofit organization concerned with improvement of the legal profession and the public good," the court concluded that "[t]he considerations which led to the statutory test of possession of an interest, no matter how small, in a profit corporation are not present here and we think it inappropriate to use that test." *Id.* at 1262 n. 6. Instead, the court determined that "[t]he substantial effect test" utilized in connection with ownership of government securities, § 455(d)(4)(iv), and with "any other interest," § 455(a)(4), was the appropriate test to apply in analyzing disqualification issues involving nonprofit organizations.

*3 Certainly the County, as much as the ABA, is a "nonprofit organization" concerned with the public good. For the reasons which led the Third Circuit to reject a *per se* "ownership" test in *Plechner,* so too do I reject the equation of CLRR's obligation to perform services for a set fee with the kind of legal or equitable interest held in a for-profit, business organization. [FN6]

I turn, therefore, to the County's contention that the pending award of the second phase of the Brandywine Park master plan project [FN7] constitutes an interest "that could be substantially affected by the outcome of the proceeding." In support of its contentions, the County focuses, not on my alleged interest, but on its interest in its decision-making process. According to the County, because "the award of the contract [for the second phase] is a discretionary act of the County,"

[t]he County's decision makers on the award of the contract, from Mr. Husband and Mr. Kapa [of the Department of Parks and Recreation] up the chain of approval to Mr. Danberg [of the County Law

Not Reported in F.Supp.                                                                          Page 3
(Cite as: 1994 WL 827161, *3 (D.Del.))

Department] and County Executive Greenhouse, are placed in the awkward position of deciding whether to approve the phase two [CLRR]/New Castle County contract.

Either way the decision is made, it places the County's representatives in an untenable position. If the County's representatives award the additional work to [CLRR], it creates the perception that they favored [CLRR] because of its principal's relationship with [the court]. If the contract is awarded to another firm, it creates the perception that the County is "punishing" [CLRR] because of [the court's] former rulings adverse to the County.

(*Id.* at 5-6) While that concern may well play a role in some other facet of the disqualification analysis, it is not appropriately analyzed as a "financial or other interest" belonging to me. The outcome of this proceeding is in no way related to the Brandywine Park project. [FN8]

The next contention which requires examination is whether CLRR's role as a paid consultant on a single park project is the equivalent to being "an advisor or active participant in the affairs of the County." Once again, there is no case law directly on point. I find persuasive, however, the analyses applied in the context of a judge's family member being employed by a governmental entity. Referring to the situation where a judge's child is employed by the United States Attorney's office, it has been determined that the judge need not recuse himself from all cases involving the office; clearly, then, there is no requirement that he recuse himself from all cases involving the United States. [FN9] Likewise, in circumstances where a judge's spouse was appointed a member of a state housing authority, the admonition given by the Judicial Conference's Advisory Committee on Codes of Conduct was, "[i]n the event the housing authority should become involved in any litigation, the judge, of course, should not perform any act relating to the litigation involving the exercise of judicial discretion." Advisory Opinion No. 13 (emphasis added). Again, there is no suggestion that the judge recuse himself whenever the state should become involved in litigation; the disqualifying interest was limited in scope to the particular governmental agency which "employed" the judge's family member.

*4 It is undisputed in this litigation that the scope of CLRR's work is limited to a single project overseen

by the Department of Parks and Recreation. It is undisputed as well that the Brandywine Park project is not the subject of, nor is the Department of Parks and Recreation involved in, the litigation at bar. Under these circumstances, to characterize the status of an employee of a paid consultant on a single project as that of an "advisor or other active participant in the affairs of" the County, is tantamount to so characterizing any governmental employee, many of whose work and authority is much broader in scope than that in issue.

The fact that the award of the second phase of the Brandywine Park project is pending and that the County could award the second phase to some firm other than CLRR is not meaningfully distinguishable from situations where disqualification has not been mandated. For instance, when a judge's family member seeks employment in the first instance by or seeks promotion or a pay raise from a governmental entity, the governmental employer necessarily engages in subjective evaluations of such an individual. There is no indication that during any of these evaluative processes, a judge should disqualify himself because of the varied interpretations possibly accorded the government's ultimate determination.

Having analogized my husband's position to that of a government employee, the question remains whether disqualification nevertheless is required pursuant to § 455(a) because my impartiality might reasonably be questioned under the circumstances at bar. [FN10] "In determining whether recusal is required under this provision, [the court] must apply an objective standard," *Edelstein v. Wilentz,* 812 F.2d 128, 131 (3d Cir.1987), that is, "whether a reasonable person, knowing all the acknowledged circumstances, might question the district judge's continued impartiality." *In re School Asbestos Litigation,* 977 F.2d 764, 781 (3d Cir.1992) (emphasis added). As explained by the Third Circuit, because § 455(a) was "designed to promote public confidence in the impartiality of the judicial process," disqualification is required "if there is a reasonable factual basis for doubting the judge's impartiality...." *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155, 162 (3d Cir.1993).

The essential factual basis for the motions filed by the County is that the company by which my husband is employed is performing services (the conceptual organization and design of a park) for the

Not Reported in F.Supp.
(Cite as: 1994 WL 827161, *4 (D.Del.))

public in exchange for a set fee, as overseen by a department of the defendant government. The County contends that this contractual relationship could cause a reasonable person to harbor doubts regarding my impartiality. [FN11]

After a careful consideration of the County's position, I find no reasonable basis for distinguishing the instant situation from that described in Advisory Opinion No. 38, where the United States government is prosecuting a defendant before a court and the government employs the presiding judge's son. Moreover, I do not believe that my husband's contract with the County reasonably brings into question my impartiality beyond what a litigant opposing the County and its current counsel in a federal court might reasonably perceive. By this I refer to the fact that a motion for disqualification of the judges of a court apparently would not be countenanced simply because the defendant's lawyer in the litigation were the son of a prominent member of that court or because he carries the name of his distinguished father or because a courtroom in which argument is heard is dedicated to and named after the father.

*5 Certainly my husband's livelihood--garden planning and design--and connection to the government in this litigation is no less anomalous to a conclusion that my impartiality might reasonably be questioned than the reasonable conclusion that might be drawn from a lawyer's relationship to the federal judiciary. The common denominator between these situations is that courts, like governments, have been established to function impartially and are presumed to do so. If a judge can hear cases brought on behalf of and against the United States when his family member is employed by the United States, my disqualification would not seem mandated when the same circumstances exist except that a local government is involved.

## III. CONCLUSION

For the reasons stated, I conclude that my disqualification is not mandated by the circumstances at bar. Accordingly, the motions requesting such are denied.

An order shall issue forthwith.

FN1. In *Acierno v. Cloutier,* C.A. No. 92-385, the motion for disqualification was filed on behalf of the

County and the individual defendants other than Michael Mitchell. As does the County in its papers, the movants shall be collectively referred to as the "County." Defendant Mitchell also filed a motion for disqualification (D.I. 190), but has relied on the papers filed by the County in support of his motion; therefore, his motion will not be referred to or discussed separately.

FN2. The question of my disqualification allegedly arose as an aside to a discussion between defendant Mitchell and the County's outside counsel, Mr. Seitz. For a more complete description of the origins of the County's position, see the affidavit of M. Edward Danberg. (C.A. No. 92-385, D.I. 196; C.A. No. 93-579, D.I. 56)

FN3. At the time in question, the company was called Coe Lee Robinson Roesch, Inc. The company is now doing business as CLR Design, Inc. For ease of reference, hereafter it will be referred to as "CLRR."

FN4. The selection committee included, among others, representatives from a local citizens' group, the City of Wilmington's Parks Department, and the County's Department of Parks and Recreation.

FN5. In addressing the need to avoid the appearance of partiality, the following additional discussion was included:
If the judge has been on the bench for a number of years or if he is a close friend of one or more members of the bench, an additional problem may arise relating to the son's appearance before the judges of the court. This problem, however, is no different from that encountered when a judge's son or daughter is with a private law firm and must appear before other members of a court. Just as in those other instances, the problem of avoiding the appearance of partiality in this instance must be dealt with depending upon the individual relationships between the son and his father's colleagues.

