EXHIBIT 5
TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in F.Supp.                                          **Page 6**
1994 WL 720273 (D.Del.)
**(Cite as: 1994 WL 720273 (D.Del.))**
►

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Frank E. ACIERNO, Plaintiff,
v.
NEW CASTLE COUNTY, Defendant.
Civ.A. No. 93-579-SLR.

Feb. 11, 1994.

Thomas Neuberger, Wilmington, DE, and John J.
Yannacone, of Yannacone, Fay, Baldo & Daly,
Media, PA, for plaintiff.

Collins J. Seitz, Jr., and N. Richard Powers, of
Connolly, Bove, Lodge & Hutz, Wilmington, DE,
for defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

*1 Before the Court are cross motions filed by the
parties at bar. Plaintiff Frank E. Acierno has filed a
motion seeking preliminary injunctive relief [FN1]
(D.I. 2), claiming that defendant New Castle County
violated his constitutional right to substantive and
procedural due process of law and equal protection
under the law. Defendant responds by filing a
motion to dismiss or, in the alternative, to stay,
based upon the doctrine of abstention. (D.I. 13)

## II. JURISDICTION

Plaintiff has brought suit pursuant to 42 U.S.C. §
1983, [FN2] asserting that defendant's continuing
conduct violates his rights under the Fourteenth
Amendment to the Constitution. [FN3] This Court,
therefore, has jurisdiction pursuant to 28 U.S.C. §§
1331 and 1343(3).

Venue is proper in this District under 28 U.S.C. §
1391(b) because the defendant resides in this District
and because the claims asserted by plaintiff arose in
this District.

## III. PROCEDURAL HISTORY

This case represents the latest chapter in litigation
initiated in this Court by plaintiff in July 1992,
pursuant to 42 U.S.C. § 1983. *Acierno v. Michael
Mitchell and New Castle County,* C.A. No.
92-384-SLR (D.Del.1992) ( *"Acierno I"* ). By
motion filed in September 1992, plaintiff sought
preliminary injunctive relief in the form of the
issuance of a building permit for the 273 Property,
asserting that defendants' continuing conduct in
denying him the permit violated his right to due
process and equal protection under the Fourteenth
Amendment to the Constitution. After expedited
discovery and an evidentiary hearing, the Court
entered a preliminary injunction against New Castle
County concluding as follows:

> According to the evidence of record, the only
> obstacle to the permit's issuance was the reliance
> of the Department of Public Works, in the person
> of David Biloon, on the legal opinion of defendant
> Mitchell. (D.I. 24 at 136-37) Given this Court's
> conclusion that said legal opinion, although
> sanctioned by the County's final policymaking
> authorities on zoning issues, is erroneous as a
> matter of law, defendant New Castle County,
> within ten (10) days of the issuance of this
> Opinion, will direct the Department of Public
> Works to complete a review of plaintiff's May
> 1992 building permit application within twenty (20)
> days, said review to be conducted consistent with
> the findings herein. Fed.R.Civ.P. 65(d) (an order
> granting an injunction "is binding ... upon the
> parties to the action, their officers, agents,
> servants, employees, and attorneys....").

*(Acierno I,* D.I. 37 at 28-9)

Defendants filed an appeal from the Court's
Opinion and Order of December 30, 1992;
however, defendants did not file a motion to stay
proceedings in this Court during the pendency of
their appeal. Nonetheless, the permit did not issue
timely because defendant New Castle County found
that plaintiff's building permit application was
incomplete and his building design plans failed to
comply with the New Castle County Building Code.
*(Acierno I,* D.I. 70, Ex. A)

*2 On February 1, 1993, plaintiff filed a motion
with this Court seeking an order to show cause why
defendant New Castle County should not be held in
contempt of the December 30, 1992 Order. A

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *2 (D.Del.))

further evidentiary hearing was held in April 1993, and by Memorandum Opinion and Order issued July 7, 1993, this Court concluded that "defendant New Castle County violated both the letter and the spirit of the Court's December 1992 Order...." (*Acierno I,* D.I. 83 at 15.) The Court declined at that juncture to enter a finding of civil contempt, however, in order to allow the administrative process to conclude. (*Id.*) Apparently, defendant New Castle County thereafter complied with the terms of the injunction and a building permit issued. *Acierno v. Mitchell,* 6 F.3d 970 (3d Cir.1993) at 973 n. 8.

Prior to plaintiff's engaging in any "earth-disturbing activity" on the 273 Property, the United States Court of Appeals for the Third Circuit vacated this Court's judgment and remanded with instructions to dismiss without prejudice. *Acierno v. Mitchell,* 6 F.3d at 978. More specifically, the Third Circuit held plaintiff's claims to be premature:

We agree the County has made a final decision with respect to plaintiff's development plans. Plaintiff submitted three plans depicting commercial development on the M-1 portion of the property. The Department of Planning and the County Council accepted those plans, which are final decisions under state law and the County's zoning ordinance. *See Acierno v. Folsom,* 337 A.2d 309, 313 (Del.1975) (planning board has "final decision" to approve development plans). There has been no action by any authoritative body to reverse these actions, and thus we assume without deciding plaintiff has a property interest in his plans under Delaware law.

* * *

Plaintiff need only secure a final decision from the Board of Adjustment on his application for a building permit before his claims are mature. Because plaintiff has secured a final decision on his development plans, he need not seek a variance. Ordinance § 23-85(3), or rezoning, Ordinance § 23-85.1(1)-- which distinguishes this case from *Williamson* and *Taylor.* In *Williamson,* a local planning commission rejected a preliminary development plat under its zoning regulations. 473 U.S. at 181-82.... In *Taylor,* the zoning officer revoked the use permit and maintained the intended use was not proper under the Township's zoning ordinance. 983 F.2d at 1288. Because local officials had determined the intended uses were not appropriate under the relevant zoning ordinances in

both cases, plaintiffs' claims were not ripe until they sought variances from those ordinances. *See Williamson,* 473 U.S. at 188 ...; *Taylor,* 983 F.2d at 1288. Here, the Department of Planning and County Council approved plaintiff's development plans and approved commercial development on the property. The County has done nothing to revoke the approval. Plaintiff will have a "final" decision once the Board of Adjustment renders its decision. If the Board determines commercial development is prohibited under the amendment, plaintiff's application for a building permit will have been conclusively rejected and his § 1983 claims will be ripe.Fn

*3 Fn.Although plaintiff may appeal for judicial review of the Board of Adjustment's decision, Del.Code Ann. tit. 9, § 1353(a), he need not do so before his § 1983 claims are ripe. A claim is "final" after the Board of Adjustment has rendered a decision. As we noted in *Taylor,* "[f]inality does not require state court review of the board's decision." 983 F.2d at 1293 n. 12.
6 F.3d at 975, 976-77 and n. 17.

This Court dismissed plaintiff's case without prejudice by Order issued October 28, 1993. (*Acierno I,* D.I. 92)

Plaintiff filed an appeal with the New Castle County Board of Adjustment pursuant to 9 Del.C. § 1352(a); Ordinance § 23-84. By decision rendered verbally on December 16, 1993, the Board affirmed the decision of the Department of Public Works, Division of Development and Licensing, to deny plaintiff's building permit application. (Plaintiff's Exhibit, "P.Ex.," 2) The following morning, plaintiff filed his complaint and motion for a preliminary injunction in this Court. (D.I. 2) Defendant New Castle County likewise filed suit on December 17, 1993; more specifically, New Castle County filed in the Court of Chancery of the State of Delaware a complaint for declaratory relief "that defendant Frank E. Acierno ... does not have a right to proceed with commercial development plans on certain property (the "273 Property") which is zoned M-1 (manufacturing)." (P.Ex. 5)

IV. FINDINGS OF FACT

The following findings of fact incorporate record evidence from the following proceedings: *Acierno v. Mitchell,* C.A. No. 92-384-SLR (D.Del.) ("*Acierno 1* "); *Acierno v. Cloutier,* C.A. No.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8
(Cite as: 1994 WL 720273, *3 (D.Del.))

92-385-SLR (D.Del.) ("*Acierno II* ");    *In Re:*
*Appeal of Frank E. Acierno,* No. 93-1015-A (New
Castle County Board of Adjustment, January 14,
1994); [FN4] and *United States v. Slawik,* Cr.A.
No. 92-93-SLR (D.Del) ("*Slawik* ").

A. Historical Facts

              1. 273 Property
1. Plaintiff, in 1971, was the long term lessor of a
large part of a parcel of land consisting of some 40
acres situate in New Castle County (the "County")
and located near the intersection of Interstate
Highway 95 and Route 273. In 1971, plaintiff also
owned in fee simple a small parcel of land adjoining
the leased tract, which parcel fronts on Route 273.
The larger parcel of land was zoned M-1 under New
Castle County laws and regulations; the smaller
parcel was zoned C-2. [FN5] *Acierno v. Folsom,*
313 A.2d 904, 905 (Del.Ch.1973), *aff'd,* 311 A.2d
512 (Del.Supr.1975) (litigation involving the
property but not related to the issues in controversy
*sub judice* ).

2. On May 11, 1971, plaintiff filed with the
Department of Planning for New Castle County
("Planning") a so-called exploratory sketch plan for
the construction of his proposed shopping center as a
preliminary step towards obtaining approval of his
project. This initial plan was then followed up on
August 8, 1971, as required by regulations, with a
Preliminary Tentative Plan, which plan was
thereafter disapproved by Planning on October 22,
1971. *Id.* at 905. On October 26, 1971, plaintiff
appealed Planning's adverse decision to the County
Planning Board, as required by regulations. In the
meantime, New Castle County Council ("County
Council") was considering zoning changes which
would prohibit commercial uses in wholly industrial
zones (zoned M-1). The County was due to act on
the proposal on November 9, 1971. "The matter of
timing was of understandable concern to [plaintiff's]
counsel, which concern he expressed.    A special
meeting of the [County Planning] Board was
convened, in fairness to [plaintiff], on November 8,
1971 to consider his appeal.    By [a] four-to-one
vote on that date, the Preliminary Tentative Plan
was approved...." (D.I. 19 at 181)

*4 3. Thereafter, on January 24, 1972, a final plan
for plaintiff's contemplated shopping center was
filed with Planning.    On February 24, 1972,
however, Planning denied approval of plaintiff's

final plan: (1) because of its alleged conflict with
the general comprehensive development plan
adopted for New Castle County; (2) because the
shape of the tract in issue allegedly made it
unsuitable for the construction of a shopping center;
and (3) because of the impact on the area in question
of the increased traffic which would allegedly result
from the erection of the proposed shopping center.
*Acierno v. Folsom,* 313 A.2d at 905.

4. Plaintiff appealed to the County Planning Board
which, after a final hearing, informed plaintiff on
April 26, 1972 that it had voted to sustain Planning's
disapproval of plaintiff's plan. *Id.*

5. Thereafter, pursuant to applicable regulations, a
hearing on plaintiff's application was held on August
22, 1972 before County Council at which Dr. V.
Eugene McCoy, chairman of the County Planning
Board, participated in opposing plaintiff's plans,
placing on record his opposition to plaintiff's
proposed plan and arguing that plaintiff's appeal
should be dismissed, notwithstanding the fact the he
had sat on the application below as chairman of the
County Planning Board. *Id.*

6. Before a decision was reached by County
Council, however, a stipulation was entered into
between County Council, Planning, and plaintiff;
under the terms of the stipulation, it was agreed that
plaintiff's application would be returned to Planning
for the receipt of additional evidence on those three
aspects of plaintiff's proposed shopping center which
had previously been identified by Planning. *Id.*

7. Following such rehearing, Planning found
against plaintiff on all three of the questions
submitted for consideration.    Plaintiff again
appealed to the County Planning Board. *Id.*

8. A hearing was then held by such agency which,
after receiving legal advice, decided: (1) 6 to 0 in
favor of plaintiff as to the alleged incompatibility of
plaintiff's plan with the County's comprehensive
development plan; (2) 4 to 2 for plaintiff in
overruling Planning's rejection of plaintiff's plan on
the ground of unsuitable internal design of his
project; and (3) 3 to 3 to sustain Planning's
rejection of plaintiff's plan on the ground that it
would have an adverse effect on vehicular traffic in
the area. *Id.* at 906.

