# EXHIBIT 6
# TO PLAINTIFFS' COMPENDIUM OF UNREPORTED CASES TO THEIR ANSWERING BRIEF IN OPPOSITION TO THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in F.Supp.  
1995 WL 704976 (D.Del.)  
(Cite as: 1995 WL 704976 (D.Del.))  
C

Page 95

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.  
Frank E. ACIERNO, Plaintiff,  
v.  
NEW CASTLE COUNTY, Defendant.  
Civ.A. No. 93-579-SLR.

Nov. 1, 1995.

Charles M. Oberly, and Kathleen Jennings, of Oberly & Jennings, Wilmington, Delaware, and John J. Yannacone, of Yannacone, Fay, Baldo & Daly, Media Pennsylvania, for plaintiff.

Collins J. Seitz, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware, for defendant.

*MEMORANDUM OPINION*

SUE L. ROBINSON, District Judge.

*1 Before the court are cross motions for summary judgment filed by plaintiff Frank E. Acierno and defendant New Castle County. In this litigation, plaintiff challenges the conduct of the County and its officials as being violative of his rights to due process and equal protection under the Fourteenth Amendment to the Constitution.

The court has jurisdiction to hear the motions pursuant to 28 U.S.C. §§ 1331 and 1343(3). Venue is proper in this district under 28 U.S.C. § 1391(b), as both parties are residents of, and the claims asserted by plaintiff arose in, this district.

I. FACTUAL BACKGROUND

Although the historical facts leading up to this litigation have been recited extensively in several of this court's decisions, the following facts (essentially undisputed) are included to properly frame the pending issues. [FN1]

Plaintiff, in 1971, was the long-term lessor of a large part of a parcel of land consisting of some 40 acres situate in New Castle County (the "County") and located near the intersection of Interstate Highway 95 and Route 273. In 1971, plaintiff also owned in fee simple a small parcel of land adjoining the leased tract, which parcel fronts on Route 273. The larger parcel of land was zoned M-1 under New Castle County laws and regulations; the smaller parcel was zoned C-2. [FN2] *Acierno v. Folsom*, 313 A.2d 904, 905 (Del.Ch.), *aff'd*, 311 A.2d 512 (Del.1973) (litigation involving the property but not related to the issues in controversy *sub judice*).

On May 11, 1971, plaintiff filed with the Department of Planning for New Castle County ("Planning") a so-called exploratory sketch plan for the construction of a proposed shopping center as a preliminary step towards obtaining approval of his project. This initial plan was then followed up on August 8, 1971, as required by regulations, with a Preliminary Tentative Plan, which plan was thereafter disapproved by Planning on October 22, 1971. *Id.* at 905. On October 26, 1971, plaintiff appealed Planning's adverse decision to the County Planning Board, as required by regulations. In the meantime, New Castle County Council ("County Council") was considering zoning changes which would prohibit commercial uses in wholly industrial zones (zoned M-1). The County was due to act on the proposal on November 9, 1971. "The matter of timing was of understandable concern to [plaintiff's] counsel, which concern he expressed. A special meeting of the [County Planning] Board was convened, in fairness to [plaintiff], on November 8, 1971 to consider his appeal. By [a] four-to-one vote on that date, the Preliminary Tentative Plan was approved...." (D.I. 124 at 42)

On January 24, 1972, a final plan for plaintiff's contemplated shopping center was filed with Planning. On February 24, 1972, however, Planning denied approval of plaintiff's final plan (1) because of its alleged conflict with the general comprehensive development plan adopted for New Castle County; (2) because the shape of the tract in issue allegedly made it unsuitable for the construction of a shopping center; and (3) because of the impact on the area in question of the increased traffic which would allegedly result from the erection of the proposed shopping center. *Acierno v. Folsom*, 313 A.2d at 905.

*2 Plaintiff appealed to the County Planning Board which, after a final hearing, informed plaintiff on April 26, 1972 that it had voted to sustain Planning's disapproval of plaintiff's plan. *Id.* Thereafter,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *2 (D.Del.))

Page 96

pursuant to applicable regulations, a hearing on plaintiff's application was held on August 22, 1972 before County Council at which Dr. V. Eugene McCoy, chairman of the County Planning Board, placed on record his opposition to plaintiff's proposed plan and argued that plaintiff's appeal should be dismissed, notwithstanding the fact the he had sat on the application below as chairman of the County Planning Board. *Id.*

Before a decision was reached by County Council, however, a stipulation was entered into between County Council, Planning, and plaintiff. Under the terms of the stipulation, it was agreed that plaintiff's application would be returned to Planning for the receipt of additional evidence on those three aspects of plaintiff's proposed shopping center which had previously been identified by Planning. *Id.*

Following such rehearing, Planning found against plaintiff on all three of the questions submitted for consideration. Plaintiff again appealed to the County Planning Board. *Id.* A hearing was then held by the County Planning Board which, after receiving legal advice, decided: (1) 6 to 0 in favor of plaintiff as to the alleged incompatibility of plaintiff's plan with the County's comprehensive development plan; (2) 4 to 2 for plaintiff in overruling Planning's rejection of plaintiff's plan on the ground of unsuitable internal design of his project; and (3) 3 to 3 to sustain Planning's rejection of plaintiff's plan on the ground that it would have an adverse effect on vehicular traffic in the area. *Id.* at 906. After the taking of the vote at the conclusion of the hearing, in which Chairman McCoy and two other Board members voted to affirm the ruling of Planning, Dr. McCoy announced that Planning's disapproval of plaintiff's plan had been sustained. However, on December 14, 1972, before the Board had filed a written opinion, Mr. Johnson, a Board member who had been absent at the November 21, 1972 hearing, wrote Dr. McCoy that if he had been present at the hearing in question, he would have voted to overrule Planning in all three areas under consideration. *Id.*

Plaintiff again appealed to County Council which, after a hearing held on January 9, 1973, unanimously affirmed the rejection of Mr. Johnson's proffered vote and the counting of Dr. McCoy's vote by the Board, and which, after admitting further evidence on the matters in issue, voted 4 to 3 to sustain the action of Planning insofar as it had rejected plaintiff's plan on the ground of its alleged adverse effect on the flow of traffic in the area. *Id.* Plaintiff appealed the decision to the Court of Chancery of the State of Delaware. Defendants in that case (members of the New Castle County Council as then constituted and the then Director of Planning) raised the allegation for the first time (March 1973) that "plaintiff's land [was] improperly zoned." Plaintiff contended in response that Planning had admitted that plaintiff's land was "accorded 'grandfather' status under the prior code which permitted shopping centers in M-1 areas." (D.I. 124 at 54)

*3 Defendants countered:
Defendants submit that the argument is appropriate to a motion for summary judgment on the affirmative defenses raising the defense of failure to state a claim. If the M-1 zoning classification of plaintiff's land does not permit the shopping center use in plaintiff's proposed Final Plan, then plaintiff cannot obtain an order of this Court directing approval since the zoning would not support that use in any event. Furthermore, the Complaint recognizes the importance of the argument for in paragraph 3 plaintiff alleges that "no rezoning is necessary in order for a shopping center to be constructed." Thus, the allegation actually first was raised by plaintiff in the Complaint as a prerequisite to jurisdiction and/or to the relief he requests. The so-called Exhibit A attached to plaintiff's brief is not properly before this Court since it has not been submitted by affidavit and has not been identified authentically. In any event, the final determination of the matter must be made judicially no matter what administrative determination may have been suggested by the Department of Planning. It is submitted, therefore, that the affidavits placed before this Court by defendants show that a substantial part of plaintiff's land is zoned M-1 and does not permit a shopping center use.
(D.I. 19 at 30) (emphasis added).

The Court of Chancery determined that "the question of zoning, which defendants have sought to raise here, was not considered by any of the several defendants in connection with plaintiff's application for approval of his building plans and will not be considered here." (D.I. 19 at 33) (emphasis added). The Court of Chancery also held that "County Council was authorized to 'reach its own conclusion after its own deliberation and review of the record'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 4 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *3 (D.Del.))

Page 97

and to reject a subdivision plan approved by the Planning Board; that, therefore, the 'official tally of the votes at the Planning Board level' was irrelevant." *Acierno v. Folsom*, 337 A.2d 309, 311 (Del.1975) (reversing the unreported decision of the Court of Chancery).

