EXHIBIT 8
TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in F.Supp.
1997 WL 447914 (D.Del.)
**(Cite as: 1997 WL 447914 (D.Del.))**

Page 33

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Frank E. ACIERNO, Plaintiff,
v.
NEW CASTLE COUNTY, Defendant.
No. 93-579-SLR.

May 28, 1997.

Charles M. Oberly, III, Esquire, of Oberly, Jennings, & Drexler, P.A., Wilmington, Delaware; John J. Yannacone, Esquire, of Yannacone, Fay, Baldo & Daly, of Media, Pennsylvania, attorneys for plaintiff.

Collins J. Seitz, Jr., Esquire, of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware, attorneys for defendant.

MEMORANDUM OPINION

ROBINSON, District Judge.

I. INTRODUCTION

*1 After an arduous and convoluted journey, this lawsuit came to be tried by the court in March 1996. Without retracing the lawsuit's well-documented path, suffice it to say that plaintiff Frank E. Acierno initiated this litigation pursuant to 42 U.S.C. § 1983 against defendant New Castle County ("the County"), alleging that his due process and equal protection rights under the Fourteenth Amendment had been violated by the County's decision to preclude him from developing a 40-acre parcel consistent with a valid record plan.

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper in this district under 28 U.S.C. § 1391(b), as both parties are residents of, and the claims asserted by plaintiff arose in, this district.

Here follow the court's findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

II. FINDINGS OF FACT

1. The New Castle County Zoning Code ("the Zoning Code") was first adopted in 1954. *Twardowski v. Board of Adjustment,* 1992 WL 114403 at 1 (Del.Super.1992). During the years 1968-70, amendments to the Zoning Code were being considered. Of especial relevance to the litigation at bar was the proposed removal of the "hierarchy concept from the Zoning Code, as far as the commercial and manufacturing districts went." (D.I. 253 at 62) Under a "hierarchical Zoning Code," all commercial uses were permitted in a manufacturing zone; elimination of the hierarchy concept meant that commercial uses were permitted only in commercial zones.

2. Several New Castle County properties zoned for manufacturing had initial record plans for commercial development approved in March and April 1970. Within weeks of these initial record plan approval dates, a student planner identified such properties as having "existing" commercial uses in manufacturing districts. (DX 3; D.I. 251 at 109-16) There is no record evidence as to the existence in the summer of 1970 of actual commercial uses.

3. In 1971, plaintiff was the long-term lessor of a large part of a parcel of land consisting of some 40 acres situated in New Castle County and located near the intersection of Interstate Highway 95 and Route 273. In 1971, plaintiff also owned in fee simple a small parcel of land adjoining the leased tract, which parcel fronts on Route 273. The larger parcel of land was zoned M-1 under New Castle County laws and regulations; the smaller parcel was zoned C-2. [FN1] *Acierno v. Folsom,* 313 A.2d 904, 905 (Del.Ch.1973), *aff'd,* 311 A.2d 512 (Del.1975).

   FN1. The two parcels of land collectively will be referred to as the "273 Property." The proposed commercial project will be referred to as the "273 Mall."

4. On May 11, 1971, plaintiff filed with the Department of Planning for New Castle County ("Planning") an exploratory sketch plan for the construction of his proposed shopping center as a preliminary step towards obtaining approval of his project. This initial plan was then followed up on August 8, 1971, as required by regulations, with a Preliminary Tentative Plan, which plan was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ    Document 54-7    Filed 03/17/2005    Page 3 of 16

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *1 (D.Del.))

Page 34

thereafter disapproved by Planning on October 22, 1971. *Id.* at 905. On October 26, 1971, plaintiff appealed Planning's adverse decision to the County Planning Board, as required by regulations.

*2 5. In July 1971, Planning recommended that those certain properties identified by its student planner be automatically rezoned from a manufacturing to a commercial category to avoid the impact of the pending zoning changes. (DX 3)

6. On November 9, 1971, New Castle County Council ("County Council") was due to act on the proposed zoning changes which would prohibit commercial uses in wholly industrial zones (zoned M-1). A special meeting of the County Planning Board ("Planning Board") was convened on November 8, 1971, to consider plaintiff's appeal. By a 4-1 vote on that date, the Planning Board approved the Preliminary Tentative Plan. (PX 182)

7. County Council amended the Zoning Code regulations by Ordinance No. 11-104, effective November 16, 1971, to exclude commercial uses as permitted uses in M-1 districts. On January 24, 1972, plaintiff filed with Planning a final plan for the proposed shopping center. Planning denied approval of plaintiff's final plan on February 24, 1972, because: (1) the plan allegedly conflicted with the general comprehensive development plan adopted for New Castle County; (2) the shape of the tract in issue allegedly made it unsuitable for the construction of a shopping center; and (3) there would be an increase in traffic which would allegedly result from the erection of the proposed shopping center. *Acierno v. Folsom,* 313 A.2d at 905.

8. Plaintiff appealed to the Planning Board which, after a final hearing, informed plaintiff on April 26, 1972 that it had voted to sustain Planning's disapproval of plaintiff's plan. *Id.*

9. Thereafter, pursuant to applicable regulations, a hearing on plaintiff's application was held on August 22, 1972 [FN2] before County Council. Dr. V. Eugene McCoy, chairman of the Planning Board, placed on record his opposition to plaintiff's proposed plan and argued that plaintiff's appeal should be dismissed, notwithstanding the fact the he participated in the decision to deny the application as chairman of the Planning Board. *Id.*

FN2. In an internal memorandum dated August 17, 1972, Planning opined that the 273 Property "was accorded a 'grandfather' status ... for a period of three years following the Code Amendment" of November 1971 in which to pursue commercial development in a manufacturing zone. (DX 6, 7) Plaintiff's record plan, however, was not approved until after the three-year period had expired.

10. During the pendency of the appeal before County Council, plaintiff and the Delaware Division of Highways and Transportation reached an agreement concerning access to the 273 Mall. (PX 2) The Division of Highways notified the County of the agreement and indicated that the Division had no objection to the approval of the plans for the 273 Mall. (PX 4; *see also* PX 2,3) [FN3]

FN3. During the pendency of the appeal, the plaintiff also obtained County approval for lines and grades for drainage for the project. (PX 5, 6)

11. Before County Council reached a decision, County Council, Planning, and plaintiff entered into a stipulation. Under the terms of the stipulation, plaintiff's application would be returned to Planning for the receipt of additional evidence on those three aspects of plaintiff's proposed shopping center which had previously been identified by Planning. *Acierno v. Folsom,* 313 A.2d at 905.

12. Following such rehearing, Planning found against plaintiff on all three of the questions submitted for consideration. Plaintiff again appealed to the County Planning Board. *Id.*

*3 13. The Planning Board, after receiving legal advice, voted: (1) 6-0 in favor of plaintiff as to the compatibility of plaintiff's plan with the County's comprehensive development plan; (2) 4-2 for plaintiff in overruling Planning's rejection of plaintiff's plan on the ground of unsuitable internal design; and (3) 3-3 to sustain Planning's rejection of plaintiff's plan on the ground that it would have an adverse effect on vehicular traffic in the area. *Id.* at 906.

