EXHIBIT 15
TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in F.Supp.
1997 WL 792998 (E.D.Pa.), RICO Bus.Disp.Guide 9381
**(Cite as: 1997 WL 792998 (E.D.Pa.))**

**H**

Motions, Pleadings and Filings

United States District Court, E.D. Pennsylvania.
DATA COMM COMMUNICATIONS, INC., et al.
v.
THE CARAMON GROUP, INC., et al.
No. Civ.A. 97-0735.

Nov. 26, 1997.

Marc H. Perry, Law Offices of Marc H. Perry, Phila, PA, Michael C. Nugent, Phila, PA, for Data Comm Communications Inc., plaintiff.

Marc H. Perry, Michael C. Nugent, (See above), for Eric J. Perry, plaintiff.

Marc H. Perry, Michael C. Nugent, (See above), for Louis Silver, plaintiff.

Mark H. Riesenfeld, Bala Cynwyd, PA, Harold F. Kaufman, Lorry and Hymowitz, Phila, PA, The Caramon Group Inc., c/o Marvin Waldman, President, Fair Hill, Md, for The Caramon Group Inc., defendant.

Mark H. Riesenfeld, Harold F. Kaufman, (See above), for Marvin Waldman, defendant.

Mark H. Riesenfeld, Harold F. Kaufman, (See above), for Henrietta Alban, defendant.

Mark S. Haltzman, Mark S. Haltzman & Assoc., Bala Cynwyd, PA, for The Remington Group, defendant.

Andrew Bogdanoff, pro se, Bala Cynwyd, PA, for Andrew Bogdanoff, defendant.

Lloyd Scott Inc., pro se, Lloyd Baskin, President, Cherry Hill, NJ, for Loyd Scott Inc., defendant.

Salvatore A. Paparone, Jr., Paparone and Associates, Trevose, PA, for Steve Teitleman, defendant.

Lloyd Bashkin, pro se, Cherry Hill, NJ, for Lloyd Bashkin, defendant.

MEMORANDUM AND ORDER

HUTTON, J.

*1 Presently before this Court is the Motion of Defendants The Caramon Group, Inc., Marvin Waldman, and Henriette Alban to Dismiss the Plaintiffs' Complaint Pursuant to Federal Rule of Civil Procedure 12(b) for Plaintiffs' Failure to State a Claim and for Lack of Jurisdiction (Docket No. 28). For the reasons set forth below, the Plaintiffs' complaint is dismissed with leave to amend.

I. BACKGROUND

In 1995, the plaintiff, Data Comm Communications, Inc. ("Data Comm"), incorporated in the Commonwealth of Pennsylvania for the purposes of obtaining funding to bid on and to procure Federal Communication Commission licenses for personal communications systems. Compl. at ¶ 14. Specifically, Data Comm and its principals, plaintiffs Eric Perry ("Perry") and Louis Silver ("Silver"), were interested in obtaining funds to bid for 10 MHZ personal communications licenses at an August 26, 1996 FCC auction. Id. at ¶ 15. To finance the $16 million needed to bid for the licenses, the plaintiffs approached defendant Marvin Waldman ("Waldman"), the chief executive officer of defendant The Caramon Group ("Caramon"). [FN1] Id. at ¶¶ 16-18.

FN1. The other defendants in this action include Henriette Alban, Caramon's vice president and operating officer, The Remington Group and Andrew Bogdanoff, its chief executive officer and principal, Lloyd Scott & Company and Lloyd Bashkin, its president, and Steve Teitleman, an employee of Caramon. On April 17, 1997, the plaintiffs voluntarily dismissed defendants Lloyd Bashkin and Lloyd Scott & Company from this action. Further, on July 30, 1997, the plaintiffs voluntarily dismissed Steve Teitleman from this action.

The plaintiffs allege that Waldman expressed a desire to invest in Data Comm's project. In fact, Waldman told "Silver that the Data Comm project 'fell well within the Caramon Group Mission.' " Id. at ¶ 18. Moreover, Waldman revealed to Silver that because it had more than $16 million available, Caramon was interested in funding the entire project. Id. Waldman instructed Silver to send a business plan to Andrew Bogdanoff ("Bogdanoff") at the Remington Group ("Remington"), both defendants in this action, because Bogdanoff was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 792998, *1 (E.D.Pa.))

responsible for screening all of Caramon's projects. *Id.* at ¶ 19.

Defendants Bogdanoff and Waldman made a series of representations to Silver on behalf of Caramon. *Id.* at ¶ 21. The plaintiffs allege that Bogdanoff and Waldman told Silver that: 1) Caramon had unlimited investment funds; 2) the chances of Caramon funding Data Comm's project were "extremely high"; and 3) Caramon did not want Data Comm to pursue other investors. *Id.* Moreover, on November 14, 1995, Waldman told Silver that 1) Waldman had complete authority to approve Caramon's investments, 2) $16 million was already committed to this project; and 3) due diligence would take no more than four weeks and the money would be available three weeks afterwards. *Id.* at ¶ 22.

Accordingly, Waldman sent Perry a commitment letter on December 21, 1995. *Id.* at ¶ 23. However, in order to pay for Caramon's expenses in obtaining the funding, Waldman demanded $50,000 from the plaintiffs, which the plaintiffs paid. *Id.* at ¶ 26-27. After the due diligence process was completed, though, the defendants refused to provide the requested financing. *Id.* at ¶ 28.

The plaintiffs allege that Waldman and Caramon made substantial misrepresentations during the course of the parties' negotiations. More specifically, the plaintiffs allege that Waldman and Caramon were not lenders, and that Caramon never had access to the $16 million. *Id.* at ¶ 28. The plaintiffs allege that the defendants failed to reimburse the plaintiffs' $50,000 investment and other fees paid by them. *Id.* at ¶ 28. Instead, the plaintiffs claim that Caramon and Waldman planned to take the $50,000 relating to their proposed expenses, without ever having the ability to make the required loan. *Id.* at ¶¶ 28, 30, 41.

*2 On January 31, 1997, the plaintiffs filed suit in this Court alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, civil conspiracy, tortious interference with prospective economic advantage, breach of implied covenant of good faith and fair dealing, and fraud. On May 23, 1997, defendants Caramon, Waldman, and Alban filed the instant motion seeking to dismiss the plaintiffs' complaint. On July 23, 1997, this Court required that the plaintiffs file a RICO Case

Statement, pursuant to this Court's RICO Case Standing Order. The plaintiffs filed their **RICO Statement** on August 6, 1997.

## II. DISCUSSION

### A. *Standard for Dismissal under Rule 12(b)(6)*

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a)(2). Accordingly, the plaintiff does not have to "set out *in detail* the facts upon which he bases his claim." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added). In other words, the plaintiff need only "give the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Id* . (emphasis added).

When considering a motion to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), [FN2] this Court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under Rule 12(b)(6) ... is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988)); *see H.J. Inc. v. Northwest Bell Tel. Co.,* 492 U.S. 229, 249-50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The court will only dismiss the complaint if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc.,* 492 U.S. at 249-50 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 1984, 104 S.Ct. 2229, 81 L.Ed.2d 59)).

> FN2. Rule 12(b)(6) provides that: Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted....
> Fed.R.Civ.P. 12(b)(6).

### B. *Civil RICO*

RICO affords civil damages for "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 792998, *2 (E.D.Pa.))

Page 34

Under section 1962(c), RICO "prohibits any person employed by or associated with an enterprise engaged in interstate commerce from conducting or participating in the affairs of the enterprise through a 'pattern of racketeering activity.' " *Tabas v. Tabas,* 47 F.3d 1280, 1289 (3d Cir.), *cert. denied,* 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995)) (citing 18 U.S.C. § 1962(c)). Moreover, Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C. § 1962(d).

Under 18 U.S.C. § 1962(c), a plaintiff must allege the following four elements to make out a claim: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity that must include the allegation of at least two racketeering acts." *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165 (3d Cir.1989).

**\*3** Section 1962(c) applies to a culpable "person" engaged in the conduct of an "enterprise" through a pattern of racketeering activity. *Pell v. Weinstein,* 759 F.Supp. 1107, 1116 (M.D.Pa.1991), *aff'd,* 961 F.2d 1568 (3d Cir.1992); *see Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3287, 87 L.Ed.2d 346 (1985). "In the Third Circuit, the culpable 'person' and the 'enterprise' must be separate and distinct entities.... That is, the person charged with the RICO violation under § 1962(c) cannot be the same entity as the alleged enterprise." *Pell,* 759 F.Supp. at 1116. The purpose of section 1962(c) is "to prevent the takeover of legitimate businesses by criminals and corrupt organizations.... It is in keeping with that Congressional scheme to orient section 1962(c) toward punishing the infiltrating criminals rather than the legitimate corporation which might be an innocent victim of the racketeering activity in some circumstances." *B.F. Hirsch v. Enright Refining Co.,* 751 F.2d 628, 633 (3d Cir.1984) (citations omitted).

