87 Fed.Appx. 227    Page 4

87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,702, 9 Wage & Hour Cas.2d (BNA) 704

**(Cite as: 87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)))**

Complaint's RICO counts with prejudice and dismissed the state law counts without prejudice. Bonavitacola appeals the District Court's finding that the Amended Complaint failed to plead predicate acts, pattern of racketeering activity, and injury.

## II
## Standard of Review

Our review of the order dismissing the Amended Complaint for failing to state a claim under RICO is plenary. *Bald Eagle Area Sch. Dist. v. Keystone Financial, Inc.,* 189 F.3d 321, 327 (3d Cir.1999). In applying the same standard as the District Court, we will construe the complaint liberally, take all material allegations as admitted, and draw all reasonable inferences in favor of the plaintiffs. *Id.* "We will not affirm the dismissal unless the plaintiffs could prove no set of facts that would entitle them to relief." *Id.* (citing *Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1537-38 (3d Cir.1993)).

## III
## RICO Pleading Requirements

RICO provides a private civil action to recover treble damages for injuries resulting from a defendant's "racketeering activities" in violation of RICO's substantive provisions. 18 U.S.C. § 1964(c). Under one such substantive provision, it is unlawful to conduct an enterprise through a pattern of racketeering activities. *Id.* § 1962(c). Under another, it is unlawful to invest income derived from a pattern of *231 racketeering activities. *Id.* § 1962(a). To allege successfully a violation under either of these subsections, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" as well as an injury resulting from the conduct constituting a violation. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). "Racketeering activity" means one of the various predicate acts identified in the statute, including acts "indictable" under the federal mail and wire fraud statutes. 18 U.S.C. § 1961(1). When fraud is the predicate act, the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) applies. *Warden v. McLelland,* 288 F.3d 105, 114 & n. 6 (3d Cir.2002). A "pattern of racketeering activity means" at least two predicate acts that "are related and that amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

## IV.
## Analysis of the Amended Complaint

**\*3** The District Court dismissed the Amended Complaint for failing to state a claim under § 1962(a) and § 1962(c) of RICO. We agree with the District Court that the Amended Complaint did not plead the predicate acts of mail and wire fraud with particularity and did not adequately allege a "pattern of racketeering activity" that directly resulted in Bonavitacola's direct injury.

### A. Predicate Act

[1] Bonavitacola attempts to plead that Boro committed mail or wire fraud as a predicate act to violations of RICO. Mail or wire fraud consists of (1) a scheme to defraud, (2) use of the mail or interstate wires to further that scheme, and (3) fraudulent intent. *United States v. Pharis,* 298 F.3d 228, 233 (3d Cir.2002). When mail or wire fraud is the predicate act to a RICO violation, the plaintiff must allege that mailings are related to the underlying fraudulent scheme, even though mailings need not be an essential element of the scheme and need not themselves contain any misrepresentations. *Tabas v. Tabas,* 47 F.3d 1280, 1294 & n. 18 (3d Cir.1995); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1413 (3d Cir.1991). Under Federal Rule of Civil Procedure 9(b), the circumstances constituting fraud must be pleaded with particularity, though fraudulent intent may be generally alleged. In the context of RICO mail fraud allegations, this means that the complaint must "identify the purpose of the mailing within the defendant's fraudulent scheme and specify the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentation." *Annulli v. Panikkar,* 200 F.3d 189, 201 n. 10 (3d Cir.1999). Put another way, the "who, what, when

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 Fed.Appx. 227                                                                                                              Page 5

87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,702, 9 Wage & Hour Cas.2d (BNA) 704

**(Cite as: 87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)))**

and where details of the alleged fraud" are required. *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network,* No. CIV-A-99-4653, 2001 WL 41143 (E.D.Pa. Jan. 18, 2001).

The Amended Complaint alleges that "the defendant Boro Developers, Inc. knowingly and repeatedly used the United States mails and/or interstate wire transmissions in violation of 18 U.S.C.A. § 1341 and § 1343." Amended Complaint ¶ 41. The Amended Complaint also alleges that each of the three bids contained a fraudulent promise to comply with prevailing wage law and that Boro falsified over one hundred certified payroll reports in connection with the three contracts. But the Amended Complaint does not identify any particular mail or wire transmissions or allege how any mail or wire transmissions are connected to a fraudulent scheme.

