Not Reported in F.Supp.2d                                                                                         Page 18
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

omitted). Additionally, as set out previously, the mere failure of the Defendants to agree to Garrity's request for more time was not completely irrational when coupled with the fact that the Board believed that the plans for Creekside Commons were not progressing in an adequate fashion.

3. Plaintiff's Expert Reports

The Plaintiff additionally relies on the reports of two of its experts, Joseph J. Viscuso, P.E. ("Viscuso") and Marc D. Jonas, Esq. ("Jonas") to defeat Defendants' Summary Judgment Motion. For the following reasons, however, these two expert reports do not create a material issue of fact so as to defeat Defendants' Summary Judgment Motion.

Viscuso is "a licensed professional engineer with an M.S. degree in Civil Engineering who currently serves as municipal engineer or special consultant for seven municipalities and authorities." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 57). The report issued by Viscuso states that as submitted, the Second Revised Preliminary Plan is in compliance with the Township's SALDO. Such an opinion by Viscuso does not substantiate a substantive due process claim. Rather, Viscuso's report simply amounts to a difference of opinion he has with Zarko's interpretation of the Township's SALDO as it relates to the Second Revised Preliminary Plan for Creekside Commons. Even a bad faith violation of state law remains only a violation of state law. *United Artists Theatre Circuit,* 316 F.3d at 402 (citing *Chesterfield Development Corp. v. City of Chesterfield,* 963 F.2d 1102, 1104-05 (8th Cir.1992)). Thus, since Viscuso's report only goes to whether Zarko applied the correct legal standard under the local ordinance in his denial recommendation, it does not create a material issue of fact so as to preclude the Defendants' Summary Judgment Motion.

Plaintiff additionally submits the report of Jonas which it contends creates a material issue of fact as to its substantive due process claim. As the Plaintiff sets forth, Jonas is a distinguished land use attorney. Jonas' report sets forth twenty-four circumstances/actions by the Defendants that he believed could be considered "conscience-shocking." (Br. Pl. in Opp'n to Defs. Mot. for Summ. J. Ex. 19). By doing so, Jonas is stating a legal conclusion drawn by applying the law to the facts. A similar issue regarding an expert report occurred in *VIM, Inc. v. Somerset Hotel Association,* 19 F.Supp.2d 422, 427 n. 4 (W.D.Pa.1998), aff'd 187 F.3d 627 (3d Cir.1999). The issue in *VIM* was whether the defendants tactics in prosecuting an opposition to the building of a Hampton Inn was objectively baseless. *Id.* Before the court was a report by a former President Judge of the Commonwealth Court of Pennsylvania which purported to state that the Defendants land use appeals were not objectively baseless as a matter of law. *Id.* at 427 n. 4. As the court observed however:

*20 that lack of objective baselessness is not the sort of issue that lends itself to expert testimony under Fed.R.Evid. 702 and 704. While testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact, *an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.*
*Id.* (emphasis added)(internal quotation marks omitted)(citing *Okland Oil Co. v. Conoco, Inc.,* 144 F.3d 1308, 1328 (10th Cir.1998); *accord Burger v. Mays,* 176 F.R.D. 153, 156-57 (E.D.Pa.1997); *Haberern v. Kaupp Vascular Surgeons, Ltd.,* 812 F.Supp. 1376, 1378 (E.D.Pa.1992); *Rich v. Bailey,* No. 95-6932, 1996 WL 745298, at *5 (E.D.Pa. Dec.23, 1996), aff'd mem. 135 F.3d 766 (3d Cir.1997)). Ultimately, then District Court Judge Smith ruled that "because such testimony would not assist the jury to determine a fact in issue, I cannot consider it as factual evidence on the motion for summary judgment." *VIM,* 19 F.Supp.2d at 427 n. 4. However, Judge Smith did treat the report as additional legal argument. *Id.*

Similar to Judge Smith's analysis in *VIM,* Jonas' report cannot create a material issue of fact merely because he states that the Defendants' actions "shocked the conscience." Specifically, this amounts to a legal conclusion clearly within the purview of this Court's decision making power

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 19
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

rather than a party's expert. This Court has already applied the factual scenario giving rise to this case to the "shock the conscience" standard and found that the Defendants' actions did not rise to such a stringent level. Thus, Jonas' report fails to create a material issue of fact on this point.

