with respect to a particular application; (2) the Board's public safety concerns are reason enough to send the Solicitor to the ZHB hearing; and (3) the Board's action in authorizing the Solicitor to oppose Levin's application was reasonable and for a legitimate government purpose. High concluded by saying that it is the Board's job to look after the public welfare and to challenge those whose development it believes pose a threat to the public safety. Therefore, opined High, the Board acted well within the proper scope of its legitimate authority. Significantly, Levin offered no expert report, or anything else, to attempt to counter High's expert opinion.

(iv). Conduct of ZHB Members.

Levin claims that certain conduct of ZHB members shocks the conscience. First, he alleges that during the zoning hearings, *ex parte* communications occurred between ZHB member Gorring, who was appointed by the Board of Supervisors to the ZHB prior to the second zoning hearing, and some of the intervening neighbors. Second, Levin alleges that during the course of the zoning hearing, the ZHB received an *ex parte* memo from Code Enforcement Officer Kuhns, dated February 25, 1998. Levin claims that the memo includes an attached critique of Levin's HEC-II study by Calvin Larson, an engineer who lives in the Township. Levin also claims that the critique of Levin's HEC-II study is set forth in a February 22, 1998, e-mail from Larson to the Township's Environmental Advisory Committee ("EAC") Chairman, Stanley Arabis. [FN5] Levin alleges that no copy of the critique was given to him or to his attorney. He also claims that it was not until the March 31, 1998 zoning hearing, when ZHB Chairwoman Hirst referred to the critique, that Levin or his attorney became aware of Larson's critique. And, says Levin, it was not until April 19, 1998 that the Township engineer faxed a copy of Larson's critique, which was redacted to omit Larson's name, the February 22, 1998 date of the e-mail and the fact that the e-mail was from Larson to Arabis. Moreover, says Levin, neither Larson nor Arabis testified at any of the hearings and the critique was never entered into the ZHB's record.

FN5. Levin says that Larson testified that Arabis asked that Larson review Levin's application. However, Levin says that Arabis denied ever making such a request.

*664 **10 However, the evidence of record does not support Levin's allegations. Levin alleged that a man named Washburn was privy to the *ex parte* communications between Gorring and intervening neighbors. However, Washburn testified in his deposition that he did not hear any conversation between Gorring and the intervening landowners, Lamm and Kovacevich. Washburn only testified that he saw, but did not hear, Gorring talk to an intervening landowner named Devlin. Moreover, we cannot help but note that while Levin alleges *ex parte* communications occurred, and suggests that those *ex parte* communications were somehow improper, he never bothers to inform us of the content of the alleged *ex parte* communications.

With regard to the Larson critique, the Township concedes that at some point during the application process, Larson submitted comments to Williams, the Township engineer, about Levin's application. However, Williams testified that he reviewed Larson's comments and forwarded them to Levin's engineer for comment. Levin, while trying to make much of his claim that neither he nor his attorney saw Larson's critique, does not dispute testimony that Williams mailed the critique to Levin's engineer. Moreover, because Larson's comments were forwarded to Levin's engineer, they cannot be *ex parte*. In addition, the Township claims that the ZHB was provided with Larson's e-mail to Arabis and that was stated on the record at the March 31, 1998 hearing. The Township, claims that Levin's lawyer was present, but made no objection. Significantly, Levin fails to mention this rather critical fact.

In addition, the Township says that other evidence, neither mentioned nor rebutted by Levin, shows that the ZHB members acted properly.

• ZHB member Fisher testified at deposition that he had not heard anything about Levin's application before the first night of the hearings, nor did he talk to any of the Supervisors or the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653

Page 11

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

Solicitors before the hearings began. He did not speak to Kuhns before the first night of the hearings and has no knowledge of any ZHB member speaking to the Supervisors or Solicitors before the hearings began. He never spoke to any of the neighbors about the application at anytime other than during the hearings. Similarly, he has no knowledge that any ZHB member spoke to any neighbors.

• ZHB member Hirst testified that she was not aware of any *ex parte* communications concerning Levin's application. She testified that she did not have any discussion with anyone from the Township outside of the hearing room during the hearings. She testified that she was concerned about the safety of rescue personnel having to go to rescue people living in the proposed household.

