## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FRANK E. ACIERNO, CHRISTIANA TOWN CENTER, LLC, a Delaware limited liability company, 395 ASSOCIATES, LLC, a Delaware limited liability company, ESTATE HOMES, INC., a Delaware corporation, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 04-1376 |
| GEORGE O. HAGGERTY, individually and in his official capacity as Assistant General Manager of the New Castle County Department of Land Use, SCOTT G. WILCOX, individually and in his official capacity as a First Assistant County Attorney, TIMOTHY P. MULLANEY, individually and in his capacity as New Castle County Attorney, CHARLES L. BAKER, individually and in his capacity as General Manager of the New Castle County Department of Land Use, JAMES H. EDWARDS individually and in his capacity as Inspections Manager and Licensing Division Manager of the New Castle County Department of Land Use, and SHERRY L. FREEBERY, in her individual capacity as Chief Administrative Officer of New Castle County, and NEW CASTLE COUNTY, a political subdivision of the State of Delaware, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>COMPENDIUM OF UNREPORTED CASES FOR THE INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR TO STAY THE PROCEEDINGS</u>

Vol 1 (Tabs 1 & 2)

# TABLE OF CONTENTS

TAB

*Allen Neurosurgical Associates, Inc. v. Lehigh Valley Health Network,*
    No. Civ. A. 99-4653, 2001 WL 41143 (E.D. Pa. Jan. 18, 2001) . . . . . . . . . . . . . . . . . . . . 1

*Barber v. City of Lewes,*
    No. 95C-08-006, 1997 WL 127951 (Del. Super. Ct. Jan. 31, 1997) . . . . . . . . . . . . . . . . 2

*Cardillo v. The Council of South Bethany,*
    C.A. No. 86A-NO-2, 1991 WL 113632 (Del. Super. Ct. June 11, 1991) . . . . . . . . . . . . 3

*Christiana Town Center, LLC, v. New Castle County,*
    No. 3342004, 2004 WL 2921830 (Del. Dec. 16, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Christiana Town Center, LLC, v. New Castle County,*
    C.A. No. 03A-07-008, 2004 WL 1551457 (Del. Super. Ct. July 7, 2004) . . . . . . . . . . . 5

*Christiana Town Center, LLC, v. New Castle County,*
    No. Civ. 20215, 2003 WL 21488200 (Del. Ch. June 23, 2003) . . . . . . . . . . . . . . . . . . 6

*Citizens for Smyrna-Clayton First v. The Town of Smyrna,*
    C.A. No. 1545-K, 2002 WL 31926613 (Del. Ch. Dec. 24, 2002) . . . . . . . . . . . . . . . . . 7

*Dianese, Inc. v. Comm. of Pennsylvania,*
    C.A. No. 01-2520, 2002 WL 1340316 (E.D. Pa. June 19, 2002) . . . . . . . . . . . . . . . . . 8

*Healthguard of Lancaster, Inc. v. Gartenberg,*
    C.A. No. 02-2611, 2004 WL 632722 (E.D. Pa. March 5, 2004) . . . . . . . . . . . . . . . . . . 9

*Highway Materials, Inc. v. Whitemarsh Tp., Montgomery County, Pennsylvania,*
    C.A. No. 02-3212, 2004 WL 2220974 (E.D. Pa. Oct. 4, 2004) . . . . . . . . . . . . . . . . . . 10

*Izquierdo v. Sills,*
    No. 15505-NC, 2004 WL 2290811 (Del. Ch. June 29, 2004) . . . . . . . . . . . . . . . . . . . 11

*Jones v. City of Boston,*
    No. Civ. 03-12130, 2004 WL 1534206 (D. Mass. July 9, 2004) . . . . . . . . . . . . . . . . . 12

*Kotler v. Bd. of Medical Practice,*
    No. 92A-03-004, 1993 WL 54587 (Del. Super. Ct. Jan. 19, 1993) . . . . . . . . . . . . . . . 13

*Lynch v. The City of Rehoboth,*
    C.A. No. 2266-S (Del. Ch. Apr. 21, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Perma-Vault Safe Co. v. Keep-It-Safe, Inc.,*
  No. Civ. A. 02-7960, 2004 WL 603392 (E.D. Pa. March 25, 2004) . . . . . . . . . . . . . . . 15

*Robert C. Robinson v. Limerick Tp.,*
  No. Civ. A. 04-3758, 2005 WL 627880 (E.D. Pa. March 18, 2005) . . . . . . . . . . . . . . . 16

*Scott v. City of Harrington,*
  1987 WL 11461 (Del. Super. Ct. May 15, 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Supra Medical Corp. v. Baker,*
  Civ A. No. 95-556, 1996 WL 571544 (D. Del. Sept. 26, 1996) . . . . . . . . . . . . . . . . . . 18

*Thornbury Noble, Ltd, v. Thornbury Tp.,*
  No. Civ. A. 99-6460, 2000 WL 1358483 (E.D. Pa. Sept. 20, 2000) . . . . . . . . . . . . . . . 19

*Town of South Bethany v. Cat Hill Water Co., Ltd.,*
  C.A. No. 93C-04-004, 1997 WL 27108 (Del Super. Ct. Jan. 7, 1997) . . . . . . . . . . . . . 20

*Truvia v. Julien,*
  No. Civ. A. 04-0680, 2005 WL 83246 (E.D. La. Jan. 13, 2005) . . . . . . . . . . . . . . . . . . 21

*Wilmington Hospitality, LLC v. New Castle County,*
  No. Civ.A. 03C-07-213, 2004 WL 2419157 (Del. Super. Ct. Oct. 8, 2004) . . . . . . . . . 22

1

Westlaw.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: 2001 WL 41143 (E.D.Pa.))**

C

United States District Court, E.D. Pennsylvania.

ALLEN NEUROSURGICAL ASSOCIATES, INC.,
v.
LEHIGH VALLEY HEALTH NETWORK, et al.

No. CIV. A. 99-4653.

Jan. 18, 2001.

*MEMORANDUM*

O'NEILL.

*1 The Amended Complaint makes claims under RICO, the Lanham Act, and state law. Presently before me is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motion will be GRANTED.

I. BACKGROUND

This case arises out of a staffing/credentialing dispute between the physicians that comprise plaintiff Allen Neurosurgical Associates, Inc. ("ANA") and defendant Lehigh Valley Health Network, including certain hospital subsidiaries, officers, and employees (collectively the "Network").

Over the years, ANA's neorosurgeons provided free trauma coverage in the Network's Lehigh Valley Hospital. Amended Complaint ¶¶ 103-04. On March 5, 1999, however, ANA notified the Network that it intended to cease coverage of the trauma service. *Id.* ¶ 103. ANA alleges that in covering both NeuroTrauma and Emergency Medicine it was "devoting 40% of its neurosurgeon resources without compensation." *Id.* On the other hand, the Network's "ability to offer neurosurgical services in the trauma center" generated at least $4 million in annual revenue. *Id.* ¶ 104. Defendants responded by threatening to terminate

ANA's neurosurgeons' clinical privileges and medical staff memberships "for failing to perform according to the ByLaws [sic] of the Common Medical Staff." *Id.* ¶ 105. Defendants "falsely represented ... that the Bylaws [ ] required all neurosurgeons on staff to cover trauma for free." *Id.*

The parties attempted to negotiate a "mutually acceptable solution," but the attempt failed. *Id.* ¶ 109. Subsequently, defendants instituted a "campaign" to "conquer" ANA. *Id.* ¶ 110. This campaign consisted of: 1) publically characterizing ANA's withdraw of trauma coverage as being based on "compensation" issues; 2) spreading the rumor that ANA physicians were no longer on staff; 3) misleading new neurosurgery hires by falsely informing them that they were eligible for appointment to the faculty of Hershey Medical School; 4) informing the medical staff that it should not refer cases to ANA; 5) refusing to refer callers on the Network's physician referral line to ANA; 6) unlawfully intercepting, withholding and converting $70,000 originally sent to ANA as payment for research activities by an unrelated drug company; and 7) "co-opting" one of the ANA physicians, defendant Dr. Mark C. Lester, to breach his fiduciary duties. *Id.* ¶ 94-102, 111.

The Amended Complaint further alleges that defendants' actions against ANA were part of a larger "attempt to maximize power, resources and revenues and grow into one of the largest health care facilities in Pennsylvania." *Id.* ¶ 31. In pursuit of this goal, defendants pursued a number of "schemes," including: 1) an "exclusive credentialing" scheme that required physicians who had staff membership and/or were seeking staff membership to agree to admit patients exclusively or principally to the Network's hospitals (*id.* ¶¶ 39- 53); 2) a "secret medical staff classification scheme" that placed physicians into categories based upon their relationship with the Network and then gave preferential treatment to the physicians in some of the categories (*id.* ¶¶ 55-72); and 3) a "secret Staff Development Plan" that rewarded "loyal" physicians with "manpower slots," i.e., the ability to add new

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: 2001 WL 41143 (E.D.Pa.))**

partners or associates to the physicians' practice at the hospital (*id.* ¶¶ 75-82).

The Amended Complaint makes claims under RICO (Counts I and II) the Lanham Act (Count VI), and state law (Counts III, IV, V, VII, VIII, IX, and X).

## II. DISCUSSION
### A. Standard of Review

*2 A motion to dismiss under Fed.R.Civ.P. 12(b)(6) does not address the merits of a case but rather tests the legal sufficiency of the complaint. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). I may dismiss the complaint only if I determine that no relief can be granted under any set of facts that could be proved consistent with the allegations. *See Hishohn v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Nami,* 82 F.3d at 65. I must accept all well-plead factual allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). However, I need not accept bald assertions, unwarranted inferences, or legal conclusions. *See Maio v. Aetna, Inc.,* 221 F.3d 472, 485 n. 12 (3d Cir.2000); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). "[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998).

### B. RICO Claims

The RICO statute, 18 U.S.C. § 1961 et seq., makes it unlawful to: 1) conduct or participate, directly or indirectly, in an enterprise that engages in a pattern of racketeering activity; or 2) conspire to conduct or participate in such an enterprise. *See 18 U.S.C. § 1962(c) and (d).* A RICO "enterprise" can be "virtually any de facto or de jure association." *Seville Indus.*

*Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 789 (3d Cir.1984). A "pattern of racketeering activity" is statutorily defined to "require[ ] at least two acts of racketeering activity." *See 18 U.S.C. § 1961(5).* Such activity includes mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and a long list of other specifically enumerated "predicate acts." *See 18 U.S.C. § 1961(1); Annulli v. Panikkar,* 200 F.3d 189, 200 (3d Cir.1999) (noting that § 1961(1)'s "list of acts constituting predicate acts of racketeering is exhaustive."). RICO is primarily a criminal statute, but it provides treble damages for "any person injured in his business or property by reason of a violation of [the criminal provisions]." *See 18 U.S.C. § 1964(d).*

ANA alleges violations of §§ 1962(c) and (d). In order to state a claim for a violation of either provision, plaintiff must adequately plead a pattern of racketeering activity, i.e., at least two predicate acts of racketeering. *See 18 U.S.C. § 1961(5).* I conclude, however, that the Amended Complaint fails to adequately plead a single act of racketeering as defined in § 1961(1) and the RICO counts must therefore be dismissed.

