## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FRANK E. ACIERNO, CHRISTIANA TOWN CENTER, LLC, a Delaware limited liability company, 395 ASSOCIATES, LLC, a Delaware limited liability company, ESTATE HOMES, INC., a Delaware corporation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No.  04-1376 |
| GEORGE O. HAGGERTY, individually and in his official capacity as Assistant General Manager of the New Castle County Department of Land Use, SCOTT G. WILCOX, individually and in his official capacity as First Assistant County Attorney, TIMOTHY P. MULLANEY, individually and in his capacity as New Castle County Attorney, CHARLES L. BAKER, individually and in his capacity as General Manager of the New Castle County Department of Land Use, JAMES H. EDWARDS individually and in his capacity as Inspections Manager and Licensing Division Manager of the New Castle County Department of Land Use, and SHERRY L. FREEBERY, in her individual capacity as Chief Administrative Officer of New Castle County, and NEW CASTLE COUNTY, a political subdivision of the State of Delaware, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPENDIUM OF UNREPORTED CASES FOR THE INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR TO STAY THE PROCEEDINGS

Vol 3 (Tabs 7 & 8)

7

Westlaw.

Not Reported in A.2d
2002 WL 31926613 (Del.Ch.)
(Cite as: 2002 WL 31926613 (Del.Ch.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

CITIZENS FOR SMYRNA-CLAYTON FIRST, Sharon L. Durham, and Michael H. McGrath, Plaintiffs,
v.
THE TOWN OF SMYRNA, a political subdivision of the State of Delaware, and Wal-Mart Stores East, L.P., a Delaware limited partnership, Wal-Mart Stores East, Inc., an Arkansas corporation, Carter & Burgess, Inc., a Texas corporation, Elizabeth M. Brown, and Edward C. Brown, Jr., as nominal Defendants, Defendants.

No. Civ.A. 1545-K.

Submitted Dec. 20, 2002.
Decided Dec. 24, 2002.

Richard L. Abbott, The Bayard Firm, Wilmington, Delaware; for Plaintiffs.

John Terrance Jaywork, Hudson, Jones, Jaywork & Fisher, Dover, Delaware; for Town of Smyrna.

John W. Paradee, Prickett, Jones & Elliott, Dover, Delaware; for Wal-Mart Stores East, L.P., Wal-Mart Stores East, Inc., and Carter & Burgess, Inc.

Paul H. Boswell, and Noel E. Primos, Schmittinger & Rodrigues, P.A., Dover, Delaware; for Elizabeth M. Brown and Edward C. Brown, Jr.

MASTER'S REPORT

GLASSCOCK, J.

**\*1** On September 9, 2002, the defendant, Town of Smyrna ("the Town"), approved a site plan submitted by the Wal-Mart defendants ("Wal-Mart") [FN1] contemplating construction of a "distribution center," that is, a large warehouse complex in which non-food consumer items, prepackaged for sale to the individual consumer, could be received and distributed to Wal-Mart's regional retail outlets. As proposed in the site plan, the distribution center would be located on 189 acres (the "Brown Farm") currently owned by nominal defendants Elizabeth M. Brown and Edward C. Brown, Jr. The Town holds an option to purchase the property from the Browns, and Wal-Mart in turn holds an option to purchase from the Town.

> FN1. The Wal-Mart defendants include Wal-Mart Stores East, L.P., Wal-Mart Stores East, Inc., and Carter & Burgess, Inc. The latter entity is a land agent and represented Wal-Mart's interests in connection with the land development at issue here. For purposes of this report it is unnecessary to distinguish among these entities, and I will refer to them collectively and individually as "Wal-Mart ."

The plaintiffs, Citizens for Smyrna-Clayton First, Sharon L. Durham and Michael H. McGrath, allege that the approval process followed by the Town was flawed, and thus illegal or unconstitutional. They seek an injunction prohibiting the Town from issuing a building permit based on its approval of the site plan, and enjoining the Town from further facilitation of the construction of the distribution center.

*I. FACTS*

Wal-Mart first approached the Town regarding the construction of a distribution center in September, 2001. Smyrna already had an area zoned as an "industrial/office/research park," which was designated for "manufacturing use" under the Town's existing comprehensive land use plan. After a public hearing before the Town Council on December 17, 2001, the Town Council voted unanimously to approve a rezoning of the Brown Farm for inclusion in the area zoned for an industrial park. Shortly thereafter, the Town and Wal-Mart held a joint press conference at which they announced that Wal-Mart intended to build a $50 million, one-million-square-foot-plus distribution

Not Reported in A.2d
2002 WL 31926613 (Del.Ch.)
(Cite as: 2002 WL 31926613 (Del.Ch.))

center on the Brown Farm.

In May, 2002, Wal-Mart applied to the Town for an approval of a site plan and a building permit for the distribution center. Under the Town's code, the steps for approval of a land development plan are as follows: The application is given to the Town Planning Department, which submits it to the Planning Commission. That body reviews the land development plan and makes a recommendation to the Smyrna Mayor and Council (the "Town Council"). The Town Council then reviews the land development plan along with the Planning Commission recommendation and staff report. If approved by the Town Council, the development plan (as approved) is then reviewed by the planning department for its evaluation, and a final review is made by the Town manager. Town of Smyrna Subdivision and Land Development ordinance of December 2001 (the "S.O."), § 3.04. [FN2]

> FN2. Wal-Mart's site plan application has been approved by the Town Council, with several conditions not pertinent to my analysis here. It awaits final review by the planning department and Town manager. In that sense, the development plan has not yet been approved. The parties agree, however, that assuming all contingencies are complied with, land development in accordance with the site plan will be approved, and there will be no further substantive review of the site plan by Town officials before approval.

The Town planning staff reviewed Wal-Mart's application and recommended approval of the site plan, assuming a number of conditions were satisfied. After a June 19th public hearing, the Town planning commission considered the site plan application. Only four of the five commissioners were present. The commission voted two for and two against the approval of the site plan.

*2 Upon its failure to received a favorable recommendation from the planning commission, Wal-Mart submitted a revised site plan application to the planning staff. The revised site plan was substantively unchanged from the initial version, apart from minor concessions to complaints raised by the public at the June 19, 2002 hearing. [FN3] Again the Town planning staff recommended approval subject to a number of conditions. After a public hearing on July

22, 2002, the planning commission recommended approval of the site plan application by a vote of three to two. Thereafter, the matter was presented to the Town Council for a hearing and decision. A public hearing was held on September 9, 2002. After a rather extensive presentation by Wal-Mart and by members of the public (including the plaintiffs here), the Town Council approved the site plan, with the restrictions advocated by the planning staff.

> FN3. These concessions included the provision in the site plan of a 12' high berm around the site planted with trees to reduce noise, as well as shielding for lighting on the facility.

The plaintiffs seek to enjoin the Town from issuing further permits or otherwise facilitating construction of the distribution center. They initially sought both temporary and permanent injunctive relief. At a teleconference with the Chancellor, however, the parties agreed to waive the hearing on the preliminary injunction and proceed directly to a decision on the permanent injunction. The parties agree that the issues presented are legal in nature and are content to have the matter decided on the briefing and current record. [FN4] Because Wal-Mart's plans to build the distribution center are contingent upon its exercise of its option to acquire the Brown Farm, and because that option expires on December 31, 2002, this matter has proceeded on an expedited basis. By stipulation, the parties have waived a draft report. This is my final report. [FN5]

> FN4. The current record includes the record available before the Town Council together with the very limited discovery which the plaintiffs have pursued since this action was filed. The parties disagree about the admissibility of the material discovered in this proceeding, however.

> FN5. Obviously, all parties retain the right to take exception to any issue in this final report.

## II. THE PARTIES' CONTENTIONS

The plaintiffs allege that the Town's approval of

Not Reported in A.2d
2002 WL 31926613 (Del.Ch.)
**(Cite as: 2002 WL 31926613 (Del.Ch.))**

Wal-Mart's site plan was illegal or unconstitutional in a number of ways, and that each of these instances of illegality or unconstitutionality has led to the approval of the site plan, which in turn will result in Wal-Mart's construction and operation of the distribution facility. The plaintiffs allege that operation of the facility will cause them irreparable harm.

The plaintiffs' allegations of flaws in the site plan approval process can be conveniently divided into three groups.

*(A) The allegedly defective vote of recommendation by the planning commission.*

The plaintiff alleges:

(1) that the planning commission's recommendation that the Town Council consider the site plan application favorably was improperly arrived at, because one of one of the commission members stated that his vote was based on the fact that the distribution center's operation would bring jobs to the community. According to plaintiffs, the commissioners' recommendations must be based upon the applicant's demonstration of compliance with Town ordinances and site plan requirements;

(2) that the planning and zoning committee recommendation is invalid because it failed to require Wal-Mart to submit a wetlands delineation report in connection with the site plan application, as required by Town ordinance;

**\*3** (3) that the planning commission's failure to require a wetlands delineation report in connection with its public hearing deprived the plaintiffs of their due-process right to comment upon the report;

(4) that the planning and zoning commission's recommendation is invalid because it did not require Wal-Mart to submit a traffic impact study as required by Town ordinance before the committee considered the application;

(5) that the failure of the planning and zoning commission to require the submission of a traffic impact study deprived the plaintiffs of their due-process right to be heard on the traffic impact study at the public hearing.

*(B) The alleged flaws in the Town Council's approval of the site plan application.*

The plaintiffs allege:

(1) that the approval of the Wal-Mart site plan by the Town Council was invalid because the Town Council failed to require a wetlands delineation report before consideration of the site plan;

(2) that the failure to require the submission of the wetlands delineation plan deprived the plaintiffs of their due-process right to be heard on this issue at the public hearing before the Town Council;

(3) that the Town Council's approval of the site plan is invalid because the Town Council relied on a traffic impact study which failed to address safety issues as required by Town ordinance;

(4) that the Town Council's approval of the site plan was invalid because it relied on a Delaware Department of Transportation ("DelDOT") review of the plaintiffs' traffic impact study which was itself incomplete or invalid;

(5) that the Town Council's approval of the site plan was invalid because it failed to require Wal-Mart to submit proof of compliance with "performance standards," as required by Town ordinance; and

6) that the Town Council's failure to require proof of compliance with the performance standards deprived the plaintiffs of their due-process right to comment upon Wal-Mart's attempt to meet the standards.

*C) The zoning claims.*

The plaintiffs claim that the approval of the site plan by the Town Council is illegal because construction of the distribution facility in compliance with the site plan would lead to activities on the site which are precluded by the zoning code, including:
    (1) facilities for truck service or repair;
    (2) facilities for the bulk storage of flammable liquids; and
    (3) the storage of explosives.

The plaintiffs claim that an injunction is justified based on these alleged illegalities and constitutional violations, because, unless enjoined, Wal-Mart will proceed, with the Town's approval, to build a distribution facility which will cause irreparable harm to the plaintiffs and the public in that they will be subject to unwarranted noise, pollution, and danger emanating from the site, and that the roads in the area

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

will become unsafe. The plaintiffs also allege that this harm outweighs any potential harm to Wal-Mart or the Town if the injunction is entered. The defendants deny that the plaintiffs have standing to challenge the site plan approval; and contend that in any case the approval was lawful and in compliance with the plaintiffs' due process rights. They deny that the plaintiffs face irreparable harm.

### III. THE LEGAL STANDARD

**\*4** The plaintiffs seek permanent injunctive relief. In order to demonstrate an entitlement to such relief, the plaintiffs must demonstrate: (1) success on the merits of their claims; (2) that they will be subject to irreparable harm if injunctive relief is not granted; and (3) the harm that will result if an injunction is not entered outweighs the harm that would befall the opposing party if an injunction is granted. *E.g. Draper Communication, Inc. v. Delaware Valley Broadcasters L.P., Del. Ch., 505 A.2d 1283, 1288 (1985).* In order to satisfy the first prong of the injunctive relief standard, the plaintiffs must show that the actions of the Town in approving the site plan were unsupported by the evidence, otherwise arbitrary and capricious, or unlawful. In order for the actions of the Council to withstand this review, they must not have been arbitrary and capricious. That is, they must be the result of an orderly reasoning process, and based on the evidence. I need not be persuaded that I would have come to the same conclusion as the Council in order to uphold an action. I must find, however, that the action was based on substantial evidence: more than a scintilla, if less than a preponderance. *See East Lake Partners v. City of Dover Planning Commission, Del.Super., 655 A.2d 821, 823 (1994); Olney v. Cooch, Del.Supr., 425 A.2d 610, 613-14 (1981).*

The plaintiffs' burden goes beyond a showing that the Town's actions were improper, however. The plaintiffs have chosen to forego their potential remedy at law under a writ of certiorari. *See, e.g., Eastlake Partners v. Dover, Del.Super., 655 A.2d 821 (1994).* [FN6] Instead, the plaintiffs seek the extraordinary equitable remedy of injunction. After demonstrating success on the merits by showing impropriety in the approval process, the plaintiffs will not be entitled to an injunction unless they also show that they will be irreparably harmed absent entry of the injunction, and that the equities balance in their favor.

