## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FRANK E. ACIERNO, CHRISTIANA TOWN CENTER, LLC, a Delaware limited liability company, 395 ASSOCIATES, LLC, a Delaware limited liability company, ESTATE HOMES, INC., a Delaware corporation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No.  04-1376 |
| GEORGE O. HAGGERTY, individually and in his official capacity as Assistant General Manager of the New Castle County Department of Land Use, SCOTT G. WILCOX, individually and in his official capacity as a First Assistant County Attorney, TIMOTHY P. MULLANEY, individually and in his capacity as New Castle County Attorney, CHARLES L. BAKER, individually and in his capacity as General Manager of the New Castle County Department of Land Use, JAMES H. EDWARDS individually and in his capacity as Inspections Manager and Licensing Division Manager of the New Castle County Department of Land Use, and SHERRY L. FREEBERY, in her individual capacity as Chief Administrative Officer of New Castle County, and NEW CASTLE COUNTY, a political subdivision of the State of Delaware, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPENDIUM OF UNREPORTED CASES FOR THE INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR TO STAY THE PROCEEDINGS

Vol 4 (Tabs 9 & 10)

9

Westlaw.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
(Cite as: 2004 WL 632722 (E.D.Pa.))

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
HEALTHGUARD OF LANCASTER, INC., Plaintiff
v.
Mark GARTENBERG; Steven Gartenberg; Mark
Tischler; Greenfield Sports Medicine &
Rehab, P.C.; Premier Sports Medicine & Rehab
Center, P.C.; Main Line Medical
Services, Inc., Defendants
No. Civ.A. 02-2611.

Filed May 1, 2002.
March 5, 2004.

represented by Andrew F. Lucarelli, Hartman
Underhill & Brubaker LLP, Lancaster, PA, Lead
Attorney, Attorney to be Noticed, Robert M.
Frankhouser, Hartman Underhill & Brubaker LLP,
Lancaster, PA, Lead Attorney, for Healthguard of
Lancaster, Inc., Plaintiff.

represented by Dorothy M. Claeys, Lawrence J.
Tabas, Richard P. Limburg, Obermayer Rebmann,
Maxwell & Hippel LLP, Philadelphia, PA, Lead
Attorney, Attorney to be Noticed, for Mark
Gartenberg, Defendant.

represented by Dorothy M. Claeys, Lawrence J.
Tabas, Richard P. Limburg, (See above for address),
Lead Attorney, Attorney to be Noticed, for Steven
Gartenberg, Defendant.

represented by Dorothy M. Claeys, Lead Attorney,
Attorney to be Noticed, John W. Morris,
Philadelphia, PA, Lead Attorney, Attorney to be
Noticed, Lawrence J. Tabas, Richard P. Limburg,
(See above for address), Lead Attorney, Attorney to
be Noticed, for Mark Tischler, Defendant.

represented by Dorothy M. Claeys, John W. Morris,
Lawrence J. Tabas, Richard P. Limburg, (See above
for address), Lead Attorney, Attorney to be Noticed,
for Greenfield Sports Medicine & Rehab, P.C.,
Defendant.

represented by Dorothy M. Claeys, John W. Morris,
Lawrence J. Tabas, Richard P. Limburg, (See above
for address), Lead Attorney, Attorney to be Noticed,
for Premier Sports Medicine & Rehab Center, P.C.,
Defendant.

represented by Dorothy M. Claeys, Lawrence J.
Tabas, Richard P. Limburg, (See above for address),
Lead Attorney, Attorney to be Noticed, for Main
Line Medical Services, Inc., Defendant.

*MEMORANDUM*

BAYLSON, J.

I. *Statement of the Case*

*1 Plaintiff is a health maintenance organization
which has brought a civil RICO claim against
Defendants, alleging fraudulent billing processes in
providing medical and/or chiropractic services in the
Lancaster, Pennsylvania area. The issues involved in
this case are serious, as any fraudulent diversion of
healthcare funds for fraud must, if proven, be dealt
with severely. As discussed below, although the
record contains evidence of fraud, the Court
concludes that Plaintiff has been unable to connect
the dots of fraud to the rigorous requirements of civil
RICO. Thus, Defendants' Motion for Summary
Judgment will be granted, and its state law claims
will be dismissed without prejudice for refiling, in
state court, should Plaintiff so choose.

On December 6, 2002, the Court granted Defendants'
Motion to Dismiss Plaintiff's original RICO
Complaint, which also asserted various state law
claims (insurance fraud, common law fraud, and
breach of warranty), but granted Plaintiff leave to file
an Amended Complaint along with a RICO Case
Statement. Plaintiff did so and engaged in discovery
for a number of months. On October 8, 2003,
Defendants jointly moved for summary judgment,
asserting that Plaintiff, despite completion of
discovery, has not demonstrated evidence to support
the elements of RICO, or any genuine issues of fact
for trial as to the RICO claims.

Defendants' Motion states that it relies on "the
pleadings, answers to interrogatories, and deposition
testimony of Dr. David Raab to show that
Healthguard has neither alleged nor produced

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
**(Cite as: 2004 WL 632722 (E.D.Pa.))**

evidence of any scheme to defraud or any specific predicate acts constituting a pattern of racketeering activity." In opposition, Plaintiff has relied on affidavits of two chiropractors and one medical doctor, who were employed by one or more of the Defendants, and a large group of papers summarizing allegedly fraudulent bills submitted by Defendant Main Line Medical Services, Inc. ("MLM") to Plaintiff, but has not submitted any deposition excerpts or other documents.

Prior to oral argument on December 23, 2003, the Court requested Plaintiff to be prepared at the oral argument to document its evidence and supporting case law as to several elements of RICO (Docket No. 51).

## II. *Statement of Facts and Contentions*

Plaintiff is a health maintenance organization with 100,000 members, which operates in and around Lancaster, Pennsylvania. As Plaintiff describes its operations, Healthguard members receive medical services from participating healthcare providers, such as Defendants, who submit insurance claims to Healthguard seeking payment for services rendered. When a healthcare provider submits a claim for payment, the provider warrants to Healthguard that the services identified in the claim were actually provided in the manner described in the claim and were medically appropriate. Upon receipt of a claim, Healthguard forwards payment to the healthcare provider on behalf of the member.

**\*2** Plaintiff alleges that Defendants, who operate a chiropractic business and provider chiropractic services to Healthguard members, devised a scheme to make their business more profitable, but in doing so, engaged in various fraudulent practices, including submitting false claims for medical services. Plaintiff asserts that the claims submitted under the provider number for one physician, Dr. David Raab, described medical services that either were not performed by a physician, were not performed properly, were not performed at all, or were not medically necessary or appropriate. Although Plaintiff has demonstrated genuine issues of fact as to elements of the common law tort of fraud, the issue before the Court is whether there is sufficient evidence meeting the requirements of RICO.

Plaintiff's Amended Complaint and RICO case statement asserts that the RICO scheme was implemented through one of the Defendants, MLM, a management company owned and operated by other Defendants, which conducted extensive telemarketing to solicit patients for Defendants' medical practices, and then processed the insurance claims generated by each practice. Plaintiff asserts that in conducting the affairs of MLM, Defendants caused thousands of fraudulent insurance claims to be sent through the U.S. mail to Healthguard (and other health insurers) for processing and payment.

## III *Summary Judgment Motion*

The first issue is whether the Defendants have properly supported their Motion for Summary Judgment. In its landmark decision in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the Supreme Court rejected the holdings of some lower courts which had required the moving party to submit affidavits or other sworn materials to contradict the pleadings of the non-moving party, and held that the moving party need only "show" the court where there was one or more deficiencies in the existence of an element essential to the non-moving party's case and on which the non-moving party will bear the burden of proof at trial:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

> * * *

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

> * * *

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
(Cite as: 2004 WL 632722 (E.D.Pa.))

Page 3

showing that there is a genuine issue for trial."

* * *

**\*3** Instead, as we have explained, the burden on the moving party may be discharged by "showing"-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case.
477. U.S. at 322-25.

First, Defendants rely on Plaintiff's pleadings, including the RICO Case Statement which the Court required at the outset of the case as indicative of its claim that Plaintiff has not presented sufficient evidence to create a triable issue of fact for trial. As discussed above, this satisfies Defendant's burden, under Rule 56 procedure. However, Plaintiff cannot rely on its own unsworn pleadings to rebut a motion for summary judgment, rather Plaintiff must demonstrate to the Court that it has sufficient evidence to create a triable issue of fact as required by *Celotex. See Id.* at 322 (summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ."); *see also* Fed. R. Civ. P. 56(e) ("the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.").

Second, Defendants rely on their own answers to certain interrogatories served by Plaintiff. In the interrogatories, the individual Defendants describe their professional qualifications and their relationship to the corporate entities. Defendant Mark Gartenberg does not identify himself as a chiropractor or other health professional, nor of having any role as an officer or a director of any of the Defendant corporations. (M.G.Interrog.¶ ¶ 4,7.) He was, however, an employee of MLM and the father of Defendant Steven Gartenberg. (*Id.* ¶ 6.) Steven Gartenberg asserts that he is the sole shareholder, owner, director and officer of MLM since December 1998, and is also an officer of a non-party entity, CMS, Inc., which he describes as doing telemarketing for Greenfield. (S.G.Interrog.¶ ¶ 4, 8.) The other individual Defendant, Mark Tischler, describes himself as a chiropractor who has been an employee of Greenfield (M.T.Interrog.¶ 4) and MLM at various times, and was also a director and officer of a non-party entity referred to as Bala Medical Management ("Bala"), from 1999-2002. (*Id.*) [FN1]

FN1. Bala is not further identified in Defendants' papers, but there are implications that Bala had a role in the relationships among the various individuals and corporate Defendants. However, it does not appear to have been pursued by Plaintiff or explained by Defendants. There is little in the record as to Bala Medical Management, Inc. Dr. Raab testified that Bala provided unspecified services for Greenfield (Raab Dep. at 11, 71). Tischler was the president and sole shareholder of Bala (*see* M.T. Interrog. ¶ ¶ 4, 8).

Although normally answers to interrogatories are used by the party propounding the interrogatories, there is no reason, under the rules and decided cases under Rule 33 of the Federal Rules of Civil Procedure, that a party may not use his or its own sworn answers to interrogatories, which are not otherwise contested to prove a point in supporting a motion for summary judgment. [FN2] *See Celotex, supra* at 325 (explaining that "the burden on the moving party may be discharged by 'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."); *Santa Fe Natural Tobacco Co. v. Judge,* 963 F.Supp. 437, 439 (M.D.Pa.1997) (granting a plaintiff's motion for summary judgment where the plaintiff supported its motion with defendant's answers to interrogatories).

FN2. It should be noted that these answers to interrogatories are not self-serving narratives, but are merely descriptive. It is also necessary to point out that the Defendants interposed so-called "form objections" to the interrogatories before answering them. However, Plaintiff does not appear to have contested the adequacy or accuracy of the answers, and thus the Court will consider them.

**\*4** Third, Defendants rely on the deposition of Dr. David Raab, [FN3] a long-standing physician in the Lancaster, Pennsylvania area, who had retired from various private practices and then took a job with Defendant Greenfield Sports Medicine and Rehab, P.C. ("Greenfield") as medical director--a position in which he was not required to fully understand anything about the business side of Greenfield. Dr. Raab worked at Greenfield from approximately May 17, 1999 to sometime in November of 2000. Prior to commencing his employment, Dr. Raab signed the incorporation of Greenfield on April 22, 1999. He

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
(Cite as: 2004 WL 632722 (E.D.Pa.))

Page 4

also signed a consent to be the sole Director of the Board of Directors of Greenfield, which indicated that he was also President and Treasurer, and that Defendant Mark Tischler would be Secretary, (*see* Exhibits 3-4), and he signed a Service Agreement between Greenfield and a non-party, Bala Medical Management, Inc., dated April 22, 1999, in which Dr. Raab summarized in his deposition as providing that he would make medical decisions, but not business decisions on behalf of Greenfield.

> FN3. Defense Counsel deposed Dr. Raab. Plaintiff's counsel did not ask any questions. The record shows that Plaintiff's counsel had previously interviewed Dr. Raab. There is no affidavit from Dr. Raab, in the record, further explaining his knowledge of the facts.

Dr. Raab also testified to his work in reviewing different medical forms, including filling out claim sheets that MLM submitted to Plaintiff. He had the impression, but had no direct evidence to support it, that the Gartenberg Defendants controlled Greenfield and that Greenfield was a subsidiary of Bala. (Raab Dep. at 70, 75). Specifically, Raab stated that he did not know exactly what the relationship was between Greenfield, Bala and the Gartenberg defendants. (*Id.* at 75.) He also stated that he did not know whether or not Tischler was the president of Bala but knew that Tischler did communicate with Bala. (*Id.* at 70-71) However, the record contains no evidence as to the content of Tischler's communications with Bala. Finally, after working at Greenfield for approximately eighteen months, Dr. Raab left because he came to believe that a number of the tests that were being performed were unnecessary (*Id.* at 58-59, 64).

In opposition to summary judgment, Plaintiff supplies three affidavits by doctors who were employed by one or more of the Defendants, and the aforementioned large volume of billing statements. Although Plaintiff submitted an expert report as part of its papers in opposition, it is unsworn and this Court cannot rely upon the expert statement. *Small v. Lehman,* 98 F.3d 762, 765 (3d Cir.1996) ("Rule 56 of the Federal Rules of Civil Procedure states that motions both for and in opposition to summary judgment may be supported by affidavits; unsworn statements, such as those relied upon in the instant matter, fail to meet this requirement.") Plaintiff has not submitted any other factual materials. It does not appear from the record that any of the individual Defendants were ever deposed, or that Plaintiff

invoked Federal Rule of Civil Procedure 30(b)(6) and deposed a representative of any of the corporate defendants.

