**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| FRANK E. ACIERNO, CHRISTIANA TOWN CENTER, LLC, a Delaware limited liability company, 395 ASSOCIATES, LLC, a Delaware limited liability company, ESTATE HOMES, INC., a Delaware corporation, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 04-1376 |
| GEORGE O. HAGGERTY, individually and in his official capacity as Assistant General Manager of the New Castle County Department of Land Use, SCOTT G. WILCOX, individually and in his official capacity as a First Assistant County Attorney, TIMOTHY P. MULLANEY, individually and in his capacity as New Castle County Attorney, CHARLES L. BAKER, individually and in his capacity as General Manager of the New Castle County Department of Land Use, JAMES H. EDWARDS individually and in his capacity as Inspections Manager and Licensing Division Manager of the New Castle County Department of Land Use, and SHERRY L. FREEBERY, in her individual capacity as Chief Administrative Officer of New Castle County, and NEW CASTLE COUNTY, a political subdivision of the State of Delaware, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**COMPENDIUM OF UNREPORTED CASES FOR THE INDIVIDUAL DEFENDANTS'**
**REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS**
**OR TO STAY THE PROCEEDINGS**

Vol 5 (Tabs 11-13)

11

Westlaw.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

**H**
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
Alfred IZQUIERDO, resident of The City of
Wilmington, State of Delaware,
Plaintiff,
v.
James SILLS, Jr., Mayor of the City of Wilmington--
City of Wilmington Resident;
in official capacity; Mary Dees, Director of Personnel
of the City of
Wilmington--A Wilmington Resident; in official
capacity; Samuel D. Pratcher,
Chief of Police of the City of Wilmington--A
Wilmington Resident; both in
official capacity and individually; Michael Boykin,
Inspector of the City of
Wilmington Policy Department--Head of the Office
of Professional Standards for
the Wilmington Police Department--A Wilmington
Resident, both in official
capacity and individually; Captain Gilbert Howell of
the Wilmington Police
Department--A City of Wilmington Resident, both in
official capacity and
individually; Captain Rita Crowley, of the
Wilmington Police Department--A City
of Wilmington Resident in official capacity; Captain
John Monaghan of the
Wilmington Police Department--A Wilmington
Resident, in official capacity;
Captain Keith Ashe, of the City of Wilmington Police
Department--A Wilmington
Resident, in official capacity; Master Sgt. Henry
Alfree of the Wilmington
Police Department--A Wilmington Resident, in both
official and personal
capacity; Sgt. Corey Staats of the Wilmington Police
Department--A Wilmington
Resident, both in official capacity and individually;
William J. Rhodunda, Jr.,
Esq., Asst. City Solicitor of the City of Wilmington--
A Wilmington Resident, in
official capacity; Carolyn R. Schlecker, Esq., City
Solicitor of the City of
Wilmington--A Wilmington Resident, both in official
and individual capacity;
and the Municipality of the City of Wilmington,

Delaware and its City Council,
Defendants.
**No. 15505-NC.**

Submitted Nov. 19, 2003.
Decided June 29, 2004.
Victor F. Battaglia, Jr., of Biggs and Battaglia,
Wilmington, Delaware, for Plaintiff.

Jan A.T. van Amerongen, Jr., of Jan A.T. van
Amerongen LLC, Wilmington, Delaware, for
Defendants.

MEMORANDUM OPINION

NOBLE, Vice Chancellor.

*1 Plaintiff Alfred Izquierdo ("Izquierdo") is a City
of Wilmington police officer. While on duty, he was
involved in an altercation at a nightclub. He was
investigated for improper use of force and accused of
dishonesty in an effort to cover up his conduct.
Disciplinary proceedings stemming from this
investigation resulted in a lengthy suspension and a
cloud over his career. He brought this action to
remedy the adverse consequences resulting from
what he perceived to be shortcomings in the
investigative and disciplinary processes.

Before the Court are cross-motions for summary
judgment filed by Izquierdo and by Defendants
James Sills, Jr. ("Sills"), Mary Dees ("Dees"),
Samuel D. Pratcher ("Pratcher"), Michael Boykin
("Boykin"), Gilbert Howell ("Howell"), Rita Crowley
("Crowley"), John Monaghan ("Monaghan"), Keith
Ashe ("Ashe"), Henry Alfree ("Alfree"), Corey Staats
("Staats"), William J. Rhodunda, Jr. ("Rhodunda"),
Carolyn R. Schlecker ("Schlecker") (collectively, the
"Individual Defendants"), and The Municipality of
the City of Wilmington, Delaware (the "City,"
together with the Individual Defendants, the
"Defendants"). [FN1] The amended complaint
contains numerous counts of breach of contract for
violation of a Collective Bargaining Agreement (the
"CBA") [FN2] entered into by the City and the
Fraternal Order of Police Lodge # 1 (the "FOP");
state law tort claims including misrepresentation,
civil conspiracy, and violation of the Law
Enforcement Officers' Bill of Rights (the
"LEOBOR"); [FN3] and state constitutional claims.
[FN4] Izquierdo has moved for partial summary

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
(Cite as: 2004 WL 2290811 (Del.Ch.))

Page 2

judgment on Counts I-VIII and Count XXIV of the amended complaint. Defendants have moved for summary judgment on all outstanding counts.

FN1. At the time of the events leading to this litigation, Sills was the Mayor of the City and Dees was the City's personnel director. Schlecker was the City Solicitor and Rhodunda was an Assistant City Solicitor. Pratcher served as Chief of Police. Boykin was an Inspector in the City of Wilmington Police Department and commanding officer of the Office of Professional Standards. Howell, Crowley, Ashe, and Monaghan all were Captains in the Wilmington Police Department. Howell commanded the Office of Professional Standards unit involved in this case. Staats was a Sergeant with the Wilmington Police Department and led the investigation at issue in this case. Alfree, a Master Sergeant in the Wilmington Police Department, also worked on the investigation.

FN2. The CBA is submitted to the Court at pages A359 through A390 of the Appendix to the Brief in Support of Defendants' Motion for Summary Judgment. References to this appendix throughout this Memorandum Opinion will appear as "DX-." References to the Appendix to Plaintiff's Opening Brief in Support of Motion for Partial Summary Judgment will appear as "PX-."

FN3. 11 Del. C. § 9200 et seq.

FN4. The amended complaint initially contained federal civil rights claims as well. As discussed below, the United States District Court for the District of Delaware dismissed those claims. *Izquierdo v. Sills,* 68 F.Supp.2d 392 (D.Del.1999).

All of Izquierdo's claims arise out of the investigation and subsequent disciplinary process carried out by the Wilmington Police Department (the "WPD"). Izquierdo seeks review of a decision concerning application of the CBA's procedural requirement that a hearing be afforded an officer no more than 30 days after an investigation is complete (the "30-Day Rule"), as well as monetary and equitable relief because of the procedures utilized by those involved in carrying out the investigative and disciplinary processes. For the reasons set forth

below, Izquierdo's motion for summary judgment is denied in its entirety and Defendants' motion for summary judgment is granted in part and denied in part.

## I. STANDARD

Under Court of Chancery Rule 56, motions for summary judgment may be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." [FN5] The moving party has the burden of demonstrating the absence of any genuine issue of fact. [FN6] In considering the motion, the Court must view the facts in the manner most favorable to the nonmoving party and make all factual inferences in favor of the nonmoving party. [FN7] However, when the nonmoving party would have the burden of proof at trial, "he must show specific facts demonstrating a plausible ground for his claim, and cannot rely merely upon allegations in the pleadings or conclusory assertions in the affidavits." [FN8] If that burden of production is not met, summary judgment will be granted in favor of the moving party.

FN5. Ct. Ch. R. 56(c); *see also 99-Year Lease Tenants of Lynn Lee Village v. Key Box "5" Operatives, Inc.,* 2003 WL 22332173, at *2 (Del. Ch. Oct. 10, 2003).

FN6. *Nash v. Connell,* 99 A.2d 242, 243 (Del. Ch.1953).

FN7. *Judah v. Del. Trust Co.,* 378 A.2d 624, 632 (Del.1977).

FN8. *In re Tri-Star Pictures, Inc. Litig.,* 1992 WL 37304, at *4 (Del. Ch. Feb. 21, 1992), *aff'd in part, rev'd in part,* 364 A.2d 319 (Del.1993).

*2 Importantly, in ruling on a motion for summary judgment, a judge should not weigh evidence and accept the argument perceived to be of greater weight. [FN9] On a motion for summary judgment, judges may only determine whether or not there is a genuine issue as to a material fact; they may not try that issue. [FN10] This is especially true in the context of competing motions for summary judgment which "are not the procedural equivalent of a stipulation of decision on a paper record." [FN11]

FN9. *Cont'l Oil Co. v. Pauley Petro., Inc.,* 251 A.2d 824, 826 (Del.1969).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
(Cite as: 2004 WL 2290811 (Del.Ch.))

FN10. *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504, 506 (Del. Ch.1953).

FN11. *Motorola, Inc. v. Amkor Tech., Inc.,* 2004 WL 1195458, at *4 (Del. May 27, 2004).

## II. FACTUAL AND PROCEDURAL BACKGROUND
### A. *The Governing Law and Documents*

The LEOBOR, applicable to most law-enforcement disciplinary proceedings throughout Delaware, [FN12] provides certain rights to law-enforcement officers, including the sworn members of the WPD. [FN13] Section 9203 of the LEOBOR states that "[i]f a law-enforcement officer is ... (3) charged with a breach of discipline of any kind, which charge could lead to any form of disciplinary action ... which may become part of the officer's permanent personnel record, then that officer shall be entitled to a hearing." [FN14] The guaranteed hearing is to be conducted according to the LEOBOR *"unless a contractual disciplinary grievance procedure executed by and between the agency and the bargaining unit of that officer is in effect, in which case the terms of that disciplinary grievance procedure shall take precedence and govern the conduct of the hearing."* [FN15] Here, the agreed-upon contractual grievance procedures of the CBA have been substituted for the procedures of the LEOBOR. Specifically, the CBA takes precedence over the terms of Sections 9203, 9204, 9205, and 9207 of the LEOBOR. [FN16]

FN12. 11 *Del. C.* § 9209.

FN13. *Id.* § 9200(b).

FN14. *Id.* § 9203.

FN15. *Id.* (emphasis added).

FN16. CBA § 11.1. The CBA left uncertain whether its terms preempt Section 9206 of the LEOBOR. That section deals with evidence obtained in violation of an officer's rights. Specifically, it states
No evidence may be obtained, received or admitted into evidence in any proceeding of any disciplinary action which violates any of the rights established by the United States Constitution or Delaware Constitution or by [the LEOBOR]. The tribunal may not enter any judgment or sustain any disciplinary

action based on any evidence obtained in violation of the officer's rights as contained in [the LEOBOR].
This Section of the LEOBOR is of no consequence to the pending motions. To the extent it would be implicated by constitutional shortcomings of the investigative and disciplinary processes, any allegations of such shortcomings are dismissed on their merits in Part III.C of this Memorandum Opinion. Moreover, Counts based on violations of the LEOBOR are dismissed on their merits in Part III.D .2 of this Memorandum Opinion. Thus, there is no underlying violation upon which a claim under Section 9206 may be based.

Article 11 of the CBA deals with work rules and regulations. Section 11.1 of the CBA is structured so that when Article 11 is silent as to an issue, the WPD's work rules and regulations, including WPD directives (the "Directive(s)"), shall apply. If the CBA and Directives are silent, the LEOBOR applies. Thus, a hierarchy of authorities governs disciplinary procedures: The CBA is the primary authority. [FN17] If the CBA is silent, the Directives control. If both the CBA and Directives are silent, the LEOBOR default rules apply.

FN17. This is true only as to the sections of the LEOBOR that the CBA specifically preempts. Thus, the CBA governs hearing requirements, scheduling, notice, procedure, and the written decisions and findings of fact of the hearing board.

At the heart of this case is Izquierdo's argument that there were violations of the 30-Day Rule and of Izquierdo's discovery rights. The 30-Day Rule is found in Directive 8.7(E). [FN18] That Directive states, "In the event the accused is entitled to a hearing, a hearing shall be scheduled within a reasonable time from the alleged incident, *but in no event more than thirty (30) days following the conclusion of the investigation,* unless waived in writing by the charged officer." [FN19] The CBA, the Directives, and the LEOBOR, however, do not define "conclusion of investigation."

FN18. The CBA preempts the LEOBOR in dealing with hearing procedure. The LEOBOR has a substantially similar 30-day rule at Section 9204.

