## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FRANK E. ACIERNO, CHRISTIANA )
TOWN CENTER, LLC, a Delaware limited )
liability company, 395 ASSOCIATES, LLC, )
a Delaware limited liability company, )
ESTATE HOMES, INC., )
a Delaware corporation, )
)
      Plaintiffs, )
)
        v. )      C.A. No.  04-1376
)
GEORGE O. HAGGERTY, individually and )
in his official capacity as Assistant General )
Manager of the New Castle County Department )
of Land Use, SCOTT G. WILCOX, )
individually and in his official capacity as a )
First Assistant County Attorney, TIMOTHY P. )
MULLANEY, individually and in his )
capacity as New Castle County Attorney, )
CHARLES L. BAKER, individually and in his )
capacity as General Manager of the New Castle )
County Department of Land Use, JAMES H. )
EDWARDS individually and in his capacity as )
Inspections Manager and Licensing Division )
Manager of the New Castle County Department )
of Land Use, and SHERRY L. FREEBERY, )
in her individual capacity as Chief Administrative )
Officer of New Castle County, and )
NEW CASTLE COUNTY, a political subdivision )
of the State of Delaware, )
)
      Defendants. )

## COMPENDIUM OF UNREPORTED CASES FOR THE INDIVIDUAL DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS OR TO STAY THE PROCEEDINGS

Vol 6 (Tabs 14 & 15)

14

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

| | | |
|---|---|---|
| ELLEN B. LYNCH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No.  2266-S |
| | ) | |
| THE CITY OF REHOBOTH | ) | |
| BEACH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Master's Report

Date Submitted:  October 8, 2004
Draft Report:  February 15, 2005
Final Report:  April 21, 2005
(Cross motions for summary judgment)

George F. Gardner, III, Esquire, Parkowski, Guerke & Swayze, P.A., Dover, Delaware;
Attorney for Plaintiffs.

Collins J Seitz, Jr., Esquire, M. Edward Danberg, Esquire and Max B. Walton, Esquire,
Connolly, Bove, Lodge & Hutz, LLP, Wilmington, Delaware; Walter W. Speakman, Jr.,
Esquire, Brown, Shiels, Beauregard & Chasanov, Dover, Delaware; Attorneys for City of
Rehoboth Beach Defendants.

John A. Sergovic, Jr., Esquire, Sergovic, Ellis & Shirey, P.A., Georgetown, Delaware;
Attorney for Defendants Meta M. West and Anna M. Salmons.

GLASSCOCK, Master

The plaintiffs are the owners of five contiguous lots (the "Property") on or near Columbia Avenue in the City of Rehoboth.[1]  On February 18, 2003, the city rezoned this property (as well as several contiguous lots owned by non-plaintiff parties) from C-3, a commercial designation, to R-2, a residential designation.  On property designated C-3, certain commercial activity is permitted in addition to *all* residential activities permitted on property zoned R-2.  The plaintiffs claim that this rezoning is illegal or unconstitutional for a variety of reasons, and seek to enjoin its enforcement.  The matter is currently before me on cross-motions for summary judgment.  Summary judgment is appropriate here, because the appeal of zoning decisions from a city Board of Commissioners is decided upon the record developed before the Commissioners.  For the reasons stated below, the plaintiffs' motion for summary judgment must be denied and the motion for summary judgment of the City of Rehoboth (the "City") must be granted.

On December 2, 2002, the defendant Commissioners of the City (the "Commissioners") passed a resolution calling for a public hearing to consider rezoning the property and other parcels of real estate located on or near Columbia Avenue in Rehoboth. The property had been acquired by the parents or grandparents of the current plaintiffs before the second World War.  The other five lots affected are next to the plaintiffs' lots, near the "Pines" section of Rehoboth.

---

[1]The lots are located at 141, 143 and 145 Columbia Avenue and 1and 2 Grove Street.

2

At the time the resolution was passed, the proper zoning for the lots in question had recently been subject to the consideration of the City Planning Commission. The Planning Commission is an advisory board which makes recommendations to the Commissioners. *See* 22 Del. C. §702. Throughout 2002, Rehoboth was under a comprehensive development plan enacted in 1996, which provided that the city should examine whether development was occurring in conformity with current zoning and consider appropriate zoning changes. As required by statute,[2] the city in 2002 was considering a new comprehensive development plan (the "New Comprehensive Plan"). The proposed New Comprehensive Plan called for (among many other proposals) the rezoning, from commercial to residential, of the ten lots at issue here. A two-day public hearing was held by the Planning Commission on November 14 and 16, 2002 concerning the New Comprehensive Plan. All property owners in the city, including the plaintiffs, had been given notice of this public hearing. Several of the plaintiffs appeared at the public hearing and voiced opposition to the New Comprehensive Plan.[3] Testimony before the Commission was limited to three minutes per person. At the conclusion of the hearing, the Planning Commission recommended that the Commissioners adopt the New Comprehensive Plan (which described the rezoning of the plaintiffs' and other lots along Columbia Ave as the "most pressing current land use issue" facing the City.)

---

[2] 22 Del. C. §702.

[3] One of the plaintiffs, Ellen Lynch, also provided a written comment to the Planning Commission in opposition to the New Comprehensive Plan.

Subsequently, on December 2, 2002, the Commissioners entered the resolution described above, calling for a public hearing on the rezoning along Columbia Avenue[4].

On January 13, 2003, at a scheduled Planning Commission meeting, the Planning Commission "reaffirmed" its support for the rezoning of the Columbia Avenue lots, including the plaintiffs' lots. The January 13th meeting was not a public hearing, and the plaintiffs were neither given notice of it nor appeared. On January 18, 2003, the Commissioners held the public hearing on rezoning the property called for in the December 2nd resolution. The Commissioners received a statement from a representative of the Planning Commission, communicating the Commission's "reaffirmation" of its recommendation for rezoning the property and adjacent lots, as called for in the proposed New Comprehensive Plan. The commission also heard from numerous members of the public in support of the rezoning.

The plaintiffs, who were represented by counsel, appeared at the hearing and presented evidence and argument in opposition to the rezoning. They also presented the expert testimony of Mr. Pusey, a traffic engineer, in opposition to the Planning Commission's finding that a rezoning would help alleviate traffic problems. The majority of those speaking at the hearing, however, were members of the public in favor of the

---

[4]Counsel for both sides agree that plaintiffs were angered by the rezoning proposed in the New Comprehensive Plan, and that this anger, in part, was the motivation for the removal of a number of mature pine trees from their property on the edge of the "Pines" section of Rehoboth Beach, a residential area north of Rehoboth Avenue characterized by a canopy of large pines. According to counsel, this "concerned" the Commissioners and led to the accelerated consideration of the rezoning at issue, before any consideration of the New Comprehensive Plan as a whole.