FN6. The County has cited no case in which the *per se* financial interest rule has been applied to a contractual or employment relationship with a governmental entity. *See, e.g., Davis v. Xerox,* 811 F.2d 1293 (9th Cir.), *cert. denied,* 484 U.S. 966 (1987); *In re Cement Antitrust Litigation,* 688 F.2d 1297 (9th Cir.1982), *aff'd,* 459 U.S. 1191 (1983). The court notes in this regard that even in a business setting, the *per se* ownership test is not always clearly applicable or uniformly applied; *see, e.g.,* Neil A. Lewis, *Justice Breyer Severs Ties To the Lloyd's Syndicate,* N.Y. Times, November 11, 1994, at A24.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 827161, *5 (D.Del.))

Page 5

FN7. The Department of Parks and Recreation has been advised by the County Law Department to take no action on awarding a contract for the second phase of the work until the motion to recuse has been decided.

FN8. In keeping with the distinction made by the Supreme Court in *Berger v. United States,* 295 U.S. at 88, that governments serve different interests than do businesses, the County's decision to award the second phase of the Brandywine Park project should no more be affected by the litigation at bar than should the decision of a federal judge sitting in a criminal case be affected by the fact that the prosecutor employs the judge's son.

FN9. Indeed, there is no authority supporting the proposition that a judge whose spouse is otherwise "employed" by the United States--in Congress or by another agency--need recuse himself unless that particular arm of the government is directly involved in the litigation.

FN10. The County relies in its analysis on Advisory Opinion No. 27. The question presented in that advisory opinion was whether a judge should disqualify himself where a defendant corporation had a lease arrangement as lessee with a trustee and the judge's spouse was the beneficiary of the arrangement. The Advisory Committee determined, first, that the judge's spouse did not have a financial interest in the subject matter in controversy or in a party to the proceeding. Nevertheless, the Committee advised the judge to disqualify himself in the proceeding because his impartiality might reasonably be questioned: "For a judge to preside in a case involving a defendant which pays a substantial amount of rent which eventually is paid or credited to the judge's wife as the sole beneficiary of a trust managed by the lessor as trustee would, in our opinion, be reasonably subject to the claim of an appearance of impropriety on his part and to questioning his impartiality."
The fact that the Committee did not find a financial interest where the judge's spouse, as a sole

beneficiary, received a substantial amount of money from the defendant, supports a similar conclusion under the facts at bar. Moreover, in this case there is no financial interest which could be affected by the outcome of the litigation; regardless of the outcome, CLRR's remuneration is limited by contract. Finally, as will be discussed *infra,* the ultimate conclusion drawn in Advisory Opinion No. 27 is inapplicable to a relationship between a government and its "employee."

FN11. My husband has had in the past, has currently, and hopes to have in the future, contracts to plan and design public gardens with various governmental entities, including the United States, the State of Delaware, the City of Wilmington and the County. This court routinely entertains suits filed by and against these same governmental entities in a variety of contexts, ranging from criminal prosecutions (in the case of the United States) to civil rights actions filed by citizens against the governments (most notably, actions filed under 42 U.S.C. § 1983 by state inmates). If the County's analysis were correct, my husband would effectively be precluded from ever performing work in his area of expertise for any governmental entity unless I disqualified myself whenever such a governmental entity were sued, regardless of the circumstances. Such a draconian application of the disqualification statute to these circumstances is supported neither by the case law or by common sense and cannot be reconciled with commonly accepted exceptions to said statute.

1994 WL 827161 (D.Del.)

Motions, Pleadings and Filings (Back to top)

.          1:93CV00579          (Docket)
(Dec. 17, 1993)

.          1:92CV00385          (Docket)
(Jul. 01, 1992)

END OF DOCUMENT

EXHIBIT 4

TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in F.Supp.
1992 WL 694590 (D.Del.)
**(Cite as: 1992 WL 694590 (D.Del.))**
H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Frank E. ACIERNO, Plaintiff,
v.
Michael MITCHELL and New Castle County,
Defendants.
Civ. A. No. 92-384-SLR.

Dec. 30, 1992.

Carl A. Agostini, Agostini, Levitsky & Agostini,
Wilmington, and John J. Yannacone, Yannacone,
Fay, Baldo & Daly, Media, PA, for plaintiff.

Henry E. Gallagher, Jr., Collins J. Seitz, Jr., and
James D. Heisman, of Connolly, Bove, Lodge &
Hutz, Wilmington, DE, for defendants.

OPINION

SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 Before the Court is a motion filed by plaintiff
Frank E. Acierno for preliminary injunction seeking
an order compelling the issuance of a building
permit for a certain parcel of land consisting of
approximately forty (40) acres situate in New Castle
County, Delaware in the vicinity of the intersection
of Interstate Highway 95 and Route 273 (hereinafter
referred to as the "subject property"), which parcel
is owned by plaintiff. (D.I. 11) Defendants New
Castle County and Michael Mitchell, First Assistant
County Attorney, oppose the issuance of such relief
and have, in turn, filed a motion for summary
judgment. (D.I. 17)

Discovery was conducted on an expedited basis in
connection with plaintiff's motion. [FN1] (D.I. 13)
Briefing on the pending motions was concluded at
the close of the expedited discovery and an
evidentiary hearing was conducted. (D.I. 24) For
the reasons that follow, plaintiff's motion will be
granted and defendants' motion will be denied in
part and granted in part.

II. JURISDICTION

Plaintiff brought suit pursuant to 42 U.S.C. § 1983
[FN2], asserting that defendants' continuing conduct
violates his rights to due process and equal
protection under the Fourteenth Amendment to the
Constitution. [FN3]

Venue is proper in this District under 28 U.S.C. §
1391(b) because all defendants reside in this District
and because the claims asserted by plaintiff arose in
this District.

III. FINDINGS OF FACT

For purposes of these proceedings, the Court makes
the following findings of fact:

1. Plaintiff, in 1971, was the long term lessor of a
large part of a parcel of land consisting of some
forty acres situate in New Castle County and located
near the intersection of Interstate Highway 95 and
Route 273. In 1971, plaintiff also owned in fee
simple a small parcel of land adjoining the leased
tract, which parcel fronts on Route 273. The larger
parcel of land was zoned M-1 under New Castle
County laws and regulations; the smaller parcel was
zoned C-2. *Acierno v. Folsom,* 313 A.2d 904, 905
(Del.Ch.1973), *aff'd,* 311 A.2d 512
(Del.Supr.1975) (litigation involving the property
but not related to the issues in controversy *sub
judice* ).

2. On May 11, 1971, plaintiff filed with the
Department of Planning for New Castle County a
so-called exploratory sketch plan for the
construction of his proposed shopping center as a
preliminary step towards obtaining approval of his
project. This initial plan was then followed up on
August 8, 1971, as required by regulations, with a
preliminary-tentative building plan, which plan was
thereafter disapproved by the Department of
Planning on October 22, 1971. Plaintiff thereupon
appealed to the Planning Board which reversed the
ruling of the Department of Planning. 313 A.2d at
905.