9. After the taking of the vote at the conclusion of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *4 (D.Del.))

Page 9

the hearing, in which Chairman McCoy and two other Board members voted to affirm the ruling of Planning, Dr. McCoy announced that Planning's disapproval of plaintiff's plan had been sustained. However, on December 14, 1972, before the Board had filed a written opinion, Mr. Johnson, a Board member who had been absent at the November 21, 1972 hearing, wrote Dr. McCoy that if he had been present at the hearing in question, he would have voted to overrule Planning in all three areas under consideration. *Id.*

*5 10. Plaintiff again appealed to County Council which, after a hearing held on January 9, 1973, unanimously affirmed the rejection of Mr. Johnson's proffered vote and the counting of Dr. McCoy's vote by the Board, and which, after admitting further evidence on the matters in issue, voted 4 to 3 to sustain the action of Planning insofar as it had rejected plaintiff's plan on the ground of its alleged adverse effect on the flow of traffic in the area. *Id.*

11. Plaintiff appealed the decision to the Court of Chancery of the State of Delaware. Defendants (members of the New Castle County Council as then constituted and the then Director of Planning) in that case raised the allegation for the first time (March 1973) that "plaintiff's land [was] improperly zoned"; plaintiff contended in response that Planning had admitted that plaintiff's land was "accorded 'grandfather' status under the prior code which permitted shopping centers in M-1 areas." (D.I. 19 at 18)

12. Defendants argued the following in their responsive brief:
Defendants submit that the argument is appropriate to a motion for summary judgment on the affirmative defenses raising the defense of failure to state a claim. If the M-1 zoning classification of plaintiff's land does not permit the shopping center use in plaintiff's proposed Final Plan, then plaintiff cannot obtain an order of this Court directing approval since the zoning would not support that use in any event. Furthermore, the Complaint recognizes the importance of the argument for in paragraph 3 plaintiff alleges that "no rezoning is necessary in order for a shopping center to be constructed." Thus, the allegation actually first was raised by plaintiff in the Complaint as a prerequisite to jurisdiction and/or to the relief he requests. The so-called Exhibit A attached to plaintiff's brief is not properly before

this Court since it has not been submitted by affidavit and has not been identified authentically. In any event, the final determination of the matter must be made judicially no matter what administrative determination may have been suggested by the Department of Planning. It is submitted, therefore, that the affidavits placed before this Court by defendants show that a substantial part of plaintiff's land is zoned M-1 and does not permit a shopping center use.
(D.I. 19 at 30) (emphasis added).

13. The Court of Chancery determined that "the question of zoning, which defendants have sought to raise here, was not considered by any of the several defendants in connection with plaintiff's application for approval of his building plans and will not be considered here." (D.I. 19 at 33) The Court of Chancery also held that "County Council was authorized to 'reach its own conclusion after its own deliberation and review of the record' and to reject a subdivision plan approved by the Planning Board; that, therefore, the 'official tally of the votes at the Planning Board level' was irrelevant." *Acierno v. Folsom,* 337 A.2d 309, 311 (Del.Supr.1975) (reversing the unreported decision of the Court of Chancery).

*6 14. Plaintiff appealed this decision to the Supreme Court of the State of Delaware. By decision rendered March 14, 1975, the Supreme Court reversed the lower court's decision, finding that "an approval of the Planning Board was binding upon the Planning Department; that upon such approval the Director of the Department was obliged to certify that the plan was in conformity with the Regulations; and that upon such certification, the County Council was obliged, as a ministerial function, to register its approval for recordation purposes." *Id.* at 313.

15. Having so found, the Court then concluded that there was approval of plaintiff's plan by the Board: "We think there was for the reason that the Chairman of the Board acted unlawfully in denying the application of the [plaintiff] that he disqualify himself and abstain from sitting in the case." *Id.* at 314.

16. Judgment having been reversed, the cause was remanded for further proceedings consistent with the Supreme Court's decision.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *6 (D.Del.))

17. After review by Planning and the New Castle County Department of Law in order to ensure that Planning "follow[ed] the letter of the subdivision regulations in processing [plaintiff's] Record Plan submission" (*Acierno I*, D.I. 93), plaintiff's plan was approved by County Council by Resolution No. 75- 195 adopted on October 28, 1975: "Plan of 273 Shopping Mall, White Clay Creek Hundred." (*Acierno I*, D.I. 16, A10)

18. Defendant New Castle County amended its zoning code regulations by Ordinance No. 71-104, effective November 16, 1971, to exclude commercial uses as permitted uses in M-1 districts. [FN6] (*Acierno I*, D.I. 18 at 4)

19. Sometime in the "early eighties", plaintiff purchased the 273 Property. (*Acierno I*, D.I. 24 at 19)

20. According to the evidence of record, plaintiff submitted a Record Resubdivision Plan in September 1987 for the 273 Property. The plan proposed to: a) subdivide the property into three parcels; b) change building locations and sizes to accommodate the present market; and c) correct drafting errors along some boundary courses. This resubdivision was the subject of a memorandum dated January 26, 1988, from Charles D. McCombs, II, of Planning to plaintiff's engineers, Mann-Talley, in which a specific notation is made:

6. Provide a note referencing previous court action that permitted commercial development in the M-1 zoning district.

*In Re: Appeal of Frank E. Acierno*, No. 93-1015-A (New Castle County Board of Adjustment, January 14, 1994) (D.I. 19 at 119).

21. A note consistent with Planning's instruction was included on the plan. On February 26, 1988, New Castle County Planning Director Wayne Grafton approved the plan for recording. (D.I. 19 at 119) On May 15, 1988, Grafton approved a land development plan for "Hampton Inn" on a parcel zoned M-1. The *Acierno v. Folsom* case was noted. (D.I. 19 at 212)

22. In November 1988, plaintiff again submitted a resubdivision plan to: "revise buildings & parking for buildings 1, 2, & 3" and to "correct drafting errors along some boundary courses." This resubdivision was approved by Grafton's signature on March 7, 1989 and was identified as Micro No.

9669. That resubdivision plan depicted, among other uses, a detached 70,000 square foot building, designated on the plan as "building 4" located in the parcel zoned M-1. The *Acierno v. Folsom* case was noted. (D.I. 19 at 213)

*7 23. During the years 1987 through 1989, record evidence indicates that plaintiff submitted at least drainage calculations, a drainage area plan, and an entrance plan in connection with the "proposed hotel" situated on a parcel zoned M-1. (*Acierno I*, P.Exs. 4, 5)

### 2. Westhampton Property

24. On October 5, 1984, plaintiff purchased as well a parcel of land comprising approximately 38 acres situate in New Castle County, Delaware (the "Westhampton Property"). Plaintiff purchased the Westhampton Property for a price of over $1,000,000. As of April 1971, the Westhampton Property had a zoning classification referred to as "diversified, planned unit development" ("DPUD"). On April 11, 1974, a major land development plan for the Westhampton Property had been approved and recorded by the County. The approved record development plan provided for the development of a 322-unit apartment complex [FN7] together with development of .87 acres of land for commercial use.

25. The Westhampton Property's DPUD zoning classification and the fact that the Westhampton Property was the subject of an approved record development plan were critical factors in plaintiff's decision to purchase the property. Plaintiff "paid a premium of approximately [$900,000] in reliance upon the DPUD zoning classification and the fact that the property was the subject of an approved record plan." (*Acierno II*, D.I. 61, Ex. A at ¶ 3; *Acierno II*, D.I. 55 at A-3)

26. Prior to closing for the purchase of the Westhampton Property, plaintiff, through a realtor, sought and received assurances from Planning regarding the current zoning and record plan status of the Westhampton Property. Correspondence supplied in response to plaintiff's request contained the following assurances:

The land is still currently zoned Diversified Planned Unit Development (DPUD). The status of the record plan is that it is current and, therefore, the uses permitted are noted on the plan subject to limitations regarding the density,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *7 (D.Del.))

Page 11

commercial area, etc.
(*Acierno II*, D.I. 55 at A-6)

27. Plaintiff's representatives, on or around October 21, 1985, filed with Planning a revised development plan for the Westhampton Property. ( *Acierno II*, D.I. 55 at A-8) Planning officials then directed plaintiff's engineers to make certain modifications and updates to the development plan. (*Acierno II*, D.I. 55 at A-8)

28. On or around December 17, 1985, County Council issued Resolution No. 85- 443 requesting, "pursuant to Section 23-81(21) of the [then] New Castle County Code," "that the Department of Planning give County Council a recommendation to consider voiding the existing record development plan for the project previously known as 'the Maples Apartments,' now known as 'Westhampton' in Millcreek Hundred." (*Acierno II*, D.I. 55 at A-10) [FN8] The purported bases for this request were that County Council (1) "[was] concerned with DPUD rezonings which have not been developed in a timely fashion"; (2) "[was] acutely [sic] interested in the quality of life in the county" and "housing density has a direct impact on that quality"; (3) "wishe[d] to have proper review of traffic, water and sewer facilities in support for the [Westhampton] project"; and (4) "desire[d] to have the subject project reviewed by the Subdivision Advisory Committee in light of the character of the existing neighborhood." (*Acierno II*, D.I. 55 at A-10)

*8 29. The record indicates that the only property having an approved record DPUD plan subject to County review at that time was the Westhampton Property at issue. (*Acierno II*, D.I. 55 at A-10) There is no record of any consideration by the County of voiding the record development plan for the Westhampton Property prior to plaintiff's purchase thereof, although the record shows that the status of said plan was "current" and "approved" for ten years prior to plaintiff's purchase of the Westhampton Property. (*Acierno II*, D.I. 55 at A-3 to A-4, A-6)

30. In response to County Council's request for "a recommendation to consider voiding the existing record development plan for" the Westhampton Property, Planning reported to County Council as follows:

As directed by ... Resolution [No. 85-443], this

Department has reviewed your request and has solicited comments from Artesian Water Company, New Castle County Department of Public Works, and [DelDOT], Division of Highways. Attached are their responses. [D.I. 55 at A-12 to A-14] In all three cases, they have indicated that adequate capacity exists to serve this project, recorded as a Major Land Development Plan for The Maples (Microfilm No. 2600). Accordingly, this Department sees no reason to recommend that you consider voiding [said] Record Plan.
(*Acierno II*, D.I. 55 at A-11)

31. Approximately two months later, then County Council's attorney Gary Bryde sent a memorandum to County Council regarding Resolution No. 85-443. The memorandum states the following:

After review of the January 14, 1986 memo of Wayne W. Grafton, Director of Planning, to you and Council, it is my opinion that there is nothing remaining for Council to consider with regard to Resolution No. 85-443. Accordingly, I suggest that a letter or memo be sent to the Department of Planning indicating that it should now continue its review process in its normal course.

My opinion is based upon Section 23-81(21) of the New Castle County Code, the memo of Scott A. Green, County Attorney, to Wayne W. Grafton dated 12/9/85, and the memo of Richard A. Hauge, Assistant County Attorney, to the Honorable Deborah Boulden dated 12/3/85.

The operative language of Section 23-81(21) as it applies to the matter is as follows:

"If construction has not been completed ... within five (5) years after the date of approval of the record development plan for the DPUD ... then the approval shall be voidable at the discretion of county council, upon recommendation of the department of planning.

This language indicates that the Department must affirmatively support the voiding of a record plan before Council's discretion comes into being. Without such prerequisite support, Council has no discretion to act. If this were not the case, review by the Department would be meaningless.