Plaintiff appealed this decision to the Supreme Court of the State of Delaware. By decision rendered March 14, 1975, the Supreme Court reversed the lower court's decision, finding that "an approval of the Planning Board was binding upon the Planning Department; that upon such approval the Director of the Department was obliged to certify that the plan was in conformity with the Regulations; and that upon such certification, the County Council was obliged, as a ministerial function, to register its approval for recordation purposes." *Id.* at 313. Having so found, the Court then concluded that there was approval of plaintiff's plan by the Board: "We think there was for the reason that the Chairman of the Board acted unlawfully in denying the application of the [plaintiff] that he disqualify himself and abstain from sitting in the case." *Id.* at 314.

Judgment having been reversed, the cause was remanded for further proceedings consistent with the Supreme Court's decision. After review by Planning and the New Castle County Department of Law in order to ensure that Planning "follow [ed] the letter of the subdivision regulations in processing [plaintiff's] Record Plan submission" (*Acierno v. Michael Mitchell and New Castle County*, C.A. No. 92-384-SLR (D.Del.1992), "*Acierno I*," D.I. 93), plaintiff's plan was approved by County Council by Resolution No. 75-195 adopted on October 28, 1975: "Plan of 273 Shopping Mall, White Clay Creek Hundred." (D.I. 124 at 58)

*4 Defendant New Castle County amended its zoning code regulations by Ordinance No. 71-104, effective November 16, 1971, to exclude commercial uses as permitted uses in M-1 districts. [FN3] (*Acierno I*, D.I. 18 at 4)

The record resubdivision plan approval process has been described of record as follows:
[A]n engineer would submit a plan to the Department of Planning labeled as a resubdivision plan and defining what the purpose of that plan was....
The Department [of Planning] would review that for conformity with both the subdivision and zoning codes of New Castle County, and if found in conformity, would approve that.
It really depends on the individual plan, how much, not how much review, but how much involvement other entities might have in that process.
For example, if the resubdivision plan had issues related to design of circulation features, the department would want to make sure that both the Department of Highways, Transportation, and possibly the fire marshal were cognizant of those changes and would approve them.

* * *

[Planning] view[s] a record resubdivision plan in large measure no differently than we do the original plan.
The resubdivision process is really more for, not necessarily convenience, but since it's not substantive, it's not a new development, but it's just a modification to a previously approved development, it's a more abbreviated process, but the same level of review by the Department of Planning, the same concerns by the department of planning are addressed as we would address in the original review.
(D.I. 27 at 22-3) Moreover,
when a plan is submitted for review under the subdivision and zoning regulations, the department [of planning] reviews it not only for full compliance with the subdivision land development regulations, but as well as the zoning code....
[I]f in fact the proposed use is not consistent with the zoning code, the Planning Department's responsibility is to disapprove the plan....
(*Acierno I*, D.I. 31 at 25)
[I]f the department of planning determines that they believe some legal analysis or legal question that they have ascertained needs review, they would contact the department of law.
A typical resubdivision plan is not seen by the department of law. I mean, the department of planning is responsible for reviewing and approving record plans. So it is that department that usually will raise the question.
The department of law is not out looking at every single plan seeing if there are legal issues.
(D.I. 27 at 24)

Therefore, if a resubdivision plan is approved and recorded, the resultant approval and recordation of that plan indicates either that Planning did not see

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *4 (D.Del.))

Page 98

any legal impediments to recordation (and, thus, the County Law Department was not consulted), or the County Law Department, upon review, did not see any legal impediments to recordation. (D.I. 192 at 24-5; D.I. 27 at 18, 25-7; *see also Acierno I,* D.I. 32 at 18, 25-7)

*5 Land development is a dynamic process, subject to such limitations as traffic and sewer capacity, as well as fluctuations in market demand. Presently there are at least 14 other properties situate in the same "metroform" as the 273 Property, all vying for a share of the market and of the land's limited capacities to handle development. (D.I. 27 at 24)

Sometime in the "early eighties", plaintiff purchased the 273 Property. (*Acierno I,* D.I. 24 at 19) According to the evidence of record, plaintiff submitted a Record Resubdivision Plan in September 1987 for the 273 Property. The plan proposed to: (1) subdivide the property into three parcels; (2) change building locations and sizes to accommodate the present market; and (3) correct drafting errors along some boundary courses. This resubdivision was the subject of a memorandum dated January 26, 1988, from Charles D. McCombs, II, of Planning to plaintiff's engineers, Mann-Talley, in which a specific notation is made:
  6. Provide a note referencing previous court action that permitted commercial development in the M-1 zoning district.
(D.I. 124 at 59) A note consistent with Planning's instruction was included on the plan. On February 26, 1988, New Castle County Planning Director Wayne Grafton approved the plan for recording. (D.I. 19 at 119)

By letter dated May 12, 1988, Planning received a letter from plaintiff's agent regarding "a record minor subdivision development plan of the Hampton Inn at the 273 mall site." The following notation was made by Planning employee Herbert V. Blackwelder, Jr.: "Reviewed with M. Mitchell-- Okay. Reference on record plan." (D.I. 192 at 14) On May 15, 1988, Grafton approved a land development plan for "Hampton Inn" on a parcel zoned M-1. The *Acierno v. Folsom* case was noted. (D.I. 19 at 212)

In November 1988, plaintiff again submitted a resubdivision plan to "revise buildings & parking for buildings 1, 2, & 3" and to "correct drafting errors along some boundary courses." This resubdivision was approved by Grafton's signature on March 7, 1989 and was identified as Micro No. 9669. The resubdivision plan depicted, among other uses, a detached 70,000 square foot building, designated on the plan as "Building 4," located in the parcel zoned M-1. The *Acierno v. Folsom* case was noted. (D.I. 19 at 213)

By letter dated April 3, 1991, to County attorney Michael Mitchell, William S. Gee, Esquire, forwarded copies
  of two of the decisions regarding the 273 Mall. I have forwarded the same for your convenience prior to reviewing the entire file. I greatly appreciate your prompt response to my needs. I will keep you advised as matter[s] progress regarding my client's undertaking at that site.
(D.I. 170) No one is noted as having been copied on this letter.

Gee corresponded further with Mitchell by letter dated April 8, 1991:
  As a follow-up to our conversation of the other day, my client has had further conversations with Mr. **Acierno**. He is alleging that because his record plan was recorded, the same provides him the necessary zoning authorization for retail sales in an M-1 zone. As we discussed, I believe such a position to be in error.
  *6 The foregoing notwithstanding, Mr. **Acierno** claims to have some documentation to this effect. I will forward it to you for your information upon its receipt from my client. Whether or not my client goes forward, I wanted to keep you advised of Mr. **Acierno**'s position such that when the issue arises at some later date, you will be prepared.
(D.I. 170) No one is noted as having been copied on this letter.

Mitchell responded to Gee's letters on April 16, 1991:
  In regard to your recent correspondence and our telephone conversations concerning the above-referenced matter, I want to thank you for keeping me apprised of the ongoing events. I also look forward to receiving the documentation that Mr. **Acierno** claims supports his theory that he has authorization for retail sales in an M-1 zoning district. Upon receipt of those materials, I will contact you to discuss my feelings concerning this matter. Once again, I thank you for your assistance.
(D.I. 170) No one is noted as having been copied

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *6 (D.Del.))

Page 99

on this letter.

By memorandum dated April 18, 1991 from Mitchell to David J. Biloon ("Biloon"), Chief, Development and Licensing Division, Department of Public Works, New Castle County, Mitchell represented that in response to a telephone inquiry from Gee, he

> obtained a copy of the original Record Plan for this site as well as recent Resubdivision Plans. In addition, [he] reviewed the Chancery and Supreme Court opinions issued in the early- to mid-1970s that involve this site and the original Record Plan.

(D.I. 170) Mitchell, in his memorandum to Biloon, then "summarized the history of this site and the litigation that has led Mr. **Acierno** to believe that the site is appropriately zoned for retail sales." Mitchell concluded:

> In reviewing the most recent Plan for the 273 Mall, Parcel C, which is a little over one (1) acre in size, is the only portion of the property that is zoned for commercial purposes, being zoned C-2. A sliver of the property fronting on Route 273 is zoned R-1-C, while the remaining 38.20 acres is zoned M-1. Much of the proposed use of the property involves retail sales, a fast-food restaurant and a hotel. These uses are not permitted in an M-1 district. The warehouse use with related retail sales appears, on its face, to be permitted by the Code, but that would depend on the particular use that Mr. **Acierno** proposes. Nevertheless, the majority of the property is not properly zoned for the apparent intended use of the property. Given that fact, no building permit should be issued for any construction on this site until extensive review and consultation between the Division of Development and Licensing, Department of Planning and Department of Law is initiated and concluded concerning any proposed use. Given the types of tenants that he has approached; *i.e.,* the movie theater chain, it is clear that Mr. **Acierno** intends to initiate a use of the property that is not in conformity with the New Castle Zoning Code.
> *7 In order to implement this directive, a general hold should be placed on any building permits that could be issued for this site. If that cannot be accomplished, all plan examiners and other officials involved in the building permit process should be advised of this situation and ordered to report any application for a building permit directly to you. If Mr. **Acierno** applies for a Building Permit for the 273 Mall, please contact this Department so that the review discussed above may be initiated.