14. After the taking of the vote at the conclusion of the hearing, in which Chairman McCoy and two other Planning Board members voted to affirm Planning's ruling, Dr. McCoy announced that Planning's disapproval of plaintiff's plan had been sustained. However, on December 14, 1972, before the Planning Board had filed a written

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *3 (D.Del.))

Page 35

opinion, Mr. Johnson, a Board member who had been absent at the November 21, 1972 hearing, wrote Dr. McCoy that if he had been present at the hearing in question, he would have voted to overrule Planning in all three areas under consideration. *Id.*

15. Plaintiff again appealed to County Council which, after a hearing held on January 9, 1973, affirmed the rejection of Mr. Johnson's proffered vote and the counting of Dr. McCoy's vote by the Planning Board, and which, after admitting further evidence on the matters in issue, voted 4-3 to sustain Planning's action insofar as it had rejected plaintiff's plan on the ground of its alleged adverse effect on traffic flow in the area. *Id.*

16. Plaintiff appealed the decision to the Court of Chancery of the State of Delaware. In the Chancery Court action, the County Department of Law, representing the then members of County Council and the Director of the Planning Department, argued that "in order for a shopping center to be constructed, it will be necessary for the M-1 parcel to be rezoned to a commercial classification." (PX 190 at 8) The County further argued that "[i]f the M-1 zoning classification of plaintiff's land does not permit the shopping center use in plaintiff's proposed Final Plan, then plaintiff cannot obtain an order of this Court directing approval since the zoning would not support that use in any event." (PX 190 at 6) Plaintiff argued that "no rezoning is necessary in order for a shopping center to be erected." (PX 190 at 6)

17. The Court of Chancery determined that "the question of zoning, which defendants have sought to raise here, was not considered by any of the several defendants in connection with plaintiff's application for approval of his building plans and will not be considered here." *Acierno v. Folsom*, 313 A.2d at 907. The Court of Chancery also held that "County Council was authorized to 'reach its own conclusion after its own deliberation and review of the record' and to reject a subdivision plan approved by the Planning Board; that, therefore, the 'official tally of the votes at the Planning Board level' was irrelevant." *Acierno v. Folsom*, 337 A.2d 309, 311 (Del.1975) (reversing an unreported decision of the Court of Chancery).

*4 18. Plaintiff appealed this decision to the Supreme Court of the State of Delaware. By decision rendered March 14, 1975, the Supreme Court reversed the lower court's decision, finding that "an approval of the Planning Board was binding upon the Planning Department; that upon such approval the Director of the Department was obliged to certify that the plan was in conformity with the Regulations; and that upon such certification, the County Council was obliged, as a ministerial function, to register its approval for recordation purposes." *Id.* at 313. Having so found, the Court then concluded that there was approval of plaintiff's plan by the Planning Board: "We think there was for the reason that the Chairman of the Board acted unlawfully in denying the application of the [plaintiff] that he disqualify himself and abstain from sitting in the case." *Id.* at 314.

19. Judgment having been reversed, the case was remanded for further proceedings consistent with the Supreme Court's decision.

20. Following the remand, the County Departments of Law and Planning carefully reviewed plaintiff's final plan. (PX 8, 10, 12, 13, 16, 18,19) [FN4] There is no indication in any of the correspondence exchanged between Planning and the County Department of Law during the processing of plaintiff's final plan that M-1 zoning would prohibit plaintiff's construction of a shopping center. Nor is there any indication that the land would have to be rezoned in order for the shopping center use to be permissible under the Zoning Code.

> FN4. Planning had earlier requested and obtained from the County Department of Law advice as to the circumstances under which Planning could recommend disapproval of the final plan. (PX 188, 189)

21. In a letter dated May 23, 1975, from the Director of Planning to the County Department of Law, the director listed 23 items which would have to be complied with in order for plaintiff to gain approval of his final plan. Rezoning was not listed as a condition. (PX 10) In a memorandum dated July 7, 1975, Assistant County Attorney Joseph M. Bernstein made it clear that Planning was to follow "the letter of the subdivision regulations in processing this Record Plan submission." (PX 12)

22. By Order dated July 7, 1975, the Court of Chancery, pursuant to the mandate of the Supreme Court, directed the approval of plaintiff's final plan for the 273 Mall. (PX 11) The Court further

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *4 (D.Del.))

Page 36

directed Planning and County Council "to take such further actions in respect to plaintiff's proposed submission of a Record Plan for plaintiff's 273 Shopping Mall as are not inconsistent with this order and with the New Castle County Subdivision Regulations as interpreted by the Supreme Court in this action." (PX 11)

23. On August 18, 1975, plaintiff resubmitted his record plan for the 273 Mall together with letters of approval from the Delaware Division of Highways and Transportation, the County Department of Public Works, and other governmental agencies. (PX 14) The fact that plaintiff intended to construct the proposed shopping center on land zoned M-1 was clearly set forth in plaintiff's application for plan review. (PX 15)

*5 24. By memorandum dated August 22, 1975, Planning indicated that there were 12 conditions which would have to be met in order to gain approval of the plan. (PX 16) Again, there was no indication that rezoning would be necessary. Plaintiff resubmitted his plan on September 12, 1975, meeting the 12 conditions. (PX 17) By memorandum dated September 18, 1975, Planning requested that three additional conditions be met. (PX 18) Again, there was no indication that any rezoning was necessary.

25. On October 8, 1975, plaintiff's plan finally met with the approval of Planning. (PX 19) By letter dated October 8, 1975, the Director of Planning informed the then President of County Council: "This plan [273 Mall] was reviewed and approved by the Department on October 8, 1975. The Department of Planning found the plan to be in compliance with the *New Castle County Zoning Code* and the *Subdivision and Land Development Regulations*." (PX 19) Among those copied on the Director's letter were Melvin Slawick, then County Executive, and Thomas Luce, then County Attorney.

26. On October 20, 1975, the Department of Public Works indicated that it had no objection to the recordation of plaintiff's plan. (PX 20) County Council approved plaintiff's plan by resolution number 75-195, adopted on October 28, 1975: "Plan of 273 Shopping Mall, White Clay Creek Hundred." (PX 21) The County-approved plan was recorded in the Office of the Recorder of Deeds on October 31, 1975. (PX 22, 23)

27. From 1976 to 1986, plaintiff expended approximately $770,000.00 in reliance upon the County's approvals for commercial use of the property. [FN5] These expenditures included lease payments, legal fees, real estate taxes, and engineering costs. (PX 112) On December 31, 1986, the plaintiff purchased the 273 Property through an exchange of property. The net value of the property which the plaintiff traded in order to acquire the 273 Property was $1,050,877.00. (PX 112)

> FN5. From 1971 to 1976, plaintiff spent approximately $326,000. (PX 112)

28. In September 1987, plaintiff submitted a record resubdivision plan for approval by the County. [FN6] (PX 26, 27) Like plaintiff's earlier plan, this resubdivision plan depicted commercial retail use--a shopping center--on the portion of the 273 Property zoned M-1.