A plaintiff must allege the following two elements to make out a claim under section 1962(d): "(1) [an] agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b), or (c)

." *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989). Moreover, a "conspiracy claim must also contain supportive factual allegations ... sufficient 'to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in the conspiracy.' " *Id.* (quoting *Alfaro v. E.F. Hutton & Co.,* 606 F.Supp. 1100, 1117-18 (E.D.Pa.1985)).

Treble damages are available to any person who, by reason of a violation of § 1962, is injured in his or her business or property. 18 U.S.C. § 1964(c). Thus, "the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima,* 105 S.Ct. at 3285. The injury must be direct; that is, it must "flow from the commission of the predicate acts." *Id.* The directness requirement ensures that a "defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured." *Id.* (quoting *Haroco, Inc. v. American Nat'l Bank & Trust Co. of Chicago,* 747 F.2d 384, 398 (7th Cir.1984), *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)).

*C. Plaintiffs' 1962(c) Claim*

*1. Pattern of Racketeering*

In the defendants' Motion to Dismiss for failure to state a claim, the defendants argue that the plaintiffs fail to plead adequately RICO's pattern of racketeering activity requirements. First, the defendants claim that the plaintiffs have not sufficiently pled the legal elements of any predicate acts by the defendants. Defs.' Mot. at 2, 4, 5. Second, the defendants argue that the plaintiffs have not alleged that the defendants' conduct meets RICO's continuity requirements, because the defendants' alleged scheme lasted less than nine months. Defs.' Mot. at 1-7.

**\*4** The RICO statute "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern.... It thus places an outer limit on the concept of a pattern of racketeering that is broad indeed." *H .J. Inc.,* 492 U.S. at 237. While the concept of "pattern" is difficult to define, the Court has at least provided a basic guideline for fulfilling

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 792998, *4 (E.D.Pa.))

the pattern requirement: "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239.

### a. *Related Predicate Acts*

Section 1962(c) prohibits "any person employed by or associated with any enterprise ... [from] participat[ing] ... in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "Racketeering activity" means "any act 'chargeable' under several generically described state criminal laws, any act 'indictable' under numerous specific federal criminal provisions, including mail and wire fraud, and any 'offense' involving bankruptcy or securities fraud or drug-related activities that is 'punishable' under federal law." *Sedima,* 473 U.S. at 481-82 (citing 18 U.S.C. § 1961(1)). Section 1961(5) defines "pattern of racketeering activity" as at least two acts of racketeering activity within ten years; however, a plaintiff must also "show that the racketeering predicates are related." *H.J. Inc.,* 492 U.S. at 239.

### (1) *Racketeering Activity*

In the instant case, the plaintiffs allege that the defendants have committed the following predicate acts: extortion and mail fraud. Pls.' RICO Case Statement at ¶ 4(a); Compl. at ¶¶ 50, 51. [FN3] The plaintiffs list several paragraphs of facts in their complaint to substantiate these claims.

> FN3. Although the plaintiffs' complaint also states that the defendants committed commercial bribery, Compl. at ¶¶ 50, 51, the plaintiffs' RICO Case Statement withdraws this allegation. Pls.' RICO Case Statement at ¶ 4. Further, the plaintiffs fail to substantiate this allegation in their complaint. Thus, this Court analyzes only the plaintiffs' mail fraud and extortion allegations.

### (a) *Extortion*

18 U.S.C. § 1951(a) prohibits anyone from obstructing, delaying, or affecting "commerce ... by ... extortion." Extortion is defined as "the obtaining of property of another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). "The requisite fear suffered by the victim of the extortion need not be one of physical harm." *United States v. Inigo,* 925 F.2d 641, 649 (3d Cir.1991). "It is well settled that the element of 'fear' required ... can be satisfied by placing a person in apprehension of economic loss." *United States v. Agnes,* 753 F.2d 293, 302 n. 15 (3d Cir.1985). "Examining the situation from the perspective of the victim 'the proof need establish that the victim reasonably believe first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment.' " *United States v. Traitz,* 871 F.2d 368, 391 (3d Cir.), *cert. denied,* 493 U.S. 821, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989) (quoting *United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987)).

*5 "Under § 1951, the economic loss to be feared is not the loss of the property obtained by the extortioner, but the threatened economic harm that the victim could reasonably believe would befall it if the extortionate demand were not met." *Inigo,* 925 F.2d at 649-50 (citation omitted). Moreover, the "potential economic loss need not be one that would put an entity out of business. Instead, there must just be a reasonable fear of an economic loss sufficient to induce the victim to part with the property demanded rather than face the threatened consequent loss." *Id.* at 650.

In support of its extortion allegations, the plaintiffs claim that the defendants misrepresented their investment capabilities, in order to convince the plaintiffs to rely on the defendants' access to investment funds. Compl. at ¶ 28. Then, when the plaintiffs were in their most vulnerable position, with deadlines pending, the defendants allegedly demanded $50,000 in previously announced fees. Compl. at ¶¶ 26, 27. The defendants refused to give the plaintiffs the loan if the plaintiffs failed to pay the sum. Compl. at ¶¶ 26, 27, 38, 39. Without access to the investment funds, the plaintiffs would have been precluded from bidding on the FCC licenses. Compl. at ¶ 16. Because of the plaintiffs' earlier reliance on the defendants' promises to grant the loan and the imminent deadlines, the plaintiffs claim that they had no choice but to pay the required amount. Compl. at ¶ 57. Given the broad definition of extortion, the plaintiff have met their burden of sufficiently pleading facts regarding the defendants' alleged extortion, arising out of the plaintiffs' fear of economic harm.

Not Reported in F. Supp.
**(Cite as: 1997 WL 792998, \*5 (E.D.Pa.))**

(b) *Mail Fraud*

Moreover, the plaintiffs have sufficiently pled facts to substantiate their allegations of mail fraud. Under 18 U.S.C. § 1341, "[m]ail fraud has two elements: 1) a scheme to defraud, and 2) use of the mails in furtherance of the scheme." *City of Rome v. Glanton,* 958 F.Supp. 1026, 1044 (E.D.Pa.1997) (citing *United States v. Dreer,* 457 F.2d 31 (3d Cir.1972). As the Third Circuit recently stated:

The mail fraud statute prohibits any person from knowingly causing the use of the mails "for the purpose of executing" any "scheme or artifice to defraud." 18 U.S.C.A. § 1341 (Supp.1990). The actual violation is the mailing, although the mailing must relate to the underlying fraudulent scheme. Moreover, each mailing that is "incident to an essential part of the scheme" constitutes a new violation. *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The mailing need not contain any misrepresentations. Rather, " 'innocent' mailings--ones that contain no false information--may supply the mailing element." *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734 (1989).

*Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1413-14 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

**\*6** Rule 9(b) of the Federal Rules of Civil Procedure states that a plaintiff must allege fraud with particularity. *See Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 791 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (Rule 9(b) must "place the defendants on notice of the precise misconduct with which they are charged"); *Alfaro,* 606 F.Supp. at 1118. This requirement is "particularly important in civil RICO pleadings in which the predicate racketeering acts are critical to the sufficiency of the RICO claim." *Alfaro,* 606 F.Supp. at 1118; *accord O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 230 (S.D.N.Y.1989) ("All of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions.").

In the instant case, the plaintiffs have alleged mail fraud with sufficient particularity. Taking the plaintiffs' allegations as true, the plaintiffs have established a scheme by the defendants. According to the complaint, the defendants falsely led the plaintiffs into believing that the defendants would finance the plaintiffs' project. Compl. at ¶¶ 28. When the plaintiffs' need for the money grew, the defendants continued to assure the plaintiffs that the defendants were committed to loaning the necessary funds. Compl. at ¶¶ 21- 23. However, as the plaintiffs faced strict deadlines and after all other loan opportunities were inaccessible under the time constraints, the defendants required the plaintiffs to pay them $50,000 to secure the loan. Compl. at ¶¶ 33-39, 57. Moreover, the plaintiffs assert that the defendants used the mails in furtherance of their scheme, both as a device to send their misrepresentations and to advance their extortion requests. Compl. at ¶¶ 34, 36.