*232 Even if Bonavitacola had alleged in the Amended Complaint that the certified payroll reports were the underlying U.S. mail or interstate wire transmissions, it is not at all clear from the Amended Complaint how they relate to an underlying fraudulent scheme. Bonavitacola alleges that the intent of the fraudulent scheme was "to obtain the award of electrical contracts from the Ridley and Nashaminy School Districts and the Department of the Navy." Amended Complaint ¶ 41. But the Amended Complaint contains no alleged facts connecting the certified payroll reports, which Boro submitted after being awarded the contract, to the alleged purpose of the fraudulent scheme, which was to obtain the award of the contracts.

**B. Pattern of Racketeering**

**\*\*4** To plead sufficiently the requisite "pattern of racketeering activity," a RICO plaintiff must allege predicate acts that are related and amount to or pose a threat of continued criminal activity. *H.J. Inc.,* 492 U.S. at 239.

**1. Relatedness**

[2] Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.,* 492 U.S. at 240; *Tabas,* 47 F.3d at 1292. In *Kehr Packages,* we observed that relatedness "will nearly always be satisfied in cases alleging at least two acts of mail fraud stemming from the same fraudulent transaction." 926 F.2d at 1414; *see also Banks v. Wolk,* 918 F.2d 418, 422 (3d Cir.1990) (unspecified acts of mail and wire fraud all related to a single real estate transaction satisfied relatedness requirement).

As discussed above, the Amended Complaint fails to allege predicate acts of mail or wire fraud. At best, the Amended Complaint alleges three separate fraudulent transactions: the Ridley School District bid, the Nashaminy School District bid, and the U.S. Navy bid, each of which contained the allegedly false promise to comply with prevailing wage law. Each of those bids is related to the various, allegedly falsified certified payroll reports prepared for the same project. *See Kehr Packages,* 926 F.2d at 1415.

However, the Amended Complaint does not allege that the three fraudulent transactions are related to each other. Bonavitacola ignored the District Court's clear instructions in *Bonavitacola I* to state in the Amended Complaint "how the alleged predicate acts relate to each other as part of a common plan." *Bonavitacola I,* at *5. Rather, Bonavitacola retained the initial complaint's vague and conclusory allegations that predicate acts of fraud were related by their similar purpose of procuring electrical construction contracts. This is not an allegation of common plan, and without more--such as allegations detailing the transactions' similar results, participants, victims, manner of commission, or other characteristics--will not satisfy the relatedness requirement. *H.J. Inc.,* 492 U.S. at 240.

**2. Continuity**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 Fed.Appx. 227    Page 6

87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,702, 9 Wage & Hour Cas.2d (BNA) 704

**(Cite as: 87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)))**

[3] Continuity is "both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc.,* 492 U.S. at 241. For closed-ended continuity, a RICO plaintiff must allege "a series of related predicates lasting a 'substantial period of time.' " *Hughes v. Consol-Penn. Coal Co.,* 945 F.2d 594, 609 (3d Cir.1991) (citing *H.J., Inc.,* 492 U.S. at 242). For open-ended continuity, the plaintiff must allege a *233 "threat of continuity" that "exists when the predicate acts are a part of defendant's 'regular way of doing business.' " *Hughes,* 945 F.2d at 609-10 (citing *H.J., Inc.,* 492 U.S. at 242).

**5 Finding no relatedness between the three separate transactions, we cannot measure continuity by collectively considering the numerous alleged acts of deceit associated with all three bids, which spanned eight years. Thus the Amended Complaint lacks predicate acts occurring over a "substantial period of time" necessary for a proper allegation of closed-ended continuity.