For the reasons previously stated, and in light of the relevant case law in this Circuit, this Court has specifically found that there is no issue of material fact as to whether the Defendants' actions "shocked the conscience." Therefore, based on the relevant case law, the facts currently before this Court and that the Plaintiff's expert witnesses have failed to present a material issue of fact that could substantiate a substantive due process claim, Plaintiff's substantive due process claim must also be knocked out. [FN18]

> FN18. In support of their summary judgment motion, the individual Defendants also argue they are entitled to qualified immunity. However, as the court noted in *Corneal,* because there is no material issue of fact outstanding as to whether the Defendants' conduct "shocked the conscience," it is unnecessary for this Court to determine whether the individual Defendants are entitled to qualified immunity. 313 F.Supp.2d at 470 n. 11 (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

C. EQUAL PROTECTION

*21 The final claim being brought by HMI against the Defendants is that the Defendants violated HMI's equal protection rights under the Fourteenth Amendment. The Fourteenth Amendment to the United States Constitution states that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Where the state law does not classify by suspect class, "the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Here, HMI does not argue that it is a member of a suspect class. Instead, it pursues its equal protection claim under a "class of one" theory. As the United States Supreme Court ("Supreme Court") has noted, "cases have recognized equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in the treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(per curium) (citations omitted). Additionally, "a 'class of one' can attack intentionally different treatment if it is 'irrational and wholly arbitrary.' " *Eichenlaub,* 2004 WL 2093439, at * 10 (quoting *Olech,* 528 U.S. at 564).

The Third Circuit recently had the opportunity to compare an equal protection and substantive due process claim in the context of a land use/zoning dispute. As the Third Circuit noted:
> [t]he "irrational and wholly arbitrary" standard is doubtless difficult for a plaintiff to meet in a zoning dispute, and we do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation. It may be very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach.

*Id.* (internal citation omitted). The Third Circuit in *Eichenlaub,* however, remanded the equal protection claim because the District Court had failed to address the equal protection claim. Thus, now that the relevant standard for HMI's equal protection claim has been set, this Court will now turn to analyzing whether an equal protection claim can be substantiated at this summary judgment stage so as to defeat the Defendants' Summary Judgment Motion.

As previously stated, there are two elements necessary to establish an equal protection claim under a "class of one" theory. First, a party has to show that they were intentionally treated differently than others who were similarly situated. If a party satisfies this first step, the second step requires a party to show that there was no rational basis for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 20
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

difference in treatment. Both steps are required to substantiate an equal protection claim. The parties vigorously contest both steps. For the following reasons, this Court will decline to address step one of the equal protection analysis because step two has failed to create a material issue of fact necessary to overcome Defendant's Summary Judgment Motion. [FN19]

> FN19. Initially the parties dispute whether HMI and its property is similarly situated. At the crux of this dispute is determining how to make such a comparison to determine whether HMI is similarly situated. HMI suggests that it should be compared to all other developers who filed plan applications to develop their properties in Whitemarsh Township. The Defendants assert that the proper comparison should be whether HMI's property is similarly situated to other properties in Whitemarsh Township. However, in the case currently before this Court, "it is undisputed that there are no other active quarry properties in Whitemarsh Township." (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 71; Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 68). Thus, as Plaintiff notes, it would be impossible for them to be similarly situated since no other properties are even remotely similar to their parcel. However, since step two of the equal protection analysis has not been substantiated at this summary judgment stage, it is unnecessary for this Court to consider the issue what is the proper comparison.

*22 Even assuming *arguendo,* that the Plaintiff can show that it was intentionally treated differently from others similarly situated, the Plaintiff has not shown that there was no rational basis for the treatment. As the Supreme Court has noted, the issue is whether the Defendants' decision to rezone and ultimately deny HMI's Second Revised Preliminary Plan "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." *City of New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)(per curium). More specifically and more recently, the Supreme Court has noted:

> [w]hether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In the areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

*Fed. Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citations omitted). As with the procedural and substantive due process claims, this Court will analyze whether the purported "one-two punch" substantiates Plaintiff's equal protection claim.

1. "Punch One"

"The equal protection clause affords the states particularly wide latitude with respect to zoning." *Acierno v. New Castle County,* No. 92-385, 2000 WL 718346, at *6 (D.Del. May 23, 2000)(citing *City of Cleburne,* 473 U.S. at 440). Thus,

> a zoning ordinance not affecting suspect classes "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead a classification must be upheld against equal protection if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."

*Id.* (quoting *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). As stated previously in *supra* Part IV.B.1, the Defendants did have a rational basis to rezone HMI's property. Here, the Township had a legitimate concern as to how the reclaimed quarry properties were going to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2004 WL 2220974 (E.D.Pa.)

**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

Page 21

interact and conform with the surrounding neighborhood. This is particularly the case where the entire surrounding neighborhood was residential, a golf course or agricultural properties. [FN20] Since rezoning the property to conform it to the immediate surrounding area is a rational reason for rezoning, the rezoning of HMI's property does not violate the Equal Protection Clause.

>  FN20. This of course excludes the small 15-acre KYW property which had a radio antennae and a small building.