• ZHB member Gorring testified that once he was appointed, he did not have any discussions with anyone concerning any matter that was pending before the ZHB, including Levin's application.

In sum, Levin's claim that the conduct of the members of the ZHB shocks the conscience has not a shred of record support.

(v). Delay in Issuing Permits.

**\*\*11** Levin contends that the delay in issuing permits demonstrates conscience-shocking conduct on the part of the Township. He recounts the delay as follows. Not unexpectedly, the Township says that none of the alleged "delay" constitutes conscience-shocking conduct. At the outset, the Township claims that Levin's allegations of delay are mere allegations and that he has not produced any evidence to support **\*665** them. More importantly, according to the Township, in May 2000, Levin applied only for a foundation permit, although he believed that he paid the fee for both the foundation permit and the building permit because the fees could not be broken apart. The Township admits that the issuance of the foundation permit was stayed pending the appeal process on the advice of the Solicitor. According to the Township, the foundation permit was further delayed because Levin did not submit the necessary documents. However, the Township claims that once Levin submitted the necessary documents, the foundation permit was approved.

In addition, the Township claims that when his counsel requested a building permit in January 2002, Levin was presented with a list of items he must first submit before obtaining the permit. A dispute then arose as to whether Levin had paid the appropriate fee. The Township alleges that Levin claimed that he paid the building permit fee back in 2000 when he applied for the foundation permit, but that Kuhns's cover letter indicates that the fee was only for a foundation permit. The Township claims that Levin produced no evidence contradicting Kuhns's cover letter saying that the fee previously paid was for the foundation permit only. In any event, says the Township, the building permit was issued one week later on February 5, 2002, immediately after Levin paid the building permit fee and the remaining conditions were met.

It is obvious that the parties to this dispute tell completely different stories about the cause of the claimed delay in issuing Levin's permits. However, the dispute does not rise to a genuine issue of material fact because, even accepting Levin's version as true, we do not see any conduct in the permit-issuing process that shocks the conscience. At most, Levin tells a tale of overbearing conduct by a Township employee. That overbearing conduct is neither so egregious, nor so outrageous, that it shocks the contemporary conscience. We remind Levin that among the "slings and arrows of outrageous fortune," Hamlet included "[t]he insolence of office," and "the law's delay." WILLIAM SHAKESPEARE, HAMLET, act 3, sc. 1.

We also fail to understand how the Open Space Plan and the proposed Canal Setback Ordinance constitute conscience-shocking behavior. Both the Plan and the proposed Ordinance are legitimate areas of governmental concern. Moreover, Levin's Property was never taken for Open Space and the Canal Setback Ordinance was never adopted. Therefore, neither the Open Space Plan nor the proposed Canal Setback Ordinance impinged on any protected property interest Levin has in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Property.

**\*\*12** To sum up, there is no conduct by the Township that shocks the conscience. Therefore, Levin was not deprived of any substantive due process right and it is not necessary for us to go to the second step of the qualified immunity inquiry to determine if the alleged right was clearly established at the time of the alleged violation. The district court's grant of summary judgment to the Township on Levin's substantive due process claim was proper.

B. Abuse of Process.

[2] Levin asserted a state-law abuse of process claim against the Township, the Board of Supervisors and the Solicitors. Under Pennsylvania law:

> The tort of abuse of process is defined as the use of legal process against another primarily to accomplish a purpose for which it is not designed. To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the \*666 plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff. This tort differs from that of wrongful use of civil proceedings in that, in the former, the existence of probable cause to employ the particular process for its intended use is immaterial. The gravamen of abuse of process is the perversion of the particular legal process for a purpose of benefit to the defendant, which is not an authorized goal of the procedure. In support of this claim, [a plaintiff] must show some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

*Shiner v. Moriarty,* 706 A.2d 1228, 1236 (Pa.Super.1998) (citations, internal quotations and ellipses omitted).