### 1. Allegations of Conduct that is Not Racketeering Activity

*3 The Amended Complaint makes a host of allegations regarding conduct that, even if proven true, does not constitute racketeering activity. Plaintiff claims that defendants violated: 1) the "federal and state Medicare, Medicaid and insurance prohibitions against fraud and abuse known as the Anti Kickback laws, and the Anti Referral laws known as the Stark Laws" (Amended Complaint ¶ 30a); 2) the "freedom of choice provisions of both federal and state Medicare and Medicaid law" (*id.* ¶ 30b); and 3) the "Antitrust laws of the United States" (*id.* ¶ 30c). None of these acts are included in the specific enumeration of predicate acts contained in § 1961(1), and the Court of Appeals has emphasized that that list is "exhaustive." *See Annulli,* 200 F.3d at 200. Therefore, these allegations do not support plaintiff's claim that defendants engaged in a pattern of racketeering activity.

### 2. Allegations of Mail and Wire Fraud that are not Plead with Particularity

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
(Cite as: 2001 WL 41143 (E.D.Pa.))

Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." When the predicate acts in a RICO complaint sound in fraud, Rule 9(b) applies. See *Rose v. Bartle,* 871 F.2d 331, 356 n. 33 (3d Cir.1989). "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." *Seville,* 742 F.2d at 791. This generally requires a plaintiff to plead the "who, what, when, and where details of the alleged fraud." *United States ex rel. Waris v. Staff Builders, Inc.,* No. 96-1969, 1999 WL 179745, at *4 (E.D.Pa. Mar.4, 1999). While a complaint need not set out "precise words," it should adequately describe the nature and subject of an alleged misrepresentation. See *Seville,* 742 F.2d at 791. Nonetheless, courts should not focus "too narrow[ly]" on the particularity language of Rule 9(b) and should take into account the "general simplicity and flexibility contemplated by the rules." *Id.*

With these principles in mind, it is clear that most of the potential predicate acts listed in the RICO Case Statement [FN1] are not plead with the particularity required by Rule 9(b). [FN2] Plaintiff does not plead the "date, place or time" of the alleged misrepresentations, which, though not an absolute requirement under Rule 9(b), would "inject precision and some measure of substantiation" into the allegations. See *Seville,* 742 F.2d at 791. Nor does plaintiff plead "who made the representations" at issue. See *Saporito v. Combustion Eng'g,* 843 F.2d 666, 675 (3d Cir.1988), *cert. granted and judgment vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). Instead, plaintiff simply attributes the allegedly fraudulent communications to "the conspirators," which, given the number of corporate defendants, individual defendants, and John Doe defendants, could be any one of dozens of people. Similarly, plaintiff does not plead "who received the allegedly fraudulent information." *Id.; Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at *4 (E.D.Pa. Dec.1, 1999). Given the breadth of the allegations, the universe of potential recipients is exponentially larger than the universe of potential speakers. Finally, plaintiff pleads

nothing of the content of each alleged misrepresentation. *Saporito,* 843 F.2d at 675 (allegations should include "the general content of the representations"); *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) (allegations of mail fraud should contain the "precise content of each particular mailing"); *Smith,* 1999 WL 1081065, at *5 (same).

FN1. The RICO Case Statement is a pleading that may be considered part of the operative complaint for the purposes of a motion to dismiss. See *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993); *Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at *3-*5 (E.D.Pa. Dec.1, 1999).

FN2. The relevant portions of the RICO Case Statement read:
a. List the alleged predicate acts and the specific statutes that were allegedly violated ... Correspondence, interstate telephone communications, facsimile and/or email communication concerning:
--The conspirators [sic] false characterizations of ANA's actions in withdrawing from NeuroTrauma as being based on "compensation" issues. Despite being warned by ANA's counsel that these statements were false and defamatory, the conspirators continued those false representations through interstate wire.
--The conspirators [sic] false rumors that ANA physicians were no longer on staff. At least two of ANA [sic] patients were treated by Lester in his new capacity because those patients had been told that their ANA physicians were no longer on staff, and interstate mail and wire communications were generated as a result.
--The conspirators [sic] misleading of new neurosurgery hires by falsely informing them, through the interstate mails and wires, that they are eligible for appointment to the faculty of Hershey Medical School.
--The conspirators [sic] directing callers to the enterprise's physician referral line--an

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
(Cite as: 2001 WL 41143 (E.D.Pa.))

Page 4

interstate wire--away from ANA.

--The conspirators [sic] directing the approximately one hundred fifty physicians, including transmissions through the mail and wires, in the enterprise [sic] practice group subsidiary, LVPG, to not refer patients to ANA, no matter what the patient's need for expertise might be.

--The conspirator's [sic] unlawful interception, withholding and conversion of seventy thousand dollars ($70,000) originally sent to ANA as payment for research activities by unrelated drug companies, including the mail and wire communications attendant thereto.

In addition to the acts of wire and mail fraud recited above, the mail and interstate wire fraud has occurred through mailings of correspondence, bills and payments between and among various lawyers representing defendants, receipt of correspondence to and from defendants, the transmission of the ByLaws [sic] of The Common Medical Staff and correspondence regarding the ByLaws [sic], applications for manpower slots, grants and/or denials of manpower slots, and correspondence regarding the manpower slots, telephone calls and correspondence regarding the payment of Medical Staff dues, transmission of correspondence regarding the internal "termination" procedure, transmissions of Insurance [sic], Medicare and Medcaid payments, transmission of benefits and reimbursements to the secret classifications of physicians and other documents regarding the benefits those secret classifications physicians have received, the transmission of the staff development plan, correspondence regarding the staff development plan and/or drafts of the named documents thereof through the United States Mails and courier by defendants, or at their instruction, and interstate telephone communications, facsimile and/or email communication between and among the defendants, and members of the Medical Staff and those who attempted to become members of the Medical Staff.

See RICO Case Statement at 5-6.

In short, plaintiff is not pleading "acts" of mail and wire fraud. Rather, the Amended Complaint and RICO Case Statement allege a set of facts which, drawing all inferences in plaintiff's favor, support the conclusion that defendants acted with some animus towards plaintiff. Plaintiff assumes that at some point defendants used the mail and interstate wires in acting upon that animus in a manner that constituted fraud. The RICO Case Statement then lists every conceivable scenario under which this may have happened. Where the Rule 9(b) standard applies, plaintiff is not entitled to the inference that the essential elements of mail and wire fraud occurred; plaintiff must plead those essential elements with particularity.

3. Allegations of Mail Fraud that are Plead with Particularity

*4 Plaintiff does plead three potential acts of mail fraud with sufficient particularity to pass the Rule 9(b) test: 1) the April 2, 1999 letter from defendant Dr. David M. Caccese to plaintiff; 2) the April 14, 1999 letter from defendant Dr. Robert J. Laskowski to Drs. Chovanes, Morrow, Salotta, and Elias of ANA; and 3) the letter of June 30, 1999 from defendant John W. Hart to Drs. Chovanes and Morrow. See Amended Complaint ¶¶ 98 and 105; RICO Case Statement at 5. I nonetheless conclude that these mailings were not part of a scheme or artifice to defraud within the meaning of the mail fraud statute and/or did not induce reliance, which is required when mail fraud serves as a predicate act under the RICO statute.

The mail fraud statute provides in relevant part:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purposes of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned not more than five years, or both.

See 18 U.S.C. § 1341.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: 2001 WL 41143 (E.D.Pa.))**

In interpreting § 1341, the Court of Appeals has held that: "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1415 (3d Cir.1991). "The scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies the deprivation of something of value by trick, deceit, chicane or overreaching." *Id.* (internal quotes and citations omitted). Moreover, a person who knows that a representation is untrue cannot claim that the misrepresentation defrauded him. *See Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 746-47 (3d Cir.1996); *Reynolds v. East Dyer Dev. Co.,* 882 F.2d 1249, 1253 (7th Cir.1989).

Unlike common law fraud, reliance is not an element of mail fraud. *See United States v. Sanders,* 893 F.2d 133, 138 (7th Cir.1990). However, most courts now agree that reliance must be shown when mail fraud is a predicate act in a civil RICO case. *See Summit Properties, Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 559 (5th Cir.2000); *Chisolm v. TranSouth Fin. Corp.,* 95 F.3d 331, 337 (4th Cir.1996); *Appletree Square I v. W.R. Grace & Co.,* 29 F.3d 1283, 1286 (8th Cir.1994); *Central Distribs. of Beer, Inc. v. Conn.,* 5 F.3d 181, 184 (6th Cir.1993); *Pelletier v. Zweifel,* 921 F.2d 1465, 1499-1500 (11th Cir.1991); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1311 (2d Cir.1990). [FN3] This additional requirement derives from the proximate cause requirement of civil RICO, which limits recovery in civil RICO cases to "[a]ny person injured in his business or property *by reason of* a violation of [the criminal provisions]." *See* 18 U.S.C. § 1964(c) (emphasis added). As the *Summit Properties* Court put it: "[T]he government can punish unsuccessful schemes to defraud because the underlying mail fraud violation does not require reliance, but a civil plaintiff 'faces an additional hurdle' and must show an injury caused 'by reason of' the violation ... reliance is necessary to establish proximate cause under RICO." *Summit Properties,* 214 F.3d at 559. *See also Chisolm,* 95 F.3d at 337 ("[O]ur rule that reliance be shown in civil RICO fraud actions does not also dictate that the fraud be the sole legal cause of the plaintiff's injury, so

long as it is a legal cause. The only caveat is that, where fraud is alleged as a proximate cause of the injury, the fraud must be a 'classic' one. In other words, the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation.").

> FN3. I note that *Summit Properties,* 214 F.3d at 560 n. 16, claims that the Third Circuit in *Ideal Dairy* and the Seventh Circuit in *Reynolds* also adopted the reliance requirement in civil RICO cases. I disagree. In my view, those cases are better read as standing for the proposition that a person cannot be defrauded by a representations that he knows to be untrue. *See Ideal Dairy,* 90 F.3d at 746-47 (holding that "no fraudulent act occurred" where plaintiff knew "early in the relationship" that defendant was overcharging on contract price for dairy products); *Reynolds,* 882 F.2d at 1254 (holding that no mail or wire fraud occurred where defendant failed to disclose a soil problem on property purchased by plaintiffs but plaintiffs already knew of the problem). There is a distinction between *Ideal Dairy* and *Reynolds* on the one hand and the *Summit Properties* line of cases on the other, although it admittedly is a fine one. *Ideal Dairy* and *Reynolds* are based on the nature of fraud and ask whether there was a misrepresentation. The *Summit Properties* line of cases are based on the proximate causation requirement in RICO and, conceding that there was a misrepresentation, ask whether plaintiffs' injuries were proximately caused by the misrepresentation. This distinction is important because *Ideal Diary* and *Reynolds* arguably could be applied generally to the mail and wire fraud statutes, but the *Summit Properties* line of cases are limited to the civil RICO context.