FN6. I found separately, based on the claims

which the plaintiffs have alleged here, that under the unique facts of this case, the legal remedy was insufficient to supply the relief sought, conferring jurisdiction on this Court. All parties supported a finding of equitable jurisdiction.

The plaintiffs agree with the standard stated above, but argue that if they can demonstrate that the Town acted unlawfully, irreparable harm is self-proving. That is, the plaintiffs argue that if the Town omitted a step called for in its own ordinances, or acted arbitrarily in the approval process, or if its ordinances afforded the plaintiffs the right to be heard on an issue, but the Town failed to permit them to be heard, as members of the public suffering this illegality the plaintiffs have been irreparably harmed. This tautology cannot state the standard for injunctive relief, however.

First, a de minimis invasion of rights, even the right to procedural due process, is simply beyond a remedy. [FN7] *Citizens Coalition, Inc. v. County Council of Sussex County, Del. Ch., 773 A.2d 1018, 1023 (2000).* More important here, an injunction will not enter except where required to prevent a tangible, irreparable injury. I conclude that, after showing that the Town approved the site plan unlawfully, to satisfy the actual-harm requirement of the injunctive relief standard, the plaintiffs must show that they will suffer tangible harm as a result, such as that they will be harmed by a feature of the facility which would have been avoided absent the improper action of the Council.

FN7. For instance, a plaintiff alleging he was denied the right to speak at the public hearing could not enjoin the Town to hold a second hearing so that he could speak *in favor* of the application as approved.

### IV. DISCUSSION

### STANDING

**\*5** The individual plaintiffs are landowners living adjacent to or near the Brown Farm. [FN8] The defendants maintain that the plaintiffs have failed to establish that they have standing to challenge the actions of the Town Council in approving Wal-Mart's site plan.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                              Page 5
2002 WL 31926613 (Del.Ch.)
**(Cite as: 2002 WL 31926613 (Del.Ch.))**

FN8. One plaintiff is the civic corporation, Citizens for Smyrna-Clayton First, Inc. The standing requirements are more restrictive for organizations, like this plaintiff, than for individual plaintiffs. Since the relief available will be the same with or without standing on the part of the corporation, I have not separately analyzed its standing here.

There is no explicitly-created right of action to challenge a site plan approval by the Town Council. The parties agree that to establish standing to challenge the actions of the Town Council in approving the site plan under the applicable ordinances, the plaintiffs must 1) demonstrate that the interests they seek to protect are within the zone of interests the ordinances seek to protect, and 2) allege a related injury-in-fact. *See Committee of Merchants v. Longo*, Del.Super., C.A. No. 95A-06-009, Lee, J. (Nov. 18, 1996)(ORDER) at 4, *citing Gannett Co. v. State*, Del.Supr., 565 A.2d 895 (1989). According to the plaintiffs, meeting this two-part test is sufficient to demonstrate standing. Wal-Mart maintains that there is a third prong to the standing test applicable in cases where, as in this challenge to the actions of the Town Council, the plaintiffs seek review of a decision without any statutory right of appeal: the plaintiffs must demonstrate an interest distinguishable from the general public interest. The question is a simple one: where A and B are adjoining landowners, and the local government has granted B's application to improve his property, does A have standing to challenge this decision on the ground that the approval was contrary to law, even though his interest is no more than a keener variation of the interest of every member of the public in seeing the zoning ordinances enforced?

In *LeMay v. New Castle Co.*, Del. Ch., No. 12462, Berger, V.C. (May 6, 1992) (Mem.Op.), this Court answered that question in the negative. *LeMay* involved a challenge to approval by the county of a plan to expand a retirement home. One issue involved the violation of a requirement in the county code that certain information be submitted with a subdivision plan. The Court held that:

I am not satisfied that the LeMays have standing to seek relief for this code violation. The subdivision filing requirements do not appear to have been enacted for the special benefit of adjoining landowners; there is nothing in the relevant statute to suggest an intention to create a private remedy and, if a private remedy were implied, it might well

impede the administrative process of approving subdivision plans. *See Couch v. Delmarva Power & Light Co.*, Del. Ch., 593 A.2d 554, 558 (1991)(setting forth the three part inquiry for determining whether the statute provides for a private right of action). Accordingly, this claim must be dismissed.

*LeMay* (Mem.Op.) at 6. *Accord, Concord Towers, Inc. v. McIntosh Inn of Wilmington, Inc.*, Del. Ch., No. 15656-NC, Steele, V.C., at 3 (July 27, 1977) (Order adopting Master's Report); [FN9] *Committee of Merchants* (Letter Ord.) at 4; *Committee of Merchants and Citizens Against the Proposed Annexation, Inc. v. Longo*, Del. Ch., No 1768, Chandler, V.C. (Nov. 16, 1995) (Mem.Op.) at 2-3; *The Committee of Merchants and Citizens Against the Proposed Annexation, Inc. V. Longo*, Del.Supr., 669 A.2d 41, 44 (1995). [FN10] Because the plaintiffs here cannot establish an interest distinguishable from the other residents and property owners of the Town, the plaintiffs cannot show standing to attack the actions of the Town based on statutory grounds. [FN11]

FN9. In adopting the report, Vice Chancellor Steele indicated that the plaintiff there may have had standing "based on [its] ownership of the ... parking area [adjoining the proposed development] that could have an interconnecting access way from" the defendant's parcel for which building permits had issued. *Concord Towers*, at 1. That, of course, would indicate an interest of a type different from that of the public.

FN10. The various *Committee of Merchants* cases do not appear to have involved enjoining landowners, however.

FN11. The Town (joined by Wal-Mart) approaches the question of standing from a different but related prospect. The Town's argument is that the requirements of the Town ordinances at issue are enacted for the benefit of the Town, not for the benefit of the public and not for the especial benefit of adjacent landowners. *See LeMay* (Mem.Op.) at 6. Thus, argues the Town, the plaintiffs are not within the zone of interests which the ordinances seek to protect, and lack standing. *See Gannett Co.*, 565 A.2d 895 (1989).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d                                                              Page 6
2002 WL 31926613 (Del.Ch.)
**(Cite as: 2002 WL 31926613 (Del.Ch.))**

Because of my decision on the broader standing argument addressed above, I need not address the Town's argument further.

I do note, however, that despite the broad statements in the cited cases above that a demonstration of standing requires a showing of an interest distinguishable from that of the public, each of these cases would reach the same result based on application of the "zone of interest" prong of the standing test; and that the cited cases also analyze standing based on that criterion (*see, e.g., Committee of Merchants, 669 A.2d at 44*). A principled approach to this issue would be to simply fold the analysis of the character of the plaintiffs' interest into the "zone of interest" requirement for standing. *See Id.* Applied here, that would lead to a conclusion that the plaintiffs had standing to question administration of ordinances aimed directly at securing the safety and convenience of Town residents, but exclude standing to contest internal requirements and deadlines designed to insure only a process for review of applications convenient for the Town itself.

**\*6** The plaintiffs respond that the three-part standing test relied on by Wal-Mart originated from language in *Stuart Kingston, Inc. v. Robinson,* Del.Supr., 596 A.2d 1378 (1991), and that that decision represents an "aberration," [FN12] and was overruled *sub silentio* by *Oceanport Industries, Inc. v. Wilmington Stevedores, Inc.,* Del.Supr., 636 A.2d 892 (1994) and *Chao v. State,* Del.Supr. 780 A.2d 1060, 1066 n. 14 (1995). The other decisions cited above, according to the plaintiffs, erroneously followed the discredited test of *Stuart Kingston* rather than the two-prong test of *Oceanport Industries* and *Chao.*

> FN12. *Stuart Kingston* involved standing to invoke private contractual rights. In addressing this issue, the Court stated generally as a requirements for standing: "In order to achieve standing, the plaintiffs interest in the controversy must be distinguishable from the interest shared by other members of a class or the public in general." 596 A.2d at 1382.

Nothing in the *Chao* case, however, serves to limit the

holding of *Stuart Kingston.* Ms. Chao, a criminal defendant, sought to challenge a denial of funding for counsel by the trial court. Among the issues on appeal was whether that claim was moot because she lacked standing. There was no question that the denial of the funds to Ms. Chao was an issue in which she held an interest beyond that of the public at large. In the *Oceanport Industries* case, the Supreme Court mentioned that the Superior Court had overturned a decision of the Environmental Appeals Board (the "EAB") denying that a stevedore's union had standing to contest issuance of a permit allowing construction in the coastal zone. The EAB had relied on, among other things, the decision in *Stuart Kingston* that a plaintiff must have an interest beyond that of the public in general. The Superior Court, in reversing the EAB, distinguished *Stuart Kingston* because that case involved a private contract dispute rather than public property.

The Supreme Court, while reversing the Superior Court on other grounds, noted that in creating a private right of action, the legislature had conferred standing on the general public with respect to the issues there involved. The Supreme Court in *Oceanport Industries,* therefore, never reached the question of the applicability of *Stuart Kingston* outside the realm of private contracts (the Supreme Court ultimately reversed in *Oceanport Industries,* finding that the union did not have *organizational* standing).

Neither *Chao* nor *Oceanport Industries,* therefore, demonstrate that the cases cited above, which apply the standing test of *Stuart Kingston* in the area of land regulation, are not good law. *See Committee of Merchants, 669 A.2d at 44* (applying *Stuart Kingston* requirement - that plaintiff have interest beyond that of the general public to have standing - to a land annexation case *after Oceanport Industries* was decided). Under the rationale of those cases, the nearby-resident plaintiffs here have no standing to challenge the actions of the Town Council in approving Wal-Mart's site plan, based on the Town ordinances themselves. [FN13]

> FN13. There is no statutory right of appeal from the decisions of the Town Council in making a land use decision. Therefore, for the plaintiffs to have any right of review, they must demonstrate standing to invoke the Superior Court's issuance of a writ of certiorari, or the collateral review sought here

under this Court's equitable jurisdiction.

The plaintiffs also argue that the nature of the interests of a neighbor in construction on an adjacent parcel, particularly as here where the construction will be massive, indicates that the standing requirement of the cases following *Stuart Kingston* should not be followed as a matter of public policy, and that I should find the plaintiffs, as adjoining landowners, to have standing *per se* to seek a review of the approval of the site plan. However persuasive this argument may be, this is not a matter of first impression, and these arguments are misplaced before me. See footnote 11 *supra*.

**\*7** This determination does not end the matter, however, and I will proceed to address the merits for at least two reasons. The plaintiffs allege that the Town, in failing to follow certain procedures set out by ordinance, deprived them of the right to due process, a claim which confers standing to seek redress in this Court. *E.g., Couch v. Delmarva Power & Light Co., Del. Ch., 593 A.2d 554, 561 (1991).* Thus, with respect to those more narrow claims, the plaintiffs are entitled to a determination on the merits. Second, I am mindful of the fact that this Report will be given de novo review by a constitutional judicial officer. *See DiGiacobbe v. Sestak, Del.Supr., 743 A.2d 180 (1999).* Therefore, in the interest of judicial economy, it is appropriate that I address all plaintiffs' claims substantively.

THE MERITS

*A) The plaintiffs' claims based on the recommendation by the planning commission that the Town Council approve the site plan.*

In order for a site plan to be approved by the Town, the site plan must first be submitted to the planning staff of the Town, who consider it in light of the regulations and issue a recommendation to the planning commission. The members of the commission then consider the application and vote for or against recommendation of the site plan based upon the criteria stated by Town ordinance. After action by the zoning commission, the application is directed to the Town Council to make the determination of whether the site plan meets the criteria for approval.

The Town ordinances do not provide that a public hearing must be held in connection with consideration by either the planning commission or the Town Council. The defendants argue that there is no constitutional right for an individual to be heard on issues regarding the exercise of property rights of another, where the action contemplated will have only indirect effects upon the individual. *See Couch v. Delmarva Power & Light Co., Del. Ch ., 593 A.2d 554, 561-62 (1991).* Nevertheless, the Town conducted three public hearings on the approval of the site plan: one on the initial and one on the revised site plan, before the planning commission; and a third before the actual consideration of the site plan by the Town Council itself. The defendants concede that, having opened the process up to public review, some degree of procedural due process attaches to the hearing process itself. Procedural due process requires adequate notice to individuals concerned; an opportunity to be heard by a person potentially aggrieved; a decision reflecting the reasons underlying the decision; and adherence to controlling law. *County Council of Sussex County v. Green, Del.Supr., 516 A.2d 480, 481 (1986).*

As stated above, the planning and zoning commission held two hearings. After the initial site plan submitted by Wal-Mart was reviewed by the planning staff, and after the staff recommended approval of the site plan (with conditions), the planning and zoning commission held a public hearing. The commission consists of five members, one of whom was absent at the time of the hearing. After the hearing, the commission voted, recommending two for and two against approval of the site plan. Wal-Mart then submitted an amended site plan to the planning staff. The amendments were not substantial: in response to public comment at the first hearing Wal-Mart stipulated that it would create a tree-and-berm sound barrier around the facility and shield outdoor lighting. The planning staff again recommended approval of the site plan with conditions. Another public hearing was held. After this hearing the commission voted three to two in favor of approval of the site plan.