### IV. *RICO Requirements*

*5 The Amended Complaint in this case (¶ ¶ 36-37) charged Defendants of violating two sections of RICO, 18 U.S.C. § § 1962(c) and (d), which are defined as follows:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

As the Supreme Court has held in *Sedima SPRL v. Imrex Co.,* 473 U.S. 479, 496 (1985), "a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity as well as injury resulting from the conduct constituting a violation." Prior to the oral argument on December 23, 2003, the Court issued an Order requesting Plaintiff to be prepared to demonstrate the existence of a genuine issue for trial on several of these elements including conspiracy as charged in 18 U.S.C. § 1962(d), predicate acts (which are defined in the statute), relatedness (of the various predicate acts to the alleged pattern of racketeering activity), and also what evidence there is that injury was suffered as a result of the activities alleged, and also what evidence Healthguard had, in the record, to support its definition of an "enterprise."

After review of the papers and the arguments of counsel, the Court has identified several areas in which Plaintiff has failed to establish the elements of RICO liability:

> 1. A confusing and legally insufficient identification of an "enterprise."
> 2. A lack of evidence that any of the Defendants were in "control" of the enterprise.
> 3. A lack of evidence to show that there was a "pattern" of racketeering activity.
> 4. A lack of evidence of conspiracy.

### A. *The "Enterprise"*

The Amended Complaint, ¶ 30, and the RICO Case Statement, ¶ C(1), alleged that MLM is the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 5
2004 WL 632722 (E.D.Pa.)
**(Cite as: 2004 WL 632722 (E.D.Pa.))**

"enterprise." In filing its response to the Court's Order of December 11, 2003, Plaintiff asserted that MLM "constituted an enterprise through which 'persons' Mark Gartenberg, Steven Gartenberg, and Mark Tischler acted." However, at oral argument Healthguard's counsel identified the enterprise as "a combination of individuals with professional corporations known as Greenfield Sports Medicine and Premier Sports Medicine ... all of the individuals ... and the two professional corporations ... as well as the billing enterprise [MLM]." Plaintiff's counsel made it explicit that the enterprise "is a combination of the Defendants." Asked whether there is any difference between the Defendants and the enterprise, he said "the Defendants made up the enterprise, each of the entities provided a different piece." In response to a question as to whether the enterprise and the Defendants are identical, Plaintiff's counsel unequivocally stated "yes." (N.T. at 11-12). Plaintiff's counsel subsequently articulated this contention as follows: "It's the individuals and Main Line Medical acting through an otherwise legitimate business organization, i.e., Greenfield and Premier." (N.T. p. 37).

**\*6** Section 1961(4) provides that the term "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." The leading Supreme Court case interpreting the enterprise requirement is _United States v. Turkette,_ 452 U.S. 576 (1981) in which the court noted that the term encompasses both legitimate and illegitimate organizations without distinction and that it can be proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The court noted that there is a difference between the "enterprise" and "pattern" requirements: "The 'enterprise' is not the 'pattern of racketeering activity', it is an entity separate and apart from the pattern of activity in which it engages. 452 U.S. at 583.

Much has been written about the requirement of an "enterprise" in civil RICO cases. _See generally,_ Gregory P. Joseph, _Civil Rico: A Definitive Guide_ 67-79 (2d Ed.2000). In this case, the Court finds it helpful to distinguish between the elements of common law fraud and the elements of RICO as follows: proving common law fraud requires a showing of fraudulent statements made with the intent to deceive someone, _see Sowell v. Butcher & Singer, Inc.,_ 926 F.2d 289, 296 (3d Cir.1991) (noting that common law fraud requires that there be a

misrepresentation made with the intent that the receiver of the misrepresentation be induced to act in reliance thereof), however, in order for a plaintiff to turn a fraud case into RICO, the plaintiff must also show that the fraud was carried out through the operation of what may functionally be referred to as a "superstructure" which the RICO statute calls an "enterprise." In other words, the plaintiff proceeding to trial in a RICO case must show more than fraud. It must show that the conduct of the fraudulent scheme was perpetrated through an enterprise (either an existing entity or an association of individuals and entities).

Federal courts have required a showing of distinctiveness between the enterprise and the individuals who are allegedly controlling the enterprise. It must be noted that only the person and not the enterprise is liable under § 1962(c). _See Hirsch v. Enright Refining Co.,_ 751 F.2d 628, 633 (3d Cir.1984) ("the 'person' subject to liability cannot be the same entity as the 'enterprise." ').

The Third Circuit clarified this rule in _Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,_ 46 F.3d 258 (3d Cir.1995), in which a RICO plaintiff alleged the existence of an enterprise consisting of a corporation and its officers and employees, who managed the corporation through a pattern of racketeering activity. After a trial, the jury found for plaintiff and awarded damages against the individual defendants. Although _Jaguar Cars_ is sometimes referred to as a case that bears on the appropriate definition of an "enterprise," its holding is really confined to the requirement of a "person" in control of an "enterprise" with a conclusion "that when officers and/or employees operate and manage a legitimate corporation, and use it to conduct a pattern of racketeering activity in interstate commerce, those defendant persons are properly liable under § 1962(c)." 46 F.3d at 269. In _Jaguar Cars,_ the theory of liability was not dissimilar to the theory in the present case. Plaintiff, Jaguar Automobile Company, accused the defendants, operating a Jaguar dealership, of fraud in the handling of warranty claims, specifically that the defendants submitted, and were paid, for warranty claims for work that was never done, or was grossly misrepresented. The plaintiff alleged that Royal Oaks [the dealership] "is the enterprise through which the defendants conducted their racketeering activity." _See_ 46 F.3d at 264. The defendants asserted that this was a fatal designation of an enterprise because the plaintiff had ignored the distinctiveness requirement, and that the "person" in "control" (i.e., the defendants) could not be the same as the enterprise.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
(Cite as: 2004 WL 632722 (E.D.Pa.))

Page 6

**\*7** Although the Third Circuit in *Jaguar Cars* never specifically ruled on the propriety of the designated "enterprise", it did find that under the Supreme Court's decision in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), "liability under § 1962(c) is limited to those who 'participate in the operation or management of the enterprise itself.' " 46 F.3d at 265-66. Under this holding, the Third Circuit concluded, (and in the process abrogated earlier holdings to the contrary), that the distinctiveness requirement was satisfied when officers and employees of the corporation operate and manage a legitimate corporation and use it to conduct a pattern of racketeering activity.

More recently, the Supreme Court in *Cedric Kushner Motions Ltd. v. King*, 533 U.S. 158 (2001) endorsed the holding in *Jaguar Cars* and concluded that the defendant in that case was a "person" (the president and sole shareholder of a corporation) who was sufficiently distinct from the alleged enterprise, the corporation itself, to satisfy the enterprise/person distinctiveness requirement. The court specifically noted the principle that in order to establish liability under § 1962(c), a party must allege a "person" who is separate and distinct from the alleged enterprise. The Supreme Court concluded that under circumstances where "a corporate employee, acting within the scope of his authority, allegedly conducts the corporation's affairs in a RICO forbidden way .... [that the] corporate owner/employee ... is distinct from the corporation itself." *Cedric Kushner Promotions. Ltd. v. King*, 533 U.S. at 162.

Plaintiff asserts that its definition of an enterprise consisting of all the Defendants is appropriate, notwithstanding the lack of distinctiveness, under the *Jaguar Cars* ruling, because the Plaintiff alleges, as in *Jaguar Cars*, that the individual Defendants used at least one of the corporate Defendants (MLM) to conduct the pattern of racketeering activity. In *Jaguar Cars*, the Third Circuit noted (despite the caption of the case) that "Jaguar has not brought a claim against Royal Oaks, but instead seeks recovery from the [individual] defendants, as persons operating and managing the Royal Oaks enterprise through a pattern of racketeering activity." 46 F.3d at 268. Thus, in *Jaguar Cars*, the enterprise and the defendants were not identical.

Although the Amended Complaint and RICO Case Statement assert that the "enterprise" is MLM, the above-quoted statements at oral argument contradict that, and ask the Court to allow the case to proceed

with an enterprise identical to the Defendants. This is clearly not proper under *King*, because Plaintiff has completely blurred and ignored the distinctiveness requirement. *Accord Baker v. IBP*, Nos. 02-3967 & 02-4065, slip op. at 11 (7th Cir. Feb. 4, 2004) (holding that "[w]ithout a difference between the defendant and the 'enterprise' there can be no violation of RICO.").

**\*8** However, if the Court were to ignore counsel's expanded definition of an enterprise and consider that the enterprise is, as alleged in the Amended Complaint and RICO Case Statement, limited to MLM, the evidence still does not withstand summary judgment. Virtually the only evidence in the record as to the affairs of MLM comes from its own answers to interrogatories. MLM is owned and controlled by Defendant Steven Gartenberg, (MLM Interrog. ¶ ¶ 3, 5), but it states that it has no written or oral management, marketing or consulting agreements with Defendants Tischler, Greenfield or Premier. (*Id.* ¶ 7.) It also denies that it provides services to patients, and it has not employed any Pennsylvania licensed healthcare professional other than Steven Gartenberg. (*Id.* ¶ 10.)

Considering further Dr. Raab's deposition testimony, although he does refer to MLM at times, it is clear that he was at least an employee of Greenfield, [FN4] and that he does not show any personal knowledge of the affairs of MLM. Furthermore, as will be discussed in greater detail below, while three affidavits from doctors who worked for Greenfield refer to MLM, they do so only in the context of MLM performing billing and/or telemarketing services for Greenfield.

> FN4. Exhibits attached to his deposition show that even if he was not aware of it, Dr. Raab may have been a sole incorporator, director, president, treasurer and sole shareholder of Greenfield. (Raab Dep. Ex. 2- 4.)

Therefore, even assuming that the Court would allow the case to go forward with Plaintiff's original designation of MLM as the "enterprise", there is insufficient evidence in the record as to the function and activities of MLM, and to show that it was through MLM that the other Defendants conducted any pattern of racketeering activity.

*B. Control*

As noted above, the Third Circuit, in *Jaguar Cars*,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
**(Cite as: 2004 WL 632722 (E.D.Pa.))**

discusses the sufficiency of evidence necessary for a plaintiff to show that a particular defendant was in "control" of the enterprise conducting the pattern of racketeering activity. In that case, the court acknowledged that there was no dispute that the dealership conducted a pattern of racketeering activity. However, one of the individual defendants disputed the sufficiency of the evidence as to whether or not he was one of those in "control" of the enterprise. The court reviewed specific evidence that showed that this individual was a supervisor of someone who was carrying out the illegal scheme, "met with him daily to discuss the operation of the dealership, including its parts and service department, and was majority owner of the dealership, and was otherwise actively involved in its operation." 46 F.3d at 270-71. The court found that the evidence was sufficient for the jury to find that this individual defendant was liable because he was aware of, if not participating in, the illegal scheme. The court recognized that under *Reves, supra,* the evidence must show that a defendant participated in the operation or management of the enterprise itself.

The Court will now review the evidence in this case to see whether this requirement is met. In Plaintiff's response to the Court's Order of December 11, 2003, the Plaintiff relies on the affidavits of Dr. Craig W. Colditz, Dr. Brian F. Wallace, and Dr. Leilani Gyening, but the Court cannot conclude from these affidavits that there is a genuine issue of fact for trial as to the element of "control" regarding any of the Defendants.

**\*9** Dr. Wallace testified that he was hired by Defendant Tischler, and that his treatments would be billed under Dr. Gyening's physician number. Dr. Wallace said he was instructed (but does not say by whom) to use a billing code for manual therapy technique, which carried a $100 charge for a chiropractic adjustment for which he had previously charged $25. He also stated that Defendant Tischler pressured him to "do more testing" and told him that "we must get our numbers up." Each day Dr. Wallace would receive a phone call from either Mark or Steven Gartenberg inquiring about the number of patients that were seen each day and the amount billed. The only reference to MLM was that it performed "telemarketing for patients."

The affidavit of Dr. Colditz indicates that he was interviewed by Steven Gartenberg who said he would be employed by a non-party chiropractic management system, in its Lancaster County office. In this employment, Dr. Colditz received instructions

from Defendant Tischler. Initially, Tischler did the billing for the office by entering procedure codes into a computer and transmitting them to MLM. Colditz later assumed this responsibility and billed for Dr. Raab as well. Dr. Colditz also said that at the conclusion of each day, Mark Gartenberg called the Lancaster County office to find out the number of new patients that appeared, what had been billed for each day, and to advise about what new patients his telemarketing operation had generated for the next day. MLM would fax a schedule of new patients generated by its telemarketing operations for the Lancaster County office. In Dr. Colditz' experience, the patients who came to the Greenfield office thought they were coming to a medical practice. He also said that he was pressured by Defendant Tischler to perform more testing and on some unspecified number of occasions where Colditz believed testing was unnecessary for a particular patient, Tischler directed him to do the testing anyway.

Dr. Gyening had originally submitted an unsworn statement, but at the suggestion of the Court, Plaintiff provided an affidavit from Dr. Gyening filed as of January 13, 2004, which mentions several of the Defendants, and reiterates some of the same facts Dr. Wallace provided as to the method of doing business, billing practices, etc. She states that after a period of time, she became concerned that some of the documents relating to the formation of Premier Sports Medicine and Rehabilitation Center ("Premier"), which she was filling out, should not be submitted based upon her belief that the activities of Dr. Tischler and MLM were illegal. Nonetheless, Dr. Gyening testified that despite her objection the documents were filed with the Commonwealth of Pennsylvania and they listed her as the President of Premier. This is virtually the only mention of Defendant Premier in the entire case.