FN19. Directive 8.7(E), DX-A407

Not Reported in A.2d                                                    Page 4
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

(emphasis added).

Izquierdo's right to a full and complete record of interviews held in connection with an investigation is in a section of the LEOBOR not preempted by the CBA: Section 9200. LEOBOR Section 9200(c)(7) mandates:

*3 A complete record, either written, taped or, if taped, transcribed as soon as practicable, shall be kept of all interviews held in connection with the administrative investigation upon notification that substantial evidence exists for seeking an administrative sanction of the law-enforcement officer. A copy of the record shall be provided to the officer or the officer's counsel at the officer's expense upon request. [FN20]

FN20. 11 *Del. C.* § 9200(c)(7).

LEOBOR Section 9200(c)(10) and Directive 8.7(L) provide law-enforcement officers certain discovery rights with regard to exculpatory evidence contained in the investigatory record, [FN21] but LEOBOR Section 9200(c)(7) is the only section mandating a "complete record of interviews."

FN21. Specifically, LEOBOR Section 9200(c)(10) provides:
An officer who is charged with violating any departmental rules or regulations, or the officer's representative, will be provided access to transcripts, records, written statements, written reports, analyses and video tapes pertinent to the case if they are exculpatory, intended to support any disciplinary action or are to be introduced in the departmental hearing on the charges involved. Upon demand by the officer or counsel, they shall be produced within 48 hours of the written notification of the charges.
Directive 8.7(L) reads:
The accused officer does not have the right of discovery regarding reports and/or statements submitted by other members of the Department or civilians relative to the incident, unless such reports are exculpatory, or are introduced as evidence into the hearing, or otherwise supplied to the Complaint Hearing Board or Appeal Board, or in the event that the officer or civilian who prepared the report or statement testifies at the Complaint Hearing Board, or Appeal Board, about subjects covered in his report statement.

Notably, Directive 8.7(L) begins with a preclusion of discovery, and follows with exceptions--allowing discovery solely for exculpatory evidence or evidence to be introduced at a hearing.

*B. Administrative Procedural History*

*1. Incident and Investigation*

Izquierdo and two other officers were involved in an altercation with three civilians at a Wilmington nightclub on January 28, 1996. During the altercation, one or more of the officers used force on one or more of the civilians. None of the civilians was arrested at that time.

Immediately following the altercation, the civilians went to the WPD headquarters, where they attempted to file complaints against Izquierdo and the other officers. While at the headquarters, one of the civilians, Dennis Givens ("Givens"), was placed under arrest by Izquierdo, who charged him with terroristic threatening and menacing. After the arrest, Givens was transported to the Wilmington Hospital Emergency Room, where he refused medical treatment. Givens was then transported back to the police station by Izquierdo and another officer and remained there until his release the next morning.

On January 31, 1996, Givens went to the WPD's Office of Professional Standards (the "OPS") to file the complaint he had tried to file on the night of January 28. On February 6, 1996, Givens's brother, Keith, who was another of the three civilians involved in the altercation, filed a complaint with OPS indicating that he, Givens, and the third involved civilian were unnecessarily beaten by three WPD officers.

Staats, an officer in the OPS, led the investigation of the civilian complaints. Izquierdo received a notification of complaint on February 19, 1996, and again on March 19, 1996. On March 15, 1996, Staats interviewed both Givens and his brother Keith. [FN22] Staats spoke to each of the brothers before turning on a tape recorder. On March 18, 1996, both of the other officers involved in the altercation provided tape-recorded interviews to Staats. They gave the interviews because, they said, previous information they had given was inaccurate. Because of this change of testimony and the concern that one or more of the officers might perjure themselves, Schlecker determined the misdemeanor charges against Givens should be dropped. A *nolle prosequi*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
(Cite as: 2004 WL 2290811 (Del.Ch.))

was entered in that case.

> FN22. Staats interviewed the third civilian complainant on March 20, 1996.

On March 25, 1996, Staats interviewed Izquierdo in the presence of Rhodunda and Izquierdo's then-attorney. [FN23] That same day, Howell notified Izquierdo he was assigned to administrative duties effective immediately. This assignment prohibited Izquierdo from carrying weapons, on or off duty, and from working any extra-duty or overtime assignments.

> FN23. Izquierdo's current attorney assumed representation of Izquierdo after this interview.

*4 The last of Staats's investigative activity appears to have occurred on April 6, 1996. [FN24] The date appearing on the cover of the investigative report is April 8, 1996. A draft of this report was sent to transcription on April 10, 1996, and the final investigative report was completed on April 12, 1996. Howell then signed off on the report and Staats prepared an "information packet" and charge papers against Izquierdo. There is no date appearing on Howell's signature page and there is dispute as to the date Howell signed the report. [FN25] Izquierdo was served with these papers on April 17, 1996.

> FN24. Staats's investigative report is at DX-A169.

> FN25. The Complaint Hearing Board, in its summary of the facts, recounted that Howell stated "that April 12th was the date he signed the investigative report submitted by ... Staats, as being acceptable." PX-A166. Defendants' briefs present this date as April 15, 1996. See Br. in Supp. of Defs.' Mot. for Summ. J., at 19 ("Howell presented an opening statement to the Appeal Board in which he asserted that the earliest date that the investigation could have concluded was April 15th, which is when he, as Staats's commanding officer, signed off on the report."); Answering Br. in Opp'n to Pl.'s Mot. for Partial Summ. J., at 18 (same). Defendants cite to a videotape for this assertion, which they have volunteered to provide to the Court. This date, thus, presents a question of fact which cannot be resolved at the summary judgment stage.

### 2. The First Complaint Hearing Board

On May 13, 1996, a hearing was held by the Complaint Hearing Board (the "CHB"). [FN26] This board was comprised of Ashe, Crowley, and Monaghan. Izquierdo joined with the other officers who were facing disciplinary charges arising out of the same events in a motion to dismiss, which argued that the hearing was held too late, thus in violation of the 30-Day Rule, and that Staats had not complied with LEOBOR Section 9200(c)(7)'s complete report and disclosure requirements, which, Izquierdo alleges, affected his discovery rights under LEOBOR Section 9200(c)(10) and Directive 8.7(L). [FN27] Specifically, the motion to dismiss argued that conclusion of investigation was on April 8, 1996. In regard to the discovery violations, the motion pointed to the fact that before turning on a tape recorder to conduct interviews, Staats "interviewed" Givens and his brother Keith.

> FN26. Thus, thirty days before May 13, 1996, was April 13, 1996.

> FN27. PX-161.

The CHB determined there was no LEOBOR discovery violation, but that there was a violation of the 30-Day Rule. The CHB decided that the date of the conclusion of the investigation was on April 12, 1996. The CHB, accordingly, dismissed the charges against Izquierdo and the other officers.

### 3. The First Appeal Board

Three days after the CHB's decision, on May 16, 1996, Howell [FN28] addressed an appeal board (the "AB") consisting of Dees, Pratcher, and Master Sergeant John Fogelgren. [FN29] Rhohunda served as legal advisor to the AB, and Schlecker assisted the OPS in presenting the appeal. The AB ruled that the 30-Day Rule period began to run when the officers were served, thus on April 17, 1996. [FN30] Having found no violation of the CBA, the AB remanded the case to the CHB.

> FN28. Izquierdo suggests that Pratcher ordered the appeal. The District Court has already found that Howell alone made the decision to appeal, Izquierdo, 68 F.Supp.2d at 401 n.11, and that determination is binding on this Court. The procedural posture in this case presents an interesting question of whether to consider determinations made in the District Court's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
(Cite as: 2004 WL 2290811 (Del.Ch.))

Page 6

opinion binding as a matter of collateral estoppel or as a matter of law of the case. As discussed later, Izquierdo's case was removed to the federal court and subsequently remanded to this Court.

In discussing estoppel (albeit in the framework of partial remand by an appellate court to a trial court), the United States Court of Appeals for the Third Circuit has stated, "[w]hen the estoppel is operative in proceedings in the same case on remand, courts frequently speak in terms of the law of the mandate or the law of the case rather than collateral estoppel but the underlying principle is the same." *Cowgill v. Raymark Indus., Inc.,* 832 F.2d 798, 802 (3d. Cir.1987).

There are some differences between the two doctrines. Collateral estoppel "bars a party from relitigating a *factual* issue previously litigated." *Ingram v. 1101 Stone Assocs. LLC,* 2004 WL 691770, at *8 (Del.Super.Mar. 18, 2004) (emphasis added). Collateral estoppel applies to bar such relitigation if "(1) the issue previously decided is identical to the issue at bar; (2) the prior issue was finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in a prior action." *Id.* The law of the case doctrine applies as a constraint to reconsideration of *legal* issues. The law of the case is established "when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation." *Kenton v. Kenton,* 571 A.2d 778, 784 (Del.1990).

Further, while collateral estoppel is considered an absolute bar to relitigation of an issue, there are two exceptions to the law of the case doctrine: when "the previous ruling was clearly in error or there has been an important change in circumstances," or when "the equitable concern of preventing injustice" trumps the doctrine. *Hamilton v. State,* 831 A.2d 881, 887 (Del.2003).

In this case, nothing has been submitted which would lead the Court to invoke either of the two exceptions to the law of the case doctrine. Further, the Court finds that as a general matter, the last three requirements of

the collateral estoppel doctrine are met. (Because the first requirement of collateral estoppel is fact specific, the Court will only rely on the District Court's opinion when the matter it addresses is identical to a matter presently under consideration.) As such, regardless of nomenclature, this Court considers the determinations of the federal court, as to those issues also before this Court, binding as a general matter of estoppel.

FN29. Fogelgren, president of the FOP, has not been named as a defendant in this action.

FN30. The AB considered, and did not accept, an argument that even if the conclusion of investigation were deemed to be April 12, the fact that May 12 was a Sunday would not have served to allow extension of the 30-day period through the next business day.

4. *Izquierdo's Discovery Request*

In a letter dated May 31, 1996, Izquierdo's counsel requested discovery. On June 17, 1996, Staats provided records pertaining to Givens's refusal of treatment at the Wilmington Hospital Emergency Room. Staats has testified that he did not have possession of these hospital records before the first CHB, but afterwards was able to obtain them from the records division and forward them to Izquierdo.

5. *The Second Complaint Hearing Board*

The CHB, still comprised of Ashe, Crowley, and Monaghan, reconvened on June 19, 1996. Izquierdo again filed and joined on various motions to dismiss, again arguing that the original CHB hearing was scheduled in violation of the 30-Day Rule, and that Staats had failed to keep a complete record of interviews. Izquierdo argued that the CHB was not bound to follow the determination of the AB. Izquierdo also argued that the hospital records, given to him only two days before the second CHB hearing, were not delivered in a timely fashion and that he was not provided with certain other exculpatory evidence.

*5 The CHB found that the 30-Day Rule issue had been decided by the AB (and declined to revisit it) and that Staats's records of the interview were complete. After deliberating, the CHB, as to Izquierdo, found insufficient evidence to support

charges of improper use of force and failure to provide medical treatment to a prisoner, but sufficient evidence to support charges of dishonesty, inaccurate reporting, and failure to report the use of force. The CHB imposed a 10-day suspension for the failure to report use of force, and a 10- day suspension for inaccurate reports, and dismissal for dishonesty.

### 6. *The Second Appeal Board*

After repeated requests by Izquierdo's counsel, a second AB hearing was scheduled for August 27, 1996. Before the hearing, Izquierdo's counsel sent a letter, dated August 16, 1996, to Boykin requesting that Boykin remove Pratcher and Dees from the AB "because of bias and prejudice against" Izquierdo. [FN31] The basis for this was that both Pratcher and Dees had sat on the first AB, and thus had prior knowledge of the case. Further, Izquierdo's counsel argued that both Pratcher and Dees were to be defendants in a writ of mandamus action that had not yet been filed. [FN32] Boykin denied the request on August 26, 1996.

> FN31. DX-A340.

> FN32. Izquierdo filed a petition for a writ of mandamus in Superior Court on August 23, 1996, seeking an order to compel the rescission of his termination, reinstatement to his former position, and back pay. On September 9, 1996, Izquierdo informed the Superior Court that he intended to dismiss the petition.

The second AB hearing ended with a rejection of all of Izquierdo's arguments except that his termination was an unjustly harsh punishment. The AB modified Izquierdo's sentence to a suspension without pay and credited him for time served since the second CHB hearing. Izquierdo returned to work on September 3, 1996.