4

rezoning. The January 18th hearing lasted seven hours and adjourned without a decision by the Commissioners.

On February 18, 2003, the Commissioners met again and considered the rezoning. The Commissioners determined that, because the plaintiffs had filed a protest against the rezoning under 22 Del. C. §305, the Commissioners were permitted to rezone only upon a three-fourths favorable vote. The Commissioners then voted six to one in favor of the rezoning.[5] This litigation ensued.

During the pendency of this action, on August 8, 2004, the Commissioners considered the New Comprehensive Plan in its entirety. The plan was adopted and approved by the state, and now has the force of law.[6] *See* 22 Del. C. §702(d).

*The Defendants' summary judgement motion and the burden of proof before the Court.*

The Defendants ask that I enter summary judgement, upholding the rezoning. As I must, I start with the presumption that the zoning legislation at issue here is valid. *E.g,* Willdel Realty, Inc. v. New Castle County, Del. Supr., 281 A.2d 612, 614 (1971); Tate v.

_____

[5]The rezoning ordinance provides that certain non-conforming uses of the property (such as the rental of sites for trailer homes) are "grandfathered" and are not prohibited by the rezoning.

[6]The comprehensive development plan adopted on August 8, 2004 commits the town to the rezoning at issue here. This would appear to make a victory here for the plaintiffs, for practical purposes, illusory. However, as plaintiffs point out, additional steps would be required on the part of the City to implement the rezoning called for in the now-adopted comprehensive development plan, and thus the issues here are not, technically, moot.

Miles, Del. Supr., 503 A.2d 187, 191 (1986). This presumption is rebuttable, but only on a showing that the actions of the defendant Commissioners were clearly arbitrary or capricious in that the resulting legislation is not rationally related to the health, safety or welfare of the residents of the City. Id. The zoning change was adopted pursuant to a motion made by Commissioner Sargent. That motion cited the fact that the neighborhood effected by the zoning is residential in character and that commercial development would worsen the congested nature of the area. Seven hours of debate and testimony followed. Numerous witnesses testified, including an expert testifying on behalf of the plaintiffs as well as the plaintiffs themselves and numerous witnesses in favor of the zoning change. Before the vote, in light of the testimony, Commissioner Sargent amended the motion to include proposed findings that the zoning would have a beneficial impact on the health, safety and welfare of the City; that the rezoning would moderate traffic congestion and that the then-currently-permitted commercial development would increase traffic; that the then-permitted zoning would allow for higher density development than would the proposed residential designation; that the character of the area concerned was residential; that commercial development of the area would impede distribution of light and air; that commercial development would have a negative impact on parking; that commercial development would negatively impact adjacent residential areas; and that the proposed rezoning conformed to the 1996 comprehensive plan. This motion with its factual recitation is consistent with a proper purpose for rezoning legislation. Therefore (assuming that the legislation was adopted by the

6

proper majority of the Commissioners and otherwise comports with due process) the zoning change is valid if supported by the record.

I find that there is substantial evidence to support the rationale of the motion as adopted by the commission. Numerous witnesses testified that the area covered by the rezoning change was residential in nature and that commercial development would be harmful to that residential area. Based on the record, the Commissioners were entitled to find that the increased density of use permitted by the commercial designation, if the property were so developed, would result in more congested traffic and parking and reduced light and air and would be detrimental to the residential character of the community and to the health, safety and welfare of the community as a whole.[7] *See* Willdel, 281 A.2d at 615. That is not to say that there was not evidence to the contrary presented. The plaintiffs' traffic expert, Mr. Pusey, testified that some uses of the property permitted as commercial development would not have a negative effect on the neighborhood.[8] Plaintiffs at the hearing pointed out that their property was near a *de facto* boundary between residential and commercial development, that properties on the other side of Columbia Avenue had been rezoned in recent years *from* residential *to* commercial, and hotly contended that their area should be

_____

[7]The 1996 comprehensive development lan, while not specifically calling for rezoning of the property, did provide that "...commercial areas that are zoned but not developed, and commercial areas developed as residential" should be "examined for rezoning." Having found that the property was located in a residential area, the Commissioners could rationally find the rezoning to be in conformity with the 1996 comprehensive plan as well.

[8] Mr. Pusey, however, agreed that some uses permitted under the commercial designation would in fact be detrimental.

7

more properly characterized as commercial, rather than residential. Having found that substantial evidence exists to support the actions of the Commissioners, however, I may not substitute my judgment for that of the Commissioners in pursuit of their legislative duties.

*The Plaintiffs' Contentions*

       *A. Due Process*

       The plaintiffs contend that their procedural due process rights were infringed because they were permitted only three minutes of argument against the New Comprehensive Plan when it was considered by the Planning Commission, and were not given notice of the proposed "reaffirmation" of that plan by the Planning Commission at its closed meeting of January 13, 2003. As a result, they argue, the rezoning is an unconstitutional nullity. Plaintiffs concede that there was no statutory requirement for the Planning Commission to consider the rezoning and that the Commission's recommendations are precatory. However, they contend that because the Planning Commission did meet, and because the Commissioners and those testifying before them relied in part on the Planning Commission, due process required that they be given an opportunity for a more fulsome presentation before the Planning Committee.

      Due process requires notice and an opportunity to be heard before a decision affecting property rights like the rezoning here at issue. *E.g.* The Citizens' Coalition, Inc. v. Sussex, Del. Ch., 773 A.2d 1018, 1023 (2000). There is no question that the plaintiffs had notice to

appear at the January 18th public hearing and that they could and did present arguments, at length, against adoption of the rezoning ordinance. In fact, the plaintiffs were represented by counsel at that hearing and presented expert testimony as well. The plaintiffs argue, however, that the brief opportunity they were presented to oppose the recommendation by the Planning Committee of the adoption of the New Comprehensive Plan, and their complete lack of notice with regard to the "reaffirmation" of that portion of the plan concerning the zoning ordinance at issue, is a denial of due process. They argue that a more extensive presentation before the Planning Committee might have resulted in its recommendation being favorable to the plaintiffs.

The problem with this argument, as I see it, is that the plaintiffs could, and did, make this argument directly to the decision-making body, the Commissioners themselves. That is, the plaintiffs had an opportunity both to explain to the decision-makers why rezoning was not in the interests of the city, *and* to explain why they felt that the Planning Committee's recommendation was unreliable or inadequate. Because the plaintiffs had a full opportunity to present all these arguments to the ultimate decision-maker, their due process rights were not offended and due process does not serve as a ground for reversal of the decision of the Commissioners. *See* Citizens for Smyrna-Clayton First v. Smyrna, Del. Ch., No. 1545-K, Glasscock, M. (Dec. 24, 2002)(Master's Report) at 8 (finding that petitioners cannot demonstrate harm resulting from allegedly wrongful actions of Planning and Zoning Commission of Town, where recommendation of that body does not bind the Town Council).