3. Thereafter, on January 24, 1972, a final plan for
plaintiff's contemplated shopping center was filed
with the Department of Planning. On February 24,
1972, however, the Department of Planning denied
approval of plaintiff's final plan: (1) because of its
alleged conflict with the general comprehensive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *1 (D.Del.))

development plan adopted for New Castle County; (2) because the shape of the tract in issue allegedly made it unsuitable for the construction of a shopping center; and (3) because of the impact on the area in question of the increased traffic which would allegedly result from the erection of the proposed shopping center. *Id.*

*2 4. Plaintiff thereupon appealed to the Planning Board, which, after a final hearing, informed plaintiff on April 26, 1972 that it had voted to sustain the Department of Planning's disapproval of plaintiff's plan. *Id.*

5. Thereafter, pursuant to applicable regulations, a hearing on plaintiff's application was held on August 22, 1972 before the County Council of New Castle County ("County Council") at which Dr. V. Eugene McCoy, chairman of the Planning Board, participated in opposing plaintiff's plans, placing on record his opposition to plaintiff's proposed plan and arguing that plaintiff's appeal should be dismissed notwithstanding the fact the he had sat on the application below as chairman of the Planning Board. *Id.*

6. Before a decision was reached by the County Council, however, a stipulation was entered into between County Council, the Planning Department, and plaintiff; under the terms of the stipulation, it was agreed that plaintiff's application would be returned to the Department of Planning for the receipt of additional evidence on those three aspects of plaintiff's proposed shopping center which had previously been identified by the Planning Department. *Id.*

7. Following such rehearing, the Department of Planning found against plaintiff on all three of the questions submitted for consideration. Thereupon, plaintiff again appealed to the Planning Board. *Id.*

8. A hearing was then held by such agency which, after receiving legal advice, decided: (1) 6 to 0 in favor of plaintiff as to the alleged incompatibility of plaintiff's plan with the County's comprehensive development plan; (2) 4 to 2 for plaintiff in overruling the Department's rejection of plaintiff's plan on the ground of unsuitable internal design of his project; and (3) 3 to 3 to sustain the Planning Department's rejection of plaintiff's plan on the ground that it would have an adverse effect on vehicular traffic in the area. *Id.* at 906.

9. After the taking of the vote at the conclusion of the hearing, in which Chairman McCoy and two other Board members voted to affirm the ruling of the Department of Planning, Dr. McCoy announced that the Department's disapproval of plaintiff's plan had been sustained. However, on December 14, 1972, before the Board had filed a written opinion, Mr. Johnson, a Board member who had been absent at the November 21, 1972 hearing, wrote Dr. McCoy that if he had been present at the hearing in question, he would have voted to overrule the Department in all three areas under consideration. *Id.*

10. Plaintiff thereupon again appealed to County Council which, after a hearing held on January 9, 1973, unanimously affirmed the rejection of Mr. Johnson's proffered vote and the counting of Dr. McCoy's vote by the Board, and which, after admitting further evidence on the matters in issue, voted 4 to 3 to sustain the action of the Department insofar as it had rejected plaintiff's plan on the ground of its alleged adverse effect on the flow of traffic in the area. *Id.*

*3 11. Plaintiff appealed the decision to the Court of Chancery of the State of Delaware, which held "the County Council was authorized to 'reach its own conclusion after its own deliberation and review of the record' and to reject a subdivision plan approved by the Planning Board; that, therefore, the 'official tally of the votes at the Planning Board level' was irrelevant." *Acierno v. Folsom*, 337 A.2d 309, 311 (Del.Supr.1975) (reversing an unreported decision of the Delaware Court of Chancery).

12. Plaintiff appealed this decision to the Supreme Court of the State of Delaware. The Supreme Court reversed the lower court's decision, finding that "an approval of the Planning Board was binding upon the Planning Department; that upon such approval the Director of the Department was obliged to certify that the plan was in conformity with the Regulations; and that upon such certification, the County Council was obliged, as a ministerial function, to register its approval for recordation purposes." *Id.* at 313.

13. Having so found, the Court then concluded that there was approval of plaintiff's plan by the Board: "We think there was for the reason that the Chairman of the Board acted unlawfully in denying

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *3 (D.Del.))

the application of the [plaintiff] that he disqualify himself and abstain from sitting in the case." *Id.* at 314.

14. Judgment having been reversed, the cause was remanded for further proceedings consistent with the Supreme Court's decision.

15. By Resolution No. 75-195, adopted by County Council on October 28, 1975, plaintiff's plan was approved: "Plan of 273 Shopping Mall, White Clay Creek Hundred". (D.I. 16, A10)

16. Defendant New Castle County, meanwhile, amended its zoning code regulations by Ordinance No. 71-104, effective November 16, 1971, to exclude commercial uses as permitted uses in M-1 districts. [FN4] (D.I. 18 at 4)

17. Sometime in the "early eighties", plaintiff purchased the subject property. (D.I. 24 at 19)

18. According to the evidence of record, plaintiff submitted a Record Resubdivision Plan in September 1987, which was approved by the Department of Planning in January 1988. Plaintiff submitted another Record Resubdivision Plan in November 1988, which was approved by the Department of Planning in January 1989 and recorded in March 1989. (D.I. 16 at A12; D.I. 24 at 29-32 and Ex. 4)

19. In connection with these Record Plans, plaintiff submitted surveys, drainage area plans, site plans, grading and utility plans, sanitary sewer plans, lines and grades plans, entrance details, and road plans. All of these plans were accepted by the various County and State agencies. (D.I. 16 at A13; D.I. 24 at 29-33 and Ex. 4) Plaintiff expended thousands of dollars in connection with this work. (D.I. 24 at 22-4 and Ex. 3)

20. In addition, plaintiff entered into a sewer/ drainage agreement for the 273 Mall in September 1990 with the Department of Public Works; plaintiff obtained a permit for entrance construction in April 1989 from the Delaware Department of Transportation. Plaintiff also entered into a traffic signal installation and maintenance agreement in June 1989 with the Department of Transportation. (D.I. 16 at A14-21; D.I. 24 at 36-40 and Exs. 5, 6, 7)

*4 21. Also received into evidence were documents

indicating correspondence between plaintiff and/or his contractors and various New Castle County Departments relating to the 273 Mall, dating from 1987. (D.I. 24 at 34-6 and Ex. 5)

22. During the years 1975 to present, all Record Plans for the 273 Mall depicted a commercial use in the M-1 zone. (D.I. 16 at A11; D.I. 24, Ex. 4)

23. During the years 1975 to present, no representative from the Department of Planning informed plaintiff that he could not develop the subject property for commercial use. (D.I. 24 at 51)

24. During the years 1975 to present, the Department of Planning has not formally noticed plaintiff that his Record Plan for the 273 Mall is invalid. (D.I. 24 at 51)

25. During the years 1975 to present, no governmental body has acted to void any of plaintiff's Record Plans for the 273 Mall. (D.I. 24 at 51)

26. By memorandum dated April 18, 1991 from defendant Michael Mitchell to David J. Biloon ("Biloon"), Chief, Development and Licensing Division, Department of Public Works, New Castle County, defendant Mitchell represented that in response to a telephone inquiry from William S. Gee, Esquire, on behalf of a prospective tenant of the 273 Mall, defendant Mitchell initiated a review of the zoning of the subject property. More specifically, plaintiff related the litigation history of the subject property and identified four Record Plans, recorded at Microfilm Nos. 3072, 9073, 9209, and 9669. Defendant Mitchell concluded:

In reviewing the most recent Plan for the 273 Mall, Parcel C, which is a little over one (1) acre in size, is the only portion of the property that is zoned for commercial purposes, being zoned C-2. A sliver of the property fronting on Route 273 is zoned R-1-C, while the remaining 38.20 acres is zoned M-1. Much of the proposed use of the property involves retail sales, a fast-food restaurant and a hotel. These uses are not permitted in an M-1 district. The warehouse use with related retail sales appears, on its face, to be permitted by the Code, but that would depend on the particular use that Mr. Acierno proposes. Nevertheless, the majority of the property is not properly zoned for the apparent intended use of the property. Given

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F. Supp.
(Cite as: 1992 WL 694590, *4 (D.Del.))

that fact, no building permit should be issued for any construction on this site until extensive review and consultation between the Division of Development and Licensing, Department of Planning and Department of Law is initiated and concluded concerning any proposed use. Given the types of tenants that he has approached; *i.e.,* the movie theater chain, it is clear that Mr. Acierno intends to initiate a use of the property that is not in conformity with the New Castle Zoning Code.