As part of its review as requested by Council's resolution relating to this ordinance, the Department actually solicited and received very similar input to that requested for approving a proposed final record plan. The letters supplied by Artesian Water, the Department of Public Works and the Division of Highways all indicate that adequate capacities presently exist for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *8 (D.Del.))

Page 12

proposed project. Thus, had the record plan been voided, the plan would have been subject to virtually the same review that it has just received. Therefore, the safeguards to prevent stale development have been met.

*9 (*Acierno II*, D.I. 55 at A-15 to A-16)

32. On March 11, 1986, County Council President Karen Peterson informed plaintiff that "according to the opinion" of County Council's attorney "regarding the status of Resolution No. 85-443," " 'there is nothing remaining for Council to consider with regard to Resolution No. 85-443.' " (*Acierno II*, D.I. 55 at A-17) The correspondence further explained that County Council had "not received any other ordinances or resolutions to be placed on Council's agenda with regard to this matter." ( *Acierno II*, D.I. 55 at A-17)

33. During the period from approximately March 1986 to December of that same year, plaintiff revised the development plan for the Westhampton Property in order to address concerns raised by the County regarding the planned use of the development site. (*Acierno II*, D.I. 61, Ex. A at ¶¶ 7, 13-16) On or around June 4, 1986, Planning informed plaintiff and other interested parties that his revised and updated record plan, referred to as "SLD 85-343 (Westhampton)," "Microfilm Number 8034," was approved and recorded on April 18, 1986. (*Acierno II*, D.I. 55 at A-18) It appears from the record that this new plan replaced and modified the prior record plan, referred to as "SLD 70-193," "The Maples Apartments," "Microfilm No. 2600." (*Acierno II*, D.I. 55 at A-8 to A-9, A-47 to A-48, A-54, A-55, A-57, A-86, A-93) A revised record development plan referred to as "Westhampton" and reflecting the agreed-upon changes and revisions was approved and recorded on December 5, 1986. ( *Acierno II*, D.I. 55 at A-23) According to the record, said plan "superseded" the approved plan recorded on April 18, 1986. (*Acierno II*, D.I. 55 at A-20)

34. In 1987, County Council, together with various County agencies and officials, particularly Planning, undertook to substantially revise, update and amend the County's DPUD zoning ordinance. In October 1987, drafting of the amended version of the DPUD ordinance was substantially completed and County Council conducted a "workshop" with Planning officials regarding the amended ordinance. At the time of the workshop, the proposed DPUD amended

ordinance contained a "savings clause" that provided as follows:

Section 4. This ordinance shall become effective immediately upon its adoption and approval except for rezoning applications currently pending DPUD approval which shall be exempt from the provisions of this ordinance, but subject to the provisions of the Code in effect at the time of rezoning to DPUD.

(*Acierno II*, D.I. 81, Ex. 1 at 21) The proposed DPUD ordinance containing this savings clause, which County Council did not enact into law, was referred to as "Substitute Ordinance No. 1 to Ordinance No. 87-025."

35. As a result of the workshop, County Council and Planning apparently determined that certain changes in the language of this savings provision were necessary. (*Acierno II*, D.I. 81, Ex. 3) Accordingly, Section 4 of the amended DPUD ordinance was revised to read as follows:

*10 Section 4. This ordinance shall become effective immediately upon its adoption and approval except for rezoning applications currently pending DPUD approval which shall be exempt from the provisions of this ordinance except Section 23-81(18), but subject to the provisions of the Code in effect at the time of rezoning to DPUD.

(*Acierno II*, D.I. 81, Ex. 2 at 21 (emphasis supplied to highlight change in language)). The revised version of the proposed amended DPUD ordinance, referred to as "Substitute Ordinance No. 2 to Ordinance No. 87-025," ultimately was adopted by County Council on October 13, 1987. [FN9]

36. In 1988, plaintiff further revised his record development plan and submitted the revised plan for County review. On or around June 16, 1988, Planning informed plaintiff and other interested parties that development plan "SLD 88-95 (Westhampton)" was approved, recorded and "assigned Microfilm Number 9236." (D.I. 55 at A-31) The record indicates that the 1988 record plan "supersede[d]" the "record plan of Westhampton recorded on" December 5, 1986. (D.I. 55 at A-27)

B. The Development Process

37. The record resubdivision plan approval process has been described of record as follows:

[A]n engineer would submit a plan to the department of planning labeled as a resubdivision

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *10 (D.Del.))

plan and defining what the purpose of that plan was....

The department [of planning] would review that for conformity with both the subdivision and zoning codes of New Castle County, and if found in conformity, would approve that.

It really depends on the individual plan, how much, not how much review, but how much involvement other entities might have in that process.

For example, if the resubdivision plan had issues related to design of circulation features, the department would want to make sure that both the Department of Highways, Transportation, and possibly the fire marshal were cognizant of those changes and would approve them.

\* \* \*

[Planning] view[s] a record resubdivision plan in large measure no differently than we do the original plan.

The resubdivision process is really more for, not necessarily convenience, but since it's not substantive, it's not a new development, but it's just a modification to a previously approved development, it's a more abbreviated process, but the same level of review by the department of planning, the same concerns by the department of planning are addressed as we would address in the original review.

(P.Ex. 10 at 27-30)

38. Moreover,

when a plan is submitted for review under the subdivision and zoning regulations, the department [of planning] reviews it not only for full compliance with the subdivision land development regulations, but as well as the zoning code....

[I]f in fact the proposed use is not consistent with the zoning code, the Planning Department's responsibility is to disapprove the plan....

(*Acierno I,* D.I. 31 at 25)

*11 39. [I]f the department of planning determines that they believe some legal analysis or legal question that they have ascertained needs review, they would contact the department of law.

A typical resubdivision plan is not seen by the department of law. I mean, the department of planning is responsible for reviewing and approving record plans. So it is that department that usually will raise the question.

The department of law is not out looking at every single plan seeing if there are legal issues.

(P.Ex. 19 at 38-9)

40. Therefore, if a resubdivision plan is approved and recorded, the resultant approval and recordation of that plan indicates either that Planning did not see any legal impediments to recordation (and, thus, the County Law Department was not consulted), or the County Law Department, upon review, did not see any legal impediments to recordation. (P.Ex. 19 at 18, 25-7; *see also Acierno I,* D.I. 32 at 18, 25-7)

41. Land development is a dynamic process, subject to such limitations as traffic and sewer capacity, as well as fluctuations in market demand.

42. Presently there are at least 14 other properties situate in the same "metroform" as the 273 Property, all vying for a share of the market and of the land's limited capacities to handle development. (Defendant's Exhibit, "D.Ex.," 1, Ex. 17)

C. Defendant's Conduct

43. County attorney Michael Mitchell first became aware of plaintiff through reviewing *Acierno v. Folsom,* 337 A.2d 309 (Del.Supr.1975). (P.Ex. 19 at 6) Mitchell came to learn more about plaintiff through his engaging in litigation initiated by defendant New Castle County against plaintiff commencing in 1989 through February 1992. (P.Ex. 19 at 7-27)

44. By memorandum dated April 18, 1991 from Mitchell to David J. Biloon ("Biloon"), Chief, Development and Licensing Division, Department of Public Works, New Castle County, Mitchell represented that in response to a telephone inquiry from William S. Gee, Esquire, of Saul Ewing Remick & Saul (ostensibly on behalf of a prospective tenant of the 273 Property), he

obtained a copy of the original Record Plan for this site as well as recent Resubdivision Plans. In addition, [he] reviewed the Chancery and Supreme Court opinions issued in the early- to mid-1970s that involve this site and the original Record Plan.

(*Acierno I,* D.I. 26, Ex. 13) Mitchell, in his memorandum to Biloon, then "summarized the history of this site and the litigation that has led Mr. Acierno to believe that the site is appropriately zoned for retail sales." (*Id.*) Mitchell concluded:

In reviewing the most recent Plan for the 273 Mall, Parcel C, which is a little over one (1) acre in size, is the only portion of the property that is zoned for commercial purposes, being zoned C-2.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *11 (D.Del.))

Page 14

A sliver of the property fronting on Route 273 is zoned R-1-C, while the remaining 38.20 acres is zoned M-1. Much of the proposed use of the property involves retail sales, a fast-food restaurant and a hotel. These uses are not permitted in an M-1 district. The warehouse use with related retail sales appears, on its face, to be permitted by the Code, but that would depend on the particular use that Mr. Acierno proposes. Nevertheless, the majority of the property is not properly zoned for the apparent intended use of the property. Given that fact, no building permit should be issued for any construction on this site until extensive review and consultation between the Division of Development and Licensing, Department of Planning and Department of Law is initiated and concluded concerning any proposed use. Given the types of tenants that he has approached; *i.e.,* the movie theater chain, it is clear that Mr. Acierno intends to initiate a use of the property that is not in conformity with the New Castle Zoning Code.

*12 In order to implement this directive, a general hold should be placed on any building permits that could be issued for this site. If that cannot be accomplished, all plan examiners and other officials involved in the building permit process should be advised of this situation and ordered to report any application for a building permit directly to you. If Mr. Acierno applies for a Building Permit for the 273 Mall, please contact this Department so that the review discussed above may be initiated.

(*Id.*) (emphasis added). [FN10]

45. By memorandum dated May 3, 1991 for circulation within the Division of Development & Licensing, Biloon put into effect Mitchell's request:

Please inform your respective staffs to keep an eye out for any activity, i.e., building permit applications, for either the 273 Mall or Westhampton....

We have been advised by the Law Department that there is a zoning problem at the 273 Mall site. Basically, the site is zoned M-1 which will not support retail shopping uses. At this point in time, I will not try to explain the legal reasons as to why there is a valid Record Plan or why the Record Plan cannot be rescinded by the County; but, never the less [sic], we have been instructed by the Law Department to withhold building permits for any activity....

The Westhampton [P]roject is being reevaluated in

regard to its legal status as a Record Plan which contains DPUD zoning and which has not commenced activity within a five-year period.

Both of these sites are currently owned by Frank E. Acierno. Please be sure this information gets placed with the Record Plans in our files for future reference and again remind your staffs to continually check Record Plans prior to issuance of permits.

(*Acierno I*, D.I. 16 at A22) (emphasis added). [FN11]

46. According to Mitchell, the fact that the status of both the 273 Property and the Westhampton Property was addressed by him in April 1991 was

happenstance more than anything else. The primary motivator of the memo was the Route 273 issue that had been raised by Mr. Gee in his phone call to me.

I don't have a specific recollection, but I believe that it was my conclusion that county council at least informally was expressing a desire to somehow at least have an opportunity to review and address some concerns with respect to the Westhampton project.

Consequently, I included reference to Westhampton in the memorandum to Mr. Biloon more as a heads up than anything else so that a permit wouldn't inadvertently issue before council had an opportunity to take whatever action they wanted to take, if any at all.

(P.Ex. 19 at 47-8)

47. On or around April 23, 1991, County Council once again introduced a resolution "request[ing] that the Department of Planning provide County Council a recommendation in consideration of voiding the existing record development plan for the [Westhampton Property]." (*Acierno II*, D.I. 30, Ex. A) The purported bases for Resolution No. 91-107 were essentially identical to those set forth as justification for County Council's prior such request. The resolution indicated that it was introduced "[p]ursuant to Section 23-81(21) of the New Castle County Code." (*Acierno II*, D.I. 30, Ex. A)

*13 48. In late April or May 1991, at a County Council workshop, then County Council President Philip Cloutier "requested that the department of law review whether or not New Castle County Council had the authority to void the record land development plan of Westhampton." (P.Ex. 19 at 58)

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *13 (D.Del.))

49. By correspondence dated April 25, 1991, Bryan C. Shuler, then Director of Planning, informed the Department of Transportation ("DelDOT") that County Council

has asked the Department of Planning to prepare a recommendation regarding this project. The recommendation will be based on an analysis of all of the technical issues affecting development of the site. The issues will be identified by soliciting comments from all of the Department's Subdivision Advisory Committee members.