(D.I. 170) (emphasis added). The following officials were copied on this memorandum: William W. Bowser, County Attorney; Robert W. O'Brien, Director, Department of Public Works; Bryan C. Shuler, AICP, Director, Department of Planning; and Saurabh Srivastava, Site Management, Department of Public Works.

By memorandum dated May 3, 1991 for circulation within the Division of Development & Licensing, Biloon put into effect Mitchell's request:

> Please inform your respective staffs to keep an eye out for any activity, i.e., building permit applications, for either the 273 Mall or Westhampton....
> We have been advised by the Law Department that there is a zoning problem at the 273 Mall site. Basically, the site is zoned M-1 which will not support retail shopping uses. At this point in time, I will not try to explain the legal reasons as to why there is a valid Record Plan or why the Record Plan cannot be rescinded by the County; but, never the less [sic], we have been instructed by the Law Department to withhold building permits for any activity.
> The Westhampton [P]roject is being reevaluated in regard to its legal status as a Record Plan which contains DPUD zoning and which has not commenced activity within a five-year period.
> Both of these sites are currently owned by Frank E. **Acierno**. Please be sure this information gets placed with the Record Plans in our files for future reference and again remind your staffs to continually check Record Plans prior to issuance of permits.

(D.I. 170) (emphasis added). The following were copied on this memorandum: Robert W. O'Brien; Warren S. O'Sullivan; Bryan Shuler; Michael Mitchell; and Thomas J. Fede.

According to Mitchell, the fact that the status of both the 273 Property and the Westhampton Property was addressed by him in April 1991 was

> happenstance more than anything else. The primary motivator of the memo was the Route 273 issue that had been raised by Mr. Gee in his phone call to me.
> I don't have a specific recollection, but I believe that it was my conclusion that county council at least informally was expressing a desire to somehow at least have an opportunity to review

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 7 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *7 (D.Del.))

Page 100

and address some concerns with respect to the Westhampton project.
Consequently, I included reference to Westhampton in the memorandum to Mr. Biloon more as a heads up than anything else so that a permit wouldn't inadvertently issue before council had an opportunity to take whatever action they wanted to take, if any at all.
*8 (D.I. 27 at 27-8)

By letter dated May 15, 1991, Gee formally requested a zoning certification of the 273 Property from Brian C. Shuler, Director of Planning:
My firm represents a potential lessee of a portion of the above-referenced property for the proposed operation of a multi-screen movie theatre complex. The property is owned by Mr. Frank **Acierno**, who proposes to build the complex to our client's specifications and to execute a long term lease for the property. We are writing to request a zoning certification that such a proposed use is permitted for the property. Enclosed is our firm's check for $50.00 to cover the cost of this certification.
As you may know, the property was the subject of litigation in the early 1970's, which ended when the Delaware Supreme Court held that Mr. **Acierno's** subdivision plan, which included commercial uses, was approved by the County Council as a matter of law. This decision ended a four year fight over approval of the record plan, which began in 1971.
The property currently is zoned M-1. Under the current definition of M-1 zoning, our client's proposed commercial use, a multi-screen movie theatre complex, would not be permitted. However, in the early 1970's when the subdivision plan for the property was first submitted, M-1 zoning supported our client's proposed commercial use.
We have been informed by Mr. **Acierno** that our client's proposed use for the property was "grandfathered" because at the time the subdivision sketch plan was submitted, such a proposed use was permitted. Unfortunately, the Court decisions in the litigation, as well as Mr. **Acierno's** lawyer's files do not contain definitive documentation that the proposed use was grandfathered. However, Mr. **Acierno's** lawyer's files did contain several documents which clearly show that the County recognized and endorsed the grandfathering of this proposed use.
For example, on August 17, 1972, Richard M. Bauer, the then director of Planning of New Castle County, wrote a memorandum (Tab A) in response to Mr. **Acierno's** appeal to the Council for reconsideration of the denial by the New Castle County Department of Planning of the final plan for the property. At page 7 of the memorandum, Mr. Bauer notes that the zoning code was amended to delete certain commercial uses,, but that the "subject land was accorded a 'grandfather' status in such regard, i.e., could continue to be used for such purposes for a period of three years following the Code Amendment, as per Art. XXI, Sec. 1, of the Code."
Mr. Bauer's memorandum makes reference to a June 4, 1971 letter of Frank Bonifacino (Tab B), wherein Mr. Bonifacino expresses the opinion that the parcel in question should not be developed as a commercial center. However, on page 2 of the letter, Mr. Bonifacino states that "the Department realizes that ... commercial uses are permitted as a matter of right in manufacturing zoning districts."
Finally, on December 12, 1972, the Planning Board solicited an opinion letter from Bruce M. Stargatt, Esquire (Tab C), wherein it was presumed that the proposed subdivision plan complied with the zoning code. In addition, on page 2, subsection B, the letter provides that "at the time the sketch was submitted, commercial use of the **Acierno** land was permitted since 38 acres of the land was zoned M-1, and lesser uses were then allowed in M-1 zones."
*9 Based on the enclosed documents, it appears that the County has recognized and supported the proposition that our client's proposed commercial use for the property is grandfathered. Hopefully, your files will contain documentation supporting this conclusion.
One further matter bears mention. Specifically, Mr. **Acierno** will need a new record plan for my client's proposed theatre and parking areas. As such, a separate issue is presented in that such a revised plan may waive any "grandfathering."
Please contact me after you have had the opportunity to review your files in this matter to determine the County's position on the grandfathering issue, so that we can advise our client accordingly. In the interim, if you have any questions, do not hesitate to contact me.
(D.I. 170) A Mr. John Hynes was copied on this letter.

Also on May 15, 1995, Gee wrote to Mitchell:
Enclosed is a courtesy copy of my correspondence to the Department of Planning. While we wanted

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 8 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *9 (D.Del.))

Page 101

to review their file on this matter, they asked that a formal request for an opinion be made.
As you know, it is our goal to consummate this transaction and, thus, we hope to obtain a positive answer from the Department of Planning. Since I am sure you will be involved in their review, I would appreciate your contacting me with your thoughts on this subject.
(D.I. 170) No one was copied on this letter.

By letter dated May 17, 1991, Gee forwarded to plaintiff a copy of his correspondence
to the Department of Planning regarding the 273 Mall. After speaking with Mr. Bonifacino, it was asked that a formal request be made. Hence, the enclosed was prepared and forwarded.
I will let you know what we learn from the Department of Planning as soon as I receive the same.
(D.I. 170) Mr. Hynes once again was copied.

By memorandum dated May 22, 1991, Shuler requested that Mitchell review Gee's request and the "material that was evidently culled [by Gee] from the Department of Planning and private counsel files concerning" the 273 property. (D.I. 170) Gee was copied on this memorandum.