> FN6. A "resubdivision plan" is a plan that amends "an earlier major land development plan or a major subdivision plan." (D.I. 255 at 78) Unlike the approval process for a major land development or subdivision plan (which involves review and approval by the Subdivision Advisory Committee, Planning and County Council), the resubdivision plan approval process is administered by Planning, with review and approval by the Departments of Transportation and of Public Works. (D.I. 255 at 78-81)

29. David J. Biloon ("Biloon"), on behalf of the Department of Public Works, reviewed plaintiff's proposed resubdivision plan. Biloon indicated that seven conditions would have to be met in order to gain approval. (PX 27, 28) No indication was given that the zoning designation would prohibit the use proposed by plaintiff. From October 1987 through December 1987, plaintiff's engineers worked with the Department of Public Works to address the conditions identified by Biloon. (PX 29)

30. Plaintiff resubmitted his plan in December 1987. (PX 32) On January 4, 1988, Biloon, on behalf of the Department of Public Works, approved plaintiff's resubdivision plan. (PX 32, 35, 36)

31. On January 26, 1988, Planning reviewed plaintiff's plan and found it to be acceptable subject to 12 conditions. (PX 37). Planning directed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *5 (D.Del.))

Page 37

plaintiff to "[p]rovide a note referencing previous court action that permitted commercial development in the M-1 zoning district." (PX 37) Plaintiff complied with each of the conditions identified by Planning. (PX 38)

*6 32. On February 4, 1988, plaintiff purchased land from the State of Delaware at the price of $28,500.00 to be used for a portion of the entrance to the 273 Mall. (PX 39) On February 26, 1988, then Planning Director Wayne Grafton gave final approval to the Record Resubdivision Plan on behalf of Planning and County Council. (PX 47) The plan clearly depicted commercial use, a shopping center, in the area zoned M-1. (PX 47) No indication was given by any public official that plaintiff's use of the property for commercial purposes would violate the Zoning Code or be otherwise impermissible. On April 29, 1988, Planning gave plaintiff formal notice that the plan had been recorded with the Office of the Recorder of Deeds. (PX 49)

33. Plaintiff next submitted a record minor land development plan in April 1988, proposing the construction of a motel, the Hampton Inn, to be located on parcel "B" of the 273 Property. (PX 50) The Department of Public Works approved the plan on May 6, 1988. (PX 51)

34. The Hampton Inn plan was next reviewed by Herbert Blackwelder, Jr. ("Blackwelder"), a representative of Planning. (PX 53) Blackwelder requested that plaintiff provide a Declaration of Restrictions to memorialize the fact that 24 parking spaces located on parcel "A" as shown on the record resubdivision plan for the 273 Mall would be available for use by the motel to be constructed on parcel "B."

35. In a letter dated May 12, 1988, plaintiff's general counsel, Daniel H. Krapf, forwarded to Blackwelder and First Assistant County Attorney Michael T. Mitchell ("Mitchell") [FN7] a copy of the Declaration of Restrictions for review and approval. (PX 53)

> FN7. From 1988 through the time of trial, Mitchell was the primary attorney from the County Department of Law assigned to work on land use issues.

36. On Planning's copy of Krapf's letter, the following notation was made by Blackwelder: "5/ 23/88, reviewed with M. Mitchell--o.k. reference on record plan." (PX 54) Blackwelder and Mitchell reviewed the Declaration. Mitchell approved the Declaration and directed that a reference to the Declaration be placed upon the plaintiff's record plan. (D.I. 251 at 68-9) The proposed use of the M-1 land for commercial purposes was not questioned.

37. Mitchell had numerous conversations with Krapf. During this time period, Mitchell never indicated to Krapf that there was any issue with respect to zoning. (D.I. 252 at 6-10)

38. On May 15, 1988, Planning Director Grafton approved the record minor land development plan for the Hampton Inn on behalf of Planning and County Council. (PX 55) Consistent with Mitchell's directive, the reference to the Declaration of Restrictions was made on the plan. (PX 55)

39. On June 6, 1988, Krapf forwarded a letter to Mitchell confirming that the Declaration had been recorded. (PX 58) Planning provided official notification of the recording of the plan to plaintiff by a memorandum dated June 7, 1988. (PX 59)

40. On July 27, 1988, plaintiff submitted a lines and grades plan, storm drainage profiles, and a sedimentation and erosion control plan for the entrance to the 273 Mall and Hampton Inn sites. (PX 61) The Department of Public Works approved the drainage/sanitary sewer plans on July 27, 1988. (PX 62) A proposed sewer and drainage construction agreement was forwarded to plaintiff. (PX 63)

*7 41. On September 1, 1988, plaintiff's engineer submitted a drainage area plan for County approval. (PX 64) By letter dated September 2, 1988, Mitchell provided Krapf with a copy of the recorded Hampton Inn Declaration of Restrictions. (PX 65) There was no indication that plaintiff's proposed use of the property would violate the Zoning Code or be otherwise impermissible.

42. Saurabh Srivastava, then Chief of Plans and Permits for the Department of Public Works, forwarded plans with permits for the installation of pipe to serve the entrance to the 273 Mall site and the Hampton Inn, by letter dated October 21, 1988, directed to the Delaware Division of Highways. (PX 68) Shortly thereafter, a Franchise/Use and Occupancy Agreement was entered into by the

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *7 (D.Del.))

Page 38

Department of Public Works and the State Division of Highways. (PX 69)

43. A resubdivision plan for the 273 Mall dated November 28, 1988 was next submitted to Planning. The Department of Public Works approved plaintiff's November 1988 resubdivision plan on January 10, 1989. (PX 73) Planning found plaintiff's plan to be acceptable subject to three conditions. (PX 74) Plaintiff met each of the conditions set forth by Planning. Accordingly, plaintiff's record resubdivision plan was approved by Planning Director Grafton, acting on behalf of Planning and County Council, on March 7, 1989. (PX 78) The resubdivision plan depicted, among other uses, a detached 70,000 square foot building designated on the plan as "Building 4" located within the parcel zoned M-1. Reference to the *Acierno v. Folsom* case appeared on this plan as well.

44. On March 13, 1989, the Division of Highways notified plaintiff's engineers that plaintiff's entrance plan had been approved. (PX 79) Planning issued formal notice of the recordation of plaintiff's resubdivision plan with the Office of the Recorder of Deeds on March 21, 1989. (PX 80)

45. On April 3, 1989, a drainage plan, which included drainage for a proposed McDonald's to be located on the 273 Property, received Department of Public Works' approval. [FN8] (PX 81) Drainage calculations for the 273 Property site were approved by the Department of Public Works on April 3, 1989. (PX 82) By letter dated April 4, 1989, the Department of Public Works notified plaintiff's engineers that the previously submitted drainage, sediment/erosion control, and lines and grades plans had been approved. (PX 83)

> FN8. McDonald's was to be located on a part of the 273 Property zoned C-2.