Therefore, this Court finds that the plaintiffs have sufficiently pled the elements required to make out a claim for extortion and mail fraud. Both of these crimes constitute "racketeering activity," pursuant to 18 U.S.C.1961(1). The next issue before this Court is whether these activities are related.

(2) *Relatedness of the Racketeering Activity*

As defined in *H.J., Inc.,* predicate acts are related where they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)). "The relatedness test will nearly always be satisfied in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction--by definition the acts are related to the same 'scheme or artifice to defraud.' " *Kehr,* 926 F.2d at 1414.

In the instant case, the plaintiffs have sufficiently pled RICO's relatedness requirements. First, the plaintiffs assert that the defendants used the mail on ten different occasions to further their fraud. Compl. at ¶¶ 34, 36. Second, the alleged mail fraud and extortion claims were both aimed at defrauding the plaintiffs out of $50,000, through the same underlying scheme. Thus, they "have the same or similar purposes, results, participants, victims, or methods of commission, [and] otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240 (quoting 18 U.S.C. § 3575(e)).

**\*7** Thus, the plaintiffs have sufficiently pled the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 792998, *7 (E.D.Pa.))

Page 37

elements required to establish that the defendants performed related racketeering predicates. This Court must now decide whether the defendants' alleged racketeering endeavors "amount to or pose a threat of continued criminal activity." *H.J., Inc.,* 492 U.S. at 239.

b. *Continuity*

" 'Continuity' is both a closed- and open-ended concept." *H.J ., Inc.,* 492 U.S. at 241. It may be shown by proving a series of predicate acts over a "substantial" period of time. *Id.* at 242. "In other cases, the threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.*

(1) *Closed-Ended Continuity*

In *Tabas v. Tabas,* the Third Circuit discussed how a party may " 'by prov [[[e] a series of related predicates extending over a *substantial* period of time.' " *Tabas,* 47 F.3d at 1292 (quoting *H.J., Inc.,* 492 U.S. at 242) (emphasis added by *Tabas* ). The Third Circuit recognized that it "has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity." *Tabas,* 47 F.3d at 1293 (citations omitted). The *Tabas* court cited five Third Circuit opinions reaching this result. *Id.* at 1293. In all of these cases, plaintiffs had alleged that conduct constituted RICO violations, although the actions lasted less than one year and did not threaten future violations; in response, the Third Circuit held that RICO's continuity requirement had not been met. [FN4] *See Hughes v. Consol-Pennsylvania Coal Co.,* 945 F.2d 594, 610-11 (3d Cir.1991), *cert. denied,* 504 U.S. 955 (1992) (defining limitations to closed continuity); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (same); *Kehr,* 926 F.2d at 1413 (same); *Banks v. Wolk,* 918 F.2d 418, 422-23 (3d Cir.1990) (same); *Marshall-Silver Constr. Co. v. Mendel,* 894 F.2d 593 (3d Cir.1990) (same).

> FN4. In *Tabas,* the Third Circuit found that a scheme lasting three and one half years "extends over a 'substantial' period time and therefore constitutes the type of 'long-term criminal conduct' that Rico was enacted to address." *Tabas,* 47 F.3d at 1294 (citations omitted). Moreover, the court cited *United States v. Pelullo,* 964 F.2d 193, 209 (3d

Cir.1992), and *Swistock v Jones,* 884 F.2d 755, 759 (3d Cir.1989), as authority indicating that nineteen months and fourteen months, respectively, may be sufficient to constitute closed-ended continuity. *Tabas,* 47 F.3d at 1294.

In *Hughes,* for example, the plaintiffs testified that two defendant companies, among others, fraudulently misrepresented facts to obtain favorable prices in an attempt to purchase the plaintiffs' property. *Hughes,* 945 F.2d at 607. The trial judge found that the scheme lasted one year, *id.* at 611, and "granted defendants' motion for judgment n.o.v. on the federal RICO claims because plaintiffs failed to prove the continuity prong of RICO's 'pattern of racketeering activity' requirement." *Id.* at 609 (citing 18 U.S.C. § 1962(c)). In affirming the lower court's decision, the *Hughes* court stated that:

[C]ases finding substantial period, including *H.J., Inc.,* dealt with fraudulent conduct lasting *years,* sometimes over a decade. Such findings of substantial time periods are consistent with Congress' intent to combat "long-term criminal conduct." *H.J. Inc.,* 492 U.S. at 242, 109 S.CT. at 2902. Recently we noted that "[a]lthough RICO has not been limited to organized crime activity, we must not overlook that it was occasioned by Congress' perception of the danger posed by organized crime-type offenses, which are almost by definition continuing." *Hindes,* 937 F.2d at 874

**\*8** The time period of this case belongs with those of *Marshall-Silver* (seven months), *Banks* (eight months), and *Hindes* (eight months). We therefore find no continuity under a closed-ended scheme. In *Hindes* we declined to set forth a "litmus test" to measure duration. *Id.* at 875. We still decline. We conclude only that there is no qualitative difference between eight and twelve months for the purposes of RICO continuity. *Hughes,* 945 F.2d at 611 (emphasis in original).

In the instant case, the plaintiffs have not sufficiently pled a closed-ended case. According to the plaintiffs, the defendants' culpable conduct lasted from November of 1995 through July of 1996. Compl. at ¶ 29. Although the plaintiffs allege that during this time the defendants committed several predicate acts, the alleged scheme lasted only nine months. Thus, this Court finds that the plaintiffs have not set forth facts sufficient to constitute closed-ended continuity.

Not Reported in F.Supp.
(Cite as: 1997 WL 792998, *8 (E.D.Pa.))

## (2) *Open-Ended Continuity*

"[I]f a RICO action is brought before a plaintiff can establish long-term criminal conduct, the 'continuity' prong may still be met if a plaintiff can prove a threat of continued racketeering activity." *Tabas,* 47 F.3d at 1295. This burden is satisfied "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.' " *H.J. Inc.,* 492 U.S. at 243; *see Tabas,* 47 F.3d at 1295 n. 20 (effect upon others doing business with entity, as well as effect on plaintiff, may be considered in open-ended continuity analysis). Moreover, where plaintiffs "allege that such tactics are [the defendants'] 'regular way of doing business', *Tabas,* 47 F.3d at 1296, [the plaintiffs] have to make [the allegation] consistent with Federal Rules of Civil Procedure 9(b) and 11." *Puricelli v. Estate of Bachman,* No. CIV.A.95-1713, 1995 WL 447474, at *6 (E.D.Pa. July 27, 1995), *aff'd,* 111 F.3d 127 (3d Cir.1997) (table).

In *Swistock,* the Third Circuit found open-ended continuity was present. *Swistock,* 884 F.2d at 759. There, the plaintiffs alleged that the defendants committed "various acts of wire and mail fraud as part of a scheme to defraud." *Swistock,* 884 F.2d at 756. The district court dismissed the plaintiff's complaint, finding that the plaintiffs did not adequately plead a pattern of racketeering activity. *Id.* Although the defendants' conduct concerned false representations regarding a single lease agreement, the Third Circuit reversed.

The *Swistock* court found that the plaintiffs alleged several predicate acts of wire and mail fraud over a fourteen month period, in order to induce the plaintiffs to sign the lease. *Id.* at 759. Moreover, the plaintiffs alleged that the defendants made "misrepresentations ... in regard to other potential transactions with plaintiffs, ... [which is] not inconsistent with proof that the defendants regularly conducted their business via predicate acts of racketeering." *Id.* Accordingly, the court found that the plaintiffs might be able to prove open-ended continuity at trial. *Id.*

*\*9 In *Kehr,* the Third Circuit further defined the requirements necessary for open-ended continuity. *Kehr,* 926 F.2d at 1418-19. The *Kehr* plaintiffs alleged that the defendants, who were Fidelity employees, made misrepresentations to the plaintiffs concerning the defendants' attempts to secure loans for the plaintiffs. *Id.* at 1410. Furthermore, the plaintiffs alleged that the defendants unreasonably delayed approving the sale of the plaintiffs' business, thereby forcing the plaintiffs to liquidate. *Id.* at 1411.

The *Kehr* court found that the plaintiffs failed to allege closed- or open-ended continuity. In its finding that open-ended continuity was absent, the court stated:

[T]here is no apparent threat that the misrepresentations of Cohen and Noon would have continued past the time they left Fidelity. By contrast, the regulatory decisions involved in *H.J. Inc.* were a continuous part of the defendant's business, and thus the bribes likely would have continued into the future. Unlike *Swistock,* the additional confirmatory misrepresentations of Cohen and Noon did not concern future transactions, and thus do not pose a threat of additional criminal activity. There is no indication that Cohen or Noon made other false statements to Kehr, or *treated other customers in a similar manner.*
*Id.* at 1418.