Additionally, nothing in the Amended Complaint suggests that Boro's alleged fraudulent transactions are its regular way of doing business. There is no allegation that Boro submitted other bids in which they falsely promised to comply with prevailing wage law in order to get that business. As the District Court properly noted, "[i]f, for example, over these eight years, Defendants had 100 different contracts, the fact that they may have committed fraud as to three of them (Ridley School District, Nashaminy School District, and the Department of Navy) would be plainly insufficient to support a scheme under RICO." See *Kehr Packages,* 926 F.2d at 1418 (with "no indication that [defendants] made other false statements or treated other customers in a similar manner," the complaint did not indicate that fraud was a regular way of doing business).

Thus, the Amended Complaint did not allege fraud that was related or continuous so as to plead sufficiently the "pattern of racketeering activity" element of a RICO claim.

**C. Injury**

[4] To have standing, a RICO plaintiff must also show that the alleged RICO violations proximately caused injury to the plaintiff's business property. 18 U.S.C. § 1964(c); *Holmes v. Sec. Investor Protection Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). An indirect injury remotely caused by the RICO violation will not satisfy proximate cause requirement.

Bonavitacola's alleged injury is that, as a result of Boro's false promise to comply with the prevailing wage law, Bonavitacola was denied the opportunity to compete with Boro "on a fair and honest basis," and consequently lost income and profits that it would have earned if it had been awarded the Ridley School District [FN4] contract.

> FN4. Bonavitacola does not explain why only the Ridley School District bid formed the basis for its damages allegations.

The Amended Complaint does not allege how Boro's promise to comply with prevailing wage law influenced Ridley School District's decision to award its contract to Boro and not Bonavitacola. For example, the Amended Complaint does not indicate the extent to which Boro's bid was lower than Bonavitacola's bid or whether Boro's bid had lower labor costs than Bonavitacola's bid. Nor does it allege that Boro's bid incorporated any misclassified wages, or that the amount by which Boro underbid Bonavitacola was attributable to misclassified wages. In contrast, the Second Circuit's decision in *Commercial Cleaning Services, LLC v. Colin Service Systems, Inc.* (which Bonavitacola cites in support of its direct-injury argument) illustrates proper allegations of competitor-injury in a RICO complaint: "The complaint asserts that Pratt & Whitney chose Colin because Colin submitted 'significantly lower' bids in a 'highly competitive' price-sensitive market. *234 According to the complaint, Colin was able to underbid its competitors because its scheme to hire illegal immigrant workers permitted it to pay well below the prevailing wage for legal workers." 271

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

87 Fed.Appx. 227                                                                                                 Page 7

87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,702, 9 Wage & Hour Cas.2d (BNA) 704

**(Cite as: 87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)))**

F.3d 374, 382 (2d Cir.2001). A similar description does not apply to Bonavitacola's complaint.

**\*\*6** Furthermore, judging by the facts in the Amended Complaint, Boro's promise to comply with prevailing wage law did not become a false promise until sometime *after* Boro had been awarded the bid, when it began to submit (allegedly) false certified payroll reports. As Bonavitacola had already lost the bid, it is not at all obvious what its injury could have been. Nor is any explanation provided in the Amended Complaint.

[5] The labor unions' alleged injury is even more remote than Bonavitacola's. The unions state that they would have received additional contributions to their multi-employer benefit plans for employees if Bonavitacola had been awarded the contract. The District Court correctly noted that the Amended Complaint "does not state the requisite allegations to show how the contract revenues following to Plaintiff Bonavitacola, assuming it had been awarded any contract, would have resulted in benefit to the plaintiff labor unions." *Bonavitacola II,* at \*12. Nor does the Amended Complaint allege that the labor unions have standing to sue for "these types of damages which, presumably are for the benefit of the union members." *Id.*

For these reasons, we conclude that neither Bonavitacola nor the labor unions have alleged the direct injury required for standing under RICO.

### V.
### Conclusion

We conclude that Bonavitacola did not allege predicate acts of fraud with the requisite particularity, did not allege a "pattern of racketeering activity" and did not allege direct injury required for standing under RICO. Thus we affirm the judgment of the District Court.