2. "Punch Two"

*23 As previously discussed in *supra* Part IV.B.2, the Defendants have set forth a rational basis for which they denied the Second Revised Preliminary Plan for Creekside Commons. Most notably, according to the Defendants, the Second Revised Preliminary Plan did not comport with the Township SALDO's requirements for approving a preliminary plan. Additionally, while the Plaintiff requested an extension, the denial of that proposal also had a rational basis since the Defendants believed that the proposal for Creekside Commons was not making any significant progress toward approval. Thus, there was a rational basis for denying the Second Revised Preliminary Plan, and since the rezoning of Plaintiff's property also had a rational basis, Plaintiff's equal protection claim must also be knocked out. [FN21]

>  FN21. Additionally, the Plaintiff states that the Township implemented procedural "firsts" in reviewing the plan for Creekside Commons, which it asserts help to substantiate its equal protection claim. However, as one court has noted, "as a matter of logic and law a plaintiff may not convert a procedural due process claim into an equal protection claim by expediently alleging that he was denied procedural rights by an official who has accorded such rights to others in the past." *Stop-Save Township Open Places, Inc. v. Bd. of Supervisors of Montgomery Township,* No. 96-7325, 1996 WL 663875, at *3 (E.D.Pa. Nov.15, 1996) (citations omitted). As set out in *supra* Part IV.A, this Court has already examined and knocked out Plaintiff's procedural due process claim.

V. *CONCLUSION*

In conclusion, this Court has analyzed the Defendants' Motion for Summary Judgment under the relevant legal standards. The Defendants moved for summary judgment on all three counts of the Plaintiff's Complaint. The claims were procedural due process, substantive due process and equal protection. This Court has found that as to all three claims, the Defendants have met their burden and there are no material issues of fact outstanding requiring this Court to deny Defendants' Motion. As such, Defendants' Motion will be granted.

An appropriate Order follows.

*ORDER*

AND NOW, this 4th day of October, 2004, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 64) as to all three claims of Plaintiff's Complaint, the Response and Replies thereto, it is hereby ORDERED that Defendants' Motion is GRANTED.

2004 WL 2220974 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:02CV03212  (Docket)
(May. 24, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

90 Fed.Appx. 653

Page 1

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))

H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Bennet LEVIN, Appellant,
v.
UPPER MAKEFIELD TOWNSHIP, Bucks County, Pennsylvania; Rose Marie Sauter; Conrad Baldwin; William Gunser; Edward X Ford; John Titterton; Lawrence Saltzman; John Walsh; Barbara Hirst; Robert Gorring; Eric Fisher; Michael Frank; Steven Harris, Esquire; Gregory Sturn, Esquire; Harris & Harris, Attorneys; John Devlin; Mary Devlin; Jonathan Lamm; Mary Lamm; Thomas Kovacevich; Mary Kovacevich; Deborah Devlin; Donna v. Lamm.
No. 03-1860.
Submitted Pursuant to Third Circuit LAR 34.1(a)
Feb. 12, 2004.
Decided March 8, 2004.

**Background:** Landowner brought § 1983 action alleging that township and officials, in opposing his application for a zoning variance, violated his due process rights and committed Pennsylvania torts of civil conspiracy and abuse of process. The United States District Court for the Eastern District of Pennsylvania, Legrome D. Davis, J., granted township's motion for summary judgment. Landowner appealed.

**Holdings:** The Court of Appeals, McKee, Circuit Judge, held that:
(1) landowner was not deprived of substantive due process by the township's opposition to his variance request;
(2) township did not commit abuse of proces, under Pennsylvania law, when Board of Supervisors voted to authorize intervention in landowner's appeal in state court and subsequent appeals; and
(3) landowner was not the target, under Pennsylvania law, of any civil conspiracy.
Affirmed.

West Headnotes

**[1] Constitutional Law** ☞278.2(1)
92k278.2(1) Most Cited Cases

**[1] Zoning and Planning** ☞503
414k503 Most Cited Cases
Alleged conduct by township and its officials, of misrepresenting whether policies existed concerning building in floodplain, of having a policy to prevent such building, of voting to oppose landowner's request for a variance so that could build a house in a floodplain, of engaging in ex parte communications, and of delaying the issuance of building permits, did not shock the conscience, and therefore landowner was not deprived of substantive due process by the township's opposition to his variance request; landowner was told the truth about the existence of zoning ordinances and Board of Supervisors had legitimate health and safety concerns. U.S.C.A. Const.Amend. 14.

**[2] Process** ☞171
313k171 Most Cited Cases
Township did not commit abuse of process, under Pennsylvania law, when its Board of Supervisors

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                                                                                                           Page 2

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

voted to authorize intervention in landowner's appeal in state court of zoning board's denial of his request for a variance allowing him to build a house in a floodplain, and subsequently voted to authorize appeals from the state court decision in landowner's favor; Board was not singling landowner out for harassment, but had legitimate concerns for public safety and health.

**[3] Process ⇐171**
313k171 Most Cited Cases
Alleged delay by township in issuing building permits, following state court decision reversing zoning board's denial of landowner's request for a variance, did not constitute an abuse of process, under Pennsylvania law; alleged delay was not incident to the legal process, inasmuch as most of it occurred after state court appeals process had ended and such delay as did occur was not incident to the litigation.