[3] Levin contends that the legal process abused is the state appeals process. He claims that Board of Supervisors authorized the Solicitors to intervene in his appeal of the ZHB's decision to the Court of Common Pleas, that the Board authorized the Solicitors to appeal the Court of Common Pleas decision to the Commonwealth Court, and that the Board authorized the Solicitors to file a petition for allowance of appeal with the Pennsylvania Supreme Court, "to accomplish a purpose for which the appeals process was not designed, namely to harass Levin and cause him financial and emotional injury and force him to abandon his attempts to build his home." [FN6] Levin's Br. at 36. In making that contention, he merely cites to a number of pages in the appendix, but does not begin to tell us what those citations might reveal. Therefore, we question how serious Levin is about his abuse of process claim.

> FN6. Levin also says that the alleged delay in issuing the permits constitutes abuse of process. Under Pennsylvania law, "[t]he word 'process' as used in the tort of abuse of process has been interpreted broadly, and encompasses the entire range of procedures incident to the litigation process." *Shiner,* 706 A.2d at 1237. However, the majority of the alleged delay occurred after the state court appeal process had ended. Therefore, the delay cannot, even in the most liberal sense, be an "incident" to the legal process. More importantly, in *Shiner,* the things that were found "incident" to the legal process were all of the motions and petitions filed, not just a form of coercive legal process such as a subpoena or a writ employed for an improper purpose. Therefore, even the alleged delay that did occur before the state appeals process ended cannot be incident to the litigation. The alleged delay is not legal process.

However, if one takes the trouble to read the portions of the record Levin cites to, but does not recite, one quickly concludes that the record clearly shows that the members of the Board of Supervisors were not improperly singling out Levin or using the legal process to harass him. Rather, they simply believed that there were public safety issues

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                                                                                              Page 13

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

involved with new construction in the floodplain and that the zoning ordinance providing that there should not be construction in the flood plain was reasonable. For example, in his deposition Board member Falconi testified:

> **\*\*13** Q: Okay. Did you consult with Mr. Williams at all before making your vote in favor of seeking review by the Pennsylvania Supreme Court?
> A: No.
> Q: Is there any reason why?
> A: Why I didn't consult with him?
> Q: Right.
> **\*667** A: No. I had a belief that our ordinance was reasonable and that the State Supreme Court should determine whether our ordinance was reasonable, which is an ordinance saying that there should be no new residences in the flood plain.
> Q: Is that your understanding -
> A: I thought that was a reasonable ordinance and that's--I didn't feel any need to do further investigation. It just made sense to me, so, I thing that was the principle that was being tested.

App. at 5583-84. As another example, Board member Welsh testified that he voted to authorize the Solicitor's opposition to Levin's application before the ZHB because of Welsh's concerns about public health issues. When asked whether he relied on the Solicitor's advice in voting to oppose the application, Welsh testified:

> I think it was the description of the general conditions of the site as Steve outlined them and the feeling on the part of the supervisors that if we didn't object to this one, you know, we're saying, okay, you can just do it everywhere. You have to be somewhat consistent, I mean, and one of the issues that's involved here is what happens when all of those septic systems flood and these things. I mean, there are major issues that aren't just the level of the site as it sits right there.

App. at 3549.

Given these legitimate concerns, we conclude that Levin's abuse of process claim is without merit and the district court's grant of summary judgment to the Township on that claim was proper.

C. Civil Conspiracy.

[4] Levin alleged a state-law civil conspiracy claim against the Township, the Board of Supervisors, the Zoning Hearing Board and the Solicitors. "In Pennsylvania, to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *General Refractories v. Fireman's Fund Ins. Co.*, 337 F.3d 297, 313 (3d Cir.2003) (citation and internal quotations omitted). Moreover,

> the established rule is that a cause of action for civil conspiracy requires a separate underlying tort as a predicate for liability. Thus, one cannot sue a group of defendants for conspiring to engage in conduct that would not be actionable against an individual defendant. Instead, actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor.

*In re: Orthopedic Bone Screw Prods. Liab. Litig.,* 193 F.3d 781, 789 (3d Cir.1999) (citations and internal quotations omitted).