**\*5** Applying these standards to the predicate acts that were plead with particularity, it is clear that there was no scheme or artifice to defraud and/or there was no reliance. The April 2nd and June 30th letters allegedly "falsely represented ... that the Bylaws of the Common Medical Staff required all neurosurgeons on staff to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: 2001 WL 41143 (E.D.Pa.))**

cover trauma for free." Amended Complaint ¶ 50. In other words, plaintiff alleges that defendants asserted an incorrect legal interpretation of a public document. That interpretation, even if obviously wrong, was not a misrepresentation of fact and could not have been reasonably calculated to deceive the physicians at ANA. A person of ordinary prudence would be expected to seek independent legal counsel before relying on such an interpretation. Moreover, plaintiff obviously did receive such independent counsel and as a result never accepted or relied upon that interpretation. ANA disputed that interpretation of the bylaws at the time and implicitly continues to dispute it in these proceedings.

The April 14th letter was equally benign. The contents of the letter requested that ANA agree to continue trauma coverage for at least one year (*id.* ¶ 98), but ANA does not claim that the contents constituted fraud. Rather, plaintiff argues that the letter was fraudulent because a "blind copy" was sent to defendant Dr. Lester, who was both a partner at ANA and Divisional Chief of Neurological Surgery at one of the Network's hospitals at the time. I will assume without deciding that a blind copy of a letter might constitute fraud in some circumstances, particularly where the letter purports to be a confidential communication. In this instance, however, ANA should have anticipated that Dr. Lester, as Divisional Chief, would have either received a copy of the letter or would have been apprised of its contents. At most, the blind copy of the letter was part of defendants' alleged attempts to "co-opt" Dr. Lester into breaching his fiduciary duties. However, a breach of fiduciary duties does not constitute a scheme to defraud within the meaning of the mail fraud statute. *See Manion v. Freund,* 967 F.2d 1183, 1186 (8th Cir.1992); *Bonton v. Archer Chrysler Plymouth, Inc.,* 889 F.Supp. 995, 1002-03 (S.D.Tex.1995).

**\*6** Therefore, the allegations regarding the April 2nd, April 14th, and June 30th letters fail to state a claim for violations of the mail fraud statute and do not support plaintiff's claim that defendants engaged in a pattern of racketeering activity.

4. Commercial Bribery

The final potential predicate act that plaintiff alleges is the state law crime of commercial bribery. I conclude, however, that plaintiff has not alleged any conduct that could be construed to be commercial bribery.

Section 1961(1) of the RICO statute defines "racketeering activity" to include "any act or threat involving ... bribery ... which is chargeable under State law and punishable by imprisonment for more than one year. *See* 18 U.S.C. § 1961(1)(A). Under Pennsylvania law, commercial bribery is a second degree misdemeanor. *See* 18 Pa.C.S.A. § 4108. As such, it is punishable by up to two years of imprisonment. *See* 18 Pa.C.S.A. § 106(b)(7). Therefore, the Pennsylvania crime of commercial bribery qualifies as a predicate act of racketeering under RICO. *See Westlake Plastic Co. v. O'Donnell,* 182 F.R.D. 165, 170 (E.D.Pa.1998).

Plaintiff specifically alleges that defendants violated 18 Pa.C.S.A. § 4108(b), which provides:
> A person who holds himself out to the public as being engaged in the business of making disinterested selection, appraisal, or criticism of commodities or services commits a misdemeanor of the second degree if he solicits, accepts or agrees to accept any benefit to influence his selection, appraisal or criticism.

Plaintiff alleges that defendants' exclusive credentialing "scheme," which required physicians with staff membership to agree to admit patients exclusively or principally to the Network's hospitals, violated § 4108(b):
> The individual defendants have engaged in commercial bribery by accepting benefits that affect their purportedly disinterested selection or appraisals of various physicians services. The individual defendants and the enterprise hold themselves out to the public as disinterested in their selection of physicians for admittance to the Medical Staff. Yet the individual defendants have, at the same time, implemented their exclusive credentialing "pay to play" scheme, which provides them and the enterprise with all or most of the referrals generated by the Medical Staff, as well as the generation of all or most of the revenues used by the referring and referred physicians.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases  P 73,167, RICO Bus.Disp.Guide 10,004
(Cite as: 2001 WL 41143 (E.D.Pa.))

**\*7** *See* Amended Complaint ¶ 51.

Plaintiff's argument is similar to the argument rejected by the Court of Appeals in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 527-28 (3d Cir.1998). *Brokerage Concepts* was a RICO case brought by a Third Party Administrator ("TPA") against an HMO. The HMO had conditioned a pharmacy's membership in its provider network on the pharmacy's agreement to stop using an independent TPA and begin using the HMO's TPA services. *Id.* at 501. The independent TPA then brought antitrust, civil RICO, and intentional interference claims against the HMO. *Id.* A jury found the HMO liable on the RICO claims, but the Court of Appeals overturned the verdict because there was insufficient evidence that the HMO had committed any predicate acts of racketeering. *Id.* at 529.

One of the predicate acts found to have been committed by the jury but rejected by the Court of Appeals was commercial bribery under § 4108(b). The TPA argued that the HMO held itself out "as selecting providers disinterestedly, based solely on the quality of the provider." *Id.* at 528. The Court of Appeals disagreed:

> The "bottom line" is that U.S. Healthcare is not a disinterested appraiser of healthcare providers; it is an HMO. An HMO is designed to provide access to low-cost, good quality health care, at a profit for the HMO. Thus, while U.S. Healthcare is required by law to allow only qualified providers into its network, and chooses its providers from the set of qualified providers, it alone decides whom within that set to admit largely on the basis of a provider's willingness to furnish care at managed care rates. There is nothing disinterested about this process, and we find no evidence to support a finding that U.S. Healthcare represented to the public that the process was, in fact, disinterested.
> *Id.*

I conclude that this analysis is dispositive of plaintiff's commercial bribery claim in this case. The Network is not a disinterested appraiser of its hospitals' staff members. It has a legal and ethical duty to appoint qualified physicians, but it does so with other needs in mind, which, even for a non-profit corporation, includes revenue needs. Moreover, plaintiff does not allege, other than in the bald assertions quoted above (*see* Amended Complaint ¶ 51), that defendants held themselves out as being disinterested in their medical staff.

In addition, I think that there is another basis for holding § 4108(b) inapplicable in this case. By its explicit terms, § 4108(b) applies to a person who holds himself out as "being *engaged in the business* of making disinterested selection, appraisal, or criticism." *See* 18 Pa.C.S.A. § 4108(b) (emphasis added). This clause limits the application of § 4108(b) to persons whose primary business is making critical judgments, not persons who make critical judgments incident to some other business activity. The former category is relatively narrow. It might include, for example, food critics, art appraisers, and, possibly, certified public accountants. The latter category is as broad as the realm of economic activity. Defendants in this case clearly fall into the latter category. The Network is "engaged in the business" of providing healthcare. It is not "engaged in the business" of selecting staff members. Therefore, § 4108(b) simply does not apply to its activities.

**\*8** This reading of § 4108(b) is justified for two reasons. First, it is true to the plain language of the statute. The key word in § 4108(b) is "disinterested," which is not synonymous with "objective." A person "engaged in business" could never be "disinterested" in evaluating or selecting things that affect his business, but he could be objective. In this case, for example, the Network could never be disinterested in selecting physician staff members, though it could potentially make such selections based solely upon objective criteria. Second, this reading is consistent with the rule of lenity, which provides that criminal statutes should be strictly construed so as to give individuals fair warning of the criminal law and avoid due process problems. [FN4] *See generally United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

> FN4. The rule of lenity applies in this civil case because § 4108(b) is a criminal statute that is a predicate act of civil RICO by virtue

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases P 73,167, RICO Bus.Disp.Guide 10,004
(Cite as: 2001 WL 41143 (E.D.Pa.))

of 18 U.S.C. § 1961(1).

Plaintiff has failed to allege a set of facts that could be construed as constituting commercial bribery. Therefore, plaintiff has failed to allege any predicate acts of racketeering and the RICO claims must be dismissed.

C. Lanham Act Claim

Count VI of the complaint asserts a claim under Section 43(a) of the Lanham Act, which provides in relevant part:

> Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*See* 15 U.S.C. § 1125(a).

I conclude that plaintiff fails to state a claim for a violation of the Lanham Act because the statements complained of are not "commercial advertising or promotion" within the meaning of § 1125(a). The test of what constitutes commercial advertising or promotion was first enunciated by the Court of Appeals for the Fifth Circuit in *Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir.1996).* Under the *Seven-Up* test, commercial advertising or promotion consists of: 1) commercial speech; 2) by a defendant who is in commercial competition with the plaintiff; 3) for the purpose of influencing consumers to buy the defendant's goods or services; and 4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry. *Id.* at 1384. The *Seven-Up* test has since been adopted by other circuit courts and by the courts of this District. *See Proctor & Gamble, Co. v. Haugen, 222 F.3d 1262, 1273-74 (10th Cir.2000); Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 735 (9th* Cir.1999); *Peerless Heater Co. v. Mestek, Inc., No. 98-6532, 2000 WL 637082, at \*10 (E.D.Pa. May 11, 2000); Synygy, Inc. v. Scott-Levin, Inc., 51 F.Supp.2d 570, 576 (E.D.Pa.1999); J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.,* No. 96-5819 & 95-2179, *1997 WL 83766, at \*16 (E.D.Pa. Feb.24, 1997); Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co., No. 95-3997, 1995 WL 723186, at \*3 (E.D.Pa. Nov.14, 1995).*

The statements at issue in this case fail the second, third, and fourth prongs of the *Seven-Up* test: 1) they were not disseminated by plaintiff's commercial competitors; 2) they were not intended to influence consumers to use defendants' services; and 3) they were not sufficiently disseminated to the relevant purchasing public. None of the defendants, with the possible exception of Dr. Lester, are alleged to have been commercial competitors of the physicians at ANA. [FN5] Rather, the Network and the ANA physicians were in contractual privity. Similarly, the statements at issue may have been designed to harm ANA, but they were not designed to attract patients to the Network. Since the services offered by ANA and the Network are not fungible, harming the reputation of one does not automatically help the other. Finally, none of the statements at issue are alleged to have been sufficiently disseminated to the relevant purchasing public. At worst, plaintiff alleges that two patients were told that the ANA physicians were no longer on staff. *See* Amended Complaint ¶ 111b. Two patients does not constitute "sufficient dissemination" under the *Seven-Up* test. The only alleged conduct that could potentially constitute sufficient dissemination involves the physician referral line. However, plaintiff alleges that the Network stopped referring callers on the referral line to ANA. *See* Amended Complaint ¶ 111e. This is not a misrepresentation; it is a lack of endorsement that clearly is not commercial advertising or promotion.