**\*8** The plaintiffs contend that the recommendation of the planning and zoning commission was invalid because one of the members of the commission, Memphis Evans, indicated that he had based his vote on the prospect of jobs to be created by the distribution center, rather than on the criteria set forth in Town ordinances. The plaintiffs also contend that the commission was required to direct Wal-Mart to submit a traffic impact study and a wetlands delineation study, as well as documentation showing that it would be in compliance with air pollution and noise ordinances, before considering the site evaluation plan. The commission's failure to secure these studies before a

Not Reported in A.2d
2002 WL 31926613 (Del.Ch.)
(Cite as: 2002 WL 31926613 (Del.Ch.))

Page 8

hearing and vote, argue plaintiffs, made its actions *ultra vires* and deprived the plaintiffs and the public of their right to comment upon the required studies. The defendants dispute that the actions of the commission were unlawful, [FN14] and contend that the plaintiffs are without standing to challenge the actions of the commission.

> FN14. Because I find that any improper proceeding by the planning commission cannot have irreparably harmed the plaintiffs, I have not discussed here the arguments by which the defendants seek to refute each of the plaintiffs' claims.

I find, however, that I need not reach the merits of this claim because it is clear to me that under no circumstances can the plaintiffs demonstrate that any actions or failures of the planning and zoning commission caused them potential irreparable harm. That is because the recommendations of the commission do not provide an independent legal basis for approval of the site plan. The site plan must be approved by the Town Council. Before acting, the Town Council held a public hearing on the issue of approval of a site plan. Therefore, if plaintiffs face irreparable harm as a result of the approval of the site plan, that harm must originate in some act or omission of the hearing before and actions of the Town Council, and not the actions of the planning and zoning commission. *See generally* Pottock v. Continental Can Co., Del. Ch., 211 A.2d 622, 624-25 (1965)(holding that this Court will not enjoin a de minimis injury).

The plaintiffs argue that I must at least evaluate whether Commissioner Evans' vote should be counted as in favor of the site plan approval, or disregarded. This is because the Town ordinance requires the commission to forward the recommendation of the majority of its members to the Council before that body may consider a site plan: according to the plaintiff, while a vote 3-2 is a recommendation "for," and a vote 2-3 is a recommendation "against," a vote 2-2 (which would result from the invalidation of Mr. Evans' vote), is neither a majority vote for nor against and thus is not a "recommendation" at all. The result, according to the plaintiffs, is that while a commission vote 0-5 *against* a site plan approval allows the application to go forward to potential approval by the Town Council, a vote of 2-2 by the commission freezes the application in limbo forever. This argument is clever but

unpersuasive. The ordinance requires the commission to forward its recommendation, and indicate the majority position. Nothing in the ordinance indicates that a recommendation of two for and two against a proposal is not a recommendation because neither side of the proposition holds a majority.

*B) The plaintiffs' claims based upon the actions of the Town Council.*

**\*9** The plaintiffs claim they were denied the right to be heard before approval of the site plan with respect to certain issues, in violation of their constitutional right of procedural due process; that the approval of the plan was unlawful because the Council failed to follow procedures set forth in its own ordinances, and that the Council made factual findings without substantial evidence or otherwise arbitrarily and capriciously. The plaintiffs allege that they face irreparable harm as a result.

1) The Wetlands Delineation Report.

Pursuant to federal law, Wal-Mart was required to engage an engineer and submit a wetlands delineation report to the Army Corps of Engineers. That body has jurisdiction over the regulation of wetlands. Wal-Mart engaged Duffield Associates ("Duffield") as its engineer to ensure compliance with wetland regulations. Duffield completed the required wetlands delineation report and submitted it to the Corps of Engineers in the spring of 2002. The report showed that the distribution facility was not to be constructed illegally in wetlands. The Corps of Engineers conducted an on-site review and accepted the wetlands report in July, 2002. The Corps of Engineers determined that it had jurisdiction over the wetlands on the Brown Farm, and informed Wal-Mart that if it must not fill any wetlands without a permit.

The Town also requires submission of a wetlands delineation report before approval of a site plan. [FN15] The ordinance does not disclose the reason for requiring a wetlands delineation report: presumably the Town has an interest in regulating drainage within its limits. For some reason undisclosed, although the Duffield wetlands report was finalized by July, 2002, it was not submitted to the Town or the public by the time of the public hearing on September, 9, 2002. The Town did have the site plan showing the location of the planned Wal-Mart improvements, which showed that the construction was not to be within the wetlands. As the plaintiffs point out, that plan shows only the area

Not Reported in A.2d                                                    Page 9
2002 WL 31926613 (Del.Ch.)
**(Cite as: 2002 WL 31926613 (Del.Ch.))**

within which construction will occur; it does not show the whole property, and fails to "delineate" an area of wetlands on the property, albeit in an area where construction is not contemplated. [FN16]

> FN15. Wal-Mart argues, based on its reading of the ordinances, that a wetlands delineation report is required only for subdivision approval, not where (as here) approval is sought for a site plan. Because of the result I reach on this issue, I need not address Wal-Mart's contention.

> FN16. Construction is to be toward the center of the parcel. The site plan does not show the bulk of the wetlands on the Brown Farm, which are located along the South-East boundary along Mill Creek.

At the Council meeting, members of the public raised the fact that the wetlands report had not been filed. There was in fact a motion, which did not carry, to table consideration of the Wal-Mart application pending receipt of the report. Wal-Mart's counsel stated at the meeting that the report was consistent with the delineation of wetlands on the site plan which was available to the public and the Council. Wal-Mart's counsel offered to arrange for a copy of the report to be delivered to the hearing that evening. Instead, based on the representations of Wal-Mart's counsel, the Council voted to approve the site plan conditioned on the wetlands delineation report being delivered and reviewed by the Town manager prior to the issuance of any building permit. In fact, the Wetlands delineation report was delivered to the Town on September 10, the day following the public hearing. Consistent with the representation of Wal-Mart's counsel at the hearing, the delineation report matched the depiction of wetlands shown on the portion of the site depicted in the site plan, and demonstrated that the distribution facility was not to be constructed within wetlands.

**\*10** The parties have spilt much ink over the questions of whether the Town may waive the requirement that a wetlands delineation report be provide prior to the Council's consideration of a site plan, and whether any of the plaintiffs have standing to assert such a breach. [FN17] I need not reach those questions, because the plaintiffs have utterly failed to demonstrate potential harm in connection with the wetlands delineation

report.

> FN17. In addition to the overarching question of whether the plaintiffs have standing under the *Stuart Kingston* test, discussed *supra.*, the defendants argue that the zoning ordinance requires submission of certain information for the convenience of the planning commission and the Town only, and that as members of the public the plaintiffs are not within the "zone of interest" of those ordinances.

The plaintiffs allege that their rights to procedural due process were violated, because they were denied the right to comment at the public hearing since they "could not comment upon a report which they hadn't seen." Of course, plaintiffs and other members of the public were aware of the requirement that a wetlands delineation report be produced, and as described above that very issue was debated at the hearing. Based upon counsel's representation that the report was available and consistent with the demonstration on the site plan that the facility would not be built in a wetland, the Town approved the recommendation with the condition described above. [FN18]

> FN18. Actually, Town approval of the site plan contains a number of other conditions not pertinent to this issue.

To the extent the plaintiffs have a protected interest in seeing and commenting upon the wetlands delineation report before Council's vote, it can only be to ensure that the improvements contemplated will not encroach upon or fill the wetlands. If the report filed on September 10 had shown such encroachment, the plaintiffs may have been able to show injury resulting from the late filing of the report. Since the report does not demonstrate encroachment, the plaintiffs have suffered no harm sufficient to justify enjoining the Town to reconsider the application, as the plaintiffs seek.

The plaintiffs argument that they could have attacked the methodology of the wetlands report at the hearing, had they been given timely access to it, rings hollow. The plaintiffs have had access to the report for several months. They can point to no defect in it. They have also had access to the Brown Farm for purposes of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

testing the conclusions of the report, but have failed to indicate any deficiency with the document. The Army Corps of Engineers has accepted the wetlands report, and taken jurisdiction over regulation of wetlands on the Brown Farm. Accordingly, if there was some violation of law in connection with the filing of the wetlands delineation report on September 10, the plaintiffs have failed to demonstrate resulting irreparable harm and are not entitled to enjoin the valid operation of the site plan approval on that ground.

2) The Traffic Impact Study.

The proposed Wal-Mart distribution facility will require numerous daily trips to and from the facility over a public highway, Route 300, which runs within the Town limits. Under the Town's Subdivision Ordinance (the "S.O."), "a traffic impact study will be required ... if the number of peak hour trips generated by the proposed development exceeds 50 vehicles. If DelDOT maintained roads are involved, the traffic study must be reviewed by DelDOT and comments or approval given prior to the final subdivision plan approval." S.O., § 4.05(a)(5). The traffic impact study ("TIS") must be prepared by a professional engineer, and indicate anticipated vehicular traffic to be generated by the development. S.O., § 405(a)(3). Wal-Mart hired Landmark Engineering, a licenced engineering firm, to perform a TIS for the facility. That study concluded that "all intersections studied within the scope of the Traffic Impact Study currently operate at acceptable levels of service (LOS) and will continue to do so in the future with or without the development of the distribution center." The TIS listed four improvements necessary, in Landmark's opinion, to safely accommodate future traffic. [FN19] The TIS was submitted to DelDOT. DelDOT then reviewed the TIS, and required certain changes. Landmark revised the TIS accordingly. DelDOT reviewed the revised TIS, and based on its review provided a report to the Town indicating that, with certain recommended improvements, [FN20] the intersections on Route 300 within the Town would accommodate all anticipated traffic, including that generated by the distribution center, at an "acceptable level of service." [FN21] At this point, Wal-Mart had complied with the requirements of the S.O., and the Town Council so found in approving the site plan.

FN19. The results of the TIS were presented by a representative of Landmark at the July 22, 2002 public hearing before the planning

commission.

FN20. These included such items as turn lanes and improved traffic signals.

FN21. Exhibit 16 at the public hearing of September 9, 2002.

**\*11** The plaintiffs' own expert spoke at the public hearing before the Town Council. David Jamison, a traffic engineer, told the Council that, in his opinion, Route 300 would need to be provided with paved shoulders to accommodate the increase in truck traffic expected due to operation of the distribution center. [FN22] The Town was thus faced with a dispute of opinion. It chose to accept the opinion of Landmark's engineer, as reviewed by DelDOT, rather than that of Mr. Jamison. Under the S.O., the Town is required to find only that the TIS has been produced by a licensed engineer and reviewed favorably by DelDOT. The Town had substantial evidence to accept the Landmark TIS (given certain infrastructure improvements) as sufficient to meet the requirements of the S.O.

FN22. Truck traffic into/out of the facility is estimated to be up to 750 vehicle round-trips per day.

The plaintiffs note that the purpose of the S.O. is "to insure the orderly development of land within the Town's corporate limits and to promote the health, safety, convenience and welfare of residents and visitors to the Town." S.O., § 1.01. The plaintiffs argue that this general statement of purpose makes an analysis of "safety" a part of each requirement under the S.O.; they then argue that because the DelDOT review refers only to an acceptable level of service, rather than an acceptable level of safety, [FN23] the review was insufficient on its face. This argument is misplaced. Route 300 is a public highway under the jurisdiction of DelDOT. DelDOT is charged with maintaining jurisdiction over the public highways. [FN24] DelDOT approved the sufficiency of Route 300 to handle the traffic which the distribution center will generate, and the Town is entitled to rely on the expertise of DelDOT. The S.O. requires no more. *See, e.g., Blake v. Sussex County Council,* Del. Ch., No. 1757, Steele, V.C. (July 15, 1997)(Mem.Op.) at 5. The plaintiffs make another

argument with respect to the TIS review. The plaintiffs point out that under the "DelDOT Rules and Regulations for Subdivision Streets," DelDOT is required to base its review of a TIS upon the procedures in the "Highway Capacity Manual," and to provide the engineer preparing the traffic impact study with both the "intersections to be analyzed" and the "roadway segments to be analyzed." The import of this section, according to the plaintiffs, is that a TIS must include an analysis of roadway segments as well as intersections. The plaintiffs thus argue that 1) the TIS and TIS review were defective because the TIS was based on an analysis of intersections only, and 2) the Town Council abused its discretion in relying on a legally deficient TIS review. With respect to the first assertion, the language of the DelDOT Rules and Regulations referred to, read in context, does not, in my opinion, require that all, any or some particular combination of segments and intersections of a route subject to the TIS review be analyzed in every case: it simply directs DelDOT to indicate to the engineer preparing the TIS what analysis must be done in that particular case . [FN25] More fundamental here, however, is that the plaintiffs have not made DelDOT a party, and it is not DelDOT's action from which plaintiffs seek relief. Their complaint here is that the Town Council should have concluded that DelDOT's review was invalid, and therefore rejected the site plan. Nothing on the face of the TIS or the DelDOT review would have indicated to the members of the Council that there were irregularities in those documents. Again, it is DelDOT which is charged with jurisdiction over the public highways. The Town was entitled to rely on DelDOT's review and approval of the TIS. S.O., § 4.05; *see East Lake*, 655 A.2d at 825-26 (reversing city planning commission where that body failed to accept conclusion of DelDOT report); *Blake* (Mem.Op.) at 5. Similarly, the plaintiffs allegation that the Town Council should have rejected the DelDOT review of Wal-Mart's TIS because the review was based insufficiently on the "Highway Capacity Manual" must be rejected. [FN26]

FN23. According to the defendants, the Town police department opined at the public hearing that, with the improvements indicated, the roads in the Town could safely handle the traffic anticipated, however.