Dr. Raab also provided testimony on the issue of control, but little of it was based on personal knowledge, except that Defendant Tischler had asked for Dr. Raab's signature so that Tischler could make a rubberstamp of the same, (Raab Dep. at 13) and that Dr. Raab gave his consent to Tischler to use his signature stamp on a Greenfield checking account (*Id.* at 13-14). Plaintiff fails to connect these facts to any of the alleged racketeering acts by any of the Defendants.

**\*10** On the issue of control, Dr. Raab testified (*Id.* at 21) that Dr. Tischler instigated the treatment plans, but Dr. Raab did not make any change in the diagnostic procedure, depending on who the carrier

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
(Cite as: 2004 WL 632722 (E.D.Pa.))

Page 8

was. Dr. Raab also said that he never received any supervision from Mark or Steven Gartenberg. He stated that "to my understanding, Greenfield was simply a subsidiary of Bala or Mr. Gartenberg." (Raab Dep. at 75.) He did not state the basis of his knowledge.

The above summary of the testimony of the activities of the Defendants only shows that Plaintiff has evidence that they were in formal control (i.e., directors and/or officers) of the various entities. However, the Court has examined the record and is unable to find that any of the Defendants controlled the "enterprise," however defined, despite contradictory assertions from time to time in this case.

Completely lacking from the record in this case is any direct firsthand testimony as to how the alleged "enterprise" (in either way it has been defined) operated. Giving Plaintiff every inference, there is basically no information whatsoever about Defendant Premier. It appears that Defendant Greenfield operated a chiropractic and/or medical practice in the Lancaster area and was a legitimate medical business, seeing and treating patients. The claim forms submitted on behalf of Greenfield to Plaintiff appear to have been verified by Dr. Raab, and despite this practice having continued for 18 months, it was only the very end of this period, in approximately November of 2000 that Dr. Raab concluded that improper claims were being made.

The evidence does not show that Defendant Tischler, assuming arguendo that he was in control of Greenfield, had any specific role in the alleged "pattern of racketeering." He may have on some occasions directed a doctor to do tests the doctor did not think were necessary, and said to one of the doctors that "we need to get our numbers up." While this may constitute evidence of fraud, it certainly is not sufficient to prove that he was in "control" of a racketeering enterprise, as defined by RICO, and as alleged by Plaintiff.

There is no evidence in the record as to activities by Defendant Mark Gartenberg.

As to Defendant Steven Gartenberg, his answers to interrogatories only establish that he was the owner of MLM, he was never an employee of Bala, and he was not a shareholder of any corporate entity that provided management services to the medical or chiropractic practices whose services or bills Healthguard is challenging in this case. This assertion

is not challenged by Plaintiff.

Additionally, although the record acknowledges that Steven Gartenberg was in control of MLM, there is no firsthand testimony as to how MLM operated, or how it conducted its day-to-day working relationship with Greenfield or Premier. There is no evidence that Mark or Steven Gartenberg had any participation in the affairs of Greenfield; there is no evidence that Tischler had any participation in the affairs of MLM. The mere fact that MLM had a telemarketing operation that referred patients to Greenfield, or that it performed billing for Greenfield, does not make for fraud, and does not establish that any of these defendants controlled an enterprise engaged in a pattern of racketeering activity.

*11 The Court does acknowledge that the doctors' affidavits do evidence, in general, a practice by Greenfield of billing chiropractic services as medical services, presumably to achieve a higher reimbursement rate. There is also evidence that Greenfield occasionally billed for tests that were not appropriate prescribed or needed. However, there is no quantification whatsoever of these practices, and although there was evidence that Tischler was the person responsible for more than some of these practices, the record contains no evidence that he was in "control."

The physician affidavits also refer to the fact that Greenfield only wanted to treat patients who had insurance coverage. Although this practice was not uniform, the Court finds nothing illegal about it.

The record evidence would also allow an inference that Greenfield provided services by both a medical and chiropractic doctor. The physician would prescribe diagnostic testing, following which the patient would receive a chiropractic examination and treatment. Dr. Colditz says that the treatment plan for each patient was virtually identical, irrespective of the patient's complaints. Dr. Colditz also says that after procedure codes were entered into the computer at Greenfield, they were electronically transferred to MLM, which also performed billing services. (Colditz Aff. ¶ 5). Once again, the Plaintiff fails to connect this evidence with any act by a particular Defendant that would provide support for a genuine issue for trial that such Defendant was in "control" of an enterprise.

Returning to the issue of the definition of the "enterprise" with respect to the foregoing discussion regarding "control," the Court again concludes that if

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
(Cite as: 2004 WL 632722 (E.D.Pa.))

its ignores the suggestion of Plaintiff's counsel at oral argument that the enterprise is all of the Defendants, and assumes that Plaintiff would, if it could, proceed to trial on its original allegation that the enterprise is MLM, there is insufficient evidence to proceed on that basis. As noted above, the only Defendant as to whom there is any evidence of control regarding MLM is Steven Gartenberg, who was the owner and sole officer of MLM. However, the Court also concludes that the mere ownership of a corporation is not necessarily synonymous with "control" of that corporation for RICO purposes. *See e.g. Jaguar Cars, 46 F.3d at 270-71* (examining whether or not a 51% owner of a claimed enterprise controlled that enterprise). Rather, there needs to be evidence in the record as to Steven Gartenberg's activities on a day-to-day, month-to-month or year-to-year basis in order for the Court to infer that he controlled MLM as a racketeering enterprise. The only evidence of MLM's role is that it processed bills and performed telemarketing services for Greenfield. The fact that a minor portion of those bills were allegedly, or even presumptively, fraudulent does not make up the elements of RICO.

Alternatively, assuming that the enterprise is as described at the oral argument, all of the Defendants, and the Court ignores the distinctiveness requirement, there is still no evidence that any of the individual Defendants were in control of all of the organizations named as both Defendants and members of this enterprise, i.e., MLM, Greenfield and Premier.

*12 Although Plaintiff, in its Amended Complaint and RICO Case Statement, asserts that all three of the individual Defendants controlled the enterprise and used the enterprise to conduct a pattern of racketeering activity, the above review shows there is really nothing in the summary judgment record to support these contested allegations. As such, Plaintiff has not met its burden of coming forward with evidence of a genuine issue for trial.

V. *Pattern of Racketeering Activity*

In moving for summary judgment, Defendants assert that the Plaintiff has failed to show a genuine issue of fact for trial on the requirement of a "pattern of racketeering activity." Defendants' brief relies extensively on the pleadings, i.e., the Amended Complaint and the RICO Case Statement, but the obligation of the Court is to look at the record of the case as it exists at this time, including depositions, answers to interrogatories, etc. in determining whether Plaintiff has come forward with sufficient

evidence to show a genuine issue for trial.

The requisite pattern is demonstrated by showing both that the various predicate acts are "related" and also are "continuous." *See H. J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229 (1989), Kehr Packages, Inc. v. Fidelcor Inc., 926 F.2d 1406, 1411-12 (3d Cir.1991).* Plaintiff has shown the requisite predicate acts which took place in this case--namely the mailing of the claim forms, which was allegedly fraudulent and could constitute the crime of mail fraud. Defendants do not dispute that Plaintiff has demonstrated "relatedness". *See* (Defendants' Brief at 20.) However, Defendant does contend that Plaintiff has failed to demonstrate continuity, because Plaintiff only alleges a single victim and a single scheme episode, which began with the incorporation of Greenfield on April 20, 1999 and terminated in October 2000, when Healthguard ceased paying Greenfield's invoices. Plaintiff asserts that the fraud extended for at least 26 months. Both parties agree that the leading case on continuity in this Circuit is *Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir.1995),* which discusses the differences between closed and open-ended continuity. The Third Circuit has held that one year is not sufficient for a closed-ended scheme. *Hughes v. Consol-Pa Coal Co., 945 F.2d 594 (3d Cir.1991), cert. denied, 504 U.S. 955 (1992).*

At oral argument, Plaintiff's counsel asserted that the scheme was "close-ended" because "it had a defined end, they ceased business and ceased submitting claims." (N.T. 23). The Court will accept this characterization, but the evidence is too insufficient to form a "pattern."

Although the Court would not grant summary judgment against Plaintiff merely because the Plaintiff was the only victim of the alleged scheme, the lack of evidence as to the manner in which the alleged scheme was carried out is fatal. The affidavits of the three physicians who worked at Greenfield only supply sporadic evidence of fraud; they do not establish that there was a routine or even a common or usual manner of treating patients, which is required to establish a pattern. There is an absence of universality about the conduct of the Greenfield office where they worked, from which a jury could find a pattern. Although their affidavits do establish instances of conduct that would be readily characterized as fraudulent, the Court cannot conclude from the affidavits themselves (which along with Dr. Raab's deposition are the only evidence of how the Greenfield practice was conducted) that there is sufficient evidence to show that there existed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
**(Cite as: 2004 WL 632722 (E.D.Pa.))**

Page 10

a "pattern of racketeering activity."

*13 Plaintiff asserts that Defendants submitted hundreds of false claims, which Plaintiff asserts amount to $249,814.11. (N.T. at 21.) In support, Plaintiff refers to a chart (Ex. E), which shows that a large number of claims lacked documentary support. However, the absence of documentation does not equate to fraud. It was incumbent upon Plaintiff to provide an affidavit explaining such a complex document and why the absence of documentation would allow the Court to find a genuine issue of fact for trial. Also, at oral argument, Plaintiff's counsel did not explain how Exhibit E establishes evidence of fraud. (N.T. at 20-22.) Hence, there is no evidence that the uniform practice and procedure of the Greenfield office was to conduct tests that were not needed, or to charge higher rates than allowed, etc. for the patients whose care was outlined in Exhibit E. In fact, there is nothing in the three affidavits or the testimony of Dr. Raab which provides any consistency or quantification whatsoever as to the extent of the alleged fraudulent practices.

Even if the unsworn expert report, excluded above, were to be admitted for the truth of the matters asserted in opposition to summary judgment, the Court notes that it would be of very limited value. First, Dr. Shyminsky's expert qualifications are not set forth. The report is in the form of a memorandum dated July 8, 2003 to Thomas P. Brennan, Director of Special Investigations, without indicating the entity to which Mr. Brennan is related. The report reviews the records of 35 separate patients of Greenfield, noting progress notes, complaints, treatment and claims. The conclusion states in part "the medical necessity for the services billed has not been established ..., that virtually every patient received trigger point injections or nerve blocks, diagnostic studies were performed routinely, and the treatment plan did not appear to be tapered for the patient individually, the number of services provided appears to be in excess of what would be expected, the length of treatment appears to be excessive, and exceeded what would generally be expected per the patient's condition, and the documentation submitted in a particular physician's progress notes did not substantiate the medical necessity for the diagnostic studies performed or the medical necessity for the frequency of such studies."

These findings and conclusions may be relevant and important on a claim of fraud, and they would tend to establish that the mailings of such forms to MLM would constitute "predicate acts." However,

assuming the existence of mail fraud, it still leaves the Plaintiff's evidence lacking on the other elements of RICO. The expert report does not connect the 35 allegedly fraudulent submissions to the conduct of the enterprise as part of a "pattern" alleged or discuss the conduct of any of the individuals who are alleged to be in control of the enterprise.

### VI. *Conspiracy*

As noted above, the Plaintiff was also proceeding on § 1962(d) which makes it unlawful for any person to conspire to violate § 1962(c).

*14 Defendants cannot be liable for a conspiracy to violate RICO if the evidence is insufficient to hold any of them liable for a violation of RICO itself under § 1962(c). *See State Farm Mut. Auto. Ins. Co. v. Makris,* No. 01-5351, 2003 U.S. Dist. LEXIS 3374 (E.D.Pa. Mar. 4, 2003) (noting that an element of a § 1962(c) claim involves " 'knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c)." ') (quoting *Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989)). Thus, the Court need not dwell on this except to note that at oral argument the Court queried Plaintiff's counsel on the allegations of conspiracy, and disputes the adequacy of Plaintiff's reliance on the affidavits of Drs. Wallace and Colditz, and the subsequently submitted affidavit of Dr. Gyening. There is nothing in these affidavits to establish who participated in the illegal conspiracy.

Thus, Defendants' motion for summary judgment will be granted on Count I. An appropriate Order follows.

### ORDER

AND NOW THIS 5th day of March, 2004, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Docket No. 37) is GRANTED, as to Count I of Plaintiff's Complaint. Judgment is entered in favor of Defendants and against Plaintiff as to Count I. Counts II-IV are dismissed without prejudice for lack of subject matter jurisdiction. The Clerk is directed to close this case.

2004 WL 632722 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

•            2:02CV02611_____(Docket)
(May. 01, 2002)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 632722 (E.D.Pa.)
**(Cite as: 2004 WL 632722 (E.D.Pa.))**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10

Westlaw.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

HIGHWAY MATERIALS, INC., Plaintiff,
v.
WHITEMARSH TOWNSHIP, MONTGOMERY
COUNTY, PENNSYLVANIA, et al., Defendants.

**No. CIV.A. 02--3212.**

Oct. 4, 2004.

*MEMORANDUM*

ROBERT F. KELLY, Sr. J.

I. *INTRODUCTION*

*1 Presently before this Court is the Defendants', Whitemarsh Township, the Board of Supervisors of Whitemarsh Township, Ann D. Younglove ("Younglove"), Ronald J. DeRosa ("DeRosa"), William P. Rimel ("Rimel"), Peter P. Cornog ("Cornog"), Michael A. Zeock ("Zeock") and Thomas F. Zarko ("Zarko"), Motion for Summary Judgment Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. On May 24, 2002, the Plaintiff, Highway Materials, Inc. ("HMI"), filed its Complaint against the Defendants. Plaintiff's Complaint contains three counts; specifically, Plaintiff asserts that the Defendants violated its substantive and procedural due process rights under Counts I and II of the Complaint. Additionally, in Count III, the Plaintiff asserts that the Defendants denied it equal protection under the law. The instant Motion asks this Court to enter summary judgment in favor of the Defendants as to all three Counts. For the following reasons, the Defendants' Motion will be granted.