### C. *Judicial Procedural History*

Izquierdo initially filed a complaint in this Court on February 10, 1997. An amended complaint dated August 8, 1997, was subsequently filed. The amended complaint brings claims against Pratcher, Boykin, Howell, Alfree, and Schlecker in both their official and individual capacities. Claims brought against Sills, Dees, Rhodunda, Crowley, Ashe, Monaghan, and Staats [FN33] are brought against them in their official capacity only.

> FN33. Although the amended complaint named Staats in both his official and individual capacities, the District Court approved a stipulation dismissing all claims against Staats in his individual capacity with prejudice on November 11, 1998.

Defendants removed the case to the United States District Court for the District of Delaware. That court granted summary judgment in favor of Defendants as to all of Izquierdo's federal claims [FN34] and remanded the remaining state claims to this Court. [FN35] Izquierdo moved for partial summary judgment, and Defendants responded with a motion for summary judgment.

> FN34. Counts XXIX–XXXIII of the amended complaint.

> FN35. *Izquierdo,* 68 F.Supp.2d at 420.

### III. ANALYSIS

#### A. *Breach of Contract Claims Against the Individuals Defendants*

Counts I-VI, IX, XI, XIV, and XVII-XXVIII are premised on breach of contract. [FN36] This section addresses those Counts to the extent they involve any of the Individual Defendants.

> FN36. Count XIV is premised upon both breach of contract and tort claims. To the extent it brings breach of contract claims against any of the Individual Defendants, it is addressed here.
> There is disagreement as to whether Count II of the amended complaint is grounded in contract or tort. *See* Br. in Supp. of Defs.' Mot. for Summ. J., at 46-47; Pl.'s Answering Br. Opposing Defs.' Mot. for Summ. J., at 38-39; Reply Br. in Supp. of Defs.' Mot. for Summ. J., at 2. Count II is titled, "Misrepresentation." The Count alleges:
> 32. OPS through Defendants Staats, Alfree and Howell did maliciously and with reckless and willful wanton disregard subject Plaintiff to a Complaint Hearing Board in breach of the contract, by forwarding arguments of unwritten policy directly in contravention of the contract provisions, i.e. WPD DIR 8.7(E), regarding the 30-Day Rule with the intent to influence the first Hearing Board to violate said contract provision.
> 33. Defendants by their actions breached the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
(Cite as: 2004 WL 2290811 (Del.Ch.))

contract.

> It seems clear that although the captioning of the Count is "Misrepresentation," Izquierdo is attempting to set forth a breach of contract claim. For the sake of thoroughness, I will address the issue when considering both breach of contract and tort claims.

Izquierdo asserts that the CBA has been breached. The CBA is entitled, "Agreement between The City of Wilmington, a municipal corporation of the State of Delaware, and Fraternal Order of Police Lodge # 1." It is signed by Sills for the City, in his capacity as Mayor, and by three representatives of the FOP. None of the other Individual Defendants signed the CBA in any capacity. As such, the parties to the CBA are the City and the FOP only. This Court has recognized the "general principle of contract law that only a party to a contract may be sued for breach of that contract." [FN37]

> FN37. *Wallace v. Wood,* 752 A.2d 1175, 1180 (Del. Ch.1999); *see also Traffas v. Bridge Capital Investors II,* 1993 WL 339293, at \*3 (D.Kan. Aug. 23, 1993) ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the contract being sued upon."), *cited in TruePosition, Inc. v. Allen Telecom, Inc.,* 2003 WL 151227, at \*2 (D.Del. Jan. 21, 2003).

**\*6** Izquierdo argues, "[a]s agents of Defendant City, [the Individual Defendants] owe a duty to the Plaintiff to follow the parties' agreement. In essence, those Defendants are fiduciaries to an intended third party creditor beneficiary of the City of Wilmington and FOP contract." [FN38] Izquierdo cites no authority for this assertion, which is simply inaccurate. Even after assuming Izquierdo is a creditor beneficiary of the CBA and recognizing that the Individual Defendants are agents of the City, Izquierdo's argument runs headlong into the principle that agents are not liable to third parties for contracts of a disclosed principal. While the agent may have liability to the principal, there is no contractual relationship between the agent and the third-party creditor beneficiary. [FN39]

> FN38. Pl.'s Answering Br. Opposing Defs.' Mot. for Summ. J., at 40 (May 9, 2003).

> FN39. *See generally* ARTHUR LINTON

CORBIN, CORBIN ON CONTRACTS § 779(E) (1951) (discussing beneficiaries of contracts between principals and agents). Corbin states, "It seems reasonably clear that, where B is the agent of A to perform, the contract [between A and B] should not be regarded as made for the benefit of C or as giving him an enforceable right." *Id.*

Because the Individual Defendants are not parties to the CBA and there is no basis for holding these nonparties liable for breach of the CBA, Defendants' motion for summary judgment, with respect to the Individual Defendants, is granted as to those Counts listed above. Izquierdo's motion for summary judgment as to Counts I-VI and XXIV with respect to the Individual Defendants, is denied. [FN40]

> FN40. These conclusions are, of course, limited, as to Counts II and XIV, to their allegations based in contract.

### B. Tort Claims [FN41]

> FN41. As the District Court remarked, "[t]he Amended Complaint, seemingly adopting a blunderbuss approach both as to legal theories and named defendants, has the additional vice of suffering from a lack of clarity." *Izquierdo,* 68 F.Supp.2d at 404. True to this characterization, it is not clear which of the counts premised on tort theory seek monetary damages and which seek equitable relief. To the extent those counts seek monetary damages, they are addressed in this section.

> Counts VII, VIII, and XIII, based on civil conspiracy, would not separately confer any equitable relief. Any equitable relief would be in the form of expunging of Izquierdo's disciplinary record and restoration to a status as if there had been no discipline. Thus, it would take the form of an order directed at the City, not the Individual Defendants named in these Counts. (Sills and Pratcher, to whom such an order might have been directed because of their then-status a Mayor and Chief of Police, are not named in these Counts.) Such an order would not be focused on the broad scope of liability envisaged by the finding of a civil conspiracy. To the extent those Counts may be seeking equitable relief, then, Defendants' motion for summary judgment is granted and Izquierdo' motion for summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 9
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

judgment is denied.

Count II, also (seemingly) based in tort, is better considered, to the extent it may be seeking equitable relief, in Part III.D.1.a, addressing breach of contract against the City.

Counts X and XII are premised on the same nucleus of facts as Counts IX and XI. To the extent Counts X and XII seek equitable relief, they will be addressed with, and dismissed on their merits for the same reasons as, Counts X and XII in Part III.D.2. Count XIV is supported by both contract and tort language. To the extent it is based in tort and seeks equitable relief, it is also discussed and dismissed on its merits for the same reasons as those discussed in Part III.D.2.

Counts II, VII-VIII, X, and XII-XIV, are all, wholly or partially, or in the case of Count II, hypothetically, based in tort law. [FN42] This section addresses these Counts with respect to both the Individual Defendants and the City.

> FN42. Counts X and XII are fully, and Count XIV is partially, based on a theory of violation of a statutory duty. Both sides have submitted extensive briefing as to whether the LEOBOR is the source of an implied private right of action. The Court does not reach this issue. For purposes of these claims, the Court assumes that a private right of action exists under the LEOBOR. *See Knox v. City of Elsmere,* 1995 WL 339096 (Del.Super. May 10, 1995) (denying a summary judgment motion because of the existence of material question of fact, but suggesting that a private action would be implied under the LEOBOR); *Gale v. Sapp,* 1993 WL 54463 (Del.Super.Feb. 11, 1993) (resolving an issue based on the text of a bargaining agreement that, pursuant to 11 *Del. C.* § 9203 preempted the LEOBOR, without regarding whether a private right of action would exist under the LEOBOR). Such right of action, if it exists, would be subject to the Delaware Tort Claims Act. 10 *Del. C.* § 4001 et. seq. The Court thus rejects Izquierdo's assumption that a private right of action, if one exists under the LEOBOR, would be a statutory exception to the Delaware Tort Claims Act. *See* 10 *Del. C.* § 4011(a) (*"Except as otherwise expressly provided by statute,* all

governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages.") (emphasis added).

The Delaware Tort Claims Act (the "Tort Claims Act") provides that "all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." [FN43] Governmental entities are defined to include the City. [FN44] Employees are defined as individuals "acting on behalf of a governmental entity in any official capacity." [FN45] and, the Individual Defendants fall within this definition. [FN46]

> FN43. 10 *Del. C.* § 4011(a). 10 *Del. C.* § 4012 provides exceptions to this immunity, but none of those exceptions applies here.

> FN44. *Id.* § 4010(2).

> FN45. *Id.* § 4010(1).

> FN46. Although Izquierdo names Pratcher, Schlecker, Boykin, Howell, and Alfree in their individual capacities, the tort counts allege actions that were taken in official capacities. Regardless, those defendants' actions would have to meet the requirements of 10 *Del. C.* § 4011(c). *See Holman v. Walls,* 1989 WL 66636, at *7 (D. Del. June 13, 1989) ("The only reasonable construction of [the Tort Claims Act] is to permit actions against an employee in his or her individual capacity if the requirements of § 4011(c) are met but to bar actions against an employee in his or her official capacity.").

Section 4011(c) of the Tort Claims Act is an exception to employee immunity. [FN47] It provides:

> FN47. This subsection only applies to employees of governmental entities; it does not apply to the entities themselves. *Smith v. Comm'rs of Dewey Beach,* 685 F.Supp. 433, 435 (D.Del.1988).

(c) An employee may be personally liable for acts or omissions causing property damage, bodily injury or death in instances in which the governmental entity is immune under this section, but only for those acts which are performed with wanton negligence or willful and malicious intent.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922

**(Cite as: 2004 WL 2290811 (Del.Ch.))**

Izquierdo argues that this section applies to the Individual Defendants, thus lifting the shield of immunity. He argues that the Individual Defendants acted with wanton negligence. However, in order for an employee to be personally liable for the result of an action taken with wanton negligence, that action must cause property damage, bodily injury, or death. Izquierdo argues that he has sustained property damage by being denied his role as a police officer and having to defend his property right to employment. He also claims economic damages. [FN48]

FN48. Pl.'s Answering Br. Opposing Defs.' Mot. for Summ. J., at 19.

"[I]n order to avoid defeating the broad grant of immunity set forth in Section 4011(a), the exception set forth in Section 4011(c) is to be narrowly construed." [FN49] In *Dale v. Town of Elsmere,* the Delaware Supreme Court applied this maxim to a suit brought by landowners against the Mayor of Elsmere. The landowners alleged that the town had created a nuisance by providing a loading zone for a deli adjacent to their land and sought monetary compensation for lost enjoyment and value. The Mayor argued that 10 *Del. C.* § 4011(c) required an allegation of *physical* property damage, not intangible property damage. While not directly addressing this argument, the Supreme Court wrote, "economic harm alone does not constitute 'property damage' as that term is used in the Act." [FN50] Further, in *Carr v. Town of Dewey Beach,* the United States District Court applied the Tort Claims Act. In that case, the plaintiff claimed that he had lost profits because an allegedly retaliatory stop work letter issued by the municipality had delayed construction of a restaurant. [FN51] The District Court wrote, "[Plaintiff] claims no physical damage to the property itself. By its terms, therefore, Section 4011(c)'s exception is inapplicable to [the individual defendant], and plaintiff's claim ... will be dismissed." [FN52]

FN49. *Wilcher v. City of Wilmington,* 60 F.Supp.2d 298, 306 (D.Del.1999); *see also Dale v. Town of Elsmere,* 702 A.2d 1219, 1222 (Del.1997) ("[E]xceptions to broad grants of immunity are to be construed narrowly.").

FN50. *Dale,* 702 A.2d at 1223 (citing *Carr v. Town of Dewey Beach,* 730 F.Supp. 591, 602 (D. Del 1990)).

FN51. *Carr v. Town of Dewey Beach,* 730 F.Supp. 591, 594-97 (D.Del.1990).

FN52. *Id.* at 602.

**\*7** Similarly, in the case at bar, Izquierdo seeks economic damages for loss of income and argues that he sustained property damage as the result of having been harmed in his role as a police officer. In light of *Dale* and *Carr,* this is not the type of property damage anticipated by Section 4011(c). Because the harm Izquierdo alleges is not within the scope of Section 4011(c), there is no need to reach whether the Individual Defendants' actions were performed with wanton negligence or willful and malicious intent.