*B. The "Burden of Proof" at the hearing.*

9

During the discussion of the rezoning at the February 18th meeting of the Commissioners, Commissioner Derrickson stated that the burden was on the city to demonstrate the necessity for the rezoning:

"The rezoning of the property to me is an uphill. The person asking for the rezoning has the burden, to me."

The City Solicitor, Mr. Speakman, said the following in response:

> In rezoning law, the legislative body is presumed to be valid unless it is clearly shown the rezoning was not reasonably related to the public health and welfare. And so the burden is on those protesting the rezoning to show that the Commissioners' *decision* was arbitrary and capricious. So legally the burden is on— *I understand you may be meaning something else, but I wanted to just—it gave me an opening and I wanted to make sure I said that.* (Emphasis added).

This statement by the city solicitor was an accurate statement of the law with respect to a review by the Court of the actions of the Commissioners. *E.g.* Willdel, 281 A.2d at 614. Plaintiffs point out, however, that at the time it was made no action by the Commissioners had yet been taken so that the presumption of validity had nothing to which to attach at that point. Plaintiffs argue that, in light of that fact, the solicitor's statement was either inaccurate or, at best, misleading. They argue that the city bore the burden of proof that a rezoning was in the interest of the citizens of Rehoboth. Plaintiffs allege that it is likely that the Commissioners were misled into thinking that the landowners had the burden of showing that rezoning should not take place, and that plaintiffs are, therefore, entitled to a new hearing.

10

The Commissioners acting in their legislative capacity are bound by no "burden of proof," as such, in considering a rezoning. The burden on the Commissioners is to determine whether a proposed rezoning is in the interests of the health, safety of welfare of the residents and property owners of the city; that is, to act in conformity with due process. *See* Shelburne, Inc. v. Roberts, Del. Ch., 244 A.2d 250, 253 (1966). The solicitor's statement was a correct statement of the burden in a *challenge* to such a determination, but was inapplicable to the Commissioners themselves. The statement, in context, may have been confusing. However, since I find, *infra* that the Commissioners determined that a rezoning was in the interest of the city, and in so doing did not act capriciously or arbitrarily, there is simply nothing in the record which indicates that an erroneous understanding of the "burden" can have effected the outcome here.

### C. The Participation of Commissioner Sargent

The plaintiffs argue that Commissioner Sargent demonstrated his animus towards them and his bias in favor of the rezoning by his comments at the hearing on January 18th. I have reviewed carefully the statements of Mr. Sargent, which the plaintiffs have quoted at length in their briefs.

It is clear from his comments that Sargent developed a view of the evidence which favored the rezoning. His remarks at some point appeared to be somewhat hectoring and sarcastic. However, a legislator is entitled to have a view of the evidence and to express that view. There is nothing in the behavior of Commissioner Sargent that demonstrates that he

held a personal animus towards the plaintiffs, had a financial interest in the outcome or was otherwise unable to act in the public interest in his role as a Commissioner.

### D. The Rationale for the Commissioners' Vote in Favor of Rezoning

The plaintiffs argue that, although reasons exist on the record to support the rezoning decision, the Commissioners failed to adequately state the basis on which they made their votes, rendering this Court unable to determine whether those votes were capricious or arbitrary. "Zoning is a legislative action presumed to be valid unless clearly shown to be arbitrary and capricious because not rationally related to public health, safety of welfare." Willdel, 281 A.2d at 614. Nevertheless, the courts of this state have long expressed concern that local zoning authorities state with some particularity their rationale. Without a statement of rationale, this court is unable to fulfill its role to ensure that zoning decisions not be arbitrary or capricious. *E.g.* Tate, 503 A.2d at 191.

Here, Commissioner Sargent made a motion that the Commissioners adopt the rezone based on findings that: the rezoning would have a beneficial impact on the health, safety and welfare of the City; would moderate traffic and parking congestion; would prevent high-density development and preserve the residential characteristics of the area; would prevent impedance of the distribution of light and air; and that commercial development of the parcels in question would have a negative effect on adjoining residential areas and that rezoning conformed to the then-effective 1996 comprehensive plan. These findings were explicitly made a part of the motion which received six out of seven positive votes.

12

The plaintiffs argue that in describing their rationale for voting in favor of the zoning change, two of the Commissioners gave inadequate explanations of their motives.[9] I need not examine the adequacy of these Commissioners' statements, however, because in voting for the motion to amend the zoning code, the Commissioners were necessarily voting for the findings of fact stated in that motion. Since those findings of fact reflected record evidence that related rationally to the zoning change, a vote in favor of the motion is adequately supported to pass muster on judicial review.

The plaintiffs point out that Mr. Sargent's motion was made orally and was hardly a model of clarity, and that the inclusion of the proposed findings in the motion came at the prompting of the City solicitor.[10]     They note that the solicitor also

---

[9] Commissioner Aguirre stated that he thought that the area around the property should "convey more . . .residential character" at the time he cast his vote; Commissioner McGuiness simply said she "agreed" with Commissioners Sargent and Kane.

[10]     The pertinent section of the record is as follows:
Commissioner Sargent:  My motion, I thought, included the fact that this will have a positive impact on the health, safety, and welfare of the community, due to several reasons: One is lessening congestion due to traffic issues; another is density, due to the fact that C-3 would allow for much higher density than R-2; another is for the character of the neighborhood, in maintaining the character of the neighborhood; and another one was for open space, and for light and air, because the size building that would be allowed in C-3 would impede that.  I mean I think I covered all those, or that would be my rationale to vote for it.
Walter, is there anything else that you think I should include, based on the conversations that we've had?
Mr. Speakman: Well, I think you need to -- how is it going to impact the traffic?  I think you need to state --
Commissioner Sargent:  Well, I think as I said in what -- I quoted Mr. Pusey when he said that the traffic planner that was hired by the protesting property owners, he suggested that he would not allow a restaurant because parking would be -- or other retail establishment that did not allow parking because parking would be a real nightmare up there.
Clearly when we talk about a hotel that builds 83 rooms, that the size of that -- well, first of all, the 83 rooms in and of itself will have an incredible negative impact on the density of the

13

neighborhood.

I think that the size of any building that could encompass 83 rooms, and we've seen other buildings around town build in C-3 areas that were massive, even in what is predominantly commercial areas, that this would have -- that the potential size of a building that would be built on those 5 units -- or five properties would have a negative impact on the movement of air or light throughout the area.