In order to implement this directive, a general hold should be placed on any building permits that could be issued for this site. If that cannot be accomplished, all plan examiners and other officials involved in the building permit process should be advised of this situation and ordered to report any application for a building permit directly to you. If Mr. Acierno applies for a Building Permit for the 273 Mall, please contact this Department so that the review discussed above may be initiated.

*5 (D.I. 26, Ex. 13) (emphasis added).

27. The following officials were copied on this memorandum: William W. Bowser, County Attorney; Robert W. O'Brien, Director, Department of Public Works; Bryan C. Shuler, AICP, Director, Department of Planning; and Saurabh Srivastava, Site Management, Department of Public Works.

28. By memorandum dated May 3, 1991 from Biloon to Donald A. Laubach and Joan Taylor, Biloon put into effect defendant Mitchell's request:

Please inform your respective staffs to keep an eye out for any activity, i.e., building permit applications, for either the 273 Mall or Westhampton [another property owned by plaintiff]....

We have been advised by the Law Department that there is a zoning problem at the 273 Mall site. Basically, the site is zoned M-1 which will not support retail shopping uses. At this point in time, I will not try to explain the legal reasons as to why there is a valid Record Plan or why the Record Plan cannot be rescinded by the County; but, never the less [sic], we have been instructed by the Law Department to withhold building permits for any activity....

Both of these sites are currently owned by Frank E. Acierno. Please be sure this information gets placed with the Record Plans in our files for future

reference and again remind your staffs to continually check Record Plans prior to issuance of permits.

(D.I. 16 at A22) (emphasis added).

29. The following were copied on this memorandum: Robert W. O'Brien; Warren S. O'Sullivan; Bryan Shuler; Michael Mitchell; and Thomas J. Fede.

30. By memorandum dated July 9, 1991 from defendant Mitchell to Bryan C. Shuler, Director, Department of Planning, New Castle County, defendant Mitchell related that by letter dated May 15, 1991, Mr. Gee requested that the Department of Planning issue zoning certification for a multi-screen movie theater complex at the 273 Mall. "The parcel is zoned M-1, while his client's proposed use is first permitted in a C-2 district." Defendant once again related the litigation history of the subject parcel and concluded, consistent with his April 18, 1991 memorandum, that plaintiff's Record Plans should not be accorded "any effect inasmuch as they purport to permit that which is not permitted by the Zoning Code." (D.I. 16 at A28) According to defendant Mitchell, the basis for his conclusion rested on application of Article XXI, Section 3, New Castle County Code (codified as § 23-6(a), in the present Code). Defendant Mitchell opined that the November 8, 1971 approval of plaintiff's Preliminary Tentative Plan for the 273 Mall "activated" § 23-6, which provides:

(a) No proposed ordinance to amend the zoning map shall be acted upon by county council within three (3) years after the latest of any of the following actions:....

(3) Prior approval under the subdivision regulations of a preliminary plan involving any parcel of land, or portion thereof, whose zoning classification would be changed by the proposed amendment.... In no event shall the period permitted under this paragraph exceed three (3) years from the earliest approval under the subdivision regulations of a preliminary plan involving such parcel, or portion thereof.

*6 (c) No amendment to the zoning code regulations shall be applicable to any parcel or parcels of land protected by subparagraphs ... (3) ... of subsection (a) of this section during the period of such protection....

(D.I. 16 at A29-31) (emphasis added). According to defendant Mitchell:

Since this property would have been accorded the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *6 (D.Del.))

Page 60

three-year stability protection regarding a proposed rezoning for the site, it also received the protections accorded by Section 23-6(c) of the Code....

The purpose of the three-year "moratorium" provision is to provide stability to the process. In this case, Section 23-6(c) permits a lot owner three (3) years to establish a use that but for a recent Zoning amendment would have been permitted in that district if the particular parcel was protected by Paragraph (1), (3) or (4) of Section 23-6(a). The protection is afforded only for the three-year period and the property owner must establish the non-conforming use during that time. If the use is not established, the Code affords no further protection to that particular parcel. Thereafter, the property owner must comply with the revised provisions of the Zoning Code.

Nor does the recordation of a plan create any rights, vested or otherwise. It is the use that is conferred non-conforming status, not a plan or a permit of any kind. Therefore, since Mr. Acierno did not establish a non-conforming commercial use within the three-year period provided for in Section 23-6(c), he is no longer entitled to establish any commercial use except those very limited instances where such commercial uses are now presently permitted in a M-1 district accessory to the permitted manufacturing/industrial use. (D.I. 16 at A27)

31. By memorandum dated August 6, 1991 from defendant Mitchell to Robert O'Brien, Director, Department of Public Works, defendant Mitchell forwarded his July 9, 1991 memorandum so that Mr. O'Brien could "take appropriate action to ensure that no building permit is issued for any principal commercial use.... Accordingly, would you please take any steps necessary to ensure that no permits are issued for this site until complete review and consultation is accomplished with this Department and the Department of Planning." (D.I. 16 at A32)

32. The following officials were copied on this memorandum:    William W. Bowser, County Attorney; Bryan C. Shuler; and David J. Biloon.

33. During the spring and summer of 1991, plaintiff was negotiating with several prospective commercial tenants, including Mr. Gee's client, General Cinema, and with Caldor, Inc. (D.I. 16 at A33-5; D.I. 26, Ex. 13)

34. In connection with his negotiations with Caldor, Inc., plaintiff, in or about December 1991, submitted an application for a permit to build a Caldor store. By letter dated December 18, 1991 from David Biloon to plaintiff, plaintiff was informed of the following:

Please be advised that New Castle County cannot accept your building permit application for the proposed Caldor Department Store at this site. Commercial ventures of this nature cannot be situated on lands which contain a manufacturing zoning classification. Additionally, the existing Record Plan (Microfilm # 9669) allows for a 70,000 square foot building denoted as Building # 4. The proposed structure is 112,000 square feet. This is also a discrepancy which must be rectified prior to the issuance of any permits.

*7 (D.I. 16 at A34)

35. The following were copied on Biloon's letter: Robert W. O'Brien;    Warren S. O'Sullivan; Saurabh Srivastave; Donald A. Laubach; Michael Mitchell; Bryan C. Shuler;    Caldor Department Stores.

36. In February 1992, plaintiff's temporary erosion and sediment control plan for the 273 Mall site was approved by the State of Delaware, Department of Natural Resources and Environmental Control. (D.I. 24 at 52 and Ex. 12)

37. In May 1992, plaintiff resubmitted his application for a building permit; the accompanying plan provided for a 70,000 square foot building drawn in accordance with County standards. (D.I. 24 at 54 and Ex. 13)

38. On May 27, 1992, Biloon communicated with defendant Mitchell regarding plaintiff's latest application:    "We have another application for the dept. store. This time the building plans agree with the record plan.    What is our next move?" (D.I. 26, Ex. 16)

39. Defendant Mitchell responded immediately: "It is not zoned for a retail department store. He does not get a permit." (D.I. 26, Ex. 14)

40. Biloon replied within the hour:    "What about your meeting with Phil C.? Frankie's boys tell me that Phil told you back off!!!!" (D.I. 26, Ex. 15)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *7 (D.Del.))

Page 61

41. The meeting referred to above occurred in "early '92" with at least the following individuals in attendance: Philip D. Cloutier, then President of New Castle County Council; State Representative Ennis; County Councilman Cecil; defendant Michael Mitchell; and Herbert V. Blackwelder, Jr., a Planner 3 in the Subdivision Section of the Department of Planning. The meeting was not publicly noticed; the primary focus of the meeting was on another of plaintiff's properties, Merchant Square. The 273 Mall site was discussed, however, in the context of plaintiff's negotiations with Caldor, Inc.; apparently, Caldor needed two stores in the County and plaintiff was proposing that his two sites, Merchant Square and the 273 Mall, were appropriate choices for Caldor. According to Mr. Blackwelder.