With this in mind, I have enclosed a copy of the current record plan (Microfilm No. 9236) and herein request that you review the plan and submit your written comments, if any, to the Department. Of specific interest is the need to identify any issues that would preclude development of the site as depicted by the plan.

It is hoped that a recommendation can be presented to Council at its next meeting. As such, I would also like to request that, if possible, you respond on or before Friday, May 3, 1991. Your cooperation in this matter is greatly appreciated.... (P.Ex. 13) (emphasis added).

50. In the spring of 1991, Stephen A. Raign, a subdivision manager for DelDOT, was prepared to recommend that plaintiff's application for a highway entrance permit be approved for the Westhampton Property. (P.Ex. 13 at 40-1) Because the Westhampton Property became the subject of "outside" pressures (from the County, state legislators, and the community) and became "an issue of beyond the technical thing," plaintiff's permit application instead was referred to the then Secretary of DelDOT, Kermit Justice. [FN12] (P.Ex. 13 at 46-7, 62)

51. By letter dated May 3, 1991, DelDOT subdivision engineer Carolann Wicks executed (over Mr. Raign's name) the following response to Planning's April 25, 1991 letter:

In response to your request of April 25, 1991, DelDOT has reviewed the above referenced record plan (microfilm No. 9236) and as previously documented, in our opinion insufficient property frontage exits along McKennans Church Road to design an adequate entrance necessary to service the entire project of 323 townhouse condominium units. Given the frontage available, the entrance as designed can serve a maximum of 100 dwelling units. In addition, even though Oakridge Drive is 36' feet wide it is questionable as to how much

additional traffic the street can handle and what type of access if any can be accommodated. Also, it is felt that if Oakridge Drive were to be utilized as a second point of access, the additional traffic generation would hamper the traffic operation at the intersection of McKennans Church Road and Newport Gap Pike. Further, we are uncertain of the traffic impact on the remaining streets in Oakwood Hills and in particular the intersection of Valley Brook Drive and Graves Road.

*14 With the new developments that have been built since the recordation of the Westhampton plan in addition to the increased traffic volumes on the contiguous highway system, DelDOT feels that a traffic study would be beneficial in determining any current and anticipated traffic problems brought about by full development of this property. Therefore, DelDOT recommends based on the change of circumstances that the developer have his engineer do a traffic study addressing the issues raised, if the project still contemplates units in excess of 100.

As a matter of information, DelDOT has received a request from the developer to approve an application for highway entrance permit onto McKennans Church road to serve a maximum of 74 dwelling units. This request is complete and in accordance with all previous discussions and comments concerning an acceptable entrance design for serving partial development of the Westhampton project. The application for highway entrance permit could be approved by this office if proper assurances are given restricting the development to 74 dwelling units, until adequate access can be provided for the entire project. However, in light of the County's Request and our desire not to have a piece meal solution to the issue of access by restricting development, we will withhold approval of the entrance design and permit at this time....
(P.Ex 13)

52. In a memorandum from Shuler to County Council dated May 22, 1991, Shuler advised County Council that Subdivision Advisory Committee members "were asked to comment on [the approved Westhampton record plan] and identify any issues that might preclude development of the site as depicted by the plan." (*Acierno II*, D.I. 55 at A-60) The memo specifically noted that the plan under consideration for voiding was "the current record plan (Microfilm No. 9236)," i.e., the record development plan approved and recorded on June

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *14 (D.Del.))

Page 16

16, 1988. (*Acierno II,* D.I. 55 at A-60) In his May 22, 1991 memorandum to County Council, Shuler also detailed various purported deficiencies in the Westhampton plan found to exist by the assortment of government agencies in response to Planning's request that the agencies "identify any issues that might preclude development" of the Westhampton Property. Shuler acknowledged, however, that "[t]his situation can be remedied ... through voluntary revisions to the current plan...." (*Acierno II,* D.I. 55 at A-65)

53. In a letter dated May 29, 1991, plaintiff advised Planning that he intended to cooperate with Planning and the other involved governmental agencies to address and resolve the cited deficiencies. (*Acierno II,* D.I. 55 at A-64-67)

54. On or around July 2, 1991, County attorney Mitchell issued a legal memorandum for County Council setting forth his opinion regarding the issue of whether County Council had authority to lawfully void plaintiff's approved record development plan for the Westhampton Property. Mitchell offered the following legal analysis:

*15 The current provision, codified as 23-81(18) of the New Castle County Code provides a sunset period of ten (10) years, rather than five (5) years. In addition, the current provision provides for review by the Department subsequent to the sunset date and staging of the development in accordance with adequate support facilities as determined by the Department.

In determining the applicability of the two (2) provisions, Section 4 of Substitute Ordinance No. 1 to Ordinance No. 87-205 is paramount. That Ordinance amended the DPUD provisions. Section 4 provides:

This Ordinance shall become effective immediately upon its adoption and approval except for rezoning applications currently pending DPUD approval which shall be exempt from the provisions of this ordinance, but subject to the provisions of the code in effect at the time of rezoning to DPUD.

In adopting the current DPUD provisions, the County Government expressly excluded any pending rezoning applications from the requirements of the revised DPUD Ordinance. Having included a "savings clause" in the current Ordinance, the rights of property owners who had DPUD zonings pending review at that time are governed by the statute in effect when the application was filed, not the newly-adopted

provision. [citations omitted] While Section 4 of Substitute Ordinance No. 1 to Ordinance No. 87-025 expressly applies only to those rezoning applications currently pending DPUD approval, it can necessarily be implied that the intent of the County Government was that the then existing DPUD provisions applied to lands already rezoned to the DPUD classification.

In light of the foregoing, the provisions of Ordinance No. 70-10 must be applied to the Plan of Westhampton. Pursuant to that Ordinance, the New Castle County Council does have the authority to void the [Westhampton] Plan upon recommendation from the Department [of Planning].

(*Acierno II,* D.I. 55 at A-69 to A-71 (citations omitted) (emphasis added)).

55. By memorandum dated July 9, 1991, from County attorney Mitchell to Bryan C. Shuler, Director of Planning, Mitchell once again related the litigation history of the 273 Property and concluded, consistent with his April 18, 1991 memorandum, that plaintiff's record plans should not be accorded "any effect inasmuch as they purport to permit that which is not permitted by the Zoning Code." ( *Acierno I,* D.I. 16 at A28) According to Mitchell, the basis for his conclusion rested on application of Article XXI, Section 3, New Castle County Code (codified as § 23-6(a) in the present Code). Mitchell opined that the November 8, 1971 approval of plaintiff's Preliminary Tentative Plan for the 273 Property "activated" § 23-6, which provides:

(a) No proposed ordinance to amend the zoning map shall be acted upon by county council within three (3) years after the latest of any of the following actions:....

(3) Prior approval under the subdivision regulations of a preliminary plan involving any parcel of land, or portion thereof, whose zoning classification would be changed by the proposed amendment.... In no event shall the period permitted under this paragraph exceed three (3) years from the earliest approval under the subdivision regulations of a preliminary plan involving such parcel, or portion thereof.

*16 (c) No amendment to the zoning code regulations shall be applicable to any parcel or parcels of land protected by subparagraphs ... (3) ... of subsection (a) of this section during the period of such protection....

(*Acierno I,* D.I. 16 at A29-31) According to Mitchell:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *16 (D.Del.))

Page 17

Since this property would have been accorded the three-year stability protection regarding a proposed rezoning for the site, it also received the protections accorded by Section 23-6(c) of the Code....

The purpose of the three-year "moratorium" provision is to provide stability to the process. In this case, Section 23-6(c) permits a lot owner three (3) years to establish a use that but for a recent Zoning amendment would have been permitted in that district if the particular parcel was protected by Paragraph (1), (3) or (4) of Section 23-6(a). The protection is afforded only for the three-year period and the property owner must establish the non-conforming use during that time. If the use is not established, the Code affords no further protection to that particular parcel. Thereafter, the property owner must comply with the revised provisions of the Zoning Code.

Nor does the recordation of a plan create any rights, vested or otherwise. It is the use that is conferred non-conforming status, not a plan or a permit of any kind. Therefore, since Mr. Acierno did not establish a non-conforming commercial use within the three-year period provided for in Section 23-6(c), he is no longer entitled to establish any commercial use except those very limited instances where such commercial uses are now presently permitted in a M-1 district accessory to the permitted manufacturing/industrial use.

(*Acierno I,* D.I. 16 at A27)

56. By memorandum dated August 6, 1991 from Mitchell to Robert O'Brien, Director, Department of Public Works, Mitchell forwarded his July 9, 1991 memorandum so that Mr. O'Brien could "take appropriate action to ensure that no building permit is issued for any principal commercial use [on the 273 Property].... Accordingly, would you please take any steps necessary to ensure that no permits are issued for this site until complete review and consultation is accomplished with this Department and the Department of Planning." (*Acierno I,* D.I. 16 at A32) [FN13]

57. During the spring and summer of 1991, plaintiff negotiated with several prospective commercial tenants, including Caldor, Inc. (*Acierno I,* D.I. 16 at A33-5; *Acierno I,* D.I. 26, Ex. 13)

58. In connection with his negotiations with Caldor, plaintiff, in or about December 1991, submitted an application for a permit to build a Caldor store. By

letter dated December 18, 1991 from David Biloon to plaintiff, plaintiff was informed of the following:

Please be advised that New Castle County cannot accept your building permit application for the proposed Caldor Department Store at this site. Commercial ventures of this nature cannot be situated on lands which contain a manufacturing zoning classification. Additionally, the existing Record Plan (Microfilm # 9669) allows for a 70,000 square foot building denoted as Building # 4. The proposed structure is 112,000 square feet. This is also a discrepancy which must be rectified prior to the issuance of any permits.

*17 (*Acierno I,* D.I. 16 at A34) [FN14]

59. In February 1992, plaintiff's temporary erosion and sediment control plan for the 273 Property was approved by the State of Delaware, Department of Natural Resources and Environmental Control. ( *Acierno I,* D.I. 24 at 52 and Ex. 12)

60. During the period from May 1991 to April 1992, plaintiff continued his efforts to remedy any and all purported deficiencies related to the Westhampton Property. (*Acierno II,* D.I. 61, Ex. A at ¶¶ 35 to 44 and documents cited therein; *Acierno II,* D.I. 55 at A-83 to A-85) In early September 1991, Planning informed plaintiff that he had complied with all material deficiencies set forth in the May 22, 1991 Shuler memorandum. (*Acierno II,* D.I. 55 at A-78)

61. By letter dated November 8, 1991, Anthony D. Peer, Manager, Intergovernmental Coordination, DelDOT, informed Planning of the following:

In summary we recommend that the vehicular access shown on Oakridge Drive (aka Valley Brook Road aka Oakridge Road) be deleted from the plan. While we have no objection to the plan being recorded with 323 dwelling units, for the foreseeable future access will be permitted for only 100 dwelling units.

(P.Ex. 12) Plaintiff "placed a note (# 27) on the [Westhampton] plan limiting development to 100 dwelling units 'until such time as the appropriate requirements are met for ingress and egress....'." (P.Ex. 13)

62. As of April 2, 1992, the "majority of the substantive issues [identified as deficiencies in plaintiff's Westhampton Property record plan were] resolved.." (*Acierno II,* D.I. 55 at A-89 to A-90) By memorandum of that date, Shuler advised County

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *17 (D.Del.))