By memorandum dated July 9, 1991 from County attorney Mitchell to Shuler, Mitchell once again related the litigation history of the 273 Property and concluded, consistent with his April 18, 1991 memorandum, that plaintiff's record plans should not be accorded "any effect inasmuch as they purport to permit that which is not permitted by the Zoning Code." (D.I. 170) According to Mitchell, the basis for his conclusion rested on application of Article XXI, Section 3, New Castle County Code (codified as § 23-6(a) in the present Code). Mitchell opined that the November 8, 1971 approval of plaintiff's Preliminary Tentative Plan for the 273 Property "activated" § 23-6, which provides:
(a) No proposed ordinance to amend the zoning map shall be acted upon by county council within three (3) years after the latest of any of the following actions:
....
(3) Prior approval under the subdivision regulations of a preliminary plan involving any parcel of land, or portion thereof, whose zoning classification would be changed by the proposed amendment.... In no event shall the period permitted under this paragraph exceed three (3) years from the earliest approval under the subdivision regulations of a preliminary plan involving such parcel, or portion thereof.
*10 (c) No amendment to the zoning code regulations shall be applicable to any parcel or parcels of land protected by subparagraphs ... (3) ... of subsection (a) of this section during the period of such protection....
(D.I. 170; *See also Acierno I*, D.I. 16 at A29-31)
According to Mitchell:
Since this property would have been accorded the three-year stability protection regarding a proposed rezoning for the site, it also received the protections accorded by Section 23-6(c) of the Code....
The purpose of the three-year "moratorium" provision is to provide stability to the process. In this case, Section 23-6(c) permits a lot owner three (3) years to establish a use that but for a recent Zoning amendment would have been permitted in that district if the particular parcel was protected by Paragraph (1), (3) or (4) of Section 23-6(a). The protection is afforded only for the three-year period and the property owner must establish the non-conforming use during that time. If the use is not established, the Code affords no further protection to that particular parcel. Thereafter, the property owner must comply with the revised provisions of the Zoning Code.
Nor does the recordation of a plan create any rights, vested or otherwise. It is the use that is conferred non-conforming status, not a plan or a permit of any kind. Therefore, since Mr. **Acierno** did not establish a non-conforming commercial use within the three-year period provided for in Section 23-6(c), he is no longer entitled to establish any commercial use except those very limited instances where such commercial uses are now presently permitted in a M-1 district accessory to the permitted manufacturing/industrial use.
(D.I. 170; *see also Acierno I*, D.I. 16 at A27)
There is no indication that anyone else received a copy of this memorandum at this time. [FN4]

Gee corresponded with Mitchell on July 17, 1991:
In speaking with Frank Bonifacino the other day, he indicated that he thought a decision would be forthcoming on the 273 Mall in the near future. Any efforts to resolve this matter, one way or the other, would be appreciated such that my client is not left "hanging."
(D.I. 170) No one was copied on this letter.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 9 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *10 (D.Del.))

Page 102

Just two days later, by letter to Shuler dated July 19, 1991, Gee withdrew his request for the zoning certification because "negotiations between the owner of the [273 Property] and [Gee's] client [had] been terminated." (D.I. 170) No one was copied on this letter. By letter dated July 22, 1991, Gee forwarded to plaintiff a copy of his July 19, 1991 letter to Shuler. (D.I. 170) No one was copied on this letter.

By memorandum dated August 6, 1991 from Mitchell to Robert O'Brien, Director, Department of Public Works, Mitchell forwarded his July 9, 1991 memorandum so that O'Brien could "take appropriate action to ensure that no building permit is issued for any principal commercial use [on the 273 Property].... Accordingly, would you please take any steps necessary to ensure that no permits are issued for this site until complete review and consultation is accomplished with this Department and the Department of Planning." (D.I. 170) (emphasis added). The following officials were copied on this memorandum: William W. Bowser, County Attorney; Bryan C. Shuler; and David J. Biloon.

*11 During the spring and summer of 1991, plaintiff negotiated with several prospective commercial tenants, including Caldor, Inc. (*Acierno I*, D.I. 16 at A33-5; *Acierno I*, D.I. 26, Ex. 13) In connection with his negotiations with Caldor, plaintiff, in or about December 1991, submitted an application for a permit to build a Caldor store. By letter dated December 18, 1991 from David Biloon to plaintiff, plaintiff was informed of the following:

> Please be advised that New Castle County cannot accept your building permit application for the proposed Caldor Department Store at this site. Commercial ventures of this nature cannot be situated on lands which contain a manufacturing zoning classification. Additionally, the existing Record Plan (Microfilm # 9669) allows for a 70,000 square foot building denoted as Building # 4. The proposed structure is 112,000 square feet. This is also a discrepancy which must be rectified prior to the issuance of any permits.

(*Acierno I*, D.I. 16 at A34) The following were copied on Biloon's letter: Robert W. O'Brien; Warren S. O'Sullivan; Saurabh Srivastave; Donald A. Laubach; Michael Mitchell; Bryan C. Shuler; Caldor Department Stores.

In February 1992, plaintiff's temporary erosion and sediment control plan for the 273 Property was approved by the State of Delaware, Department of Natural Resources and Environmental Control. (*Acierno I*, D.I. 24 at 52 and Ex. 12) In May 1992, plaintiff resubmitted his application for a building permit in connection with the 273 Property; the accompanying plan provided for a 70,000 square foot building drawn in accordance with County standards. (*Acierno I*, D.I. 24 at 54 and Ex. 13)

On May 27, 1992, Biloon communicated with County attorney Mitchell regarding plaintiff's latest application: "We have another application for the dept. store. This time the building plans agree with the record plan. What is our next move?" (*Acierno I*, D.I. 26, Ex. 16) Mitchell responded immediately: "It is not zoned for a retail department store. He does not get a permit." (*Acierno I*, D.I. 26, Ex. 14) Biloon replied within the hour: "What about your meeting with Phil C.? Frankie's boys tell me that Phil told you back off!!!!" (*Acierno I*, D.I. 26, Ex. 15)

The meeting referred to above occurred in "early '92" with at least the following individuals in attendance: Philip D. Cloutier, then President of New Castle County Council; State Representative Ennis; County Councilman Cecil; County attorney Michael Mitchell; and Herbert V. Blackwelder, Jr., a Planner 3 in the Subdivision Section of the Department of Planning. The meeting was not publicly noticed; the primary focus of the meeting was on another of plaintiff's properties, Merchant Square. The 273 Property was discussed, however, in the context of plaintiff's negotiations with Caldor, Inc.; apparently, Caldor needed two stores in the County, and plaintiff was proposing that his two sites, Merchant Square and the 273 Property, were appropriate choices for Caldor. According to Mr. Blackwelder,

> *12 [n]ear the end of that meeting--I don't know who initiated it--but I believe Mr. Cloutier was aware that the Law Department had raised concerns about the zoning with the 273 site. And, of course, I was aware of it as well at that time. And I indicated to Mr. Cloutier that the Department of Planning was not involved unless a record plan was advanced. And in terms of Mr. Mitchell's opinion, I did not disagree with his opinion. I did express concerns about its implication and wanting to talk to Mr. Mitchell if the Department of Planning was involved in having

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 10 of 20

Not Reported in F.Supp. Page 103
(Cite as: 1995 WL 704976, *12 (D.Del.))

to review and act on an approved record plan ... My concern was that the opinion might have broader implications beyond this site for other--for other sites, but I don't know whether or not-- you know, I would still have those concerns, once I would have the opportunity to sit down and discuss with Mr. Mitchell his rationale for the conclusion. Since the Planning Department was not involved in having to review and react to a plan or the zoning issue, Mr. Mitchell and I really have not had an opportunity to discuss his opinion at any length at all.
(*Acierno I*, D.I. 31 at 40-1) (emphasis added).

A permit number was assigned to the 273 Property project, then voided by Biloon. (*Acierno I*, D.I. 24 at 55-6 and Ex. 13) By letter dated June 4, 1992, Biloon advised plaintiff that
New Castle County still cannot accept your building permit application for the proposed 70,000 square foot Caldor Department Store at [the 273 Property]. The situation noted in my December 18, 1991, letter to you regarding the conflict between the proposed commercial use and the manufacturing zoning classification for the property remains unchanged. Please refer all questions and future correspondence regarding this matter to the New Castle County Law Department.
(*Acierno I*, D.I. 16 at A36) The following were copied on the letter: Robert W. O'Brien; Warren S. O'Sullivan; Saurabh Srivastava; Bryan C. Shuler; Michael Mitchell; Donald A. Laubach; A. Norman Paul; and Caldor Department Stores.

Section 23-6 has never before or since been applied to invalidate a recorded plan. (*Acierno I*, D.I. 30 at 74-8) During the years 1975 to present, all record plans for the 273 Property depicted a commercial use in the M-1 zone. (*Acierno I*, D.I. 16 at A11; *Acierno I*, D.I. 24, Ex. 4) During the years 1975 to present, no representative from Planning has informed plaintiff that he could not develop the 273 Property for commercial use. (*Acierno I*, D.I. 24 at 51) During the years 1975 to present, Planning has not formally noticed plaintiff that his record plan for the 273 Property is invalid. (*Acierno I*, D.I. 24 at 51) During the years 1975 to present, no governmental body has acted to void any of plaintiff's record plans for the 273 Property. (*Acierno I*, D.I. 24 at 51)

II. STANDARD OF REVIEW

Summary judgment must be granted where no genuine issue of material fact exists for resolution at trial and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). On summary judgment, the moving party need not disprove the opposing party's claim, but does have the burden to show the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1985). If the movant meets this burden, then the opponent may not rest on allegations in pleadings, but must counter with specific facts which demonstrate that there exists a genuine issue for trial. *Id.* When the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the nonmoving party has not offered evidence sufficient to establish the existence of an element essential to its case. *Id.* at 322. "[I]n ruling on a motion for summary judgment, a court must assess the material facts against the proof required of the plaintiff on substantive issues." *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1131 (3d Cir.1995).