46. In order to proceed with the construction of the entrance and exit to the 273 Property, plaintiff tendered an irrevocable letter of credit in favor of the Delaware Department of Transportation ("DELDOT") in the amount of $125,324.00. (PX 84) On April 20, 1989, DELDOT issued a permit for the construction of the entrance to the 273 Property. (PX 85)

47. On May 9, 1989, plaintiff received formal approval from the Department of Public Works for the sanitary sewer plan and lines and grades plan. (PX 86, 87)

48. On May 17, 1989, plaintiff received approval from the Delaware Department of Natural Resources and Environmental Control to construct the sewer. (PX 88) On June 9, 1989, plaintiff entered into a traffic signal installation and maintenance agreement with DELDOT. (PX 89) Shortly thereafter, plaintiff engaged R.A. Boyer, Inc. to commence excavation and other site improvements. From November 1989 through February 27, 1990, plaintiff paid R.A. Boyer, Inc. $72,469.11 for site improvements. (PX 112)

*8 49. With a letter dated September 13, 1990, the County Department of Public Works forwarded to plaintiff an original and three copies of the "Sewer/Drainage Construction Agreement for the 273 Mall." (PX 90) No indication was given that plaintiff's proposed use of the land would violate the Zoning Code.

50. In the spring and summer of 1991, plaintiff was engaged in negotiations with several prospective commercial tenants, including Caldor, Inc. and General Cinema. Counsel for General Cinema, William S. Gee ("Gee"), contacted Mitchell in March 1991 to discuss the property. (D.I. 255 at 26) Gee testified that, in his initial conversation with Mitchell, Mitchell indicated that there was a "story" behind and "a problem with" the site: "It is not a cut-and-dried thing." (D.I. 255 at 27)

51. In a letter addressed to Gee dated April 16, 1991, Mitchell indicated that he "look[ed] forward to receiving the documentation that Mr. Acierno claims supports his theory that he has authorization for retail sales in an M-1 zoning district." (DX 24) This is the first indication that any County official questioned the validity of plaintiff's record plan.

52. Within two days, on April 18, 1991, Mitchell issued an 11-page memorandum directed to Biloon placing a general hold on any building permits for the site, whether for commercial or manufacturing uses: "[N]o building permit should be issued for any construction on this site until extensive review and consultation between the Division of Development and Licensing, Department of Planning and Department of Law is initiated and concluded concerning any proposed use." (PX 91 at 10) (emphasis added). The following were copied

Case 1:04-cv-01376-KAJ    Document 54-7    Filed 03/17/2005    Page 8 of 16

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *8 (D.Del.))

Page 39

on the memorandum: William W. Bowser, County Attorney; Robert W. O'Brien, Director, Department of Public Works; Bryan C. Shuler, Director, Department of Planning; and Saurabh Srivastava, Site Management, Department of Public Works. No notice was provided to plaintiff or Gee. At that point in time, Mitchell had reviewed only the Supreme Court and Chancery Court decisions, the Zoning Code, and the recorded plans. (D.I. 257 at 65)

53. By memorandum dated May 3, 1991, Biloon put into effect Mitchell's directive:

> Please inform your respective staffs to keep an eye out for any activity, i.e., building permit applications, for either the 273 Mall or Westhampton.....
> We have been advised by the Law Department that there is a zoning problem at the 273 Mall site. Basically, the site is zoned M-1 which will not support retail shopping uses. At this point in time, I will not try to explain the legal reasons as to why there is a valid record plan or why the record plan cannot be rescinded by the County; but, never the less [sic], we have been instructed by the Law Department to withhold building permits for any activity.....
> Both of these sites are currently owned by Frank E. Acierno. Please be sure this information gets placed with the Record Plans in our files for future reference and again remind your staffs to continually check Record Plans prior to the issuance of permits.

*9 (PX 92) The memorandum was directed to the staff of the Division of Development and Licensing. The following were copied on the memorandum: Robert W. O'Brien; Warren S. O'Sullivan; Bryan Shuler; Michael Mitchell; and Thomas J. Fede. No notice was provided to plaintiff or Gee.

54. Mitchell next directed Gee to formally request a zoning certification through the Director of Planning. Gee did so in a letter dated May 15, 1991. (DX 27) In the letter Gee stated the following:

> We have been informed by Mr. Acierno that our client's proposed use for the property was "grandfathered" because at the time the subdivision sketch plan was submitted, such a proposed use was permitted .... Mr. Acierno's lawyer's files did contain several documents which clearly show that the County recognized and endorsed the grandfathering of this proposed use....
> Based on the enclosed documents, it appears that the County has recognized and supported the proposition that our client's proposed commercial use for the property is grandfathered. Hopefully, your files will contain documentation supporting this conclusion.

(DX 27 at 2) A representative of General Cinema, John Hynes, was copied on the letter. A courtesy copy of the letter was provided under separate cover by Gee to Mitchell on May 15, 1991. (DX 28)

55. In a memorandum dated July 9, 1991 from Mitchell to Shuler, Mitchell again related the history of the 273 Property and concluded, consistent with his April 18, 1991 memorandum, that plaintiff's record plans should not be accorded "any effect inasmuch as they purport to permit that which is not permitted by the Zoning Code." (PX 94 at 6) Mitchell asserted that the November 8, 1971 approval of plaintiff's preliminary tentative plan for the 273 Property activated Section 23-6(c) of the County Code [FN9] such that plaintiff had a period of three years from the date of plan approval to build the shopping center. (PX 94 at 4) According to Mitchell, at best the plaintiff had three years after the 1975 plan approval to construct the shopping center. (PX 94 at 4) There is no indication that anyone else received a copy of the memorandum at the time.

FN9. Section 23-6 provided in relevant part in 1971 as follows:

> (a) No proposed Ordinance to amend the Zoning Map shall be acted upon by County Council within three years after the latest of any of the following actions:
>
> * * *
>
> (3) Prior approval under the Subdivision Regulations of a Preliminary Tentative Plan involving any parcel or parcels of land, or portion thereof, whose zoning classification would be changed by the proposed amendment; provided that the applicant and owner of such parcel or parcels may withdraw such Plan and the provision of this paragraph shall then cease to be applicable to such parcel or parcels. In no event shall the period permitted under this paragraph exceed 3 years from the earliest approval under the subdivision Regulations of a Preliminary Tentative Plan involving such parcel or parcels, or portion thereof.
>
> * * *
>
> (c) No amendment to the Zoning Code regulations shall be applicable to any parcel or parcels of land

Not Reported in F.Supp.
**(Cite as: 1997 WL 447914, *9 (D.Del.))**

Page 40

> protected by Paragraphs 1, 3, and 4 of Section [ (a) ] during the period of such protection, unless the owner thereof shall waive the protection of this Section. Such waiver shall be filed with the Department of Planning.
>
> Effective February 1974, Section 23-6(a)(3) was amended to read:
>
> Prior approval under the subdivision regulations of a preliminary tentative plan involving any parcel of land, or portion thereof, whose zoning classification would be changed by the proposed amendment; provided, that the applicant and owner of such parcel may withdraw such plan and the provisions of this paragraph shall then cease to be applicable to such parcel or parcels. In no event shall the period permitted under this paragraph exceed three years from the earliest approval under the subdivision regulations of a preliminary tentative plan involving such parcel, or portion thereof.