In the instant case, this Court finds that the plaintiffs have sufficiently pled the open-ended continuity requirements. In their complaint, the plaintiffs state that the defendants' scheme was "to extort substantial sums of money from prospective businesses, including plaintiffs[']," by convincing people to pay the defendants sums of money, under the rouge that these payments would enable the businesses to obtain loans. Compl. at ¶ 44. By demanding these payments when newly formed companies were at their most vulnerable, the defendants allegedly extorted "substantial sums of money from prospective startup companies and other businesses while misrepresenting their investment abilities." *Id.* at ¶ 55.

Moreover, in their RICO Case Statement, the plaintiffs allege that the defendants have committed the same type of scheme on another start-up company in Philadelphia. Pls.' RICO Case Statement at pp. 5-7. According to the plaintiffs, the defendants again misrepresented their ability to obtain investment money. *Id.* at 6. Moreover, after the start-up company paid the defendants' required fees, the defendants failed to provide any funding.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 792998, *9 (E.D.Pa.))

Page 39

Thus, the plaintiffs claim that the defendants' acts represent "a specific threat of repetition extending indefinitely into the future and are the enterprise's regular way of conducting business." Compl. at ¶ 42.

The Third Circuit has applied the *H.J. Inc.* standard liberally, giving RICO allegations a "broader interpretation" than before. *Swistock,* 884 F.2d at 758. In practice, this means that "in many cases plaintiffs will be able to withstand a facial attack on the complaint and have the opportunity to have their pattern allegations threshed out in discovery." *Banks,* 918 F.2d at 419-20 (quoting *Swistock,* 884 F.2d at 758). "It may be that many of these issues will then be susceptible to resolution via summary judgment." *Swistock,* 884 F.2d at 758. Thus, while this Court finds that the plaintiffs' have sufficiently pled the open-ended continuity requirements, the defendants have the opportunity at summary judgment to refute the allegations that this scheme is part of their ongoing business.

### 2. *Enterprise*

*10 There is one outstanding problem associated with the plaintiffs' complaint. Although the defendants have not raised this issue in their motion, under section 1962(c) a defendant may not be named as the RICO "enterprise" and defendant. *Kehr,* 926 F.2d at 1411; *Banks,* 918 F.2d at 421 (citing *B.F. Hirsch,* 751 F.2d at 633-34). Such a dual rule is impermissible in section 1962(c) cases. *Banks,* 918 F.2d at 421.

In the instant case, the plaintiffs name the following parties as defendants: Caramon, Waldman, Alban, Remington, and Bogdanoff. Compl. at ¶¶ 4-9. However, the plaintiffs allege that "Waldman, Alban, [and] Bogdanoff ... constitute[[ ] an "enterprise ." *Id.* at ¶ 47. Moreover, the plaintiffs claim that the enterprise as "defined by plaintiffs in their complaint consists of The Caramon Group, ... The Remington Group," and the above-named other defendants. Pls.'s RICO Statement at ¶ 5(a).

Although "[s]uch a dual role is permissible in actions based in 18 U.S.C. § 1962(a)," this is prohibited under section 1962(c). *Banks,* 918 F.2d at 421. The plaintiffs' failure to choose which defendants constitute the "enterprise" and which are culpable actors under section 1962(c) prevent this Court from allowing this case to proceed. Thus,

although the plaintiffs have properly alleged most of the RICO elements, this Court must dismiss the plaintiffs' complaint. However, the complaint is dismissed with leave to amend, so that the plaintiffs may revise their complaint accordingly. [FN5]

> FN5. In *Rose,* the Third Circuit held that:
> We see nothing in our decisions that would necessarily preclude an entity from functioning both as an "innocent victim" of certain racketeering activity, and thus be the enterprise under section 1962(c), and as a perpetrator of other such activity, and thus be a person under that subsection.
> *Rose,* 871 F.2d 331, 359 (3d Cir.1989). If this is the plaintiffs' objective, they must express that intent in their amended complaint, should they choose to file one. However, it seems unlikely that all of the remaining defendants could assume this dual role.

### D. *Plaintiffs' 1962(d) Claim*

Because this Court finds that the plaintiffs did not state a valid section 1962(c) claim, this Court must also dismiss the dependant section 1962(d) claim. *Kehr,* 926 F.2d at 1411 n. 1. If the plaintiffs choose to amend their complaint, this Court will determine the validity of the plaintiffs' 1962(d) claim at that time.

### E. *Pendent State Claims*

Pursuant to 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over state law claims. However, the Court may decline supplemental jurisdiction if:
  (1) the claim raises a novel or complex issue of State law,
  (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
  (3) the district court has dismissed all claims over which it has original jurisdiction, or
  (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.
28 U.S.C. § 1367(c). The Court may properly decline to exercise supplemental jurisdiction and dismiss the State claims if any one of these applies. *See Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1284 (3d Cir.1993).

The Courts in this district "ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed." *Eberts v. Wert,* No. CIV.A.92-3913, 1993 WL

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
**(Cite as: 1997 WL 792998, \*10 (E.D.Pa.))**

304111, at \*5 (E.D.Pa. Aug.9, 1993), *aff'd,* 22 F.3d 301 (3d Cir.1994) (table). Here, the RICO claims are the only claims in the complaint over which this Court has original jurisdiction. Since those counts have been dismissed, it is appropriate to decline to exercise supplemental jurisdiction over the remaining state law claims.

\*11 An appropriate Order follows.

### ORDER

AND NOW, this 25th day of November, 1997, upon consideration of the Motion of Defendants The Caramon Group, Inc., Marvin Waldman, and Henriette Alban to Dismiss the Plaintiffs' Complaint Pursuant to Federal Rule of Civil Procedure 12(b) for Plaintiffs' Failure to State a Claim and for Lack of Jurisdiction (Docket No. 28), IT IS HEREBY ORDERED that the Defendants' Motion is GRANTED.

IT IS FURTHER ORDERED that the Plaintiffs' complaint is DISMISSED with leave to amend within twenty (20) days of the date of this Order.

1997 WL 792998 (E.D.Pa.), RICO Bus.Disp.Guide 9381

Motions, Pleadings and Filings (Back to top)

.    2:97CV00735    (Docket) (Jan. 31, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 16
TO PLAINTIFFS' COMPENDIUM OF
UNREPORTED CASES TO THEIR ANSWERING
BRIEF IN OPPOSITION TO THE INDIVIDUAL
DEFENDANTS' MOTION TO DISMISS OR STAY

Not Reported in A.2d
2005 WL 396341 (Del.Ch.)
(Cite as: 2005 WL 396341 (Del.Ch.))
H

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Richard J. KORN and Andrew Dal Nogare,
Plaintiffs,
v.
NEW CASTLE COUNTY, a political subdivision of
the State of Delaware,
Christopher A. Coons, as County Executive and
David W. Singleton as Chief
Administrative Officer, and Paul G. Clark, as
President of New Castle County
Council, and Joseph Reda, Robert S. Weiner,
William J. Tansey, Penrose Hollins,
Karen G. Venezky, Patty W. Powell, George
Smiley, John J. Cartier, Timothy P.
Sheldon, Jea P. Street, David Tackett, and James
W. Bell as Members of New
Castle County Council, Defendants.
No. Civ.A. 767-N.

Submitted Jan. 11, 2005.
Decided Feb. 10, 2005.
Revised Cover Page Feb. 14, 2005.
Ronald G. Poliquin, of Young, Malmberg and
Howard, P.A., Dover, Delaware, for Plaintiffs.

Dennis J. Siebold, Acting County Attorney, New
Castle County Law Department, New Castle,
Delaware, for Defendants.

### OPINION

CHANDLER, J.

**\*1** This case was initiated by two taxpayers and
residents of New Castle County, Delaware, who
allege that New Castle County, and various
members of the County government, acted illegally
by accumulating "unauthorized reserves" within
New Castle County's General Fund and Sewer
Fund. Resolution of this issue will necessarily touch
upon broad public concerns of governmental
accountability and fiscal responsibility.
Consequently, this Court is cautious not to
impermissibly encroach upon the independent
authority of each separate branch of county
government.