87 Fed.Appx. 227, 2003 WL 23155074 (3rd Cir.(Pa.)), RICO Bus.Disp.Guide 10,702, 9 Wage & Hour Cas.2d (BNA) 704

**Briefs and Other Related Documents (Back to top)**

- 03-1713 (Docket) (Mar. 18, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

2004 WL 2220974 (E.D.Pa.)

(Cite as: 2004 WL 2220974 (E.D.Pa.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
HIGHWAY MATERIALS, INC., Plaintiff,
v.
WHITEMARSH TOWNSHIP, MONTGOMERY COUNTY, PENNSYLVANIA, et al., Defendants.
No. CIV.A. 02--3212.

Oct. 4, 2004.

MEMORANDUM

ROBERT F. KELLY, Sr. J.

I. *INTRODUCTION*

*1 Presently before this Court is the Defendants', Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Ann D. Younglove ("Younglove"), Ronald J. DeRosa ("DeRosa"), William P. Rimel ("Rimel"), Peter P. Cornog ("Cornog"), Michael A. Zeock ("Zeock") and Thomas F. Zarko ("Zarko"), Motion for Summary Judgment Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. On May 24, 2002, the Plaintiff, Highway Materials, Inc. ("HMI"), filed its Complaint against the Defendants. Plaintiff's Complaint contains three counts; specifically, Plaintiff asserts that the Defendants violated its substantive and procedural due process rights under Counts I and II of the Complaint. Additionally, in Count III, the Plaintiff asserts that the Defendants denied it equal protection under the law. The instant Motion asks this Court to enter summary judgment in favor of the Defendants as to all three Counts. For the following reasons, the Defendants' Motion will be granted.

II. *BACKGROUND*

This case arises from a land use dispute. HMI is the owner of a 309-acre tract of land in Whitemarsh Township, Montgomery County, Pennsylvania that consists of three parcels. The property was previously known as the Corson Limestone Quarry. The Plaintiff purchased this property on June 21, 1997. The portion of HMI's property that is the subject of this lawsuit is a fifty-four-acre portion of the HMI owned property (hereinafter referred to as "Parcel One"). [FN1] Up until late 2001/early 2002, the majority of Parcel One was zoned HVY-X Industrial except for a small portion which was zoned AA-Residential. The parties are in agreement that the HVY-X zoning designation permitted a wide array of uses, the principal exception being that residential development was not permitted under the HVY-X zoning regulations. (*See* Defs.' Mem. Law in Supp. of Mot. for Summ. J., at 7; Brief of Pl. in Opp'n to Defs' Mot. for Summ. J., at 6). To the east, north and south of Parcel One is the Philadelphia Cricket Club Golf Course.

> FN1. For the purposes of this Memorandum, the other two parcels of HMI's property shall be known as Parcel Two and Parcel Three respectively. As stated by the Plaintiff, "Parcel Two is a 67-acre tract consisting largely of a quarry site that is in the process of being filled in. HMI also operates a concrete production business on this parcel. Parcel Three is a 188-acre trace which contains an active quarry and a bituminous production business." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 5)(internal citations omitted). With one exception, all the properties surrounding HMI's property is zoned residential. Indeed, the only property near HMI's property that cannot be considered residential, agricultural or a golf course is a fifteen-acre parcel of land

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                   Page 2
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

located to the west of Parcel Two which is zoned HVY-X. This fifteen-acre parcel is owned by KYW and has a radio transmitting tower and a small building on the property.

The Whitemarsh Township's subdivision and land development procedures, requirements and standards are set forth in the Township's Subdivision Land Development Ordinance ("SALDO"). Section 105-12 of the Whitemarsh SALDO provides a general outline of township land development procedures. [FN2] As the SALDO states, there are three steps in the land development process. The filing of a sketch plan constitutes the first step. This step is optional. As stated by Section 105-13 of the SALDO:

> FN2. Section 105-12 of the Whitemarsh SALDO states the following:
> A. There are three (3) stages in the procedure for approval of subdivision and land development plans. These stages are necessary to enable the Planning Commission and the Board of Supervisors to have an adequate opportunity to review the submissions and to ensure that their formal recommendations are reflected in the final plans.
> B. The separate stages of approval include the submission of an optional sketch plan, a preliminary plan and a final plan. These plans differ in their purpose and required level of detail....
> C. Sketch plans shall require no more than a sixty-day review period. The review process required for preliminary and final plans shall include no more than ninety (90) days starting from the date of the regular meeting of the Planning Commission next following the date the application is accepted by the Manager and ending with the applicant being notified of the decision of the Board of Supervisors.
> D. The presentation of the preliminary plan and a final plan shall each be considered a separate submission and the maximum ninety-day review period may be required for each. A sixty-day review period may be required for a sketch plan. No limitations for the action of any public official or agency set forth in this Article shall be construed as mandatory.
> E. The applicant is encouraged to meet informally with the Township Planner and the Planning Commission to obtain information regarding zoning and subdivision requirements and development alternatives prior to the initial submission.
> (Defs.' Mot. for Summ. J. at Ex. H).

(1) [t]he purpose of the sketch plan, which is an optional submission, is to afford the applicant the opportunity to consult early and informally with both the Planning Commission and the Township Planner before the preparation of the preliminary plan and formal application for approval.
(2) During the sketch plan procedure, the applicant can advantageously make use of the services of the Planning Commission and the Township Planner to help him analyze the problem of the development and plan more adequately for its sound coordination with the community. The sketch plan procedure also affords the opportunity to give informal guidance to the applicant at a stage when potential points of difference can be more easily resolved. It can also simplify official action and safe unnecessary expense and delay.
(Defs.' Mot. for Summ. J. Ex. H). The filing of a preliminary plan is the second step of the process. Section 105-14 of the SALDO states that "[t]he purpose of the preliminary plan is to obtain formal conditional approval in order to minimize changes and revisions before final plans are submitted." (*Id.*). Finally, Section 105-15 of the Whitemarsh SALDO states that "the final plan shall conform to the preliminary plan, as approved." (*Id.*). Stated differently, "when a preliminary application has been duly approved, the applicant *shall be entitled* to final approval in accordance with the terms of the approved preliminary application as hereinafter provided." 53 PA. CONS.STAT. ANN. § 10508(4)(i)(emphasis added).

A. INITIAL LAND USE DISCUSSIONS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 3
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

*2 While most of the facts giving rise to this case occurred in late 2001 and early 2002, HMI's interactions with the Township began several years before the most relevant facts giving rise to this case occurred. In 1999, the Plaintiff retained E. Van Rieker, a land planner to explore development possibilities for Parcel One. In early 2000, HMI requested a waiver from one of the Township's stormwater management requirements. As stated by the Plaintiff, "[u]nder Township regulations, in calculating the required size of a planned development's stormwater facilities, a developer must account for the difference between the stormwater runoff the project will create and the runoff a hypothetical 'meadow' would create at the site." (Br. Pl. in Opp'n to Defs. Mot. for Summ. J., at 7 n.5). After a request from the Township's engineer requesting as to what the site would look like if HMI complied with the existing requirements, HMI submitted three plans to the Township, each of which depicted a detention pond on a small area of Parcel One. As would become an issue later, this dentention basin was apparently depicted on a portion of Parcel One zoned AA-Residential. Ultimately, the Board rejected the wavier request because the Board found that options were available to HMI that would comply with the stormwater ordinance.

As this was going on, the Plaintiff was in the process of preparing a sketch plan for Parcel One. On November 30, 2000, Plaintiff submitted a sketch plan to the Township. This sketch plan was for what the parties have described as a "mixed-use" plan. The sketch plan proposed 450,000 square feet of office space along with 600 apartment units. Because this sketch plan called for residential units, as well as office space, it did not conform with the HVY-X zoning of Parcel One that was in place at the time of the sketch plan submission. Thus, if this "mixed-use" plan was to ever be approved, Parcel One would have to be rezoned or HMI would have to seek a variance from the Township's Zoning Hearing Board.