**[4] Conspiracy ⇐8**
91k8 Most Cited Cases
Landowner, whose application for a zoning variance that would allow him to build a house in a floodplain was opposed by township, was not the target of any civil conspiracy, under Pennsylvania law, aimed at taking his land as part of an effort to conserve open space in the township; township's open space plan was not adopted by Board of Supervisors until six months after Board voted to oppose variance request, and no evidence linked the two decisions.

*654 Appeal from the United States District Court for the Eastern District of Pennsylvania. (Civ. No. 99-cv-05313). District Judge: Hon. Legrome D. Davis.

Steven H. Lupin, Hamburg, Rubin, Mullin, Maxwell & Lupin, Lansdale, PA, for Appellant.

H. Robert Fiebach, Kristine Maciolek, Cozen & O'Connor, Bernard E.J. Quinn, German, Gallagher & Murtagh, Philadelphia, PA, for Appellee.

Before SCIRICA, Chief Judge, and ROTH and MCKEE, Circuit Judges.

OPINION

McKEE, Circuit Judge.

**1 Bennet Levin has filed this appeal from the district court's grant of summary judgment in favor of the defendants in his § 1983 action in which he alleged that the defendants' conduct in opposing his application for a zoning variance violated his substantive due process rights and constituted state law torts of civil conspiracy and abuse of process. For the reasons that follow, we will affirm the district court.

I. FACTUAL BACKGROUND
In June 1997, Levin purchased two lots, approximating seven acres of unimproved land (the "Property") bisected by River Road in Upper Makefield Township, Bucks County, Pennsylvania. Levin wanted to build a single family home on the 4.009 acre lot for himself and his wife. The Property borders the Delaware River on one side and the Delaware Division of the Pennsylvania Canal on the other. As a result of its location and topography, the Property is classified as being located in a floodplain as depicted on Federal Emergency Management Administration maps and as set forth in the Township's Joint Municipal Zoning Ordinance ("JMZO"). The Property is zoned Conservation Management Zoning District ("CMZD"). Levin claims that the CMZD permits single family homes by right and also lies within the overlay Floodplain Zoning District (the "Floodplain"), which consists of the flood fringe and the floodway.

The Township, its Board of Supervisors, its Zoning Hearing Board ("ZHB") members *655 and its Solicitors (collectively the "Township") claim that long before Levin purchased the Property he knew that it was located within the floodplain and, therefore, he would have to obtain a variance to build in the floodplain. The Township also claims that before he purchased the Property, Levin learned that the prior owner had applied for a variance to construct a single-family residence on the Property several years earlier and that the variance had been denied. Yet, notwithstanding this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                                                                                                      Page 3
90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))
**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

knowledge (or perhaps because of it), Levin purchased the Property at a substantial discount.

Levin says that before he purchased the Property, he met with Township Code Enforcement Officer David Kuhns on at least two occasions and was told there was no official policy in the Township that precluded Levin from building his home. According to Levin, the only requirement was compliance with § 905 of the Township Zoning Ordinance and other applicable sections of the Zoning Ordinance. Levin claims that he purchased the Property relying on Kuhn's representations.

For its part, the Township asserts that the Property is governed by both the provisions of the JMZO, the local zoning ordinance which applies in the Township as well as several other neighboring townships, and the Municipalities Planning Code, the Pennsylvania statute governing the land use process. The JMZO not only addresses the criteria for the CMZD in which the Property lies, but it also contains a Floodplain District Overlay-- § 905--which applies to every property located in a floodplain, including Levin's, and contains additional criteria which must be met in addition to the requirements of other normal zoning districts.

**\*\*2** The purpose of § 905 is "to prevent the loss of property and life, the creation of health and safety hazards, the disruption of commercial and government services, the extraordinary and unnecessary expenditure of public funds for flood protection and relief, and the impairment of the tax base." JMZO § 905(I)(A). The Township claims, contrary to Levin's assertion, that new residential construction is not permitted as of right or by special exception under § 905. Rather, it is incumbent upon an applicant to request and obtain a variance. Section 905 itemizes a number of considerations the ZHB must consider when deciding whether to grant a variance application for construction in the floodplain. Among the many considerations outlined are the following:
• The danger to life and property due to increased flood heights or velocities caused by encroachments. No special exception or variance shall be granted for any proposed use, activity, or development that will cause any increase in the one hundred (100) year flood levels in the Floodplain District as delineated in the Flood Insurance Study referenced in Section 905.III.A.I.
• The safety of access to the property by ordinary and emergency vehicles in time of flood.
JMZO § 905(IV)(E)(1)(a) and (j).

In addition to the criteria for obtaining a variance set forth in § 905, the JMZO also requires that "variances shall be in accordance with the provisions of the Pennsylvania Municipalities Planning Code ('MPC')." JMZO § 1507(D). In deciding whether to grant a variance, § 10910.1 of the MPC provides:
The board may grant a variance, provided that all of the following findings are made where relevant in a given case:
(1) That there are unique physical circumstances or conditions ... peculiar to the particular property ...
**\*656** (2) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance ...
(3) That such unnecessary hardship has not been created by the appellant.
(4) That the variance, if authorized ... [would not] be detrimental to the public welfare.
(5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.
53 P.S. § 10910.2. The Township contends these requirements are mandated by state law and the JMZO. According to the Township, applicants such as Levin who seek to build new construction in the floodplain must meet three different sets of requirements: (1) the criteria set forth in their specific Zoning District (for Levin, the requirements of CMZD); (2) the criteria contained in the § 905, the floodplain overlay; and (3) the five-pronged test set forth in § 10910.2 of the MPC and incorporated into the JMZO.