**\*\*14** We are hard-pressed to understand Levin's civil conspiracy claim. He alludes to the abuse of process claim and the alleged delays in issuing permits, but then shifts to a discussion of the Township's Open Space Plan. Thus, we suppose that he is arguing that there was a conspiracy involving all of the Township defendants to preserve his Property as open space in the Open Space Plan. His argument is as follows:

> The abuse of appeals process and permitting process were instituted in a deliberate attempt at all costs by the Township to preserve open space in the Township, specifically to preserve Levin's property as open space. Shortly before Levin purchased his Property and submitted his application for variance, **\*668** a $5.9 million bond issue to preserve open space was approved. The Township EAC drafted a plan to preserve Upper Makefield Township's farmland and open

90 Fed.Appx. 653                                                                                                           Page 14

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

space at the same time Levin appeared before the Zoning Hearing Board. The Plan was approved while Levin's application was pending. The Township's Open Space Plan identifies Levin's Property as potentially being part of the Plan. The Open Space Plan also advocates that the Township protect open space within the Township through "non-acquisition based methods." Board Supervisors demonstrated how the Township has used non-acquisition based methods to preserve open space. The Township engaged in a course of action that it thought would "wear-down" Levin to the point that he would be willing to talk with the Township about selling the Property to the Township and/or that he would abandon his attempts to construct his proposed home.

Levin's Br. at 38-39. All of this "evidence," says Levin, presents a genuine issue of material fact and therefore precludes the grant of summary judgment in favor of the Township. However, Levin's argument is pure conjecture.

It is undisputed that the Open Space Plan was not adopted until six months after the Board of Supervisors decided to oppose Levin's request for a variance. Moreover, the Environmental Advisory Committee, which drew-up and developed the Plan, is an advisory counsel to the Board of Supervisors. Its actions are not Township policy unless and until those actions are adopted by the Board of Supervisors. Significantly, Levin has not produced any evidence that the Board decided to adopt the Open Space Plan in an effort to thwart Levin's attempt to build his house divorced from proper consideration of safety. And, Levin has produced no evidence that there is a link between the Board's decision to oppose Levin's variance request and its decision to adopt the Open Space Plan.

Further, the Open Space Plan does not identify Levin's Property as part of the Plan. Certain sections of the Plan do identify "those natural resources deserving of protection," but Levin's Property, consisting of two separate tax parcels, is not identified among those natural resources. Levin claims that the following language from the Plan targets his Property:

**\*\*15** As another outgrowth of the work done on part of the Plan, Upper Makefield Township is reviewing the possibility of undertaking a program to acquire or permanently protect the many tiny lots of land located between River Road and the Delaware River. It is felt that there riparian buffer properties play an important role in maintaining the ecosystem of the riverfront as well as ensuring at lease the visual access to river along the highly traveled river road corridor.

App. at 3107. However, Levin's Property is not referenced by name or tax parcel in this paragraph. Moreover, the Plan talks about pieces of property located between River Road and the Delaware River. Only a portion of Levin's Property is between River Road and the Delaware River. The remainder of the Property is on the other side of River Road and his proposed construction was on that side of River Road. At most, only a portion of Levin's Property may have been subject to the Open Space Plan. The portion on which he wants to build is not.

In addition, the $5.9 million bond issue to preserve open space was the subject of a voter referendum that received voter approval. Therefore, the bond issue can not be used as evidence of a conspiracy among the Township officials given that it **\*669** was action taken by a majority of the Township's voters. Finally, Levin's Property was never taken by the Township for open space.

In sum, Levin's allegation that there was a civil conspiracy whose underlying tort was the institution of the Open Space Plan is meritless.

IV.

Accordingly, when all is said and done, and all the dust has settled this suit appears to be little more than a resident's inability to understand why the Township might not think it prudent land use planning to allow someone to build a home in a flood plain. Accordingly, for all of the above reasons, we will affirm the district court.

90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

90 Fed.Appx. 653                                                                                                                Page 15
90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.))
**(Cite as: 90 Fed.Appx. 653, 2004 WL 449189 (3rd Cir.(Pa.)))**

- 03-1860  (Docket)             (Mar. 31, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



112 Fed.Appx. 185

Page 1

112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.))

(Cite as: 112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.)))

H

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
THORNBURY NOBLE, LTD. Appellant,
v.
THORNBURY TOWNSHIP, et al.
No. 03-4476.

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
Sept. 28, 2004.
Decided Oct. 18, 2004.