> FN5. Dr. Lester was a neurosurgeon, but the actions plaintiff complains of were not taken in his capacity as a neurosurgeon. In fact, the gravamen of plaintiff's complaint against Dr. Lester is that he breached his fiduciary duty by acting in the best interests of the Network

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases  P 73,167, RICO Bus.Disp.Guide 10,004
**(Cite as: 2001 WL 41143 (E.D.Pa.))**

instead of acting as an ANA neurosurgeon.

**\*9** For these reasons, I conclude that the statements complained of were not commercial advertising or promotion and plaintiff has failed to state a claim for violation of the Lanham Act.

D. State Law Claims

Because the federal claims will be dismissed, I will not exercise jurisdiction over the state law claims in Counts III, IV, V, VII, VIII, IX, and X. *See* 28 U.S.C. § 1367(c)(3).

E. Leave to Amend

Fed.R.Civ.P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Plaintiff has not sought leave to amend the complaint. In previous cases, however, I have granted leave to amend *sua sponte* in RICO cases where I felt it was appropriate. *See, e.g., Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at \*6 (E.D.Pa. Dec.1, 1999).

This case does not warrant leave to amend for two reasons. First, plaintiff had an opportunity to refine his complaint by filing a RICO Case Statement, which I considered in ruling on this motion. Second, leave to amend can be denied on the basis of undue delay, bad faith, dilatory motive, prejudice, and futility. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). Granting leave to amend would be futile because plaintiff's claims are essentially state claims that are not predicate acts of racketeering under RICO. Therefore, leave to amend will be denied.

III. CONCLUSION

**\*10** At most, plaintiff complains of breach of contract, breach of fiduciary duties, and intentional interference with contract, state law claims that have no place in a federal forum absent some other basis for jurisdiction.

An appropriate Order follows.

*ORDER*

AND NOW, this _____ day of January, 2001, after consideration of defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6), and plaintiff's response thereto, and for the reasons contained in the accompanying memorandum, it is ORDERED that the motion is GRANTED and the complaint is DISMISSED.

2001 WL 41143 (E.D.Pa.), 2001-1 Trade Cases  P 73,167, RICO Bus.Disp.Guide 10,004

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2

Westlaw.

Not Reported in A.2d                                            Page 1
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, Sussex County.
Harold B. BARBER, II, Plaintiff,
v.
CITY OF LEWES, et al. Defendants.
No. 95C-08-006.

Submitted Oct. 8, 1996.
Decided Jan. 31, 1997.

Vincent H. Vickers, II, Stumpf, Vickers, & Sandy,
P.A., Georgetown, for Plaintiff.

W. Wade W. Scott, Prickett, Jones, Elliott, Kristol &
Schnee, Wilmington, for Defendants in their Official
Capacities.

William W. Bowser, Young, Conaway, Stargatt &
Taylor, P.O. Wilmington, for Defendants in their
Individual Capacities.

*MEMORANDUM OPINION*

GRAVES, Judge.

**\*1** Plaintiff Harold B. Barber, II ("Plaintiff") filed
this lawsuit against the City of Lewes, the Mayor of
Lewes, City Council, the City Manager, the Director
of Public Safety, and Al Stango, George Smith, John
P. Adams, John A. Warrington, Elaine Bisbee,
George Cleaver, James Ford, Anthony Pratt, Eleanor
L. Sheehan and Howard Parker, in their official and
individual capacities (collectively referred to as
"Defendants"; individual defendants are referred to as
"Individual Defendants") as a result of his demotion
by the City Council from his position of Chief of
Police of the City of Lewes to Corporal. In his
complaint, Plaintiff alleges the following: violation of
procedural due process, violation of substantive due
process, interference with contract, invasion of
privacy, intentional infliction of emotional distress
and prima facie tort. Pending before the Court is the
Defendants' motion for summary judgment.

*FACTS AND PROCEDURAL HISTORY*

Plaintiff began his employment with the City of

Lewes Police Department as a police officer with the
rank of Patrolman in May 1980, and by 1984, he had
attained the rank of Corporal. On August 2, 1984, the
City Council promoted Plaintiff to the position of
Acting Chief of Police, which position became
permanent in 1985 following a probationary period.

From 1985 until July 1990, three entries were made
in Plaintiff's personnel file which criticized his
performance as Chief of Police. The first was a letter
from Mayor Alfred Stango to Plaintiff expressing the
Mayor's displeasure with the excessive amount of
time Plaintiff was spending in the office rather than
performing shift work. This letter was followed by a
June 28, 1989 Job Description for the Chief of Police
from the Mayor, which again suggested Plaintiff was
spending too much time in the office. In July 1990,
Mayor Stango discovered that Plaintiff was paid to
work a special duty job while he was already on
regular duty, when such jobs are supposed to go to
officers who are off-duty. As a result, Mayor Stango
suspended Plaintiff for three (3) days without pay.

During this five year period, Plaintiff's job was
defined by a job description Mayor Stango gave him
in 1988, which stated that the Chief of Police was
responsible for public safety and enforcement of all
laws and ordinances in Lewes and must ensure that
the police department operated with maximum
efficiency and effectiveness in protecting the public.
The job description also listed the major job duties,
including the scheduling of personnel, monitoring all
activities of personnel and performing the initial
disciplining of personnel.

On September 14, 1990, Mayor Stango hired Jack
Warrington ("Warrington") as the Director of Public
Safety because the Mayor was concerned about the
Plaintiff's performance as Chief of Police and with
the morale of the entire police department.
Immediately upon assuming the position of Director
of Public Safety, Warrington took over Plaintiff's
office and Plaintiff was moved into the common area
to share desk space with other officers. In October
1990, Warrington drafted a new job description
which made the Chief of Police second in command
with primary responsibility for operational activities,
with the Chief of Police reporting directly to the
Director of Public Safety. The new job description
did not include the scheduling of personnel and the
initial disciplining of personnel, which were in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

Page 2

previous job description. The new job description also added a direction that the Chief of Police work rotating shift duty at the discretion of the Director, and maintain enforcement activities, including parking meter violations and complaint investigations.

**\*2** On June 11, 1991, Warrington suspended Plaintiff's authority to supervise and discipline his subordinates and his authority to communicate with the men on disciplinary issues or any issues of departmental policy without prior approval from Warrington. Warrington further requested that he review all police reports in conjunction with Plaintiff. On June 13, 1991, Warrington called an emergency meeting of the Lewes Police Department, excluding Plaintiff, and informed them that he would handle all disciplinary problems and all personnel problems, while the Plaintiff would continue the responsibility of "Field-Line" supervision. That same day, Warrington further amended the Chief of Police job description in accordance with the temporary suspension of Plaintiff's duties as discussed above.

On June 14, 1991, Plaintiff requested a hearing regarding his new job description pursuant to 11 *Del. C.* § 9301, the Lewes Code Enforcement Ethics § A201-16w(1), and the City Charter. Plaintiff did not receive a hearing before City Council, but on June 27, 1991, met with Mayor Stango and the City Manager, Elaine Bisbee. The Mayor assured Plaintiff that he had not been dismissed, demoted, nor suspended, nor was his salary taken away, but that these decisions regarding his duties were within Warrington's prerogative.

On August 11, 1991, Plaintiff asked by letter that he be informed in writing as what specific criteria he would have to meet to resume his role as Chief of Police. On August 26, 1991, Plaintiff was informed that his police car was going to be sold and that he would not be provided with a replacement. On September 9, 1991, Plaintiff wrote another letter to Warrington requesting a response to his August 11, 1991 letter regarding how he could resume his full duties as Chief of Police. Also on September 9, 1991, Plaintiff discussed the suspension of his Police Chief duties with Warrington. Plaintiff brought up the issue of his police vehicle being taken away from him and when he asked for a reason, Warrington replied, "No [reason]. None that I have to give to you, except that there's not one going to be made available." On December 19, 1991, Plaintiff's attorney, Vincent H. Vickers, II, Esquire, contacted John P. Messick, Esquire, the City Attorney, to lodge an official

complaint. On February 21, 1992, Mr. Messick responded that it was his belief that Warrington's actions were permissible under the Charter and did not amount to a dismissal of the Plaintiff.

Beginning in March 1991, Warrington began compiling a mass of documentation regarding Plaintiff's performance as Chief of Police, which included complaints lodged against Plaintiff and Warrington's numerous critiques of Plaintiff's performance. Plaintiff alleges that this documentation was kept in a "confidential file" and its contents were circulated to members of City Council. Defendants deny that a confidential file existed.

On August 14, 1992, Plaintiff met with Warrington to express his concerns regarding their relative positions. Plaintiff also informed Warrington that he was under a doctor's care for depression and was on anti-depressant medication due to the stress that was being placed upon him at work.

**\*3** On March 31, 1993, Warrington informed Plaintiff by memorandum that he would be on probation for a six month period. The memorandum detailed specific problems that Warrington believed had not been corrected in the past and that formed the basis of the institution of probation, including a lack of managerial and supervisory skills, an inability to manage report writing and an inability to resolve personnel problems. In this memorandum, Warrington told Plaintiff that he believed that "there's little possibility that you can efficiently function as Chief of Police." The memorandum asked Plaintiff to respond with a plan of action regarding how Plaintiff would improve the problems mentioned. Plaintiff responded in writing on April 5 and May 2, 1993. On May 2, 1993, Plaintiff also requested a meeting with City Council in executive session.

On May 5, 1993, Plaintiff and Warrington met to discuss his probation, which would end on November 5, 1993. Plaintiff was told he would be restored to full operational responsibilities for day-to-day operations of the Police Department, but the administrative and over-all responsibilities of the police department would be Warrington's responsibility. The two men discussed exactly how Plaintiff would handle scheduling, budget requests, patrol duties and the chain of command.

After placing Plaintiff on probation, Warrington read to the members of the police department a statement explaining that Plaintiff was being given full responsibility as Chief of Police on a six month

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

Page 3

probationary period to afford Plaintiff the opportunity to improve his skills to enable him to function as the Chief of Police.

On May 11, 1993, John P. Adams was elected Mayor of Lewes, and the City Council now consisted of Anthony P. Pratt, James L. Ford, III, Eleanor L. Sheehan, and George H.P. Smith. Elaine M. Bisbee remained as City Manager. Stango retired.

On April 3, 1993, just prior to the commencement of Plaintiff's probationary period, Plaintiff received a written reprimand from Warrington for Plaintiff's failure to unlock the Market Street Public Bathrooms by 8:00 a.m. During his six month probation period, Plaintiff received over 50 written reprimands, which are described below.

On May 21, 1993, Warrington presented Plaintiff with nine instances of improprieties in carrying out his work responsibilities, which Plaintiff signed. When Plaintiff responded with some anger at being handed nine complaints in a group and then hurriedly signed them, he received another written complaint for being upset and not receptive to counseling. This complaint was not shown to Defendant.

On June 14 1993, Warrington presented Plaintiff with four reprimands. On June 16, Warrington issued three reprimands. On June 18, Warrington issued one reprimand. On July 26, Warrington presented Plaintiff with eleven instances of improprieties in carrying out his work responsibilities from June 18 to July 26, including failure to properly fill out payroll cards and to schedule the officers efficiently. Plaintiff signed these notices in protest, acknowledging their receipt but not agreeing with the contents.