FN24. *See generally* 17 *Del. C.* §§ 131, 132, 134.

FN25. *See* DelDOT Rules and Regulations for Subdivision Streets, § 15- 2.

FN26. The plaintiffs took the deposition of DelDOT's engineer, Mr. Brockenbrough. Both sides cite that testimony as in support of that sides' position as to the validity of the TIS review. While the action for injunctive relief pursued by plaintiffs here is broader than the certiorari review which they could have pursued at law, a review of arguments over the significance of the testimony of Mr. Brockenbrough in light of DelDOT's internal Rules and Regulations indicates the mischief that would result if the underlying validity of evidence presented to a local government in planning and zoning matters were opened to collateral review in equity. If local governments are not permitted to rely on the competence of, for instance, state agencies specifically charged with responsibility for the area in which they opine before the local body, the decisions of those bodies would become a never-ending source of litigation. That is the reason that a decision to affirm the action of a Town Council on a writ of certiorari requires only that the record below demonstrate substantial evidence--more than a scintilla but less than a preponderance is all that is required. *See Olney,* 425 A.2d at 613-14. While I may go beyond the record below as equity requires, the plaintiffs have failed to demonstrate to me why I should delve into the internal review procedure of DelDOT engineers in this action against the Town of Smyrna. *See Blake* (Mem.Op.) at 5 (refusing to go beyond the face of a DelDOT report in order to decide whether a planning commission acted reasonably. "[Q]uestioning the reasonableness of DelDOT's procedures is altogether different than questioning the reasonableness of the Council's reliance upon their report").

**3) The "performance standards"**

**\*12** Section 6.9 of the Zoning part of the Smyrna Town Code (the "zoning code") sets "performance standards" by which "all structures and uses in the Town are to be regulated." The stated purpose is to "regulate any use which may be objectionable through the emission of ...

Not Reported in A.2d
2002 WL 31926613 (Del.Ch.)
**(Cite as: 2002 WL 31926613 (Del.Ch.))**

air pollution, noise, vibration, fire ..." and other dangers and annoyances. Among the standards applicable to the use of property is included that "[n]o emission shall be permitted which can cause any damage to health, animals, vegetation, or other forms of property ..." and that volumes of sound, measured along the property line, shall be within proscribed limits. Section 6.9.b(1), e. These regulations are directed toward existing, rather than proposed uses - the "sound level" requirement, for instance, directs the measurement of sound emissions with a "sound level meter," a task not possible prior to the use of the property. Section 5.14.a of the zoning code, however, provides that no building shall be *erected* in areas zoned as industrial park "except ... in accordance with the performance standards of Section 6 and subject to site plan approval as set forth" in the S.O. According to the plaintiffs, this language imposes on the Town an additional duty beyond insuring that a site plan meets the requirements of the S.O. discussed above: insuring, through the site plan review process, that the facility is designed to operate in conformity with the performance standards of Section 6.9 of the zoning code.

Section 6.9 provides that "[p]rovisions for administration of these standards are set forth in Section 7.5 of this ordinance." Section 7.5.D requires the applicant for a major site plan approval to submit to the Town, among other things,

a description of the proposed machinery, operations and products. Specifications for the mechanisms and techniques to be used in restricting the elements mentioned in Section 6.6  [FN27] of this ordinance shall be submitted by the applicant. The applicant shall submit a written statement acknowledging his understanding of the performance standards and agree to conform to the standards at all times.

FN27. This is apparently a typographical error in the code. Section 6.9, not 6.6, sets forth the performance standards.

If the Town finds that there is any "reasonable doubt as to the likelihood of conformance" with the standards, the planning commission is directed to acquire and review the report of "an expert consultant" on the issue of compliance. Section 7.5.D.

According to the plaintiffs, the Town approved the site plan without requiring submission of sufficient information to ensure compliance with the performance standards in the areas of air pollution and noise.

The defendants contend that, since the plaintiffs failed to object that the defendants were violating Section 7.5 at any of the three public hearings on this matter, the plaintiffs are estopped from raising the matter here. Whatever the weight of that argument in a proceeding on a writ of certiorari, I think the defendants argument is not dispositive here. If I find that the Town acted unlawfully, that the unlawful action will lead to irreparable harm absent an injunction, and that a balancing of the equities supports equitable relief, the plaintiffs are entitled to the injunction they seek. [FN28]

FN28. Of course, when it comes to a balancing of the equities, the fact that the plaintiffs sat mute below could have significance.

**\*13** In connection with its application, Wal-Mart provided the Town with some 1600 pages of architectural/engineering drawings and specifications for all phases of the distribution center. The Town was informed that the facility is to be surrounded by 12' berms planted with Leland Cypress trees to screen it visually and sonically. At the July 22 public hearing, Wal-Mart presented evidence that the Delaware Department of Natural Resources and Environmental Control (the "DNREC") had represented that the distribution center would not require an emissions permit because anticipated emissions from the facility would be below State thresholds, and that the DNREC would not require an air pollutants survey for this facility; that tests conducted by Wal-Mart at its distribution facility in New York State, measuring discharges of hydrocarbons, carbon monoxide and nitrous oxide, indicated that no mitigation measures for this similar facility would be required; and that the facility would abide by state and federal regulations. This information was provided to the Town Council at its public hearing on September 9, 2002 (in the form of the minutes of the Planning Commission hearing), and was supplemented by evidence submitted by Wal-Mart that, based on a review of DNREC records, the truck traffic generated by the facility would constitute less than 1/4 of one percent of the aggregate air emissions of Kent County.

At the September 9 public hearing, Wal-Mart provided evidence that based on noise level studies at its similar facilities, noise levels generated by the facility on the property line would be about 45 decibels, an acceptable

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
2002 WL 31926613 (Del.Ch.)
**(Cite as: 2002 WL 31926613 (Del.Ch.))**

Page 13

level (according to Wal-Mart) under the Town ordinance, and that existing traffic noise on Route 300 was about 50 decibels. The Council was informed that the sound at the boundaries would be the equivalent of a large transformer at 100 feet, that by contrast a diesel truck going 40 mph creates 84 decibels at a distance of 50 feet, and that the Town's existing electrical generator, located in another area of the industrial park, creates 69 decibels. Wal-Mart also provided evidence at the hearing on how its activities would be conducted to minimize sound. The Town thereafter approved the site plan, with conditions, including the imposition of an on-site 15 mph speed limit to minimize "gear-shifting" noise.

In sum, the Town had substantial evidence to conclude, based upon Wal-Mart's representations, that emissions from the property will not endanger health or property and that sound levels will comply with the Town ordinance. The facts presented, including the extensive presentation about noise and the representation that emissions would be within the limits imposed by the DNREC, were substantial evidence from which the Town could find that there was no reasonable doubt that Wal-Mart would comply with the performance standards, and thus no need for an independent expert review. [FN29] The Town did not act arbitrarily or capriciously in granting the site plan approval in light of the performance standards.

> FN29. Of course, if after operation begins, Wal-Mart's representations to the Town turn out to be erroneous, nothing precludes action to enforce the standards set by the zoning code.

**\*14** The plaintiffs make another argument with respect to the performance standards. Because a good deal of the evidence on the specific questions of emissions and noise was presented orally at the public hearings on the site plan, the plaintiffs argue that they did not have the opportunity before those hearings to prepare a response to Wal-Mart's presentation. According to the plaintiffs, this deprived them of an effective right to be heard at the hearings in violation of their rights to procedural due process.

The plaintiffs arguments are unpersuasive. Wal-Mart's application was vetted at three public hearings. The plaintiffs were aware of the performance standards requirements of the code, and had ample opportunity to

inform the Town Council of their belief that Wal-Mart had failed to demonstrate compliance. They had the benefit of Wal-Mart's presentation at the planning commission hearing several weeks before the hearing before the Town Council. While they failed to raise this issue before either the planning commission or the Council, the plaintiffs and other members of the public expressed concerns about both noise and emissions from the facility. Moreover, the plaintiffs do not indicate what response they would have made had Wal-Mart's evidence been presented to them prior to the hearings. They merely claim that the information provided was insufficient under the zoning code, a claim which they were able to, but failed to, raise at the public hearing, and a claim which I have rejected above. The plaintiffs were not denied a full and fair opportunity to be heard on the issue of compliance with the performance standards.

4)Summary

The issue before this Court is not whether, as a policy matter, Route 300 should have paved shoulders installed, or whether more thorough pollution or noise studies should be required before industry is allowed to locate in the Town of Smyrna. The issue before this Court is whether the plaintiffs have demonstrated that, in approving the site application, the Town acted illegally or arbitrarily and capriciously; and whether the plaintiffs have demonstrated irreparable harm will result therefrom. The plaintiffs have failed to so demonstrate, and their injunction request accordingly must be denied.

C) *The plaintiffs' contentions that the operation of the distribution center, as indicated in the site plan, will violate the Town's zoning ordinance.*

The plaintiffs argue that the operation of the distribution center as contemplated in the site plan will violate the zoning code in a number of way. First, incidental to its use as a trucking terminal and warehouse, Wal-Mart has indicated that it intends to install gas and diesel pumps and a two-bay maintenance and truck washing facility, uses that the plaintiffs claim are prohibited under the current "industrial park" classification in which the facility will be located. Next, the site plan shows a portion of the warehouse dedicated as an "aerosol room," a portion of the facility specially constructed to store items such as propane cylinders, hair spray and rifle ammunition, pre-packaged for sale to consumers, which pose a special danger in case of fire. The plaintiffs contend that this would amount to prohibited bulk storage of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
2002 WL 31926613 (Del.Ch.)
**(Cite as: 2002 WL 31926613 (Del.Ch.))**

Page 14

flammable liquids and explosives. Wal-Mart and the Town contend stoutly that the truck-fueling-and-repair facility is a permitted incidental use to the warehouse/truck terminal permitted by the zoning, and that provisions against bulk storage of flammable liquids and storage of explosives should not be construed to exclude storage of prepackaged consumer goods containing propane or gunpowder.

**\*15** Unlike the claims of the plaintiffs which I addressed above, which are remediable at law, if at all, by the common-law writ of certiorari, violations of zoning laws have a remedy at law prescribed by statute. That remedy is had through the Town board of adjustment created specifically to address such claims. A statutory right of appeal from any decision of that body lies within the jurisdiction of the Superior Court. *See* 22 *Del. C.,* Ch. 3, Subch. II.; *Bethany West Recreation Assoc. v. ECR Properties, Inc.,* Del. Ch., No 1739-S, Chandler, V.C. (April 28, 1995)(OPINION) at 6 (stating that remedy for zoning violation "must be through the [Town] Board of Adjustment and the Superior Court").

It is clear that, having assumed jurisdiction of a portion of this case, this Court may exercise the discretion to resolve the remaining legal issues, as justice requires. I find that there is no justification for addressing the zoning issues here, however. The boards of adjustment are tailor-made by the legislature for addressing just the issues of law raised here. Those boards and the Superior Court have the expertise for that determination, and this Court should not interrupt the statutory scheme unless some compelling reason, absent here, exists.

First, there is as yet no violation of the zoning ordinance, nor will construction of the facility in conformity with the site plans necessarily result in harm even under the plaintiffs' view of these proceedings. The Brown Farm is zoned as an industrial park, and construction of warehouses and truck terminals are permitted. This is not a parcel of land in a residential neighborhood where the erection of a commercial building itself is both unlawful and potentially harmful. The plaintiffs cannot be harmed by anticipatory breaches of the zoning ordinance. There are potential grounds to enjoin the *use* of the facility for truck fueling and maintenance, and for storage of flammable liquids and ammunition; not so for the construction of facilities that could be used for that purpose.