II. *BACKGROUND*

This case arises from a land use dispute. HMI is the owner of a 309-acre tract of land in Whitemarsh Township, Montgomery County, Pennsylvania that consists of three parcels. The property was previously known as the Corson Limestone Quarry. The Plaintiff purchased this property on June 21, 1997. The portion of HMI's property that is the subject of this lawsuit is a fifty-four-acre portion of the HMI owned property (hereinafter referred to as "Parcel One"). [FN1] Up until late 2001/early 2002, the majority of Parcel One was zoned HVY-X Industrial except for a small portion which was zoned AA-Residential. The parties are in agreement that the HVY-X zoning designation permitted a wide array of uses, the principal exception being that residential development was not permitted under the HVY-X zoning regulations. (*See* Defs.' Mem. Law in Supp. of Mot. for Summ. J., at 7; Brief of Pl. in Opp'n to Defs' Mot. for Summ. J., at 6). To the east, north and south of Parcel One is the Philadelphia Cricket Club Golf Course.

> FN1. For the purposes of this Memorandum, the other two parcels of HMI's property shall be known as Parcel Two and Parcel Three respectively. As stated by the Plaintiff, "Parcel Two is a 67-acre tract consisting largely of a quarry site that is in the process of being filled in. HMI also operates a concrete production business on this parcel. Parcel Three is a 188-acre trace which contains an active quarry and a bituminous production business." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 5)(internal citations omitted). With one exception, all the properties surrounding HMI's property is zoned residential. Indeed, the only property near HMI's property that cannot be considered residential, agricultural or a golf course is a fifteen-acre parcel of land located to the west of Parcel Two which is zoned HVY-X. This fifteen-acre parcel is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

owned by KYW and has a radio transmitting tower and a small building on the property.

The Whitemarsh Township's subdivision and land development procedures, requirements and standards are set forth in the Township's Subdivision Land Development Ordinance ("SALDO"). Section 105-12 of the Whitemarsh SALDO provides a general outline of township land development procedures. [FN2] As the SALDO states, there are three steps in the land development process. The filing of a sketch plan constitutes the first step. This step is optional. As stated by Section 105-13 of the SALDO:

> FN2. Section 105-12 of the Whitemarsh SALDO states the following:
> A. There are three (3) stages in the procedure for approval of subdivision and land development plans. These stages are necessary to enable the Planning Commission and the Board of Supervisors to have an adequate opportunity to review the submissions and to ensure that their formal recommendations are reflected in the final plans.
> B. The separate stages of approval include the submission of an optional sketch plan, a preliminary plan and a final plan. These plans differ in their purpose and required level of detail....
> C. Sketch plans shall require no more than a sixty-day review period. The review process required for preliminary and final plans shall include no more than ninety (90) days starting from the date of the regular meeting of the Planning Commission next following the date the application is accepted by the Manager and ending with the applicant being notified of the decision of the Board of Supervisors.
> D. The presentation of the preliminary plan and a final plan shall each be considered a separate submission and the maximum ninety-day review period may be required for each. A sixty-day review period may be required for a sketch plan. No limitations for the action of any public official or agency set forth in this Article shall be construed as mandatory.

> E. The applicant is encouraged to meet informally with the Township Planner and the Planning Commission to obtain information regarding zoning and subdivision requirements and development alternatives prior to the initial submission.
> (Defs.' Mot. for Summ. J. at Ex. H).

(1) [t]he purpose of the sketch plan, which is an optional submission, is to afford the applicant the opportunity to consult early and informally with both the Planning Commission and the Township Planner before the preparation of the preliminary plan and formal application for approval.
(2) During the sketch plan procedure, the applicant can advantageously make use of the services of the Planning Commission and the Township Planner to help him analyze the problem of the development and plan more adequately for its sound coordination with the community. The sketch plan procedure also affords the opportunity to give informal guidance to the applicant at a stage when potential points of difference can be more easily resolved. It can also simplify official action and save unnecessary expense and delay.

(Defs.' Mot. for Summ. J. Ex. H). The filing of a preliminary plan is the second step of the process. Section 105-14 of the SALDO states that "[t]he purpose of the preliminary plan is to obtain formal conditional approval in order to minimize changes and revisions before final plans are submitted." (*Id.*). Finally, Section 105-15 of the Whitemarsh SALDO states that "the final plan shall conform to the preliminary plan, as approved." (*Id.*). Stated differently, "when a preliminary application has been duly approved, the applicant *shall be entitled* to final approval in accordance with the terms of the approved preliminary application as hereinafter provided." 53 PA. CONS.STAT. ANN. § 10508(4)(i)(emphasis added).

A. INITIAL LAND USE DISCUSSIONS

**\*2** While most of the facts giving rise to this case occurred in late 2001 and early 2002, HMI's interactions with the Township began several years before the most relevant facts giving rise to this case occurred. In 1999, the Plaintiff retained E. Van Rieker,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

a land planner to explore development possibilities for Parcel One. In early 2000, HMI requested a waiver from one of the Township's stormwater management requirements. As stated by the Plaintiff, "[u]nder Township regulations, in calculating the required size of a planned development's stormwater facilities, a developer must account for the difference between the stormwater runoff the project will create and the runoff a hypothetical 'meadow' would create at the site." (Br. Pl. in Opp'n to Defs. Mot. for Summ. J., at 7 n.5). After a request from the Township's engineer requesting as to what the site would look like if HMI complied with the existing requirements, HMI submitted three plans to the Township, each of which depicted a detention pond on a small area of Parcel One. As would become an issue later, this detention basin was apparently depicted on a portion of Parcel One zoned AA-Residential. Ultimately, the Board rejected the wavier request because the Board found that options were available to HMI that would comply with the stormwater ordinance.

As this was going on, the Plaintiff was in the process of preparing a sketch plan for Parcel One. On November 30, 2000, Plaintiff submitted a sketch plan to the Township. This sketch plan was for what the parties have described as a "mixed-use" plan. The sketch plan proposed 450,000 square feet of office space along with 600 apartment units. Because this sketch plan called for residential units, as well as office space, it did not conform with the HVY-X zoning of Parcel One that was in place at the time of the sketch plan submission. Thus, if this "mixed-use" plan was to ever be approved, Parcel One would have to be rezoned or HMI would have to seek a variance from the Township's Zoning Hearing Board.

On January 29, 2001, the Montgomery County Planning Commission reviewed the "mixed-use" sketch plan. [FN3] Overall, the Montgomery County Planning Commission found that the "mixed-use" sketch plan was "too intense in both its impervious coverage and density for [Parcel One] and the surrounding area." (Defs.' Mot. for Summ. J. at Ex. L). Additionally, the County Planning Commission recommended that:

FN3. Upon review of the sketch plan, the Montgomery County Planning Commission

issued a letter stating that "the review comments and recommendations contained in this report are advisory to the municipality and final disposition for the approval of any proposal will be made by the municipality." (Defs.' Mot. for Summ. J. at Ex. L).

the applicant and the township work together to draft a new zoning district that would allow office buildings and apartments in a campus setting, with appropriate dimensional requirements. To develop this site as proposed under the HVY-X District dimensional requirements will create a new, dense, village surrounded by a semi-rural area, disconnected from other dense areas of the township.

*3 (Id.). Subsequently, on February 27, 2001, the Whitemarsh Township Planning Commission reviewed the "mixed-use" sketch plan proposal at an open meeting attended by the public. At this meeting, Plaintiff's attorney, James Garrity ("Garrity"), made a presentation regarding the "mixed-use" sketch plan and "indicated that [HMI was] seeking comments from the Planning Commission." (Id. at Ex. N). Additionally, at this meeting, several people from the community spoke out against the proposal detailed in the "mixed-use" sketch plan. (Id.).

On May 24, 2001, the Plaintiff presented the "mixed-use" sketch plan to the Board of Supervisors at an open meeting. Once again, Garrity appeared on behalf of the Plaintiff to discuss the "mixed-use" sketch plan. As in the Planning Commission meeting, members of the Township spoke out against the development of Parcel One, or at least the proposal as set out in the "mixed-use" sketch plan. [FN4] For example, the Township citizens expressed concerns about additional traffic and that the HMI proposal was to large. Additionally, members of the Board of Supervisors also expressed their concerns about the HMI proposal. For example, Supervisors Elizabeth W. Graf and Kimel expressed concerns that the proposal was too dense.

FN4. Some of the people that spoke out against the "mixed-use" sketch plan identified themselves as members of the Whitemarsh Township Residents Association ("WTRA"). The Plaintiff asserts that the WTRA was an ad

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

hoc civic association "created to oppose development in the Township." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 9). Apparently, the WTRA has grown into quite a large civic organization comprising 1,500 members.

B. REZONING

After sensing the reluctance of the Township and its citizens to its "mixed-use" sketch plan, HMI set to work on formulating a preliminary plan that would not require any rezoning of the property. Specifically, during the summer of 2001, HMI began to prepare a preliminary plan for an office park. According to the HVY-X zoning that Parcel One was under during the summer of 2001, if HMI were to submit an all office space plan, then no rezoning would be required since such a proposal would lack any residential component that was prohibited under the HVY-X regulations. Thus, during the summer months of 2001, HMI began to prepare a preliminary plan for an all office space development in Parcel One that would conform with the HVY-X zoning regulations. Subsequently, on September 10, 2001, HMI submitted its preliminary plan for Parcel One (hereinafter referred to as the "Initial Preliminary Plan"). The Initial Preliminary Plan submitted by HMI consisted of 500,000 square feet of office space. This office park was to be called "Creekside Commons." Since this plan lacked any residential space, no rezoning by the Township was required before the Board of Supervisors could approve Creekside Commons.

During the summer of 2001, the Township also began the process to rezone HMI's property. The Whitemarsh Township zoning ordinances allow individuals to submit proposals to change the Township's zoning map. Section 116-239 of Whitemarsh's zoning regulations states:

**4 [w]henever the owners of fifty per centrum (50%) or more of the property owners within any district or the property fronting on the same street or streets or abutting on the property sought to be changed, and situate within one thousand (1,000) feet of the property sought to be change, shall present to the Board of Supervisors a petition duly signed and

acknowledged, requesting an amendment, supplement, change, modification or repeal of the regulations prescribed, or of the Zoning Map, including such district, it shall be the duty of the Board of Supervisors to hold a public hearing thereon and cause notice thereof to be given in the manner prescribed in § 116-237.

(Id. at Ex. G). Subsequently, on July 3, 2001, an attorney representing a neighbor to HMI's property submitted a petition to rezone HMI's property to EX-Extraction. [FN5] As will be explained, HMI's property was properly rezoned in Feburary of 2002.

> FN5. As stated by the Defendants regarding changing the property from HVY-X to EX-Extraction:
>
> [t]he overall effect of the [proposed] changes in the Zoning Ordinance and Zoning Map was to rezone major portions of Plaintiff's three parcels, including the 54 acre parcel [Parcel One] (with the exception of the portion zoned AA-Residential) to EX-Extraction which ... as stated before, permitted the extractive quarry use to continue, but once abandoned and the property reclaimed, the land could be used for residential purposes. Previously, under the HVY-X Industrial District land use regulations, any use except those restricted (including residential), were permitted in the HVY-X District. Permitted uses in a HVY-X District would include administrative and executive offices.
>
> (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J. at 17).

At a Board of Supervisors meeting on September 20, 2001, the Whitemarsh Board of Supervisors voted to authorize the rezoning of Parcel One. Then, at their October 18, 2001 meeting the Board voted to rezone HMI's property to EX-Extraction. However, this action by the Board was procedurally improper, and HMI filed a challenge to the rezoning with the Township's Zoning Hearing Board. Ultimately, the October 18, 2001 rezoning was deemed procedurally defective and the rezoning was re-enacted on February 28, 2002.

It is important to note the timing of HMI's preliminary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

plan submission. As stated previously, HMI submitted their preliminary plan proposal for Creekside Commons on September 10, 2001. Since HMI's preliminary plan proposal for Creekside Commons was filed with the Township before the Board of Supervisors had enacted the EX-Extraction rezoning ordinance for Plaintiff's property, the preliminary plan proposal would be governed by the HVY-X zoning regulations. Pennsylvania Law states that:

> [f]rom the time an application for approval of a plat, whether preliminary or final, is duly filed as provided in the subdivision and land ordinance, and while such application is pending approval or disapproval, no change or amendment of the zoning, subdivision or other governing ordinance shall affect the decision on such application adversely to the applicant and the applicant shall be entitled to a decision in accordance with the provisions of the governing ordinances or plans as they stood at the time the application was duly filed. In addition, when a preliminary application has been duly approved, the applicant shall be entitled to final approval in accordance with the terms of the approved preliminary application as hereinafter provided. However, if an application is properly and finally denied, any subsequent application shall be subject to the intervening change in governing regulations.

53 PA. CONS.STAT. ANN. § 10508(4)(i).

**B. REVIEW AND ULTIMATE DENIAL OF HMI'S PRELIMINARY PLAN**

*5 As both parties recognize, "a Township must act on land development plans within ninety days after the first Planning Commission meeting after the filing of the plans. If no action is taken within the statutory time frame, the land development plans are deemed approved." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J. at 20-21)(internal citations omitted). However, HMI afforded the Township a routine extension of time.