Pursuant to 10 *Del. C.* § 4011(a) and interpreting caselaw, and to the extent these Counts seek monetary damages and are based in tort, Defendants' motion for summary judgment is granted as to Counts II, VII-VIII, X, and XII-XIV. Similarly, and to the same extent, Izquierdo's motion for summary judgment as to Counts II, VII, and VIII is denied.

C. *Constitutional Claims*

1. *Count XV--Confrontation of Witnesses and Due Process Violations*

Count XV alleges that Crowley, Monaghan, and Ashe "violated Plaintiff's constitutional civil rights to a fair hearing and confrontation of witnesses against him." It is unclear from the text of the amended complaint if this Count addresses federal or state constitutional claims. It is also unclear from the amended complaint which provision of Delaware's Constitution Izquierdo invokes. Finally, although the Count incorporates all preceding allegations of the amended complaint, it does not identify specifically the acts by Crowley, Monaghan, and Ashe that allegedly violated Izquierdo's constitutional rights.

Article 1, Section 9 of the Constitution of 1897 provides "every man for an injury done him in his reputation, person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land." Further, Section 7 of that article establishes that "[i]n all criminal prosecutions, the accused hath a right ... to meet the witnesses in their examination face to face" and that the accused shall not "be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land." The Delaware Supreme Court has held that "[t]he phrase 'due

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922

(Cite as: 2004 WL 2290811 (Del.Ch.))

process of law' in the Federal Constitution and the phrase 'law of the land' in the Delaware Constitution have substantially the same meaning," [FN53] and should be interpreted in the same fashion.

> FN53. *In re Carolyn S.S.,* 498 A.2d 1095, 1098 (Del.1984); *see also Opinion of the Justices,* 246 A.2d 90 (Del.1969) (noting that Article I, § 7 of the Delaware Constitution "is held to have substantially the same meaning as the due process clauses of the Fifth and Fourteenth Amendments to the Federal Constitution").

The United States Supreme Court, in *Mathews v. Eldridge,* [FN54] set forth the three factors to be balanced in deciding what "due process" requires when a property interest (not one's physical liberty) is at stake: [FN55]

> FN54. 424 U.S. 319 (1976).

> FN55. The parties, in the District Court, did not dispute that Izquierdo has a property interest in continued employment. *See Izquierdo,* 68 F.Supp.2d at 414. The District Court noted, however, that the Supreme Court has " 'not had occasion to decide whether the protections of the Due Process Clause extend to discipline of tenured public employees short of termination." ' *Id .* (quoting *Gilbert v. Homar,* 520 U.S. 924, 929 (1997)). That Court, nevertheless, proceeded on the assumption that a property right existed.

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [FN56]

> FN56. 424 U.S. at 335.

**\*8** This test is based, at its heart, on the notion that " '[t]he fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." " ' [FN57]

> FN57. *Izquierdo,* 68 F.Supp.2d at 415 (quoting *Mathews,* 424 U.S. at 333 (quoting

*Armstrong v. Manzo,* 380 U.S. 545, 552 (1965))).

As stated above, the amended complaint does not detail which acts taken by Crowley, Monaghan, and Ashe (who comprised the CHB) violated Izquierdo's constitutional rights. Izquierdo has also provided no briefing on the subject and as such, an application of the *Mathews v. Eldridge* calculus is virtually impossible. Assumedly, Izquierdo believes that the CHB's proceeding allegedly in violation of the 30-Day Rule and its determination that there were no discovery violations caused him constitutional harm. In the District Court, Izquierdo "conceded he had no due process right to compliance with the provisions of the 30-day rule." [FN58] Izquierdo has not argued otherwise under the State Constitution. To the extent Izquierdo may be alleging constitutional harm based on other decisions of the CHB, he has not briefed the subject and has not fairly put in evidence before the Court or satisfied the burden of production imposed on the nonmoving party at the summary judgment stage. Further, it appears from the undisputed facts presented, notwithstanding the requirements of the CBA, that Izquierdo was provided the opportunity to be heard "at a meaningful time and in a meaningful manner." Defendants' motion for summary judgment as to this Count is granted. [FN59]

> FN58. *Id.* at 419. The District Court held, in this context, that there was also no due process right to notice of the WPD's interpretation of the 30-Day Rule. *Id.* at 419 n.33.

> FN59. The District Court stated that "all the federal question claims have been dismissed." *Id.* at 421. Thus, to the extent Count XV may have been based on the Federal Constitution, it has already been addressed.

*2. Count XVI--Denial of Fair Hearing Because of Grant of* Nolle Prosequi

Count XVI alleges that Schlecker and her agents deprived Izquierdo of "a constitutional civil right of a fair hearing and effective cross-examination of [Givens] by prejudicing or influencing [Givens] either subjectively or objectively against Plaintiff." Schlecker is alleged to have done so by entering a *nolle prosequi* in Givens's criminal proceedings.

As to Count XVI, while not explicitly resolving the claim alleged there, the District Court rejected the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 12
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

argument it presents. [FN60] Although the District Court applied the Federal, not Delaware, Constitution, Izquierdo has pointed to no authority suggesting that the District Court's reasoning would not hold true under the Delaware Constitution. The District Court's opinion, while perhaps dicta, is wholly consistent with the Delaware Constitution and is applicable here. Izquierdo has shown no reason why Schlecker's use of *nolle prosequi* denied Izquierdo due process of law. I see no reason why the due process clause should be read to limit a prosecutor's traditionally broad discretion to decide whether or not to bring criminal charges.

> FN60. Specifically, the District Court wrote Izquierdo can point to no fact which would suggest the *nolle pros.* caused either WPD officials or the civilian complainant to doubt or dislike Izquierdo. Rather, prior to the *nolle pros.*, two of Izquierdo's fellow officers had changed their statements to conflict with his. Further, the civilian complainant had accused Izquierdo of beating him. The notion that without the *nolle pros.* the complainant would not have sided with OPS is patently absurd. Second, the notion that a prosecutor cannot grant a *nolle pros*. when advised that one or more officers might perjure themselves without violating the due process rights of any officers under investigation for the same events is wholly without merit. Applying the *Mathews* test, the interest of Izquierdo and others similarly situated in such a bar is minimal, especially given the existence of other procedural safeguards, including an opportunity to cross-examine the complainant. However, the interest of the government in preventing a perjury-laden prosecution is vast. Therefore, Izquierdo cannot possibly make a showing that the *nolle pros.* in any way caused a constitutional violation....
> *Id.* at 418 n.30.

Defendants' motion for summary judgment as to Count XVI is granted.

### D. *Breach of Contract Claims Against the City*

While the Individual Defendants are nonsignatories to the CBA, and thus cannot be held liable for any breach of it, the City is a signatory to the CBA and, of course, may be liable for a breach of contract claim based upon it. [FN61] Although the amended complaint is not clear as to which individual counts are intended to apply to the City, Count XXVIII alleges "Defendants [Sills] and City are liable for the actions and policies of their employees, designees, agents and servants in that Defendants were aware either constructively or actually of the Defendants' abuses." [FN62] While all claims against the Individual Defendants will be dismissed, because the City is the signatory to the CBA and because it is ultimately responsible for breaches of the CBA based on the actions of its employees, I now turn to the breach of contract claims, whether expressly applying to the City or impliedly through Count XXVIII, [FN63] to determine whether summary judgment may be granted on any of these Counts.

> FN61. *See* DX A360 (titling the CBA as between the City and the FOP); *id.* at 390 (signature page of the CBA).

> FN62. Amended Compl. ¶ 120. This paragraph of the amended complaint captures the notion that the City is responsible for the acts of its employees. For example, by itself, the City cannot breach the CBA; it can only do so by the actions of its employees and agents. Thus, to the extent the Individual Defendants acted in a way that is both within the scope of their employment (and hence their authority), and in breach of the CBA, the City may be held liable. *Cf. Harris v. Dependable Used Cars, Inc.,* 1997 WL 358302, at *1 (Del.Super.Mar. 20, 1997)* ("Delaware follows the principle that in a breach of contract action, where the principal is disclosed, only the principal is liable for a breach thereof, not the agent.") (citations and internal quotations omitted). In this context, the parties do not dispute that the Individual Defendants' actions were within the scope of their employment.

> FN63. Izquierdo has not moved for summary judgment on Count XXVIII. Defendants' motion for summary judgment on this Count, to the extent claims addressed in this section survive summary judgment, will be denied.

### 1. *Counts Alleging Lack of Disciplinary Jurisdiction*

**\*9** The following Counts allege that, for certain reasons, either the CHB or AB was divested of the power to exercise jurisdiction over Izquierdo. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

Counts require the Court to make a determination of law--an interpretation of the CBA--that affects the power of the CHB and AB to exercise control over the case. [FN64]

> FN64. While the Counts discussed in subsections (c) and (d) of this section of this Memorandum Opinion would involve an interpretation of the CBA that goes to the jurisdiction of the CHB and AB, those Counts are dismissed at this stage because of the lack of any resultant harm, not because of the Court's construction of the CBA.

*a. 30-Day Rule*

The 30-Day Rule forms the basis of Counts I-IV and Count XXIV. [FN65] As recounted above, this rule provides that a hearing may not be scheduled "more than thirty (30) days following the conclusion of the investigation." [FN66] The term "conclusion of investigation" is not defined in the CBA, Directives, or LEOBOR. The Court is then left to interpret the meaning of "conclusion of investigation."

> FN65. Count I is the only count related solely to the interpretation of the 30-Day Rule. Counts II-IV are based on conduct by the Individual Defendants in presenting arguments relating to the 30-Day Rule. Count XXIV, entitled "Failure to Provide Rules of Procedure for Disciplinary Hearing Grievance; Unfair Notice," is based on the premise that the Defendants "failed to provide Plaintiff with a copy or notice of their unwritten governing procedures of the 30-Day Rule interpretation," and therefore "Defendants breached their contractual duty ... to fully inform Plaintiff of all procedural rules, thus hampering Plaintiff's ability to conduct an adequate defense." Amended Compl. ¶¶ 107, 108.
>
> Because Counts II-IV and XXIV are based on the conduct of WPD officers (and the WPD itself) in relation to interpreting the 30-Day Rule, which as discussed in this section, appears ambiguous, the Court will deny summary judgment on these Counts as well. The practical consequences of this denial are minimal because the substantive basis of these Counts may be within Count I.

> FN66. Directive 8.7(E).

In interpreting a contract, [FN67] the court "must first examine the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous." [FN68] Initially, the Court looks to the terms of the contract. If the terms are clear on their face, "the court must apply the meaning that would be ascribed to the language by a reasonable third party." [FN69] Where there is an ambiguity in the contract--that is, when a contract's provisions are "reasonably susceptible to two or more meanings" [FN70]--the Court should consider extrinsic evidence to glean the "reasonable shared expectations of the parties at the time of contracting." [FN71] This function may be performed in a summary judgment proceeding "where the moving party's record is not *prima facie* rebutted so as to create issues of material fact." [FN72] If, however, questions of material fact exist, "the trial court must resolve those issues as the trier of fact." [FN73]

> FN67. The 30-Day Rule is found in Directive 8.7(E), not the CBA. Nevertheless, Directive 8.7(E) is authorized pursuant to Section 11.1 of the CBA, and it is interpreted in the same manner as the CBA itself.

> FN68. *Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del. Ch.2003).

> FN69. *True North Communications, Inc. v. Publicis,* 711 A.2d 734, 738 (Del. Ch.2001), *aff'd,* 705 A.2d 244 (Del.1997), *quoted in Comrie,* 837 A.2d at 13.

> FN70. *Amtower v. Hercules, Inc.,* 1999 WL 167740, at *12 (Del.Super.Feb. 26, 1999).

> FN71. *Comrie,* 837 A.2d at 13.

> FN72. *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232-33 (Del.1997).

> FN73. *Id.* at 1233.

Here a material question of fact exists as to what "conclusion of investigation" means that cannot be resolved at this stage of litigation. Various events have been suggested by the parties as meeting this standard--the last investigative activity; when the investigative report is complete; when the commander of OPS signs off on the report; when the lead investigator prepares an "information packet;" and when the officer is served with charge papers all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
(Cite as: 2004 WL 2290811 (Del.Ch.))

of which are reasonable interpretations of "conclusion of investigation." As the Supreme Court stated in *Continental Oil Corporation v. Pauley Petroleum, Inc.,* "the function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is *any* evidence supporting a favorable conclusion to the nonmoving party." [FN74] Since both sides have submitted evidence to support their differing interpretations of Directive 8.7(E), both Izquierdo's and Defendants' motions for summary judgment, with respect to Counts I, III, IV, XXIV, and II (to the extent that Count is based on either breach of contract or in tort and seeks equitable relief), [FN75] and with respect to the City only, are denied.