Mr. Speakman: Well, would it increase traffic? Is that --

Commissioner Sargent: Well, I think absolutely; if you develop that commercially you would increase traffic. I mean that was the point that Mr. Pusey made when he looked at that situation and looked at it from a traffic standpoint, he testified that it would have a negative impact, a very negative; such a negative impact that he said he would not allow it.

Mr. Speakman: And that has nothing to do with the proposed round-about? I mean that was his major --

Commissioner Sargent: No. Anybody who has been here when I've talked about the round-about knows that I haven't given up on that one.

Mr. Speakman: Well, for instance, are all the lots immediately adjacent to the property zoned R-2?

Commissioner Sargent: Well, yeah, and I probably should elaborate on that. The reason that this would have, I believe, a negative impact in other areas is exactly that: The surrounding areas, the character of the neighborhood. The adjacent properties in the back are all zoned residential.

The properties to the next -- next door to the five properties that are -- or the five lots that were protested are, even though they're zoned resident, have requested -- I mean they're zoned commercial, some of them have requested to be changed, and most of them are used with the residential impact even if they're not using residential; four of the five of those are residential structures, one of them is used commercially, but they would be very negatively impacted by a large commercial development next door, even though that type of development may be appropriate in other areas of town.

Mr. Speakman:  Are you referring to the properties that are in the rezoning or --

Commissioner Sargent: Yes.

Mr. Speakman: All right.  And what about --

Commissioner Sargent: And also the properties that are directly behind it, which are residential, they also would be negatively impacted by this.

Mr. Speakman: What about the present Burton use?

Commissioner Sargent: Well I think that one of the things I said in my motion was that zoning should reflect the neighborhood. And I think the testimony that we heard in the public hearing was very clear, that the only commercial use that that property's being used for is the rental of land. It is my understanding that although we do not allow somebody to place a trailer on the property, that if in fact somebody wanted to rent their residential land for somebody else to build a building on, that that is a legal use in a residential area.

So according to the testimony and the records that we saw in the public hearing, the Burton property is not currently being used for use that would be not allowed in the R-2 zone.

14

So what would have to be grandfathered in that property if we change this zoning is exactly what's grandfathered in this property right now, which is the allowing of the trailers to be placed on the property.

But in fact whereas we may have to include one other property that has a commercial use on it in grandfathering, I don't believe there's anything that would -- that's happening on the Burton property that would be included in grandfathering, and that's based on the testimony and the records that we got from the building inspector as far as which taxes have been paid over the past several years.

Mr. Speakman: I think -- I apologize, I don't remember, it seemed like a long time ago.
Commissioner Sargent: That's all right.

Mr. Speakman: Did you mention whether it was in -- the rezoning could be in conformance with the present comprehensive plan?

Commissioner Sargent: I touched on that, and it would. And one of the things that people had talked about was the history of how long that property had been zoned commercially.

But I'd like to point out that the planning commission, in our long-range plan which is currently in force and was adopted by the Commissioners I believe in 1996, says all vacant -- and this is on page 32, when talking about future land use action, says "all vacant or transitional large properties should be reviewed for appropriate zoning. Residential areas that are partially commercialized, commercial areas that are zoned but not developed, and commercial areas developed as residential should be examined for rezoning." I believe that this property fits in that.

The proposed comprehensive development plan, which although it has not been passed by the Commissioners, has been considered and brought to a public hearing by the planning commission says, quote, "the most press --" and this is on page 34, "the most pressing current land use issue is the commercial zoning of several residential properties in the northwestern section of the town along Columbia Avenue and Sussex Street. The character of these areas is now small-scale cottage-style residential, and encapsulates an older and quieter Rehoboth Beach." And they go on to specifically list the north side of Columbia Avenue between Grove Street and Felon Street will be rezoned from C-3 to R-2.

After the Commissioners advertised this, the public hearing in this rezoning change, a motion was passed by the planning commission that touched on both the current long-range plan, the draft comprehensive development plan, and went on to say, "In its public hearings on the comprehensive development plan, the planning commission's basis for recommending rezoning were overwhelmingly supported. No issue received more comment in writing and in live testimony than the proposed rezoning of this block.

Over 100 persons submitted comments and over 90 percent of them supported the rezoning, and affirmed many of the public interest reasons for rezoning that were listed in Section 8.22 of the comprehensive development plan."

So I believe that the planning commission has addressed this issue specifically over the years, and I believe that what we're doing is consistent with our existing long-range plan, along with the proposed comprehensive development plan.

Mr. Speakman: Do you have anything else you want to add?

15

Commissioner Sargent:  Not unless you've got anything you want me to add.

Mr. Speakman:  I just want to bring up that you brought up a point that, for the record, that one of the arguments made was that the rezoning would be defeated on appeal because it was not brought first to the planning commission.

And I have found nothing in our code or Title 22, Chapter 3 or Chapter 7 that would require us to send this rezoning to the planning commission first for a hearing, public hearing, and recommendation; and you've already mentioned what we have done.

The only possible statute that requires, that I can see, is 22 Delaware Code 705, and that only talks about change of addition to official map where they're adding new public ways and enlarged parks, et cetera, which this is definitely not doing. so I don't find any provision that requires us to do that.

Yes, in the county law, in their Title 9 statute, is directly in their rezoning and zoning that they have to send, it's directly in their statute, that they have to do that.  But I found nothing that, any source, that would mandate the city to do that first.

Commissioner Sargent:  So, again, Walt, you're comfortable, without commenting on whether we should do this, you're comfortable that we have fulfilled our legal obligations in order to legally do this?

Mr. Speakman: Yeah, Whether you should do this is your decision, not mine.

Commissioner Sargent:  Okay.

Mayor Cooper:  Does that conclude the discussion?

Mr. Speakman: And is that all, what you've just stated, is that part of your motion now?

Commissioner Sargent: That is part of my motion and my commentary and my rationale, if Commissioner Shreeve will accept that as a second to my motion?

Commissioner Shreeve: Yes.

Commissioner Sargent:  Okay.

Mayor Cooper:  Are you ready for the question?  Commissioner Derrickson?

Commissioner Derrickson:  I'm sorry, no.

Mayor Cooper:  Commissioner Sargent?

Commissioner Sargent:  For the reasons that I state, yes.

Mayor Cooper:  Commissioner Kane?

Commissioner Kane:  For the reason that the character of the neighborhood is residential, and that residential is the most appropriate use of this land, yes.

Mayor Cooper:  Commissioner Aguirre?

Commissioner Aguirre:  For the reason that I'd like to see the front of our town convey more of the residential character for what our town is known for, I support the motion.

Mayor Cooper:  That's a yes?

Commissioner Aguirre:  Yes

Mayor Cooper:  Commissioner McGuiness?

Commissioner McGuiness:  I say yes, in agreement with Betty Ann and Rich.