[n]ear the end of that meeting--I don't know who initiated it--but I believe Mr. Cloutier was aware that the Law Department had raised concerns about the zoning with the 273 site. And, of course, I was aware of it as well at that time. And I indicated to Mr. Cloutier that the Department of Planning was not involved unless a record plan was advanced. And in terms of Mr. Mitchell's opinion, I did not disagree with his opinion. I did express concerns about its implication and wanting to talk to Mr. Mitchell if the Department of Planning was involved in having to review and act on an approved record plan.... My concern was that the opinion might have broader implications beyond this site for other--for other sites, but I don't know whether or not-- you know, I would still have those concerns, once I would have the opportunity to sit down and discuss with Mr. Mitchell his rationale for the conclusion. Since the Planning Department was not involved in having to review and react to a plan or the zoning issue, Mr. Mitchell and I really have not had an opportunity to discuss his opinion at any length at all.

*8 (D.I. 31 at 40-1) (emphasis added).

42. A permit number was assigned to the project, then voided by Biloon. (D.I. 24 at 55-6 and Ex. 13)

43. By letter dated June 4, 1992, Biloon advised plaintiff that

New Castle County still cannot accept your building permit application for the proposed 70,000 square foot Caldor Department Store at this site. The situation noted in my December 18, 1991, letter to you regarding the conflict between the proposed commercial use and the manufacturing

zoning classification for the property remains unchanged. Please refer all questions and future correspondence regarding this matter to the New Castle County Law Department.

(D.I. 16 at A36)

44. The following were copied on the letter: Robert W. O'Brien; Warren S. O'Sullivan; Saurabh Srivastava; Bryan C. Shuler; Michael Mitchell; Donald A. Laubach; A. Norman Paul; and Caldor Department Stores.

45. Caldor located its stores elsewhere. (D.I. 24 at 63)

46. Through October 15, 1992, the date of defendant Mitchell's continued deposition, he had not met with William R. Bowser, the County Attorney, or with any other official regarding his July 9, 1991 opinion. (D.I. 26 at 182; D.I. 31 at 40-1)

47. In deposition, Biloon testified that in May 1991, "the only indication [his Department, Public Works] had that there was a problem with the acceptability of the recorded plan was a legal opinion that was received from the Law Department." (D.I. 32 at 14) Biloon could not recall ever having "a plan certified after recordation". (D.I. 32 at 17) Biloon testified with respect to defendant Mitchell's relationship with plaintiff:

I can recall discussing the--how can I say it? The fact that Mr. Mitchell has been involved with Mr. Acierno over time now on numerous issues involving enforcement of County code and County law to get compliance with code that I administer as well as the Complaints Department administers primarily. And those dealings have not been, you know, a very--on a very friendly basis all the time, let alone professional. And it's--you know, it was a known fact that, you know, there were not good relationships between those two people. There was a lot of consternation because of the County's efforts to get Mr. Acierno to comply and his unwillingness in cases to comply. So, I mean, you know, that's a known fact.

What is a known fact?

That Mr. Acierno and Mr. Mitchell obviously do not like each other. Okay. Based on lot of the discussions and things that have gone on.

Yes.

And I think the--if I ever used that type of terminology, whether it was with Mr. Skurlock or

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *8 (D.Del.))

Page 62

Mr. O'Sullivan, it was probably just in a context of reinforcing a statement that it's known that those two people don't like each other and which makes administration of County codes from my side sometimes a lot more difficult.

Why does it make your job more difficult?

With the--I guess I would say that with the involvement that Mr. Mitchell and I have in discussing the application of the code, I think it is sometimes apparent that some of the decisions that are made at my level and other levels in the County are Mr. Mitchell's personally rather than Mr. Mitchell's interpretation of the code or professional decisions or even my decision or someone else's decision based on getting his opinion. And I think there have been some very straightforward answers and decisions made that are just reinforcement of my interpretation or someone else's interpretation of the code that have been offered by Mr. Mitchell that have not been in the--met with Mr. Acierno's favor and that's why we have problems.

*9 (D.I. 32 at 57-9) (emphasis added).

48. In testimony proffered at the October 9, 1992 hearing, a tenant in another of plaintiff's commercial projects stated that his building permit had been held up by Biloon; a permit was finally authorized on August 12, 1992, with Biloon saying: "Screw Mitchell's agenda. I am going to issue the permit, and I will deal with him later." (D.I. 24 at 10)

49. Defendant Mitchell testified during his deposition that, although he issued a directive to the Department of Public Works in April 1991 that "no building permit should be issued for any construction on [plaintiff's 273] site", based solely on the articulated fact that the M-1 zoning classification, as amended, does not permit commercial uses, his "conclusion was not reached until the July 9, 1991 memorandum to Bryan Shuler", when Section 23-6 was mentioned for the first time. (D.I. 26 at 155-57)

50. Section 23-6 has never before been applied to invalidate a recorded plan. (D.I. 30 at 74-8)

III.  MOTION  FOR  PRELIMINARY INJUNCTION

A. Standard of Review

It is beyond dispute that "the grant of injunctive

relief is an 'extraordinary remedy, which should be granted only in limited circumstances.' " *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir.1989), *citing, Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir.1988). Thus, in ruling on a motion for a preliminary injunction, this Court must consider:

(1) the likelihood that the [movant] will prevail on the merits at final hearing; (2) the extent to which the [movant] is irreparably harmed by the conduct complained of; (3) the extent to which the [nonmoving party] will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191-92 (3d Cir.1990). As recently reaffirmed by the United States Court of Appeals for the Third Circuit, an

injunction should issue only if the [movant] produces evidence sufficient to convince the ... [C]ourt that all four factors favor preliminary relief.

*Merchants & Evans, Inc. v. Roosevelt Bldg. Products, Co.*, 963 F.2d 628, 632-33 (3d Cir.1992). *See also, Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d at 800, *quoting Re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982).

B. Reasonable Probability of Success on the Merits

Plaintiff in his request for injunctive relief asserts that his constitutionally protected rights to substantive and procedural due process and to equal protection of the laws have been violated by the conduct by defendants Mitchell and New Castle County. Because the Court concludes that plaintiff has established a reasonable probability of success on the merits of his substantive due process claim, the remainder of plaintiff's claims will not be addressed in this portion of the Opinion.

*10 In connection with his substantive due process claim, plaintiff alleges that defendant Mitchell used his official position as First Assistant County Attorney in order to carry out his personal agenda against plaintiff.

In a series of cases starting with *Heritage Farms, Inc. v. Solebury Township*, 671 F.2d 743 (3d Cir.), *cert. denied*, 456 U.S. 990 (1982), the Third Circuit has recognized a cause of action under 42 U.S.C. §

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *10 (D.Del.))

Page 63

1983 based on allegations that public officials "have used their governmental offices ... to destroy plaintiffs' constitutional rights to conduct a legitimate business." *Id.* at 748. In *Bello v. Walker,* 840 F.2d 1124 (3d Cir.), *cert. denied,* 488 U.S. 851 and 868 (1988), the Court found that plaintiffs in that case had

> presented evidence from which a fact finder could reasonably conclude that certain council members, acting in their capacity as officers of the municipality improperly interfered with the process by which the municipality issued building permits, and that they did so for partisan political or personal reasons unrelated to the merits of the application for the permits. These actions can have no relationship to any legitimate governmental objective, and if proven, are sufficient to establish a substantive due process violation actionable under section 1983.

*Id.* at 1129-30. The Court distinguished *Bello* from an earlier case, *Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023 (3d Cir.), *cert. denied,* 482 U.S. 906 (1987), finding that the "plaintiff in *Pace* did 'not present a case involving actions aimed at this developer for reasons unrelated to land use planning.' " *Id.* at 1129.