Council that "the only remaining issue with respect to our memo of May 22, 1991, is access through the Oakwood Hills subdivision" and that "[s]hould Council be of the opinion that this issue warrants voiding of the plan, the Department would recommend that it proceed with action on Resolution No. 91-107 as this appears to be the only method of bringing closure on this issue." (*Acierno II,* D.I. 55 at A-90)

63. On April 14, 1992, County Council enacted Ordinance No. 91-190 voiding the approved record development plan for the Westhampton Property. ( *Acierno II,* D.I. 30, Ex. D)

64. On April 15, 1992, only one day later, Philip Cloutier, then a member of County Council, informed Shuler that "[p]ursuant to Section 23-85.1(1)(c) [of the New Castle County Code], I will introduce an ordinance to change the zoning classification of [plaintiff's] property" from DPUD back to R-2, the Westhampton Property's zoning classification prior to its rezoning to DPUD in 1971. (*Acierno II,* D.I. 55 at A-93)

65. As required by statute, legal notice of the proposed zoning ordinance appeared in the *Wilmington News Journal* on June 20, 1992. ( *Acierno II,* D.I. 55 at A-97, p. 4) The title of the proposed ordinance contained in the notice informed the public that the ordinance, if enacted, would rezone the Westhampton Property from DPUD to an R-2 zoning classification.

*18 66. Also in May 1992, plaintiff resubmitted his application for a building permit in connection with the 273 Property; the accompanying plan provided for a 70,000 square foot building drawn in accordance with County standards. (*Acierno I,* D.I. 24 at 54 and Ex. 13)

67. On May 27, 1992, Biloon communicated with County attorney Mitchell regarding plaintiff's latest application: "We have another application for the dept. store. This time the building plans agree with the record plan. What is our next move?" ( *Acierno I,* D.I. 26, Ex. 16)

68. Mitchell responded immediately: "It is not zoned for a retail department store. He does not get a permit." (*Acierno I,* D.I. 26, Ex. 14)

69. Biloon replied within the hour: "What about

your meeting with Phil C.? Frankie's boys tell me that Phil told you back off!!!!" (*Acierno I,* D.I. 26, Ex. 15)

70. The meeting referred to above occurred in "early '92" with at least the following individuals in attendance: Philip D. Cloutier, then President of New Castle County Council; State Representative Ennis; County Councilman Cecil; County attorney Michael Mitchell; and Herbert V. Blackwelder, Jr., a Planner 3 in the Subdivision Section of the Department of Planning. The meeting was not publicly noticed; the primary focus of the meeting was on another of plaintiff's properties, Merchant Square. The 273 Property was discussed, however, in the context of plaintiff's negotiations with Caldor, Inc.; apparently, Caldor needed two stores in the County, and plaintiff was proposing that his two sites, Merchant Square and the 273 Property, were appropriate choices for Caldor. According to Mr. Blackwelder,

[n]ear the end of that meeting--I don't know who initiated it--but I believe Mr. Cloutier was aware that the Law Department had raised concerns about the zoning with the 273 site. And, of course, I was aware of it as well at that time. And I indicated to Mr. Cloutier that the Department of Planning was not involved unless a record plan was advanced. And in terms of Mr. Mitchell's opinion, I did not disagree with his opinion. I did express concerns about its implication and wanting to talk to Mr. Mitchell if the Department of Planning was involved in having to review and act on an approved record plan.... My concern was that the opinion might have broader implications beyond this site for other--for other sites, but I don't know whether or not-- you know, I would still have those concerns, once I would have the opportunity to sit down and discuss with Mr. Mitchell his rationale for the conclusion. Since the Planning Department was not involved in having to review and react to a plan or the zoning issue, Mr. Mitchell and I really have not had an opportunity to discuss his opinion at any length at all.
(*Acierno I,* D.I. 31 at 40-1) (emphasis added).

71. A permit number was assigned to the 273 Property project, then voided by Biloon. (*Acierno I,* D.I. 24 at 55-6 and Ex. 13)

*19 72. By letter dated June 4, 1992, Biloon advised plaintiff that
New Castle County still cannot accept your

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

building permit application for the proposed 70,000 square foot Caldor Department Store at [the 273 Property]. The situation noted in my December 18, 1991, letter to you regarding the conflict between the proposed commercial use and the manufacturing zoning classification for the property remains unchanged.    Please refer all questions and future correspondence regarding this matter to the New Castle County Law Department. (*Acierno I,* D.I. 16 at A36)    [FN15]

73. Caldor located its stores elsewhere.  (*Acierno I,* D.I. 24 at 63)

74. On July 7, 1992, a statutorily required hearing

could not recall ever having "a plan certified invalid after recordation."  (*Acierno I,* D.I. 32 at 17) Biloon testified with respect to Mitchell's relationship with plaintiff:

> I can recall discussing the--how can I say it?   The fact that Mr. Mitchell has been involved with Mr. Acierno over time now on numerous issues involving enforcement of County code and County law to get compliance with code that I administer as well as the Complaints Department administers primarily.   And those dealings have not been, you know, a very--on a very friendly basis all the time, let alone professional.   And it's--you know, it was a known fact that, you know, there were not good relationships between these two people.  There was

a lot of consternation because of the County's efforts to get Mr. Acierno to comply and his unwillingness in cases to comply.   So, I mean, you know, that's a known fact.

**\*20** What is a known fact?

> That Mr. Acierno and Mr. Mitchell obviously do not like each other.   Okay. Based on lot of the discussions and things that have gone on.

Yes.

> And I think the--if I ever used that type of terminology, whether it was with Mr. Skurlock or Mr. O'Sullivan, it was probably just in a context of reinforcing a statement that it's known that those two people don't like each other and which makes

was held before the New Castle County Department of Planning and Planning Board concerning the proposed rezoning amendment for the Westhampton Property. (*Acierno II,* D.I. 30, Ex. F) Two weeks later, Planning recommended the adoption of a substitute ordinance to proposed Ordinance 92-119. The recommended substitute ordinance, instead of rezoning the Westhampton Property from DPUD to R-2, would rezone it from DPUD to R-1-B.  ( *Acierno II,* D.I. 55 at A-99, p. 4)

75. On September 9, 1992, County Council adopted Substitute 1 to Ordinance No. 92-119 rezoning the Westhampton Property from the DPUD zoning

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *20 (D.Del.))

developer and somebody in the law department that's head of zoning and stuff has a problem with you, a lot of stuff is discretionary, so it was just interesting.")

79. In testimony proffered at the October 9, 1992 hearing, a tenant in another of plaintiff's commercial projects stated that his building permit had been held up by Biloon; a permit was finally authorized on August 12, 1992, with Biloon saying: "Screw Mitchell's agenda. I am going to issue the permit, and I will deal with him later." (*Acierno I*, D.I. 24 at 10)

80. County attorney Mitchell has testified at deposition that, although he issued a directive to the Department of Public Works in April 1991 that "no building permit should be issued for any construction on [the 273 Property]," based solely on the articulated fact that the M-1 zoning classification, as amended, does not permit commercial uses, his "conclusion was not reached until the July 9, 1991 memorandum to Bryan Shuler," when Section 23-6 was mentioned for the first time. (*Acierno I*, D.I. 26 at 155-57)

81. Section 23-6 has never before or since been applied to invalidate a recorded plan. (*Acierno I*, D.I. 30 at 74-8)

82. During the years 1975 to present, all record plans for the 273 Property depicted a commercial use in the M-1 zone. (*Acierno I*, D.I. 16 at A11; *Acierno I*, D.I. 24, Ex. 4)

83. During the years 1975 to present, no representative from Planning has informed plaintiff that he could not develop the 273 Property for commercial use. (*Acierno I*, D.I. 24 at 51)

*21 84. During the years 1975 to present, Planning has not formally noticed plaintiff that his record plan for the 273 Property is invalid. (*Acierno I*, D.I. 24 at 51)

85. During the years 1975 to present, no governmental body has acted to void any of plaintiff's record plans for the 273 Property. (*Acierno I*, D.I. 24 at 51)

86. Carolann Wicks, a subdivision engineer for DelDOT, does not recall "the County ever, prior to [its April 25, 1991 letter regarding the Westhampton

Property], requesting that [DelDOT] identify issues which would preclude a development...." (P.Ex. 14 at 17) (emphasis added).

87. Section 23-81(21) of the DPUD regulations has never been applied to void a record land development plan other than the plan recorded for the Westhampton Property. (*Acierno II*, D.I. 61, Ex. A at ¶ 48)

88. During the years March 1989 through January 1993,

[t]here was a preoccupation with regard to the County executive office having to do with Mr. Acierno. Whatever was going on between the law department and the County executive's office involving Mr. Acierno, there was a need to address it. There was a need for the County executive office and the law department to be in consultation.
(P.Ex. 16 at 27)

89. There is additional evidence of record that plaintiff's development projects have been adversely affected in the past due to personal animosity. (*Slawik*, D.I. 38 at 36-7; P.Ex. 18B at 345-47; P.Ex. 15 at 36-7)

E. Damages

90. Plaintiff has expended substantial sums of money in reliance on the resubdivision plans approved by defendant for the 273 Property. (*Acierno I*, D.I. 24 at 24-5 and P.Ex. 3; *Acierno v. Mitchell*, 6 F.3d at 975 n. 13)

91. Plaintiff has permanently lost the opportunity to lease space on the 273 Property to Caldor, Inc.

92. Plaintiff is currently negotiating to lease space on the 273 Property with several other tenants. (P.Ex. 21)

93. If plaintiff is unable to obtain building permits consistent with the resubdivision plans approved by defendant for the 273 Property, those prospective tenants will lease at other locations. (P.Ex. 21)

94. So long as plaintiff is unable to obtain building permits consistent with the resubdivision plans approved by defendant for the 273 Property, his ability to develop the property at all is diminished due to competitive market demands and land use

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *21 (D.Del.))

Page 21

limitations.

## V. ABSTENTION

Defendant contends that, although jurisdiction is properly found in this Court over plaintiff's constitutional claims, nonetheless this Court should "decline to exercise its jurisdiction so that a state court ... will have the opportunity to decide the matters at issue." *Heritage Farms, Inc. v. Solebury Township,* 671 F.2d 743, 746 (3d Cir.), *cert. denied,* 456 U.S. 990 (1982). As explained by the Third Circuit in the above-referenced case, the doctrine of abstention

was born out of a concern for the maintenance of our federal system; seeking to avoid unnecessary conflicts between the federal judiciary and state government. *See Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 500- 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941). However, the Supreme Court has recognized that abstention is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1062-63, 3 L.Ed.2d 1163 (1959). Consistent with its perception of abstention as the exception rather than the rule, the Supreme Court has recognized only three situations in which abstention is appropriate. *See Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).

*22 *Id.* Accord, New Orleans Public Service, Inc. v. Council of New Orleans,* 491 U.S. 350, 358-59 (1989) (the obligation of federal courts "to adjudicate claims within their jurisdiction [is] 'virtually unflagging' ").

Defendant urges that this Court, relying on any one of the three types of abstention, could properly decline to exercise its jurisdiction in the present case. Initially, defendant contends that abstention is proper under the rationale of *Younger v. Harris,* 401 U.S. 37 (1971). As explained by the Third Circuit in *Heritage Farms, Inc. v Solebury Township,*

[t]he *Younger* doctrine requires a district court to abstain where, absent bad faith, harassment, or a

patently invalid state statute, the moving party is attempting to enjoin pending state criminal proceedings. 401 U.S. at 54....

671 F.2d at 746. The *Younger* doctrine has its limitations, however, for

[a]lthough our concern for comity and federalism has led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, ..., and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions ..., it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States....

*New Orleans Public Service, Inc. v. Council of New Orleans,* 491 U.S. at 368-69 (citations omitted).

As noted above, there is a pending state action related to the federal case at bar. The question is whether the Delaware court action "is the type of proceeding to which *Younger* applies." *Id.* at 369. The Court finds that application of the *Younger* abstention doctrine to the facts at bar is inappropriate. Plaintiff at bar is not attempting to enjoin the pending state proceeding; the instant federal cause of action relates back to July 1992, long before the state court action was initiated. Indeed, it is apparent that the state proceeding was initiated in a race to the court house for the purpose of circumventing federal jurisdiction. Under these circumstances, the *Younger* abstention doctrine has no application.