III. PROCEDURAL DUE PROCESS

*13 Both parties move for entry of a summary judgment on the issue of procedural due process. To recover for an alleged procedural due process violation, plaintiff must demonstrate that: 1) he possessed a property interest subject to protection by the due process clause of the Fourteenth Amendment; 2) the County infringed said property interest; and 3) the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process. *Midnight Sessions, Ltd. v. City of Philadelphia,* 945 F.2d 667, 679-80 (3d Cir.1991), *cert. denied,* 503 U.S. 984 (1992).

A. Property Interest

The constitutional underpinnings of procedural due process have been described in recent years by reference to the Supreme Court's opinion issued in *Board of Regents of State Colleges v. Roth,* 408 U.S. 564 (1972). The Supreme Court in *Roth* commenced its discussion of procedural due process by declaring that
[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 11 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *13 (D.Del.))

Page 104

by procedural due process is not infinite....
[T]o determine whether due process requirements apply in the first place, we must look not to the "weight" but to the nature of the interest at stake.... We must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property.
The Court has ... made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process.
Yet, while the Court has eschewed rigid or formalistic limitations of the protection of procedural due process, it has at the same time observed certain boundaries. For the words "liberty" and "property" in the Due Process Clause of the Fourteenth Amendment must be given some meaning.
Id. at 569-72 (citations omitted) (emphasis added).

In defining the scope of protectible property interests in Roth, then, it was already understood that "ownership of real estate, chattels, or money" were among the property interests protected by procedural due process. The Court's task in Roth was to describe what kinds of intangible rights and privileges might qualify for protection. The Court concluded:
To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
*14 Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.
Id. at 577 (emphasis added). The respondent in Roth, an assistant professor at a state university, alleged that the petitioners' decision not to rehire him infringed his Fourteenth Amendment rights. The Court determined, however, that "the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment." Id. at 578. Neither "was there any state statute or University rule or policy that secured [respondent's] interest in re-employment or that created any legitimate claim to it." Id. Under these circumstances, the Court found no property interest sufficient to require a pretermination hearing.

On the same date that the Roth decision was issued, the Court issued an opinion in Perry v. Sindermann, 408 U.S. 593 (1972), a case also involving a professor whose employment contract was not renewed. As in Roth, there was no explicit contractual provision regarding re-employment. There were, however, "rules and understandings, promulgated and fostered by state officials," [FN5] that the Court held came within the scope of protected interests as just defined in Roth:
We have made clear in Roth ... that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." ... A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.
Id. at 601 (emphasis added).

During the ensuing decades, Supreme Court jurisprudence has focused on refining the characterization of protected property interests, primarily (if not exclusively) in the context of interests other than "real estate, chattels, or money." [FN6] Indeed, in one of the relatively few post-Roth cases dealing with tangible property, the Court held as a matter of law that
respondent's claim satisfies three prerequisites of a valid due process claim: the petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, even though negligently caused, amounted to a deprivation. Standing alone, however, these three elements do not establish a violation of the Fourteenth Amendment. Nothing in that Amendment protects against all deprivations of life, liberty, or property by the State. The Fourteenth Amendment protects only against

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                            Page 105
(Cite as: 1995 WL 704976, *14 (D.Del.))

deprivations "without due process of law." ... Our inquiry therefore must focus on whether the respondent has suffered a deprivation of property without due process of law. In particular, we must decide whether the tort remedies which the State of Nebraska provides as a means of redress for property deprivations satisfy the requirements of procedural due process.

*15 *Parratt v. Taylor,* 451 U.S. 527, 536-37 (1981) (an inmate of a state prison, whose mail order hobby materials were lost when normal procedure for receipt of mail packages was not followed, brought suit under 42 U.S.C. § 1983 against prison officials to recover their value). *Accord, Hudson v. Palmer,* 468 U.S. 517 (1984).

The evolution of the Third Circuit's jurisprudence on procedural due process in the context of land use disputes begins for our purposes with *Rogin v. Bensalem Tp.,* 616 F.2d 680 (3d Cir.1980), a case in which homeowners who purchased lots in a developer's condominium project brought suit against various township zoning officers who denied the issuance of building permits because the development "no longer complied with the township's zoning ordinance...." *Id.* at 683. The Third Circuit did not address or identify the property interest at stake in *Rogin;* rather, the Court's analysis began with the question of whether the property owners' substantive and procedural due process rights had been violated by the changes in zoning, changes which indisputably were legislative in nature. [FN7] The Court concluded, consistent with *Bi-Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441 (1915), [FN8] "that the protections of procedural due process do not extend to legislative actions." 616 F.2d at 693.

Likewise, in *Bello v. Walker,* 840 F.2d 1124 (3d Cir.), *cert. denied,* 488 U.S. 851 and 488 U.S. 868 (1988), the Court addressed the plaintiffs' procedural due process claim without first identifying the property interest at stake. Plaintiffs in *Bello* argued that the municipality's delay in issuing them a building permit was a denial of property without predeprivation due process. Although the Court held that "[t]his case does not involve a pre-deprivation denial of property, but rather a decision to deny a building permit," the Court nonetheless examined the process available, concluding that plaintiffs had no justifiable due process claim. *Id.* at 1128.

In *Midnight Sessions, Ltd. v. City of Philadelphia,* unsuccessful applicants for a city license to operate an all-night dance hall brought a civil rights action against the City for, *inter alia,* violation of their procedural and substantive due process rights. On appeal, the Third Circuit specifically addressed the issue of whether the appellees had a protectible property interest under the Fourteenth Amendment.

For the appellees to recover for the alleged procedural due process violations the City must have infringed a property interest encompassed by the Fourteenth Amendment. For these purposes, however, property interests are defined somewhat differently than they are for taking purposes for here we focus on what the appellees sought from the City, dance hall licenses, rather than the use of property they already had.

945 F.2d at 679 (emphasis added). The Court went on to reiterate the definition of "property interest" from *Roth,* that is, "a 'legitimate claim of entitlement' created by an independent source such as state law." *Id.* After reviewing the rules, regulations, ordinances, and laws applicable to dance halls, the Court concluded that "the 'safe and proper' language makes it plain that the City retains discretion to determine the safety and propriety of the operation" and that "[t]his broad discretion precludes a finding that an[y] applicant has a 'legitimate claim of entitlement' in a dance hall license for procedural due process purposes...." *Id.* at 679. [FN9] Even assuming that the appellees had protected property interests in dance hall licenses, the Court found that they were not denied procedural due process "under the dance hall licensing procedure." *Id.* at 680.

*16 The issue of due process has most recently been addressed by the Third Circuit in *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592 (3d Cir.1995). In discerning whether DeBlasio possessed a property interest worthy of protection under substantive due process, the Court reviewed a line of cases which differentiated between procedural and substantive due process by the nature of the property interests involved. In *Ransom v. Marrazzo,* 848 F.2d 398 (3d Cir.1988), for example, city residents, who were denied water and sewer service until they paid delinquent service charges incurred by the prior occupants of the residences, filed a civil rights action alleging that they were denied due process and equal protection. The Court found that "the expectation of utility service rises to the level ... of a 'legitimate claim of

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 13 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *16 (D.Del.))

Page 106

entitlement' encompassed in the category of property interests protected by the Due Process Clause" and indicated that such an interest would be subject to the "tri-partite balancing analysis" articulated in *Mathews v. Eldridge,* 424 U.S. 319 (1976), for a determination of what procedural safeguards were due. 848 F.2d at 409. The court rejected the notion, however, that a property interest worthy of procedural due process protection necessarily was a property interest worthy of substantive due process protection.

> Substantive due process refers to and protects federal rights. The provision of water and sewer services, whether by a municipality or by a private utility company, is not ... a federally protected right.... The legal fact that, once a municipality ... establishes a utility for its citizens, a citizen's expectation of receiving that service rises to the level of a property interest cognizable under the Due Process Clause ... merely brings that expectation within the compass of the Fourteenth Amendment's procedural protections, measured according to the *Mathews v. Eldridge* analysis. It does not transform that expectation into a substantive guarantee against the state in any circumstance.
>
> *Id.* at 412.