56. On July 17, 1991, Gee wrote to Mitchell inquiring about the status of the matter, indicating to Mitchell that any efforts to resolve the matter would be appreciated such that his client would not be left "hanging." Mitchell never indicated to Gee that a decision had been reached. (D.I. 255 at 49-51)

57. By letter to Shuler dated July 19, 1991, Gee withdrew his request for the zoning certification because "negotiations between the owner of the [273 Property] and [Gee's] client [had] been terminated." (DX 33)

58. During the summer of 1991, plaintiff continued negotiations with Caldor. (PX 95) On August 6, 1991, Mitchell issued a memorandum to Robert O'Brien, the Director of Public Works, enclosing the July 9, 1991 memorandum so that O'Brien could "take appropriate action to ensure that no building permit is issued for any principal commercial use [on the 273 Property].... Accordingly, would you please take any steps necessary to ensure that no permits are issued for this site until complete review and consultation is accomplished with this Department and the Department of Planning." (PX 96) The following officials were copied on the memorandum: William W. Bowser, County Attorney; Bryan Shuler, Director of Planning; and David J. Biloon, Chief of Development and Licensing. No notice was provided to plaintiff.

*10 59. On November 26, 1991, a meeting was conducted at the office of Caldor's counsel, at which the principal terms of a lease were agreed to for the 273 Mall site, as well as Merchants Square, another property owned by plaintiff. (PX 97) The Merchants Square building was to be delivered in November 1992, and the 273 Mall site building was to be delivered in November 1993 "or sooner." (PX 97) Detailed review of the Caldor lease terms continued into December 1991. (PX 99)

60. Plaintiff submitted an application for a permit to build a store in December 1991. By letter dated December 18, 1991, signed by Biloon, the County rejected plaintiff's building permit application stating:

> Please be advised that New Castle County cannot accept your building permit application for the proposed Caldor Department Store at this site. Commercial ventures of this nature cannot be situated on lands which contain a manufacturing zoning classification. Additionally, the existing Record Plan (Microfilm # 9669) allows for a 70,000 square foot building denoted as Building # 4. The proposed structure is 112,000 square feet. This is also a discrepancy which must be rectified prior to the issuance of any permits ....
>
> Any questions you may have regarding this matter should be directed to the New Castle County Law Department.

(PX 100) The following officials were copied on this letter: Robert W. O'Brien, Warren S. O'Sullivan, Saurabh Srivastava, Donald A. Laubach, Michael Mitchell, and Bryan Shuler. Caldor Department Stores was also copied on the letter.

61. By January 6, 1992, negotiations with Caldor were completed. The only open item was Caldor's request that both stores be delivered by September 1992. (PX 101)

62. On February 21, 1992, plaintiff's temporary erosion and sediment control plan for the 273 Property was approved by the Delaware Department of Natural Resources and Environmental Control. [FN10] (PX 102)

> FN10. By the spring of 1992, plaintiff had expended approximately $2,389,000.00 in reliance upon the County's approvals for commercial use of the property. (D.I. 252 at 164)

63. On or about May 26, 1992, plaintiff resubmitted his application for a building permit. Plaintiff sought a permit for the construction of a 70,000 square foot building, Building # 4, as

Case 1:04-cv-01376-KAJ    Document 54-7    Filed 03/17/2005    Page 10 of 16

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *10 (D.Del.))

Page 41

depicted on the latest County-approved record resubdivision plan. (PX 103)

64. On May 27, 1992, Biloon forwarded an E-mail note to Mitchell regarding plaintiff's last application: "We have another application for the dept. store. This time the building plans agree with the record plan. What is our next move?" (PX 104) Mitchell responded immediately: "It is not zoned for a retail department store. He does not get a permit." (PX 105) Biloon replied within the hour: "What about your meeting with Phil C.? Frankie's boys tell me that Phil told you back off!!!!" [FN11] (PX 106) Mitchell instructed Biloon to deny the building permit. (D.I. 252 at 69-71)

> FN11. "Phil C." is Philip Cloutier, then President of County Council. "Frankie" is plaintiff, Frank E. Acierno.

65. By letter dated June 4, 1992, Biloon advised plaintiff that
> New Castle County still cannot accept your building permit application for the proposed 70,000 square foot Caldor Department Store at [the 273 Property]. The situation noted in my December 18, 1991 letter to you regarding the conflict between the proposed commercial use and the manufacturing zoning classification for the property remains unchanged. Please refer all questions and future correspondence regarding this matter to the New Castle County Law Department.

*11 (PX 109) The following were copied on the letter: Robert W. O'Brien; Warren S. O'Sullivan; Saurabh Srivastava; Bryan C. Shuler; Michael Mitchell; Donald A. Laubach; A. Norman Paul; and Caldor Department Stores.

66. On June 4, 1992, an employee of plaintiff wrote to Biloon confirming a conversation between the two on that day: "During our conversation, you advised me that the reason this permit is being denied is because there is a note in your file from Mike Mitchell indicating that no permits are to be issued for this site." (PX 110) Biloon testified that he did not make any independent judgment regarding the zoning issue. Biloon simply followed Mitchell's orders. (D.I. 252 at 66-7, 87-9)

67. On December 16, 1993, the New Castle County Board of Adjustment voted to affirm the County's June 4, 1992 permit denial. Plaintiff relied on the historical record at the hearing. The County presented evidence in the form of expert legal opinion, as well as brief factual testimony regarding the current status of the area's land use development. (DX 43)

68. During the years 1975 to present, all record plans for the 273 Property depicted a commercial use in the M-1 zone. During the years 1975 to present, no governmental body acted to void any of plaintiff's record plans for the 273 Property. (PX 111) During the years 1975 to present, no representative from Planning informed plaintiff that he could not develop the 273 Property for commercial purposes. Furthermore, Planning has not formally noticed plaintiff that his record plan for the 273 Property is invalid.

69. The record demonstrates, by a preponderance of the evidence, that interpretation and enforcement of the Zoning Code and regulations is a subjective exercise and, therefore, susceptible to arbitrary, irrational and/or biased applications.

a. Retail sales (a commercial use) are permitted "as an accessory use" to any permitted "principal" manufacturing, industrial or warehouse use in a M-1 zone. An "accessory use" is defined in this context only by the percentage of the total space devoted to retail sales (no more than 15%) versus manufacturing uses (such as "warehousing" or storage). The record reflects that there is no system in place to ensure that the manufacturing/retail ratio depicted on a plan is the manufacturing/retail ratio actually implemented, or that the manufacturing/retail ratio initially implemented is maintained consistent with the Zoning Code and regulations. (D.I. 251 at 226-34)

b. A permitted use in a manufacturing zone is a "building supply store." A permitted use in a commercial zone is a "home center store." The only difference between these two uses is whether or not a "majority" of the storage and display area is devoted to "building materials" as opposed to "small hardware-type items." The record reflects that there is no system in place to ensure that the ratio of building materials to small hardware-type items depicted on a plan is the ratio actually implemented, or that the ratio initially implemented is maintained consistent with the Zoning Code and regulations. (D.I. 251 at 156-65)

*12 c. A factor identified by the County as

Case 1:04-cv-01376-KAJ    Document 54-7    Filed 03/17/2005    Page 11 of 16

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *12 (D.Del.))