New Castle County, as a political subdivision of the
State, should be accorded a degree of deference
necessary to manage its affairs for the benefit of its
citizens. Embodied in this approach is the notion that
most disputes concerning the County's policies are
political in nature and must be resolved at the polls,
not in the courts. This is a rare case, however,
where the County, despite its broad home rule
powers, exceeded its own authority established by
law. It is therefore appropriate for the Court to
resolve this controversy, as it is clear that once the
County had determined for itself that it would retain
surplus revenues (and established the procedure by
which that should be accomplished) the County
became obligated to follow its own ordinance.
Indeed, the concept of fidelity to the law
"presupposes a commitment by the governing
authority to abide by its own rules...." [FN1] The
public has a right to expect no less.

FN1. LON L. FULLER, THE MORALITY OF
LAW 234 (Yale University Press, 1964).

Plaintiffs' complaint contains five counts. Count I
seeks a judgment declaring that the "New Castle
County Executive and County Council Members
cannot make appropriations beyond the fiscal year
unless encumbered." [FN2] Count II seeks a
judgment declaring that the "New Castle County
Executive cannot create off-budget reserve accounts
other than those within the General and Sewer
Fund." [FN3] Count III seeks a judgment declaring
that the "amount of the reserve fund cannot exceed
20 percent of the total estimated revenue of the fund
for the fiscal year." [FN4] Counts IV and V
requests a preliminary and permanent injunction
staying an $80 million bond sale, pending resolution
of the issues raised in Counts I through III. [FN5]

FN2. Compl. at 11.

FN3. Id.

FN4. Id. at 12.

FN5. Id. at 13, 15.

The parties have stipulated to the material facts and
have filed cross-motions for summary judgment. For
the reasons set forth below, I grant the relief

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

requested in Counts I through III of the complaint. I dismiss Count IV as moot and, in the exercise of my discretion, I deny the request in Count V for an injunction permanently enjoining the bond sale.

## I. BACKGROUND

On October 20, 2004, Richard Korn and Andrew Dal Nogare, who are both residents and taxpayers of New Castle County, brought suit against: (1) New Castle County, the nominal defendant and a political subdivision of Delaware; (2) Thomas Gordon--the County's former Executive; (3) Sherry **Freebery**-- the County's former Chief Administrative Officer; and (4) the then seven Members of the New Castle County Council. Their complaint was predicated upon the County's budgetary process and the administration's policy of accumulating unlimited reserves within the County's General and Sewer Fund.

**\*2** Since the filing of the complaint, several months and one election have passed. This election replaced Thomas Gordon with Christopher A. Coons as the new County Executive. Coons then named David W. Singleton to replace Sherry **Freebery** as Chief Administrative Officer. In addition, six seats were added to the County Council to increase the seven-member Council to thirteen. Despite this election, the erroneous policies of the former administration remain in effect, thus keeping the controversy ripe for decision. As such, the Court is required by law to substitute the newly elected officials for the defendants that they have replaced. [FN6] It is left, therefore, to the new stewards of New Castle County to give effect to this decision and to put right the errors they have inherited.

> FN6. Christopher A. Coons is substituted for Thomas P. Gordon in his capacity as county executive; David W. Singleton is substituted for Sherry **Freebery** in her capacity as Chief Administrative Officer; Paul G. Clark is substituted for Christopher A. Coons in his capacity as County President. *See* CT. CH. R. 25(d) Since the filing of this action, J. Robert Woods has resigned from County Council and was replaced by Joseph Reda. Reda is therefore substituted for Woods in his capacity as Council Member. *See id.* On December 22, 2004, plaintiffs filed an uncontested letter indicating to the Court that six new seats were added to the County Council. The Court finds that in these parties absence, complete relief could not be accorded among those already parties. I therefore treat plaintiffs' letter as a motion filed pursuant to Chancery Rule 19(a) and join: George Smiley, John

J. Cartier, Timothy P. Sheldon, Jea P. Street, David Tackett, and James W. Bell. All of the defendants have been represented in their official capacity by the Acting County Attorney, Dennis Siebold.

### A. Gordon's Speech

Plaintiffs' complaint finds its genesis in the budgetary policies of the previous administration. Those policies were brought to light during Thomas Gordon's annual budgetary address delivered in March 2004. That speech highlighted a 2005 operating budget of $207.5 million and a capital budget of $68.4 million. [FN7] The capital budget is funded predominately through the issuance of general obligation bonds with the balance derived from various other sources. In terms of the operating budget, income is derived from numerous sources, the greatest of which is the $98.5 million generated from real estate and real estate transfer taxes. Once collected, the money used for the County's operations is designated to three funds: the General Fund, the Sewer Fund, and the Street Light Fund. From these three funds, 71 percent ($147,703,795) of the 2005 fiscal year budget is derived from the General Fund, the Sewer Fund represents 27 percent ($56,534,674), and the Street Light Fund comprises the rest.

> FN7. Parties' Limited Stipulation of Facts ("LSF") at 5 ¶ 12 & Ex. A.

In addition to the revenues annually collected by the County, Gordon's speech went on to reveal that the County had accumulated a combined surplus of $242 million. [FN8] This amount marked a steady increase of reserves held by the County and, in fact, from fiscal year 1996 through 2003, "reserves" within the General Fund alone grew from $30 million to $139 million. [FN9] Gordon explained that he had "created reserve accounts and stabilization accounts to earmark [the] surplus dollars to protect [the County's] future from tax increases." [FN10] Outlining "the plan for how [the] $242 million" [FN11] was to be used, Gordon highlighted twelve discrete reserve and stabilization accounts from which the money would be spent. Those accounts include: $61 million for financial reserves to protect the property tax rate; $59 million for sewer capital replacement and renovation; $29 million for the sewer fund earmarked for user rate stabilization; $26 million for "pay as you go" funding of selected capital projects; $26 million for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the general fund legislated "rainy day" fund; $10 million for the sewer fund legislated "rainy day" fund; $9 million for general fund undesignated balances; $9 million in a general fund reserve for future compensated absences; $4 million for operating costs of new and expanded facilities; $6 million for self-insurance fund; $2 million for fleet replacement reserve; and $1 million for community services designated grants. Out of these twelve categories, only two represent amounts the County was authorized to hold. Those reserves include the "$26 million for the general fund legislated 'rainy day' fund" [FN12] and the "$10 million for the sewer fund legislated 'rainy day' fund." [FN13] The remaining "reserve and stabilization accounts" are not authorized by state law or the New Castle County Code. Rather, the money is held for "future applications" [FN14] in four discrete investment accounts and, despite their executive designations, there is no limitation on how the money is spent. [FN15]

FN8. LSF at 5 ¶ 12.

FN9. Id. Ex. B ("Audited General Fund Balance").

FN10. Pls.' Resp. to Req. for Produc. of Docs. Ex. A ("Thomas P. Gordon, Budget Message to New Castle County Council, March 2004," ("Budget Message")) at 17. See also LSF at 5 ¶ 11 (stipulating to accuracy of the Budget Message).

FN11. Budget Message at 17.

FN12. Defs.' Am. and Supplemental Resps. to Pls.' Req. for Admis. at 10 ¶ 15 ("This account was specifically legislated by New Castle County Council pursuant to § 14.01.013 of the New Castle County Code.").

FN13. Id. at 11 ¶ 17 ("This account was specifically legislated by New Castle County Council pursuant to § 14.01.013 of the New Castle County Code.").

FN14. LSF at 5 ¶ 13.

FN15. Id.

*3 In short, as of June 30, 2004, New Castle County Council had accumulated a surplus of approximately $237 million. [FN16] Even more confounding is that approximately $200 million of that surplus clearly exceeds the amount of reserves the County is authorized by law to hold. These numbers overshadow, and in fact exceed, 100 percent of the estimated revenues the County expects to take in through various taxes, fees, and state reimbursements in fiscal 2005.

FN16. As of June 30, 2004, $145,302,914 of this surplus is held in the County's General Fund. Of that amount only $27,005,000 is allocated to the legislatively created General Fund's "rainy day" reserve account. Similarly, $91,177,761 of surplus monies is held in the Sewer Fund, with $9,754,679 allocated to the legislatively created "rainy day" reserve account. See LSF Exs. A-C.

B. The $80 million Bond Sale

In March 2004, Ronald A. Morris, the County's former Chief Financial Officer, presented to the Council his long-term financial projections that included the gradual drawdown, through fiscal year 2009, of the executively designated reserves. [FN17] That presentation indicated that the current revenues within the General Fund would be insufficient to fund current expenditures beginning in fiscal year 2005. [FN18] Morris indicated further that at the County's current rate of spending, some of the accumulated surplus would need to be tapped or an increase in property tax rates would be inevitable. [FN19] Morris concluded his presentation by indicating that the County's growing deficits would deplete the entire surplus by fiscal year 2009. [FN20]

FN17. LSF at 5-6 ¶ 16.