On January 29, 2001, the Montgomery County Planning Commission reviewed the "mixed-use" sketch plan. [FN3] Overall, the Montgomery County Planning Commission found that the "mixed-use" sketch plan was "too intense in both its impervious coverage and density for [Parcel One] and the surrounding area." (Defs.' Mot. for Summ. J. at Ex. L). Additionally, the County Planning Commission recommended that:

> FN3. Upon review of the sketch plan, the Montgomery County Planning Commission issued a letter stating that "the review comments and recommendations contained in this report are advisory to the municipality and final disposition for the approval of any proposal will be made by the municipality." (Defs.' Mot. for Summ. J. at Ex. L).

the applicant and the township work together to draft a new zoning district that would allow office buildings and apartments in a campus setting, with appropriate dimensional requirements. To develop this site as proposed under the HVY-X District dimensional requirements will create a new, dense, village surrounded by a semi-rural area, disconnected from other dense areas of the township.

*3 (*Id.*). Subsequently, on February 27, 2001, the Whitemarsh Township Planning Commission reviewed the "mixed-use" sketch plan proposal at an open meeting attended by the public. At this meeting, Plaintiff's attorney, James Garrity ("Garrity"), made a presentation regarding the "mixed-use" sketch plan and "indicated that [HMI was] seeking comments from the Planning Commission." (*Id.* at Ex. N). Additionally, at this meeting, several people from the community spoke out against the proposal detailed in the "mixed-use" sketch plan. (*Id.*).

On May 24, 2001, the Plaintiff presented the "mixed-use" sketch plan to the Board of Supervisors at an open meeting. Once again, Garrity appeared on behalf of the Plaintiff to discuss the "mixed-use" sketch plan. As in the Planning Commission meeting, members of the Township spoke out against the development of Parcel One, or at least the proposal as set out in the "mixed-use" sketch plan. [FN4] For example, the Township

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 2220974 (E.D.Pa.)

**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

Page 4

citizens expressed concerns about additional traffic and that the HMI proposal was to large. Additionally, members of the Board of Supervisors also expressed their concerns about the HMI proposal. For example, Supervisors Elizabeth W. Graf and Rimel expressed concerns that the proposal was too dense.

> FN4. Some of the people that spoke out against the "mixed-use" sketch plan identified themselves as members of the Whitemarsh Township Residents Association ("WTRA"). The Plaintiff asserts that the WTRA was an ad hoc civic association "created to oppose development in the Township." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 9). Apparently, the WTRA has grown into quite a large civic organization comprising 1,500 members.

B. REZONING

After sensing the reluctance of the Township and its citizens to its "mixed-use" sketch plan, HMI set to work on formulating a preliminary plan that would not require any rezoning of the property. Specifically, during the summer of 2001, HMI began to prepare a preliminary plan for an office park. According to the HVY-X zoning that Parcel One was under during the summer of 2001, if HMI were to submit an all office space plan, then no rezoning would be required since such a proposal would lack any residential component that was prohibited under the HVY-X regulations. Thus, during the summer months of 2001, HMI began to prepare a preliminary plan for an all office space development in Parcel One that would conform with the HVY-X zoning regulations. Subsequently, on September 10, 2001, HMI submitted its preliminary plan for Parcel One (hereinafter referred to as the "Initial Preliminary Plan"). The Initial Preliminary Plan submitted by HMI consisted of 500,000 square feet of office space. This office park was to be called "Creekside Commons." Since this plan lacked any residential space, no rezoning by the Township was required before the Board of Supervisors could approve Creekside Commons.

During the summer of 2001, the Township also began the process to rezone HMI's property. The Whitemarsh Township zoning ordinances allow individuals to submit proposals to change the Township's zoning map. Section 116-239 of Whitemarsh's zoning regulations states:

> *4 [w]henever the owners of fifty per centrum (50%) or more of the property owners within any district or the property fronting on the same street or streets or abutting on the property sought to be changed, and situate within one thousand (1,000) feet of the property sought to be change, shall present to the Board of Supervisors a petition duly signed and acknowledged, requesting an amendment, supplement, change, modification or repeal of the regulations prescribed, or of the Zoning Map, including such district, it shall be the duty of the Board of Supervisors to hold a public hearing thereon and cause notice thereof to be given in the manner prescribed in § 116-237.