On November 24, 1997, Levin submitted an application for a zoning variance which included a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                                                                                                                   Page 4
90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))
**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

request for a hearing before the ZHB to obtain a variance to construct a single-family detached dwelling within the 100-year floodway fringe of the Delaware River (the "Application"). Levin claims that the lot he wanted to build on lies within the flood fringe, which is located outside of the floodway, the area that carries the large bulk of any 100-year floodwaters. The Application contained materials prepared by his engineer, among which was a HEC-II study required by § 905 of the JMZO. According to Levin, the HEC-II study measures whether a proposed structure improvement would cause a rise in the 100-year flood and whether the proposed structure causes backwater on the upstream of the property or a significant increase in the velocity of the river. Levin says that along with his Application, he submitted an existing features plan which identified by size and species all trees located on his property and a plan identifying the proposed location of the home, the proposed location for an on-site sanitary system, the on-site well and the suggested driveway location, as well as actual tests of the soil for percolation and the results of water drawn from a test well that had been drilled to conform to the requirements of § 905.

**\*\*3** Upon receiving Levin's Application, Township staff placed it on the agenda for the December 17, 1997, public meeting of the Board of Supervisors for discussion and comment, as they do with every variance application. At the meeting, Stephen Harris on behalf of the Township Solicitor, Harris & Harris, advised the Supervisors that Levin had submitted an Application that requested a variance to construct a single-family home in the floodplain. After Harris provided a brief description of the property and the specific variance sought by Levin, Harris inquired into whether the Supervisors wanted to authorize the Township Solicitor to attend the ZHB meetings and oppose the Application on behalf of the Township. A public discussion was held, members of the public made comments, and a motion was ultimately made to authorize the Solicitor to represent the Board of Supervisors in opposing Levin's Application. The motion carried and the Solicitor was directed to oppose the Application on behalf of the Township. The Supervisors did not approve or deny the variance request itself, as that is left exclusively to the ZHB.

Levin claims that the December 17, 1997 meeting of the Supervisors was the first time many of the five Supervisors actually **\*657** saw the Application and none of them claimed to have previously read or considered it. Levin alleges that he was not given notice that his Application would be considered by the Supervisors and that neither he nor his attorney were aware of the meeting so as to be able to present and discuss the Application to the Supervisors. Levin claims the Board's minutes are silent as to any concerns for the public health, safety and welfare of the community due to the Application. He also claims there is no evidence that the Supervisors considered the merits of the application in any respect before voting to oppose it. He further alleges that the minutes do not reflect that the Township Engineer had reviewed the Application as required by § 905. In fact, Levin claims that Township Manager Richard Gestrich confirmed that the Supervisors did not have a report from the Township Engineer at the December 17, 1997 meeting.

According to Levin, on January 20, 1998, Township Engineer Williams, as required by § 905, submitted his findings to the Supervisors stating that the Application was in order and that the required HEC-II study was satisfactory in all respects. Levin also claims that Williams testified that Levin's engineer went beyond the zoning ordinance requirements and included an additional HEC-II study based upon the then unadopted model of the Delaware River floodplain by the U.S. Army Corp of Engineers. Moreover, Levin alleges that Williams testified that the HEC-II study prepared by Levin's engineer was the most complete and thorough analysis of any application that he had reviewed.

Even though the Supervisors had previously authorized the Solicitor to oppose Levin's Application, the issue was raised again the following month inasmuch as the make-up of the Board had changed at the end of 1996 and the ZHB hearings on Levin's Application had not yet begun. The newly-elected Supervisors held two of the five

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                                                                                                Page 5

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

seats on the Board as of January 5, 1998. After comment and discussion at the January 21, 1998 public meeting, the now-different slate of Supervisors again voted to authorize the Solicitor to represent the Township in opposition to Levin's Application. The Township claims that this was the final direct involvement of the Supervisors in Levin's variance request until the ZHB issued its decision.

**\*\*4** The Township claims that even if the Supervisors had not authorized the Solicitor to oppose Levin's Application, and instead had taken no position or had sent the Solicitor to support it, the Application would still be decided by the ZHB based on whether the ZHB concluded that Levin had satisfied the requirements of the Township ordinances, the five-pronged criteria set forth in the MPC, and the JMZO criteria regarding issuance of a variance.