**Background:** Landowner who was denied a zoning change sued township, alleging, inter alia, a substantive due process violation. The United States District Court for the Eastern District of Pennsylvania, Thomas N. O'Neill, J., entered judgment against the landowner, and the landowner appealed.

**Holding:** The Court of Appeals, Fuentes, Circuit Judge, held that, even if township zoning board privileged the zoning request of another applicant, the board's actions still did not rise to a level shocking the conscience.
Affirmed.

West Headnotes

**Constitutional Law** ⚔══278.2(1)
92k278.2(1) Most Cited Cases

**Zoning and Planning** ⚔══156
414k156 Most Cited Cases
Even if a township zoning board privileged the rezoning request of another applicant over the plaintiff landowner's request in exchange for the other applicant's $600,000 contribution to the township for the purchase of open space, the board's actions still did not rise to the level of shocking the conscience, so as to violate the landowner's substantive due process rights; it was well-settled that the preservation of open spaces was a legitimate municipal goal. U.S.C.A. Const.Amend. 14.

*186 On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 99-6460). District Judge: Honorable Thomas N. O'Neill.

Mary Ann Rossi, Macelree Harvey Ltd., West Chester, PA, for Appellant.

Craig A. Styer, Fox Rothschild LLP, Andrew J. Bellwoar, Siana, Bellwoar & McAndrew, LLP, Exton, PA, Walter F. Kawalec III, Marshall, Dennehey, Warner, Coleman & Goggin, Cherry Hill, NJ, for Appellees.

Before RENDELL, FUENTES, and SMITH, Circuit Judges.

OPINION OF THE COURT

FUENTES, Circuit Judge.

**\*\*1** Appellant Thornbury Noble ("Noble") is the owner of a property in Thornbury Township, Chester County ("the Township") known as "Thornbury Commons" ("the Property"). Noble had hoped to convince Thornbury Township Board of Supervisors ("the Board") to rezone the Property

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 Fed.Appx. 185                                                                                                    Page 2
112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.))
**(Cite as: 112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.)))**

to allow for the construction of a box-shaped supermarket, but was unsuccessful. The Board, however, did grant another developer, Waters & Associates ("Waters"), the zoning changes necessary to build a supermarket at another site in the Township. Noble contends that Waters' zoning request was approved more quickly because Waters agreed to make a $600,000 contribution to the Township for the purchase of open space. Noble filed a four count complaint in the Eastern District of Pennsylvania against the Township, the Board, and members of the Board in their individual and official capacities (collectively referred to as "the Defendants"), which included a claim that Noble's substantive due process rights pursuant to 42 U.S.C. § 1983 had been violated. [FN1] Through a series of decisions, the District Court dismissed all the counts *187 in the complaint. The substantive due process claim is what is before us on appeal. [FN2] We affirm the decision of the District Court because there is no genuine issue of material fact as to whether the actions of Defendants shock the conscience, even when viewed in the light most favorable to the plaintiff.

> FN1. Section 1983 provides a cause of action for "any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of law." *Curley v. Klem,* 298 F.3d 271, 277 (3d Cir.2002). Noble's § 1983 claims here stem from alleged violations of substantive due process rights under the Fourteenth Amendment. The complaint also alleged: a violation of the Pennsylvania Municipalities Planning Code (Count II); a regulatory taking (Count III), and a claim for intentional interference with prospective contract (Count IV).
>
> FN2. The four issues Noble raised on appeal are all related to the substantive due process claim.