*4 On June 14, 1993, Plaintiff met with the City Council and Mayor Adams in Executive Session, as well as Mr. Messick and Elaine Bisbee, to discuss his job description, charter changes concerning his job description, his probation status, a request for an office and a police vehicle for the Chief of Police and the possibility of moving the Director of Public Safety out of the police department. At this meeting, there was no discussion of any of the complaints which had been lodged against Plaintiff. At the conclusion of the meeting, the Mayor and City Council informed Plaintiff that he would remain on probation.

On June 17, 1993, Plaintiff met with Mayor Adams to discuss the terms of his probation. Adams made it clear that during his probation, Plaintiff would operate under the 1990 Chief of Police job description prepared by Warrington and that the planned changes in the Charter to the job descriptions for Chief of Police and Director of Public Safety would not become effective during Plaintiff's probationary period.

On July 19, 1993, Plaintiff met with Mayor Adams to discuss how his probation was going. The Mayor discussed his concerns regarding Plaintiff's ability to write the schedules. Plaintiff and Mayor Adams met again on August 11, 1993. The Mayor expressed to Plaintiff that he did not believe that Plaintiff was taking his probation very seriously and did not recognize the serious consequences that could follow.

On August 20, 1993, Plaintiff and Warrington met to review Plaintiff's monthly self evaluation report for July. Warrington addressed several of the written criticisms of the Plaintiff in the month of July, but also told Plaintiff that "[g]enerally speaking, you have done a good job this past month of July." The transcription of the taped meeting had the words "interrupted by Barber" inserted in several places where Warrington was speaking. On October 27, Plaintiff received a written reprimand for these interruptions.

In September 1993, Plaintiff received three reprimands from Warrington for failure to carry out an assignment regarding the enforcement of the City's dog regulations, the failure to properly monitor an investigation, and inadequate report writing. In October 1993, Warrington presented Plaintiff with 18 memoranda of criticism of his performance on the job. Plaintiff signed these reprimands as "acknowledgement only" or "in protest". On November 4, 1993, Plaintiff received a reprimand for "poor managerial tactics resulting in a dysfunctional relationship with a subordinate through manipulative tactics and deceitfulness."

On November 5, 1993, Warrington wrote a report to the Mayor and City Council stating that Plaintiff had failed his probationary period and recommended Plaintiff's dismissal. The report referred to an additional available documentation that would "clearly verify that Chief Barber doesn't possess the managerial characteristics required to be a good Chief of Police." On November 8, 1993, the Mayor and City Counsel held an Executive Session concerning the Plaintiff. The Mayor recommended Plaintiff's dismissal and the Council unanimously accepted the recommendation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

**\*5** On November 9, 1993, Mayor Adams informed Plaintiff that City Council unanimously had decided that he no longer could continue as Chief of Police. Mayor Adams suspended Plaintiff with pay and offered Plaintiff the option of resigning from his position, but if he did not resign, he would be fired. He had until November 12, 1993 to make his decision.

Plaintiff asked for a two week extension of the deadline, which was granted. Plaintiff asked for a copy of his personnel file, which was provided to him. On November 15, 1993, Plaintiff, through his counsel, asked if there were any other files or information available and in response, was provided with hundreds of pages of documentation, which Plaintiff alleges was the "Confidential" file. On November 29, 1993, Plaintiff advised Mayor Adams that he would not resign and demanded a pre-termination hearing in light of this decision. A hearing was scheduled for Saturday, January 15, 1994. In a December 22, 1993 letter, the Mayor informed Plaintiff of the basis for his dismissal: (1) incompetency and inefficiency in the exercise of organization of leadership of the police force; (2) failure to secure and keep the respect and support of his subordinates on the police force; and (3) improper conduct unbecoming a police officer to members of the female sex.

Following Plaintiff's suspension, the local newspapers published accounts of the fact of his suspension, the hiring of James Liguori, Esquire as special prosecutor, the three grounds for his dismissal, referred to above, and an account of the pending public hearing. On January 12, 1994, Plaintiff's counsel filed a motion for a temporary restraining order in the Court of Chancery to prevent the City from going forward with the January 15 hearing. Plaintiff alleged that the pending hearing was going to be prosecuted without basic standards of fairness, including a lack of an adequate opportunity to be heard and defend, and a lack of a neutral and detached decision maker. The Chancery Court scheduled a hearing on the request for the injunction for January 14, 1994.

On January 13, 1994, the City Council met in a special meeting and voted 3 to 1 to demote Plaintiff to Corporal effective January 25, 1994. Council was advised by James Messick, City Attorney, that Plaintiff did not have a property interest in his position as Chief of Police and that a hearing was not required because a demotion was not equivalent to a dismissal. On January 14, 1993, Mr. Messick, on behalf of the City, wrote the Vice Chancellor to indicate that the City had decided to cancel the hearing on the dismissal of Plaintiff as Chief of Police and that the hearing would not be rescheduled. The Court dismissed the motion for a temporary restraining order as moot.

On January 14, 1994, the City Council issued a press release regarding the decision to demote Plaintiff. The statement stated that "City Council, after careful review with its special counsel of the evidence supporting the numerous allegations of misconduct that Mr. Barber acknowledged receiving, was satisfied that significant cause existed to warrant some significant remedial action."

**\*6** Plaintiff had until January 25, 1994 to report to work in his position as corporal. Plaintiff responded that he only would return as Chief of Police and informed the Council that its actions taken to remove him were improper. Plaintiff did not return to work by January 25 and then received a letter from Mayor Adams informing him that the City would proceed on the assumption that he had abandoned his position.

On August 4, 1995, Plaintiff filed a complaint against Defendants alleging violation of procedural due process, violation of substantive due process, interference with contract, invasion of privacy, intentional infliction of emotional distress and prima facie tort. On March 21, 1996, the parties filed a stipulation of partial dismissal, dismissing Defendants George Cleaver and Howard Parker in their individual capacities. Defendants have filed a motion for summary judgment to all of Plaintiff's claims.

*DISCUSSION*

Summary judgment may be granted only when no material issues of fact exist, and the moving party bears the burden of establishing the non-existence of material issues of fact. *Moore v. Sizemore,* Del. Supr., 405 A.2d 679, 680 (1979). Once the moving party meets its burden, then the burden shifts to the non-moving party to establish the existence of material issues of fact. *Id.* at 681. Where the moving party produces an affidavit or other evidence sufficient under Superior Court Civil Rule 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. Super. Ct. Civ. R. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). If, after discovery, the non-moving party cannot make a sufficient showing of the existence of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
(Cite as: 1997 WL 127951 (Del.Super.))

an essential element of his or her case, then summary judgment must be granted. *Burkhart v. Davies,* Del. Supr., 602 A.2d 56, 59 (1991), *cert. den.,* 112 S. Ct. 1946 (1992); *Celotex Corp. v. Catrett, supra.* If however, material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is inappropriate. *Ebersole v. Lowengrub,* Del. Supr., 180 A.2d 467, 470 (1962).

Plaintiff's counsel has requested that the Court reserve decision on the motion for summary judgment on all issues except for the issue of qualified immunity. Plaintiff states that he has delayed taking depositions of certain individuals because he was waiting to see if the Court's decision on the qualified immunity issue would render the need for such depositions moot. The deadline for discovery to be completed was September 27, 1996. The parties have thoroughly briefed the issues and had the opportunity to address the legal issues involved. The Court has reviewed the myriad of documents in both parties' appendices and has determined that it is appropriate to address all of the issues in Defendants' motion for summary judgment. Therefore, the Court will rule on all of the issues raised in Defendants' motion for summary judgment.

I. PROCEDURAL DUE PROCESS CLAIM

A. Property Interest

**\*7** Plaintiff first asserts that he has been deprived of a constitutionally protected property interest. A person claiming deprivation of an interest is entitled to procedural due process only when such interest is circumscribed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents v. Roth,* 408 U.S. 564 (1972); *Perry v. Sinderman,* 408 U.S. 593 (1972). An employee has a property right in his employment protected by due process only if a source independent of the Federal Constitution, such as state law, creates the right. *Durig v. Woodbridge Bd. of Educ.,* Del. Super., C.A. No. 90C-NO-22, Ridgely, P.J. (October 9, 1992), *aff'd,* Del. Supr., No. 576, 1992, (March 3, 1993); *Cook v. City of Harrington,* Del. Super, C.A. No. 89C-FE-21, Ridgely, P.J. (February 22, 1990). The existence of a property right must be determined on a case-by-case basis where entitlement may arise from a 'statute, ordinance, regulation or contract, either express or implied, or a combination thereof, as interpreted by the law of the state involved.'" *Durig, supra,* at 7 (quoting *State Troopers Lodge v. O'Rourke,* Del. Ch., 403 A.2d 1109, 1112 (1979)).

Plaintiff asserts that his property interest in the position of Chief of Police arises from 11 *Del. C.* § 9301 and Sections 15(e) and 24(a) of the Charter of the City of Lewes.

Section 9301 of Title 11 of the Delaware Code, which is titled "Police Chief Removal; Right to a Public Hearing", states in pertinent part:

No chief of police or police superintendent ... shall be *dismissed* unless there is a showing of just cause and such person has been given notice in writing of the specific grounds for such dismissal and an *opportunity to be heard* in the chief's or the superintendent's own defense, personally and/or by counsel, *at a public hearing* before the elected governing body of the jurisdiction. Such public hearing, unless otherwise specified by charter, shall be held not less than 5 nor more than 30 days after such notice. [Emphasis added.]

Section 24(a) of the Lewes City Charter states:

The chief of police and members of the police force shall be appointed by the mayor of the City of Lewes for an *indefinite* term by and with the advice and consent of a majority of all the elected members of the City Council and each of them may be removed for *just cause* by a majority vote of all elected members of the City Council .... [Emphasis added.]

Section 15(e) of the Lewes City Charter states:

The mayor may, or may not, for any *reasonable cause,* by and with the consent or upon address of the majority of all members of the council, remove from office *any person appointed by him or any of his predecessors.* The person against whom the mayor or council may be about to proceed, shall receive five (5) days notice thereof, accompanied by the statement of the cause alleged for the removal and *shall be accorded a full and fair hearing* .... [Emphasis added.]

**\*8** A law that allows the dismissal of an employee only for just cause can create a property interest protected by due process. *Cook v. City of Harrington,* Del. Super., C.A. No. 89C-FE-21, Ridgely, J. (February 22, 1990) (citing *Meding v. Hurd,* D. Del., 607 F. Supp. 1088, 1104-05 (1985)). *See also Sturgess v. Neeley,* D. Del, 761 F. Supp. 1089, 1095 (1991) (if a public employee may only be terminated for cause, employee possesses a property interest in employment). In *Meding v. Hurd, supra,* the Court stated that in enacting an ordinance that raised "the threshold for termination of classified employees to one for cause only, the Town transformed what were formerly at-will employees, into employees with rights tantamount to property interests." *Meding v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

_Hurd,_ 607 F. Supp. at 1105.