I point this out not to elevate form over substance, but

to demonstrate that there is no urgency to the resolution of the zoning issues. Of course, if Wal-Mart installs its maintenance and fueling facilities, or devotes a portion of its warehouse to a specially-constructed room suitable for the storage of flammable consumer goods, it runs the risk of ultimately not being permitted to put these facilities to their intended use. That is simply a business decision which Wal-Mart must make. I see no potential irreparable harm in dismissing the allegations of zoning violations, without prejudice, to allow the plaintiffs to pursue their remedy at law once a building permit issues.

*V. CONCLUSION*

The individual plaintiffs live near an industrial park. Understandably, they are alarmed that a very large warehouse facility is planned for that park. The zoning of the Brown Farm as an industrial park is not challenged here, however. For better or worse, one of the attributes of the plaintiffs' property is that it is adjacent to land which is devoted to industrial development.

**\*16** The issue here is much more limited. It is whether the manner in which the Town approved the Wal-Mart site plan was unlawful, and whether that illegality, absent the injunction sought, will result in the development of the Brown Farm in a manner which will cause the plaintiffs to be harmed irreparably. This the plaintiffs have failed to demonstrate, and they are not entitled to a permanent injunction.

Once this report becomes final, the parties should submit a form of order consistent with the reasoning above.

2002 WL 31926613 (Del.Ch.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

8

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
DIANESE, INC., Gaetano Dianese, and Rosemarie
Dianese, Plaintiffs,
v.
COMMONWEALTH OF PENNSYLVANIA, et al.,
Defendants.
**No. CIV.A. 01-2520.**

June 19, 2002

Reed, S. J.

*MEMORANDUM*

**\*1** This action arises out of various contractual
disputes involving a number of construction projects.
Plaintiffs acting *pro se,* except for the corporate
plaintiff which proceeds without representation and
without *pro se* status, [FN1] have brought suit against
over twenty defendants, including unnamed John
Does, asserting claims under the Racketeer Influence
and Corrupt Organization ("RICO") Act, 18 U.S.C. §
§ 1961 *et seq.,* and federal civil rights statutes, 42
U.S.C. § § 1981, 1983, 1985, and 1986. This Court
has jurisdiction over the action pursuant to 28 U.S.C.
§ 1331. Now before the Court is the motion of
Dryfoos Insurance Agency, Inc. ("Dryfoos") for a
more definite statement pursuant to Federal Rule of
Civil Procedure 12(e) (Doc. No. 13), the motion of
Pinnacle Roofing & Sheet Metal, Inc. ("Pinnacle")
for summary judgment or in the alternative for
dismissal (Doc. No. 23), and the motions for
dismissal by the following defendants: Selective
Insurance, Selective Way Insurance, and Selective
Insurance Group (the "Selective Defendants") (Doc.
Nos.14, 91); Byerly Insurance Agents and Brokers,
Inc., ("Byerly") and Central Pennsylvania Indemnity
("Central") (Doc. Nos.16, 17); PNC Financial Group,
Inc. ("PNC") (Doc. No. 22); First Federal Bank and
Northeast PA Financial ("First Federal") (Doc. No.
24); Mid-States Surety Corp. ("Mid-States") (Doc.
Nos.27, 28); the Borough of Jim Thorpe (Doc. No.
49); the Commonwealth of Pennsylvania, the
Department of General Services, Michael Peapos,
David McCarty, Merle H. Ryan, and Steven Busterna
(Doc. Nos.50, 94); Laputka Bayless Ecker & Cohn,
PC ("Laputka") (Doc. Nos.58, 73, 78); Washington

International Surety Corp. ("Washington") (Doc. No.
74); Parente Rudolph Orlando Carey & Associates
("Parente") (Doc. Nos.79, 80); the United States, the
Department of the Army, the Tobyhanna Army
Depot, Fred Beynon and Alice Fitzgerald (Doc. No.
98); and the responses thereto (Doc. Nos.219-235) as
well as plaintiffs' request for leave to amend as
incorporated in their responses. [FN2] For the
reasons set forth below, the request for leave to
amend the amended complaint will be denied, the
motion for a more definite statement will be denied,
the motions for dismissal of the defendants will be
granted, and the claims against Manufacturers &
Traders Trust Bank Co. ("M & T") and Dryfoos and
the amended complaint will be dismissed in their
entirety.

> FN1. See Orders of August 16, 2001 (Doc.
> No. 84), and April 9, 2002 (Doc. No. 207).

> FN2. All of the described motions and the
> plaintiffs' motion to amend are directed
> toward the amended complaint.

I. Background [FN3]

> FN3. All facts are taken as true from the
> amended complaint, as required by law.

Plaintiff Dianese, Inc. is a contracting corporation
that entered into several public works contracts with
the Department of General Services ("DGS") of the
Commonwealth of Pennsylvania (the
"Commonwealth") between 1998 and 2000. Through
a number of unresolved disputes that arose over the
contracted projects in the Hamburg Center
("Hamburg project") and Eckley Miner's Village
("Eckley project"), plaintiffs have not yet received
disputed payments for their completed work.
Through alleged misrepresentations by the
Commonwealth and plaintiffs' own lawyers' law firm,
plaintiffs were persuaded to settle their claims
pursued in the Commonwealth grievance process, but
have yet to receive the promised settlement funds.
Due to the resulting financial difficulties, the plaintiff
corporation and its personal guarantors, plaintiffs
Gaetano and Rosemarie Dianese, have encountered
troubles in satisfying their loans and in paying their
creditors. Plaintiffs subsequently had further
problems in gaining additional financing, insurance,
or performance bonds to secure their operations. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

Page 2

addition, contract disputes similar to those encountered in the Commonwealth projects have arisen in the plaintiffs' public works contracts with defendants the Borough of Jim Thorpe and the Tobyhanna Army Depot. Plaintiffs allege that the defendants have participated in a conspiracy to bankrupt plaintiffs by withholding contractually owed funds and by creating financial difficulties to prevent plaintiffs from further pursuing the disputed funds. Plaintiffs assert claims under the RICO and federal civil rights statutes against the state and federal government, several officials therein, financial and insurance organizations, creditors, and plaintiff's former law and accounting firms.

 Plaintiffs originally filed suit in January 2001 on behalf of Dianese, Inc., its sole shareholder Gaetano Dianese, and his wife Rosemarie Dianese, asserting claims under section 1983 against the Commonwealth and the DGS. *See Dianese, Inc. v. Commonwealth of Pennsylvania*, C.A. No. 01-488, 2001 U.S. Dist. LEXIS 11491 (E.D. Pa. April 17, 2001). On March 13, 2001, this Court dismissed the previous action based on the defendants' Eleventh Amendment immunity. *Id.*

*2 In June 2001, plaintiffs brought this action, adding more defendants and asserting claims under both constitutional tort law as well as the civil RICO statute. Plaintiffs filed an amended complaint on June 12, 2001. With the exception of defendant M & T who filed an answer to the amended complaint, and defendant Dryfoos who filed a motion for a more definite statement, all of the remaining named defendants filed motions for dismissal. Plaintiffs' response to these motions were considerably delayed as they consistently challenged this Court's orders directing them to retain and utilize counsel for their corporation as required under the federal rules. *See Rowland v. California Men's Colony*, 506 U.S. 194, 202, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993). Although counsel for plaintiffs entered an appearance in September 2001, plaintiffs continued both to dispute the legal requirement for counsel to represent Dianese, Inc. and to file papers *pro se* rather than through their counsel of record. Similarly, plaintiffs persisted in continually and impermissibly removing actions from state court to join this action despite various remand orders instructing plaintiffs as to the proper grounds for removal. Finally, on March 1, 2001, having found that the accumulated meritless *pro se* filings by plaintiffs constituted an abuse of the litigation process, the Court was forced to enjoin plaintiffs from filing any further non-responsive papers absent leave of Court. On March 26, 2002, the

Court held a hearing to consider the motion of plaintiffs' counsel to withdraw and plaintiffs' request to represent Dianese, Inc. *pro se.* On April 9, 2002, the Court granted the motion for counsel to withdraw and allowed plaintiffs Gaetano and Rosemarie Dianese to proceed *pro se,* but determined that Dianese, Inc. did not qualify for an exception to the long-standing rule requiring representation of corporations by attorneys. The Court thus ordered that if plaintiffs could not retain counsel to file responses to the pending motions on behalf of Dianese, Inc., the corporation would go unrepresented. Plaintiffs have failed to do so; consequently, the plaintiff corporation has not responded to the pending motions. The motions to dismiss the claims asserted by the plaintiff corporation thus stand unopposed. Any further reference to plaintiffs herein shall be construed as referring solely to plaintiffs Gaetano and Rosemarie Dianese.

II. Legal Standard

*3 Rule 12 (b) of the Federal Rules of Civil Procedure provides that "the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted." In deciding a motion to dismiss under Rule 12(b)(6), a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *See Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). Because the Federal Rules of Civil Procedure require only notice pleading, the complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). A motion to dismiss should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In considering a motion to dismiss, the proper inquiry is not whether a plaintiff will ultimately prevail, but rather whether a plaintiff is permitted to offer evidence to support its claim. *See Children's Seashore House v. Waldman*, 197 F.3d 654, 658 (3d Cir.1999), cert. denied, 530 U.S. 1275, 120 S.Ct. 2742, 147 L.Ed.2d 1006 (2000) (quoting *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). The moving party bears the burden of showing that the non-moving party has failed to state a claim for which relief can be granted. *See Gould Elec. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir.2000). While all facts in the complaint must be accepted as true, this Court "need not accept as true

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                            Page 3
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

unsupported conclusions and unwarranted inferences." *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 184 (3d Cir.2000), cert. denied, 532 U.S. 1038, 121 S.Ct. 2000, 149 L.Ed.2d 1003 (2001) (citations omitted).

This Court is mindful of the fact that *pro se* complaints are to be construed liberally to afford litigants all reasonable latitude. *See Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 230 L.Ed.2d 652 (1972). Nevertheless, this leniency does not excuse a *pro se* plaintiff from conforming to the rules of civil procedure or from pleading the essential elements of his claim. *See Floyd v. Brown & Williamson Tobacco Corp.,* 159 F.Supp. ed 823, 832 (E. D.Pa.2001); *Smith v. SSA,* 54 F.Supp.2d 451, 454 (E.D.Pa.1999).

III. Analysis

A. Motion for Leave to Amend

In addition to their responses and as incorporated therein, plaintiffs Gaetano and Rosemarie Dianese filed a document entitled "New Amended Complaint" (Doc. No. 236, Appendix A) ("New Am. Compl."). The Court construes the submission of the New Amended Complaint as a request for leave to file a second amended complaint. After amending a complaint once or after an answer has been filed, the plaintiff may amend only with leave of court or the written consent of the opposing party, but "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) (citations omitted). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. *Id.* (citing *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996)). In assessing "futility," the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). *Id.*

Several defendants have argued that granting leave to file the new amended complaint would be futile as it still fails to state a claim for relief. The 116-paged proposed new amended complaint provides 404 paragraphs outlining a detailed, sometimes confusingly circuitous, description of the alleged conspiracy. The proffered new amended complaint provides greater factual specificity to support plaintiffs' claims. Nevertheless, even reading it liberally in favor of the plaintiffs, for the reasons set forth below, I conclude that the new amended complaint would still fail to state a claim upon which relief can be granted. Because I find that further amendment of the amended complaint would be futile, the request of plaintiffs for leave to amend will be denied.

B. Motions to Dismiss

1. Jurisdiction

a. The Commonwealth Defendants

**\*4** Plaintiffs have brought suit against the Commonwealth and the DGS, an agency of the Commonwealth (collectively, "the Commonwealth Defendants"). Additionally, they have sued Michael Peapos, Regional Director of DGS; David McCarty, Director of the Bureau of Construction of the Commonwealth; Merle H. Ryan, Deputy Secretary for Public Works of the Commonwealth; and Steven Busterna, an attorney in the Office of the Chief Counsel for the Commonwealth (collectively, the "State Officers"). The State Officers have all been sued in their official and individual capacity.

The Commonwealth Defendants have moved for dismissal based on the Eleventh Amendment. The Eleventh Amendment bars federal courts from hearing actions by private parties against a state and its agencies. [FN4] *See Kimel v. Florida Board of Regents,* 528 U.S. 62, 120 S.Ct. 631, 643-44, 145 L.Ed.2d 522 (2000); *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 1122, 134 L.Ed.2d 252 (1996). This jurisdictional bar is both a testament to and protection of the sovereignty of each state as balanced against the power of the federal government. As part of the executive branch of the Commonwealth, the DGS is also protected by Eleventh Amendment immunity. *See* 71 Pa.C.S. § 61; *Lavia v. Pennsylvania Dep't of Corrections,* 224 F.3d 190, 195 (3d Cir.2000). Eleventh Amendment immunity is subject to two exceptions: congressional abrogation and state waiver. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). Accordingly, unless the Commonwealth has consented to suit or Congress has expressly abrogated Eleventh Amendment immunity in the statutes under which plaintiffs have brought suit, this action is barred as against the Commonwealth and the DGS.