After the preliminary plans were submitted on September 10, 2001, "in accordance with the provisions of the SALDO, the Township administrative staff distributed copies of the application and/or plans to various individuals and organizations, including the Montgomery County Planning Commission and ... Zarko, the Township's consulting engineer." (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 18). The Montgomery County Planning Commission reviewed the Initial Preliminary Plan for Creekside Commons and stated the following in a November 20, 2001 letter to Whitemarsh Township:

> [a]s we stated in our January 29, 2001 letter, we believe that this project is too intense for this site. The HVY-X zoning, under which the plan was submitted, was developed many years ago for heavy industrial uses. Hence, its development standards are not appropriate for redevelopment of this site. When applied to suburban-style office buildings the coverage of the site becomes excessive, resulting in buildings surrounding by acres of paving. As we previously stated in our earlier letter, we believe that this results in a project that, while initially attractive because of its newness, will not age well.

(Defs. Mot. for Summ. J. Ex. BB). The Montgomery County Planning Commission recommended the following:

> [w]e recommend that the applicant work with the township and their consultant on development scenarios for this site and the rest of the quarry. While we recognize that the applicant has vested property rights with the site, a project developed to this scale and intensity will have a deleterious effect on the surrounding area and will eventually lose its appeal for tenants as better designed projects with site amenities become available.

(*Id.*). As with the January 29, 2001 letter, the Montgomery County Planning Commission noted that its comments and recommendations were merely advisory and that final authority for disposition of the preliminary plan remained with the municipality.

Even before the Montgomery County Planning Commission issued its advisory report and recommendations, Zarko reviewed the Initial Preliminary Plan for Creekside Commons. On October 11, 2001, Zarko submitted his first review of HMI's Initial Preliminary Plan for Creekside Commons. This review detailed areas where the Initial Preliminary Plan was non-compliant with the SALDO, zoning ordinance and the grading ordinance.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

As both sides attest, it is normal practice for a preliminary plan to undergo revisions before it is finally approved or denied. Indeed, in responding to Zarko's October 11, 2001 review letter, HMI submitted a revised preliminary plan for Creekside Commons on December 24, 2001 (hereinafter referred to as the "First Revised Preliminary Plan"). Engineer Zarko reviewed the First Revised Preliminary Plan, and while this plan had less deficiencies than the September 10, 2001 Initial Preliminary Plan proposal, Zarko continued to find deficiencies and non-compliances when compared to the Township's ordinances. [FN6] After this review letter by Zarko, the purported deficiencies as stated by the Defendants became evident. Indeed, the Defendants assert that "none of the three major zoning issues had been dealt with" in the First Revised Preliminary Plans. (Defs. Mem. of Law in Supp. of their Mot. for Summ. J., at 20). According to the Defendants, the First Revised Preliminary Plan failed to address the lack of a berm and fence to surround Creekside Commons as required by the HVY-X regulations, the continued location of a stormwater retention basin on the portion of Parcel One that was zoned AA-Residential and the selection of a sanitary stormwater option. The Plaintiff contests the impact or relevancy of these three items. First, HMI states that after its Initial Preliminary Plan was reviewed by Zarko in October of 2001, HMI constantly requested meetings with the Township on how best to move forward on the storm sewer issue. Additionally, the Plaintiffs assert that on January 16, 2001, representatives of the Township contacted Garrity and advised HMI to continue to show both a public sanitary sewer and on-site sewer option on the Preliminary Plan so as to allow the Board to elect which option it preferred. Additionally, the Plaintiff asserts that as to the berm/fence requirement and the location of the detention basin, Zarko's zoning interpretations were simply incorrect.

> FN6. The Defendants assert that the Initial Preliminary Plan had ninety items of non-compliance and that the First Revised Preliminary Plan had seventy-three.

As the preliminary plan process continued for Creekside Commons, there was also movement toward revisiting the "mixed-use" plan for Parcel One. The Plaintiff asserts that Gregan and Weiss advised Garrity that the Board of Supervisors had agreed to schedule a public meeting on HMI's "mixed-use" plan. HMI then submitted a "mixed-use" plan on February 12, 2002 and a public meeting to discuss the "mixed-use" plan was scheduled for March 7, 2002. As set out in the minutes of the March 7, 2002 meeting, "Mr. Garrity presented an alternative mixed use sketch plan for the site which he opined was less intense than the office use. The "mixed use" sketch plan proposed 308,000 sq. ft. of office space in four three-story buildings and 380 apartments in ten four-story buildings of 38 apartments each." (Defs. Mot. for Summ. J. Ex. S). As with the previous "mixed-use" sketch plan discussed at meetings in early and mid-2001, the "mixed-use" plan discussed at the March 7, 2002 meeting met with significant opposition from the public as well as from some Board members. [FN7]

> FN7. For example, "Supervisor Zeock opined that the project is too intense and that, in his opinion, the two big issues are traffic and drainage." (Defs. Mot. for Summ. J. Ex. S).

*6 A day after the March 7, 2002 Board meeting discussing the "mixed-use" concept, the Township Manager ("Gregan") sent a letter to Garrity stating that HMI's all-office preliminary plan proposal was going to be scheduled "for action" by the Whitemarsh Township Planning Commission on March 19, 2002 and would be acted upon by the Board of Supervisors Regular Meeting on March 21, 2002. The Defendants assert that since the First Revised Preliminary Plan was filed on December 24, 2001:

> the Board of Supervisors was legally obligated to act on the [First Revised Preliminary Plan] by March 24, 2002 not only in accordance with the Municipalities Planning Code, but pursuant to HMI's offered extension which was accepted by the Board of Supervisors. If the Board did not act on the plans within that time frame, it ran the risk that the [First Revised Preliminary Plans], as deficient as they were, would be "deemed approved" in accordance with section 508 of the Municipalities Planning Code. 53 P.S. § 10508(3). That section of the Code provides for an automatic approval of plans if not acted upon within the 90 day period. Because the last

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

Page 7

Supervisors' meeting before the deadline was March 21, 2002, the [First Revised Preliminary Plans] had to be acted upon by that date, absent a further extension accepted by the Township.

(Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 27). The Plaintiff responds by providing this Court a letter dated March 12, 2002. In that letter, Garrity offered an extension of time for the Board of Supervisors to act so that the First Revised Preliminary Plans would not be deemed approved by a lack of Board action. As Plaintiff notes, even with an offer to extend the time for Board action, the Board refused to accept the Plaintiff's offer of an extension. Instead, the [First Revised Preliminary Plans] were to be ready "for action" at the March 19, 2002 Township Planning Commission meeting and then ready "for action" at the Board of Supervisors meeting two days later on March 21, 2002.

Leading up to the March 21 Board of Supervisors meeting, the Plaintiff prepared and ultimately filed a new revised preliminary plan for Creekside Commons on March 19, 2002 (hereinafter referred to as the "Second Revised Preliminary Plan"). [FN8] Since the Second Revised Preliminary Plans were filed on the same day as the Planning Commission meeting, the Planning Commission had no statement from the Township's engineer as to the adequacy of the newly submitted plan.

> FN8. The filing of the Second Revised Preliminary Plans on March 19, 2002 started a new ninety-day period for the Defendants to act.

*7 After receipt of the Second Revised Preliminary Plan, Zarko began to review it in preparation for the March 21, 2002 Board of Supervisors meeting. Zarko issued his review and report of the Second Revised Preliminary Plan on March 21, 2002, a few hours before the Board of Supervisors meeting was to take place. A copy of Zarko's report was faxed to Garrity approximately two hours before the Board of Supervisors meeting was to begin. In his report, Zarko set forth the areas he felt the Second Revised Preliminary Plan failed to comply with the Township's SALDO, zoning ordinance and grading ordinance. For

example, Zarko once again noted HMI's proposal for a retention basin in the area of Parcel One that was zoned AA-Residential. Zarko also noted that the specifications concerning the Second Revised Preliminary Plan failed to provided details concerning the proposed on-site sewage treatment plant. Additionally, Zarko once again stated that the plan failed to provide a berm and chain link fence around the perimeter of the proposal. [FN9] The Plaintiff contends that the Township Solicitor, Weiss, instructed Zarko to deviate from his normal routine in making his report. Specifically, the Plaintiff asserts that Zarko's letter was not divided into sections entitled "Preliminary Plan Approval Requirements" as previous reports were noted and that Zarko intentionally jumbled the items on the March 21, 2002 report so they differed in order from the January 24, 2002 report.

> FN9. Specifically, Zarko provided the following comments in his March 21, 2002 review letter: 1. The plan that was submitted for the Project is inconsistent with the following provisions of Chapter 116 "Zoning" of the Whitemarsh Township Code:
> a. The applicant proposes to construct a retention basin on the southeasterly portion of the Project site, which is located within the AA Residential Zoning District, which is not a permitted use within the aforementioned District. (Sections 116-35 and 116-48)
> b. Details/design specifications concerning the proposed on-site sewage treatment plant depicted on the Plan were not submitted to the Township for review. (Section 116-152.A.4)
> c. A suitably sized berm and chain link fencing were not provided around the perimeter of the proposed land development site in the specific locations required by the Whitemarsh Township Code. (Sections 116-156.B and C)
> d. The applicant proposes to construct the on-site sewage treatment plant on the southeasterly portion of the project site, within the 200 ft. setback from the AA-Residential Zoning District, which is not permitted. (Defs. Mot. for Summ. J. Ex. WW). The letter also details other problems/deficiencies associated with the Second Revised

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

Preliminary Plan. (*Id.*).

At the start of the March 21, 2002 Board meeting, Garrity made a short presentation of the plans and again reiterated HMI's request for an extension of time. [FN10] The Supervisors ultimately rejected Garrity's request for an extension of time and moved forward to vote on the Second Revised Preliminary Plan. At their depositions, the Board members testified as to the reasons for denying the preliminary plan. First, the members stated that they felt that no real progress had been made on the Creekside Commons all-office proposal and that the proposal was going nowhere. Thus, members of the Board thought an extension of time would be futile. Additionally, the Board members stated that they relied on the report issued by Zarko earlier in the day which stated that the plans did not conform to the Township Ordinances. Thus, the Defendants assert there were valid, legal reasons for denying the plans as well as denying Plaintiff's request for additional time.

> FN10. It should be noted that Weiss had arranged for a court reporter to document the proceedings, as well as chose to have the Township witnesses sworn.

By refusing to grant the extension as requested by HMI, and rejecting the Second Revised Preliminary Plan, the Board of supervisors essentially locked HMI into a plan that would have to be governed by the EX-Extraction zoning requirements. The parties are in agreement that any new submission made by HMI to the Township would be deemed a new plan and, therefore, would not be considered under the previous HVY-X zoning requirements. This is because such a new submission would be deemed a new plan and, therefore, would not be grandfathered in under the old zoning ordinance. As stated previously, the all-office space Creekside Commons proposal was allowed under the HVY-X zoning, but not under the new EX-Extraction zoning implemented initially in October of 2001, and then re-enacted in February of 2002.

### III. *STANDARD*

**\*8** Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson,* 477 U.S. at 249. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id.* at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir.1989)(citing *Celotex,* 477 U.S. at 325 (1986)). Further, the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. *Celotex,* 477 U.S. at 322-23. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Id.* at 322; *Wisniewski v. Johns-Manville Corp.,* 812 F.2d 81, 83 (3d Cir.1987).

### IV. *DISCUSSION*

Plaintiff's Complaint contains three counts. The Plaintiff asserts that through their actions, the Defendants violated its procedural and substantive due process rights under the Fourteenth Amendment. Additionally, the Plaintiff asserts that the Defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

Page 9

did not afford it equal protection guaranteed under the law. Throughout its Brief, the Plaintiff refers to the actions of the Defendants as a "one-two punch." The Plaintiffs assert that "punch one" was the rezoning of its property from HVY-X to EX-Extraction. "Punch two" was the deficient process of consideration, and ultimate denial of its preliminary plans for Creekside Commons. Thus, this Court will analyze whether one or both of these "punches" can substantiate a procedural or substantive due process claim, and/or whether one or both of these "punches" can substantiate an equal protection claim. As will be discussed, after reviewing the Brief's and exhibits of the parties, this Court finds that summary judgment is proper as to all three claims and, therefore, Defendants' Motion will be granted.

A. PROCEDURAL DUE PROCESS

*9 It is important to first note the elements that are necessary to satisfy a procedural due process claim. As stated by the United States Court of Appeals for the Third Circuit ("Third Circuit"), "[t]o establish a cause of action for violation of procedural due process, a plaintiff in addition to proving that a person acting under color of state law deprived it of a protected property interest, must establish that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process." *Midnight Sessions, Ltd. v. City of Phila.,* 945 F.2d 667, 680 (3d Cir.1991), *overruled on other grounds, United Artists Theatre Circuit, Inc. v. Township of Warrington,* 316 F.3d 392 (3d Cir.2003)(citing *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). [FN11] The parties agree that the Defendants were acting under color of state law and that the Plaintiff has a protected property interest. Both sides, however, do contest whether the Plaintiff has satisfied the other requirements of substantiating a procedural due process claim so as to defeat the Defendants Summary Judgment Motion. First, this Court will analyze whether the purported "punch one" substantiates a procedural due process claim. Then, this Court will analyze whether the purported "punch two" substantiates a procedural due process claim.

FN11. As will be explained, the standard for establishing a substantive due process claim

was fundamentally changed by the Third Circuit in *United Artists Theatre Circuit. See infra* Part IV.B. However, cases predating *United Artists Theatre Circuit* remain good law on the issue of substantiating a procedural due process claim including *Midnight Sessions* and similar cases.