> FN74. 251 A.2d 824, 826 (Del.1969) (emphasis added).

> FN75. Count II--the only count based in tort which survives summary judgment--only survives to the extent that it seeks equitable relief. As discussed in note 41, *supra,* equitable relief available would take the form of an order directed at the City, or, by reason of their then-positions with the City, Sills and Pratcher. Because Sills and Pratcher are not named in Count II, the substitution provision of Court of Chancery Rule 25(d) is not implicated and the Defendants' motion for summary judgment is granted as to the Individual Defendants and Izquierdo's motion for summary judgment is denied.

### b. *Appeal Board's Jurisdictional Limits For Review*

***10** Count V is based on the notion that the CBA was breached because "Defendants Dees and [Pratcher] ... [went] beyond the Appeal Board's jurisdictional limits for review, i.e. [Directive] 8.8(C)(1) and (2), i.e. fairness and whether the Hearing Board's findings were supported by the evidence." Directive 8.8(C) provides, in pertinent part,

C. The Captain of the Internal Affairs Division and/or the Chief of Police, within five (5) days of receipt of the Complaint Hearing Board's decision and recommendation, may convene an Appeal Board to consider the following:
1. Whether the Complaint Hearing Board was not carried out in a manner fair to both employee and to the Internal Affairs Division prosecuting the case; or
2. Whether the decision of the Complaint Hearing Board was not supported by the evidence; ... [FN76]

> FN76. DX-A411, A412.

The crux of this Count is that the AB, in deciding the 30-Day Rule had not been violated (and thus that the decision of the CHB at the first CHB hearing was not supported by the evidence), went beyond the record introduced to the CHB. [FN77] Directive 8.8(D) lists the procedures for the AB. It provides:

> FN77. The AB decided only that "the findings of the [CHB] were not supported by the evidence," not that the CHB was not carried out in a fair manner. Further, it is unclear whether the CBA would allow the WPD to appeal on anything other than that "the decision of the [CHB] is not supported by the evidence and record." *See* CBA § 11.9 (providing four criteria for appeal, with only one seeming to allow the WPD to initiate the process).

The action ... is that of an administrative review of the case. The appeal shall be on the record and shall not constitute a full hearing of the facts of the case, addressing only the specifics of the appeal. The Administrative Review can, but shall not [be] required to perform the following:
1. Review of those portions of the taped transcript designated by the original [CHB], in regard to the specifics of the appeal.
2. Interviewing witnesses, in regard to the specifics of the appeal.
3. Interviewing the accused (with legal counsel if the accused so desires).
4. Reviewing all pertinent information or evidence previously introduced.
5. Reviewing new evidence not available at the [CHB], but sought by the accused to be entered on his behalf, or evidence excluded by the original [CHB].... [FN78]

> FN78. DX-A412.

Izquierdo states that "the [first AB] breached its restriction of powers ... in evaluating the [appeal] by accepting evidence not in the CHB findings, nor introduced ... on the record below." [FN79] Izquierdo points to consideration by the AB of the following as beyond the scope of what the AB is entitled to review:

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

FN79. Pl.'s Opening Br. in Supp. of Mot. for Partial Summ. J., at 25- 26.

• A letter drafted to the accused officers notifying them of a hearing date with their Packages attached was sent on April 15;
• The officers received the Packages on April 17, 18, and 23;
• Thirty days from April 12 was May 12; and
• The text of Court of Chancery Rule 6, Supreme Court Rule 11, Federal Rule of Civil Procedure Rule 6, Superior Court Civil Rule 6. [FN80]

FN80. *Id.* Although not mentioned in Izquierdo's opening brief, the AB did allow, over his objection, the introduction of pages 1 and 16 of the CBA, which were the cover page and Article 11.1 (work rules and regulations of the CBA). Review of the cover page is irrelevant to the 30-Day Rule. The issue regarding Article 11 seems to be that the CHB utilized the 30-Day Rule found in the LEOBOR, but the AB utilized the 30-Day Rule found in Directive 8.7(E). As discussed above, the LEOBOR's 30-Day Rule is substantially similar to that found in the Directive. And, importantly, the AB unanimously held "that even though the contract states that the directives take precedence over Title 11, Section 9203, 9204, 9205, and 9207, there is no difference in the 30-day requirement addressed in [the CHB's 30 Day Rule findings].)" DX-A224.

The AB denied the admission of the court rules as relevant evidence. [FN81] Observing that thirty days span April 12 and May 12 is certainly something that is within the power of the AB. A review of the first CHB's report shows it considered that letters were sent to the accused officers on April 15. [FN82] As discussed above, April 13, 1996 was thirty days before the hearing. [FN83] Thus, since consideration of the April 15 sent date is proper, any consideration of the fact that the officers received the Packages on April 17, 18, and 23 is error of no consequence, if it is error at all. [FN84] For this reason, Defendants' motion for summary judgment as to Count V is granted and Izquierdo's motion for summary judgment with regard to that Count is denied. [FN85]

FN81. DX-A224.

FN82. *Id.* at A206.

FN83. *See supra* note 26 and accompanying text.

FN84. Directive 8.8(D) may be read to allow review of all pertinent information or of all pertinent information previously introduced. This is ambiguous. Nevertheless, the issue is resolved without need to look to that term.

FN85. Izquierdo also tried to question *ex post* the AB's reasoning in coming to its decision. At best, he has shown that one member of the AB considered policy in making a decision. The Court has found the AB did not review evidence beyond its authority. The Court will not undertake review of the AB's reasoning process.

### c. Hearing Board Exceeds Jurisdiction

**\*11** In Count XXVI, Izquierdo alleges that the CHB exceeded its jurisdiction and breached its contractual duty to him under the CBA by terminating him immediately following the conclusion of the penalty phase of the second hearing, instead of by providing a recommendation to Pratcher (Chief of the WPD). Regardless of the merits of the argument, [FN86] any potential wrong was remedied by the AB's subsequent decision, which reinstated Izquierdo effective September 3, 1996, and credited him for suspension time served based on the CHB's ruling. Izquierdo has not suggested that the imposition of penalty by the AB was wrongful in substance. For this reason, Defendants' motion for summary judgment on Count XXVI is granted.

FN86. This argument was rejected by the District Court. *See Izquierdo,* 68 F.Supp.2d at 411.

### d. Timeliness of Second AB Hearing

Again, in Count XXVII, Izquierdo raises concerns regarding an action that, even if a wrong, has already been remedied. The AB's second hearing was convened 67 days after it was requested. Izquierdo claims that during this time he was "without pay or benefits and with the stigma imposed upon his character" and "was unable to find substitute employment." [FN87] The result of the second AB hearing, for the reasons discussed above, remedied any potential loss coming out of this alleged wrong. Accordingly, Defendants' motion for summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
(Cite as: 2004 WL 2290811 (Del.Ch.))

judgment on Count XXVII is granted.

>        FN87. Amended Compl. ¶ 118.

2. *Counts Addressing CHB and AB Determinations Regarding Permissible Discovery*

While the breach of contract claims addressed above go to the continuing power of both the CHB and AB to exercise jurisdiction over Izquierdo, Counts IX and XI seek court review of determinations made by those bodies. [FN88]

>        FN88. Counts XI and XII are driven by the same underlying alleged discovery violations; the only difference between the Counts is that Count XI is based on Directive 8.7(L) and Count XII is based on LEOBOR Sections 9200(c)(7) and (10). All of these provisions go to recordkeeping and discovery. Thus, to the extent Count XII seeks equitable relief, it is discussed here and is dismissed for the same reasons as Count XI.
>        Counts IX and X both are dependent upon the alleged failure by Crowley, Monaghan and Ashe to impose sanctions for the alleged discovery violations underlying Counts XI and XII. Thus, once Counts XI and XII are dismissed, the substantive bases for Counts IX and X are absent. Count IX, then, to the extent it seeks equitable relief, is dismissed in this section of the Memorandum Opinion. Moreover, to the extent that Count XIV is based on breach of contract, or in tort seeking equitable relief, it is addressed here. That Count is based on one of the alleged discovery violations referenced in Count XI and XII.

Specifically, Izquierdo alleges that Staats did not record or keep records of *all portions* of his interviews with the civilian complainants under LEOBOR Section 9200(c)(7), which in turn affected his discovery rights under Directive 8.7(L) and LEOBOR Section 9200(c)(10). Moreover, Izquierdo alleges the complainants were "coached" in recalling the facts of the altercation while no tape recorder was in use. This was a basis for the motion to dismiss filed at the first CHB hearing.

In addition, Izquierdo's current claims seem to rest on other alleged disclosure violations listed in a motion to dismiss considered during the second CHB hearing, [FN89] including a failure to take written

notes of a February 22, 1996 interview of the manager of the club where the altercation took place and a failure to provide the addresses or phone numbers of certain witnesses. Izquierdo argued this is exculpatory information because all witnesses could have provided information as to Givens's initial contact with the WPD officers involved in the altercation, Givens's behavior, and Givens's alleged intoxicated state on the night at issue. Izquierdo's motion further argued that certain hospital records were provided to him too late to allow him adequate review before the second CHB hearing was convened. Finally, Izquierdo argued that OPS failed to obtain a recorded copy of radio transmissions, which, he wrote, would have provided him with witnesses and other relevant officer identifications.

>        FN89. This motion to dismiss was submitted at DX-A286.

**\*12** The CHB (at both its hearings) and the AB (at its second hearing) addressed these contentions. All bodies were in agreement that there was no violation of either the LEOBOR or the CBA.

The LEOBOR does not expressly provide for any form of judicial review; it merely sets forth certain minimum procedures, which may be altered by contract. The CBA, which altered the LEOBOR in some respects, also does not have any procedure for judicial review. As shown above, this Court may act to ensure that the contemplated review bodies were not divested of jurisdiction to hear the case. Without reaching whether or not this Court may review situations not questioning the jurisdictional power of a board to make decisions over a case, the Court concludes that Izquierdo has not demonstrated any cognizable harm arising out of the alleged discovery violations. Perhaps more importantly, he has not shown that his ability to defend himself was compromised in any way. [FN90]

>        FN90. The Superior Court has the power to issue a writ of mandamus if there is a "clear right to performance of the duty." *Knox,* 1995 WL 339096, at \*1 (quotation and internal citation omitted). In this case, Izquierdo does not seek performance of a duty, but, instead, seeks equitable and monetary relief based on the principles of tort and breach of contract. Assuming a private right of action exists under the LEOBOR, *see supra* note 42 (discussing whether or not such an action exists), this Court would only grant relief to the extent

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

harm could be drawn.

As to the manager of the nightclub, Izquierdo interviewed him and moved to enter into evidence a typed transcript of that interview; this transcript was admitted over the objections of the prosecutor. As to the civilian complainants, both Givens and his brother were available for cross-examination (and were cross-examined for three hours). Moreover, while Count XIV alleges "coaching" of the civilian complainants, Izquierdo has pointed to no evidence to support such an allegation (*e.g.*, depositions, interrogatory answers or affidavits), much less any evidence suggesting that Staats's dialogue with the complainants before turning on a tape recorder was an "interview," and not simply a conversation. Further, the fact that the civilian complainants were given copies of their statements for reference at the second CHB hearing is of no consequence.

As to the hospital records, [FN91] it was Izquierdo who took Givens to the hospital and transported the records back to the WPD. He was aware of what happened at the hospital, and, in any event, he received the records two days before the second CHB hearing convened. Moreover, these records only state Givens refused medical treatment; they do not discuss how he was injured or the extent of his injuries, other than that he had an abrasion over his left eye. [FN92]

> FN91. DX-A37.

> FN92. A fact that may have been inconsistent with Izquierdo's report that he only struck Givens once on the forearm.

Finally, Izquierdo has not presented any basis for concluding that Staats's discussion with certain hatcheck employees of the nightclub, or that the radio transmissions were not provided, caused him cognizable harm.

For these reasons, Defendants' motion for summary judgment on Counts IX, XI, and, to the extent based on breach of contract, Count XIV (and Counts X, XII, and XIV to the extent they are based in tort and seek equitable relief) is granted.