Commissioner Shreeve:  I --

Mayor Cooper:  Commissioner Shreeve?

Commissioner Shreeve:  I'm sorry, I should have waited.  Appreciating that there have

16

instructed each commissioner to state his reasons for his vote on the record. The plaintiffs argue that, as a result, the explanation for his vote given by each Commissioner must stand on its own merit, without reference to the findings included in the motion. The purpose of examining the rationale for the votes of the Commissioners is to insure that their votes were not arbitrary or capricious. *See* Tate, 503 A.2d at 191. For this purpose, individual Commissioner's statements are sufficient, as are findings of fact adopted by the legislating body. *See* Blake v. Sussex County, Del. Ch., No. 1757, Steele, V.C. (July 15, 1997)(Mem. Op.) at 6. While a more formal and concise statement than that made by Mr. Sargent as part of his motion would indeed be preferable, I find that the proposed findings of the motion adopted by the Commissioners with their votes are sufficient to demonstrate a proper rationale for the adoption of the zoning change. In other words, after careful review of the transcript here I conclude that it was clear to the Commissioners that they were, in voting for

---

been substantial gains in value through the years to most lots in Rehoboth Beach and to the affected properties, and in light of overwhelming public concern for safety, with the possibility of 83 units which would bring in quite a few cars, with concern to congestion and undue concentration of population, diminishing light and air to neighboring properties, and in keeping the character of the district small residential structures, conserving the value of existing buildings, and continuing the most appropriate use of this property which is substantially residential, I vote for it.

     Mayor Cooper: That's a yes?

     Commissioner Shreeve: Yes.

     Mayor Cooper: I've, for all the reasons that Richard enumerated and Betty Ann, but to just elaborate a little bit. I mean I thought the public hearing was very instructive and I congratulate everybody that came out.

     And I think there's substantial evidence on the record that if these lots were developed, these 10 lots were developed commercial, it would do harm to the neighborhood and, for that reason, they should be rezoned to residential which is the -- is the character of that neighborhood. So I vote yes, and the motion carries. Thank you.

17

the motion, adopting the findings of fact stated by Commissioner Sargent, and that their vote was therefore rationally related to the public interest of the City of Rehoboth.

## CONCLUSION

This court's role, in a challenge to a rezoning, is to ensure that the appellant property owner received due process, and to determine whether the appellant property owners have demonstrated clearly that the actions of the Commissioners were arbitrary or capricious. I find that the plaintiffs did receive the notice and hearing required by due process; and that the rationale of the Commissioners was adequately explained and supported by sufficient evidence that it appears neither arbitrary nor capricious. Beyond such a determination, this court will not attempt to substitute its judgment for that of the Commissioners in pursuit of their duty. For that reason, the plaintiffs' motion for summary judgment on its request that the city be enjoined from enforcing the zoning regulation must be denied; and the defendants' motion for summary judgment must be granted.

/s/*Sam Glasscock, III*
Master in Chancery

efiled

18

15

Westlaw.

Not Reported in F.Supp.2d
2004 WL 603392 (E.D.Pa.)
(Cite as: 2004 WL 603392 (E.D.Pa.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

PERMA-VAULT SAFE COMPANY
v.
KEEP-IT-SAFE, INC., Discount Safe Co., Gary
Savrin, individually and t/a Savrin
Associates, and Ronald S. Johnson

No. Civ.A.02-7960.

March 25, 2004.

Norman Perlberger, Perlberger Law Associates, PC,
Ardmore, PA, for Plaintiff.

Eric C. Milby, Lundy Flitter Beldecos & Berger PC,
Narberth, PA, for Defendants.

*MEMORANDUM & ORDER*

SURRICK, J.

*1 Presently before us is Defendants' Keep-It-Safe,
Inc., Discount Safe Co., Gary Savrin, and Ronald
Johnson's Motion to Dismiss Count I Pursuant to
Fed.R.Civ.P. 12(b)(6) (Doc. No. 4). For the following
reasons, Defendants' motion will be granted.

1. Background

This action arises out of the alleged breach of a
non-compete agreement. On October 30, 2000, Plaintiff
Perma-Vault Safe Company and Dornisch Discount
Safe Co. ("Dornisch") purchased all of the assets of
their parent, Bonafide Factory Products, Inc.
("Bonafide") pursuant to an Asset Purchase Agreement
(the "Agreement"). (Compl.¶ 15.) At that time, Marvin

Sobel [FN1] and Irving Plaksen were the owners of
Bonafide. (*Id.* ¶ 9.) Defendant Gary Savrin, trading as
Savrin Associates, acted as the outside auditor and
accountant for Plaintiff and Dornisch. (*Id.* ¶¶ 6, 11.)
Savrin also acted as Sobel's personal accountant. (*Id.* ¶
12.) Defendant Ronald S. Johnson was the general
manager of the Plaintiff and Dornisch. (*Id.* ¶ 10.)
Plaintiff alleges that Johnson and Savrin were uniquely
situated to secure inside corporate information,
including Plaintiff's products, existing and prospective
customer lists, vendors, distributors, banking
relationships, inventory, computer security codes and
data banks, product specifications, copyright, patent
and trademark materials, advertising and sales
materials, technical and bid specifications, cost of
manufacturing and sales, pricing information, business
strategies and processes, internal corporate and
accounting books and records, all of which where
privileged, secret, and confidential. (*Id.* ¶ 13.)

FN1. Sobel was named as a defendant in this
lawsuit but settled with Plaintiff on May 30,
2003. (Doc. No. 13.)

In connection with the Agreement, Sobel executed a
non-compete agreement and a consulting agreement
with Plaintiff. (*Id.* ¶ 15 .) In the non-compete
agreement, Sobel agreed, among other things, for a
period of three years (1) not to engage or compete with
Plaintiff anywhere in the United States; (2) not to have
any interest in any business (except a stock ownership
not to exceed one percent of a publicly-traded
company) that competes with Plaintiff; (3) not to divert
or by aid of others do anything which would tend to
divert any trade or business away from Plaintiff; (4) not
to solicit, induce, or attempt to induce any employee or
independent contractor of Plaintiff to leave or terminate
his relationship so as to engage in a competitive
business; and (5) not to use or disclose any of Plaintiff's
confidential information. (*Id.* ¶ 16.)

Plaintiff alleges that Defendants conspired to compete
with it in violation of Sobel's non-compete agreement
and ultimately buy back the company at a distressed

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 603392 (E.D.Pa.)
(Cite as: 2004 WL 603392 (E.D.Pa.))