More recently, in *Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d 1195 (3d Cir.1992), the Third Circuit once again acknowledged a cause of action under 42 U.S.C. § 1983 based upon allegations that the defendants, Lower Gwynedd Township and the five members of the Township's Board of Supervisors, applied certain local land use ordinances maliciously in order to deprive plaintiff of its federal constitutional and statutory rights. In its discussion, the Court distinguished its decision in *Midnight Sessions, Ltd. v. Philadelphia,* 945 F.2d 667, 682-83 (3d Cir.1991), *cert. denied,* 112 S.Ct. 1668 (1992), a case involving the legality of land use ordinances, not the abusive application of such ordinances. *Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d at 1202.

Based on the case law recited above, this Court also has recognized that an official's "deliberate and arbitrary decision to delay or deny issuing a building permit may violate a developer's substantive due process rights." *Elsmere Park Club Ltd. Partnership v. Elsmere,* 771 F.Supp. 646, 649 (D.Del.1991). *Accord Epstein v. Whitehall,* 693 F.Supp. 309, 314 (E.D.Pa.1988).

Instantly, there is evidence of record supporting plaintiff's allegations that there was personal antagonism between defendant Mitchell and plaintiff and that defendant Mitchell, on his own authority, directed the Department of Public Works in April 1991 that "no building permit should be issued for any construction on this site until extensive review and consultation between the Division of Development and Licensing, Department of Planning and Department of Law is initiated and concluded concerning any proposed use." (D.I. 26, Ex. 13) (emphasis added). Defendant Mitchell issued his internal directive without notice to plaintiff, although defendant had knowledge that plaintiff was going forward with development plans based on commercial uses. Defendant Mitchell issued his internal directive without the benefit of "extensive review and consultation" with his supervisor or other agency. Indeed, when plaintiff applied for a building permit in December 1991 and again in May 1992, the permit was denied without any further review or consultation having been conducted by defendant with any other County official or agency. (D.I. 26 at 182; D.I. 31 at 40-1)

**\*11** Defendant Mitchell responds to these facts by arguing that any question of personal motive is irrelevant unless the Court determines that his legal opinion is arbitrary and irrational. The Court so concludes.

Looking to section 23-6(c) of the County Code, the subsection applied by defendant Mitchell against plaintiff in the case at bar, two conditions precedent must exist to invoke the provisions of this subsection. First, there must be an "amendment to the zoning code regulations" applicable to the subject parcel of land. This condition precedent was satisfied; Ordinance No. 71-104 amended, *inter alia,* the zoning code regulations pertaining to the M-1 zoning classification to eliminate lesser commercial uses as permitted uses within a zoned manufacturing district. Second, the subject parcel of land must be "protected by subparagraphs (1), (3) and (4) of subsection (a) of this section during the period of such protection...." Defendants argue that plaintiff was "protected" under subparagraph (3); the Court disagrees.

Subsection (a) of section 23-6 is applicable only where: 1) an "ordinance to amend the zoning map"

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *11 (D.Del.))

Page 64

has been "proposed" but not enacted by County Council; and 2) a developer has obtained "[p]rior approval under the subdivision regulations of a preliminary plan involving [his] parcel of land ... whose zoning classification would be changed by the proposed amendment ..." to the zoning map. The record at bar demonstrates that no amendments to the zoning map were ever proposed or enacted in connection with the subject property; it has been zoned M-1 at all times relevant to this litigation. Therefore, subsection (a) of section 23-6 was never applicable to plaintiff's parcel of land and plaintiff was never "protected" under the provisions of subsection (a). Consequently, section 23-6 has no relevance whatsoever to the facts at bar; as a matter of statutory construction, defendant Mitchell's conclusion to the contrary is simply wrong. [FN5] Consequently, the Court may infer, based upon defendant Mitchell's singular and clearly erroneous application of section 23-6 combined with the undisputed record evidence of defendant's personal animus toward plaintiff, that defendant Mitchell's legal opinion was in fact influenced by his personal feelings and that plaintiff's building permit application was denied for reasons unrelated to the merits of the application.

Defendants argue in opposition to the issuance of a preliminary injunction that the conduct of record does not constitute the "policy or custom" of the defendant New Castle County because neither Biloon nor defendant Mitchell had "final policymaking authority" with respect to the denial of the building permit; rather, the Board of License Inspection and Review is the final policymaking authority to determine the grant or denial of a building permit. (D.I. 18 at 24-7)

Defendants correctly state the law as characterized by this Court in *Carr v. Dewey Beach*, 730 F.Supp. 591 (D.Del.1990), citing *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988):

*12 [T]he four guiding principles for determining municipal liability [are, "f]irst ..., municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, 'that is, acts which the municipality has officially sanctioned or ordered.' Second, only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability. Third, whether a particular official has 'final policymaking authority' is a question of state law.

Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business."

730 F.Supp. at 606 (emphasis in original). [FN6] This Court in *Carr v. Dewey Beach* recognized, further, that a county "policy" may be "inferred from a 'single decision taken by the highest officials responsible for setting policy in that area of the government's business.' " *Id.*, citing *Praprotnik*, 485 U.S. at 123.

Defendants, however, misstate the issue of state law to be one of the issuance of building permits. The real, underlying issue at bar is one of zoning, that is, whether plaintiff's Record Plans are valid under the County's current zoning regulations. The final policymaking authority with respect to zoning issues, according to the Delaware Supreme Court in *Acierno v. Folsom*, 337 A.2d at 313, is the Planning Department or the County Council. Officials from both of those agencies were informed of defendant Mitchell's opinion invalidating plaintiff's Record Plans as not conforming to the County zoning regulations and implicitly ratified and adopted such opinion as County policy by their inaction.

The facts of record indicating defendant Mitchell's personal animosity towards plaintiff, combined with notice to the County's final policymaking authorities on zoning issues, are sufficient to establish a reasonable probability of success on the merits of plaintiff's substantive due process claim.

C. Irreparable Harm

It is evident from the record that plaintiff alleges economic losses in connection with his claims that defendants deprived him of his constitutional rights to due process and equal protection under the laws. Plaintiff claims other harm as well, however, including damage to his reputation as a business person and lost capacity to develop as a result of lost time and tenants due to the instant controversy, county limitations on development, and competing development. (D.I. 24 at 64-8)

As recognized by the Third Circuit, "[i]rreparable harm 'must be of a peculiar nature, so that compensation in money alone cannot atone for it.' ... Grounds for finding irreparable injury include loss of control of reputation, loss of trade and loss of good will." *Opticians Ass'n of America v.*

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *12 (D.Del.))

Page 65

*Independent Opticians,* 920 F.2d at 195.

The Court finds the facts of record sufficient to demonstrate irreparable harm clearly distinguishable from purely economic losses.

## D. Balance of Hardships

**\*13** In weighing the possibility of harm to other interested parties from the granting of the injunction, and the public interest, *Opticians Ass'n of America,* 920 F.2d at 196, several factors support the Court's conclusion that the form and magnitude of the relief contemplated by the Court are justified under the Third Circuit's preliminary injunction standards. First, there is no evidence of record that the granting of preliminary injunction relief will in any way harm defendants; indeed, it is in the public interest to have the county code applied in an evenhanded manner. Further, as recognized by the Delaware Supreme Court in *Acierno v. Folsom,*

> [p]roperty holders are entitled to know, with a reasonable degree of certainty, the legal rules and regulations, the legal processes and procedures, governing them in the use of their property. To the extent reasonably possible, the rights and obligations of a property holder under the law should be clear; and the consequences of a course of action, duly adopted and followed by him under existing law, should be predictable.

337 A.2d at 314. It is significant to note in this regard that plaintiff has utilized for the last twenty years the appropriate mechanisms provided by defendant New Castle County for public review of his Record Plans, only to have those Plans essentially invalidated by way of an unpublished memorandum authored by a nonelected official without the opportunity for public review or scrutiny.