The second and third types of abstention are closely related, as explained by the Third Circuit in *Heritage Farms, Inc. v. Solebury Township:*

The second type of abstention, *Pullman* abstention, may be invoked where there is an unsettled question of state law, the resolution of which would affect the decision of a federal constitutional issue, either by obviating the need to decide it or by changing the light in which it must be viewed. *See Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 501, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

*23 The final category--*Burford* abstention--derives its name from *Burford v. Sun Oil Co.,* 319 U.S.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *23 (D.Del.))

Page 22

315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). *Burford* abstention is appropriate where a difficult question of state law is presented which involves important state policies or administrative concerns. 319 U.S. at 332-34, 63 S.Ct. at 1106-07. In this situation, a federal court may abstain to avoid disrupting the efforts of a state "to establish a coherent policy with respect to a matter of substantial public concern." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976).
671 F.2d at 746.

Defendant at bar argues that the resolution of plaintiff's claims turns on unsettled principles of state law--the doctrines of vested rights and equitable estoppel--principles which should be interpreted by a state, not a federal, court. Defendant further argues that land use decisions are intrinsically local in nature and, therefore, should be made by a local, not a federal, court.

The Court agrees that plaintiff's due process claims rest in part on a state law foundation. The Court disagrees that the state law doctrines are unsettled; indeed, in the most recent case law cited by defendant, both the Delaware Superior and Chancery Courts recognize the "clearly established" doctrines of vested rights and of equitable estoppel. *Kejand, Inc. v. Board of Adjustment of the Town of Dewey Beach,* No. 91A-05-006, 1993 Del.Super. LEXIS (Del.Super. March 19, 1993), *reargument denied,* No. 91A-05-006 (Del.Super. May 14, 1993), *aff'd,* No. 209, 1993, 1993 Del. LEXIS 417 (Del.Supr. November 16, 1993) (D.I. 26); *The City of Rehoboth Beach v. Shirl Ann Associates,* No. 1552, 1993 Del.Ch. LEXIS 225 (Del.Ch. August 31, 1993). Thus, while state law will be involved in this case,
*Pullman* abstention is certainly not designed to prevent a federal court from applying state law altogether. As one commentator observed: "Federal and state courts are equally capable of applying settled state law to a difficult set of facts." *Note, Land Use Regulation, the Federal Courts and the Abstention Doctrine,* 89 Yale L.J. 1134, 1143 n. 55 (1980) (emphasis added). In *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), the Supreme Court found *Pullman* abstention inapplicable in part because "[w]hile state claims are involved in the case, the

state law appears to be settled." 424 U.S. at 815, 96 S.Ct. at 1245. To the extent that state law is involved in this case--for example, the law governing land use--it is settled state law, and, as such, *Pullman* abstention is inappropriate.
*Heritage Farms, Inc. v. Solebury Township,* 671 F.2d at 747 (emphasis in original).

Likewise the Court embraces the reasoning of the Third Circuit in *Heritage Farms, Inc. v. Solebuy Township* with respect to *Burford* abstention. The Court is cognizant of the local nature of land use decisions and the caution with which a federal court should entertain land use disputes. Clearly, however, the New Castle County Code "does not involve the type of uniform and elaborate statewide regulation as was adopted by the State of Texas to govern the drilling of oil wells in *Burford.*" *Heritage Farms, Inc. v. Solebury Township,* 671 F.2d at 747.

*24 Plaintiff is not challenging the statutory framework underlying land use development in New Castle County; he is challenging instead the application of County law and policies. As in the *Heritage Farms, Inc.* litigation, "this case is not simply a land use case." *Id.* at 748. The case raises troubling questions about the arbitrary use of governmental discretion in order to further private, as opposed to public, agendas. "In short, *Burford* abstention has no place in this case." *Id.*

Given this Court's decision not to abstain, its familiarity with the history of this litigation, and the fact that at least one of plaintiff's constitutional claims does not rest on state law, the Court declines as well to stay the proceedings.

## VI. MOTION FOR PRELIMINARY INJUNCTION

### A. Standard of Review

It is beyond dispute that "the grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.' " *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989), *citing, Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 102 (3d Cir.1988). Thus, in ruling on a motion for a preliminary injunction, this Court must consider:
(1) the likelihood that the [movant] will prevail on

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *24 (D.Del.))

Page 23

the merits at final hearing; (2) the extent to which the [movant] is irreparably harmed by the conduct complained of; (3) the extent to which the [nonmoving party] will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

*Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 191-92 (3d Cir.1990). As recently reaffirmed by the United States Court of Appeals for the Third Circuit, an

injunction should issue only if the [movant] produces evidence sufficient to convince the ... [C]ourt that all four factors favor preliminary relief.

*Merchants & Evans, Inc. v. Roosevelt Bldg. Products, Co.,* 963 F.2d 628, 632-33 (3d Cir.1992). *See also, Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 90-1 (3d Cir.1992).

B. Reasonable Probability of Success on the Merits

Plaintiff in his request for injunctive relief asserts that his constitutionally protected rights to substantive and procedural due process and to equal protection of the laws have been violated by the conduct by defendant New Castle County.

Although plaintiff need not demonstrate a likelihood of success on all causes of action asserted, his claims will be addressed *seriatim.*

### 1. Substantive Due Process.

"Substantive due process protects citizens from arbitrary and irrational acts of government." *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 692 (3d Cir.1993). In order for a plaintiff to prove that his substantive due process rights have been violated, he must demonstrate that: "the government's actions were not rationally related to a legitimate government interest"; or (2) "the government's actions in a particular case were in fact motivated by bias, bad faith or improper motive...." *Id.* at 692.

*25 Challenges to local land use decisions grounded on substantive due process claims have been recognized by the United States Court of Appeals for the Third Circuit in a series of cases starting with *Heritage Farms, Inc. v. Solebury Township, supra.* In that case, plaintiffs filed suit under 42 U.S.C. § 1983 alleging " 'illegal, arbitrary, unreasonable, confiscatory [and] discriminatory' acts on the part of the defendants 'to frustrate, hinder,

obstruct, delay and prevent development of plaintiffs' properties solely for the purpose of inflicting economic harm upon plaintiffs under the color of law.' " 671 F.2d at 745. The Third Circuit found that plaintiffs in *Bello v. Walker* 840 F.2d 1124 (3d Cir.), *cert. denied,* 488 U.S. 851 and 868 (1988), had

presented evidence from which a fact finder could reasonably conclude that certain council members, acting in their capacity as officers of the municipality, improperly interfered with the process by which the municipality issued building permits, and that they did so for partisan political or personal reasons unrelated to the merits of the application for the permits. These actions can have no relationship to any legitimate governmental objective, and if proven, are sufficient to establish a substantive due process violation actionable under section 1983.

*Id.* at 1129-30 (emphasis added). The Court distinguished *Bello* from an earlier case, *Pace Resources, Inc. v. Shrewsbury Township,* 808 F.2d 1023 (3d Cir.), *cert. denied,* 482 U.S. 906 (1987), finding that the "plaintiff in *Pace* did 'not present a case involving actions aimed at this developer for reasons unrelated to land use planning.' " *Id.* at 1129.

More recently, in *Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d 1195 (3d Cir.1992), the Third Circuit once again acknowledged a cause of action under 42 U.S.C. § 1983 based upon allegations that the defendants, Lower Gwynedd Township and the five members of the Township's Board of Supervisors, applied certain local land use ordinances maliciously in order to deprive plaintiff of its federal constitutional and statutory rights. In its discussion, the Third Circuit distinguished its decision in *Midnight Sessions, Ltd. v. Philadelphia,* 945 F.2d 667, 682-83 (3d Cir.1991), *cert. denied,* 112 S.Ct. 1668 (1992), a case involving the legality of land use ordinances, not the abusive application of such ordinances. *Gwynedd Properties, Inc. v. Lower Gwynedd Township,* 970 F.2d at 1202.

Based on the case law recited above, this Court also has recognized that an official's "deliberate and arbitrary decision to delay or deny issuing a building permit may violate a developer's substantive due process rights." *Elsmere Park Club Ltd. Partnership v. Elsmere,* 771 F.Supp. 646, 649 (D.Del.1991). *Accord Epstein v. Whitehall,* 693 F.Supp. 309, 314

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *25 (D.Del.))

Page 24

(E.D.Pa.1988).

### a. Rational Relationship

With respect to the first test, whether defendant's actions were "rationally related to a legitimate government interest," the critical factor in the Court's legal analysis is identifying the "actions" to be scrutinized. Defendant would argue that its actions were simply those of enforcing its zoning policies as written, a legitimate governmental activity.   And if, in fact, those were the only "actions" taken by defendant, such an argument would undoubtedly prevail.   The facts of record indicate otherwise, however.

*26 As an initial matter, defendant was enforcing its zoning policies (as published by the 1975 Supreme Court mandate and County Council resolution and the subsequent approval of plaintiff's three record plans) until 1991, when County attorney Mitchell, of his own initiative, directed the Department of Public Works that "no building permit should be issued for any construction on this site until extensive review and consultation between the Division of Development and Licensing, Department of Planning and Department of Law is initiated and concluded concerning any proposed use." (*Acierno I,* D.I. 26, Ex. 13) (emphasis added).   Mitchell issued his internal directive based on application of County Code § 23-6 without notice to plaintiff, although Mitchell had knowledge that plaintiff was going forward with development plans based on commercial uses.   Mitchell issued his internal directive without the benefit of "extensive review and consultation" with his supervisor or other agency.   Indeed, when plaintiff applied for a building permit in December 1991 and again in May 1992, the permit was denied without any further review or consultation having been conducted by any County official within any County agency. (*Acierno I,* D.I. 26 at 182; *Acierno I,* D.I. 31 at 40-1)

Consistent with the caselaw recited above, the Third Circuit in its appellate decision at bar recognized that the facts asserted by plaintiff raised substantive due process concerns:

We agree the County has made a final decision with respect to plaintiff's development plans. Plaintiff submitted three plans depicting commercial development on the M-1 portion of the property.   The Department of Planning and the County Council accepted those plans, which are final decisions under state law and the County's

zoning ordinance.   *See Acierno v. Folsom,* 337 A.2d 309, 313 (Del.1975) (planning board has "final decision" to approve development plans). There has been no action by any authoritative body to reverse these actions, and thus we assume without deciding plaintiff has a property interest in his plans under Delaware law.

*Acierno v. Mitchell,* 6 F.3d at 975.

### 1) Property Interest

"A property interest subject to protection by the due process clause results from a 'legitimate claim of entitlement' created by an independent source such as state law." *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d at 679, quoting *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972).

Under Delaware law, one can acquire a vested right from a land use decision where "there h[as] been a substantial change in position, expenditures, or incurrence of obligations, made lawfully and in good faith" in reliance on the decision. *Shellburne, Inc. v. Roberts,* 224 A.2d 250, 254 (Del.1966); *see also Amico v. New Castle County,* 101 F.R.D. 472, 483 (D.Del.1984) (explaining vested rights doctrine under Delaware law), *aff'd,* 770 F.2d 1066 (3d Cir.1985).

*27 *Acierno v. Mitchell,* 6 F.3d at 975 n. 13. *Accord, Kejand, Inc. v. Board of Adjustment of the Town of Dewey Beach,* 1993 Del.Super. LEXIS 141, at 6.

Under the doctrine as described above, defendant did affirmatively grant plaintiff permission to develop the 273 Property commercially.   There is no record evidence contrary to that offered by plaintiff demonstrating that he "expend[ed] over one million dollars ($1,000,000) in reliance upon the County's approval for commercial use...." *Acierno v. Mitchell,* 6 F.3d at 975 n. 13.