Following *Ransom,* the Third Circuit in *Reich v. Beharry,* 883 F.2d 239 (3d Cir.1989), reaffirmed the notion "that although state contract law can give rise to a property interest protectible by procedural due process, not every interest held by virtue of a contract implicates such process." *Id.* at 242. Assuming without deciding that appellant was deprived of a protected property interest when the county controller refused to issue payment for work done by appellant, the Court determined (after application of "the familiar tripartite test" set out in *Mathews v. Eldridge* ) that appellant had available to him all the process that was constitutionally due. Citing, *inter alia,* to Justice Powell's view in *Regents of University of Michigan v. Ewing,* 474 U.S. 214, 228 (1985), the Court declared "that, in this circuit at least, not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." 883 F.2d at 244.

*17 Returning to the analysis in *DeBlasio,* the Court concluded that

> ownership is a property interest worthy of substantive due process protection.... Indeed, one would be hard-pressed to find a property interest more worthy of substantive due process protection than ownership. Thus, in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached. Where the plaintiff so alleges, the plaintiff has, as a matter of law, impliedly established possession of a property interest worthy of substantive due process protection.
>
> 53 F.3d at 600-01 (emphasis added).

That ownership is a property interest worthy of due process protection cannot be gainsaid.

> It is well recognized that the Due Process Clauses of the United States Constitution grew out of the "law of the land" provision of Magna Carta and its later manifestations in English statutory law. That the home was at the center of those property interests historically sought to be protected by due process is underscored by the fact the phrase "due process of law" first appeared in the following codification: "No man of what state or condition he be, shall be put out of his lands or tenements nor taken, nor disinherited, nor put to death, without he be brought to answer by due process of law."
>
> *O'Bannon v. Town Court Nursing Center,* 447 U.S. at 792 n. 2 (J. Blackmun, concurring) (emphasis in original). *See also, U.S. v. James Daniel Good Real Property,* 114 S.Ct. 492, 500-01 (1993) ("Good's right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance.... The seizure deprived Good of valuable rights of ownership, including the right of sale, the right of occupancy, the right to unrestricted use and enjoyment, and the right to receive rents."); *Lucas v. South Carolina Coastal Council,* 112 S.Ct. 2886 (1992).

In defining the scope of plaintiff's property interest at bar, defendant embraces the analysis in *Midnight Sessions* and maintains that under applicable state law, plaintiff was not entitled to a building permit, therefore, he has no property interest worthy of constitutional protection. Defendant rejects the analysis in *DeBlasio,* contending that if such a standard were used rather than the "legitimate claim

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 14 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *17 (D.Del.))

Page 107

of entitlement standard," "every permit license approval the government gives dealing with land would require a pre-deprivation hearing." (D.I. 191 at 28-9)

The court disagrees. Contrary to defendant's assertion that "[t]he legitimate claim of entitlement standard has been the standard ever since the *Roth* case was decided" (D.I. 191 at 29), review of the Supreme Court procedural due process cases reveals that the Supreme Court has never separated the rights associated with land ownership from entitlement to use the land; a property owner has the right to "unrestricted use and enjoyment." Surely if ownership of a hobby kit is a property interest worthy of a due process analysis, then ownership of real property must be accorded a similar status.

*18 Moreover, while it may be true that the property owners in these land use cases were seeking the government's permission to use their land in a particular way, nevertheless, they were not seeking a benefit out of whole cloth (as are individuals seeking rights to, e.g., re-employment, education, utility service); they are seeking the full enjoyment of an interest already recognized by the state. Indeed, the Third Circuit, up until its decision in *Midnight Sessions,* did not question that property owners had a protectible property interest. In *Rogin,* for example, the homeowners sought a "benefit" from the state when they applied for a building permit, the issuance of which was denied because the property's zoning status had been amended. Despite the fact that they were not "entitled" to the "benefit" under state law, the Third Circuit examined the question of whether their procedural due process rights had been violated by the zoning change. [FN10]

Finally, the court is hard-pressed to divine how an individual with property interests worthy of substantive due process protection could have insufficient interests for purposes of procedural due process, when the "substantive" interests are more fundamental. *DeBlasio,* 53 F.3d at 599. Although not addressed specifically by the Court in *DeBlasio,* the answer must be that "ownership is a property interest worthy of [procedural] due process protection." *Id.* at 600.

For all the reasons stated above, the court concludes that plaintiff has a property interest protected by procedural due process.

B. The Process Due

Defendant is concerned by this outcome because, it is predicted, the floodgates of litigation will open and subject the federal courts to a multitude of land use cases. This, of course, has not happened to any noteworthy extent with *Roth*-type employment cases (and the court would hazard a guess that more people are employed than are land owners). The reason is simple: not all deprivations require predeprivation process.

Due process requires that a deprivation of property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542 (1985). In *Stana v. School Dist. of City of Pittsburgh,* 775 F.2d 122, 130 (3d Cir.1985), the Third Circuit embraced this standard by holding that "if [a] governmental entity could have, but did not, provide predeprivation procedures, a § 1983 action complaining of the lack of procedural due process may be maintained in federal court, notwithstanding the availability of state judicial routes as well."

In the context of land use cases, the Third Circuit in *Rogin* held that,
> [b]efore a governmental body may deprive a landowner of a property interest, it must provide due process. The exact process required varies with the demands of the particular situation in question. A balancing test has been articulated by the Supreme Court to determine the requirements of due process for any given situation: the private interest affected by the governmental action and the value of additional procedural safeguards are to be weighed against the fiscal and administrative burdens that additional procedures would impose on the government.

*19 616 F.2d at 694, referencing *Mathews v. Eldridge,* 424 U.S. at 335. [FN11] Several years later, the Court in *Bello* described
> the determination whether to issue a building permit [as] an administrative decision, and it was the plaintiffs' decision to invoke that governmental mechanism by applying for the permit. This case does not involve a pre-deprivation denial of property, but rather a decision to deny a building permit. Nevertheless, the procedure at issue must comport with constitutional due process.

840 F.2d at 1128 (emphasis added). The Court in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ   Document 54-5   Filed 03/17/2005   Page 15 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *19 (D.Del.))

Page 108

*Bello* then stated that "a state provides adequate due process when it provides 'reasonable remedies to rectify a legal error by a local administrative body.' " *Id.*, citing *Cohen v. City of Philadelphia*, 736 F.2d 81, 86 (3d Cir.1984).

Consistent with *Parratt v. Taylor*, [FN12] the Court in *Cohen* held that "substantive mistakes by administrative bodies in applying local ordinances do not create a federal claim so long as correction is available by the state's judiciary." 736 F.2d at 85 (emphasis added). The reasoning of the Supreme Court in *Parratt* was extended in *Hudson v. Palmer* to intentional conduct.

> The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" since the state cannot know when such deprivations will occur. We can discern no logical distinction between negligent and intentional deprivations of property insofar as the "practicability" of affording predeprivation process is concerned. The state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct.... Accordingly, we hold that an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.

468 U.S. at 533. Thus, according to Supreme Court precedent, "[t]he controlling inquiry is solely whether the state is in a position to provide for predeprivation process." *Id.*

The court observes at the outset that this case presents more than a simple denial of a building permit. There is uncontested evidence of record that defendant intended to "circumvent the implementation of [plaintiff's development] plans through the permit procedure" long before plaintiff applied for a building permit. *Acierno v. Mitchell*, 6 F.3d at 976 n. 15. Clearly this is a case where, applying the balancing test articulated in *Mathews v. Eldridge* and informed by *Hudson v. Palmer*, plaintiff's protectible property interest [FN13] and the public's interest in ensuring that the government's decisionmaking process is impartial and well-informed, [FN14] far outweigh the fiscal and administrative burdens that predeprivation notice and a hearing would impose in this most unusual case. [FN15]

*20 In the absence of any genuine issues of material fact, the court concludes that plaintiff is entitled to entry of a summary judgment as a matter of law on the issue of procedural due process.

IV. SUBSTANTIVE DUE PROCESS

Both parties request entry of a summary judgment on plaintiff's substantive due process claim. For plaintiff to recover for the alleged substantive due process violations, plaintiff must demonstrate that: (1) he possessed a property interest worthy of substantive due process protection; (2) he was deprived of said property interest by a land use decision which was arbitrarily or irrationally reached. *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d at 600-01.