Page 42

significant in its land use decision-making process is the impact of development on traffic capacity (i.e., whether the County's infrastructure can support the increased traffic associated with any proposed development). The record demonstrates that there have been failing levels of traffic capacity for years, providing the County with the opportunity to use traffic impact to block or to allow development at its discretion. (D.I. 251 at 136-43, 148-52, 199-216)

d. Enforcement of the Zoning Code and regulations is complaints-based. A complaints-based system of enforcement is subject to selective enforcement and abuse. (D.I. 256 at 120-23; D.I. 257 at 149-50, 160-68)

70. The record demonstrates, by a preponderance of the evidence, that over the years the County has exercised its discretionary authority against plaintiff.

a. Although the County was aware in November 1971 that plaintiff's preliminary tentative plan depicting commercial uses for the 273 Property had been approved, the 273 Property was not included among the group of properties afforded the benefit of spontaneous zoning changes. (DX 3)

b. The County has never before (or since) used the equitable provisions of Section 23-6(c) of the County Code to block implementation of an approved record plan. (D.I. 251 at 84-88; D.I. 252 at 105-106; D.I. 257 at 111-112)

c. The County has never before (or since) refused to honor a record plan. (D.I. 252 at 53-4, 82, 101-105)

d. The County has enforced its regulations in order to discourage plaintiff's development efforts. (PX 187, 188; D.I. 255 at 63-67, 74-76; D.I. 257 at 168-78)

71. The record demonstrates, by a preponderance of the evidence, that accompanying the County's dealings with plaintiff were expressions of personal animosity. (D.I. 251 at 22; D.I. 252 at 93, 100; D.I. 255 at 63-76; D.I. 256 at 14, 24, 137; D.I. 257 at 127-29; DX 72 at 49-51)

72. The record demonstrates, by a preponderance of the evidence, that Mitchell did not exercise reasonable professional judgment in advising Biloon.

a. In March 1991, Mitchell possessed general knowledge of the history of the 273 Property and specific knowledge that plaintiff was pursuing commercial development of that property. (DX 16-24; D.I. 255 at 26-44; D.I. 257 at 8-14, 54-61)

b. In April 1991, Mitchell demanded that "no building permit should be issued for any construction on this site until extensive review and consultation between the Division of Development and Licensing, Department of Planning and Department of Law is initiated and concluded concerning any proposed use." (DX 25, with emphasis added) Mitchell cited neither statutory nor case law support for his position and, despite his knowledge of ongoing business negotiations, informed neither Gee nor plaintiff of his broad directive. [FN12] (D.I. 257 at 68)

> FN12. Plaintiff was not formally notified by the County of any zoning problem until December 1991. (D.I. 252 at 57)

c. In July 1991, Mitchell issued a legal opinion wherein he stated, for the first time, that commercial development of the 273 Property was not permitted by operation of Section 23-6(c) of the County Code. Aside from the reference to Section 23-6(c) in the opinion, there is no evidence of record that Mitchell conducted any legal research [FN13] in connection with his *opinion*. Mitchell testified that he reviewed the archived files from the Departments of Law and Planning; however, he made no attempt to discuss the documents with anyone involved in the events. (D.I. 251 at 78, 91-3; D.I. 257 at 18-20, 65-7, 79-80, 108-110, 119-122, 146, 155-60)

> FN13. Although Mitchell testified that he relied on Delaware case law, there are no cases cited in the opinion or in his file. (PX 94; D.I. 257 at 155-57)

*13 d. There is no evidence of record that any review and consultation, let alone extensive review and consultation, ever took place between the Division of Development and Licensing, the Department of Planning and the Department of Law before plaintiff's building permit was denied by Biloon in December 1991 or before the permit was denied again in April 1992. (DX 30, 36; D.I. 251 at 78, 91-3) Nevertheless, Mitchell expected that no permit would issue, as per his directive. (D.I. 257 at 124-25, 178)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-01376-KAJ    Document 54-7    Filed 03/17/2005    Page 12 of 16

Not Reported in F.Supp.                                                                                     Page 43
(Cite as: 1997 WL 447914, *13 (D.Del.))

73. The record demonstrates, by a preponderance of the evidence, that the Board of Adjustment did not exercise reasonable professional judgment in its decision to deny plaintiff a building permit.

a. The Board of Adjustment is a politically appointed board of lay persons whose primary duty is to review *ab initio* requests by landowners for relief from the Zoning Code through the issuance of use and area variances. These reviews are fact-intensive exercises. *See, e.g., Berg v. Board of Adjustment,* 1990 WL 18306 (Del.Super.1990); *Hockessin Gulf, Inc. v. Board of Adjustment,* 1990 WL 35266 (Del.Super.), *aff'd,* 557 A.2d 753 (Del.1990); *DiCriscio v. Board of Adjustment,* 1990 WL 35231 (Del.Super.1990); *DiCriscio v. Board of Adjustment,* 1990 WL 105027 (Del.Super.1990); *Weaver v. Board of Adjustment,* 1991 WL 236963 (Del.Super.1991); *Stone Mill Properties, L.P. v. Board of Adjustment,* 1992 WL 91164 at 2 (Del.Super.1992); *Berkowitz v. Board of Adjustment,* 1992 WL 240423 (Del.Super.1992), *aff'd,* 625 A.2d 278 (Del.1993); *Profita v. Board of Adjustment,* 1992 WL 390625 (Del.Super.1992); *Fairwinds Shopping Center v. Board of Adjustment,* 1993 WL 258801 at 5 (Del.Super.1993); *Burgess v. Board of Adjustment,* 1993 WL 258718 at 2 (Del.Super.1993), *aff'd,* 637 A.2d 825 (Del.1994); *Paul v. Board of Adjustment,* 1993 WL 485925 (Del.Super.1993); *Albright v. Board of Adjustment,* 1993 WL 543891 at 2 (Del.Super.1993).

b. The Board of Adjustment has in the past requested information from other County agencies, including representatives from Planning, in reaching its decisions. *See, e.g., Stone Mill Properties, L.P. v. Board of Adjustment,* 1992 WL 91164 at 3 (Del.Super.1992). In the case at bar, the Board of Adjustment made no effort to obtain information from Planning.

c. The Board of Adjustment has in the past been admonished to consider as relevant evidence the actions of other County agencies. *See, e.g., Twardowski v. Board of Adjustment,* 1992 WL 114403 at 5 (Del.Super.1992). In the case at bar, the Board of Adjustment simply assumed that the historical conduct of Planning had been in error.

d. The Board of Adjustment, serving in an appellate capacity in the proceedings at bar, [FN14] allowed the County to offer *post hoc* legal justifications for Mitchell's initial legal opinion without consultation or attempted reconciliation with Planning or County Council, all in the name of serving the purpose of an equitable statute, Section 23-6(c) of the County Code.