FN18. Id.

FN19. Id.

FN20. Id.

In September 2004, the Council met to discuss methods of funding various capital projects previously approved. To that end, the Council considered approving the issuance of $80 million in County bonds. During the meeting, Morris submitted a report suggesting that if the bonds were not issued and the Council in fact drew on the surplus to fund these capital projects, the surplus would not gradually deplete over the next four fiscal years, but instead, would dry up much sooner. [FN21] That report estimated that without issuing the bonds, a property-tax increase, as much as 15 percent the first year, with a regular annual increase

of five percent thereafter, would be necessary. [FN22] On October 5, 2004, the Council approved the bond issue. [FN23] Fifteen days later, plaintiffs filed this action.

FN21. *Id.* at 6 ¶ 17.

FN22. *Id.*

FN23. *Id.*

## II. ANALYSIS
### A. Applicable Legal Standards

On October 20, 2004, plaintiffs filed their five-count complaint. Three of those counts sought a declaratory judgment. The last two counts sought a preliminary and permanent injunction. On October 25, 2004, defendants filed a motion for judgment on the pleadings and their brief in opposition to the injunctions. Before a hearing on the injunctions, defendants voluntarily stayed the bond issuance pending resolution of Count I through Count III of the complaint. Both parties have conducted discovery, have filed the Limited Stipulation of Facts, and now present their cross-motions for summary judgment.

In light of this procedural history, the Court now finds the following issue before it. First, because defendants have submitted matters outside the pleadings, I will treat their Rule 12(c) motion as a motion for summary judgment pursuant to Rule 56. I will, therefore, consider the arguments defendants presented in their Rule 12(c) motion concurrently with their present cross-motion for summary judgment and will apply the same standard to the issues raised in both motions. Second, because defendants have voluntarily stayed the bond issue until a decision is reached, I consider the relief sought in Count IV of the complaint moot and dismiss it as such. [FN24] That leaves the Court to consider whether summary judgment is appropriate to resolve the issues implicated in Counts I through III and Count V of the complaint.

FN24. *See City of Wilmington v. Wilmington FOP Lodge # 1,* 2004 Del. Ch. LEXIS 86, at *7 (June 22, 2004) (dismissing as moot a motion for preliminary injunction to enjoin arbitration proceedings when parties voluntarily rescheduled).

**\*4** A party is entitled to summary judgment "if the

pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [FN25] When the Court is faced with cross-motions for summary judgment the same standard must be applied to each of the parties' motions and the mere existence of cross-motions does not necessarily indicate that summary judgment is appropriate for one of the parties. [FN26] Thus, when presented with cross-motions for summary judgment a movant will be granted relief only if the Court determines that the record does not require a more thorough development to clarify the law or its application to the case. [FN27] As applied to Counts I through III, this standard is met and will therefore be decided pursuant to Rule 56(c). [FN28] The facts concerning Count V, however, are not sufficiently developed and therefore summary judgment is not appropriate.

FN25. CT. CH. R. 56.

FN26. *Kronenberg v. Katz,* 2004 Del. Ch. LEXIS 77, at *38 (May 19, 2004).

FN27. *Id.*

FN28. The Court is positioned to grant summary judgment as to Counts I through III, because the Limited Stipulation of Facts creates a record sufficient to determine that no genuine issue exists as to any material fact and, to a large extent, the relevant questions presented by those Counts concern statutory interpretation.

### B. New Castle County's Authority to Carry Reserves

The Court first turns to the organic authority of the Council to carry surplus funds, and begins that analysis by looking to the County's charter. [FN29] There we find that the State has delegated to the County "all powers which, under the Constitution of this State, it would be competent for the General Assembly to grant by specific enumeration, and which are not denied." [FN30] Clearly within that delegation are the enumerated powers to adopt annual operating and capital budgets.

FN29. It remains unclear whether plaintiffs still take issue with the authority to carry a reserve but because defendants have briefed the issue it is herein addressed. *See, e.g.,* Defs.' Br. in Supp. of Mot. for

Not Reported in A.2d                                                    Page 24
(Cite as: 2005 WL 396341, *4 (Del.Ch.))

Summ. J. ("Defs.' Open. Br.") at 7.

FN30. 9 Del. C. § 1101.

These budgets are adopted as one would expect--through the combined efforts of *both* the County's Executive and the Council. The process begins with the County Executive who identifies and estimates the County's expenditures. If the revenues for the year are insufficient to meet that demand, the County Executive must recommend "revenues sufficient to achieve a balanced budget." [FN31] These projections are then submitted to the County Council for their consideration. [FN32] If accepted, the Council "ordain[s] such taxes and other revenue measures as will yield sufficient revenue, which, together with any available surplus, will balance the budget. Thus, both the Council and Executive are vested with wide discretion [FN33] when adopting and administering the County's two budgets. [FN34] This discretion remains, however, subordinate to the State's proscription on spending more than the County takes in. [FN35] The public policy incorporated into an annual balanced budget requirement is strong and the effect twofold. A balanced budget first, "inculcate[s] sound business principles and practices into the [county economy,] with particular reference to avoidance of waste, extravagance, and ill-considered expenditures." [FN36] Second, by dispelling opaqueness with transparency, interested taxpayers are provided a window into the "anticipated disposition of public moneys." [FN37]

FN31. 9 Del. C. § 1132(d).

FN32. Once the proposed operating budget is completed, and no later than April 1, the County Executive presents to the County Council the annual budgets in a form of ordinance ready to be enacted. *Id.* §§ 1132(f), 1134(c).

FN33. Eight specific categories must be included in the operating budget. *See, e.g., id.* § 1132(e)(1)-(9). Although no specific line items are mentioned, there are several limitations on the preparation of the capital budget (limitations not relevant to the decision today). *See id.* §§ 1134(a)-(e).

FN34. The County is authorized by law to administer two budgets--the annual operating budget and the annual capital budget. The operating budget allocates the County's operating funds for the fiscal year beginning July 1 and ending June 30. The

capital budget allocates funds to the County's capital program. By law, the capital budget must be adopted before the operating budget, thus affecting the revenues available for the operating budget. *See id.* § 1159(a).

FN35. "The annual operating budget ordinance shall not become effective until the County Council shall have adopted revenue measures which, together with the available surplus, shall in the opinion of the County Executive be estimated to yield sums at least sufficient to balance the proposed expenditures. The Office of Finance shall not approve any expenditure under any portion of an annual operating budget ordinance until such balancing shall have been provided." *Id.* § 1158(d).

FN36. 56 AM.JUR.2D Municipal Corporations § 535 (2000).

FN37. *Id.*

**\*5** Nowhere in this statutory design is the power to set aside surplus money expressly denied. In fact, the only reference to surplus money is the affirmative obligation to use any available surplus to balance each year's operating budget. Thus, each year, the County's charter envisions that the money not expended or encumbered will lapse and become available to appropriate to another item that year--through a supplemental budget ordinance--or will become available for the proceeding year to balance the budget. [FN38] If, however, unencumbered cash were appropriated to a duly created reserve account, it would, of course, become unavailable to balance the budget. This process of taking unencumbered cash and appropriating it to a reserve allows the County to carry a surplus for that fiscal year instead of expending it to balance the budget. Indeed, it makes sense to keep a certain amount of easily liquidated assets on hand to fund "any unanticipated deficit in any given fiscal year or to provide funds required as a result of any revenue reduction enacted by the General Assembly or County Council." [FN39]

FN38. 9 Del. C. § 1133(a); *see also* 63C AM.JUR.2D Public Funds § 46 (defining the term "lapse").

FN39. County Code § 14.01.013(C).

A similar method of maintaining surplus funds through a reserve system is also employed by the

State. [FN40] The existence of this power on the State level suggests, "it would be competent for the General Assembly to grant [to the County the power to create and fund reserve accounts] by specific enumeration." [FN41] A noteworthy question, not raised by the parties and therefore not before the Court, is this: how large a reserve is the County authorized to carry? By Constitutional design, the State is limited to a five percent reserve account. Would it be competent for the State to delegate a budgetary power beyond its own? Notwithstanding these interesting questions, the Court concludes that the County is authorized to carry surplus funds through the use of its reserve accounts. [FN42]

FN40. *See* Del. Const. art. VIII, § 6(b)-6(d).