(*Id.* at Ex. G). Subsequently, on July 3, 2001, an attorney representing a neighbor to HMI's property submitted a petition to rezone HMI's property to EX-Extraction. [FN5] As will be explained, HMI's property was properly rezoned in Feburary of 2002.

> FN5. As stated by the Defendants regarding changing the property from HVY-X to EX-Extraction:
>
> [t]he overall effect of the [proposed] changes in the Zoning Ordinance and Zoning Map was to rezone major portions of Plaintiff's three parcels, including the 54 acre parcel [Parcel One] (with the exception of the portion zoned AA-Residential) to EX-Extraction which ... as stated before, permitted the extractive quarry use to continue, but once abandoned and the property reclaimed, the land could be used for residential purposes. Previously, under the HVY-X Industrial District land use regulations, any use except those restricted (including residential), were permitted in the HVY-X District. Permitted uses in a HVY-X District would include administrative and executive offices.
>
> (Defs.' Mem. of Law in Supp. of their Mot.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 5
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

for Summ. J. at 17).

At a Board of Supervisors meeting on September 20, 2001, the Whitemarsh Board of Supervisors voted to authorize the rezoning of Parcel One. Then, at their October 18, 2001 meeting the Board voted to rezone HMI's property to EX-Extraction. However, this action by the Board was procedurally improper, and HMI filed a challenge to the rezoning with the Township's Zoning Hearing Board. Ultimately, the October 18, 2001 rezoning was deemed procedurally defective and the rezoning was re-enacted on February 28, 2002.

It is important to note the timing of HMI's preliminary plan submission. As stated previously, HMI submitted their preliminary plan proposal for Creekside Commons on September 10, 2001. Since HMI's preliminary plan proposal for Creekside Commons was filed with the Township before the Board of Supervisors had enacted the EX-Extraction rezoning ordinance for Plaintiff's property, the preliminary plan proposal would be governed by the HVY-X zoning regulations. Pennsylvania Law states that:

> [f]rom the time an application for approval of a plat, whether preliminary or final, is duly filed as provided in the subdivision and land ordinance, and while such application is pending approval or disapproval, no change or amendment of the zoning, subdivision or other governing ordinance shall affect the decision on such application adversely to the applicant and the applicant shall be entitled to a decision in accordance with the provisions of the governing ordinances or plans as they stood at the time the application was duly filed. In addition, when a preliminary application has been duly approved, the applicant shall be entitled to final approval in accordance with the terms of the approved preliminary application as hereinafter provided. However, if an application is properly and finally denied, any subsequent application shall be subject to the intervening change in governing regulations.

53 PA. CONS.STAT. ANN. § 10508(4)(i).

B. REVIEW AND ULTIMATE DENIAL OF HMI'S PRELIMINARY PLAN

*5 As both parties recognize, "a Township must act on land development plans within ninety days after the first Planning Commission meeting after the filing of the plans. If no action is taken within the statutory time frame, the land development plans are deemed approved." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J. at 20-21)(internal citations omitted). However, HMI afforded the Township a routine extension of time.

After the preliminary plans were submitted on September 10, 2001, "in accordance with the provisions of the SALDO, the Township administrative staff distributed copies of the application and/or plans to various individuals and organizations, including the Montgomery County Planning Commission and ... Zarko, the Township's consulting engineer." (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 18). The Montgomery County Planning Commission reviewed the Initial Preliminary Plan for Creekside Commons and stated the following in a November 20, 2001 letter to Whitemarsh Township:

> [a]s we stated in our January 29, 2001 letter, we believe that this project is too intense for this site. The HVY-X zoning, under which the plan was submitted, was developed many years ago for heavy industrial uses. Hence, its development standards are not appropriate for redevelopment of this site. When applied to suburban-style office buildings the coverage of the site becomes excessive, resulting in buildings surrounding by acres of paving. As we previously stated in our earlier letter, we believe that this results in a project that, while initially attractive because of its newness, will not age well.