The ZHB held eight evidentiary hearings. During the hearings, Levin put on evidence that he had satisfied all of the relevant portions of § 905 of the JMZO. The Township put on evidence to the contrary, focusing on the inaccessibility of the Property by emergency vehicles (a § 905 factor) and that Levin had not met the five-pronged variance test (§ 10910.2 of the MPC, which is incorporated into the JMZO). The evidence presented to the ZHB centered primarily around two of the five statutory variance criteria: (1) alternative uses of the Property and (2) the public health, safety and welfare. With respect to the former, the parties offered conflicting testimony regarding whether Levin's Property could be used by Levin for alternative uses other than the new construction of a single-family residence.

Both parties presented evidence with respect to the issue of health, safety and welfare. The Township contended that **\*658** the proposed use constituted a safety hazard for Levin, the Township and other rescue personnel, and citizens in general. Along these lines, testimony was presented that portions of Levin's Property had been underwater during floods which occurred over the past ten years and beyond and that during such floods ingress and egress to the Property was impossible, thereby presenting a danger to Levin, his family and guests, and rescue personnel, as well as future occupants of the dwelling who might be unaware of the danger. Indeed, claims the Township, several years before, a woman had been killed during a flood on the road that bisects Levin's Property when that road was underwater during a flood. In addition, although Levin presented evidence that construction of his residence would not alter the 100-year flood level by any noticeable percentage, the Township presented evidence that the cumulative effect of building in the floodplain would result in a rise of the floodplain and would also have a corresponding effect on floodwater velocity. Other safety concerns such as displaced sewage and the like were also raised.

Levin disputed this evidence by presenting testimony of remedial measures he intended to take which he believed would alleviate the health, safety and welfare concerns raised by the Township. Levin offered to make installation of these measures a contingency of any variance. However, the Townships claims that Levin now says he will not install these safety features.

At a public hearing on July 30, 1998, the ZHB voted 3 to 0 to deny Levin's Application, and on August 13, 1998, the ZHB issued a written opinion containing its Findings of Fact and Conclusions of Law.

**\*\*5** After the ZHB denied Levin's Application, he filed a Land Use Appeal in the Court of Common Pleas of Bucks County on September 9, 1998. The Township filed a Notice of Intervention in the Court of Common Pleas opposing the appeal. On October 7, 1998, at a public meeting, the Board of Supervisors voted in favor of a motion to authorize the Solicitor to represent the Township in the appeal.

On February 23, 1999, Judge John J. Rufe of the Court of Common Pleas issued his initial Memorandum Opinion and Order reversing the ZHB's decision. On March 3, 1999, the Board of Supervisors authorized the Solicitor to file that decision to the Commonwealth Court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653

Page 6

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

Consequently, on May 7, 1999, Judge Rufe issued a Supplemental Opinion. On May 11, 2000, the Commonwealth Court affirmed the Court of Common Pleas' decision.

The Board of Supervisors was presented with the Commonwealth Court's opinion and, on June 7, 2000, passed a unanimous motion authorizing the Solicitor to file petition for allowance of appeal with the Pennsylvania Supreme Court. On June 12, 2000, the petition for allowance of appeal was filed; however, on November 9, 2000, the Pennsylvania Supreme Court denied it without opinion.

Although it has nothing to do with the resolution of this appeal, the Township claims that Levin has obtained his variance but has yet to begin building his home despite having received all of the necessary permits and approvals. However, Levin says that he has taken steps to start construction by clearing the land, putting in a road and grading the area of the house to bring it up to the required elevation.

II. DISTRICT COURT PROCEEDINGS

On October 26, 1999, Levin filed a complaint in the district against the Township, the members of the Board of Supervisors *659 in their individual and official capacities, the members of the Zoning Hearing Board in their individual and official capacities, and the Township's Solicitors, in their individual and official capacities. He thereafter filed an amended complaint alleging violations of his substantive and procedural due process rights pursuant to § 1983; conspiracy in violation of § 1983; and state law claims of civil conspiracy, abuse of process and wrongful use of civil process. On October 4, 2000, the Township defendants filed a motion to dismiss the amended complaint and on May 10, 2001, the district court entered an order granting in part and denying in part the motion to dismiss. As a result, the remaining claims were: (1) substantive due process violations pursuant to § 1983 against the Township, the Board of Supervisors, the ZHB and the Solicitors; (2) civil conspiracy against the Township, the Board of Supervisors, the ZHB and the Solicitors; and (3) abuse of process against the Township, the Board of Supervisors and the Solicitors.

Defendants then filed a motion for summary judgment, asserting, *inter alia,* the defense of qualified immunity. On February 25, 2003, the district court entered a memorandum and order granting summary judgment to the defendants on Levin's remaining § 1983 substantive due process claim and his state law claims.

**\*\*6** Levin then filed a timely appeal.

III. DISCUSSION

Levin argues that the district court erred by granting summary judgment to the defendants on his § 1983 substantive due process claim and his state civil conspiracy and abuse of process claims. Each argument is considered separately below.