### I. Factual and Procedural Background

The facts and evidence are adequately set forth in the District Court opinion, thus only the barest recitation is required here. Thornbury Noble, a limited partnership, is the owner of the Property in the Township. The Township is governed by the Board, a five member elected body. The Township has enacted a zoning ordinance which governs development in the Township. In November 1997, Noble sought to bring a supermarket to the property. A few years earlier, Noble had sought and received permission to develop an L-shaped retail center. To build the desired supermarket, however, the Property would have to be rezoned to permit a box-shaped building. While Noble was attempting to convince the Board to make the zoning changes, Waters was also trying to rezone a piece of property to permit the building of a shopping center that would include a supermarket. During a meeting to discuss Noble's zoning request, a Board member asked Noble's representative if he had any interest in making a voluntary contribution to help the Township acquire open space to compensate for the loss of residential zoning. The representative responded that a contribution would be considered if there were an ordinance asking for such a contribution. Waters, however, contributed $600,000 to the Township for the express purpose of purchasing additional open space. There was evidence that at least one Board member believed only one supermarket would get built and at least one Board member wanted the Waters supermarket built first. The Board approved the zoning changes requested by Waters. While Noble was fighting to have its zoning changes adopted, it lost two supermarket deals. The District Court originally dismissed the § 1983 claims against the individual Defendants in their official capacities, but otherwise denied the Defendants' motions for summary judgment with respect to Count I. The Defendants, however, renewed their motions for summary judgment after this Court handed down *United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003). The District Court concluded that the actions of the Defendants did not meet the shock the conscience standard laid out in *United Artists* for making out a successful substantive due process claim in a land-use setting.

### II. Standard of Review

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 Fed.Appx. 185                                                                                                           Page 3
112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.))
**(Cite as: 112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.)))**

**\*\*2** When reviewing a grant or denial of summary judgment, "we apply the same test employed by the District Court under Federal Rule of Civil Procedure 56(c)." *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.,* 343 F.3d 669, 679-80 (3d Cir.2003). Thus, a District Court's grant of summary judgment must be affirmed only if it appears that there is no genuine issue as to any material fact and that Appellees are entitled to a judgment as a matter of law. Id. In evaluating the evidence, we take the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *Id.*

**\*188 III. Discussion**
Noble argues that there are genuine issues of material fact as to whether the Defendants violated Noble's substantive due process rights. "The substantive component of the Due Process Clause can only be violated by governmental employees when their conduct amounts to an abuse of official power that 'shocks the conscience.' " *Fagan v. City of Vineland,* 22 F.3d 1296, 1303 (3d Cir.1994) (en banc). Under Third Circuit law, the "shock the conscience" standard applies to cases involving substantive due process claims challenging municipal land use decisions. *United Artists,* 316 F.3d at 401. "While the measure of what is conscience-shocking is no calibrated yard stick," *County of Sacramento v. Lewis,* 523 U.S. 833, 847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), we do know that conscience shocking actions would violate the "decencies of civilized conduct," *Rochin v. California,* 342 U.S. 165, 172- 73, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and would be so " 'brutal' and 'offensive' that [they] did not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957).

The most nefarious interpretation of the events that transpired before the Board would be that the Board privileged Water's zoning request over Noble's in exchange for Water's $600,000 contribution to the Township for the purchase of open space. Assuming that is the case, the actions of the Board would still not rise to the level of shocking the conscience because it is well-settled that the preservation of open spaces is a legitimate municipal goal. *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), overruled on other grounds by *First English Evangelical Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987). Because Defendants' actions do not constitute an abuse of power that shocks the conscience, Noble's substantive due process rights have not been violated.

Noble makes much of the District Court's observation that the actions of the Board were not undertaken for personal gain. Contrary to Noble's contention, the District Court did not conclude that only actions that personally benefit the Board members would meet the shock the conscience test. Instead, the District Court's observation suggested, correctly so, that soliciting a $600,000 contribution to line the pockets of the Board members is an act different from soliciting a $600,000 contribution to secure open space. Since the contribution was expressly to pursue a legitimate town goal, neither the Board's motives nor their actions were improper. [FN3] Thus, we cannot find in the instant case that the Board's actions were unconstitutional. [FN4]

> FN3. Noble similarly misconstrues the District Court's observations regarding the Board's motive. Because the Board's motives were legitimate, it was not necessary for the District Court to decide whether an improper motive in the instant case would have transformed an otherwise legitimate action into one that shocked the conscience.
>
> FN4. Noble also raises on appeal the issue of qualified immunity for the individual Board members. We need not address the issue of qualified immunity because no constitutional violation occurred.

**\*\*3** We have considered all of the other arguments advanced by the parties and conclude that they are without merit and no further discussion is necessary. Accordingly, the judgment of the district court will be affirmed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

112 Fed.Appx. 185

Page 4

112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.))

**(Cite as: 112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.)))**

112 Fed.Appx. 185, 2004 WL 2341811 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

- 03-4476 (Docket) (Nov. 21, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.