Title 11 of the Delaware Code, § 9301 requires just cause before the dismissal of the Chief of Police and the opportunity to be heard at a public hearing before any such dismissal. Thus, state law creates an independent source of entitlement. Additionally, Section 24(a) of the Lewes Charter also requires just cause for removal of the Chief of Police and § 15(e) of the Charter requires a full and fair hearing before any person appointed by the mayor may be removed from office. Plaintiff has a property interest in his position as Chief of Police.

However, this does not end the inquiry. The next issue is whether Defendants denied Plaintiff procedural due process in demoting him from his position as Chief of Police. Defendants argue that 11 _Del. C._ § 9301 and §§ 24(a) and 15 (e) of the Lewes Charter only address dismissal or removal from office, not a demotion from office, and because Plaintiff was demoted rather than dismissed, these laws "cannot provide Barber with the requisite property interest necessary for a procedural due process claim." However, as stated above, Plaintiff has the "requisite property interest" in his position as Chief of Police. The issue is whether his demotion deprived him of his property interest.

Plaintiff points out that chiefs of police are not subject to the provisions of the Law Enforcement Officers Bill of Rights, 11 _Del. C._ 9200 _et seq._ Chapter 11 _Del. C._ § 9200(c) details the procedural requirements "whenever a law enforcement officer is under investigation or is subject to questioning for any reason which could lead to disciplinary action, demotion or dismissal." Chapter 11 _Del. C._ § 9203 requires a hearing if a law enforcement officer is subject to suspension or other disciplinary action. [FN1] Plaintiff asserts that the language of the Police Chief Removal statute, 11 _Del. C._ § 9301, only uses the word "dismissed" and not the words "suspend" or "discipline" because

> FN1. If a law enforcement officer is (1) suspended for any reason, or (2) charged with conduct alleged to violate the rules or regulations or general orders of the agency that employs the officer, or (3) charged with a breach of discipline of any kind, which charge could lead to any form of disciplinary action (other than a reprimand) which may become part of that officer's permanent personnel record, then that officer shall be entitled to a hearing ....

11 _Del. C._ § 9203.

Police Chiefs are big boys, who can take care of themselves, when it comes to issues of discipline or suspension. The word 'demotion' is not mentioned because demotion from the position of chief of police is the equivalent of dismissal from the position and use of the word would be redundant.... A police officer can be demoted and still be a police officer. A chief of police, if demoted, is no longer a chief of police.
*9 Plaintiff's Answering Brief in Opposition to Summary Judgment, at 15. Black's Law Dictionary defines removal from office as "deprivation of office by an act of competent superior officer acting within scope of authority" and defines removal as the "dismissal from office." _Black's Law Dictionary_ 1295 (6th ed. 1990).

Although there is no case law addressing the language and meaning of 11 _Del. C._ § 9301 in the removal of police chiefs, the Superior Court addressed the language of the Law Enforcement Officer's Bill of Rights, 11 _Del. C._ § 9200, _et seq.,_ in _Knox v. City of Elsmere,_ Del. Super., C.A. No. 93M-12-001, Silverman, J. (May 10, 1995). In _Knox,_ the defendants, the City of Elsmere, claimed that the Law Enforcement Officer's Bill of Rights did not apply to the plaintiff's dismissal because the Chief of Police's recommendation of termination did not mention the word "discipline" nor did the Chief specifically refer to violations of the department's regulations. Therefore, the defendants argued that the plaintiff was not entitled to a hearing under 11 _Del. C._ § 9203 because this provision provides for a hearing if an officer is suspended, charged with violations of rules or regulations or charged with any breach of discipline. The defendants also asserted that this provision only mentions suspensions, not dismissals, and therefore was not applicable.

In denying the defendants' motion for summary judgment, the Court stated that the defendants' exclusion of the word "discipline" or lack of any reference to specific violations of departmental rules in dismissing the plaintiff did not automatically preclude the application of the Law Enforcement Officer's Bill of Rights. The Court observed that "whether Plaintiff's dismissal constituted a disciplinary action arising out of a breach of discipline does not turn on the parties' characterization of the matter. Rather than focusing on labels, the court must consider what happened to Plaintiff and why." _Id._ at 10. The Court could not conclude as a matter of law that the plaintiff was not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

charged implicitly with breaches of discipline and that the proceedings were not tantamount to disciplinary action.

The Court finds the *Knox* case instructive in the case *sub judice.* The Plaintiff has put forth evidence that Defendants decided to demote him simply to avoid the requisite pre-termination hearing and that such a demotion was in effect a removal from office, thus entitling him to a hearing. Furthermore, in *Ferraro v. City of Long Branch,* 3rd Cir., 23 F.3d 803 (1994), the Third Circuit, in finding that the Plaintiff was not deprived of a protected property interest when he was assigned to more manual labor and less managerial and administrative work, also stated that "we are not holding that an adverse employment action short of termination never could deprive an employee of a property interest ...." *Id.* at 807. In the case at bar, the Court concludes as a matter of law that regardless of whether Plaintiff was terminated or demoted, Defendants' actions constituted a removal from office and therefore Plaintiff was entitled to a hearing before he could be deprived of his property interest.

*\*10* Defendants assert that Plaintiff abandoned his position when he did not show up for work on January 25, 1994 and therefore he was not entitled to a hearing. Plaintiff states that he asked for a hearing once Defendants decided to dismiss him, and "on the Eve of the hearing, when the Town decided it was too embarrassed to proceed, they simply called his dismissal and canceled the hearing." Plaintiff's Answering Brief in Opposition to Summary Judgment, at 17. Because the Court has found as a matter of law that Plaintiff was removed from office, his right to a hearing arose prior to the date of his alleged abandonment, and therefore this issue is moot.

Defendants further assert that even if 11 *Del. C.* § 9301 and Charter §§ 15(e) and 24(a) covered demotions, Plaintiff does not have a property interest in his position as Chief of Police, because the only property subject to constitutional protection are salary and benefits, and his demotion maintained his salary and benefits at the same level. Plaintiff counters that "the language of the State Statute and the City Charter Provisions make it clear that protection is provided to the 'position' of Chief of Police. Small town Chiefs of Police, if not provided with such protection, would be overly subject to the political wiles and whims of elected officials." Plaintiff's Answering Brief in Opposition to Summary Judgment, at 19.

Defendants cite a Fifth Circuit case, *Jett v. Dallas Indep. Sch. Dist.,* 5th Cir., 798 F.2d 748 (1986), to support their contention that salary and benefits are the only "property" subject to constitutional protection. The Court stated:

When a public employee has a legitimate entitlement to his employment, the due process clause may protect as a "property" no more than the status of being an employee of the governmental employer in question with the economic fruits that accompany the position. *Id.* at 754, n.3. Defendants also cite a case from the Fourth Circuit, *Royster v. Board of Trustees,* 4th Cir., 774 F.2d 618 (1985), which held that a superintendent, who was terminated before the end of his contract but was paid full compensation for the duration of his contract, did not have the right to physically possess the office of superintendent as a part of his property interest in the continued expectation of public employment. *Id.* at 621.

Although these Circuits have held that the "economic fruits" of one's employment are the only property interest protected by due process, the Third Circuit recently has suggested otherwise. In *Homar v. Gilbert,* 3d Cir., 89 F.3d 1009 (1996), the Court, in discussing whether suspension with pay implicates due process concerns, stated:

While a salary is probably the most obvious property interest in employment, we think that there are clearly other interests involved. In [the plaintiff's] case they would include his interest in participating in the daily affairs of the [university] community as a police officer, along with his interest in the honor and respect that accompanies the post.

*\*11* 89 F.3d at 1018, n.7. In *Homar,* the plaintiff was a university police officer who first was suspended and then demoted to a groundskeeper. If the Third Circuit recognizes the honor and respect that accompanies a university police officer's position, then it follows that Plaintiff has an even more compelling argument that his property interest in his position as Chief of Police covers more than only his salary and benefits. Therefore, the Court rejects Defendant's argument that continuation of public employment and benefits bars a procedural due process claim.

The Court finds that Defendants are not entitled to summary judgment on the issue of Plaintiff's property interest in his position as Chief of Police.

B. Liberty Interest

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 8
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

In addition to the deprivation of his property interest in his position as Chief of Police, Plaintiff alleges that Defendants deprived him of a liberty interest through his change in status combined with the published accounts of conduct unbecoming toward a female and the town's press release that there was evidence sufficient to justify termination, and therefore he was entitled to a hearing to clear his name. In his complaint, Plaintiff asserts that "Defendants have gravely damaged Plaintiff's standing and association in the community and stigmatized Plaintiff in a way that has foreclosed his ability to take advantage of other employment opportunities."

Defendants' only response is that a public employee must be fired in order to assert a liberty interest and because the Plaintiff was not terminated, he could not have been deprived of a protected liberty interest.

An employment action implicates a Fourteenth Amendment liberty interest only if it (1) is based on a charge against the individual that might seriously damage his standing and associations in his community by impugning his good name, reputation, honor or integrity; or (2) if the charge imposed such a stigma as to foreclose his freedom to take advantage of other employment opportunities. _Board of Regents v. Roth_, 408 U.S. 564, 573 (1972). To establish a claim based on a deprivation of a protected liberty interest, the employee must establish at a minimum that (1) he had a liberty interest; and (2) defamatory statements were made about him. _Cooley v. Pennsylvania House Fin. Agency_, 3d Cir., 830 F.2d 469 (1987). Stigma to reputation alone is not sufficient to invoke a liberty interest under the Fourteenth Amendment. The stigma must be accompanied by a deprivation of present or future employment. _Meding v. Hurd_, 607 F. Supp. at 1106.

The Third Circuit very recently addressed the issue of a person's liberty interest in _Homar v. Gilbert, supra._ In _Homar_, the plaintiff claimed that his due process rights were violated when the defendants made public statements about his suspension that stigmatized him and damaged his reputation. Like the Plaintiff in the case at bar, the plaintiff in _Homar_ claimed that the defendants violated his liberty interest in two ways: (1) the public disclosure seriously damaged his good name and reputation and (2) the disclosure imposed a stigma or disability on him that foreclosed his freedom to take advantage of other employment opportunities. _Id._ at 1021-22. The Court addressed these two claims separately.

**\*12** The Court stated that to prevail on a deprivation of liberty claim based on damage to standing and associations in the community, the plaintiff, who was demoted from university police officer to groundskeeper, must demonstrate that the government "'create[d] and disseminate[d] a false and defamatory impression about [him] in connection with his termination." _Homar v. Gilbert_, 89 F.3d at 1022 (quoting _Codd v. Velger_, 429 U.S. 624, 628 (1977) (per curium)). The Court upheld the District Court's granting of summary judgment on this claim based on a lack of a liberty interest because the article disclosing charges against the plaintiff did not disclose any specifics regarding the nature of the university's concern nor did it disclose information about the disciplinary action contemplated. There was also no evidence that the university disclosed the outcome of its investigation or the fact that it demoted the plaintiff to groundskeeper.