FN4. The Eleventh Amendment provides: "The Judicial power of the United States

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Despite this wording, the Amendment has been long been held to immunize states in actions by any private citizen, including their own. *See Alden v. Maine,* 527 U.S. 706, 729, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999).

The Pennsylvania legislature has made clear its intent to retain sovereign immunity from suit. *See* 1 Pa. Cons.Stat. Ann. § 2310; 42 Pa. Cons.Stat. Ann. § 8521. This immunity has been waived in only a few specific exceptions, none of which apply in this instance. *See* 42 Pa. Cons.Stat. Ann. § 8522(b). [FN5]

> FN5. The Commonwealth has waived sovereign immunity in negligence actions involving: (1) vehicle liability; (2) medical professional liability; (3) care, custody and control of personal property; (4) Commonwealth real estate; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) National Guard activity; and (9) toxoids and vaccines. 42 Pa.C.S. § 8522(b).
>
> Plaintiffs argue that this action falls within the exception involving personal property in the care, custody and control of the Commonwealth. *See* 42 Pa.C.S. § 8522(b)(3). Nevertheless, for this exception to apply, the personal property must be the cause of the injury. *See Iseley v. Horn,* Civ. No. 95-5389, 1996 U.S. Dist. LEXIS 13471 (E.D.Pa. September 3, 1996)(immunity not waived when improper confiscation, not property itself, caused injury); *Sugalski v. Commonwealth,* 131 Pa. Commw. 173, 569 A.2d 1017, 1019 (1990) (immunity not waived when improper handling of property caused injury). In contrast, plaintiffs have alleged that injury was caused by the improper retention of plaintiffs' property, rather than by the property itself. Accordingly, Pennsylvania has not waived its immunity in this action.

Nor do the statutes under which plaintiffs have sued provide for suit against the Commonwealth. To abrogate the Eleventh Amendment, Congress must make its intention to do so "unmistakably clear in the language of the statute." *Kimel,* 120 S.Ct. at 640. Congress has not done so in RICO or in any of the federal civil rights statutes under which plaintiffs have brought suit. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 66, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil rights."); *Boykin v. Bloomsburg Univ. of Pa.,* 893 F.Supp. 378, 394 (M.D.Pa.1995) (no abrogation of sovereign immunity intended in 42 U.S.C. § § 1981, 1983, 1985 and 1986), *aff'd,* 91 F.3d 122 (3d Cir.1996); *Bair v. Krug,* 853 F.2d 672, 674-75 (9th Cir.1988)(no abrogation of sovereign immunity intended in civil RICO statute); *Gaines v. Texas Tech University,* 965 F.Supp. 886 (N.D.Tx.1997) (citing *Bair,* 853 F.2d at 674-675); *Molina v. New York,* 956 F.Supp. 257, 260 (E.D.N.Y.1995) (dicta); *McMaster v. Minnesota,* 819 F.Supp. 1429, 1434 (D.Minn.1993), *aff'd* 30 F.3d 976 (8th Cir.1994)). [FN6] Because Pennsylvania has not waived its sovereign immunity and Congress expressed no intention of disturbing the states' sovereign immunity in enacting the RICO and federal civil rights statutes, this suit is barred by the Eleventh Amendment as against the Commonwealth and the DGS.

> FN6. Plaintiffs' reliance on *United States v. Burns,* 683 F.2d 1056 (7th Cir.1982), involving the federal prosecution of an officer of a state agency for criminal RICO violations, is misplaced. A criminal prosecution by the United States against an individual state officer does not trigger the Eleventh Amendment, which protects states from suit by private citizens.

**\*5** Plaintiffs have also brought suit against a number of state officers of the Commonwealth and the DGS in their official capacity. A suit against a state officer in his official capacity for monetary damages is the same as a suit against the state itself; thus, it too is barred by the Eleventh Amendment. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1143 n. 3 (3d Cir.1995). [FN7] Nevertheless, in their new amended complaint, plaintiffs also name the State Officers in their individual capacity. The Eleventh Amendment does not bar actions for monetary damages against state officers in their individual capacity. *See Hafer v. Melo,* 502 U.S. 21, 27-31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Accordingly,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

plaintiffs' claims against the State Officers in their individual capacity are not jurisdictionally barred, but will be analyzed on their merits in the discussion below on the claims asserted.

> FN7. The Court notes that there is an exception under *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 442, 2 L.Ed. 714 (1908), that allows suit against individual state officers in their official capacity for injunctive relief. Nonetheless, because I conclude that the purported request for injunctive relief would in effect require payment of funds from the state treasury for past violations of federal law in violation of the Eleventh Amendment, *see Edelman v. Jordan,* 415 U.S. 651, 668-69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and because the claims asserted by plaintiffs against the State Officers are untenable on their merits as discussed below, the *Young* exception will not save plaintiffs' complaint from dismissal.

b. The Federal Defendants

*6 Plaintiffs have brought suit against the United States, the Department of the Army, and the Tobyhanna Army Depot ("Tobyhanna") (collectively, the "Federal Defendants"). Additionally, they have sued Fred Beynon, Contract Administrator for Tobyhanna, and Alice Fitzgerald, Contracting Officer for Tobyhanna (collectively, the "Federal Officers"). The Federal Officers have been sued in their official and, as named in the new amended complaint, in their individual capacity.

The Federal Defendants have moved to dismiss the claims against them for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6). The United States and its agencies are shielded by sovereign immunity from suit, *see* United States v. Mitchell, 463 U.S. 206, 211, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), but the federal government has provided for a limited waiver of its immunity under certain circumstances pursuant to the Federal Tort Claims Act ("FTCA") and the Tucker Act. 28 U.S.C. § 1346.

Under the FTCA, the United States has consented to suit in federal district courts for certain torts committed by its employees. *See* 28 U.S.C. § 1346(b) [FN8]; *Fed. Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 476-77, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The FTCA does not waive immunity for

all torts, however. To be actionable under the FTCA, the United States must be liable to the claimant, "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. 1346(b). Courts have construed the phrase "the law of the place" to refer to the law of the state; thus, for liability to arise under the FTCA, the source of substantive liability must be state and not federal law. *See Meyer,* 510 U.S. at 477-78; *Chen v. United States,* 854 F.2d 622, 626 (2d Cir 1988).

> FN8. Specifically, Section 1346(b) states, in relevant part:
> Subject to the provisions of chapter 171 of this title, the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death cause by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right.... [The] United States simply has not rendered itself liable under § 1346(b) for constitutional tort claims. *Meyer,* 510 U.S. at 477-78. Plaintiffs' constitutional tort and civil RICO claims are based on federal law. I therefore conclude that they are not cognizable under the FTCA.

Under the Tucker Act, however, this Court has concurrent jurisdiction with the U.S. Court of Federal Claims over claims against the United States not exceeding $ 10,000, brought pursuant to the Constitution, federal statute or federal regulation. *See* 28 U.S.C. § 1346(a)(2); [FN9] *Mitchell,* 463 U.S. at 211 n. 10. Original jurisdiction over such claims seeking more than $ 10,000 vests exclusively in the U.S. Court of Federal Claims *See Chabal v. Reagan,* 822 F.2d 349, 353-54 (3d Cir.1987); 28 U.S.C. § 1491 (the "Big Tucker Act"). [FN10] Plaintiffs seek over $ 10,000 for their claims under the RICO and federal civil rights statutes. Thus, under the Big Tucker Act, jurisdiction over plaintiffs' claims against the Federal Defendants is exclusively within the U.S. Court of Federal Claims, and is therefore outside of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

this Court's jurisdiction.

> FN9. Specifically, Section 1346(a)(2) states, in relevant part:
> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:
> .... (2) Any other civil action or claim against the United States, not exceeding $ 10,000 in amount, founded either upon the Constitution, or any Act or Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

> FN10. The Claims Court is given "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

I conclude that the federal government has not waived its immunity in this forum against the claims asserted by plaintiffs. I therefore conclude that plaintiffs' claims against defendants the United States, U.S. Army and Tobyhanna, must be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).

**\*7** Where suit is brought against officers in their official capacity, the real party in interest is the governmental entity; thus the immunities available to the officer are those of the governmental entity. See Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Accordingly, the immunities available to the federal government are available to the Federal Officers in their official capacity. I therefore conclude that plaintiffs' claims against Amy Fitzgerald and Fred Beynon in their official capacity must also be dismissed for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Nevertheless, as with the State Officers, plaintiffs' claims against the Federal Officers in their individual capacity are not jurisdictionally barred, and will be analyzed on their merits in the following discussion on the claims asserted.

   2. Claims Asserted

a. Civil RICO

The RICO statute authorizes civil suits by "any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Section 1962 contains four separate subsections, each of which address a different problem. See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir.1991), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). As explained by the Third Circuit Court of Appeals:

> Section 1962(a) prohibits "any person who has received any income derived ... from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. Section 1962(b) prohibits any person from acquiring or maintaining an interest in, or controlling any such enterprise "through a pattern of racketeering activity." Section 1962(c) prohibits any person employed by or associated with an enterprise affecting interstate commerce from "conducting or participating ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." Finally, section 1962(d) prohibits any person from "conspiring to violate any of the provisions of subsections (a), (b), or (c)."

Id. (alterations in original). In the new amended complaint, plaintiffs seek relief under each provision of section 1962, consequently, each will be considered in turn.

   i. Section 1962(a)

Plaintiffs assert section 1962(a) claims against the following defendants: the State and Federal Officers; PNC; First Federal; Dryfoos; Byerly; Central; Mid-States; Washington; Parente; Laputka; Pinnacle; and M & T. (New Am. Compl. at Count XII.) Section 1962(a) provides in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise....

**\*8** 18 U.S.C. § 1962(a). Under Section 1962(a), a plaintiff must allege that he suffered an injury specifically from the use or investment of income in the named enterprise. See id.; Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1188 (3d Cir.1993); Moore v. Reliance Standard Life Ins. Co., C.A. No. 98-4610, 1999 U.S. Dist. LEXIS 6699, at \*3 (E.D.Pa. May 10,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

1999); *Lim v. New York Life Ins. Co.,* C.A. No. 97-1972, 1998 U.S. Dist. LEXIS 318, at *3 (E.D.Pa. Jan.13, 1998). "This provision was primarily directed at halting the investment of racketeering proceeds into legitimate business, including the practice of money laundering." *Lightning Lube,* 4 F.3d at 1188. The injury resulting from the use or investment of the racketeering income must be separate from any injury resulting from the racketeering acts themselves. *See id.* An allegation that the "use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff [ ] is insufficient to meet the injury requirement of *section 1962(a).*" *Id.*

Plaintiffs here generally allege that all the named defendants diverted the proceeds of the racketeering activity to support a "select group of persons ... in the [public works] arena while denying that support to the plaintiffs." (New Am. Compl. at Count XII.) Plaintiffs proceed to allege more specifically that the State and Federal Officers used "the public funds at their disposal to invest back in government owned properties, through government contracts which generate income for all participants ..., furthering the [enterprise's] activities, increasing their control on the market and subsequently enabling the participants to continue to invest that income for the continuation of the cycle." (*Id.*) Plaintiffs further allege that defendants PNC, First Federal, Dryfoos, Byerly, Central, Mid-States, Washington and Parente committed the *section 1962(a)* violation by investing their resources to maintain a monopoly over the public works arena and to further extend their control over the market. (*Id.*) Finally, plaintiffs allege that Laputka was a co-conspirator as a legal/investment advisor to the enterprise.