1. "Punch One"

Regarding the rezoning issue, or "punch one," the Third Circuit has stated that

[t]he Pennsylvania legislature has enacted a system for processing challenges to zoning ordinances.... A landowner who wishes to challenge the validity of a zoning ordinance or amendment that restricts the use or development of its land may file a challenge with the zoning hearing board and may appeal from any decision by the zoning officer applying the ordinance. *Rogin v. Bensalem Township,* 616 F.2d 680, 694-95 (3d Cir.1980). Additionally:

[i]f the landowner is dissatisfied with the Board's decision, it then has the right to appeal to the Court of Common Pleas. The appeal may take the form of direct judicial review of the Board's decision, or the court may take new evidence and enter its own findings of fact after trial de novo. The Court is authorized to declare any ordinance or map invalid and to set aside or modify any action, decision, or order of the Township, Zoning Officer, or Zoning Hearing Board.

*Id.* at 695 (footnotes omitted).

After the initial rezoning of HMI's property in October of 2001, the Plaintiff filed an appeal with the Township's Zoning Hearing Board. As was stated previously, the Township re-enacted the rezoning on February 28, 2002 due to procedural deficiencies associated with the October, 2001 rezoning. In *Rogin,* the Third Circuit affirmatively stated that "[i]n Pennsylvania the procedure for challenging zoning ordinances substantially conforms with the general due process guidelines enunciated by the Supreme Court." *Id.* at 695. There is clearly a full judicial mechanism from which HMI could have availed itself and, as one court has noted, "when a state affords a 'full judicial mechanism' with which to challenge administrative

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

decisions of the type at issue, the state provides adequate procedural due process, regardless of whether the plaintiff avails herself of that appeal mechanism." *The Development Group, LLC v. Franklin Township Bd. of Supervisors, No. 03-2936, 2003 WL 22358440, at *8 (E.D.Pa. Sept.24, 2003).* Here, even though it appears as if HMI did not avail itself of the appeals procedures after the February, 2002 zoning re-enactment, the Pennsylvania process for challenging zoning ordinances satisfies the procedural due process requirements under the Constitution. Thus, as to "punch one," this Court cannot find any violation of Plaintiff's procedural due process.

2. "Punch Two"

*10 The thrust of Plaintiff's procedural due process claim relates to "punch two" or the lead up to and ultimate denial of the Second Revised Preliminary Plan for Creekside Commons. Similar to the procedure for appealing the rezoning of a property, Pennsylvania provides a party with a full judicial mechanism to review the denial of a preliminary plan. Indeed, Pennsylvania allows a party to appeal a land use decision to the Court of Common Pleas where the land is located. *See* 53 Pa. Cons.Stat. Ann. § 11001-A *et seq.* As the Third Circuit has noted, "[i]t is the law in this Circuit that a state provides adequate due process when it provides reasonable remedies to rectify a legal error by a local administrative body." *Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.1988), *overruled on other grounds, United Artists Theatre Circuit,* 316 F.3d 392. In *Bello,* the Plaintiff argued that the township denied it procedural due process by denying a building permit. *Id.* at 1127. As the Third Circuit noted, "Pennsylvania affords a full judicial mechanism with which to challenge the administrative decision to deny an application for a building permit." *Id.* at 1128. The Third Circuit found that the plaintiffs did not show that decision to deny the building permit was made pursuant to a constitutionally defective procedure. *Id.* Indeed, the Third Circuit reiterated this point in *Midnight Sessions,* by stating that "[t]he availability of a full judicial mechanism to challenge the administrative decision to deny an application, even an application that was wrongly decided, precluded a determination that the decision was made pursuant to a constitutionally

defective procedure." 945 F.2d at 681.

Even though HMI clearly has a full judicial mechanism with which to challenge the Board of Supervisor's decision to deny its Second Revised Preliminary Plans, HMI still argues that the Defendants have violated its procedural due process guarantee. Principally, the Plaintiff relies on *C & M Group, Inc. v. New Britain Township, No. 90-4375, 1991 WL 25684 (E.D.Pa. Feb.14, 1991).* Plaintiff quotes *C & M Group* which states that "post-deprivation remedies are adequate to satisfy due process only when the circumstances surrounding the deprivation require quick action by the state, or when pre-deprivation procedures are impractical. *Id.* at *3. However, the Plaintiff fails to consider the full breadth of *C & M Group.*

At the outset, *C & M Group* resolved a 12(b)(6) motion to dismiss. In *C & M Group,* the court noted that "[c]ourts have thus held that pre-deprivation procedures must be provided prior to the denial of a land-use permit." *Id.* at *3. Continuing, the court noted that Plaintiff's averments as to its procedural due process claim were that the board failed to provide a decision on the record and that the board failed to give the land development plan fair consideration. *Id.* However, the court noted that "even if the Board acted arbitrarily and failed to base its decision on the applicable law and the facts, that goes to substance rather than procedure. It does not amount to a failure to provide adequate procedure." [FN12] *Id.* (citing *Rogin,* 616 F.2d at 692-94). Additionally, the court noted that "the standard of procedural due process is not whether the municipality deviates from established procedure, but whether it deviates from constitutionally mandated procedure." *Id.* (citing *Eguia v. Tompkins,* 756 F.2d 1130, 1139 (5th Cir.1985)).

> FN12. Indeed, in their Reply Brief, the Defendants make a similar point by arguing that Plaintiff's complaints about how it was treated during the land development process and rezoning amount to substantive rather than procedural due process challenges since the Plaintiff was afforded pre and post deprivation procedures pursuant to the Township SALDO and Pennsylvania law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In the case currently before this Court, there were pre-deprivation procedures utilized. These included meetings and conversations with Township officials as well as three reports issued by the Township's engineer. Each of the Zarko's reports detailed deficiencies with HMI's proposal as it related to the Township's ordinances. The Plaintiff states that the third and final Zarko report was issued only two hours before the Board ultimately denied the Second Revised Preliminary Plan and that this third and final report by Zarko raised new issues not present in his other reviews. However, what is clear is that this third report issued on March 21, 2001 also detailed deficiencies that were present in previously submitted preliminary plans by the Plaintiff. While the Plaintiff vigorously states that its Second Revised Preliminary Plan was approvable, this goes to the substance rather than the procedure. The Board's reliance on an allegedly incorrect engineer's report attacks the substance of the decision and not the procedure with which it was made. Pennsylvania clearly has a scheme in place that allows HMI to appeal the denial of its preliminary plan. [FN13] Therefore, Plaintiff's procedural due process claim is knocked out.

> FN13. Indeed, HMI has taken advantage of these procedures by filing an appeal of the Township's denial of its Second Revised Preliminary Plan with the Montgomery County Court of Common Pleas in the spring of 2002.

B. SUBSTANTIVE DUE PROCESS

*11 This Court will now turn its attention to Plaintiff's substantive due process claim. "To succeed in a substantive due process claim under Section 1983, a plaintiff must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Corneal v. Jackson Township,* 313 F.Supp.2d 457, 465 (M.D.Pa.2003), *aff'd,* 94 Fed. Appx. 76 (3d Cir.2004)(non-precedential)(internal quotation marks and citations omitted). Here, since HMI is the owner of a property interest that is subject to a local land use regulation, HMI is entitled to substantive due process

protection. *Id.* (citing *DeBlasio v. Zoning Bd. of Adjustment for the Township of West Amwell,* 53 F.3d 592, 600 (3d Cir.1995)).

Next, the Plaintiff must show that the government violated the relevant standard in depriving the plaintiff of that protected property interest. Until recently, Third Circuit precedent stated that if a Township's actions were governed by an improper motive, that was enough to establish a substantive due process violation. *See e.g., DeBlasio,* 53 F.3d at 598; *Midnight Sessions,* 945 F.2d at 683; *Bello,* 840 F.2d at 1129; *Rogin,* 616 F.2d at 689. However, in *United Artists Theatre Circuit,* the Third Circuit raised the standard for a substantive due process violation in the land use context. After analyzing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Third Circuit held that the new standard to determine whether a substantive due process violation has taken place is whether the purported government action "shocks the conscience." *United Artists Theatre Circuit,* 316 F.3d at 400-01. With this holding, the "improper motive" test for substantive due process enunciated in *Bello* and its progeny was no longer good law. *Id.* at 401. Indeed, the Third Circuit noted that "[l]and use decisions are matters of local concern, and such disputes should not be transformed into substantive due process claims based only on allegations that government officials acted with 'improper motives.' " *Id.* at 402.

The "shocks the conscience" test is not a precise test "and it also 'varies depending on the factual context.' " *Eichenlaub v. Township of Indiana,* -- F.3d--, No. 03-2707, 2004 WL 2093439, at *9 (3d Cir. Sept.21, 2004)(quoting *United Artists Theatre Circuit,* 316 F.3d at 400). As a result, it is necessary to delve into the factual context of this case to see if the Defendants have satisfied their summary judgment burden. It should also be noted however, that as the Third Circuit recently stated, "[w]hat is clear is that this ["shock the conscience"] test is designed to avoid converting federal courts into super zoning tribunals. What 'shocks the conscience' is only the most egregious official conduct." *Id.* (internal quotation marks and citations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

**\*12** Once again, Plaintiff asserts that the Defendants' purported "one-two punch" of rezoning and subsequent denial of the Second Revised Preliminary Plans on March 21, 2002 violated its substantive due process rights. First, this Court will examine whether "punch one," the rezoning of the HMI property from HVY-X to EX-Extraction, "shocks the conscience." Then, this Court will analyze whether "punch two," the process and ultimate denial of HMI's Second Revised Preliminary Plan, "shocks the conscience."

1. "Punch One"

As the Third Circuit has noted, "[t]he federal courts largely defer to legislative judgment on such matters as zoning regulation 'because of the recognition that the process of democratic political decisionmaking often entails the accommodation of competing interests, and thus, necessarily produces laws that burden some groups and not others.' " *Pace Res., Inc. v. Shrewsbury Township,* 808 F.2d 1023, 1035 (3d Cir.1987)(quoting *Rogin,* 616 F.2d at 697). As to the rezoning of Plaintiff's property, this Court cannot say that the Defendants' actions were "conscience shocking." The steps that the Defendants undertook in rezoning the property from HVY-X to EX-Extraction were legitimate steps so as to conform HMI's property with the surrounding area. The Defendants rationale for the rezoning related to land use planning.

In *Pace Resources,* the Third Circuit determined whether the rezoning of property constituted a substantive due process violation. *Id.* at 1034-35. The Third Circuit stated that the plaintiff "does not present a case involving actions aimed at this developer for reasons unrelated to land use planning. Rather, the case involves a difference of opinion on how much industrial development is in the best interest of the Township and how that quantum of industrial development should be achieved." *Id.* at 1035. The Third Circuit continued by stating that "[t]he complaint states that the Township acted to curb industrial development within the Township. One can easily articulate a rational connection between each of the Township's actions and this legitimate purpose." [FN14] *Id.* Even though the Third Circuit was acting under the less stringent improper motive standard in *Pace Resources* for

substantiating a substantive due process claim, it affirmed the district court's dismissal the substantive due process claim. As the Third Circuit noted, "[r]eduction of the amount of land zoned industrial and standards and procedures that allow the Township to closely monitor any industrial development that does occur are measures rationally related to the goal of restricting industrial presence in the Township for the benefit of the general welfare." *Id.*

> FN14. It should be noted that *Pace Resources* was decided in 1987, and thus was decided under the old, less stringent, and now defunct improper motive test for substantiating a substantive due process claim.

As in *Pace Resources,* the Whitemarsh Township's actions in rezoning related to the goal of conforming HMI's property with the surrounding area, as well as other concerns relating to commercial development in the Township. Certainly, therefore, the Township's actions in rezoning cannot meet the more stringent "conscience shocking" test. Thus, the Township's rezoning of Plaintiff's property does not amount to a substantive due process violation.

2. "Punch Two"

**\*13** Next, the Plaintiff asserts that the purported "punch two" violated its substantive due process guarantee. As previously mentioned, "punch two" relates to the process by which HMI's Creekside Commons plan was reviewed and ultimately denied by the Township's Board of Supervisors. For the following reasons, "punch two" does not amount to a substantive due process violation.

The Plaintiff argues that the Defendants conspired and executed a scheme intended to deprive HMI of its property rights. The Plaintiff cites to a number of actions that took place during the course of this supposed scheme designed to thwart the development of HMI's property. However, based on the case law decided in this Circuit after *United Artists Theatre Circuit,* this Court concludes that the facts as set out in *supra* Part II as it relates to "punch two"do not amount to a substantive due process violation. First, this Court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

Page 13

will analyze the relevant case law decided after *United Artists Theatre Circuit* so as to determine how the courts have grappled with the new "shocks the conscience" standard in a land use dispute. This step is important since the "shock the conscience" standard is relatively new to this Circuit as it relates to substantiating a substantive due process violation in the land use context. Then, using those cases as a backdrop, this Court will determine whether there is a material issue of fact outstanding as to whether the process and ultimate denial of HMI's Second Revised Preliminary Plan "shocked the conscience."

Perhaps most important for purposes of deciding this Motion is the recently decided case of *Eichenlaub v. Township of Indiana,--F.3d--, 2004 WL 2093439*. In *Eichenlaub,* the plaintiffs asserted many of the same complaints against the defendants as HMI asserts here. As the Third Circuit noted:

   [b]asically, the Eichenlaubs assert that zoning officials applied subdivision requirements to their property that were not applied to other parcels, that they pursued unannounced and unnecessary inspection and enforcement actions; that they delayed certain permits and approvals; that they improperly increased tax assessments; and that they maligned and muzzled the Eichenlaubs .... these complaints are examples of the kind of disagreement that is frequent in planning disputes. As counsel for appellants acknowledged during argument, there is no allegation of corruption or self-dealing here.