*3. Miscellaneous Counts*

a. *Count VI*

Count VI states that "Defendant Dees and [Pratcher] knowingly, willfully and wantonly and with reckless

disregard did breach that contract as stated in Counts IV and V above." This Count simply repeats Counts IV and V and, to the extent necessary, has been addressed above. Defendants' motion for summary judgment as to this Count is granted and Izquierdo's motion for summary judgment as to this Count is denied.

b. *Good Faith and Fair Dealing*

**\*13** Count XXV alleges a violation of the covenant of good faith and fair dealing. Specifically, it alleges that certain defendants "either jointly or separately breached their contractual duties of good faith and fair dealing, either expressly or impliedly, *by their conduct as alleged in those counts already identified.*" [FN93] It is well established that a party "cannot assert a claim for breach of [an] implied covenant [of good faith and fair dealing] that is based on exactly the same acts which are said to be in breach of express covenants." [FN94] This Count, by merely referencing conduct discussed in earlier counts and said to be in breach of express provisions of the CBA, without more, cannot survive. Defendants' motion to dismiss Count XXV is granted.

> FN93. Emphasis added.

> FN94. *USX Corp. v. Prime Leasing, Inc., 988 F.2d 433, 439 (3d Cir.1993), quoted in Metro Communication Corp. BVI v. Advanced Mobilecomm Techs., Inc.,* 2004 WL 1043728 (Del. Ch. May 3, 2004).

c. *Impartial Tribunal (Contractual Duty of Impartiality)*

Counts XVII-XXI all are based on the allegation that Pratcher should have recused himself from the AB because he had a bias against Izquierdo and therefore breached a contractual duty to provide an impartial appeal board. Counts XVII and XVIII contradict each other in that Count XVII is based on an allegation that Pratcher appealed the CHB's first hearing decision and Count XVIII is based on the allegation that Pratcher approved Howell's appeal of that decision. Counts XX and XXI are rooted in Pratcher's keeping informed of the OPS investigation. Count XIX asserts that Pratcher "was predisposed to favor OPS' position on appeal."

The District Court, in addressing immunity from liability under 42 U.S.C. § 1983, made determinations regarding the same claims in a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922
**(Cite as: 2004 WL 2290811 (Del.Ch.))**

different context. [FN95] I find those determinations to be binding here as a matter of estoppel. [FN96] Defendants' motion for summary judgment with regard to Counts XVII-XXI is granted.

> FN95. Specifically, the District Court held that "the uncontradicted evidence is that Pratcher did not make the decision to appeal the decision of the First CHB and that his signature on the first appeal was routine. Izquierdo has not, and cannot, adduce any further facts in support of his claim that Pratcher was biased." *Izquierdo, 68 F.Supp.2d at 415.* In addressing Pratcher's knowledge of the progression of the case, the District Court wrote "Izquierdo has not adduced any facts to show Pratcher was not impartial. At best, he has shown that Pratcher had knowledge of the case before he heard it and routinely signed-off on an appeal ." *Id.* at 416.

> FN96. Even if the District Court had not previously ruled, Izquierdo has not put forth evidence of Pratcher's bias that would serve to preclude the grant of summary judgment for Defendants. *See Tafeen v. Homestore, 2004 WL 1043721, at *1 (Del. Ch. April 27, 2004)* (" '[I]t is well settled that where the opponent of summary judgment has the burden of proof at trial, he must show specific facts demonstrating a plausible ground for his claim, and cannot rely merely upon allegations in the pleadings or conclusory assertions in the affidavits' in order to avoid summary judgment being granted in favor of the proponent of the motion.") (quoting *In re Tri-Star Pictures, Inc. Litig., 1992 WL 37304, at *4 (Del. Ch. Feb. 21, 1992), aff'd in part, rev'd in part,* 364 A.2d 319 (Del.1993)).

As to Counts XXII and XXIII, which are based in the idea that both Rhondunda and Schlecker were predisposed to favor OPS' position, Izquierdo has proffered no evidence, other than his conclusory allegations, to support this notion. As such, he has not met his burden of production as a nonmoving party who would have the burden of proof at trial and Defendants' motion for summary judgment as to these two Counts is granted as a matter of law.

## IV. CONCLUSION

For the reasons stated above, Izquierdo's motion for partial summary judgment is denied in its entirety.

Defendants' motion for summary judgment with regard to the Individual Defendants is granted in its entirety. The Individual Defendants, therefore, are dismissed from this action. Defendants' motion for summary judgment with regard to the City is granted as to Counts V-XXIII, XXV-XXVII, and II, to the extent it is based in tort and seeks damages, but, otherwise, it is denied.

An order will be entered in accordance with this Memorandum Opinion.

2004 WL 2290811 (Del.Ch.), 175 L.R.R.M. (BNA) 2922

END OF DOCUMENT

12

Westlaw.

Not Reported in F.Supp.2d
2004 WL 1534206 (D.Mass.)
**(Cite as: 2004 WL 1534206 (D.Mass.))**

Page 1

C

<u>**Motions, Pleadings and Filings**</u>

Only the Westlaw citation is currently available.

United States District Court,
D. Massachusetts.
Erick J. JONES
v.
CITY OF BOSTON, Massachusetts, Suffolk County
District Attorney's Office, John
Doe, Boston Police Officer, and John Foe, Boston
Police Officer
**No. Civ. 03-12130-RGS.**

July 9, 2004.

Erick J. Jones, Shirley, MA, pro se.

Kenneth J. Forton, City of Boston Law Department,
Eva M. Badway, Attorney General's Office, Boston,
MA, for Defendants.

*MEMORANDUM AND ORDER ON DEFENDANTS
CITY OF BOSTON, JOHN DOE, AND JOHN FOE'S
MOTION TO DISMISS AND MOTION TO DISMISS
BY SUFFOLK COUNTY DISTRICT ATTORNEY'S
OFFICE*

<u>STEARNS</u>, J.

**\*1** Plaintiff Erick Jones asserts myriad claims against the City of Boston, two (initially) unnamed police officers, the Suffolk County District Attorney's Office (SCDAO), and the Suffolk County District Attorney. The claims arise out of Jones' arrest and indictment for the alleged sexual assault of a minor. All defendants maintain that each of Jones' claims are barred by statutes of limitations. The SCDAO additionally invokes Eleventh Amendment sovereign immunity. Finally, the SCDAO contends that the district attorney and his assistants are entitled to absolute immunity for their role in Jones' prosecution.

*BACKGROUND*

In May of 1995, Jones was arrested by Boston police officers after being accused by an adolescent neighbor of a sexual assault. On May 24, 1995, the Suffolk County Grand Jury returned a three-count

indictment charging Jones with indecent assault and battery on a person fourteen years of age or older; rape and abuse of a child under sixteen years of age; and assault with intent to rape a child under age sixteen. On June 1, 1995, Jones entered pleas of not guilty and a $5,000 cash bail was set. On February 26, 1996, a Superior Court Justice granted a joint motion by Jones and the Commonwealth to continue the case and place Jones on a five-year term of pretrial probation. *See* <u>G.L. c. 276, § 87</u>. Bail was then revoked and Jones was released on personal recognizance subject to his probationary conditions. On May 29, 2001, after the conclusion of the probationary term, a second Justice of the Superior Court dismissed the charges against Jones on the Commonwealth's motion. *See* <u>Commonwealth v. Cheney, 440 Mass. 568, 570-571, 800 N.E.2d 309 (2003)</u>.

According to Jones' Complaint, on March 18, 2003, the attorney who had represented Jones in the criminal matter provided him with copies of the grand jury transcript, the police reports, and the alleged victim's videotaped statement. This investigatory material, according to Jones, contained "exculpatory information revealing [his] constitutional injuries." On September 5, 2003, Jones filed this civil action in Suffolk Superior Court asserting claims under <u>42 U.S.C. §§ 1981</u>, <u>1983</u>, <u>1985</u>, <u>1986</u>, and 1988, G.L. c. 258, § 2 (the Tort Claims Act), G.L. c. 258D, <u>[FN1]</u> and <u>G.L. c. 12, §§ 11H</u> and <u>11I</u> (the State Civil Rights Act), as well as various common-law torts--assault, false imprisonment, intentional infliction of emotional distress, negligent failure to supervise, malicious prosecution, and abuse of process. On November 3, 2003, the City of Boston removed the case to the federal district court on federal question grounds. All defendants then moved to dismiss the Complaint. On February 2, 2004, Jones moved to amend his Complaint to "properly name the John Doe and John Foe defendants, ... supplement facts ..., add defendant party, and assert proper claims for relief." <u>[FN2]</u>

> <u>FN1.</u> There is no such statute. Presumably, Jones meant to cite G.L. c. 258C, the Compensation of Victims of Violent Crimes Act.

> <u>FN2.</u> While leave to amend is to be "freely given" under <u>Fed.R.Civ.P. 15(a)</u>, the motion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 1534206 (D.Mass.)
**(Cite as: 2004 WL 1534206 (D.Mass.))**

may be denied where prejudice to the opposing party is shown or where the exercise is futile. See *Foman v. David,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (motion properly denied where the amended claims were not viable); *Roman-Martinez v. Runyon,* 100 F.3d 213, 220 (1st Cir.1996) (same); *Resolution Trust Corporation v. Gold,* 30 F.3d 251, 253-254 (1st Cir.1994) (same).

### DISCUSSION

"We must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company,* 14 F.3d 697, 700 (1st Cir.1994). While a court ordinarily confines itself to the allegations of the complaint in ruling on a motion to dismiss, it may also look to matters of public record, *Boateng v. Interamerican University, Inc.,* 210 F.3d 56, 60 (1st Cir.2000), and to documents the authenticity of which are not disputed by the parties. *Watterson v. Page,* 987 F.2d 1, 3-4 (1st Cir.1993).

*2 The claims against the City of Boston, its officers, and the Suffolk County prosecutors arise solely from events that transpired in May of 1995. [FN3] Because Jones filed this action on October 10, 2003, more than eight years after the fact, the claims against all defendants are presumptively barred by the limitations period. All of the alleged common-law torts are governed by a three-year statute of limitations. The federal civil rights statutes cited by Jones are also governed by the three-year limitations period set out in G.L. c. 260, § 2A, for personal injury actions. See *McIntosh v. Antonino,* 71 F.3d 29, 33 (1st Cir.1995). [FN4] The statute of limitations applicable to Jones' Massachusetts civil rights claims is also three years. See *Pagluica v. City of Boston,* 35 Mass.App.Ct. 820, 822-823, 626 N.E.2d 625 (1994).

> FN3. The proposed Amended Complaint adds an allegation that Officer Joyce gave "perjurious testimony to the grand jury" in May of 1995.

> FN4. The exception is 42 U.S.C. § 1986, which has a one-year statute of limitations.

Jones attempts to salvage the Complaint by invoking the discovery rule, an equitable doctrine under which a statute of limitations is tolled when a plaintiff has been injured by an "inherently unknowable wrong."

*Flynn v. Associated Press,* 401 Mass. 776, 781, 519 N.E.2d 1304 (1988). [FN5] "The discovery rule starts a limitations period running when events occur or facts surface which would cause a reasonably prudent person to become aware that he or she had been harmed." *Felton v. Labor Relations Commission,* 33 Mass.App.Ct. 926, 928, 598 N.E.2d 687 (1992). Jones avers that he only learned of his injuries when his attorney (on March 18, 2003) provided him with the investigative materials related to his case. This material, however, was produced to Jones' attorney in 1995 pursuant to the mandatory rules applicable to discovery in Massachusetts criminal cases. See Mass. R.Crim. P. 14(a)(1)(B) (grand jury transcripts); Mass. R.Crim. P. 14(a)(2) (recorded witness statements); G.L. c. 218, § 26A (witness statements contained in police reports). Whether it is true, as Jones claims, that his attorney only brought the material to his attention in 2003, is irrelevant. The relationship between client and attorney is based on principles of agency. *Levinsky's, Inc. v. Wal-Mart Stores, Inc.,* 121 F.3d 122, 134 (1st Cir.1997); *Blake v. Hendrickson,* 40 Mass.App.Ct. 579, 582, 666 N.E.2d 164 (1996). Jones, as the principal, is held to constructive knowledge of the information acquired by his attorney as his agent. *DeVaux v. American Home Assur. Co.,* 387 Mass. 814, 818, 444 N.E.2d 355 (1983). [FN6] Because Jones had notice, constructive or actual, of his alleged harms in 1995, the discovery rule does not save the Complaint.

> FN5. Under the "fraudulent concealment" branch of the discovery rule, a statute will be tolled where a wrongdoer has concealed the existence of a cause of action by means of an affirmative act done with intent to deceive. *Puritan Medical Center, Inc. v. Cashman,* 413 Mass. 167, 175, 596 N.E.2d 1004 (1992). There is no allegation (nor could there be) that any of the defendants affirmatively concealed any relevant fact from Jones. The materials upon which Jones bases his Complaint were produced to Jones' attorney by the defendants contemporaneously with his prosecution.