Page 2

price when it should find itself unable to maintain sales and profit projections. (*Id.* ¶¶ 14, 29, 36 .) For example, Plaintiff alleges before that while still acting as Plaintiff's accountant, Johnson incorporated Defendant Keep-It-Safe, Inc. ("Keep-It-Safe"). (*Id.* ¶ 18.) On October 30, 2000, Johnson stopped working for Perma-Vault and began working for Keep-It-Safe. (*Id.* ¶ 21.) Later, he joined Defendant Discount Safe Co., Inc. ("Discount"), a company incorporated by Savrin. (*Id.* ¶¶ 21-22.) Plaintiff alleges that both Keep-It-Safe and Discount are companies competing with Plaintiff. (*Id.* ¶ 23.)

*2 In February, 2001, Keep-It-Safe submitted a bid for supplying safes to Temple University, a job that was being bid upon by Plaintiff. Keep-It-Safe won the bid. (*Id.* ¶ 24.) Keep-It-Safe learned of this opportunity from an insider with Plaintiff. Plaintiff believes that Sobel and/or Johnson were instrumental in providing Keep-It-Safe with the sales lead, the details of Plaintiff's bid, and assistance in how to approach Temple representatives with a bid that would beat Plaintiff's bid. (*Id.* ¶ 25.) In March, 2001, Sobel approached employees of Plaintiff and solicited their help to undermine and destroy the company, telling them that they had a future with him in his retaking ownership and control of the company. (*Id.* ¶ 26.) Between June, 2001 and January, 2002, Sobel again met with employees of Plaintiff and encouraged them to stop working for Plaintiff and help Sobel compete with Plaintiff. (*Id.* ¶ 32.) Sobel indicated to one employee that the reason Plaintiff's sales were down thirty percent was because Sobel was secretly having business "siphoned off" and diverted elsewhere. (*Id.* ¶ 34.) Johnson also encouraged Plaintiff's employees to leave Plaintiff and compete with Plaintiff. (*Id.* ¶ 35.)

In the summer of 2001, Savrin disclosed to Gregg Feinberg (an attorney for Plaintiff) that Savrin had incorporated Keep-It-Safe "for the sole purpose of continuing to do business after the sale of Bonafide." (*Id.* ¶ 27.) Then, on August 8, 2001, Savrin wrote a letter indicating that he had information regarding "the acts and events of the executives concerning their behavior leading up to sale of the business." (*Id.* ¶ 28.) Based on Savrin's conversations with Feinberg, Plaintiff began investigating the connections of the individual

Defendants to Plaintiff's competitors. (*Id.* ¶ 30.)

In connection with the sale of Bonafide's assets, Sobel knowingly overstated and misstated certain inventory in order to obtain additional cash from Plaintiff. (*Id.* ¶ 38.) Also, Plaintiff acquired inventory in the asset purchase that it found unsaleable. Plaintiff engaged Sobel under the terms of his consulting agreement to attempt to sell that inventory. (*Id.* ¶ 37.) Sobel made no attempt to sell the inventory as part of his scheme to bankrupt Plaintiff and buy it back at a distressed price. (*Id.* ¶ 38.)

In mid-October, 2001, and thereafter, Defendants tapped into Plaintiff's website and downloaded files in an effort to build websites for Keep-It-Safe and Discount. Defendants intended these websites to be similar to Plaintiff's website so the public would confuse Keep-It-Safe and Discount with Plaintiff. (*Id.* ¶ 39.) Defendants also hacked into Plaintiff's e-mail, on or before October 11, 2001, causing Plaintiff's e-mail services to be inoperative. (*Id.* ¶¶ 41-42.)

On January 15, 2002, Sobel urged Plaintiff's managers not to attend the annual NRA show because it was too pricey and not worth it. (*Id.* ¶ 46.) On February 28, 2002, after Plaintiff discovered that Sobel was conspiring against it, Plaintiff fired Sobel. Plaintiff alleges that after Sobel was fired he used confidential information to help companies he controlled win bids from Plaintiff. (*Id.* ¶¶ 47-50.)

*3 Realizing that Sobel was conspiring against it, Plaintiff decided to attend the NRA show. There it discovered that Johnson and Keep-It-Safe were soliciting business using sales materials and products virtually identical to those belonging to Plaintiff. (*Id.* ¶ 52.) At the SHDA annual conference, Johnson and Sobel solicited a number of customers, many if not all of whom considered their communications to be with Plaintiff under its "new name," Keep-It-Safe. (*Id.* ¶ 54.) The sales brochures, pricing lists, and other materials distributed at the conference by Keep-It-Safe were identical in format, content, wording, and design to Plaintiff's brochures and sales materials. Plaintiff alleges that Defendants were trying to confuse the public into believing that they were still doing business with Plaintiff. (*Id.* ¶ 55.) On June 27 and September 12,

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 603392 (E.D.Pa.)
**(Cite as: 2004 WL 603392 (E.D.Pa.))**

2002, Plaintiff alleges that Johnson and Sobel tried to interfere with Plaintiff's relationships with its customers and take business from Plaintiff. (*Id.* ¶¶ 56-57.) Johnson and Sobel told Houdini, one of Plaintiff's customers, that it should "watch out" for Plaintiff and that it should do business with Keep-It-Safe. (*Id.* ¶ 56.)

Plaintiff filed a seven count Complaint alleging violations of two federal statutes--the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964, *et seq.,* and the Lanham Act, 15 U.S.C. § 1051, *et seq.*--and numerous state law claims. Presently before us is Defendants' Motion to Dismiss the RICO claim.

## II. Standard of Review

When considering a motion to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), this Court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under Rule 12(b)(6) ... is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988)). For this reason, district courts strongly disfavor Rule 12(b)(6) motions. *Melo-Sonics Corp. v. Cropp,* 342 F.2d 856 (3d Cir.1965); *Kuromiya v. United States,* 37 F.Supp.2d 717, 722 (E.D.Pa.1999). A court will only dismiss a complaint if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Nevertheless, a court need not credit a plaintiff's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

## III. Discussion

In Count I of the Complaint, Plaintiff alleges that Defendants' actions were a violation of the RICO Act.

Under RICO, "[a]ny person injured in his business or property by reason of a violation of [RICO] section 1962 may bring a civil action for treble damages." 18 U.S.C. § 1964(c). Plaintiff alleges that Defendants violated §§ 1962(b), (c), and (d), by competing with Plaintiff by illegal means. (Compl.¶ 69.) Section 1962 provides in relevant part:

**\*4** (b) It shall be unlawful for any person through a *pattern of racketeering activity* or through collection of an unlawful debt to acquire or maintain, directly, or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity* or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section.