## E. Summary

Plaintiff has demanded that a building permit issue. According to the evidence of record, the only obstacle to the permit's issuance was the reliance of the Department of Public Works, in the person of David Biloon, on the legal opinion of defendant Mitchell. (D.I. 24 at 136-37) Given this Court's conclusion that said legal opinion, although sanctioned by the County's final policymaking authorities on zoning issues, is erroneous as a matter of law, defendant New Castle County, within ten (10) days of the issuance of this Opinion, will direct

the Department of Public Works to complete a review of plaintiff's May 1992 building permit application within twenty (20) days; said review to be conducted consistent with the findings herein. Fed.R.Civ.P. 65(d) (an order granting an injunction "is binding … upon the parties to the action, their officers, agents, servants, employees, and attorneys….").

## IV. SUMMARY JUDGMENT

### A. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to a summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." "A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The appropriate inquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

### B. Qualified Immunity

**\*14** Defendants have filed a motion for summary judgment grounded on various theories. First, defendant Mitchell claims that he is entitled to qualified immunity because the question of statutory construction was unclear; therefore, according to defendant, his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Under this standard, rights are considered "clearly established" if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). As explained by this Court in *Elsmere Park Club Ltd. Partnership v. Elsmere,* 771 F.Supp. at 654, "if there is no case directly addressing the type of

conduct at issue, officials are protected by qualified immunity if 'reasonable officials in the defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful.' " *See also Good v. Dauphin County Social Services for Children & Youth,* 891 F.2d 1087, 1092 (3d Cir.1989). This is an objective standard.

As of the spring of 1991, the Third Circuit had issued its decisions in *Heritage Farms, Inc. v. Solebury Township, supra,* and *Bello v. Walker, supra.* Therefore, there was case law in the spring of 1991 standing for the proposition that a developer's constitutional right to substantive due process may be violated by the conduct of public officials, if such conduct is "arbitrary, irrational, or tainted by improper motive." *Bello v. Walker,* 840 F.2d at 1129. Defendant Mitchell issued his directive in April 1991 to deny plaintiff any building permits for any construction on the subject property without mention of section 23-6 of the County Code; plaintiff's building permit application was denied in December 1991 and again in May 1992 based solely on defendant's interpretation of section 23-6, without the benefit of consultation with his supervisor or any other County official and without the benefit of defendant's having spoken with plaintiff or inspected the site. Until defendant Mitchell issued his directive in April of 1991, no County or other official had questioned the validity of plaintiff's various Record Plans for the 273 Mall since the first recordation was ordered by County Council in November 1975. Until defendant Mitchell issued his "opinion" in July 1991, no County or other official had ever applied section 23-6 against a developer to invalidate his Record Plans.

The Third Circuit, in *Schrob v. Catterson,* 948 F.2d 1402, 1421 (3d Cir.1991), has stated that immunity protects "all but the plainly incompetent or those who knowingly violate the law." The Court need not decide which description is applicable to the facts at bar, given its conclusion that a reasonable official, especially one who deals with land use issues on a regular basis (D.I. 30 at 9-13), would have known that such singular conduct, rather than promoting "stability" of "the process" (D.I. 16), falls within the scope of the substantive due process cases discussed above. As a result, defendant Mitchell is not entitled to qualified immunity for his acts and defendants' motion for

summary judgment is denied in this regard.

C. Procedural Due Process

*15 Plaintiff argues that defendants' denial of a building permit based on the first-time application of a county regulation as interpreted in an unpublished memorandum constitutes a denial of property without predeprivation due process. (D.I. 1, Count I) Defendants respond that there is no process under section 23-6: "Section 23-6(c) is not affirmatively 'enforced' in the same sense as are provisions of the zoning code generally. Rather, it is a basis on which a landowner such as Mr. Acierno can claim an exemption or protection for a period of three years from the County's enforcement of a zoning code provision which has been amended.... It was incumbent upon the plaintiff, not the County, to establish that an exception applies which grants plaintiff an exemption from currently applicable law." (D.I. 34 at 1-2) Defendants cite to the appeal procedure set forth in 9 Del.C. § 1363 and Code § 2-44 as the proper remedy to rectify any legal error allegedly committed by defendants. [FN7] (D.I. 18 at 14-5)

The Third Circuit has held that the constitutional requirement for adequate due process is satisfied when a state or other governmental entity "provides 'reasonable remedies to rectify a legal error by a local administrative body.' " *Bello v. Walker,* 840 F.2d at 1128, *citing Cohen v. Philadelphia,* 736 F.2d 81, 86 (3d Cir.), *cert. denied,* 469 U.S. 1019 (1984). Therefore, in order for a plaintiff to establish a procedural due process claim, he must " 'set forth behavioral or structural allegations from which [the court] can infer that process was unconstitutional.' " *Id.* (emphasis added), *citing Rogin v. Bensalem Township,* 616 F.2d 680, 694 (3d Cir.1980), *cert. denied,* 450 U.S. 1029 (1981) (emphasis added).

The Court concludes that plaintiff in the case at bar has set forth behavioral allegations of unconstitutional process sufficient to defeat defendants' motion for summary judgment. Twenty years ago, plaintiff followed the process afforded by the County mechanisms to appeal denial of his subdivision plan. Four years of process (i.e., litigation) later, the Delaware Supreme Court affirmed the validity of plaintiff's plan and the County, through its process, ordered in 1975 (some four years after Ordinance 71-104 had gone into

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *15 (D.Del.))

Page 67

effect) that plaintiff's plan be duly recorded. For the next fifteen years, plaintiff followed the County's process in recording amended plans and in getting appropriate approvals for auxiliary services consistent with the approved amended plans. It was not until defendant Mitchell, of his own accord, determined that the County's process was essentially meaningless and unreliable, that plaintiff went outside the process provided to obtain relief from this Court.

Defendants argue that "mere recordation of a plan does not confer on the landowner a permanent vested right to carry out the plan irrespective of subsequent zoning changes." (D.I. 18 at 21; see also D.I. 34 at 3). Defendants cite no Delaware case authority in support of this proposition.

*16 The Court concludes that defendants' position, in fact, is not consistent with recent Delaware law. *See, e.g., Wilmington Materials, Inc. v. Middletown,* 1988 WL 135507, 1988 Del.Ch. LEXIS 157 (Del.Ch.1988). The court in that case recognized a cause of action based on plaintiff's claim that it substantially relied upon the then-current zoning classification at the time of its building permit application and, thereby, obtained a vested right that could not be abrogated by an adverse change in the zoning classification. Also recognized was the equitable estoppel doctrine: "Under the estoppel doctrine, a municipal government or zoning authority may be estopped from exercising its zoning powers where a property owner, relying in good faith upon an act of a municipal government, has made a substantial change in its position, or has incurred such extensive obligations and expenses, that it would be highly inequitable and unjust to subject the owner to the zoning change." 1988 Del.Ch. LEXIS 157 at 19. *See also Dragon Run Farms, Inc. v. Board of Adjustment,* 1988 WL 90551, at *2, 1988 Del.Super. LEXIS 297 (Del.Super.1988) at 7 ("Although the doctrine of equitable estoppel has traditionally not been favored when sought to be applied against a governmental entity, ... it is accepted that in certain circumstances estoppel may be raised to prevent the municipality from enforcing zoning codes."); *Raley v. Stango,* 1988 WL 81162, 1988 Del.Ch. LEXIS 105 (Del.Ch.1988).

Based on the case law recited above and the record evidence, the Court concludes that plaintiff has properly stated a cause of action sufficient to overcome defendants' motion for summary judgment.

D. Equal Protection

Plaintiff contends that he has been denied equal protection under the laws because section 23-6 of the County Code has never been applied to any other developer. (D.I. 1, Count I) Defendants concede this is the case, but respond by arguing that it is plaintiff's burden to come forward with evidence of similarly-situated developers in order to demonstrate that he was in fact treated differently for arbitrary reasons.