Defendant contends presently that "[p]laintiff has no property right in the issuance of a building permit." (D.I. 18 at 22) Defendant misconstrues the question before the Court. As recognized previously by this Court and by the Third Circuit, the issue before the Court is one of zoning and whether plaintiff has acquired a vested right to develop commercially the 273 Property zoned M-1. (*Acierno I,* D.I. 37 at 26; *Acierno v. Mitchell,* 6 F.3d at 976 n. 14)

In this regard, defendant contends that the 1975 mandate from the Delaware Supreme Court, the 1975 resolution passed by County Council, and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *27 (D.Del.))

Page 25

consequent recordation on three separate occasions of plaintiff's subdivision plans by defendant, are all without legal force and effect; that the November 1971 amendment generally prohibiting commercial use on land zoned M-1 rendered all subsequent government action directed at plaintiff's land specifically a nullity; that the government action relied on by plaintiff was simply the result of an erroneous interpretation and application of a zoning ordinance. (*See, e.g.,* P.Ex. 2 at 16-17) Further, "Delaware courts have expressly refused to recognize" [FN16] the "honest error" doctrine "to ameliorate the harshness" of the vested rights and equitable estoppel doctrines. [FN17]

Assuming momentarily that Delaware courts would not recognize the honest error doctrine under any circumstances, the question remains whether legal error was committed under the facts at bar. The Delaware Supreme Court did not specifically address the question presently before the Court, whether the 1971 amendment to the M-1 zoning restrictions applied to the 273 Property in 1975 or thereafter. Nevertheless, the Delaware Supreme Court in 1975 issued a mandate to defendant to approve plaintiff's record plan for commercial development of the 273 Property, zoned M-1; the Department of Planning thereafter reviewed and approved plaintiff's record plan for commercial development of the 273 Property without further comment; New Castle County Council passed a resolution approving plaintiff's record plan for commercial development of the 273 Property; the Department of Planning thereafter approved for recordation three resubdivision plans for commercial development of the 273 Property.

Although the Board of Adjustment has final authority to review any administrative decision relating to enforcement of any zoning ordinance, 9 Del.C. § 1352(a)(1), it does not have the authority to review judicial and legislative mandates and determine their legality. This case, therefore, is distinguishable from those heretofore reviewed by the Delaware state courts, where an administrative official (generally a building inspector) grants or refuses to grant a building permit due to a mistake of fact, an administrative decision admittedly subject to review by the Board of Adjustment. Instantly, the highest relevant judicial and legislative authorities have granted plaintiff permission to develop the 273 Property commercially; neither of these authorities have done anything to revoke such

approval. *Acierno v. Mitchell,* 6 F.3d at 975, 977.

*28 So if, indeed, error has been committed, it is not within the jurisdiction of the Board of Adjustment to "cure" the error by refusing to issue an otherwise valid building permit, as affirmed by defendant's counsel in 1973 ("the final determination of the [zoning] matter must be made judicially no matter what administrative determination may have been suggested by the Department of Planning"). (D.I. 19 at 30). Moreover, if error was committed in 1975 by the Delaware Supreme Court, the Departments of Planning and Law, and by County Council, the error has been amplified by a course of conduct committed over a course of years by numerous of defendant's agents. Surely if ever there were circumstances warranting the application of the "honest error" doctrine, the circumstances at bar qualify.

### 2) Liberty Interest

Plaintiff argues that he possesses several protected fundamental liberty interests which must be free from unreasonable governmental interference. His liberty interests include the right to pursue his chosen occupation--real estate development--and his right to conduct a legitimate business without arbitrary governmental interference. These interests have been adversely impacted by the actions of defendant.

The Supreme Court in *Griswold v. Connecticut,* 381 U.S. 479 (1965), through *Roe v. Wade,* 410 U.S. 113 (1973), and their progeny, has established a broad view of protectible liberty under substantive due process. *See, Michael H. v. Gerald D.,* 491 U.S. 110, 127-28 and n. 6 (1989) (all of the justices of that Court subscribed to the protections afforded by substantive due process).

In this regard, the Third Circuit has held that "[a] claim for damages resulting from the destruction of a business is an appropriate action under 42 U.S.C. § 1983." *Pietroniro v. Borough of Oceanport,* 764 F.2d 976, 979 (3d Cir.), *cert. denied,* 474 U.S. 1020 (1985). *Accord Heritage Farms, Inc.,* 671 F.2d at 748 ("constitutional rights to conduct a legitimate business"); *Gwynedd Properties,* 970 F.2d at 1203 (conspiracy to destroy the same right). [FN18]

There is no dispute that plaintiff at bar is a "developer" who earns his livelihood buying and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *28 (D.Del.))

selling property, particularly, buying unimproved property and improving it to sell or lease to others. The fact that plaintiff is a successful developer and owns more than the 273 Property at issue has no bearing on the question at hand: whether defendant, through its agents, has made arbitrary local land use decisions which have interfered with plaintiff's ability to conduct a legitimate business. The evidence of record demonstrates that defendant's conduct vis-a-vis plaintiff's 273 Property was arbitrary and not related to a legitimate government interest; further, such conduct has obstructed and delayed, if not prevented, development of the 273 Property, thus inflicting economic and other harm upon plaintiff under the color of law.

b. Improper Motive

*29 In addition to there being evidence of record supporting plaintiff's contention that no rational relationship existed between defendant's actions and a legitimate government interest, the record demonstrates that defendant's actions were motivated by bias, bad faith, or improper motive and that defendant should be estopped from exercising its zoning powers. Under Delaware law, a governmental entity will be so estopped when a property owner: "(1) relies in good faith; (2) on an act or omission by the government; (3) and substantially changes his position or incurs such extensive obligations and expenses that enforcement of the subsequently enacted or amended ordinance would inequitably and unjustly destroy the rights he has ostensibly acquired." *Kejand, Inc.,* 1993 Del.Super. LEXIS 141 at 8. [FN19] Again, the evidence of record indicates that plaintiff relied in good faith on defendant's affirmative acts, publicly validated over the course of years, incurring extensive obligations and expenses.

As indicated by the facts of record, plaintiff was denied a building permit in 1991 and 1992 on the basis of County attorney Mitchell's legal interpretation of § 23-6 of the County Code. This Court held § 23-6 to be inapplicable to the facts at bar. (D.I. 37 at 24) Likewise, in reviewing these facts, the Third Circuit in *Acierno v. Mitchell* noted:

The County appears to concede plaintiff once had a right to develop his property commercially but now contends he lost that right. Even though the property is no longer zoned for commercial use, the County maintains § 23-6 of the County's zoning ordinance "could [have] potentially provide[d] a basis for plaintiff's proposed use

despite the improper zoning." Section 23-6. The County argues that plaintiff had three years to establish a commercial use on the property after the November 1971 amendment became effective. Because he did not, the County claims he lost the right to develop the property commercially. If this interpretation is correct, it is difficult to understand the County's approval of plaintiff's subdivision plan in 1988 and 1989--plans that depicted commercial uses. Moreover, the County's interpretation would have required plaintiff to develop his property before approval of his final development plan. The amendment restricting commercial use was enacted in November 1971, and, according to the County's interpretation of § 23-6, plaintiff was required to develop the property by November 1974. However, the Supreme Court did not direct the County to accept plaintiff's final development plan until 1975.

6 F.3d at 975-76 n. 13.

Defendant argues, despite the above, that the operation of § 23-6 divested plaintiff of any property right he had in commercial development under M-1 zoning; further, that plaintiff is "estopped" from asserting otherwise by reason of legal positions argued before the Court of Chancery in 1973. (D.I. 18 at 24) Upon closer examination, however, it is evident that the relevance of § 23-6 to plaintiff's case in 1973 was raised by defendant's representatives and it was defendant's position which was noted for the benefit of the Court of Chancery, not plaintiff's position. (D.I. 19 at 18) Moreover, the application of § 23-6 was deemed irrelevant by the Court of Chancery in its 1973 decision. (D.I. 19 at 30) The doctrine of judicial estoppel was not meant to be stretched to such limits. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.1988) at 423 (dissent by Stapleton, J.):

*30 Thus, Oneida never assumed a position which its current actions repudiate.... Nor has the bank pointed to any persuasive evidence that it was prejudiced by anything Oneida did or did not do during the bankruptcy proceeding.

In sum, equitable and judicial estoppel are extraordinary remedies to be invoked when a party's inconsistent behavior will otherwise result in a miscarriage of justice. Oneida's behavior was neither inconsistent nor inequitable.

Plaintiff's behavior in the case at bar has been

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

neither inconsistent nor inequitable. Indeed, County attorney Mitchell acknowledged plaintiff's good faith reliance on the public conduct of defendant. (*Acierno I,* D.I. 26, Ex. 13). Conversely, the deposition testimony of record indicates that defendant's conduct toward plaintiff and his business endeavors has been characterized by bias, bad faith, or improper motive. [FN20] Such testimony is buttressed by the documentary evidence of record which indicates that, commencing in 1991, defendant and its agents divested plaintiff of his ability to develop, consistent with previously recorded subdivision plans, two separate properties (the 273 and Westhampton Properties) by the affirmative application of statutory authorities never before or since invoked against any other landowner. In the case of the 273 Property, defendant's conduct apparently was initiated by County attorney Mitchell, [FN21] who opined in July 1991 that plaintiff's resubdivision plans should no longer be honored. Another of Mitchell's legal opinions which issued in July 1991 was pivotal in defendant's voiding of plaintiff's record subdivision plan for the Westhampton Property. Under the circumstances, [FN22] plaintiff has carried his burden of demonstrating that the development process controlled by defendant was subject to abuse generally and was not administered evenhandedly, in good faith, as to plaintiff.

## 2. Equal Protection

The equal protection clause of the Fourteenth Amendment requires that all persons similarly situated be treated alike. *Mahone v. Addicks Utility Dist.,* 836 F.2d 921, 932 (5th Cir.1988). "When a municipality treats similarly situated landowners differently and the discrimination is arbitrary or irrational, an equal protection violation arises." *Hidden Creek Stock Farms, Inc. v. Upper Frederick Board of Supervisors,* No. 92-4199, 1993 U.S.Dist. LEXIS 1747, at 17 (E.D.Pa. February 16, 1993) (citing *Rogin v. Bensalem Township,* 616 F.2d 680, 688 (3d Cir.1980), *cert. denied,* 450 U.S. 1029 (1981) ("passage and application ... of the zoning amendments 'so lack rationality that they constitute a constitutionally impermissible denial of equal protection.")). "Discriminatory conduct in conjunction with allegations of conspiracy among the [d]efendants with the purpose of injuring a business is sufficient to allege a claim for denial of equal protection." *Id.,* citing *Northeast Jet Center v. Lehigh-Northampton Airport Authority,* 767 F.Supp.

672, 677-78 (E.D.Pa.1991). *See also, Epstein v. Township of Whitehall,* 693 F.Supp. at 314-15; *DelMonte Dunes Ltd. v. Monterey,* 920 F.2d 1496, 1508-09 (9th Cir.1990); *Holder v. Allentown,* 987 F.2d 188, 198 (3d Cir.1993).

**\*31** In the case at bar, the record evidence establishes that plaintiff has been treated differently than other similarly situated developers, and that defendant's discriminatory conduct is not rationally related to a legitimate government interest.

### 3. Procedural Due Process

As explained by the Third Circuit in *Rogin v. Bensalem Township,* the protections of procedural due process do not extend to legislative actions which "constitute general statements of Township policy rather than specific applications of policy to a particular landowner...." 616 F.2d at 693. In the case at bar, plaintiff is entitled to claim the procedural protections of the due process clause in challenging the administrative act of denying him a building permit, so long as he has "set forth any behavioral or structural allegations from which [the Court] can infer that [defendant's] process was unconstitutional." *Id.* at 694.

Due process requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985). The opportunity to be heard must be at a meaningful time and in a meaningful manner. *Armstrong v. Manzo,* 380 U.S. 545 (1965).