A. Property Interest

As explained in *DeBlasio*, " 'the deliberate and arbitrary abuse of government power violates an individual's right to substantive due process.' " *Id.* at 599-600, citing *Bello v. Walker*, 840 F.2d at 1129. Consistent with the notion that "substantive due process rights are created by the Constitution," the property interests worthy of substantive due process protection should constitute "fundamental" property interests of the kind "implicitly protected by the Constitution." 53 F.3d at 599, citing *Reich v. Beharry*, 883 F.2d at 244. As noted above, the Third Circuit in *DeBlasio* concluded that "ownership is a property interest worthy of substantive due process protection." 53 F.3d at 600. "Thus, in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached." *Id.* [FN16]

B. Rational Relationship

The Third Circuit in *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 692 (3d Cir.1993), held that "[s]ubstantive due process protects citizens from arbitrary and irrational acts of government," citing *Rogin v. Bensalem Township*, 616 F.2d at 689. See also, *Taylor Inv., Ltd. v. Upper Darby Tp.*,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 109
(Cite as: 1995 WL 704976, *20 (D.Del.))

983 F.2d at 1292.
> A violation of substantive due process rights is proven: (1) if the government's actions were not rationally related to a legitimate government interest; or (2) "if the government's actions in a particular case were in fact motivated by bias, bad faith or improper motive...." [citation omitted]

*Parkway Garage, Inc.*, 5 F.3d at 692, citing *Midnight Sessions*, 945 F.2d at 683. [FN17] *Accord Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 263 (3d Cir.1995).

The Supreme Court has endeavored to adjust the substantive due process rationality standard to the problem of reviewing discretionary administrative authority. In *Regents of the University of Michigan v. Ewing*, the justices unanimously upheld the decision of medical school faculty and administrators to dismiss a student from a combined undergraduate degree and medical degree program. To qualify for the final two years of the program, the student was required to pass a standardized examination; the student failed. Although all other persons who previously had failed the examination had been given a chance to retake the examination, the student in the case was dismissed from the program without reexamination. The student claimed that the faculty decision violated substantive due process rights. The Court held that

> *21 [w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

474 U.S. at 225. *Accord Youngberg v. Romeo*, 457 U.S. 307, 322-23 (1982) ("[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."). *See also, Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1222 (6th Cir.1992); *Mauriello v. University of Medicine and Dentistry of New Jersey*, 781 F.2d 46, 50 (3d Cir.), *cert. denied*, 479 U.S. 818 (1986).

In the case at bar, there is a fundamental conflict, as presented by the uncontroverted record, between the "final" approval of plaintiff's development plans, conferred by the Delaware Supreme Court and County Council and endorsed through a course of conduct over years by the Planning Department, [FN18] and the "final" decision to deny plaintiff's application for a building permit by an administrative agent, [FN19] a decision affirmed by an administrative board composed of laypersons. Whether Biloon actually exercised professional judgment in denying plaintiff a building permit in light of all the circumstances, [FN20] and whether defendant's conduct as recited above was in fact motivated by bias, bad faith or improper motive, involve genuine issues of material fact. [FN21]

Under these circumstances, the court will deny both motions for entry of a summary judgment on plaintiff's substantive due process claim.

B. Liberty Interest

Plaintiff contends that he "possesses several protected fundamental liberty interests," including: "(a) the right to pursue his chosen occupation, real estate development, free from unreasonable governmental interference; (b) the right to conduct a legitimate business without arbitrary governmental interference; (c) the right to be free from harassment in his land development efforts and (d) the right to be free from arbitrary government action affecting his interest in the use and enjoyment of his property." (D.I. 120 at 29-30) As pointed out by defendant, however, "[i]t is the liberty to pursue a particular calling or occupation and not the right to a specific job that is protected by the Fourteenth Amendment." *Piecknick v. Com. of Pa.*, 36 F.3d 1250, 1262 (3d Cir.1994). The record does not support a claim that defendant's conduct has "destroyed" plaintiff's business or his ability to earn a livelihood. Although the Third Circuit has confirmed an individual's "right to be free from arbitrary and capricious government action affecting his interest in use and enjoyment of property," *DeBlasio*, 53 F.3d at 601, the above holding was issued in the context of a property interest worthy of substantive due process protection, not in the context of a liberty interest. Indeed, in none of the recent land use decisions was the Third Circuit concerned with a liberty interest. *See, e.g., Blanch Road Corp.*, 57 F.3d at 268 ("[P]laintiffs claim that defendants acted deliberately and under color of state law to deprive them of their property rights by interfering in and delaying the issuance of permits."); *Midnight Sessions*, 945 F.2d at 679 n. 7

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ   Document 54-5   Filed 03/17/2005   Page 17 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *21 (D.Del.))

Page 110

*22 The court concludes, therefore, that plaintiff has not demonstrated that he has a liberty interest worthy of substantive due process protection and that defendant is entitled to the entry of a summary judgment as a matter of law on this issue.

V. EQUAL PROTECTION

As noted by the Third Circuit in *Doe v. City of Butler, Pa.*, 892 F.2d 315, 319 n. 2 (3d Cir.1989), "[t]he Supreme Court has described the standards for equal protection and due process challenges in the same terms." "Therefore, like [his] substantive due process claim, plaintiff[ ] can prevail on [his] equal protection claim only if [defendant]'s actions were not rationally related to a legitimate purpose." *Taylor Inv., Ltd. v. Upper Darby Tp.*, 983 F.2d at 1294.

Defendant argues in its supplemental brief that plaintiff should not prevail on his equal protection claim because he cannot establish "class-based differential treatment." (D.I. 189 at 2) ("Absent a threshold showing that plaintiff is similarly situated to those who receive favorable treatment, plaintiff does not have a viable equal protection claim."). The Third Circuit has not specifically required such. Indeed, in *Holder v. City of Allentown*, 987 F.2d 188, 197 (3d Cir.1993), the Third Circuit recognized that the selective enforcement of an ordinance may violate an individual's right to equal protection.

> [I]t has long been established that discriminatory enforcement of a statute or law by state and local officials is unconstitutional. *Cox v. Louisiana*, 379 U.S. 536 ... (1965); *Oyler v. Boles*, 368 U.S. 448 ... (1962); *Ah Sin v. Wittman*, 198 U.S. 500 ... (1905); *Yick Wo v. Hopkins*, 118 U.S. 356 ... (1886). In *Yick Wo*, the Supreme Court laid down the rule that a law which is "fair on its face and impartial in its appearance" may nonetheless constitute "illegal discrimination between persons" "if it is applied and administered by public authority with an evil eye and an unequal hand." *Yick Wo*, 118 U.S. at 373-374.... Public officials engage in unconstitutional discriminatory application or administration of a facially impartial law when they seek to enforce the law "on the basis of an unjustifiable standard, such as race, or religion, or some other arbitrary factor," or when they seek to enforce the law in order "to prevent the exercise of a fundamental right." *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir.), cert. denied, 493 U.S. 995 ... (1989).

(Emphasis added) [FN22] See also, *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir.1995).

For the same reasons that the court denied entry of a summary judgment on plaintiff's substantive due process claim, the court denies defendant's motion for entry of a summary judgment on plaintiff's equal protection claim. There are genuine issues of material fact as to whether defendant's actions were rationally related to a legitimate purpose, as well as to whether defendant is enforcing its zoning code in a discriminatory fashion. [FN23]

V. EQUITABLE ESTOPPEL

*23 Defendant moves for entry of a summary judgment on plaintiff's equitable estoppel claim, arguing only that "the Board of Adjustment's factual findings and legal conclusions must be accorded collateral estoppel effect in this proceeding." (D.I. 123 at 34) For the reasons stated, the court rejects the notion that it is bound by the Board of Adjustment's decision or compelled to a legal conclusion by the Board's findings of fact. Therefore, the court will deny defendant's motion for summary judgment on the grounds asserted.

VI. CONCLUSION

For the reasons stated, the parties' cross motions for summary judgment shall be granted in part and denied in part.

An order shall issue.

FN1. The court once again rejects the notion that the Board of Adjustment's January 14, 1994 decision is binding in all respects on this court. The court acknowledges that it is required to "give preclusive effect to the factfinding of state administrative tribunals ...," *University of Tennessee v. Elliott*, 478 U.S. 788, 797-99 (1986), unless such factual findings "are not supported by substantial evidence in the record." *Acierno v. New Castle County*, 40 F.3d 645, 652 n. 10 (3d Cir.1994) (citing *Kollock v. Sussex County Bd. of Adjustment*, 526 A.2d 569 (Del.Super.1987). The Board of Adjustment in this matter made limited "findings of fact" (D.I. 124 at 4-9) which are not inconsistent with this court's prior findings. The remaining "findings" urged upon the court are contained within the text of the Board's "opinion," are not supported by substantial evidence

Case 1:04-cv-01376-KAJ    Document 54-5    Filed 03/17/2005    Page 18 of 20

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *23 (D.Del.))