> FN14. Generally, appeals are limited to the record created in the first level of review.

*14 e. Members of the Board of Adjustment were routinely represented by Mitchell on appeals to the Delaware Superior Court at the time of the proceeding at issue. *See* the above-referenced cases.

f. The proceedings before the Board of Adjustment were characterized by expressions of hostility. (DX 72 at 49-51)

74. This is the only cited instance in which a member of the County Law Department instructed the withholding of building permits for a use which has already received Planning's final approval. This is the only cited instance in which the Division of Development and Licensing attempted to circumvent the implementation of a record plan through the permitting process. There has been no other cited instance in which the Board of Adjustment has approved of the Development and Licensing Division's circumvention of a record plan.

III. CONCLUSIONS OF LAW

1. It cannot be gainsaid that disputed claims to land or territory have generated conflict since time immemorial. In contemporary America, as land becomes ever more a scarce commodity, land use issues promise to assume an ever-increasing significance. As reflected by the failed attempt of the Delaware Public Policy Institute's Land Use Study Committee to reach consensus on land use issues, there is an inherent tension in this country between the freedoms associated with the private ownership of property and the limits imposed by local governmental regulation. Compounding the tension between private and public interests in land use is the seemingly universal interest in money and power--factors which have historically influenced land use decisions.

2. Title 42 U.S.C. § 1983 provides in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia,

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *14 (D.Del.))

Page 44

subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. The United States Supreme Court held in *Monell v. Department of Social Servs.*, 436 U.S. 658, 689, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that municipalities and other local governmental bodies are "persons" within the meaning of § 1983.

4. In seeking to impose liability on a local governmental body under § 1983, a plaintiff is required to identify the governmental "policy" or "custom" that caused the plaintiff's injury. *Id.* at 694; *Pembaur v. Cincinnati*, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).
> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality..... The plaintiff must [also] demonstrate that a municipal decision reflects a deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow that decision.

*15 *Board of Comm. v. Brown*, 520 U.S. 397, ----, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997).

5. The Supreme Court has held the policy requirement satisfied
> where no rule has been announced as "policy" but federal law has been violated by an act of the policymaker itself. In this situation, the choice of policy and its implementation are one, and the first or only action will suffice to ground municipal liability simply because it is the very policymaker who is acting.... It does not matter that the policymaker may have chosen "a course of action tailored [only] to a particular situation and not intended to control decisions in later situations ...; if the decision to adopt that particular course of action is intentionally made by the authorized policymaker, "it surely represents an act of official government 'policy' " and "the municipality is equally responsible whether the action is to be taken only once or to be taken repeatedly."
*Id.* at 1395 (Souter, J., dissenting), *citing Pembaur*, 475 U.S. at 480-81.

6. It is plaintiff's burden to prove, by a preponderance of the evidence, that his constitutional rights to substantive due process and equal protection under the law have been violated. *Edwards v. City of Philadelphia*, 860 F.2d 568, 572-73 (3d Cir.1988).

A. Substantive Due Process

7. For plaintiff to recover for alleged substantive due process violations, he must demonstrate that: (1) he possessed a property interest worthy of substantive due process protection; and (2) he was deprived of said property interest by a land use decision which was arbitrarily or irrationally reached. *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 600-01 (3d Cir.), *cert. denied*, 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995).

8. As explained in *DeBlasio*, " 'the deliberate and arbitrary abuse of government power violates an individual's right to substantive due process.' " *Id.* at 599-600, *citing Bello v. Walker*, 840 F.2d 1124, 1129 (3d Cir.1988). Consistent with the notion that "substantive due process rights are created by the Constitution," the property interests worthy of substantive due process protection should constitute "fundamental" property interests of the kind "implicitly protected by the Constitution." 53 F.3d at 599, *citing Reich v. Beharry*, 883 F.2d 239, 244 (3d Cir.1989). The Third Circuit in *DeBlasio* concluded that "ownership is a property interest worthy of substantive due process protection." 53 F.3d at 600. "Thus, in the context of land use regulation, that is, in situations where the governmental decision in question impinges upon a landowner's use and enjoyment of property, a land-owning plaintiff states a substantive due process claim where he or she alleges that the decision limiting the intended land use was arbitrarily or irrationally reached." *Id.*

9. The Third Circuit in *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 692 (3d Cir.1993), held that "[s]ubstantive due process protects citizens from arbitrary and irrational acts of government," *citing Rogin v. Bensalem Township*, 616 F.2d at 689. *See also Taylor Inv., Ltd. v. Upper Darby Tp.*, 983 F.2d 1285, 1292 (3d Cir.1993).

*16 A violation of substantive due process rights is proven: (1) if the government's actions were not

Case 1:04-cv-01376-KAJ   Document 54-7   Filed 03/17/2005   Page 14 of 16

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *16 (D.Del.))

Page 45

rationally related to a legitimate government interest; or (2) "if the government's actions in a particular case were in fact motivated by bias, bad faith or improper motive...."
*Parkway Garage, Inc.*, 5 F.3d at 692, citing *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 683 (3d Cir.1991). Accord *Blanche Road Corp. v. Bensalem Township*, 57 F.3d 253, 263 (3d Cir.), cert. denied, 516 U.S. 915, 116 S.Ct. 303, 133 L.Ed.2d 208 (1995).

10. The Supreme Court has endeavored to adjust the substantive due process rationality standard to the problem of reviewing discretionary administrative authority. In *Regents of the University of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the justices unanimously upheld the decision of medical school faculty and administrators to dismiss a student from a combined undergraduate degree and medical degree program. To qualify for the final two years of the program, the student was required to pass a standardized examination; the student failed. Although all other persons who previously had failed the examination had been given a chance to retake the examination, the student in the case was dismissed from the program without reexamination. The student claimed that the faculty decision violated substantive due process rights. The Court held that
[w]hen judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.
*Id.* at 225. Accord *Youngberg v. Romeo*, 457 U.S. 307, 322-23, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ("[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."). See also, *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1222 (6th Cir.1992); *Mauriello v. University of Medicine and Dentistry of New Jersey*, 781 F.2d 46, 50 (3d Cir.1986).

11. Due to the County's bifurcated system for approval of development and building plans, the record at bar reflects two conflicting decisions rendered by two separate and distinct "final" decisionmakers. As recognized by the Third Circuit,
[t]he Planning Board is responsible for approving development plans, subject to approval by the Department of Planning and the County Council. However, the Public Works Department is responsible for issuing building permits, subject to review by the Department of License Inspection and Review and/or the Board of Adjustment.
*Acierno v. Mitchell*, 6 F.3d 970, 976 n. 15 (3d Cir.1993).