FN41. 9 *Del. C.* § 1101(a).

FN42. Plaintiffs direct the Court's attention to *Korn v. Gulotta,* 72 N.Y.2d 363 (N.Y.1988). In *Korn,* New York's highest court ordered the Nassau County Council to adopt a new budget because the budget at issue failed to set forth the year-end estimated cash balance and all estimated revenues as required by Nassau County Charter § 302(5). No similar requirement is found in New Castle County's charter. Thus, while the opinion in *Korn* is informative, its rationale is not applicable here.

### C. The Legality of Carrying Reserves in Excess of 20 Percent

With the budgetary process (and the policy that process implicates) in mind, the Court turns to the $230 million in reserves now held in the County's coffers. Plaintiffs contend that the language governing the amounts held in the reserve accounts is unequivocal and that New Castle County's Code ("County Code") § 14.01.013, which was adopted in April 2001, clearly provides that "[t]he amount of these reserves in each fund [i.e., the General and Sewer funds] at the beginning of each fiscal year *shall be equal* to twenty (20) percent of the total estimated revenues of that fund for that fiscal year." [FN43] Defendants respond by arguing that the ordinance establishing the reserve accounts was intended to serve as a floor and not a maximum. [FN44] Defendants also contend that the comments embodied in Gordon's budget address were simply remarks and "did not create true 'accounts' or binding financial appropriations or obligations on the part of the County" and that this contention "was understood by County Council, which actually voted

on the budget and, later, voted to approve the bond issue that is central to this controversy." [FN45] I address these contentions in turn.

FN43. County Code at § 14.01.013(B) (emphasis added). Section 14.01.013 provides, in its entirety, as follows:
Sec. 14.01.013. Budget Reserve Account
A. There is hereby established a Budget Reserve Account within the General Fund and the Sewer Fund.
B. The amount of the reserve in each fund at the beginning of each fiscal year shall be equal to twenty (20) percent of the total estimated revenues of that fund for that fiscal year.
C. County Council may, by a five-sevenths (5/7) vote, appropriate from the Budget Reserve Account such sums as may be necessary to fund any unanticipated deficit in any given fiscal year or to provide funds required as a result of any revenue reduction enacted by the General Assembly or County Council.
D. Any change to the percentage allocation to the Budget Reserve Account of either the General Fund or the Sewer Fund shall require a five-sevenths (5/7) vote of County Council.

FN44. *See* Defs.' Answering Br. in Supp. of Mot. for Summ. J. ("Defs.' AB") at 11; *see also* Affidavit of Ronald A. Morris, former Chief Financial Officer, New Castle County ("Morris Affidavit") ¶¶ 8-9; Affidavit of Christopher A. Coons, former President, New Castle County Council ("Coons First Affidavit") ¶ 2; Affidavit of Karen G. Venezky, Member, New Castle County Council ("Venezky Affidavit") ¶ 3; Affidavit of Robert S. Weiner, Member, New Castle County Council ("Weiner Affidavit") ¶ 2.

FN45. Defs.' AB at 4.

*6 First, defendants' reliance on the legislative intent at the time the ordinance was adopted is unavailing. In the face of unambiguous statutory language, the Court's sole method for determining legislative intent is by looking to the plain meaning of the statutory language employed. [FN46] Only if the language appears ambiguous will the Court employ its various methods of statutory interpretation. [FN47] One would be hard pressed to find statutory language plainer than "shall be equal." The phrase means no more and no less than 20 percent of the respective fund as determined at the beginning of the fiscal year. Thus, despite the County being legally permitted to retain revenues in excess of their current expenses, the County has

established for itself that those reserves "shall be equal" to 20 percent of the respective funds in which the reserves are held. Moreover, since Section 14.01.013 dictates how the amount of reserves are to be changed, [FN48] until those strictures are followed, any reserves in excess of 20 percent are illegally held.

> FN46. *See Eliason v. Englehart*, 733 A.2d 944, 946 (Del.1994) (citations omitted).

> FN47. *Id.*

> FN48. Any change in the 20 percent allocation to the Budget Reserve Account of either the General Fund or the Sewer Fund shall require a 5/7 vote of County Council. *See* Section 14.01.013(D) of the New Castle County Code.

Secondly, if the Court finds that the $230 million of public funds is being held pursuant to executive action, such a finding would be fatal to defendants' contention that the County has the authority to retain surplus money in excess of the 20 percent reserves. [FN49] Embodied in our representative form of government is the concept of the separation of powers. This hallmark of democracy is found in our Federal Constitution, our State's Constitution and even New Castle County's charter. While the exact scope of each branch's powers can sometimes become blurred, we do not face such conceptual problems here. It is and always has been within the exclusive province of the legislative branch to appropriate funds from the treasury. [FN50] This fundamental legislative responsibility is non-delegable and can never be left to the unilateral discretion of the Executive branch.

> FN49. Anticipating this consequence, defendants now contend that newly elected County Executive Coons believes that "the ultimate authority over the expenditure of County revenues lies in the power of the County Council..." Affidavit of Christopher A. Coons, County Executive, New Castle County ("Coons Second Affidavit"). It is not clear what defendants hoped to achieve by the submission of Coons' second affidavit, but it has no evident bearing on the conclusions reached here.

> FN50. *See* U.S. CONST. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"); Del. Const. art. VIII, § 6(a) ("No money shall be drawn from the treasury but pursuant to an appropriation made by Act of the General

Assembly"); 9 *Del. C.* § 1155(b) ("The County Council, upon conclusion of its public hearings but not later than the 1st day of June, shall enact the operating budget ordinance ."). *See also* 63C Am.Jur.2d Public Funds § 34 (2004) ("The appropriation of money for various state purposes rests in the sole discretion of the legislature.").

Emblematic of the consequences of eight years of unilateral management of the County's fiscal affairs is the effect the former County Executive had on the financial audit relied on in creating the 2004 fiscal year budget. In that audit, Ernst & Young, an independent accounting firm, certified that the County held $9,420,513 of "available surplus" within the General Fund and an "available surplus" of $20,816,229 within the Sewer Fund. [FN51] These amounts were then certified to the Council when it adopted the operating budget. Strikingly, the computation begins with approximately $142 million of available surplus within the General Fund and $97 million within the Sewer Fund. It is only after money is set aside for the budget reserve accounts and other "designated" purposes that the "available" surplus is reduced to the amounts outlined above.

> FN51. *See* Compl. Ex. A ("Report of Independent Accountants on Applying Agreed-Upon Procedures," June 30, 2003) at 2.

These executive designations, although not amounts *appropriated* by the Council, had real consequences on the County's budgetary process. As discussed above, the County's charter requires that each year the amount of available surplus be certified to the Council [FN52] and that the Council is to use these funds in conjunction with other revenue measures to balance the budget. [FN53] "Available" in its plainest sense means "capable of use for the accomplishment of a purpose." [FN54] If the County Executive, absent legislative authority, can designate particular funds and then use those designations as a means of reducing the available surplus, he has in reality *appropriated* those funds in violation of the County charter and usurped an exclusively legislative function. [FN55]

> FN52. 9 *Del. C.* § 1158(c).

> FN53. *Id.* at § 1158(a).

> FN54. WEBSTER'S THIRD NEW INT'L DICTIONARY 150 (1976).

FN55. Defendants contend that the meaning of appropriation refers specifically to "an authorized expenditure." *See* Defs.' Opening Br. at 9- 10 (citing Bailey, Governmental GAAP Guide for State and Local Governments (2003), § 7.05). The Court does not accept such a restrictive definition. An appropriation can mean "the designation or authorization of the expenditure of public moneys." But it may also encompass the "setting apart from the public revenue of a definite sum of money for a specified object." 63C AM.JUR.2D. Public Funds § 33 (2004).

*7 In light of these consequences, defendants cannot succeed by arguing that the executive commitments did not create actual accounts. [FN56] The fact is that the County Executive, through unilateral action, diverted surplus money into executive designations, avoiding the strictures of 9 *Del. C.* § 1158(a) that requires the use of available surpluses to balance the budget. Those acts had real and legal consequences and would only be valid if they were the objects of legislative action. [FN57] Similarly, defendants cannot cure this defect by asserting that the Council had knowledge of the surplus funds and the practice of executive designations. [FN58] The County Council does not exist to be a rubber stamp of the Executive. The Council has an independent, co-equal and indispensable role as designed by New Castle County's charter. As stewards of the public trust, this role cannot be abdicated. [FN59] Acquiescence in the face of executive abuses cannot elevate those abuses to the dignity of law. In short, any money dedicated to any purpose, reserves or otherwise, must be appropriated from the County's treasury through a duly adopted ordinance as prescribed in Section 1152 of New Castle County's charter. This procedure captures the Constitutional functions conferred upon the Legislature and has the additional benefit of informing the public openly and transparently of the County's fiscal policies. [FN60]

FN56. Defs.' Open. Br. at 9.