(Defs. Mot. for Summ. J. Ex. BB). The Montgomery County Planning Commission recommended the following:

> [w]e recommend that the applicant work with the township and their consultant on development scenarios for this site and the rest of the quarry. While we recognize that the applicant has vested property rights with the site, a project developed to this scale and intensity will have a deleterious effect on the surrounding area and will eventually lose its appeal for tenants as better designed projects with site amenities become available.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2004 WL 2220974 (E.D.Pa.)  
Page 6

**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

(*Id.*). As with the January 29, 2001 letter, the Montgomery County Planning Commission noted that its comments and recommendations were merely advisory and that final authority for disposition of the preliminary plan remained with the municipality.

Even before the Montgomery County Planning Commission issued its advisory report and recommendations, Zarko reviewed the Initial Preliminary Plan for Creekside Commons. On October 11, 2001, Zarko submitted his first review of HMI's Initial Preliminary Plan for Creekside Commons. This review detailed areas where the Initial Preliminary Plan was non-compliant with the SALDO, zoning ordinance and the grading ordinance.

As both sides attest, it is normal practice for a preliminary plan to undergo revisions before it is finally approved or denied. Indeed, in responding to Zarko's October 11, 2001 review letter, HMI submitted a revised preliminary plan for Creekside Commons on December 24, 2001 (hereinafter referred to as the "First Revised Preliminary Plan"). Engineer Zarko reviewed the First Revised Preliminary Plan, and while this plan had less deficiencies than the September 10, 2001 Initial Preliminary Plan proposal, Zarko continued to find deficiencies and non-compliances when compared to the Township's ordinances. [FN6] After this review letter by Zarko, the purported deficiencies as stated by the Defendants became evident. Indeed, the Defendants assert that "none of the three major zoning issues had been dealt with" in the First Revised Preliminary Plans. (Defs. Mem. of Law in Supp. of their Mot. for Summ. J., at 20). According to the Defendants, the First Revised Preliminary Plan failed to address the lack of a berm and fence to surround Creekside Commons as required by the HVY-X regulations, the continued location of a stormwater retention basin on the portion of Parcel One that was zoned AA-Residential and the selection of a sanitary stormwater option. The Plaintiff contests the impact or relevancy of these three items. First, HMI states that after its Initial Preliminary Plan was reviewed by Zarko in October of 2001, HMI constantly requested meetings with the Township on how best to move forward on the storm sewer issue. Additionally, the Plaintiffs assert that on January 16, 2001, representatives of the Township contacted Garrity and advised HMI to continue to show both a public sanitary sewer and on-site sewer option on the Preliminary Plan so as to allow the Board to elect which option it preferred. Additionally, the Plaintiff asserts that as to the berm/fence requirement and the location of the detention basin, Zarko's zoning interpretations were simply incorrect.

> FN6. The Defendants assert that the Initial Preliminary Plan had ninety items of non-compliance and that the First Revised Preliminary Plan had seventy-three.

As the preliminary plan process continued for Creekside Commons, there was also movement toward revisiting the "mixed-use" plan for Parcel One. The Plaintiff asserts that Gregan and Weiss advised Garrity that the Board of Supervisors had agreed to schedule a public meeting on HMI's "mixed-use" plan. HMI then submitted a "mixed-use" plan on February 12, 2002 and a public meeting to discuss the "mixed-use" plan was scheduled for March 7, 2002. As set out in the minutes of the March 7, 2002 meeting, "Mr. Garrity presented an alternative mixed use sketch plan for the site which he opined was less intense than the office use. The "mixed use" sketch plan proposed 308,000 sq. ft. of office space in four three-story buildings and 380 apartments in ten four-story buildings of 38 apartments each." (Defs. Mot. for Summ. J. Ex. S). As with the previous "mixed-use" sketch plan discussed at meetings in early and mid-2001, the "mixed-use" plan discussed at the March 7, 2002 meeting met with significant opposition from the public as well as from some Board members. [FN7]

> FN7. For example, "Supervisor Zeock opined that the project is too intense and that, in his opinion, the two big issues are traffic and drainage." (Defs. Mot. for Summ. J. Ex. S).

*6 A day after the March 7, 2002 Board meeting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.