A. Substantive Due Process.

The due process clause of the Fourteenth Amendment guarantees "more than fair process" and "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v. Lewis,* 523 U.S. 833, 840, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citations and internal quotation omitted). That substantive component is intended to prevent government officials from abusing their power or employing it as an instrument of oppression. *Id.* (citation and internal quotations omitted).

Substantive due process violations are actionable under § 1983. *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). "To prevail on a non-legislative substantive due process claim, a plaintiff must establish as a threshold matter that he has a protected property interest [FN1] to which the Fourteenth Amendment's due process protection applies." *Woodwind Estates, Ltd. v. Gretkowski,* 205 F.3d 118, 123 (3d Cir.2000), abrogated on other grounds, *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003). We have held that "ownership is a property interest worthy of substantive due process protection." *DiBlasio v. Zoning Board of Adjustment for the Township of*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                                                                                                                                    Page 7

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

*West Amwell,* 53 F.3d 592, 600 (3d Cir.1995), *abrogated on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003). "Indeed, one would be hard-pressed to find a property interest more worthy of substantive *660 due process protection than ownership." *Id.* at 601.

> FN1. Levin does not contend here that the Township officials violated a protected liberty interest.

Thus, it clear that Levin's ownership of the Property is a property interest that is entitled to substantive due process protection. Levin alleges in his § 1983 action that the Township's conduct in opposing his application for a variance violated his substantive due process property rights. However, the Township moved for summary judgment on Levin's substantive due process claim on the basis of, *inter alia,* qualified immunity.

Qualified immunity generally protects government officials performing discretionary functions from civil damages. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity applies so long as the government officials' "conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* In determining whether qualified immunity applies, a court asks: (1) whether the plaintiff has alleged the deprivation of a constitutional right, and if so, (2) whether the right was clearly established at the time of the alleged violation. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). A right is clearly established if "its outlines are sufficiently clear that a reasonable officer would understand that his actions would violate the right." *Sterling v. Borough of Minersville,* 232 F.3d 190, 193 (3d Cir.2000). Therefore, the court's task " 'is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all,' before reaching the question of whether the right was clearly established at the time." *Johnson v. Newburgh Enlarged School District,* 239 F.3d 246, 251 (2d Cir.2001) (quoting *County of Sacramento v. Lewis,* 523 U.S.

at 841 n. 5, 118 S.Ct. 1708).

**7 Prior to January 14, 2003, we took the position that executive action in a land use case violates substantive due process if it was made with any "improper motive." See *Bello v. Walker,* 840 F.2d 1124 (3d Cir.1998). However, on January 14, 2003, we adopted a new, more stringent standard to be applied to substantive due process claims. In *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003), *petition for reh'g en banc denied,* 324 F.3d 133 (3d Cir.2003), which was itself a land use dispute case, we held that the standard to be applied in all cases involving a substantive due process claim is whether the government executive's actions "shock the conscience," and this rule extends to cases arising in the land use context. [FN2] We were of the opinion that the "improper motive" substantive due process cases were in direct conflict with the Court's decision in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

> FN2. Levin argues that the "shocks the conscience" test only applies where the state executive actor had to act with urgency. Levin's Br. at 25-26, 33; Reply Br. at 7. But, says Levin, because the Township did not have to act, and did not in fact act, with any urgency, the "shocks the conscience" test does not apply to his substantive due process claim. Consequently, the less-stringent *Bello* "improper motive" test applies.
> However, there's nothing in *United Artist* that supports the distinction Levin urges upon us. In fact, *United Artist* makes it clear that the "shocks the conscience" test applies to *all* substantive due process claims.
> Levin also "takes issue" with the *United Artist* decision, claiming that it does not afford an individual any "protection from the irrational and arbitrary actions of the government and its officials." Reply Br. at 6. However, *United Artist* is the law of this circuit and, therefore, his distaste for it is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653    Page 8

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

irrelevant. Moreover, the *United Artist* "shocks the conscience standard" is precisely designed to protect an individual from arbitrary and irrational executive action.

*661 In *Lewis*, the Court explained the standard that applies when a plaintiff alleges that action taken by an executive official violates substantive due process. [FN3] The "core of the concept" of due process is "protection against arbitrary action" and "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." 523 U.S. at 845-46, 118 S.Ct. 1708 (citation omitted). Consequently, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.* at 846, 118 S.Ct. 1708. "[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.... Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action." *Id.* at 847 n. 8, 118 S.Ct. 1708.

> FN3. The issue in *Lewis* was "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." 523 U.S. at 836, 118 S.Ct. 1708.

Although "the measure of what is conscience-shocking is not a calibrated yard stick, it does ... point the way." *Id.* at 847, 118 S.Ct. 1708 (citation, internal quotations and brackets omitted). Yet, "deliberate indifference that shocks in one environment may not be so patently egregious in another." *Id.* at 850, 118 S.Ct. 1708. The shocks the conscience "test can be used to mark the beginning point in asking whether or not the objective character of certain conduct is consistent with our traditions, precedents, and historical understanding of the Constitution and its meaning."