The facts of the case _sub judice_ are distinguishable enough from the _Homar_ case to preclude summary judgment on this claim. Plaintiff has proffered two newspaper articles in the _Daily Whale_ that reveal the charges against Plaintiff, including improper conduct unbecoming a police officer towards women and a subsequent press release stating that the decision to demote was based on a careful review of the evidence supporting the numerous allegations of misconduct.

The Court points out, however, that to succeed on this claim, Plaintiff also must prove that the information published was untrue or misleading. Plaintiff claims that he was not given the opportunity to address the allegations made against him, but has not asserted that these allegations were untrue. Because Defendants only have responded that Plaintiff's demotion did not affect a liberty interest and have not addressed whether defamatory remarks were made, the Court cannot grant summary judgment.

In _Homar, supra,_ the Court also addressed the plaintiff's claim that the defendants had imposed a stigma that had foreclosed his freedom to take advantage of other employment opportunities. The Court found that the plaintiff's liberty interest was not implicated because he had not provided any evidence to suggest that the disciplinary actions taken by the university foreclosed other employment opportunities and because the university never had disclosed publicly that the plaintiff was terminated from his job as police officer.

In _Meding v. Hurd, supra,_ the District Court stated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
(Cite as: 1997 WL 127951 (Del.Super.))

that where the source of the alleged stigmatization is the town's explanation for its decision to discharge the Plaintiff, the town's decision to discharge the employee does not satisfy the requirement that he show the stigmatization affected his employment opportunities. 607 F. Supp. 1088, 1106. Because the public dissemination was not the cause of the discharge, the employee must show that the public disclosure of the accusation affected his future employment opportunities. Id. Additionally, the allegedly false charge must "so stigmatize [the employee] that he is foreclosed from obtaining alternative employment to a degree which goes beyond merely disadvantaging him in the job market." Karr v. Castle, D. Del., 768 F. Supp. 1087, 1098 (1991).

*13 Plaintiff has not proffered evidence that he has been foreclosed from obtaining alternative employment. However, as mentioned above, Defendants only have argued that an employee must be fired to assert the deprivation of a protected liberty interest in their motion for summary judgment, and accordingly, the Court will not address this issue *sua sponte*.

At this point, the Court cannot determine whether Plaintiff can prove his liberty interest claim. It is a factual determination whether the publication of accounts of conduct unbecoming to a female by a police chief, if false, is sufficiently derogatory and stigmatizing to foreclose other employment opportunities and thus implicate a liberty interest. Based on the foregoing, Defendants' motion for summary judgment on this issue is denied.

C. What Process Is Due?

Defendants next assert that even if Plaintiff had a protected property or liberty interest, he was afforded all the process he was due. They claim that the probationary period and its "attendant hearings" afford all the process that Plaintiff was due under the circumstances. Plaintiff asserts that although he had general notice of allegations against him, he still does not know what evidence was presented against him and he was not afforded the opportunity to be heard and respond to the allegations when the City Council first decided to dismiss Plaintiff and then when it decided to demote him.

The United States Supreme Court faced the question of what process is due an employee with a recognized property interest in *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) and stated that "the

tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Id. at 546. The Third Circuit recently held that a predeprivation hearing need not be elaborate, but "must be sufficient to inform the employee of the evidence against him or her and to respond to the evidence." *Homar v. Gilbert, supra*, 89 F.3d at 1018. In *Homar*, the Court affirmed the District Court's conclusion that the plaintiff's pre-deprivation hearing before he was demoted from police officer to groundskeeper did not conform to due process requirements because he was not allowed to make a meaningful response to damaging information found in a supplemental report of which he was unaware. Id.

In *Hawkins v. Board of Public Education*, D. Del., 468 F. Supp. 201 (1979), the Court described the process due in employment termination cases: (1) clear notice of the charge being considered; (2) a reasonable time interval to marshall facts and evidence to respond; (3) an explanation of the evidence supporting the charges; and (4) an opportunity to present the plaintiff's side of the case in a manner which will allow the decision maker to weigh both sides. Id. at 208 (citing *Anapol v. University of Delaware*, D. Del., 412 F. Supp 675, 678 n.8 (1976)). In *Hawkins*, the defendants claimed that various informal meetings with superiors were evidence of a hearing and that the plaintiff could have been heard by the Board of Education, but failed to avail himself of the procedure, and therefore he was not denied due process. Id. at 208-211. The Court found that plaintiff's meeting with his supervisor and the superintendent did not satisfy the requirements of due process and that the plaintiff was not given any effective notice that he could have the opportunity to be heard at the meeting of the Board of Education. Id.

*14 Defendants claim that *Hawkins* is not applicable in this case because in *Hawkins* the plaintiff was suspended without pay and then fired, whereas Plaintiff, in the case *sub judice*, never suffered an economic loss and therefore was afforded all the process that was due under the Constitution. However, as the Court pointed out above, economic benefits of public employment are not the only "property" protected by procedural due process.

In the case at bar, Defendants assert that the Plaintiff had multiple opportunities to give his side of the story and the requirements of notice and opportunity to be heard were met in this case. Defendants claim that Warrington told Plaintiff why he was being

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

placed on probation and the consequences of any failure to improve. Defendants state that Plaintiff had the opportunity to fully discuss the allegations in the March 31 memorandum from Warrington, but failed to respond to the invitation to discuss the memorandum. In addition to multiple notices of charges against him and opportunity to respond, Defendants state that Plaintiff had a hearing on June 13, 1994 before the Mayor and City Council to air his grievances regarding his probation and Plaintiff provided the Council with his agenda for his appearance. Defendants assert that "in light of the drawn out nature of the due process given Barber, further opportunities to vindicate himself after the notice of demotion would be fruitless." Defendants' Opening Brief in Support of Their Motion for Summary Judgment, at 29.

Plaintiff counters that with one exception, Plaintiff's "meetings" with his superiors and opportunities to discuss the charges against him were either between Plaintiff and Warrington or Mayor Stango or Mayor Adams. Plaintiff admits that he did meet with City Council at his own request, but that his appearance was during a Council meeting and the agenda did not include a defense to the complaints against him. Plaintiff was not present at the City Council meeting where the Council decided his termination and claims he still is unaware of the evidence that was presented. Plaintiff states he also was not present at a second meeting of City Council on January 31, 1994, at which the Council received evidence and heard from the special prosecutor, James Liguori.

Defendants further assert that Plaintiff waived his right to any pre-deprivation process provided under 11 *Del. C.* § 9301 when he sought to enjoin the scheduled hearing. However, Defendants fail to recognize that Plaintiff sought to enjoin the hearing because he asserted that he was going to be prosecuted without regard to due process requirements of adequate notice of the charges, without an adequate opportunity to hear and defend the charges and without a neutral and detached decision maker. Because the Defendants then canceled the hearing, the Chancery Court ruled that the motion to enjoin was moot.

There is clearly a factual dispute as to whether Plaintiff had the opportunity to be heard regarding the charges brought against him thereby precluding summary judgment with respect to how much process is due.

**\*15** The Court is satisfied that there is a material

dispute of fact with respect to the multiple issues involved in Plaintiff's procedural due process claim and thus, summary judgment is inappropriate, with the exception of claims asserted against Defendants Stango and Warrington, as discussed below.

D.  Procedural Due Process Claim Against Defendants Stango and Warrington

Defendants claim that because neither Warrington nor Stango was a member of Lewes City Council at the time Plaintiff was demoted, a procedural due process claim against them must fail. [FN2] Plaintiff counters that the record is replete with evidence that Stango and Warrington's actions deprived him of his right to continued employment and to a fair hearing and that Warrington engaged in a continuous course of conduct to compel Plaintiff to resign.

> FN2.  Plaintiff has agreed to dismiss Elaine Bisbee as a defendant.

In *Hawkins v. Board of Pub. Educ., supra,* the District Court held that only those defendants who had the authority to deprive the plaintiff of his property interest in his continued employment could be held liable for a denial of due process. *Hawkins,* 468 F.Supp. 201 (1979). In *Hawkins,* the Court held that only the six members of the Board of Education had the authority to deny the plaintiff procedural due process and therefore they were the only proper defendants. *Id.* at 212. Additionally, Defendants point to several Fourth Circuit cases to support their contention. In *Wright v. Collins,* 4th Cir., 766 F.2d 841 (1985), the Court stated that "in order for an individual to be liable under § 1983, it must be 'affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights.'" 766 F.2d at 850 (quoting *Vinnedge v. Gibbs,* 4th Cir., 550 F.2d 926, 928 (1977)). The official must have had personal knowledge and involvement in the deprivation to be held liable. *Id.* at 850. In *Garraghty v. Commonwealth,* 4th Cir., 52 F.3d 1274 (1995), the Fourth Circuit held that the only persons who can be liable for a deprivation of due process are those in a position to provide constitutionally adequate process. *Id.* at 1280 (citing *Melton v. City of Oklahoma City,* 10th Cir., 879 F.2d 706, 731 n.4 (1989)).

Stango's last term as Mayor of Lewes ended in 1992, over two years before Plaintiff was demoted. Stango moved to Florida after his term ended and had no involvement in the City Council meetings at which the Council voted first to terminate Plaintiff and later to demote him. Stango clearly did not have a personal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
(Cite as: 1997 WL 127951 (Del.Super.))

Page 11

connection to City Council's alleged deprivation of Plaintiff's procedural due process rights.

As to Warrington's actions, the Court agrees with Defendants' claim that the fact that Warrington's actions may have precipitated Plaintiff's demotion is irrelevant for due process purposes because Warrington did not have the authority to afford Plaintiff due process.

In _Melton v. City of Oklahoma City, supra,_ 10th Cir., 879 F.2d 706 (1989), the Court found that even though one of the defendant's actions "arguably triggered the need for a name-clearing hearing," he was not a proper defendant. _Id._ at 731 n.40. The Court stated that he could not be held liable for failure to provide adequate procedural safeguards because he was not a participant in deliberations of a review board, he was not in a position to ensure the provision of a name clearing hearing, nor was he involved in the decision to discharge the plaintiff, and thus was not a proper defendant. _Id. See also Williams v. Smith,_ 2d Cir., 781 F.2d 319, 324 (1986) (officer who filed false report, but was not present and did not testify at subsequent disciplinary hearing, was not implicated in constitutional violations that occurred at hearing). Similarly, even though Warrington's actions may have played a part in Plaintiff's demotion, he was not in a position to afford Plaintiff procedural due process and thus is not a proper defendant.

**\*16** Therefore, the Court grants summary judgment with respect to Defendants Warrington and Stango.

## II. SUBSTANTIVE DUE PROCESS

To succeed on a claim based on substantive due process, the plaintiff must establish that he had a clearly established property interest in his employment. The Court already has found that State law and the City Charter afford Plaintiff a property interest in his position as Chief of Police. Defendants assert that even if Plaintiff has a property or liberty interest in his Chief of Police position, such interests are not protected by the right to substantive due process. Plaintiff counters that Defendants have acted arbitrarily and capriciously in depriving Plaintiff of his property and liberty interests and therefore have violated his substantive due process rights.