Plaintiffs have cited no authority and have made no logical showing that public funds available for public works projects constitute racketeering proceeds. I conclude that they are not. Additionally, the allegations reflect no investment by any of the defendants to acquire an interest in or establish or operate an enterprise, as required under *section 1962(a).* Finally, the alleged "unfair advantage" enjoyed by the other contractors does not establish the requisite link between any alleged use or investment and the plaintiffs' asserted injury of failing to receive the contractually owed funds or the resulting financial problems with their creditors, insurers, bonds companies and banks. Plaintiffs thus fail to allege an injury resulting from the use or investment of racketeering income as opposed to injury from the alleged racketeering acts themselves. I therefore conclude that even a liberal reading of the

allegations set forth in either the amended or new amended complaint fails to show that plaintiffs have stated a claim for relief under *section 1962(a).*

ii. Section 1962(b)

*9 Plaintiffs assert *section 1962(b)* violations by all of the defendants. *Section 1962(b)* provides, in relevant part, "It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise.... " *18 U.S.C. § 1962(b).* Thus, *section 1962(b)* requires a plaintiff to allege that he suffered an injury from the defendant's acquisition or control of an interest in a RICO enterprise. *See Lightning Lube,* 4 F.3d at 1190; *Moore,* 1999 U.S. Dist. LEXIS 6699, at *3. For example, such an injury occurs when "the owner of an enterprise infiltrated by the defendant as a result of racketeering activities is injured by the defendant's acquisition or control of his enterprise." *Lightning Lube,* 4 F.3d at 1190 (citation omitted). The injury must be incurred from the acquisition or control of an interest in the RICO enterprise rather than from the pattern of racketeering. *Id.* at 1191. The plaintiff must also show that the interest or control of the RICO enterprise by the person resulted from the racketeering. *See id.* at 1190. It is insufficient to merely demonstrate that a person engaged in racketeering has an otherwise legitimate interest in an enterprise. *See id.* Rather, the plaintiff must firmly show a "nexus between the interest and the alleged racketeering activities." *Id.*

The amended and new amended complaints herein fail to make such allegations. In support of their assertion of a violation of *section 1962(b),* plaintiffs make the following allegations: (1) the State Officers, Federal Officers and the Borough of Jim Thorpe "used their official positions to contrive 'contract disputes,' abuse the contract and grievance procedures, harass the plaintiffs and otherwise assure that the plaintiffs suffered grave financial difficulties;" (2) PNC, First Federal and M & T manipulated the financing of public works projects and structured loans to plaintiffs in a way that would enable the RICO enterprise to eliminate them; (3) Parente manipulated the financial statements of plaintiffs to compel them to seek additional financing and thereby "leave them vulnerable" to the RICO enterprise; (4) Pinnacle maintained an interest in the enterprise by benefitting from the monopoly that the enterprise created; (5) Laputka used its position as legal counsel to plaintiffs in the grievance process to assist the abuse of the system by the Commonwealth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

Defendants; and (6) Dryfoos, Byerly, Central, the Selective Defendants, Mid-States and Washington used their positions as the insurance and bonding agents to plaintiffs "to either grant or deny bonding lines, bond claim coverage and insurance and insurance claim coverage as well as manipulated [sic] premiums" to leave plaintiffs vulnerable to the RICO enterprise. (New Am. Compl. at Count XIII.)

The allegations simply fail to allege the acquisition or control by any of the defendants of an interest in a RICO enterprise. Nor have plaintiffs pleaded facts from which the Court can reasonably infer such allegation. Moreover, any injury incurred would have resulted from the alleged acts of racketeering, and not from the acquisition or control of an interest in a RICO enterprise. Accordingly, plaintiffs fail to state a claim under section 1962(b) against the defendants.

iii. Section 1962(c)

*10 Plaintiffs assert claims under section 1962(c) against the State and Federal Officers, M & T, PNC, First Federal, Parente, Laputka, Dryfoos, Byerly, Central, the Selective Defendants, and Mid-States. Section 1962(c) prohibits persons who are employed by or associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering. Plaintiffs allege that the named defendants conducted the enterprise's affairs through a pattern of racketeering as follows: (1) Michael Peapos committed at least two predicate acts of extortion and fraud in connection with the Hamburg and Eckley projects; (2) David McMarty committed at least two predicate acts of extortion and mail fraud in connection with the abuse of contract procedures in the Hamburg and Eckley projects; (3) Merle Ryan committed at least two predicate acts of extortion and fraud in connection with the withholding of liquidated damages on the Eckley project and of the settlement funds for the Hamburg project dispute; (4) Stephen Busterna committed at least two predicate acts of extortion and fraud in connection with the settlement agreement for the Hamburg project dispute; (5) M & T, PNC and First Federal each committed at least two predicate acts of extortion and fraud in connection with the preparation, execution, handling and collection process for plaintiff's loans; (6) Parente committed at least two predicate acts of extortion and fraud in connection with preparation, presentation and mailing of fraudulent financial statements and tax returns in connection with the loans from M & T; (7) Laputka committed at least two predicate acts of extortion and fraud in connection with its representation of plaintiffs in the

Commonwealth grievance process and in the presentation of the fraudulent loan documents by M & T and First Federal; (8) Dryfoos committed at least two predicate acts of fraud in connection with the mishandling of insurance claims, over-billing and fraudulent insurance audits; (9) Byerly and Central committed at least two predicate acts of fraud in connection with the bonding line of plaintiffs for the Hamburg project and two other public works projects that were approved and then withdrawn; (10) the Selective Defendants committed at least two predicate acts of fraud in connection with over-billing and fraudulent insurance audits; (11) Mid-States committed at least two predicate acts of extortion and fraud in connection with invalid bond claims from the Eckley project and the project for the Borough of Jim Thorpe; (12) Fred Beynon and Alice Fitzgerald committed at least two predicate acts of extortion and fraud in connection with the project at Tobyhanna by withholding funds due and contriving contract disputes by change orders and delays. (New Am. Compl. at Count XI.)

A RICO enterprise is an entity made up of a group of persons associated together for the common purpose of engaging in a course of conduct. *See United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To establish the existence of an enterprise, the plaintiffs must demonstrate: (1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and (3) that the enterprise must be separate and apart from the pattern of activity in which it engages. *See Seville Indus.,* 742 F.2d at 789-90. Normally, such factors are to be proven at trial, and a bare allegation that the defendants constituted an enterprise is sufficient for the claim to survive a motion to dismiss. *Id.* at 790. Plaintiffs here allege that defendants are members of an enterprise that maintains "a monopoly of the area through a closed system of financing, and control of industry, public office and even the legal system, which is used to thwart any development that would not benefit it." (New Am. Compl. at ¶ ¶ 1, 3.) Normally, this bare allegation should suffice for the claim to survive a motion to dismiss, no matter how seemingly implausible.

*11 Nevertheless, it is well settled in RICO law that the alleged racketeering activity complained of by a plaintiff must be separate and distinct from the enterprise itself. *See Turkette,* 452 U.S. at 583. "[A] conspiracy to perform the underlying criminal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292

(Cite as: 2002 WL 1340316 (E.D.Pa.))

Page 9

offense, standing alone, is not sufficient to allege the existence of an enterprise." *Seville,* 742 F.2d at 790 n. 5. "It is an essential element of the RICO cause of action that the 'enterprise' be apart from the underlying pattern of racketeering activity." *Id.* "An enterprise is not merely a conspiracy and it should not be confused with an agreement to commit the alleged racketeering activity." *Gates v. Ernst & Young,* C.A. No. 93-2332, 1994 U.S. Dist. LEXIS 11456, at *4 (E.D.Pa. August 15, 1994) (quoting *Hartz v. Friedman,* 919 F.2d 469, 471 (7th Cir.1990)). Within the new amended complaint, plaintiffs proceed to identify the enterprise as "made up of a group of individuals, associated in fact and not a legal entity, which controls various legal entities *for the purpose of carrying out the predicate acts.*" (New Am. Compl. at ¶ 387.) (emphasis added). The alleged racketeering activities involved the following: withholding fraudulently disputed payments from plaintiffs for public works contracts; forcing plaintiffs to obtain financing to complete the projects; fraudulently delaying resolution of the grievance process; and forcing plaintiffs into bankruptcy by demanding payments for the loans. (*Id.* at ¶ ¶ 329-338.) By their own allegations, plaintiffs have pleaded that the named enterprise is indistinguishable from the alleged conspiracy between the defendants. Accordingly, plaintiffs have failed to allege an enterprise separate from the alleged underlying pattern of racketeering activity. I therefore conclude that plaintiffs fail to state a claim under section 1962(c).

iv. Section 1962(d)

*12 Plaintiffs assert section 1962(d) claims against the Borough of Jim Thorpe, Pinnacle, the Federal Officers, Byerly, Central, the Selective Defendants, Mid-States, PNC, M & T, First Federal, Parent, Laputka, and Dryfoos. To state a claim under section 1962(d), plaintiffs must plead that the defendant: (1) knew of the RICO violations of the enterprise, and (2) agreed to facilitate those activities. *See Smith v. Berg,* 247 F.3d 531, 538 (3d Cir.2001). The injury must have been caused by the RICO violation, rather than by any act in furtherance of the conspiracy. *See Beck v. Prupis,* 529 U.S. 494, 505-507, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube,* 4 F.3d at 1191. I therefore conclude that because plaintiffs have failed in both the amended and new amended complaint to state a claim under any of the other subsections of section

1962, plaintiffs cannot pursue a claim under Section 1962(d).

b. Federal Civil Rights Statutes

i. Section 1981

Section 1981 of the federal civil rights provisions prohibits racial discrimination in the making and enforcement of contracts and property transactions. [FN11] *See Brown v. Philip Morris, Inc.,* 250 F.3d 789, 796 (3d Cir.2001). To state a claim under section 1981, plaintiffs must allege facts to support the following elements: "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts." *Brown,* 250 F.3d at 797 (alternations in original) (citation omitted). Accepting as true the facts alleged in the amended and new amended complaints, plaintiffs have failed to state a cause of action pursuant to section 1981. Plaintiffs do not allege to belong to a racial minority. Although plaintiffs creatively claim to "belong to the 'race' of individuals who are either unwilling or unwelcome to participate" in the alleged RICO enterprise, (New Am.Compl. at ¶ 366), this attempt to qualify for protection under the statute clearly fails. Consequently, I conclude that plaintiffs' section 1981 claim will be dismissed.

> FN11. Section 1981(a) provides:
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other. 42 U.S.C. § 1981(a)

ii. Section 1983

Section 1983 provides a remedy for the violation of a federal constitutional or statutory right by a person "acting under color of state law." 42 U.S.C. § 1983. [FN12] To state a claim under section 1983, plaintiffs must plead that the allegedly unlawful conduct: (1) was committed by someone acting under color of state law, and (2) deprived plaintiffs of rights, privileges or immunities protected by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

Constitution or federal law. *See Cohen v. City of Philadelphia,* 736 F.2d 81, 83 (3d Cir.1984), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). Nevertheless, "government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Where the defendant in a section 1983 action claims qualified immunity, the court must first determine whether the allegations are sufficient to establish the violation of a federal constitutional right, and if so, whether that right was clearly established at the time of the alleged violation. *See id.* If the plaintiffs' allegations cannot meet this two-fold threshold inquiry, defendants are entitled to qualified immunity and dismissal of the case. *See Doe v. Delie,* 257 F.3d 309, 314-15 (3d Cir.2001).

> FN12. Section 1983 provides, in relevant part:
> Every person, who under color of any statute, ordinance, regulation, custom or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

Plaintiffs claim that the State Officers denied them both procedural and substantive due process in violation of the Fourteenth Amendment by withholding the contractual funds due to plaintiffs and wreaking financial devastation to prevent plaintiffs from pursuing the disputed balance. (New Am.Compl. at ¶ ¶ 367-69.) Because the State Officers assert a qualified immunity defense, the Court must first determine whether plaintiffs have alleged the violation of a federal constitutional right.

**\*13** "Procedural" due process defends against arbitrary government action by ensuring that adequate procedures are used when a state action impacts a person's "life, liberty or property" as protected under the 14th Amendment. [FN13] The Third Circuit Court of Appeals has ruled that there is

adequate procedural due process when the state provides "reasonable remedies to rectify a legal error by a local administrative body." *Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.1988). The Pennsylvania Board of Claims has exclusive jurisdiction over contract disputes between Commonwealth agencies and a contractor. *See* 62 Pa.C.S. § 1701, *et seq.* Appeals from decisions by the Board of Claims may be made to the Pennsylvania Commonwealth Court. *See* 62 Pa.C.S. § 1726; 42 Pa.C.S. § 763(a)(1) The availability of a "full judicial mechanism with which to challenge the administrative decision in question" provides adequate due process, regardless of whether the plaintiff utilized the appellate procedure. *DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 597 (3d Cir.), *cert. denied,* 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995) (internal citation omitted). Thus, although plaintiffs may not have taken advantage of these measures, [FN14] because Pennsylvania provides a reasonable procedural method to correct any errors by the DGS grievance procedure, I conclude that there was sufficient procedural due process and plaintiffs cannot state a claim for the violation of their procedural due process rights.

> FN13. Although it is unclear whether the property interest arising from plaintiffs' state contracts is protectible under procedural due process, *see Reich v. Beharry,* 883 F.2d 239, 242-43 (3d Cir.1989) ( "wholesale federalization of state public contract law" was not purpose of due process clause), the Court need not reach this issue because constitutionally adequate procedures were available. *See DeBlasio,* 53 F.3d at 597 n. 4 (courts may proceed directly to evaluation of process).

> FN14. Plaintiffs allege that they commenced procedures under the Commonwealth's grievance process, but that the State Officers fraudulently persuaded plaintiffs to settle and then failed to pay the settlement offer as promised. (New Am.Compl. at ¶ ¶ 86--101.) They appear to have sought no recourse with the Board of Claims.

"Substantive" due process "limits what government may do regardless of the fairness of procedures that it employs, and covers government conduct in both legislative and executive capacities." *Boyanowski v. Capital Area Intermediate Unit,* 215 F.3d 396, 399 (3d Cir.), *cert. denied,* 531 U.S. 1011, 121 S.Ct. 566, 148 L.Ed.2d 485 (2000) (citing *Count of Sacramento*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
(Cite as: 2002 WL 1340316 (E.D.Pa.))