*Id.* at *10. The Third Circuit concluded by stating that the "District Court judge applied the correct legal standard ["shocks the conscience"] and did not abuse its discretion in dismissing the substantive due process claim." *Id* Many of the complaints HMI has levied against the Defendants are similar to those the Third Circuit examined in *Eichenlaub.* For example, the Plaintiff asserts that the Township officials deviated from the requirements and standards the Township followed as compared to other preliminary plans. Additionally, the Plaintiff asserts that the delay and tactics of the Defendants caused the Second Revised Preliminary Plan to be denied. However, as both the District Court and the Third Circuit found in *Eichenlaub,* this does not meet the "shocks the conscience" test. Importantly, as was the case in

*Eichenlaub,* there is simply no evidence in this case of corruption or self-dealing so as to find that the Defendants' actions were so egregious as to "shock the conscience."

   **\*14** It should also be noted that *Eichenlaub* clearly distinguishes a case principally relied upon by HMI in its Brief in Opposition to the Defendants' Summary Judgment Motion. Specifically, the case relied upon by the Plaintiff in its Brief in Opposition to Defendants' Motion for Summary Judgment is *Associates in Obstetrics & Gynecology v. Upper Merion Township, 270 F.Supp.2d 633 (E.D.Pa.2003)*. At the outset, it should be noted that *Associates in Obstetrics & Gynecology* dealt with a Rule 12(b)(6) motion to dismiss rather than one for summary judgment. *Id.* at 655. Quite obviously, the court in *Associates in Obstetrics & Gynecology* was dealing with a much more difficult standard for the Defendants to overcome than the one currently before this Court. Additionally, as stated by the Third Circuit, in *Associates in Obstetrics & Gynecology,* that case implicated

   more than just a disagreement about conventional zoning or planning rules. In *Obstetrics,* the District Court denied a motion to dismiss a claim that municipal defendants denied substantive due process when they selectively closed plaintiff's medical office for the purpose of blocking the provision of abortion services. Because the municipal action there implicated abortion rights, the District Court's analysis of the "shocks the conscience" standard proceeded largely under those judicial decisions that address protection of abortion services under the Fourteenth Amendment.

*Eichenlaub,* 2004 WL 2093439, at *9. Thus, as the Third Circuit found in *Eichenlaub,* this Court also finds that *Associates in Obstetrics & Gynecology* is also distinguishable from the present dispute between HMI and the Defendants since what is at issue in the present case is a disagreement about rezoning and land use planning rules as applied to the Plaintiff.

   Other land use substantive due process cases decided in this District and recently affirmed by Third Circuit are also helpful in resolving the instant Motion. A land use dispute arose in *Lindquist v. Buckingham Township,* No. 00-1301, 2003 WL 22757894 (E.D.Pa.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

April 15, 2003), *aff'd* 2004 WL 1598735 (3d Cir. July 19, 2004)(non precedential). Similar to the current case before this Court, *Lindquist* involved a denial of a preliminary plan after the Board amended the zoning ordinance. Specifically, the preliminary plan filed by the plaintiffs in that case sought to develop their property as a cluster subdivision using transferable development rights that would have included 216 lots for single family homes. *Id.* at *1. Based on a sketch plan, the plaintiffs submitted their phase one preliminary plan on March 29, 1996. *Id.* at *2 This preliminary plan called for clustered subdivisions in cul-de-sacs then permitted by the SALDO. *Id.* Additionally, at the time the March 29, 1996 plan was submitted, "the Zoning Ordinance permitted the subdivision of the property into cluster subdivision as a 'by right' use in the AG-1 zoning district without the need for a public hearing or 'conditional use' approval by the Board." *Id.* at *2 n. 8. After the preliminary plan was submitted to the Board,

*15 on February 26, 1997, the Board enacted an amendment to SALDO which prohibited cul-de-sacs streets within subdivisions. The concept of such a change had arisen years earlier. However, were the amendment to apply to Lindquists' Original Phase I submission, the plan proposed would be prohibited. On June 11, 1997, the Board enacted an additional amendment to the Zoning Ordinance which eliminated cluster subdivisions as a "by-right" use in AG-1 zoning districts and provided for cluster subdivisions only as a "conditional use."

*Id.* at *4. Ultimately, the Board denied the plaintiffs' preliminary plan even though the Plaintiff requested an extension. *Id.* Thus, "[a]s a result of the denial, the Lindquists were subject to the amended zoning ordinances and could not develop their property as a single family detached cluster development as a 'by-right' use." *Id.* After this denial, the Plaintiffs commenced an action in state court. However, this state court lawsuit was resolved by a settlement which allowed the plaintiffs to resubmit a revised preliminary plan under the old zoning ordinance. *Id.* After another round of revised preliminary plans were submitted, the Board again rejected the preliminary plans. *Id.* at *5. By doing so, the Board again passed on the plaintiffs offer to extend the time for review, even though the Board had agreed to such extensions in the past. *Id.* at *5.

Thereafter, the board of supervisors passed additional resolutions so as to correct legal errors in the earlier denial resolution. *Id.*

The district court in *Lindquist* found that the plaintiffs "failed to meet their burden of establishing a substantive due process violation." [FN15] *Id.* at 8. As the court stated:

> FN15. It should be noted that the *Lindquist* decision by the District Court were findings of fact and conclusions of law after a trial without jury was held. However, the case initially went to trial under the old "improper motive" standard and it was only after trial that the Third Circuit changed the standard to the more stringent "shock the conscience" standard in *United Artists Theatre Circuit. See Lindquist*, 2003 WL 22757894, at *7.

*16 [t]he development of the Lindquist farm was an extremely complex project, involving numerous governmental approvals from a variety of public bodies and agencies and requiring compliance with numerous ordinances, regulations, and laws on the local and state level. Not surprisingly, missteps, mistakes, and prolonged delay occurred as a result. It is true that the Township and Board decisions contributed at least some, but certainly not all, of the difficulties that the Lindquists encountered during the protracted subdivision approval process. In addition, the defendants may have been negligent at times and in 1998 may have acted with an improper motive toward the Lindquists and their representatives. However, there is nothing in the facts we have found to prove that the defendants conduct was so egregious as to be "conscious shocking."

*Id.* Indeed, the Third Circuit agreed with the District Court's conclusion, albeit in a non-precedential opinion, by stating "[t]he District Court concluded that while the Township 'may have been negligent' and 'may have acted with an improper motive,' *desirous of thwarting development of the property,* its conduct did not shock the conscience. We concur." *Lindquist,* 2004 WL 1598735, at *5 (emphasis added). Therefore, as in the present dispute between HMI and the Defendants, *Lindquist* also involved the purported "one-two punch"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

of 1) submission of a preliminary plan; 2) rezoning; and 3) denial of the preliminary plan so as to force the plaintiff to file a new preliminary plan that conformed to the new zoning regulations. Similar to the District Court's holding in *Lindquist,* this Court cannot find any disputed facts which if proven would satisfy the "shock the conscience standard." Rather, as the District Court held in *Lindquist,* the Defendants' actions in the case currently before this Court is not so egregious as to be "conscience shocking."

As the Third Circuit noted in its non-precedential *Lindquist* opinion, "without more, a violation of state law, even a bad faith violation of state law, will not support a substantive due process claim in a land-use dispute." *Id.* at *5 (citing *Baker v. Coxe,* 230 F.3d 470, 474 (1st Cir.2000); *Natale v. Town of Ridgefield,* 170 F.3d 258, 262 (2d Cir.1999)). Here, the record indicates that there are disputed issues of fact as to whether the Defendants properly applied the state and local ordinances to HMI's Creekside Commons proposal, and whether the Defendants deviated from their usual procedure in analyzing the Creekside Commons proposal. However, as the case law previously cited illustrates, this, without more, does not amount to actions by the Defendants that "shocks the conscience."

Another case that is instructive and helpful in this Court's analysis of the instant Motion is *Corneal,* 313 F.Supp.2d 457. In *Corneal,* the plaintiffs sought to subdivide and sell a portion of a tract of land they recently purchased. *Id.* at 459. They had the tract surveyed for such a purpose. *Id.* at 459-60. During this time however, the Township placed a "temporary moratorium on subdividing property pending the enactment of a formal ordinance governing subdivision and land development" in January of 2000 since the Township had no subdivision ordinance to govern land development. *Id.* at 460 Subsequently, in February of 2000, the plaintiffs presented their original subdivision plan to the board. *Id.* In April of 2000, Mr. Corneal requested that the board sign five sewage modules, but the board refused. *Id.* Mr. Corneal had argued that he needed the sewage modules to begin to build his own personal house on the property, but the board stated that this would constitute a subdivision since the property already had an existing dwelling on it. *Id.* at 460-61.

Later, the plaintiffs prepared a revised plan that reflected only subdividing the property into two lots. The plaintiffs would then sell one of the lots to a buyer. However, the plaintiffs never submitted the revised preliminary plan to the Township because of the moratorium that was in place. *Id.* at 461. The plaintiffs subsequently began to develop the land and constructed a 1.5 mile driveway through the tract in the spring of 2000. *Id.*

*17 Later, Mr. Corneal requested a building permit from the township's building permit officer to build his garage. *Id.* at 461-62. The building permit officer refused to issue the permit because the board had instructed him not to issue any permits to the Corneals. At his deposition, the township's building permit officer stated that although he had

never refused to provide any other person in the Township with a permit, he refused to even provide the Corneals with a permit application. During his conversations with Mr. Corneal [the township's building permit officer] referred to Mr. Corneal as a "trouble making yuppie from over the mountain." [The township's building permit officer] used this term to describe Mr. Corneal because Mr. Corneal "just behaves like someone who wants to get their own way and his age group."

*Id.* at 462 (internal citations omitted). Ultimately, the buyer for the other tract pulled out of the agreement to purchase due to difficulties with the township associated with obtaining subdivision approval. *Id.* Additionally, after the buyers pulled out of the agreement to purchase, a board member's nephew approached the plaintiffs about purchasing the tract of land. *Id.* Ultimately, the Corneals brought a substantive due process claim against the township and the board. [FN16] As the district court noted:

FN16. The Corneals also brought other claims, but for purposes of this Court's analysis, only the substantive due process discussion is relevant.

[t]he crux of the Conreal's substantive due process claim is that Defendants acted in concert to frustrate the Conreals' effort to subdivide and develop their ninety-five acre tract of land. According to the

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

Conreals, Defendants needlessly complicated and delayed the Conreals' applications for permits and subdivision, thereby causing the Buyers to cancel their sales contract with the Conreals. Drawing all genuine factual disputes in favor of the Conreals, it appears that Defendants intentionally opposed the Conreals' efforts, at least in part, because they did not like the Conreals.... Finally, the Conreals also contend that Defendant Wilson [a board member] intentionally held up the subdivision process so that the Conreals would be unable to convey a portion of the tract to the Buyers on June 30, 2000. According to the Conreals, Defendant Wilson wished to prevent this contract from culminating so that he or his nephew could purchase the property, which belonged to Defendant Wilson's grandfather until 1960.

*18 *Id.* at 464-65 (footnotes omitted).

Ultimately, the district court in *Conreal* granted summary judgment in favor of the defendants on plaintiffs' substantive due process claim. *Id.* at 470. The court began by setting out the relevant "shock the conscience test" and then stated that:

unless the evidence indicates that a challenged decision is completely unrelated in any way to a rational land use goal, there is no violation of substantive due process. The corollary of that rule being that where the locality's decision is related in any way to some rational goal, then no due process violation occurs even if the locality may have exceeded the scope of its jurisdiction.

*Id.* at 466. The court continued by stating that it uncovered only "a single case where a plaintiff's substantive due process challenge to a local land use decision survived a summary judgment motion under the 'shocks the conscience' test " *Id.* (citing *Collier v. Town of Harvard*, CV No. 95-11652- DPW, 1997 U.S. Dist. LEXIS 23582 (D.Mass. Mar. 28, 1997)). In the case currently before this Court, even HMI has come forward with no case arising in the land use context where a party would overcame the stringent "shocks the conscience" standard so as to defeat a summary judgment motion. [FN17] As to the once case the court in *Conreal* found defeated a summary judgment motion, the court noted,

FN17. Indeed, aside from their expert reports,

HMI cites to only a relatively few number of cases to support its substantive due process claim. First, Plaintiffs rely on *Associates in Obstetrics & Gynecology,* 270 F.Supp.2d 633. As previously stated, while a land use case, the decision by the district court arose out of a 12(b)(6) motion to dismiss rather than a summary judgment motion. *Id.* at 655-56. Additionally, for similar reasons that the Third Circuit distinguished *Associates in Obstetrics & Gynecology* in its recently decided *Eichenlaub* opinion, this Court has already distinguished *Associates in Obstetrics & Gynecology.* Additionally, the Plaintiffs rely on *Estate of Smith v. Marasco,* 318 F.3d 497 (3d Cir.2003). At the outset, it should be noted, that *Estate of Smith* was not a land use case. The Plaintiffs argue that *Estate of Smith* stands for the proposition that a plaintiff's burden is less where the defendants actions are not in the context of a "hyperpressurized environment." However, in the precedential and non-precedential opinions that have been issued by the Third Circuit after *United Artists,* the Third Circuit has made no such distinction as it applies to a substantive due process challenge arising from a land use/zoning dispute. *See e.g., Eichenlaub,*--F.3d--, 2004 WL 2093439; *Lindquist,* 2004 WL 1598735; *Conreal,* 94 Fed. Appx. 76.

[e]ssentially, *Collier* involved an allegation of governmental extortion. That is, the plaintiffs' applications would have been approved if they simply capitulated to the public official's request for an easement across their property. As a result, the court found that a reasonable jury could have concluded that the [Zoning Board of Appeal's] decision to deny the plaintiffs' application was fueled solely by personal motivations totally devoid of any rational land use planning concerns. Thus, *Collier* fell within the very narrow class of challenges to local land decision which are "truly horrendous."