> FN6. While the constructive knowledge rule is different where a faithless agent has fraudulently concealed his unauthorized acts from his principal, see *Sunrise Properties, Inc. v. Bacon, Wilson et al.,* 425 Mass. 63, 67, 679 N.E.2d 540 (1997), Jones has offered no evidence that his attorney was engaged in an independent and unauthorized act from which Jones gained no benefit. Cf

*Williams v. Ely,* 423 Mass. 467, 474, 668 N.E.2d 799 (1996) (where a defendant shows that an action was untimely commenced, the plaintiff bears the burden of producing facts that, if believed, would take the case outside the statute of limitations).

Jones' claims against the SCDAO and the Suffolk County District Attorney also fail on substantive grounds. A suit against a government official in his or her official capacity is the same as a suit "against [the] entity of which [the] officer is an agent." *Monell v. New York City Department of Social Services,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because of the Eleventh Amendment's Sovereign Immunity Clause, a State, its agencies, and agency officials acting in their official capacities are not "persons" subject to a federal suit for money damages under the civil rights acts. *Will v. Michigan Department of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Laubinger v. Department of Revenue,* 41 Mass.App.Ct. 598, 601-602, 672 N.E.2d 554 (1996); *Woodbridge v. Worcester State Hospital,* 384 Mass. 38, 44-45 & n. 7, 423 N.E.2d 782 (1981); *Commonwealth v. ELM Medical Laboratories, Inc.,* 33 Mass.App.Ct. 71, 76-77, 596 N.E.2d 376 (1992) (same, State Civil Rights Act). The SCDAO is a state agency, and the District Attorney is an officer of the State. *See Commonwealth v. Gonsalves,* 432 Mass. 613, 618, 739 N.E.2d 1100 (2000). Both the SCDAO and the District Attorney are therefore entitled to invoke the State's immunity from suit under the federal (and state) civil rights laws. [FN7]

> FN7. While a state official may be sued in his official capacity for injunctive relief, *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 101-104, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), Jones' equitable request that all state judicial records relating to his prosecution be expunged is beyond the power of any of the named defendants to grant. If inaccurate information regarding Jones' criminal history appears in the state's CORI database, a recourse is provided by G.L. c. 6, § § 175-177.

*3 While a state official sued in his personal capacity is a "person" for purposes of the federal civil rights laws and may therefore be liable for money damages, *Hafer v. Melo,* 502 U.S. 21, 25-26, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), Jones' attempt to name the District Attorney and his assistants in their personal capacities founders on the doctrine of absolute prosecutorial immunity.

> [A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). Thus, the allegations that the District Attorney "authorized his assistant district attorney to present the case to the grand jury" while having "had prior knowledge about the [victim's] video statement ... containing exculpatory information," even if true, is of no bearing. As the Supreme Court explained in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), profound policy considerations

> dictate the same absolute immunity under § 1983 that the prosecutor enjoys at common law. To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.

*Id.* at 427-428. *See also Moore v. Valder,* 65 F.3d 189, 194 (D.C.Cir.1995) (a prosecutor is absolutely immune from allegations of concealing exculpatory evidence); *Reid v. New Hampshire,* 56 F.3d 332, 338 (1st Cir.1995) (same). The same immunity accorded to the prosecutor who is directly performing an adjudicatory function attaches to the supervisor who sets general prosecutorial policies governing the actions of front-line prosecutors. *Haynesworth v. Miller,* 820 F.2d 1245, 1268-1271 (D.C.Cir.1987).

While absolute immunity does not attach to a supervising prosecutor for acts performed in a purely administrative capacity unrelated to the prosecutorial function, he cannot be held liable on a theory of respondeat superior, *Monell,* 436 U.S. at 694 n. 58 (1978), but "only on the basis of [his] own acts or omissions." *Figueroa v. Aponte-Roque,* 864 F.2d 947, 953 (1st Cir.1989). While Jones asserts, no doubt correctly, that the District Attorney has the responsibility for the hiring, training, and supervision of his assistants, he offers no allegations flowing from this fact other than the authorization given by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 4

2004 WL 1534206 (D.Mass.)

**(Cite as: 2004 WL 1534206 (D.Mass.))**

the District Attorney to his assistants to proceed with his prosecution, an act for which, as previously noted, the District Attorney is absolutely immune.

*ORDER*

**\*4** For the foregoing reasons, the motions to dismiss of the City of Boston, John Doe, John Foe, the Suffolk County District Attorney's Office, and the Suffolk County District Attorney are *ALLOWED*. Jones' motion to amend the Complaint is *DENIED* on grounds of futility.

SO ORDERED.

2004 WL 1534206 (D.Mass.)

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23886607 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Motion to Dismiss by Suffolk District Attorney's Office (Dec. 08, 2003)

• 1:03CV12130_____(Docket) (Oct. 31, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

13

Westlaw.

Not Reported in A.2d                                                                                          Page 1
1993 WL 54587 (Del.Super.)
**(Cite as: 1993 WL 54587 (Del.Super.))**

**H**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware, Kent County.
Barry M. KOTLER, M.D., Appellant,
v.
BOARD OF MEDICAL PRACTICE, Appellee.
No. 92A-03-004.

Submitted: Oct 5, 1992
Decided: Jan. 19, 1993.

Upon Appeal from a Decision of the Board of
Medical Practice. Affirmed.

Jeffrey S. Goddess, of Rosenthal, Monhait, Gross &
Goddess, P.A., Wilmington, for appellant.

Frederick H. Schranck, Deputy Atty. Gen., Dover,
for appellee.

ORDER

RIDGELY, President Judge.

*1 This 19th day of January, 1993, upon
consideration of the briefs of counsel and the record
in this case, it appears that:

(1) Barry M. Kotler, M.D. ("appellant") appeals a
decision of the Board of Medical Practice ("Board")
in which the Board determined appellant to be in
violation of 24 Del.C. § 1731(b)(3) for performing
unnecessary medical tests on patients and for
excessively billing Blue Cross/Blue Shield for
medical procedures not supported by corresponding
notes in patient files. The Board disciplined
appellant by a public reprimand.

(2) From 1978 to 1987, appellant practiced family
and occupational medicine in Milford and Dover,
Delaware. In late 1985, in response to a complaint
filed with the Board against appellant, the Board
notified appellant and suggested appellant monitor
his practice more closely. The Board also informed
appellant it would do a formal investigation in the
event more complaints were received.

In June 1986, the Board began an investigation of
appellant's patient records based upon several
complaints filed with the Board. The Board
deputized Dr. Charles Allen [FN1] ("Dr. Allen") to
conduct the investigation. Dr. Allen reviewed
appellant's patient charts over a seven-month period
from January 1986 to July 1986. He then selected
five procedures frequently done by appellant and
obtained a list of appellant's patients who had
undergone such procedures. The list, which was
obtained through subpoena process from Blue Cross,
indicated all of appellant's patients for whom Blue
Cross was billed for such procedures. The subpoena
was signed by the Board's attorney, Assistant State
Solicitor Malcolm S. Cobin, and issued to Blue Cross
by the Board. The list was compared to appellant's
patient charts to determine whether appellant's notes
were consistent with his billing sheets to Blue Cross.

FN1. Dr. Allen is the Assistant Director of
the Emergency Room and Director of
Occupational Medicine at Kent General
Hospital in Dover, Delaware.

On February 1, 1991, appellant received notice that a
formal complaint was filed by the Board's
Investigating Committee. The complaint charged
appellant with violations of 24 Del.C. § 1731(b)(3),
dishonorable or unethical conduct likely to deceive,
defraud, or harm the public; 24 Del.C. §
1731(b)(11), gross misconduct, negligence, or
incompetence in the practice of medicine; and 24
Del.C. § 1731(b)(19), charging a grossly exorbitant
fee for professional services rendered. The Board
informed appellant that a hearing would be held on
March 8, 1991. At appellant's request, the hearing
was continued, and appellant filed a formal response
to the complaint.

A hearing before the Hearing Panel was held on
October 18 and 25, 1991. The Panel found appellant
to be in violation of 24 Del.C. § 1731(b)(3) and
submitted its findings of fact and conclusions of law
to the Board. On January 17, 1992, the Board
informed appellant that a hearing would be held on
March 3, 1992 to determine whether the Board
should accept the recommendations of the Hearing
Panel.

On March 3, 1992, the Board adopted the Hearing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1993 WL 54587 (Del.Super.)
**(Cite as: 1993 WL 54587 (Del.Super.))**

Panel's recommendations. The Board issued its order on March 25, 1992, determining that appellant's conduct of performing unnecessary tests on patients and charging Blue Cross for procedures which were not noted in patient files was unethical conduct under 24 *Del.C.* § 1731(b)(3). It further concluded that, because appellant's conduct did not involve a substantial sum of money, did not involve patient care, and there had been no complaints from Blue Cross, a public reprimand of appellant was appropriate discipline.

*2 (3) On an appeal from the Board of Medical Practice, the Court's duty is to examine the record and to determine whether substantial evidence exists to support the findings and conclusions of the Board. When such evidence exists and the Board has made no error of law, its decision must be affirmed. 29 *Del.C.* § 10161(21); *Bash v. Board of Medical Practice,* Del.Super., 579 A.2d 1145 (1989); *Mooney v. Benson Management Co.,* Del.Super., 451 A.2d 839 (1982), citing 29 *Del.C.* § 10142; *Air Mod Corp. v. Newton,* Del.Super., 215 A.2d 434 (1965). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it is also defined as more than a scintilla but less than a preponderance of the evidence. *Olney v. Cooch,* Del.Super., 425 A.2d 610, 614 (1981).

(4) After a review of the record, the Court is satisfied there is substantial evidence to support the Board's findings and conclusion in this case. The Board based its findings upon documentary evidence of claims sent to Blue Cross/Blue Shield for payment of medical procedures performed on six of appellant's patients during a seven-month period in 1986 which were not documented in the respective patients' medical charts and upon testimonial evidence provided by Dr. Allen to the effect that the tests performed were medically unnecessary.

(5) Appellant asserts the Court should reverse the Board's decision because the Hearing Panel disregarded the expert testimony of Drs. Frankel and Kaplan. I disagree. Although both Dr. Frankel and Dr. Kaplan testified regarding the appropriateness of the medical procedures performed, the Hearing Panel found their testimony to be of little value due to their failure to review the Blue Cross billing sheets annexed to the complaint and their failure to testify as to the individual medical charts they examined. The Hearing Panel also found the testimony given by both doctors regarding medical charts proffered by appellant was not reliable because appellant altered

the charts to include notes of his recollection relating to patients when such did not appear in the original charts. The Panel refused to admit the altered charts because "the charting as originally written must justify the treatment, including testing, which was ordered."

Any later additions to the chart based on Licensee's recollection are inherently suspect due to either conscious or unconscious rationalization of Licensee's prior actions and the Panel therefore must view any testimony based on the altered charts as unreliable as to the allegations.
*In Re: Barry M. Kotler, M.D.,* Decision of Hearing Panel of Board of Medical Practice, p. 27 (Jan. 7, 1992).

The Court may not infringe upon the Board's exclusive authority to weigh the evidence, evaluate credibility, and make factual findings and conclusions, but must affirm any legally correct Board decision supported by substantial, competent evidence of record. *Johnson v. Chrysler Corp.,* Del.Super., 213 A.2d 64 (1965). The Board was free to adopt the testimony of any of the experts and to reject the others when the evidence presented clearly conflicts and the Board's reliance upon one would satisfy the substantial evidence requirement. *DiSabatino Brothers v. Wortman,* Del.Super., 453 A.2d 102 (1982). The Board is under no duty to accept expert-opinion evidence if other evidence or circumstances lead it to a contrary inference. *Beyer v. Nanticoke Homes, Inc.,* C.A. No. 91A-01-002, Ridgely, P.J. (1992); *DiSabatino Bros. v. Wortman,* Del.Super., 453 A.2d 102 (1982). The Hearing Panel weighed the evidence before it and determined from the testimony given that appellant's witnesses were not credible. The Court's jurisdiction is limited to determining whether the Board's factual findings were supported by substantial evidence, and the Court may not weigh evidence or determine credibility of witnesses on appeal. Therefore, I find appellant's argument to be without merit.