18 U.S.C. §§ 1692(b), (c), and (d) (emphasis added). To assert a claim under any of these subsections of 1962, a plaintiff must show that defendants conducted the affairs of a RICO enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962. Section 1961(1) enumerates those predicate acts that may constitute "racketeering activity" for RICO purposes. *J. Plater-Zyberk v. Abraham,* Civ. A. No. 97-3322, 1998 WL 67545, at \*5 (E.D.Pa. Feb.17, 1998). Section 1961(5) defines a pattern of racketeering activity as "requir [ing] at least two acts of racketeering activity, one of which occurred after the effective date of the chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Defendants contend that Plaintiff has not sufficiently alleged a violation of § 1962 for two reasons. First, Defendants argue that Plaintiff has failed to sufficiently allege the necessary "predicate offense." *See* 18 U.S.C. §§ 1962(b) and (c). Second, Defendants argue that Plaintiff has failed to sufficiently allege the existence of a "pattern of racketeering activity."

### a. Predicate Act Requirement

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 603392 (E.D.Pa.)
(Cite as: 2004 WL 603392 (E.D.Pa.))

In determining the sufficiency of a RICO claim, the court must first look to the predicate acts of racketeering activity. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1411 (3d Cir.1991). In this case, Plaintiff alleges violations of the mail and wire fraud statutes. *See* 18 U.S.C. §§ 1341, 1343. [FN2] Mail and wire fraud are included in the list of predicate offenses. 18 U.S.C. § 1961(1). To prove a violation of the mail fraud statute, a plaintiff must show that the defendant employed the U.S. mails in furtherance of a scheme or artifice to defraud. *J. Plater-Zyberk,* 1998 WL 67545, at *6 (citing *Schmuck v. United States,* 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)); *see also Philadelphia Reserve Supply Co. v. Nowalk & Assocs., Inc.,* 864 F.Supp. 1456, 1470 (E.D.Pa.1994) (citing 18 U.S.C. §§ 1341, 1343) ("Both the mail and wire fraud statutes require proof of (1) the defendant devising or intending to devise (2) a scheme or artifice to defraud, (3) the use of the mails or wires for the purpose of executing or attempting to execute the scheme or artifice, and (4) knowledge by the defendant of that use."). The scheme to defraud in connection with these two statutes "must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr,* 926 F.2d at 1415 (quoting *United States v. Pearlstein,* 576 F.2d 531, 535 (3d Cir.1978)). In that way, the federal standard for mail fraud is very similar to the Pennsylvania common law definition of fraud in Pennsylvania. *See e.g. Delaware Trust Co. v. Lal,* No. Civ. A. 96- 4784, 1998 WL 833854, at *6 (E.D.Pa. Nov.30, 1998) ("Fraud consists of anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture.") (quoting *Moser v. DeSetta,* 527 Pa. 157, 589 A.2d 679, 682 (Pa.1991).

FN2. 18 U.S.C. § 1341 provides in relevant part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office

or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned for not more than 20 years, or both.
18 U.S.C. § 1343 provides in relevant part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

**\*5** Plaintiff contends that the fraud in this case is actionable under RICO because the Supreme Court has instructed that RICO is to be read broadly. It is without question that mail and wire fraud are predicate acts under RICO. However, the Third Circuit has recognized that the broad definition of these crimes may be problematic:
"RICO enumerates the offenses which constitute 'racketeering activity,' including crimes that have traditionally been associated with the transgressions of racketeers.... The statutory enumeration is ... expansive and goes on to include specific federal offenses which, although they may often be committed by those whom we would categorize as 'racketeers,' also fall into the category of common law or 'garden variety' fraud and which would, in the past, have been the subject of commercial litigation under state law.
*Tabas v. Tabas,* 47 F.3d 1280, 1290 (3d Cir.1995). Despite this potential problem, the Supreme Court has continued to recognize the broad nature of the statutory language. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497- 78 (1985) ("RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to be liberally construed to effectuate its remedial purposes.").

Defendants contend that Plaintiff has not adequately stated a claim for mail and wire fraud. Rather than

Not Reported in F.Supp.2d
2004 WL 603392 (E.D.Pa.)
(Cite as: 2004 WL 603392 (E.D.Pa.))

Page 5

alleging mail and wire fraud, Defendants argue that at best the Complaint only alleges a breach by Sobel of his agreement not to compete. Plaintiff does allege that Defendants undertook a scheme to compete with Plaintiff and make "Perma-Vault fail as a company and take it back at a depressed value." (Compl.¶ 45.) But nowhere does Plaintiff allege that Defendants fraudulently induced it to purchase the assets of Bonafide or that he reasonably relied on any such fraud. Instead, Plaintiff alleges that "Sobel is believed to be the master-mind and primary mover of this conspiracy and enterprise, Defendants Savrin and Johnson, and the Corporate Defendants, Keep-it-Safe and Discount Safe, have engaged, participated and acted in furtherance of this conspiracy and enterprise." (Id. ¶ 68.)

Plaintiff's allegations regarding the acts of Defendants in furtherance of this conspiracy are limited. Savrin is accused of incorporating Keep-it-Safe, (id. ¶ 18), and Discount, (ild.¶ 22). Johnson is accused of leaving Perma-Vault and joining Keep-it-Safe and then Discount. (Id. ¶ 21.) Keep-it-Safe is accused of using information obtained from an insider at Perma-Vault to compete and win a job from Temple University. (Id. ¶ 25.) All of the Defendants are accused of illegally interfering with and causing harm to Plaintiff's website and e-mail system. (Id. ¶ 39-42.)

While Plaintiff's allegations are sufficient to state claims for numerous common law tort claims, none of the allegations against Defendants include any claims that could amount to a finding of fraud. In Pennsylvania, the elements of common law fraud include a material misrepresentation of an existing fact, scienter, justifiable reliance, and damages. See *Booze v. Allstate Ins. Co.*, 750 A.2d 877, 880 (Pa.Super.Ct.2000). Merely characterizing immoral business conduct as "fraudulent" does not mean that Defendants are liable for fraud; the elements constituting fraud must be averred. See *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997) ("[E]ven under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice.").

*6 Plaintiff insists that the allegations of mail and wire fraud are premised on Sobel's actions. When Sobel sold

Bonafide and its assets to Plaintiff, Sobel signed an extensive non-compete agreement that circumscribed his ability to compete with Perma-Vault. (Compl. Ex. A .) Despite this agreement, Sobel continued to compete with Perma-Vault through companies incorporated by Savrin and entities operated by his children. (Id. ¶¶ 27, 31.) Sobel solicited Plaintiff's employees to terminate their employment and join a new company that would compete with Perma-Vault. (Id. ¶¶ 32, 33.) Sobel is also accused of intentionally injuring Perma-Vault while serving as a paid consultant. (Id. ¶¶ 51, 53, 55, 56, 57.) These allegations clearly illustrate how Sobel breached the covenant not to compete. But again, they do not address any of the necessary elements of common law fraud. [FN3] Nowhere does the Complaint allege how Defendants fraudulently induced Plaintiff to change his position, or that he reasonably relied on any such fraud. See *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 746-47 (3d Cir.1996) (holding that a RICO plaintiff could not recover if it had not relied upon any of the misrepresentations by the defendant).