Assuming for purposes of these proceedings that defendants' analysis is correct, nevertheless, their motion for summary judgment on this ground is premature. The Court in this case ordered expedited discovery in connection with plaintiff's motion for injunctive relief. In order for plaintiff to succeed in his request for injunctive relief, he needed to demonstrate a probability of success on the merits of only one claim. Defendants' moving for summary judgment on all claims before full discovery has been completed deprives plaintiff of the opportunity to meet his burden under Fed.R.Civ.P. 56(c). *See Carr v. Dewey Beach,* 730 F.Supp. at 611-12.

E. Intentional Interference with Prospective Economic Advantage

Defendants move for summary judgment on the ground that the County and Municipal Tort Claims Act, 10 Del.C. §§ 4010-4013 (the "Act"), immunizes defendant Mitchell from plaintiff's damages claim (D.I. 1, Count III) for tortious interference with prospective economic advantage. [FN8] The statute in question provides in relevant part that

*17 a governmental entity shall not be liable for any damage claim which results from: ... (2) The undertaking or failure to undertake any judicial or quasi-judicial act, including, but not limited to ... refusal to grant ... any license [or] permit.... [or] (3) The performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the ... ordinance ... under which the discretionary function or duty is performed is valid or invalid.

10 Del.C. § 4011(b)(2) & (3). Plaintiff has not responded to this argument.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *17 (D.Del.))

Since plaintiff's claim presumably is based upon the denial of a building permit in December 1991 and again in May 1992, "it is precisely the type of claim the Act was intended to bar. The fact that the actions taken by the [County] and its employee may have been wrongful does not prevent defendants from asserting their immunity." *Carr v. Dewey Beach,* 730 F.Supp. at 601. There are no allegations nor evidence of record indicating that the claim at issue comes within one of the exceptions provided by the Act. [FN9] Therefore, the entry of a summary judgment in favor of the defendant Mitchell on plaintiff's damages claim for tortious interference with prospective economic advantage is granted.

## F. Mandamus

Plaintiff requests that the Court grant a writ of mandamus compelling defendants to issue the subject building permit, alleging in this regard that he has a "clear legal right and entitlement to the issuance of the subject building permit" and that the defendant New Castle County "has a [purely ministerial] duty to issue the subject building permit." (D.I. 1, Count II) Given the Court's conclusions above, granting plaintiff the injunctive relief requested but dismissing his pendent state tort law claim, defendants' motion for summary judgment will be granted as to plaintiff's pendent mandamus claim.

## IV. CONCLUSION

For the reasons stated, plaintiff's motion for a preliminary injunction is granted. Defendants' motion for summary judgment is denied as to Count I and granted as to Counts II and III of the complaint.

An Order consistent with this Opinion shall issue.

> FN1. During the course of discovery, defendants refused to produce certain documents on the ground that such documents were protected by the attorney-client privilege. Similarly, defendant Mitchell refused to answer certain questions at his initial deposition based on his assertion of the attorney-client privilege. Plaintiff objected to defendants' assertion of the privilege. (D.I. 30 at 19-20, 27, 55-9)
> Plaintiff at bar alleges generally that defendant Mitchell used his office as First Assistant County Attorney to infringe on plaintiff's constitutional rights to substantive and procedural due process and

equal protection of the laws. Accordingly, defendant Mitchell's conduct is at issue in circumstances where his legal opinion and the communications related to that legal opinion were initiated by public inquiry (not by defendant New Castle County) about a member of the public, plaintiff. These circumstances indicate that the "real" client is the public. *Cf. Fausek v. White,* 965 F.2d 126, 129-30 (6th Cir.), *cert. denied,* 113 S.Ct. 814, 121 L.Ed.2d 686 (1992) (In finding that a corporation claiming the privilege was not entitled to invoke it, the court found it significant that "a corporation 'is an entity which in the performance of its functions acts wholly or partly in the interest of others' and that it was those 'others' who were seeking access to the substance of the communications in question."). The evidence of record at the time of the hearing (D.I. 16 at A1-37; D.I. 32 at 58-60) supported plaintiff's allegations that defendant Mitchell's conduct was motivated by a personal agenda rather than the objective goals of the fair administration of government regulations. I, therefore, ordered the production of the withheld documents and the redeposition of defendant Mitchell. (D.I. 21)
Subsequent to my instruction requiring production of the withheld documents, it became evident that some of the documents claimed by defendants to be privileged had already been made a part of the record at bar. (*See* D.I. 16 at A22-8; D.I. 26) Having inspected the documents and the deposition transcripts (D.I. 26, 30, 31, 32), I conclude that strong public policy counsels against defendants' invocation of the attorney-client privilege in this case and that said materials will be made part of the public record.

> FN2. Section 1983 reads, in relevant part, as follows: "Every person who, under color of any statute, ordinance, or regulation, custom or usage of any state or territory or the District of Columbia, subjects, or causes to be subject, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the parties injured in an action at law, sued in equity, or other proper proceedings for redress ... "

> FN3. The Fourteenth Amendment provides, in relevant part, as follows: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1992 WL 694590, *17 (D.Del.))

Page 69

FN4. In 1971, the larger parcel of the subject property was (and still is today) located in a M-1 district. Prior to the enactment of Ordinance No. 71-104, every use permitted in a commercial district was also permitted in a manufacturing district

FN5. Defendants cite to caselaw from the First Circuit, *PFZ Properties, Inc. v. Rodriguez,* 928 F.2d 28 (1st Cir.1991), for the proposition that "rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process." *Id.* at 31. According to the First Circuit, official conduct does not rise to the level of a constitutional deprivation of an individual's right to substantive due process unless: 1) government power has been used for "purposes of oppression"; 2) government power has been so abused as to "shock the conscience"; or 3) the official conduct is "legally irrational in that it is not sufficiently keyed to any legitimate state interests". *Id.* at 31-2. Plaintiff does not proffer, nor does the record at bar support, an allegation of oppressive official conduct. The record does evidence an abuse of official position that comes close to the mark of shocking the conscience. It is the third and final test, however, that finds substantial support in the record. Defendant Mitchell, without consultation or extensive review (public or private), applied a singular, tortured interpretation of a statute against plaintiff--a statute never before applied affirmatively against anyone, here applied against plaintiff, an individual developer whose zoning classification has been reviewed periodically for more than 15 years by the County which never before raised a zoning question. Even under defendants' standards, then, the record is sufficient to convince the Court that plaintiff has carried his burden of proof on his substantive due process claim.

FN6. This analysis is applicable to county governments as well as municipalities. *Pembaur v. Cincinnati,* 475 U.S. 469 (1986).

FN7. 9 Del.C. § 1363 is an enabling statute which empowers the County to establish by ordinance a

Board of License Inspection and Review, to which the County's denial of any license or permit may be appealed. The County established such a Board by an ordinance codified at New Castle County Code § 2-43. The appeal procedure is set forth in Code § 2- 44, as follows:

(b) Any person aggrieved ... [b]y the issuance, transfer, renewal, refusal, suspension, revocation or cancellation of any county license [defined to include any permit] ... shall, upon request and within ten (10) days thereof, be furnished with a written statement of the reasons for the action taken.

(c) Within twenty (20) days of the action taken ... the person aggrieved may file an appeal with the board of license inspection and review ....

(d) Upon the filing of an appeal ... the board shall cause public notice of the time and place of a public hearing on such appeal to be published. The public hearing shall be conducted within forty-five (45) days of the filing of the appeal....

(f) The board may affirm, modify, reverse, vacate or revoke the action appealed; provided, that such action shall be affirmed by the board if the action was not arbitrary or capricious and was taken pursuant to law.

FN8. The Court notes that the Act is inapplicable to plaintiff's federal claims under 42 U.S.C. § 1983. *Carr v. Dewey Beach,* 730 F.Supp. at 601 n. 8.

FN9. Section 4011(c) of the Act provides that "[a]n employee may be personally liable for acts or omissions causing property damage, bodily injury or death in instances in which his or her governmental entity is immune under this section, but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent."

Motions, Pleadings and Filings (Back to top)

.                1:92CV00384                (Docket) (Jul. 01, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.