In the case at bar, without notice or an opportunity to be heard, County attorney Mitchell issued memoranda effectively precluding plaintiff from developing the 273 Property for commercial purposes based on a legal analysis questioned by both this Court and the Third Circuit. [FN23] The Court concludes that, under the facts at bar, plaintiff was afforded no pre-deprivation process. The Court further concludes that the post-deprivation process provided by defendant was constitutionally inadequate. Although Delaware affords a judicial mechanism to challenge the administrative decision to deny an application for a building permit, it does not provide an adequate post-deprivation judicial mechanism for challenging conduct intended to destroy plaintiff's constitutional rights to conduct a legitimate business. *See Heritage Farms v. Solebury Township,* 671 F.2d at 748.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *31 (D.Del.))

C. Irreparable Harm

It is evident from the record that plaintiff alleges economic losses in connection with his claims that defendant deprived him of his constitutional rights to due process and equal protection under the law. Plaintiff claims other harm as well, however, including damage to his reputation as a business person and lost capacity to develop as a result of lost time and tenants due to the instant controversy, County limitations on development, and competing development. (Acierno I, D.I. 24 at 64-8; P.Ex. 21)

As recognized by the Third Circuit, "[i]rreparable harm 'must be of a peculiar nature, so that compensation in money alone cannot atone for it.' ... Grounds for finding irreparable injury include loss of control of reputation, loss of trade and loss of good will." Opticians Ass'n of America v. Independent Opticians, 920 F.2d at 195.

*32 The Court finds the facts of record sufficient to demonstrate irreparable harm clearly distinguishable from purely economic losses.

D. Balance of Hardships

In weighing the possibility of harm to other interested parties from the granting of the injunction, and the public interest, Opticians Ass'n of America, 920 F.2d at 196, several factors support the Court's conclusion that the form and magnitude of the relief contemplated by the Court are justified under the Third Circuit's preliminary injunction standards. See United States v. Spectro Foods Corp., 544 F.2d 1175, 1181 (3d Cir.1976).

On one side of the equation is the public interest in controlled land use development, respecting the limits of the land in order to maintain the quality of life the public has come to expect. The public's interest in rational land use is protected primarily by defendant through its regulatory procedures. The goal of rational land use, laudible as it is, cannot be accomplished through the arbitrary application of those governing procedures. Defendant New Castle County is "a sovereign whose obligation to govern impartially is as compelling as its obligation to govern at all...." Berger v. United States, 295 U.S. 78, 88 (1934). As recognized by the Delaware Supreme Court in Acierno v. Folsom,

[p]roperty holders are entitled to know, with a

reasonable degree of certainty, the legal rules and regulations, the legal processes and procedures, governing them in the use of their property. To the extent reasonably possible, the rights and obligations of a property holder under the law should be clear; and the consequences of a course of action, duly adopted and followed by him under existing law, should be predictable.
337 A.2d at 314.

It is significant to note once again that plaintiff utilized for close to 20 years the appropriate mechanisms provided by defendant New Castle County for public review of his record plans, only to have had those plans essentially invalidated by way of an unpublished memorandum authored by a nonelected official without the opportunity for public review or scrutiny. Such arbitrary action is constitutionally infirm.

VII. CONCLUSION

Plaintiff has demanded that a building permit issue. For the reasons stated, the Court concludes that plaintiff has carried his burden of proof under the preliminary injunction standards recited above. Therefore, the Court will grant plaintiff's request.

The parties may each submit a proposed form of order no later than Tuesday, February 15, 1994.

> FN1. More specifically, plaintiff seeks an order compelling the issuance of a building permit for a certain parcel of land consisting of approximately forty (40) acres situate in New Castle County, Delaware, in the vicinity of the intersection of Interstate Highway 95 and Route 273 (hereinafter referred to as the "273 Property"), which parcel is owned by plaintiff.

> FN2. Section 1983 reads, in relevant part, as follows: "Every person who, under color of any statute, ordinance, or regulation, custom or usage of any state or territory or the District of Columbia, subjects, or causes to be subject, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the parties injured in an action at law, sued in equity, or other proper proceedings for redress...."

> FN3. The Fourteenth Amendment provides, in relevant part, as follows: "No State shall make or enforce any law which shall abridge the privileges or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *32 (D.Del.))

Page 29

immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

FN4. The "Findings of Fact" of the New Castle County Board of Adjustment (D.I. 19, Ex. C at 4-8) are given preclusive effect. *University of Tennessee v. Elliott*, 478 U.S. 788, 798 (1986). Consistent with the Third Circuit's holding in *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 193 (3d Cir.1993) ("we do not think that an administrative agency consisting of lay persons has the expertise to issue binding pronouncements in the area of federal constitutional law"), the Court declines to grant preclusive effect to the Board's judicially unreviewed rulings regarding any questions of law addressed therein. Moreover, as analyzed *infra*, the Court questions the Board's jurisdiction to essentially review the judicial decision of the Delaware Supreme Court and the legislative decision of New Castle County years after such decisions were made and effectuated.

FN5. The two parcels of land collectively will be referred to as the "273 Property."

FN6. In 1971, the larger parcel of the 273 Property was (and still is today) located in a M-1 district. Prior to the enactment of Ordinance No. 71-104, every use permitted in a commercial district was also permitted in a manufacturing district.

FN7. The complex is sometimes refered to as comprising 323 units.

FN8. Then Code § 23-81(21) provided in relevant part as follows:
If construction has not been completed within ... five (5) years after the date of approval of the record development plan for the PUD or the date of approval of the record development plan of the last stage of PUD, if submitted in stages, whichever is longer, then the approval shall be voidable at the discretion of county council, upon recommendation of the department of planning.
*(Acierno II,* D.I. 81, Exhibit 2 at 20)

FN9. Current Code § 23-81(18) provides in relevant part as follows:
The landowner shall have ten (10) years from the effective date of the original rezoning ordinance to develop the parcel as proposed. The rezoning ordinance shall contain the expiration date for the zoning date for the zoning classification. If, at the end of ten (10) years, or at the time of requesting

revised record plan approval, the parcel has not been fully and completely developed and the landowner desires to proceed under this classification, he must submit, to the department of planning, current support facilities information demonstrating the impact on and availability of traffic, sewers, water and open space. The department of planning will evaluate the data submitted, consult with the support facilities agencies where deemed necessary, and determine whether such facilities are adequate for the development as originally established. If the support facilities are deemed adequate, the landowner can proceed with the development as shown on the original rezoning ordinance. If the support facilities are determined to be inadequate, only that portion of the development which can be supported by existing facilities will be allowed to proceed and the balance of the development will be staged based upon the availability of support facilities, if at all.
*(Acierno II,* D.I. 81, Ex. 2 at 20-21)

FN10. The following officials were copied on this memorandum: William W. Bowser, County Attorney; Robert W. O'Brien, Director, Department of Public Works; Bryan C. Shuler, AICP, Director, Department of Planning; and Saurabh Srivastava, Site Management, Department of Public Works.

FN11. The following were copied on this memorandum: Robert W. O'Brien; Warren S. O'Sullivan; Bryan Shuler; Michael Mitchell; and Thomas J. Fede.

FN12. Former Secretary Justice pled guilty in January 1993 to extortion under color of official right, *United States v. Justice*, Cr.A. No. 92-54-SLR (D.Del.1993).

FN13. The following officials were copied on this memorandum: William W. Bowser, County Attorney; Bryan C. Shuler; and David J. Biloon.

FN14. The following were copied on Biloon's letter: Robert W. O'Brien; Warren S. O'Sullivan; Saurabh Srivastave; Donald A. Laubach; Michael Mitchell; Bryan C. Shuler; Caldor Department Stores.

FN15. The following were copied on the letter: Robert W. O'Brien; Warren S. O'Sullivan; Saurabh Srivastava; Bryan C. Shuler; Michael Mitchell; Donald A. Laubach; A. Norman Paul; and Caldor Department Stores.

FN16. *Kejand, Inc.*, No. 91A-05-006 slip op. (May 14, 1993) at 4. (D.I. 26)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 720273, *32 (D.Del.))

Page 30

FN17. *City of Rehoboth Beach v. Shirl Ann Associates*, 1993 Del.Ch. LEXIS 225 at 4.

The rationale for "honest error" is that at some point after having dealt with a building inspector in good faith, a landowner's interest in a property should become secure regardless of a permit's actual validity.... [H]owever, "the courts are extremely cautious in invoking the doctrine of estoppel in these cases unless there are exceptional circumstances which make it highly inequitable or oppressive to enforce the regulations."

FN18. *Board of Regents v. Roth*, 408 U.S. at 572 (liberty includes the right "to engage in any of the common occupations of life"); *Pelletier v. Federal Home Loan Bank*, 968 F.2d 865, 872 (9th Cir.1992) ( "ongoing interference with an individual's pursuit of his chosen livelihood may amount to deprivation of a constitutionally protected liberty interest"); *Cowan v. Corley*, 814 F.2d 223, 227 (5th Cir.1987) ("deni[al of] the opportunity to pursue [a] livelihood ... is a constitutionally protected interest"); *Sanderson v. Greenhills*, 726 F.2d 284, 286-87 (6th Cir.1984) (one has "a 'liberty' interest to engage in whatever legal business [one] elects to pursue without arbitrary intereference"); *Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir.1983) ("freedom to choose and pursue a career ... qualifies as a liberty interest which may not be arbitrarily denied by the State"); *Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir.1983); *Fitzgerald v. Mountain Laurel Racing, Inc.*, 607 F.2d 589, 602 (3d Cir.1979), *cert. denied*, 446 U.S. 956 (1980). *See also, RRI Realty Corp. v. Southhampton*, 870 F.2d 911, 917 n. 4 (2d Cir.), *cert. denied*, 493 U.S. 893 (1989) (suggesting application of the above analytical framework to denial of a requested land use).

FN19. The Court notes that in *City of Rehoboth Beach v. Shirl Ann Associates*, 1993 Del.Ch. LEXIS 225, No. 1552 (Del.Ch. August 31, 1993), the Court of Chancery describes the doctrine of equitable estoppel as requiring proof that a party, acting in good faith, on an affirmative act of a municipal corporation, [made] expensive and permanent improvements in reliance thereon, and a balancing of the equities must weigh in its favor. *Id.* at 3 (citing *Miller v. Board of Adjustment of Dewey Beach*, 521 A.2d 642, 645-546 (Del.Super.1986), *citing Saah v. District of Columbia Board of Zoning Adjustment*, 433 A.2d 1114, 1116 (D.C.App.1981)). All of these cases involved landowners requesting "to continue the construction or use of buildings which violate zoning ordinances." *Miller*, 521 A.2d at 645. There are no structures involved in the case at bar. Given the nature of the development process as it has evolved to date, the doctrine of equitable estoppel as described by the Delaware Superior court in the *Kejand, Inc.* case above, affirmed by the Delaware Supreme Court, is "dispositive of the property interest issue under Delaware law." (D.I. 26)

FN20. Commenting on the quantum of proof necessary in a § 1983 action alleging arbitrary governmental conduct, the Third Circuit recently stated:

Although much of [plaintiff's] evidence as to *scienter* on the part of the City's highest policy officials may be circumstantial, such evidence, if examined carefully, is often the best and most reliable proof of the subjective motivations for the conduct of the actors. One can hardly expect them to admit to wrongdoing; circumstantial evidence in cases such as the one at bar, will usually suffice.

*Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d at 698.

FN21. Although adopted as the "policy or custom" of defendant by notice of Mitchell's actions to officials of both the Planning Department and County Council. *Carr v. Dewey Beach*, 730 F.Supp. 591, 606 (D.Del.1990).

FN22. Considered in this regard as well is defendant's conduct through the course of this litigation, which has been characterized as contemptuous by this Court.

FN23. *Acierno v. Mitchell*, 6 F.3d at 975-76 n. 13.

1994 WL 720273 (D.Del.)

Motions, Pleadings and Filings (Back to top)

· 1:93CV00579 (Docket) (Dec. 17, 1993)

END OF DOCUMENT