Page 111

in the record, and are mixed conclusions of law and fact which are not binding on this court. *See Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 193 (3d Cir.1993). The court likewise rejects the notion that the Board is the "final decisionmaker in the permitting process" for purposes of plaintiff's constitutional claims. The requirement is that local authorities be given the opportunity to "define the application of the zoning ordinance and define [ ] the harm to the owner." *Taylor Inv., Ltd. v. Upper Darby Tp.,* 983 F.2d 1285, 1291 (3d Cir.), *cert. denied,* 114 S.Ct. 304 (1993). There is no indication in the Third Circuit's decisions regarding the "finality rule" that the slate is wiped clean and the federal court is precluded from reviewing the totality of the circumstances underlying the allegations of constitutional violations. *Id.* at 1292-93.

FN2. The two parcels of land collectively will be referred to as the "273 Property."

FN3. In 1971, the larger parcel of the 273 Property was (and still is today) located in a M-1 district. Prior to the enactment of Ordinance No. 71-104, every use permitted in a commercial district was also permitted in a manufacturing district.

FN4. A copy of this memorandum apparently was found in plaintiff's files in 1992; there is no evidence of record indicating when or how plaintiff obtained a copy of the memorandum. The record does not indicate that defendant contemporaneously shared this information with plaintiff.

FN5. "Teacher Tenure: Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work."

FN6. *See, e.g., Arnett v. Kennedy,* 416 U.S. 134 (1974) (termination of employment); *Goss v. Lopez,* 419 U.S. 565 (1975) (school suspensions); *Paul v. Davis,* 424 U.S. 693 (1976) (injury to reputation); *Memphis Light, Gas and Water Division v. Craft,* 436 U.S. 1 (1978) (termination of electric, gas and water services); *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773 (1980) (continued residence at a nursing home after revocation of Medicare and Medicaid provider agreements); *Connecticut Bd. of Pardons v. Dumschat,* 452 U.S. 458 (1981) (denial of commutation of sentence); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986 (1984) (trade secret); *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985) (termination of employment).

FN7. The zoning amendment reduced the allowable density in the R-4 district, the classification applicable to the development at issue, from 12 to 10 units per acre.

FN8. "Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption." 239 U.S. at 445.

FN9. This analysis is very much akin to the approach taken in *Hewitt v. Helms,* 459 U.S. 460 (1983) and its progeny, by which state-created liberty interests were defined: "By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Sandin v. Conner,* 115 S.Ct. 2293, 2299 (1995). In the context of the land use cases, federal courts have tended to do the opposite, that is, look for language giving local authorities discretion, thus eviscerating any state-created entitlements. This approach has recently been abandoned by the Supreme Court, at least in the context of liberty interests, and we once more are directed "to examine the 'nature' of the interest with respect to interests allegedly created by the State." *Id.* at 2298, *citing, Board of Regents of State Colleges v. Roth,* 408 U.S. at 571.

FN10. Even if the *Midnight Sessions* analysis were still appropriate in the procedural due process context, plaintiff would meet the test. Clearly, Supreme Court precedent indicates that "rules and understandings, promulgated and fostered by state officials" can support a claim of entitlement. *Perry v. Sindermann,* 408 U.S. at 601. Although in this case defendant's course of conduct may not give rise to a state cause of action, there is no requirement that that be the case, so long as there are "existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth,* 408 U.S. at 577 (emphasis added).

FN11. The *Mathews v. Eldridge* test directs analysis of (1) the property interest, (2) the risk of erroneous deprivation, and (3) the government's interest.

FN12. The Supreme Court in *Parratt* held that when a "loss is not the result of some established state procedure and the State cannot predict precisely when the loss will occur[, i]t is difficult to conceive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1995 WL 704976, *23 (D.Del.))

Page 112

of how the State could provide a meaningful hearing before the deprivation takes place." 451 U.S. at 541

FN13. Defendant's conduct imposed a virtual moratorium on the issuance of any building permits for the 273 Property before any applications were filed by plaintiff.

FN14. The facts presented by this case are complex, as are the attendant legal issues. To assert, as defendant apparently does, that Biloon's decision to deny a building permit without consultation with Planning or with plaintiff did not involve a serious risk of erroneous deprivation, is not a credible position.

FN15. If this court were to consider only whether Delaware affords a full judicial mechanism with which to challenge the administrative decision (as argued by defendant), the court notes that the postdeprivation remedy available under state law is limited to an appeal, with the only relief available that of issuing a building permit. Delaware law does not provide for the recovery of either compensatory damages or attorneys' fees. See Labov v. Lalley, 809 F.2d 220, 222-23 (3d Cir.1987).

FN16. Citing Giuffre v. Bissell, 31 F.3d 1241, 1258 (3d Cir.1994), defendant argues that "in civil damage actions under § 1983, the fact finder must apply the 'shocks the conscience' standard to the defendant's conduct." (D.I. 123 at 28) The court in Giuffre cited to Fagan v. City of Vineland, 22 F.3d 1296, 1304 n. 3 (3d Cir.1994), in which it is noted that the Supreme Court in Collins v. City of Harker Heights, 112 S.Ct. 1061 (1992) "used the phrase 'arbitrary' as an alternative for, or synonymous with, 'conscience-shocking.'" Given that the Third Circuit has not specifically embraced the "shocks the conscience" standard in its most recent pronouncements on substantive due process claims in the context of land use decisions, this court likewise declines to analyze plaintiff's claim in the framework proposed by defendant. See DeBlasio, 53 F.3d at 601-02; Blanche Road Corp. v. Bensalem Tp., 57 F.3d 253, 269 (3d Cir.), cert. denied, --- U.S. ----, 1995 WL 5005.3 (1995).

FN17. Contrary to defendant's attempt to relegate the use of the rational relationship test to only those cases where legislative schemes are challenged (D.I. 123 at 26), the court notes that the test enunciated in Parkway Garage specifically refers to whether "the government's actions" were rationally related to a legitimate government interest, not whether a "legislative scheme" was so related. Unlike the cases of Rogin v. Bensalem Tp., 616 F.2d at 689, and Midnight Sessions, 945 F.2d at 683, legislative schemes were not at issue in Parkway Garage, nor are they at issue in the case at bar.
Perhaps more significantly, the distinction between legislative and administrative action is only relevant for purposes of procedural due process, not substantive due process. See Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441 (1915); Developments in the Law--Zoning, 91 Harv.L.Rev. 1427, 1508 (1978).

FN18. See Acierno v. Mitchell, 6 F.3d at 976 and n. 15.

FN19. The Third Circuit has described Biloon as the decisionmaker, because he had the discretion to follow or reject Mitchell's directives. Acierno v. Mitchell, 6 F.3d at 975 n. 12 and 976 n. 16.

FN20. For example, in this case, the Department of Planning, whose primary responsibility it is to ensure that development in the County is consistent with the zoning code, engaged in a course of conduct over years validating plaintiff's development plans, a course of conduct yet to be repudiated. The "decisionmaker" in this case, an individual whose primary responsibility it is to ensure that all buildings in the County comply with the building code adopted by the County (the BOCA National Building Code), although aware of this history, chose to ignore such and did not even consult (according to the record before the court) either Planning, the agency most familiar with the facts, or plaintiff.

FN21. Because this case does not involve a legislative scheme, but rather individual conduct leading to an administrative decision, the court does not find that the application of the rational relationship test in this instance is purely a question of law. See, Midnight Sessions, 945 F.2d at 683.

FN22. Defendant argues that Holder is inapplicable to the facts at bar because "[t]hat case ... involved a fundamental and protected right and heightened scrutiny...." (D.I. 189 at 6 n. 2) The standard of review actually described in Holder is not limited to its facts, however; indeed, the standard specifically contemplates discriminatory official action based upon suspect classifications, the exercise of fundamental rights, "or some other arbitrary factor." 987 F.2d at 197.

FN23. See, e.g., the contrary explanations given regarding certain commercial developments in the parties' equal protection papers, D.I. 189 at 4-5 and D.I. 192 at 6-8.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
**(Cite as: 1995 WL 704976, *23 (D.Del.))**

**Page 113**

1995 WL 704976 (D.Del.)

Motions, Pleadings and Filings (Back to top)

· 1:93CV00579 (Docket) (Dec. 17, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.