12. The first decision was made in 1975 by County Council to approve plaintiff's subdivision plan for the 273 Property. That decision, mandated by the Delaware Supreme Court, has not been withdrawn or otherwise voided.

*17 13. The second decision was made in 1994 by the Board of Adjustment to deny plaintiff a building permit. That decision, unique in its procedural underpinnings as well as in its effect, was essentially a legal opinion rendered by a lay board without the benefit of any inter-agency communication or factual inquiry.

14. It is reasonable to infer, from the history of dealings between plaintiff and the County when viewed in light of plaintiff's singular treatment under the circumstances at bar, that the County's conduct at issue was arbitrary or ill-motivated. See *Azzaro v. County of Allegheny*, 110 F.3d 968, 973-75 (3d Cir.1997).

15. The Third Circuit's substantive due process decisions--*Bello v. Walker* and its progeny--stand for the proposition that substantive due process is violated when government officials deprive a person of certain property rights arbitrarily, irrationally, or with ill motives. This line of authority has been the subject of recent criticism. See, e.g., *Phillips v. Borough of Keyport*, 107 F.3d 164, 183 (3d Cir.1997) (Alito, J., concurring in part and dissenting in part); *Homar v. Gilbert*, 89 F.3d 1009, 1029-30 (3d Cir.1996) (Alito, J., concurring in part and dissenting in part), cert. granted on other issue, 117 S.Ct. 678 (1997). Under the rationale expressed in the above-referenced dissents, substantive due process should be invoked only in those extreme circumstances where governmental action is "shocking to the conscience of a court in the sense of being a departure from civilized norms

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 447914, *17 (D.Del.))

Page 46

of governance, [or] offensive to human dignity." *Phillips v. Borough of Keyport,* 107 F.3d at 187. Arbitrary, irrational and even biased or ill-motivated governmental action does not rise to this threshold level of constitutional taint. *Id.*

16. So long as *Bello v. Walker* and its progeny remain good law in the Third Circuit, however, the facts of record demonstrate substantive due process violations through the deliberate and arbitrary abuse of governmental power in the land use context.

B. Equal Protection

17. As recognized by the Third Circuit,
[p]ublic officials engage in unconstitutional discriminatory application or administration of a facially impartial law when they seek to enforce the law "on the basis of an unjustifiable standard, such as race, or religion, or some other arbitrary factor," or when they seek to enforce the law in order "to prevent the exercise of a fundamental right."
*Holder v. City of Allentown,* 987 F.2d 188, 197 (3d Cir.1993) (emphasis added), *citing United States v. Schoolcraft,* 879 F.2d 64, 68 (3d Cir.1989). *See also Taylor Inv., Ltd. v. Upper Darby Tp.,* 983 F.2d at 1294 ("[P]laintiffs can prevail on equal protection only if the Township's actions were not rationally related to a legitimate purpose.").

18. While rationality is the touchstone for both equal protection and substantive due process, the focus of an equal protection analysis is whether a governmental entity has "irrationally distinguished between similarly situated classes....." *Doe v. City of Butler,* 892 F.2d 315, 319 n. 2 (3d Cir.1989). *See also, Knight v. Tape, Inc.,* 935 F.2d 617, 627 (3d Cir.1991).

*18 19. Having concluded that the County's decision to preclude plaintiff from implementing his record plan was irrational for substantive due process purposes, the question remains whether plaintiff was thereby treated differently from similarly situated individuals for equal protection purposes.

20. In this regard, it is evident that in defining the "class," one resolves the equal protection analysis. Not surprisingly, the County has suggested a narrowly defined class--essentially one tailored after plaintiff's particular circumstances--and argues that because there are no similarly situated individuals (and, thus, no disparate treatment among similarly situated individuals), plaintiff cannot prevail on his equal protection claim.

21. The court concludes, however, that the appropriate "class" is a broader segment of the population--those who have approved record plans. Consequently, the appropriate focus of the equal protection analysis is whether the application of Section 23-6(c) to plaintiff under the circumstances at bar bears a reasonable relation to the object of the statute. The object of the statute is equitable. The statute could not literally apply to the circumstances at bar. As explained above, its "application" to plaintiff years after the fact does not bear a reasonable relation to its object. Therefore, plaintiff has been treated differently from other similarly situated individuals by having the statute applied in this fashion at all.

C. Remedies

22. Plaintiff has waived his right to seek legal remedies in the context of his substantive due process and equal protection claims. "Section 1983 by its terms confers authority to grant equitable relief....." *Rizzo v. Goode,* 423 U.S. 362, 378, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). To succeed on a request for "forward looking relief" in the context of constitutional (versus statutory) violations, the Supreme Court has required plaintiffs to demonstrate that they will suffer a future "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 2104, 132 L.Ed.2d 158 (1995). [FN15]

> FN15. Indeed, it is contemplated under Supreme Court precedent that money damages constitute appropriate recompense for past injuries of a constitutional dimension, while injunctive relief is the appropriate remedy for future constitutional harm. *See e.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

23. Unlike those cases where it is not probable that a plaintiff will find himself in circumstances similar to those giving rise to the initial constitutional violation, *e.g.,* under arrest again, [FN16] plaintiff at bar still has a valid record plan depicting commercial development in a manufacturing zone.

Not Reported in F.Supp. **Page 47**
(Cite as: 1997 WL 447914, *18 (D.Del.))

In the context of the history of this litigation, plaintiff has demonstrated to a sufficient degree that he will "suffer similar injury in the future" to warrant forward-looking relief.

> FN16. *See e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. at 111.

24. To fashion an appropriate equitable remedy which fits the future harm is relatively straightforward in this case, given the existence of a valid record plan. The County shall honor the decisions of the Department of Planning, the County Council, and the Delaware Supreme Court and allow plaintiff to develop the 273 Property consistent with his record plan depicting commercial development in a manufacturing zone. [FN17]

> FN17. As recognized by the Delaware Supreme Court in *Acierno v. New Castle County*, 679 A.2d 445, 459-60 (Del.1996), the case at bar and the parallel state case addressed different issues and different remedies without preclusive effect.

IV. CONCLUSION

*19 Delaware, as well as the various local governmental units within its boundaries, prides itself on the opportunities its small size provides to individuals to affect the political process. As this court has recognized in the past, however, a personal system of government is a double-edged sword. On the one hand, much can be accomplished when bureaucratic "red tape" is minimized. On the other hand, bureaucratic red tape is intended to level the playing field and provide an objective measure of a government's regulations over those who seek its approval.

The record at bar demonstrates that this was not a case where impersonal bureaucrats made objective decisions. This was a case where the players in the dispute were well known to each other and there existed a shared history of conflict, frustration, and animosity. When such a history is played out in the subjective context of land use decisions, it is not surprising that the decisionmaking process takes on an arbitrary, unprofessional demeanor. So this court has found.

For the reasons stated, judgment shall be entered in favor of plaintiff and against defendant. An order shall issue.

1997 WL 447914 (D.Del.)

Motions, Pleadings and Filings (Back to top)

    1:93CV00579     (Docket) (Dec. 17, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.