FN57. *See supra* n. 49 (describing the appropriation of money from the treasury as exclusively a legislative function); *see also* 9 *Del. C.* § 1103 ("All powers of the government of New Castle County shall be carried into execution as provided by this title or by other law of this State or if this title or other law of this State makes no such provision, as provided by ordinance or resolution of the County Council of New Castle County."). Executive designations of non-appropriated funds are neither a law of the State, an ordinance nor a resolution.

FN58. Defs.' AB at 18.

FN59. "Government is a trust, and the officers of the Government are trustees; and both the trust and the trustees are created for the benefit of the people." Letter by Henry Clay (December 4, 1801) *reprinted in* JOHN BARTLETT, BARTLETT'S FAMILIAR QUOTATIONS (Justin Kaplan 16th ed., Little Brown & Company 1992).

FN60. *See* 9 *Del. C.* § 1152 (requiring a public hearing on the adoption of any ordinance.)

County Code Section 14.01.013 states that the reserve accounts shall be equal to 20 percent of the respective fund in which the reserve is held. Finding no denial of the power to carry a reserve, and that the County has established the means by which that is accomplished, the County must abide by its own rules.

### D. The Validity of the Bond Sale

Turning next to the question of the bond sale, the nexus between the bond sale and the 2005 fiscal year budget is clear. The rationale offered for the bond sale was the desire to avoid drying up surplus funds sooner than expected. [FN61] Because (1) the County has not used its available surplus to balance the budget; and (2) the amount of the "rainy day" reserves exceeds the legislative limit (as currently adopted), the Council has adopted an invalid budget. To the extent the decisions of the Council were made in reliance upon that budget--*i.e.,* the bond sale--the process is sufficiently tainted for the Court to conclude that the bond issuance would harm the taxpayer plaintiffs. Despite this connection, the Court is unable to ascertain (on the present record) the degree of harm that the proposed bond sale currently poses (irreparable or otherwise). Contributing to this uncertainty is the fact that the defendants have voluntarily stayed the bond issuance, and one would seriously doubt the County's ability to proceed with the sale in light of the Court's findings today. [FN62]

FN61. LSF 6 at ¶ 17.

FN62. One could also question the ability to issue the bonds in light of the holding here, as the bond prospectus must have relied on the financial status of the County and detailed that analysis to potential

investors. Once the FY 2005 budget is invalidated the prospectus would necessarily be omitting material information. Defendants also contend that their authority to issue the bonds is independent of the question concerning the reserves. The Court cannot draw such a neat distinction between the two issues, however. The County has frequently touted its AAA credit rating, which in no small part is linked to the huge sums of cash the County has on hand. Furthermore, the County's ability to borrow at low interest rates will also depend on its ability to service the debt--again tying the bond sale to the amount of cash on hand. Finally, it is clear that the proceeds from the bond sale will be used to fund projects made part of this year's budget. Accordingly, as a practical matter, the bond sale and the surplus reserves are inextricably intertwined.

### E. Counts I through III

Plaintiffs style the first three Counts for relief as requests for declaratory judgment. To exercise declaratory judgment jurisdiction there must be an actual controversy: (1) involving the rights or other legal relations of the party seeking declaratory relief; (2) in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial determination. [FN63]

> FN63. *Gannett Co. v. Bd. of Managers of the Del.Crim. Justice Info. Sys.*, 840 A.2d 1232, 1237 (Del 2003)

**\*8** As taxpayers and residents of New Castle County, plaintiffs have a "direct interest in the proper use and allocation of tax receipts ." [FN64] Moreover, since the County's budget is being challenged and any relief granted will affect the County Executive's and Council's authority to propose and adopt their annual budgets, plaintiffs have asserted a claim against those "who [have] an interest in contesting the claim." [FN65] Finally, because the parties' interests are real and adverse and the issues are ripe, the Court concludes that the standard set forth in *Gannett* is met here. [FN66]

> FN64. *Wilmington v. Lord*, 378 A.2d 635 (Del.1977); *accord Koffler v. McBride*, 283 A.2d 855 (Del. Ch.1971); *Richardson v. Blackburn*, 187 A.2d 823 (Del. Ch.1963); *Anderson v. Mayor and Council of Wilmington*, 137 A.2d 521 (Del. Ch.1958); *Haddock v. Board of Education in*

*Wilmington*, 84 A.2d 157 (Del. Ch.1951); *Fetters v. Mayor and Council of Wilmington*, 73 A.2d 644 (Del. Ch.1950).

> FN65. *Gannett*, 840 A.2d at 1237.

> FN66. The issue is ripe for determination because the County's 2005 fiscal year budget has been recommended and approved and the bond issuance waits in the balance.

### 1. Count I

Count I seeks a judgment declaring that the "New Castle County Executive and County Council Members cannot make appropriations beyond the fiscal year unless encumbered." For the reasons set forth above, the Court finds that any money appropriated to the General and Sewer Fund reserve accounts must be done so annually. To the extent those funds remain unexpended and unencumbered by the fiscal year's end, such money shall lapse and become available for the following year to be used as the County shall see fit.

### 2. Count II

Count II seeks a judgment declaring that the "New Castle County Executive cannot create off-budget reserve accounts other than those within the General and Sewer Fund." For the reasons set forth above, the Court concludes that the County Executive shall not create any such reserve account.

### 3. Count III

Count III seeks a judgment declaring that the "amount of the reserve fund cannot exceed 20 percent of the total estimated revenue of the fund for the fiscal year." For the reasons set forth above, the Court concludes that to the extent the reserve accounts are authorized by County Code § 14.01.013, as currently adopted, the amount of those accounts shall be equal to (no more and no less than) 20 percent of their respective funds. [FN67] Any deviation in this amount may be appropriated to the reserves by either amending the County's Code, or by altering the permitted appropriation for that year by a supermajority, 5/7 vote of the County Council. [FN68]

> FN67. As earlier noted, the State is itself constitutionally limited to five percent reserve account. This case does not present the question

whether the State may delegate a budgetary power greater than its own, and I offer no opinion on that question.

FN68. The Council could, by a 5/7 vote of its thirteen members, change the percentage allocation amount. It would also appear possible for the Council by a simple majority vote to alter the requirements of Section 14.01.013, including the percentage allocation requirement and the supermajority vote requirement.

*F. Count V*

Plaintiffs' final Count seeks to permanently enjoin the County's $80 million bond sale. In order to obtain a permanent injunction, a party must demonstrate: (1) that the movant has succeeded on the merits after a full hearing, (2) that imminent and irreparable injury will result if the relief is not granted, and (3) that considering the potential harm to the parties, the balance of equities favors the issuance of the relief. [FN69]

FN69. *Grand Metropolitan PLC v. Pillsbury Co.,* 558 A.2d 1049, 1052 (Del. Ch.1988); *Draper Communications, Inc. v. Delaware Valley Broadcasters,* 505 A.2d 1283, 1288 (Del. Ch.1985).

Plaintiffs have succeeded on the merits of their claim, but have failed to demonstrate whether the harm they face is irreparable. [FN70] Currently, the bond sale is voluntarily stayed. Moreover, serious doubts exist whether the County would pursue a

bond sale in light of the fact it was predicted on an illegal budget. Equally important, a new County government has recently assumed office. While it is true they have inherited some significant policy issues, they could fairly and openly remedy the deficiencies identified here. Thus, at this point, the record is not sufficiently developed to permit summary judgment on the question of a permanent injunction. As to Count V, the parties' cross-motions for summary judgment are denied. [FN71]

FN70. Based on this conclusion, it is not necessary for the Court to consider the third part of the permanent injunction test.

FN71. If plaintiffs were able to provide information to the Court at trial that the County intended to proceed with the bond sale despite the budget deficiencies the record likely would be sufficient to conclude that plaintiffs would suffer irreparable harm.

### III. CONCLUSION

*9 For the reasons set forth above, the relief requested in Counts I through III is granted. Count IV is dismissed as moot. The parties' cross-motions for summary judgment on Count V are denied.

IT IS SO ORDERED.

2005 WL 396341 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.