*Id.* at 857, 118 S.Ct. 1708 (Kennedy, J., concurring) (citing *Collins v. Harker Heights,* 503 U.S. 115, 126-28, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)).

[1] Levin argues that the district court erred by granting summary judgment to the Township on his substantive due process claim because there is a genuine issue of material fact as to whether the Township's actions shock the conscience and, therefore, constituted a substantive due process violation However, Levin misunderstands the nature of the inquiry in a case where the state executive officer invokes the defense of qualified immunity. That inquiry is stated on our decision in *Wilson v. Russo,* 212 F.3d 781 (3d Cir.2000):

> **8 The qualified immunity defense requires that we engage in a two-step analysis. First, we must determine whether the plaintiff has alleged the deprivation of a constitutional right at all. Only if he has should we proceed to determine whether that right was clearly established at the time of the alleged violation. Summary judgment is appropriate if no reasonable juror could conclude that [plaintiff's] clearly established rights were violated.
> 
> *This does not mean that the jury determines the contours of the right. Rather, after making a legal determination about the existence of a right, and whether it is clearly established, we determine whether the facts on the record are such that a jury could conclude that the clearly established right was violated.* As a methodological matter, we commonly work backwards: We arrange the facts in the light most favorable to the plaintiff, and then determine whether, given precedent, those "facts," if true, would constitute a deprivation of a right. And then, if necessary, we determine if the right is clearly established.

*662 212 F.3d at 786 (citations omitted) (emphasis added).

Given the nature of the qualified immunity inquiry, it is necessary for us to look at the facts in the light most favorable to Levin to determine if the Township's actions so shock the conscience that a substantive due process violation occurred. Levin points to a number of instances of Township

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                          Page 9
90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))
**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

conduct which he contends "shock the conscience." Each is noted separately below.

(i). Kuhns's representations to Levin.

Levin alleges that on at least two occasions he met with Code Enforcement Officer Kuhns prior to buying the Property and that Kuhns told him that there was no official or unofficial Township policy that precluded Levin from building his home on the Property. Rather, says Levin, Kuhns told him that the only requirement was compliance with § 905 of the JMZO and other applicable zoning ordinances, regulations and statutes. Therefore, says Levin, relying on Kuhns's representations, he bought the Property.

However, we completely fail to understand how this shocks the conscience. Kuhns's representations to Levin were correct. Kuhns told Levin that in order to build on the Property, Levin would have to get a variance. Levin intimates that Kuhns lied to him because there was a Township policy in place to prevent anyone from ever building on the floodplain. That issue is discussed below.

(ii). Official Policy to Prohibit Construction on the Floodplain.

Levin claims that the Township's conduct shocks the conscience because there was a Township [FN4] policy in place to prevent anyone from ever building in the floodplain and, therefore, the variance application procedure was an sham exercise. However it appears uncontested that the Board of Supervisors had formed the opinion that construction on the floodplain should not be allowed for public safety reasons. For example, in his deposition, Supervisor Baldwin relied on his personal experience to make a determination that Levin's proposed residence would pose a danger to health, safety and welfare. In Baldwin's view, it was unwise to build a single family residence in an area that flooded and, therefore, posed a safety threat to the homeowner and his family. Supervisor Ford testified to similar concerns, and, in addition, focused on the safety of rescue personnel who could be called upon to rescue floodplain homeowners in times of flooding. Supervisor Ford testified that he had personal experience with the Property and had witnessed police and fire personnel rescue neighboring landowners in a 1996 flood. Ford also testified that he was present on River Road, the road that bisects the Property, when a woman drowned there in a flood. Finally, the Board members were concerned with problems associated with surrounding water and sewer systems in times of a flood. Supervisor Ford testified that he witnessed sewage floating in flood waters when the canal went over its banks in a neighboring town in New Jersey.

> FN4. As noted, the "Township" consists of all of the defendants, viz., the Board of Supervisors and its members, the Zoning Hearing Board and its members, and the Township's Solicitors.

**\*\*9** These are obviously legitimate concerns, and we fail to understand how the Board's opposition to having any construction in the Floodplain shocks the conscience. In fact, on this record, the township's acquiescence **\*663** to such building would have been shocking. Moreover, even if the Board had formed the opinion that no construction should ever take place on the floodplain, the Board of Supervisors does not make the determination as to whether a variance should be granted. That is the function of the Zoning Hearing Board. Levin does not claim that the ZHB rubber-stamps what the Board has decided.

(iii). Board's Voting to Oppose Levin's Application.

Levin claims that it shocks the conscience that the Board of Supervisors voted to send the Solicitor to oppose Levin's application without even reviewing it and without having even first read the application. However, given the Board's safety and public health concerns, we believe that the Board members would have been derelict in their duty had they not voted to oppose Levin's application.

Interestingly, we note that the Township submitted an expert report prepared by Gilbert P. High, Jr., who the Township claims is an experienced land use attorney in the Philadelphia area. High opined: (1) that it was obligatory for the Board to review matters brought before the ZHB in order to determine whether the Board should take a position

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.