No Delaware case law on this issue could be found. The Third Circuit has stated that "in this circuit at least, not all property interests worthy of procedural due process protection are protected by the concept of substantive due process." _Independent Enterprises Inc. v. Pittsburgh Water and Sewer Auth.,_ 3d Cir., No. 96-3009, Stapleton, J. (January 6, 1997), 1997 WL 6335, at \*12 (quoting _Reich v. Beharry,_ 3d Cir., 883 F.2d 239, 244 (1989)). In order to state a substantive due process claim, a plaintiff "must have been deprived of a certain quality of property interest." _DeBlasio v. Zoning Bd. of Adjustment,_ 3d Cir., 53 F.3d 592, 600 (1995). However, the Third Circuit has declined to define the "precise contours of the 'particular quality of property interest' entitled to substantive due process protection." _Independent Enterprises Inc., supra,_ at \*13.

In _Homar v. Gilbert, supra,_ the Court remanded the case to the District Court in order for it to determine whether a state-created property interest in employment is the 'certain quality' of property interest worthy of protection under the substantive due process clause. The Court reviewed its prior case law addressing other state-created property rights which were not entitled to substantive due process protection. The Court has found that substantive due process protects neither an interest in prompt payment for professional services, _Reich v. Beharry,_ 3d Cir., 883 F.2d 239, 244-45 (1989), nor state law entitlement to sewer and water services, _Ransom v. Marrazzo,_ 3d. Cir., 848 F.2d 398, 411-12 (1988), and has suggested in dictum that a right to continued enrollment in a graduate program is not akin to the fundamental interests that the Constitution implicitly protects. _Mauriello v. University of Medicine and Dentistry of New Jersey,_ 3d. Cir., 781 F.2d 46, 50 (1986). However, the Court in _Homar_ also stated that "none of the property interests formerly considered are especially analogous to the property interest in state-created employment." 89 F.3d at 1021. The case was remanded to the District Court in Pennsylvania, but a decision has not been rendered since the United States Supreme Court granted a writ of certiorari in _Homar v. Gilbert,_ 117 S. Ct. 678 (1997), which is currently pending. In a concurring opinion, however, Justice Alito opined that a plaintiff does not have a substantive due process claim for a public employer's non-legislative deprivation of a state-created property right. 89 F.3d at 1026 (Alito, J., concurring).

**\*17** Although the Third Circuit has not decided the issue as to the "certain quality" of property interest deserving of substantive due process protection, as the Defendants point out, the Sixth Circuit and the Eleventh Circuit have held that an employee with a property right in employment is protected only by procedural due process and not substantive due process. _McKinney v. Pate,_ 11th Cir., 20 F.3d 1550,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
(Cite as: 1997 WL 127951 (Del.Super.))

Page 12

1560 (1994); _Sutton v. Cleveland Bd. of Educ.,_ 6th Cir., 958 F.2d 1339, 1350-51 (1992). In _Sutton,_ the Court found that a plaintiff's statutory right to be discharged only for cause is not a fundamental right protected by substantive due process. _Id._ at 1351. In _McKinney v. Pate, supra,_ the Eleventh Circuit overruled a decade of its prior decisions granting pretextually terminated public employees section 1983 causes of action based on substantive due process violations. 20 F.3d at 1560. The _McKinney_ Court reasoned that "[b]ecause employment rights are state created rights and are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." _Id._

The Court is persuaded by the holdings of the Sixth and Eleventh Circuits and therefore grants summary judgment with respect to Plaintiff's substantive due process claims. Because the Court finds that substantive due process does not protect Plaintiff's property and liberty interests in his employment, it is unnecessary to address whether Defendants' actions were arbitrary and capricious.

### III. QUALIFIED IMMUNITY

Because the Court has held that Plaintiff's substantive due process claim must fail, the Court will address the qualified immunity issue only with respect to the procedural due process claim as it applies to the remaining Defendants.

Defendants assert that the Individual Defendants, as governmental officials, are entitled to qualified immunity from Barber's procedural due process claim. The qualified immunity doctrine protects government officials from liability for civil damages as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." _Harlow v. Fitzgerald,_ 457 U.S. 800, 818 (1982). A constitutional right clearly is established when "the contours of the right [[[are]] sufficiently clear that a reasonable official would understand that what he is doing violates that right....[I]n the light of preexisting law the unlawfulness must be apparent." _Anderson v. Creighton,_ 483 U.S. 635, 640 (1987). Qualified immunity should be denied only if "a reasonable jury could find that the unlawfulness of [the defendant's] actions was so 'apparent' that no reasonable investigator could have believed his actions were lawful." _Lee v. Mihalich,_ 3d. Cir., 847 F.2d 66, 69 (1988) (citing _Martin v. Malhoyt,_ D.C. Cir., 830 F.2d 237, 253-54 (1987)). When the controlling law is unclear, reliance on the advice of counsel is very

relevant to a qualified immunity defense. _Lee v. Mihalich, supra,_ at 72. In _Lee,_ the Third Circuit held that because the law pertaining to the controlling Pennsylvania statute of limitations was unclear and the investigators sought the advice of counsel before filing charges, they reasonably could believe their actions were lawful and therefore were entitled to qualified immunity. _Id._

**\*18** Defendants assert that it was not apparent that Plaintiff's demotion affected a property interest, but even if it was apparent, qualified immunity is still applicable because the law was not clearly established with respect to what process was due when demoting a public employee. The governing law at the time of the demotion was not clear and there is little case law interpreting 11 Del. C. § 9301 and Sections 15(e) and 24(a) of the Charter of Lewes. There is no precedent directly on point and the scope of Plaintiff's procedural due process rights was not clearly defined so as to expose the Individual Defendants to personal liability. Furthermore, the Individual Defendants relied on the advice of the City Attorney, James Messick, Esquire, as well as special legal counsel, James Liguori, Esquire, in deciding to demote the plaintiff and therefore, the Court finds that the defendants are entitled to qualified immunity from any damages awarded against them in their individual capacities. Thus, summary judgment is granted as to the individual defendants based on qualified immunity.

### IV. STATUTE OF LIMITATIONS ON FEDERAL CLAIMS

Defendants also assert that all federal claims which accrued over two years prior to the filing of the complaint are barred by the two year state statute of limitations, and therefore Stango is entitled to summary judgment because he left office on May 11, 1993. Plaintiff counters that the continuing violation theory covers Stango's conduct while in office, which "set the wheels in motion that eventually led to Plaintiff's dismissal." Because the Court has already granted summary judgment with respect to Stango, the Court declines to address whether the statute of limitations bars a claim against him.

### V. INTERFERENCE WITH CONTRACT, INVASION OF PRIVACY AND PRIMA FACIE TORT CLAIMS

Plaintiff concedes that the County and Municipal Tort Claims Act, 10 Del. C. § 4011 bars the interference with contract, invasion of privacy and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

prima facie tort claims, and therefore should be dismissed. Thus, with respect to these claims, the Court grants summary judgment. However, Plaintiff does not concede the intentional infliction of emotional distress claim, which the Court addresses below.

## VI. THE EXCLUSIVITY PROVISION OF 19 *DEL. C.* 2304

Defendants assert the exclusivity provision of the Delaware Workmen's Compensation Act bars Plaintiff's claims for intentional infliction of emotional distress. Title 19 *Del. C.* § 2304 contains the following exclusivity provision:

> Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.

This exclusivity provision bars common law tort actions against an employer where: 1) plaintiff is an employee; 2) his condition is shown to be a "personal injury" within the meaning of the statute; and 3) the injury is shown to have arisen out of and in the course of employment. *Battista v. Chrysler Corp.,* Del. Super., 454 A.2d 286, 288 (1982) (citing 19 *Del. C.* § 2304). In *Battista, supra,* the Superior Court held that an intentional infliction of emotional distress claim "falls within the exclusive province of the Workmen's Compensation law." *Id.* at 289. Recently, the Supreme Court reiterated that the Worker's Compensation Act limits an employee's recovery for personal injuries arising out of and during the course of employment to the compensation provided under the Act, and that mental injury is among the personal injuries compensable under the Act. *Konstantopoulos v. Westvaco Corp.,* Del. Supr., No. 115, 1996, Hartnett, J. (October 2, 1996).

**\*19** Plaintiff concedes that he was an employee of the City of Lewes and his condition was a personal injury. However, Plaintiff asserts that his claim is not barred by the exclusivity provision because his injury did not arise out of and in the course of his employment as chief of police, "but rather the stress he suffered and its physical manifestations are a result of the employer's attempt to force Barber to quit his job." Plaintiff's Answering Brief in Opposition to Summary Judgment, at 32.

An injury arises out of the employment if "'it arises out of the nature, conditions, obligations or incidents of the employment, or has a reasonable relationship to it.'" *Konstantopoulos v. Westvaco Corp., supra,* at 5 (quoting *Dravo v. Strosnider,* Del. Supr., 45 A.2d 542, 544 (1945)). The phrase "in the course of employment" concerns the time, place and circumstances of the accident and "covers those things an employee may reasonably be expected to do within the time during which he is employed and at a place where he may reasonably be during that time." *Riddell v. California Plan Protection Inc.,* Del. Super., C.A. No. 87A-OC-1, Bifferato, J. (June 28, 1988), at 3. Plaintiff's claim for mental anguish based on Defendants' actions clearly arises from the nature, conditions and obligations of his position as Chief of Police and during the course of his employment as the Chief. Thus, the Worker's Compensation Act is the exclusive remedy for an intentional infliction of emotional suffering and therefore, summary judgement is granted with respect to that claim.

## VII. DELAWARE TORT CLAIMS ACT

Because the Court has found that Plaintiff's claim for the intentional infliction of emotional distress is barred by the exclusivity provision of 19 *Del. C.* § 2304, the Court will not address Defendants' claim of immunity under the Municipal Tort Claims Act, 10 *Del. C.* § 4011.

## VIII. OTHER CLAIMS

Plaintiff concedes that the claim for punitive damages against the City fails to state a claim upon which relief can be granted. Plaintiff also concedes that the Court, as a court of law, lacks jurisdiction to award reinstatement. Thus, with respect to these claims, summary judgment is granted.

## CONCLUSION

For all of the above reasons, Defendants' motion for summary judgment on Plaintiff's procedural due process claims is denied. With respect to Plaintiff's substantive due process claim and claims against Defendants Bisbee, Warrington and Stango, summary judgment is granted. With respect to the remaining Individual Defendants, the Court finds that they are protected by qualified immunity and therefore summary judgment is granted. As to Plaintiff's claims of interference with contract, invasion of privacy, prima facie tort and intentional infliction of emotional distress, as well as his claim for punitive damages and request for reinstatement, summary judgment is granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 14
1997 WL 127951 (Del.Super.)
**(Cite as: 1997 WL 127951 (Del.Super.))**

IT IS SO ORDERED.

1997 WL 127951 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.