*v. Lewis,* 523 U.S. 833, 845-46, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Under certain circumstances, substantive due process claims may be brought when procedural fairness is not an issue. *Id.* at 402. Nevertheless, "a substantive due process claim grounded in an arbitrary exercise of governmental authority may be maintained only where the plaintiff has been deprived of a 'particular quality of property interest.' " *Id.* at 402-03 (quoting *Indep. Enters., Inc. v. Pittsburgh Water & Sewer Auth.,* 103 F.3d 1165, 1179 (3d Cir.1997)). Although the "precise contours of the 'particular quality of interest' " have not been clearly defined, *id.* (quoting *Indep. Enters.,* 103 F.3d at 1180), courts look to see whether the property interest rises to the level of " 'the fundamental interests that previously have been viewed as implicitly protected by the Constitution.' " *Id.* (quoting *Mauriello v. Univ. of Med. & Dentistry of N.J.,* 781 F.2d 46 50 (3d Cir.1986) (quoting *Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 229-30, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (Powell, J. concurring))). The Third Circuit Court of Appeals has determined that not all property interests created by state contracts invoke substantive due process concerns. *See Reich,* 883 F.2d at 243-45 (citing cases).

With regard to the property interests asserted here, this Court finds persuasive the decision in *Vartan v. Nix,* 980 F.Supp. 138, 142-43 (E.D.Pa.1997) (Bartle, J.). *Vartan* involved a terminated contract for the construction and lease to the Commonwealth of a new state courthouse in Harrisburg. The plaintiff sued the former Chief Justice of the Supreme Court of Pennsylvania for due process violations under section 1983, alleging that the former Chief Justice had intervened to cause the termination of the state contract. Judge Bartle compared the cases wherein the Third Circuit Court of Appeals had determined that substantive due process did not protect the state-created interest at issue, *see Ransom v. Marrazzo,* 848 F.2d 398, 411-12 (3d Cir.1988) (right under state law to water and sewer services); *Reich,* 883 F.2d at 239-40 (right to payment for legal services rendered to state), with the cases wherein the state-created interests were deemed protected, *see DeBlasio,* 53 F.3d at 594-95 (right to seek variance for land use from local zoning law); *Neiderhiser v. Borough of Berwick,* 840 F.2d 213 (3d Cir.), *cert. denied,* 488 U.S. 822, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988) (right to seek exemption for land use from local zoning law). Finding that the property rights asserted by the plaintiff did not involve land use as those asserted in *DeBlasio* and *Neiderhiser,* and were not worthier than the rights asserted in *Ransom* and *Reich,* the

Court concluded that the property rights arising under a commercial construction contract with the state did not trigger substantive due process protection. I approve and adopt the reasoning of *Vartan,* and similarly conclude that the alleged failure of the State Officers to pay plaintiffs disputed funds pursuant to public works contracts does not rise to level of a substantive due process violation.

**\*14** Because plaintiffs cannot state a claim for due process violation under section 1983, and because they have not otherwise alleged the violation of a federal constitutional right, the State Officers are entitled to qualified immunity. Accordingly, their motion to dismiss the section 1983 claim will be granted.

Plaintiffs also assert section 1983 claims against the remaining defendants, alleging that they took joint action with the State Officers with a shared conspiratorial objective. (New Am. Compl. at ¶ 371.) Private parties who willfully participate in a conspiracy with state officials to deprive a person of a constitutional right, act "under color of state law" for purposes of section 1983. *See Dennis v. Sparks,* 449 U.S. 24, 27-28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Nevertheless, because plaintiffs have failed to allege the deprivation of a constitutional right for the reasons I have set forth above, I conclude that they have not stated a section 1983 claim against any of the remaining defendants on the asserted conspiracy theory.

iii. Section 1985

**\*15** Plaintiffs assert section 1985 claims against all of the defendants. Section 1985 of the federal civil rights provisions prohibits conspiracies to deprive a U.S. citizen of his constitutional rights based on invidious class-based discrimination. *See* 42 U.S.C. § 1985. [FN15]

> FN15. Section 1985(3) provides, in relevant part:
> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; ... [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 12
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for recovery of the damages, occasioned by such injury or deprivation against any one or more of the conspirators. 42 U.S.C. § 1985(3).

To state a claim under Section 1985 for private conspiracy, a plaintiff must allege: (a) that a racial or other class-based invidious discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that that right was consciously targeted and not just incidentally affected.

Brown, 250 F.3d at 804. Section 1985(3) is invoked to remedy discrimination based upon the plaintiff's "immutable characteristics, such as race or gender." Rourke v. United States, 744 F.Supp. 100, 104-05 (E.D.Pa.1988). As in their section 1981 claim, plaintiffs do not allege to be members of a racial minority or any other class based upon their immutable characteristics. I therefore conclude that plaintiffs have failed to state a claim under section 1985.

iv. Section 1986

Plaintiffs assert section 1986 claims against all of the defendants. Section 1986 constitutes an additional safeguard against the wrongs prohibited by section 1985. [FN16] Clark v. Clabaugh, 20 F.3d 1290, 1295 (3d Cir.1994). It provides a cause of action for recovery against anyone who with knowledge of a section 1985 conspiracy and the power to prevent its violation, neglects or refuses to do so. To state a claim under section 1986, plaintiffs must show the existence of a section 1985 conspiracy. Id. As discussed above, plaintiffs have failed to state a cause of action under section 1985; consequently, their section 1986 claim is untenable. I conclude that plaintiffs' claim under section 1986 will therefore be dismissed.

> FN16. Section 1986 provides, in relevant part:
> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses to do so, if such wrongful act be committed, shall be

liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented.... 42 U.S.C. § 1986.

c. State Law Claims

Although not expressly pleaded, in Counts II, III, IX and X of the new amended complaint, plaintiffs request relief in the form of quantum meruit and expectation damages as against the Commonwealth Defendants and the Federal Defendants for breaches of contract in the public works projects. For the reasons I have explained above regarding the issues of sovereign immunity and Eleventh Amendment immunity, the Court lacks jurisdiction to entertain claims for breach of contract against the Commonwealth and the federal government. Accordingly, any implied assertions of claims for breach of contract will be dismissed for lack of jurisdiction.

Although plaintiffs do not assert state law claims against any of the other defendants, to the extent any may be implied, the Court exercises its discretion to decline supplemental jurisdiction over them under 28 U.S.C. § 1367(c)(3).

C. Remaining Defendants and the Motion for a More Definite Statement

Neither Manufacturers & Traders Trust Co. d/b/a M & T Bank ("M & T") nor Dryfoos have joined the other defendants in moving for dismissal. Dryfoos, though, has implicitly sought dismissal in the alternative by expressing its dissatisfaction with the amended complaint by filing a motion for a more definite statement. While neither vague nor ambiguous, see Fed.R.Civ.P. 12(e), because the amended complaint will be dismissed as to Dryfoos for failure to state a claim, the motion of Dryfoos for a more definite statement will be denied as moot. The Third Circuit Court of Appeals has held that the "district court may on its own initiative enter an order dismissing the action provided that the complaint affords a sufficient basis for the court's action." Bryson v. Brand Insulations, Inc., 621 F.2d 556, 559 (3d Cir.1980) (court may sua sponte dismiss complaint on the pleadings if no set of facts can be adduced to support claim for relief, all allegations are taken as true, and all inferences are drawn in favor of plaintiff); see also McKnight v. School Dist., C.A. No. 00-573, 2000 U.S. Dist. LEXIS 13864 at ----3-4 (E.D.Pa. Sept. 25, 2000); Locke v. Medlab/General

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292

**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

Page 13

*Chem.,* C.A. No. 99-2137, 2000 U.S. Dist. LEXIS 982 at *5 (E.D.Pa. Feb.3, 2000); *Byrd v. Parris,* C.A. No. 99-769, 1999 U.S. Dist. LEXIS 15957 at ----14-15 (E.D.Pa. Oct.15, 1999). The above analysis of the insufficiency of the legal claims asserted against the moving defendants applies with equal force to the civil RICO and federal civil rights claims asserted against M & T and Dryfoos. Although the amended complaint is adequate for this Court to analyze, I conclude that plaintiffs have failed to state a claim for relief under the civil RICO and federal civil rights statutes against defendants Dryfoos and M & T; thus the complaint will be dismissed in its entirety. The failure of this Court to take this unilateral action would only prolong reaching the inevitable result reached here today and would add expense and energy-draining efforts to the lives of plaintiffs and these two defendants. Federal Rule of Civil Procedure 1 provides that the rules " ... shall be administered to secure the just, speedy, and inexpensive determination of every action."

IV. Conclusion

**\*16** The Court is sympathetic to plaintiffs' complaints of unfair treatment by the state public works department, their frustrations over their inability to secure a lawyer, and their valiant attempts to further what they believe are righteous and legally supportable claims. Nonetheless, the law requires this Court to conclude that it is barred by the Eleventh Amendment from entertaining jurisdiction over the state entities, that it lacks jurisdiction over the claims asserted against the federal government, and that plaintiffs have not stated claims for relief under the RICO and federal civil rights statutes against any of the remaining defendants.

For the reasons set forth above, all claims here asserted against the Commonwealth, the DGS, the State Officers, the Federal Defendants, the Federal Officers, Pinnacle, the Selective Defendants, Byerly, Central, PNC, First Federal, Mid-States, the Borough of Jim Thorpe, Laputka, Washington and Parente, as well as against Dryfoos and M & T, will be dismissed.

**\*17** An appropriate Order follows.

*ORDER*

AND NOW, this 19th day of June, 2002, upon consideration of the motion of Dryfoos Insurance Agency, Inc. ("Dryfoos") for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) (Doc. No. 13), the motion of Pinnacle Roofing

& Sheet Metal, Inc. for summary judgment or in the alternative for dismissal (Doc. No. 23), and the motions for dismissal by the following defendants: Selective Insurance, Selective Way Insurance, and Selective Insurance Group (Doc. Nos.14, 91); Byerly Insurance Agents and Brokers, Inc., and Central Pennsylvania Indemnity (Doc. Nos.16, 17); PNC Financial Group, Inc. (Doc. No. 22); First Federal Bank and Northeast PA Financial (Doc. No. 24); Mid-States Surety Corp. (Doc. Nos.27, 28); the Borough of Jim Thorpe (Doc. No. 49); the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty, Merle H. Ryan, and Steven Busterna (Doc. Nos.50, 94); Laputka Bayless Ecker & Cohn, PC (Doc. Nos.58, 73, 78); Washington International Surety Corp. (Doc. No. 74); Parente Rudolph Orlando Carey & Associates (Doc. Nos.79, 80); the United States, the Department of the Army, the Tobyhanna Army Depot, Fred Beynon and Alice Fitzgerald (Doc. No. 98); and the responses thereto (Doc. Nos.219-235) as well as plaintiffs' request for leave to amend as incorporated therein (Doc. No. 236, Appendix A), and for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED that (1) the request of plaintiffs to file their new amended complaint is DENIED, (2) the motion of Dryfoos for a more definite statement is DENIED, (3) all of the motions to dismiss are GRANTED, and (4) the Court *sua sponte* determines that the claims against Dryfoos and Manufacturers & Traders Trust Bank Co. and the amended complaint are DISMISSED in their entirety.

JUDGMENT is hereby ENTERED against plaintiffs Dianese, Inc., Gaetano Dianese and Rosemarie Dianese, and in favor of defendants Pinnacle Roofing & Sheet Metal, Inc., Selective Insurance, Selective Way Insurance, and Selective Insurance Group, Byerly Insurance Agents and Brokers, Inc., Central Pennsylvania Indemnity, PNC Financial Group, Inc., First Federal Bank, Northeast PA Financial, Mid-States Surety Corp., the Borough of Jim Thorpe, the Commonwealth of Pennsylvania, the Department of General Services, Michael Peapos, David McCarty, Merle H. Ryan, Steven Busterna, Laputka Bayless Ecker & Cohn, PC, Washington International Surety Corp., Parente Rudolph Orlando Carey & Associates, the United States, the Department of the Army, the Tobyhanna Army Depot, Fred Beynon, Dryfoos Insurance Agency, Inc., and Manufacturers & Traders Trust Bank Co. for failure to state a claim and for want of jurisdiction.

This is a final Order.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide 10,292
**(Cite as: 2002 WL 1340316 (E.D.Pa.))**

Page 14

 2002 WL 1340316 (E.D.Pa.), RICO Bus.Disp.Guide
10,292

   **Motions, Pleadings and Filings (Back to top)**

•      2:01CV02520_____(Docket)
(May. 22, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2005, the foregoing **Compendium of Unreported Cases for the Individual Defendants' Reply Brief in Support of Their Motion to Dismiss or to Stay the Proceedings** was filed electronically with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Abbott, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Dennis J. Siebold, Esquire
New Castle County Law Department
New Castle Corporate Commons
87 Reads Way
New Castle, DE 19720

_____
Matthew F. Boyer