*Id.* at 467 (citing *Welch v. Paicos,* 66 F.Supp.2d 138, 169 (D.Mass.1999)). In *Conreal,* the court found that the facts viewed in the light most favorable to the

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

Plaintiffs only established that the Defendants might have acted with mixed motives; "one related to a legitimate land regulation purpose (preserving land development status quo during the final approval process of the subdivision ordinance), the other related to illegitimate personal animus." *Id.* at 468. However, the court noted that "the plaintiff must demonstrate that the land use decision or regulation was so totally irrational that it could not possibly be the real reason for the locality's action, or alternatively, that the locality applied its decision selectively so that its land use concern could not have been legitimate despite the rational basis for it." *Id.* at 469. Indeed, albeit in a non-precedential opinion affirming the district court in *Corneal,* the Third Circuit stated that "[a]s noted by the district court, unless the defendants' actions were 'completely unrelated in any way to a rational land use goal,' there is no violation." 94 Fed. Appx. 76, 78 (citing *Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043).

*\*19 In the case currently before this Court, the Defendants did have rational reasons for denying the Second Revised Preliminary Plan. Most notably, the Board relied on Zarko's report which set forth the deficiencies in the Second Revised Preliminary Plan for Creekside Commons. Even if Zarko did in fact apply the wrong legal standard to these plans, this Court reiterates that an error in applying state or local law, even a bad faith mistake, does not amount to a violation of substantive due process. *See Conreal,* 313 F.Supp.2d at 470 (citations omitted). Additionally, as set out previously, the mere failure of the Defendants to agree to Garrity's request for more time was not completely irrational when coupled with the fact that the Board believed that the plans for Creekside Commons were not progressing in an adequate fashion.

3. Plaintiff's Expert Reports

The Plaintiff additionally relies on the reports of two of its experts, Joseph J. Viscuso, P.E. ("Viscuso") and Marc D. Jonas, Esq. ("Jonas") to defeat Defendants' Summary Judgment Motion. For the following reasons, however, these two expert reports do not create a material issue of fact so as to defeat Defendants' Summary Judgment Motion.

Viscuso is "a licensed professional engineer with an M.S. degree in Civil Engineering who currently serves as municipal engineer or special consultant for seven municipalities and authorities." (Br. of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 57). The report issued by Viscuso states that as submitted, the Second Revised Preliminary Plan is in compliance with the Township's SALDO. Such an opinion by Viscuso does not substantiate a substantive due process claim. Rather, Viscuso's report simply amounts to a difference of opinion he has with Zarko's interpretation of the Township's SALDO as it relates to the Second Revised Preliminary Plan for Creekside Commons. Even a bad faith violation of state law remains only a violation of state law. *United Artists Theatre Circuit,* 316 F.3d at 402 (citing *Chesterfield Development Corp. v. City of Chesterfield,* 963 F.2d 1102, 1104-05 (8th Cir.1992)). Thus, since Viscuso's report only goes to whether Zarko applied the correct legal standard under the local ordinance in his denial recommendation, it does not create a material issue of fact so as to preclude the Defendants' Summary Judgment Motion.

Plaintiff additionally submits the report of Jonas which it contends creates a material issue of fact as to its substantive due process claim. As the Plaintiff sets forth, Jonas is a distinguished land use attorney. Jonas' report sets forth twenty-four circumstances/actions by the Defendants that he believed could be considered "conscience-shocking." (Br. Pl. in Opp'n to Defs. Mot. for Summ. J. Ex. 19). By doing so, Jonas is stating a legal conclusion drawn by applying the law to the facts. A similar issue regarding an expert report occurred in *VIM, Inc. v. Somerset Hotel Association,* 19 F.Supp.2d 422, 427 n. 4 (W.D.Pa.1998), *aff'd* 187 F.3d 627 (3d Cir.1999). The issue in *VIM* was whether the defendants tactics in prosecuting an opposition to the building of a Hampton Inn was objectively baseless. *Id.* Before the court was a report by a former President Judge of the Commonwealth Court of Pennsylvania which purported to state that the Defendants land use appeals were not objectively baseless as a matter of law. *Id.* at 427 n. 4. As the court observed however:

*\*20 that lack of objective baselessness is not the sort of issue that lends itself to expert testimony under Fed.R.Evid. 702 and 704. While testimony in the form of an opinion or inference otherwise admissible

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is not objectionable because it embraces an ultimate issue to be decided by the trier of fact, *an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts.*
*Id.* (emphasis added)(internal quotation marks omitted)(citing *Oakland Oil Co. v. Conoco, Inc.,* 144 F.3d 1308, 1328 (10th Cir.1998); *accord Burger v. Mays,* 176 F.R.D. 153, 156-57 (E.D.Pa.1997); *Haberern v. Kaupp Vascular Surgeons, Ltd.,* 812 F.Supp. 1376, 1378 (E.D.Pa.1992); *Rich v. Bailey,* No. 95-6932, 1996 WL 745298, at *5 (E.D.Pa. Dec.23, 1996), *aff'd mem.* 135 F.3d 766 (3d Cir.1997)). Ultimately, then District Court Judge Smith ruled that "because such testimony would not assist the jury to determine a fact in issue, I cannot consider it as factual evidence on the motion for summary judgment." *VIM,* 19 F.Supp.2d at 427 n. 4. However, Judge Smith did treat the report as additional legal argument. *Id.*

Similar to Judge Smith's analysis in *VIM,* Jonas' report cannot create a material issue of fact merely because he states that the Defendants' actions "shocked the conscience." Specifically, this amounts to a legal conclusion clearly within the purview of this Court's decision making power rather than a party's expert. This Court has already applied the factual scenario giving rise to this case to the "shock the conscience" standard and found that the Defendants' actions did not rise to such a stringent level. Thus, Jonas' report fails to create a material issue of fact on this point.

For the reasons previously stated, and in light of the relevant case law in this Circuit, this Court has specifically found that there is no issue of material fact as to whether the Defendants' actions "shocked the conscience." Therefore, based on the relevant case law, the facts currently before this Court and that the Plaintiff's expert witnesses have failed to present a material issue of fact that could substantiate a substantive due process claim, Plaintiff's substantive due process claim must also be knocked out. [FN18]

> FN18. In support of their summary judgment motion, the individual Defendants also argue they are entitled to qualified immunity. However, as the court noted in *Corneal,*

because there is no material issue of fact outstanding as to whether the Defendants' conduct "shocked the conscience," it is unnecessary for this Court to determine whether the individual Defendants are entitled to qualified immunity. 313 F.Supp.2d at 470 n. 11 (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

## C. EQUAL PROTECTION

**\*21** The final claim being brought by HMI against the Defendants is that the Defendants violated HMI's equal protection rights under the Fourteenth Amendment. The Fourteenth Amendment to the United States Constitution states that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Where the state law does not classify by suspect class, "the general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Here, HMI does not argue that it is a member of a suspect class. Instead, it pursues its equal protection claim under a "class of one" theory. As the United States Supreme Court ("Supreme Court") has noted, "cases have recognized equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in the treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)(per curium) (citations omitted). Additionally, "a 'class of one' can attack intentionally different treatment if it is 'irrational and wholly arbitrary.' " *Eichenlaub,* 2004 WL 2093439, at * 10 (quoting *Olech,* 528 U.S. at 564).

The Third Circuit recently had the opportunity to compare an equal protection and substantive due process claim in the context of a land use/zoning dispute. As the Third Circuit noted:
[t]he "irrational and wholly arbitrary" standard is doubtless difficult for a plaintiff to meet in a zoning

Not Reported in F.Supp.2d
2004 WL 2220974 (E.D.Pa.)
(Cite as: 2004 WL 2220974 (E.D.Pa.))

dispute, and we do not view an equal protection claim as a device to dilute the stringent requirements needed to show a substantive due process violation. It may be very unlikely that a claim that fails the substantive due process test will survive under an equal protection approach.

*Id.* (internal citation omitted). The Third Circuit in *Eichenlaub,* however, remanded the equal protection claim because the District Court had failed to address the equal protection claim. Thus, now that the relevant standard for HMI's equal protection claim has been set, this Court will now turn to analyzing whether an equal protection claim can be substantiated at this summary judgment stage so as to defeat the Defendants' Summary Judgment Motion.

As previously stated, there are two elements necessary to establish an equal protection claim under a "class of one" theory. First, a party has to show that they were intentionally treated differently than others who were similarly situated. If a party satisfies this first step, the second step requires a party to show that there was no rational basis for the difference in treatment. Both steps are required to substantiate an equal protection claim. The parties vigorously contest both steps. For the following reasons, this Court will decline to address step one of the equal protection analysis because step two has failed to create a material issue of fact necessary to overcome Defendant's Summary Judgment Motion. [FN19]

    FN19. Initially the parties dispute whether HMI and its property is similarly situated. At the crux of this dispute is determining how to make such a comparison to determine whether HMI is similarly situated. HMI suggests that it should be compared to all other developers who filed plan applications to develop their properties in Whitemarsh Township. The Defendants assert that the proper comparison should be whether HMI's property is similarly situated to other properties in Whitemarsh Township. However, in the case currently before this Court, "it is undisputed that there are no other active quarry properties in Whitemarsh Township." (Defs.' Mem. of Law in Supp. of their Mot. for Summ. J., at 71; Br.

of Pl. in Opp'n to Defs.' Mot. for Summ. J., at 68). Thus, as Plaintiff notes, it would be impossible for them to be similarly situated since no other properties are even remotely similar to their parcel. However, since step two of the equal protection analysis has not been substantiated at this summary judgment stage, it is unnecessary for this Court to consider the issue what is the proper comparison.

**\*22** Even assuming *arguendo,* that the Plaintiff can show that it was intentionally treated differently from others similarly situated, the Plaintiff has not shown that there was no rational basis for the treatment. As the Supreme Court has noted, the issue is whether the Defendants' decision to rezone and ultimately deny HMI's Second Revised Preliminary Plan "so lack rationality that they constitute a constitutionally impermissible denial of equal protection." *City of New Orleans v. Dukes,* 427 U.S. 297, 305, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)(per curium). More specifically and more recently, the Supreme Court has noted:

    [w]hether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In the areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.

*Fed. Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (citations omitted). As with the procedural and substantive due process claims, this Court will analyze whether the purported "one-two punch" substantiates Plaintiff's equal protection claim.

1. "Punch One"

"The equal protection clause affords the states particularly wide latitude with respect to zoning." *Acierno v. New Castle County,* No. 92-385, 2000 WL 718346, at \*6 (D.Del. May 23, 2000)(citing *City of Cleburne,* 473 U.S. at 440). Thus,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 20
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**

a zoning ordinance not affecting suspect classes "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead a classification must be upheld against equal protection if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."
*Id.* (quoting *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)). As stated previously in *supra* Part IV.B.1, the Defendants did have a rational basis to rezone HMI's property. Here, the Township had a legitimate concern as to how the reclaimed quarry properties were going to interact and conform with the surrounding neighborhood. This is particularly the case where the entire surrounding neighborhood was residential, a golf course or agricultural properties. [FN20] Since rezoning the property to conform it to the immediate surrounding area is a rational reason for rezoning, the rezoning of HMI's property does not violate the Equal Protection Clause.

> FN20. This of course excludes the small 15-acre KYW property which had a radio antennae and a small building.

2. "Punch Two"

**\*23** As previously discussed in *supra* Part IV.B.2, the Defendants have set forth a rational basis for which they denied the Second Revised Preliminary Plan for Creekside Commons. Most notably, according to the Defendants, the Second Revised Preliminary Plan did not comport with the Township SALDO's requirements for approving a preliminary plan. Additionally, while the Plaintiff requested an extension, the denial of that proposal also had a rational basis since the Defendants believed that the proposal for Creekside Commons was not making any significant progress toward approval. Thus, there was a rational basis for denying the Second Revised Preliminary Plan, and since the rezoning of Plaintiff's property also had a rational basis, Plaintiff's equal protection claim must also be knocked out.

[FN21]

> FN21. Additionally, the Plaintiff states that the Township implemented procedural "firsts" in reviewing the plan for Creekside Commons, which it asserts help to substantiate its equal protection claim. However, as one court has noted, "as a matter of logic and law a plaintiff may not convert a procedural due process claim into an equal protection claim by expediently alleging that he was denied procedural rights by an official who has accorded such rights to others in the past." *Stop-Save Township Open Places, Inc. v. Bd. of Supervisors of Montgomery Township,* No. 96-7325, 1996 WL 663875, at \*3 (E.D.Pa. Nov.15, 1996) (citations omitted). As set out in *supra* Part IV.A, this Court has already examined and knocked out Plaintiff's procedural due process claim.

V. *CONCLUSION*

In conclusion, this Court has analyzed the Defendants' Motion for Summary Judgment under the relevant legal standards. The Defendants moved for summary judgment on all three counts of the Plaintiff's Complaint. The claims were procedural due process, substantive due process and equal protection. This Court has found that as to all three claims, the Defendants have met their burden and there are no material issues of fact outstanding requiring this Court to deny Defendants' Motion. As such, Defendants' Motion will be granted.

An appropriate Order follows.

*ORDER*

AND NOW, this 4th day of October, 2004, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 64) as to all three claims of Plaintiff's Complaint, the Response and Replies thereto, it is hereby ORDERED that Defendants' Motion is GRANTED.

2004 WL 2220974 (E.D.Pa.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 21
2004 WL 2220974 (E.D.Pa.)
**(Cite as: 2004 WL 2220974 (E.D.Pa.))**


**Motions, Pleadings and Filings** <u>(Back to top)</u>
- <u>2:02CV03212</u> (Docket)
                    (May. 24, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2005, the foregoing **Compendium of Unreported Cases for the Individual Defendants' Reply Brief in Support of Their Motion to Dismiss or to Stay the Proceedings** was filed electronically with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Abbott, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Dennis J. Siebold, Esquire
New Castle County Law Department
New Castle Corporate Commons
87 Reads Way
New Castle, DE 19720


_____
Matthew F. Boyer