*3 (6) Appellant also contends he was deprived of his procedural due process rights in that: (a) the Board unreasonably delayed in bringing its action, thereby resulting in prejudice to appellant; (b) the Board failed to provide appellant with pretrial discovery by its refusal to produce documents, answer interrogatories, and respond to noticed depositions; and (c) the Board's attorney, Assistant State Solicitor Cobin, participated in an investigative and adjudicative role with regard to the proceedings in this case.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 3
1993 WL 54587 (Del.Super.)
**(Cite as: 1993 WL 54587 (Del.Super.))**

The Board responds that appellant was not denied procedural due process because: (a) he was not substantially prejudiced by the Board's delay in bringing the action; (b) appellant was afforded pretrial discovery through subpoena process pursuant to 24 _Del.C._ § 1730(a)(8) and did receive all documents relevant to the merits of the case; and (c) Mr. Cobin's role throughout the case has been ministerial, not prosecutorial, and, therefore, did not create an unconstitutional bias against appellant. After reviewing the record in this case, the Court is not persuaded that appellant was deprived of his procedural due process rights.

(7) The integral component of procedural due process is "the right to receive notice and to be heard 'at a meaningful time and a meaningful manner' prior to the deprivation of a protected interest." _Slawik v. State,_ Del.Supr., 480 A.2d 636, 645 (1984) quoting _Armstrong v. Manzo,_ 380 U.S. 545, 552 (1965). Due process is not a technical concept unrelated to time, place, or circumstances. _Matter of Buckson,_ Del.Jud., 610 A.2d 203, 218 (1992); _Matthews v. Eldridge,_ 424 U.S. 319, 47 L.Ed.2d 18, 96 S.Ct. 893 (1976). Thus, what constitutes notice and opportunity to be heard depends in large part upon the nature of the interest involved and the nature of the subsequent proceedings. _Department of Labor, Division of Industrial Affairs of the State of Delaware v. Vepco of Delaware, Inc.,_ Del.Super., C.A. No. 88C-DE-5, Steele, J. (Sept. 14, 1992), _citing Boddie v. Connecticut,_ 401 U.S. 371, 378 (1971). However, while a judicial model of an evidentiary hearing is not required in every instance of governmental deprivation of private interests, at a minimum, due process requires some form of notice and hearing prior to deprivation of private interests. _Id._ at 9; _Slawik v. State, supra._

Sections 1733 and 1734 of the Medical Practices Act of Delaware _[FN2]_ provides that notice of pending charges must be served at least 30 days in advance of a hearing before a Hearing Panel. The parties shall have the opportunity to present evidence at the hearing, whereupon the Hearing Panel will make a written statement of its findings of fact and conclusions. If the Hearing Panel finds that the allegations against respondent are supported by the evidence presented, a formal hearing before the Board will be held to determine its own conclusions of law and the appropriate disciplinary action to be taken.

FN2. 24 _Del.C._ § 1733 states:
Respondent shall be served personally or by

certified mail with the complaint not less than 30 days nor more than 60 days prior to a hearing on the complaint, and shall be advised of the time and place of the hearing. Respondent may file with the Board a written response to the complaint within 20 days of service.
24 _Del.C._ § 1734(a) states in relevant part:
(a) _Procedure_--After the Board accepts a formal complaint which has been prepared by a Board-appointed investigative committee, the Board shall appoint a hearing panel, composed of 3 members of the Board, who shall hear all evidence concerning charges of unprofessional conduct or inability to practice medicine alleged in the complaint. Such evidence shall be taken upon sworn testimony ... After all evidence has been heard by the hearing panel, it shall make a written statement of its findings of fact and conclusions of law ... If the hearing panel finds that any or all of the factual allegations made in the complaint are supported by the evidence it has considered, the Board, excluding members of the hearing panel and any investigative committee members, will consider the statement of the findings of fact and conclusions of law ... at a formal hearing. At such a formal hearing, the Board shall meet to make its own conclusions of law and to determine what disciplinary action, if any, is appropriate based upon the findings of fact made by the hearing panel.

**\*4** The undisputed facts indicate the Board followed the administrative procedures specified in sections 1733 and 1734 of the Act. Appellant was notified at least 30 days prior to the hearing before the Hearing Panel. The record indicates appellant received a copy of the formal complaint delineating the specific pending charges against him. At the hearing before the Hearing Panel, held on October 18 and 25, appellant was given the opportunity to present his case and introduce evidence on his behalf, which he did through witness testimony. Appellant was also notified in advance of the Board's intention to hold a hearing to determine whether it would accept the findings and conclusions of the Hearing Panel. It appears from the record in this case that appellant was given adequate notice of the charges pending and a meaningful opportunity to be heard on the merits of the case.

(8) Appellant's assertion that the defense of laches

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                     Page 4
1993 WL 54587 (Del.Super.)
**(Cite as: 1993 WL 54587 (Del.Super.))**

should apply to bar the action because the Board's delay in bringing the action substantially impaired his ability to defend himself is also without merit. Contrary to appellant's allegations, the record indicates appellant was able to and did present evidence to support his claims. The record indicates witnesses testified on appellant's behalf as to the medical treatment given to his patients in 1986. In addition, despite appellant's assertion that the Board's delay caused notes made in 1986 to be missing from individual medical charts [FN3] and resulted in his inability to recollect the medical procedures performed on patients, he testified in detail with regard to the condition of six individual patients, the reasons why certain tests were performed on each patient, and why such tests were performed on a certain date. [FN4] Appellant has not shown that he was actually and substantially prejudiced by the Board's delay in bringing the action.

> FN3. Appellant contends that certain additional notes he made during treatment of patients in question were missing after the notes were copied by the Board for appellant.

> FN4. Each of the 22 counts in the complaint represents an individual patient. However, the Investigative Committee only presented evidence regarding seven of the patients listed in the complaint at the hearing. The Hearing Panel only considered those seven patients. In addition, the Investigative Committee dropped its allegations regarding one patient out of the seven considered when it failed to produce certain records in that patient's file. *In Re: Barry M. Kotler, M.D.,* Opinion and Order of the Hearing Panel of the Board of Medical Practice, p. 4, p. 41 (March 24, 1991).

(9) Appellant contends the Board's failure to provide appellant with pre-hearing discovery also violates his due process rights. Pursuant to *29 Del.C. § 10125(b)* and 24 *Del.C.* § (a)(11), the Board is empowered to cause certain types of discovery to be taken. While pre-hearing discovery is available in proceedings before the Board, appellant is incorrect in his assumption that he has an absolute due process right to engage in such discovery as a matter of course. Rather, the Board is empowered to authorize it "as needed." *29 Del.C. § 10125(b).* The phrase "as needed" clearly indicates the Board has the discretion to determine when pre-hearing discovery is necessary. In the absence of a Board rule allowing

discovery as a matter of course, appellant must first request the Board to authorize such discovery. The record shows appellant did not make such a request before the Board in this case. Because appellant served interrogatories and noticed depositions without authorization, no response was obligatory. In any event, it appears that all documentary evidence upon which Dr. Kotler was found to merit discipline was informally provided to him months before the hearing. Finally, appellant's introduction of testimonial evidence at the hearing which refuted the testimony of Dr. Allen and Dr. Buckler shows that the absence of formal discovery did not prejudice appellant.

*5 (10) Appellant also advances a due process claim on the grounds the Board was unable to render an impartial decision due to the dual role of the Board's attorney, Assistant State Solicitor Cobin, as investigator and adjudicator. Specifically, appellant asserts Mr. Cobin's subpoena of billing records from Blue Cross/Blue Shield, authorship of the Board's Opinion and Order in this case, and attendance at the Board's hearing on March 3, 1992 created an unconstitutional risk of bias throughout the proceedings in the case. I disagree.

While the due process requirements of a fair trial before an unbiased tribunal apply to administrative agencies as well as to courts, the Delaware Supreme Court has recognized that "the commingling of such roles is often implicit in the practical functioning of administrative agencies which perform both investigative and fact-finding functions" and that such does not necessarily violate due process. *Blinder, Robinson & Co., Inc. Bruton,* Del.Supr., 552 A.2d 466, 472 (1989). In *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), after investigating appellee Larkin, a licensed physician, the Wisconsin Medical Examining Board conducted its own "contested hearing" in which it temporarily suspended appellee's license to practice medicine pursuant to a determination that appellee engaged in specific criminal conduct proscribed by state statute. The United States Supreme Court held that, in order to succeed in his due process claim, appellee must overcome a presumption of honesty and integrity in those serving as adjudicators by showing a risk of actual bias exists so as to deprive appellee of his right to due process. *Id.* at 724; *Blinder, Robinson & Co., Inc. Bouton,* 552 A.2d at 473. The Court concluded actual bias may be shown where the adjudicator "has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." *Withrow v. Larkin,* 43

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 5
1993 WL 54587 (Del.Super.)
**(Cite as: 1993 WL 54587 (Del.Super.))**

L.Ed.2d at 723.

Appellant has failed to persuade this Court that Mr. Cobin's issuance of a subpoena to Blue Cross, coupled with his legal representation of the Hearing Panel, denied appellant his right to due process by creating a risk of actual bias throughout the proceedings. Appellant fails to point to any specific evidence which would infer that Mr. Cobin's issuance of a subpoena was anything more than a ministerial act in response to a request by the Investigating Committee or which would suggest that Mr. Cobin, on his own volition, initiated the investigation himself by issuing a subpoena to Blue Cross. [FN5] In addition, there is no evidence to suggest that Mr. Cobin had a pecuniary interest in the outcome of the case or that he acted in retaliation to any personal abuse or criticism by the appellant. In addition, the Hearing Panel's decision not to follow the disciplinary actions recommended by the Investigating Committee, with the exception of the public reprimand, infers non-bias on the part of Mr. Cobin, since he represents the Hearing Panel.

> FN5. The power to subpoena in this case belongs to the Investigating Committee pursuant to 24 Del.C. § 1730(a)(7), which states in pertinent part:
> (a) The Board shall have the following powers and duties in addition to the other powers and duties set forth in this chapter.
> (7) To administer oaths and to compel the attendance of witnesses and the production of documents by the filing of a praecipe for a subpoena with the Prothonotary of any county of this State, said subpoena to be effective throughout the entire State, service of such subpoena to be made by any sheriff of this State. Failure to obey a subpoena shall be punishable according to the Rules of the Superior Court.

*6 Appellant's argument that Mr. Cobin's presence during the Board's hearing on March 3, 1992 created an unconstitutional bias against appellant is tenuous at best. The Court is not persuaded that appellant suffered actual bias in the proceedings from Mr. Cobin's presence before the Hearing Panel and before the Board. Other than appellant's unsupported allegation that "Mr. Cobin had had contact with the investigating members and with Blue Cross back in 1986, [and] ... helped to guide and focus the inquiries," appellant fails to present specific evidence which would indicate any collusion between the Board and Mr. Cobin or any active participation by

Mr. Cobin during the hearing. Id. at 473; Crocco v. Board of Medical Practice, Del.Super., C.A. No. 90A-FE-6, Barron, J. (July 13, 1990).

Further, the argument that Mr. Cobin may have drafted the Opinion and Order of the Hearing Panel is not sufficient to overcome the strong presumption of honesty and integrity of Mr. Cobin or the Hearing Panel in the absence of specific evidence showing actual bias. It was the Hearing Panel's ultimate decision to determine the culpability of appellant and the appropriate penalty to be assessed and to sign the Opinion confirming such determination. Appellant fails to produce specific evidence indicating that Mr. Cobin's authorship actually biased the Hearing Panel's decision in finding appellant in violation of 24 Del.C. § 1731(b)(3). Therefore, the Court finds appellant was not deprived of due process.

(11) Finally, the Court finds appellant's contention that the Board's decision was unconstitutional because it represented a personal vendetta by Drs. Allen and Buckler and Dr. Sandra Foote to be meritless. Appellant alleges Dr. Foote complained to Dr. Buckler in retaliation for appellant's allegation that she stole patients who had been referred to her by appellant. Other than appellant's personal beliefs as to Dr. Foote's intentions, appellant cannot point to specific evidence which suggests that the Board's decision was the result of a personal vendetta by Drs. Foote, Allen, and Buckler to ruin appellant's reputation and integrity.

NOW, THEREFORE, IT IS ORDERED that the decision of the Board of Medical Practice is AFFIRMED.

1993 WL 54587 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2005, the foregoing **Compendium of Unreported Cases for the Individual Defendants' Reply Brief in Support of Their Motion to Dismiss or to Stay the Proceedings** was filed electronically with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Abbott, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Dennis J. Siebold, Esquire
New Castle County Law Department
New Castle Corporate Commons
87 Reads Way
New Castle, DE 19720

Matthew F. Boyer