FN3. Defendants argue that the common law "gist of the action" doctrine is relevant here. (Mot. to Dismiss Count 1 Pursuant to Fed.R.Civ.P. 12(b)(6) at 7.) "[T]he gist of the action test requires the court to determine from the complaint the essential nature of the claim alleged by distinguishing between contract and tort claims on the basis of the source of the duties allegedly breached; if the claim essentially alleges a breach of duties that flow from an agreement between the parties, the claim is contractual in nature, whereas if the duties allegedly breached were of a type imposed on members of society as a matter of social policy, the claim is essentially tort-based." *Caudill Seed and Warehouse Co., Inc. v. Prophet 21, Inc.*, 123 F.Supp.2d 826, 833 (E.D.Pa.2000). The allegations concerning Sobel seem to flow from a contractual duty, while the claims against the remaining Defendants are tort-based. Though the claims against these Defendants are indeed based on torts, none of the allegations against Defendants allege the tort of fraud.

Not Reported in F.Supp.2d
2004 WL 603392 (E.D.Pa.)
(Cite as: 2004 WL 603392 (E.D.Pa.))

Only one allegation can be construed as an allegation of fraud in the Complaint. Plaintiff alleges that Sobel "knowingly overstated and misstated inventory upon sale of [Bonafide] to obtain additional cash from the Plaintiff and, despite his being specifically assigned to sell the bad inventory subsequent to the sale, made no attempt to do so as part of his scheme to bankrupt [Perma-Vault] and get [Perma-Vault] back at a distressed price." (Id. ¶ 38.) However, this allegation has no connection to the use of the mail or the wires, nor has Plaintiff sufficiently pled such a connection. Bidding for the Temple contract through the mail, and attacking Perma-Vault's website, can be connected to the allegations that Defendants were unfairly competing with Plaintiff, but these acts cannot be connected to the only fraudulent statement alleged in the Complaint--Sobel's overstatement of inventory.

Defendants contend that this case is factually similar to the case of *J. Platzer-Zyberk*. In that case plaintiff filed suit when his former business partners conspired to defraud him of his interest in the corporation. *J. Platzer-Zyberk, 1998 WL 67545, at *1*. Plaintiff claimed that after contractually committing himself to the corporation, his partners--the defendants, developed a scheme to deprive him of his contractual rights. *Id.* at *6. To effect this scheme, defendants "mailed and wired him" a series of letters that culminated in his termination. In dismissing the RICO claim, the court said, "[w]hile the letters to demand that plaintiff meet certain requirements to avoid termination, they are not *deceptive*. ... Indeed the entire scheme, while possibly treacherous, lacks fraudulence entirely." *Id.*

*7 We agree with Defendants that the case before us is factually similar to *J. Platzer-Zyberk*. Both cases involve situations where the primary complaint involves a breach of contract and other related business torts. In both instances Plaintiffs have attempted to supplement the complaint with a RICO claim based on this behavior. As the court determined in *J. Platzer-Zyberk*, we do not believe that the facts alleged in this Complaint are sufficient to find that the predicate offenses of mail or wire fraud has been committed.

Even if we were to construe Plaintiff's allegations of fraud extremely liberally, the Complaint would still not

sufficiently allege fraud. <u>Federal Rule of Civil Procedure 9(b)</u> requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." <u>Fed. R. Civ. P. 9(b)</u>. <u>Rule 9(b)</u> has been held to be applicable to RICO claims predicated on mail and wire fraud. *See <u>Lum v. Bank of Am.</u>, No. 01-4348, 2004 WL 485476, at *1 (3d Cir. Mar.11, 2004)* (holding that RICO claim was properly dismissed because plaintiff failed to plead fraud with the specificity required by <u>Rule 9(b)</u>); *see also <u>Saporito v. Combustion Eng'g Inc.</u>, 843 F.2d 666, 673-76 (3d Cir.1988), vacated on other grounds, <u>489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989)</u>* (blanket allegations of mail and wire fraud in RICO case, without indicating who made or received fraudulent representation, are insufficient under <u>Rule 9(b)</u>); *<u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 791 (3d Cir.1984)* (allegations must be such as "to place the defendants on notice of the precise misconduct with which they are charged). "<u>Rule 9(b)</u> requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *<u>Seville</u>, 742 F.2d at 791*. In the present case, Plaintiff's allegations of fraud are extremely general. The only fraud complained of was Sobel's overstatement of the inventory. This allegation lacks the specificity required under <u>Rule 9(b)</u>. It does not specify what was misstated, to whom the misstatement was made, or the effect of this misstatement.

While we would usually grant Plaintiff the opportunity to amend the Complaint following a dismissal based on <u>Rule 9(b)</u>, in this instance we do not believe that the insufficiency of the Complaint can be corrected through amendment. *See <u>Lum</u>, 2004 WL 485476, at *2* (holding that district court's denial of leave to amend was proper where granting leave to amend would be futile). Even if the allegations of the misstatement were amended to specify how this fraudulent misstatement was made by use of the mail or wire, we think that the Complaint would still fail to sufficiently connect the statement made by Sobel to Defendants' actions. *See <u>Ideal Dairy Farms</u>, 90 F.3d at 747* (upholding dismissal of RICO claim where alleged predicate acts lacked element of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 603392 (E.D.Pa.)
**(Cite as: 2004 WL 603392 (E.D.Pa.))**

fraudulence). As a result we must dismiss the RICO claim.

   **\*8** An appropriate Order follows.

ORDER

   AND NOW, this *25* day of March, 2004, upon consideration of the Defendants' Motion to Dismiss Count I Pursuant to Fed.R.Civ.P. 12(b)(6) (Doc. No. 4), and all documents in support thereof, and opposition thereto, it is ORDERED that Defendants' Motion is GRANTED.

   IT IS SO ORDERED.

   2004 WL 603392 (E.D.Pa.)

   **Motions, Pleadings and Filings (Back to top)**
• 2:02CV07960 (Docket)
                         (Oct. 18, 2002)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2005, the foregoing **Compendium of Unreported Cases for the Individual Defendants' Reply Brief in Support of Their Motion to Dismiss or to Stay the Proceedings** was filed electronically with the Clerk of Court using CM/ECF which will send notification of such filing to the following:

Richard L. Abbott, Esquire
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899

Dennis J. Siebold, Esquire
New Castle County Law Department
New Castle Corporate Commons
87 Reads Way
New Castle, DE 19720

Matthew F. Boyer